UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Docket No. _____

FILED BY ___PG___ D.C.

MAR 2 7 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

JONATHAN MULLANE,

     *Plaintiff,*

v.

FEDERICO A. MORENO,
ALISON W. LEHR,
BENJAMIN G. GREENBERG,
and LISA T. ROBERTS,
in their individual and official capacities,

     *Defendants.*

_____ /

**TRIAL BY JURY DEMANDED**

## VERIFIED COMPLAINT

COMES NOW Plaintiff Jonathan Mullane (hereinafter, "Plaintiff" or "Mullane"), and

complaining of Defendants **FEDERICO A. MORENO** (hereinafter, "Moreno"), **ALISON W.**

**LEHR** (hereinafter, "Lehr"), **BENJAMIN G. GREENBERG** (hereinafter, "Greenberg") and

**LISA T. ROBERTS** (hereinafter, "Roberts") (collectively, "Defendants"), hereby brings this

action at law and in equity for declaratory and injunctive relief, together with the appropriate

monetary damages.

As and for his Verified Complaint, Plaintiff avers as follows:

SCANNED

## NATURE OF THE ACTION

If "with great power comes great responsibility," one must also observe how "with great power" comes the concomitant potential for personal gain, abuse, and the continued avoidance of any and all accountability for one's own actions. Unfortunately, the foregoing proposition is plainly evidenced and demonstrated by the facts set forth herein, *infra*.

On **May 25, 2016**, in Rodriguez v. Copenhaver, 823 F.3d 1238 (9th Cir. 2016) [**EXHIBIT A**], the United States Court of Appeals for the Ninth Circuit took the highly unusual step of publicly reprimanding Defendant Moreno himself for egregious misconduct, abuse of power, and even constitutional violations. In that matter—just as in the case at bar—Defendant Moreno unlawfully misused the cachet of his office, and his professional title as a United States District Judge for personal gain.

In Rodriguez, *supra*, the Bureau of Prisons (hereinafter, "BOP") had mailed a letter to United States District Judge Robert B. Propst to inquire about a sentence that a prisoner was serving in connection with an assault on a federal judge during a home invasion robbery. At 1241. Notwithstanding the fact that the letter was not even addressed to him (it was instead addressed to Judge Propst), Moreno unlawfully intercepted the correspondence—a **criminal** offense under federal law—and thereupon personally responded to the BOP, recommending that the prisoner *not* be released from prison. Id. Quite shockingly, in Moreno's reply to the BOP, Moreno omitted the highly material fact that he was a close friend of the victim of the crime, and that he had been *recused* from the trial because of that friendship. Id. at 1239.

The Ninth Circuit had the following to say about Judge Moreno's use of his federal judgeship for personal gain:

[Chief Judge Moreno] **had been recused from the case should not have participated in it in any way.** In this case, Chief Judge Moreno, a colleague of an alleged victim of [Defendant] Rodriguez's crimes, strongly recommended "**severe[] sanction[s]**" and the denial of the *nunc pro tunc* designation to avoid "insult" to his colleague. **To make matters worse, the chief judge presented his recommendation under the guise of a neutral adjudicator by sending his letter in place of the sentencing judge's recommendation.** The Bureau of Prisons adopted the recused judge's recommendation and denied Rodriguez's application. **Such actions do not satisfy the appearance of justice.** Nor do they afford Rodriguez his due process right to neutral adjudication. (Emphasis supplied) at 1243.

Unfortunately, the court's public reprimand and sharp rebuke in Rodriguez, *supra*, was not enough to correct Defendant Moreno's behavior. As further explained in the instant Verified Complaint, in April 2018, *i.e.*, just **two (2) years later,** Moreno once again engaged in similar misconduct and constitutional violations to the significant detriment of Plaintiff, using his office and title as a federal judge for personal gain.

These actions include, without limitation:

(i)     unlawfully procuring Plaintiff's employment records at the United States Attorney's Office (hereinafter, "USAO") without a warrant;

(ii)    sending non-public hearing transcripts to various national legal publications in order to publicly embarrass, humiliate, and denigrate Plaintiff;

(iii)   successfully causing *both* the USAO and the United States Securities and Exchange Commission (hereinafter, "SEC") to terminate their respective employment agreements with Plaintiff;

(iv)    verbally abusing Plaintiff, discriminating against him, and commenting on Plaintiff's family members and dress;

3

(v)     making numerous personal threats against Plaintiff, including threats of ruining Plaintiff's career and threats of reporting Plaintiff to the Florida Bar;

(vi)    sending defamatory letters to Plaintiff's law school; and

(vii)   making defamatory comments about Plaintiff in public filings, notwithstanding the fact that Defendant Moreno had been recused from the action.

All of the foregoing were committed by Moreno personally, and in concert with the other named Defendants herein.

## PARTIES

1.      Plaintiff Jonathan Mullane is a natural person and citizen of the Commonwealth of Massachusetts, and resides in Cambridge, Middlesex County, Massachusetts.

2.      Defendant Federico A. Moreno is a natural person and citizen of the State of Florida.

3.      Defendant Alison W. Lehr is a natural person and citizen of the State of Florida.

4.      Defendant Lisa T. Roberts is a natural person and citizen of the State of Florida.

5.      Defendant Benjamin G. Greenberg is a natural person and citizen of the State of Florida.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

7.      This Court has general personal jurisdiction as Defendants herein are citizens of the State of Florida.

8.      Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391.

4

## **MATERIAL FACTS**

9.  In or around July 2017, while present in Massachusetts, Plaintiff entered into a contractual employment agreement with the United States Attorney's Office (hereinafter, "USAO"). Specifically, the USAO solicited certain services by Plaintiff, whereby Plaintiff agreed to work as a law clerk intern in the Miami, Florida office of the USAO.

10. In or around December 2017, while present in Massachusetts, Plaintiff entered into a second, and entirely separate, contractual employment agreement with the United States Securities and Exchange Commission (hereinafter, "SEC"). Specifically, the SEC solicited certain services by Plaintiff, whereby Plaintiff agreed to work as a law clerk intern in the Miami, Florida office of the SEC.

11. At the time the events described herein occurred, Plaintiff was an employee of the USAO.

12. In or around April 2018, Defendant Moreno acted *ultra vires*, outside the scope of his professional authority, and beyond the purview of his judicial duties by willfully and knowingly interfering with Plaintiff's employment agreements with the USAO and SEC.

13. Defendant Moreno's unlawful conduct was undertaken and executed, in large part, through the material assistance of Defendants Greenberg, Lehr, and Roberts.

14. Defendants all knew, or were willful in not knowing, that Defendant Moreno's conduct as further described herein, *infra*, was unlawful.

15. Defendants knew, or were willful in not knowing, that Defendant Moreno's conduct as further described herein, *infra*, was solely undertaken for the express purpose of harming Plaintiff.

16. At all times relevant hereto, Defendants Greenberg, Lehr, and Roberts acted willfully, and deliberately sought to provide material assistance to Defendant Moreno.

5

17.  Defendant Moreno, who was *not* Plaintiff's employer, informed Plaintiff in April 2018 of Defendant Moreno's intention to directly interfere with the employment practices of the executive branch of the federal government, to wit, the United States Department of Justice and USAO, and unambiguously informed Plaintiff of his intention to directly cause the USAO to unlawfully sever its employment agreement with Plaintiff.

18.  Acting *ultra vires* and extra-judicially, Defendant Moreno unlawfully abused the cachet of his official and professional title as an Article III federal judge in order to willfully and knowingly interfere with the subject employment contracts and the employment practices of the executive branch of the United States Government, the USAO, and the SEC.

19.  *Inter alia*, Defendant Moreno unlawfully abused his office and authority by using federal court letterhead and taxpayer-funded postage for personal purposes, and by mailing numerous defamatory letters wherein Moreno:

    (1)  made personal, *ad hominem* attacks on Plaintiff and Plaintiff's character; and

    (2)  libeled him, falsely accusing Plaintiff—a mere student at the time in question—of having committed criminal conduct.

20.  Defendant Moreno enjoyed a personal relationship with Benjamin G. Greenberg (hereinafter, "Greenberg"), who was employed as acting United States Attorney during the period in question.

21.  During a *personal* telephone call with Defendant Greenberg immediately prior to Moreno's April 10, 2018 hearing with Plaintiff, Defendant Moreno knowingly interfered with the aforesaid USAO employment contract by maliciously and falsely accusing Plaintiff of criminal conduct.

22.   During the subject April 2018 telephone call with Greenberg, Defendant Moreno knowingly slandered Plaintiff by erroneously and maliciously representing to Greenberg that Plaintiff had violated 18 U.S.C. § 912, a criminal offense punishable by three (3) years in federal prison.

23.   *Inter alia*, Defendant Moreno bizarrely claimed that Plaintiff had unlawfully "pretended" to have been sent on behalf of the United States government to "deceptively" obtain copies of the **public, unsealed record** from Defendant Moreno's clerk in Plaintiff's personal **$1,600** credit card dispute.

24.   Naturally, as this Honorable Court is well aware, one need not be a federal employee in order to merely obtain certified copies of the record in a publicly-accessible, unsealed $1,600 civil credit card dispute.

25.   Of course, *any* person, even someone with zero connection to the **unsealed** civil $1,600 credit card proceeding, could have lawfully (and successfully) obtained a certified copy of the public record without using any deception whatsoever.

26.   *Arguendo*, while Defendant Moreno may have been authorized to ask the USAO, in "good faith," to conduct a criminal investigation of any suspected criminal conduct—as may be permitted within the purview of his official duties—here, Defendant Moreno unlawfully acted *ultra vires* through personal communications by alleging criminal conduct by Plaintiff as an **irrefutable "fact"** to Greenberg, Lehr, and Roberts, *i.e.*, Plaintiff's employers.

27.   Each Defendant knew, or was willful in not knowing, that the aforesaid allegations made by Moreno against Plaintiff were factually false.

28.   Moreno willfully and knowingly caused *both* the USAO and the SEC to breach their respective employment agreements with Plaintiff through the material aid and assistance of Greenberg and Roberts.

29.   In furtherance of the unlawful scheme, Moreno conspired with Roberts, who materially aided and furthered the scheme by causing the SEC's Washington, DC headquarters to terminate Plaintiff's employment agreement with the SEC.

30.   Defendants Greenberg and Roberts acted with malice vis-à-vis Plaintiff in their interference with Plaintiff's contracts, and deliberately intended to cause Plaintiff harm and to discriminate against him.

31.   Unfortunately for Plaintiff, Defendants' efforts were successful. With a view to assist Defendant Moreno in his efforts to unlawfully interfere with the aforesaid USAO and SEC contractual agreements, Greenberg and Roberts agreed to unilaterally breach the said agreements with Plaintiff.

32.   As a result, Plaintiff was subsequently prematurely terminated from his employment at the USAO, and was not even permitted to begin his subsequent employment at the SEC.

33.   Defendant Moreno harbored significant animosity and ill will toward Plaintiff due to Plaintiff's sexual orientation, and verbally abused and denigrated him during the April 10, 2018 hearing wherein Moreno appeared to be intoxicated, erratic, and incoherent. See, e.g., **EXHIBIT B**.

34.   During the April 10, 2018 hearing, Moreno made derogatory comments about: Plaintiff's family members and father; Plaintiff's clothing and dress; and numerous other bizarre and defamatory representations.

35.    During the subject April 2018 personal telephone call with Attorney Greenberg, Defendant Moreno engaged in wrongful means by intentionally defaming and slandering Plaintiff.

36.    More specifically, instead of requesting an investigation and/or first attempting to ascertain all of the pertinent facts, Defendant Moreno improperly and erroneously stated to Greenberg—as irrefutable fact—that Plaintiff had engaged in criminal conduct.

37.    At no time relevant hereto has any Defendant herein retracted the false representations and "republications" thereof regarding Plaintiff—notwithstanding the fact that no criminal charges have ever been filed against Plaintiff.

38.    Indeed, Defendant Moreno's accusations against Plaintiff during the personal April 2018 telephone call were so farfetched, illogical, and unsupported by the facts that not once has Plaintiff even been questioned by the USAO, the Federal Bureau of Investigation ("FBI"), or by any other law enforcement agency in connection therewith.

39.    At all times relevant hereto, Greenberg was aware that Plaintiff was in the employ of the USAO, and willfully and knowingly assisted Moreno in his unlawful conduct vis-à-vis Plaintiff.

40.    At all times relevant hereto, Roberts was fully aware that Plaintiff was in the employ of the SEC, and willfully and knowingly assisted Moreno in his unlawful conduct vis-à-vis Plaintiff.

41.    In reality, even to this day, Plaintiff has never been charged with violating 18 U.S.C. § 912— or any other crime—by the USAO or any other law enforcement agency in connection herewith.

42.  Defendant Moreno improperly "called in a favor" with Greenberg during the aforesaid personal telephone call in order to interfere with the subject Massachusetts contracts.

43.  Indeed, the United States District Court for the Southern District of Florida, of which Defendant Moreno was formerly the Chief Judge, had appointed Attorney Greenberg to his position as an acting United States Attorney.

44.  Defendant Moreno had previously relied on those very same personal connections at the Miami USAO office in order to secure employment as an Assistant U.S. Attorney for his own daughter, Cristina Moreno, in the said Miami office—while Plaintiff was unambiguously denied full-time, gainful employment with that same office.

45.  In or around April 2018, acting *ultra vires*, extra-judicially, and without any jurisdiction, Defendant Moreno contacted Defendant Lehr of the USAO and unlawfully demanded Plaintiff's confidential employment records.

46.  Defendant Lehr complied with Moreno's requests, and thereupon unlawfully transmitted Plaintiff's employment records to Defendant Moreno without obtaining a warrant, without obtaining Plaintiff's consent, and in violation of Plaintiff's Fourth Amendment rights.

47.  At all times relevant hereto, Plaintiff's employment records and timesheet were on Plaintiff's personal laptop computer—*not* in the custody or control of the USAO.

48.  **Because the said documents were *not* in the possession, custody and/or control of the USAO, neither the USAO nor the United States Department of Justice ("DOJ") had standing to authorize Defendants' warrantless seizure of electronic records which were on Plaintiff's personal laptop computer.**

10

49.   **No Defendant herein had any standing or lawful authority to authorize the warrantless seizure of the said electronic records on Plaintiff's personal laptop computer.**

50.   Upon Defendant Lehr's deceptive request that Plaintiff transmit the current iteration of his timesheet for work-related purposes in connection with his USAO internship, Plaintiff willingly complied and transmitted the said document from his own **personal** laptop computer to Defendant Lehr.

51.   The laptop computer was owned by Plaintiff himself—not the USAO—and was Plaintiff's own personal computer.

52.   Unbeknownst to Plaintiff, Defendant Lehr had *not* requested Plaintiff's timesheet for legitimate, work-related purposes.

53.   Unbeknownst to Plaintiff, Defendant Lehr had requested Plaintiff's timesheet for an unlawful purpose in her capacity as an agent of Moreno and Greenberg, and had requested the said document with a view to thereupon transmit it to Defendant Moreno at his request.

54.   By knowingly failing to inform Plaintiff that the said document was being requested for a non-work-related purpose, Lehr's request was dishonest and deceptive.

55.   As Plaintiff's direct superior in the USAO, Lehr had actual knowledge of the fact that the said document was physically on Plaintiff's personal computer.

56.   At no time relevant hereto did Moreno, Lehr, or Greenberg obtain any warrant or consent therefor.

57.   Defendant Greenberg had actual knowledge of Lehr's actions as described hereinabove, and had been fully apprised of Moreno's actions vis-à-vis Plaintiff.

58.  In point of fact, when Lehr contacted Defendant Greenberg—her superior—to inquire whether she should comply with Moreno's unlawful requests, **Greenberg unambiguously directed her to do so.**

59.  Lehr apprised Greenberg of the fact that the said document was on Plaintiff's personal laptop, and that it was not in the custody and/or control of the USAO.

60.  Defendant Greenberg refused to intervene *prior* to the April 10, 2018 hearing with Moreno, and failed to protect and uphold the constitutional rights of Plaintiff—*i.e.*, his employee.

61.  Defendant Greenberg even refused to intervene *subsequent* to the April 10, 2018 hearing with Moreno, and failed to protect and uphold the constitutional rights of Plaintiff—*i.e.*, his employee.

62.  Moreover, shortly after Plaintiff's April 10, 2018 hearing with Moreno, Plaintiff contacted Greenberg in writing, via electronic correspondence, in order to meet with Greenberg personally to discuss this serious and important matter, and to seek his guidance and advice as Plaintiff's employer.

63.  Being personally involved and complicit in Moreno's unlawful scheme, Greenberg knowingly refused to communicate with Plaintiff, and refused to ever meet with Plaintiff.

64.  After Greenberg failed to respond to Plaintiff's written requests and numerous pleas for help, Plaintiff thereupon proceeded to attempt to locate Greenberg personally in his USAO office.

65.  Greenberg's secretary informed Plaintiff that Greenberg was "unavailable," but that Greenberg would contact Plaintiff shortly thereafter regarding a meeting time.

66.   At no point thereafter did Greenberg or his agents ever contact Plaintiff, nor did Greenberg ever meet with Plaintiff or agree to do so.

67.   *Not only* did Defendant Greenberg knowingly refuse to assist Plaintiff in any way whatsoever, quite egregiously, Greenberg specifically encouraged and ordered Lehr to comply with Moreno's unlawful requests—all to the foreseeable detriment of Plaintiff.

68.   At no time relevant hereto was Defendant Moreno—a judge, *not* a prosecutor or law enforcement officer—lawfully or constitutionally permitted to engage in any of the innumerable wrongful acts that he engaged in in order to intentionally harm Plaintiff, all of which were clearly *ultra vires*, unauthorized, and not within the "scope of employment" of *any* type of judge in the United States (let alone actions that a prosecutor would typically perform).

69.   By unlawfully requesting, and successfully obtaining from Lehr and Greenberg, Plaintiff's confidential employment records without a warrant from Plaintiff's laptop computer, Defendant Moreno's conduct:

   (i)    violated Plaintiff's Fourth Amendment Rights;

   (ii)   is violative of the **criminal** provisions of the Privacy Act[1] of 1974, 5 U.S.C. § 552a(i)(1);

---

[1] The Privacy Act of 1974 provides for criminal penalties as well as civil remedies. Pursuant to 5 U.S.C. § 552a(i)(1), "[a]ny officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000."

(iii) is violative of the **criminal** provisions of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701;

(iv) is violative of the **criminal** provisions of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; and

(v) further violates the **criminal** provisions of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

70. By materially and directly assisting Defendant Moreno through the unlawful transmission of Plaintiff's confidential employment records, *inter alia*, and by acting without Plaintiff's consent or knowledge at the time in question, Lehr and Greenberg violated both the Fourth Amendment of the United States Constitution together with the foregoing federal statutes.

71. At all times relevant hereto, Defendant Lehr was an attorney in the employ of the United States, to wit, the Miami office of the USAO.

72. Acting in concert with Defendant Moreno, and acting as his agent, Greenberg and Lehr entered into an unlawful agreement and understanding with Defendant Moreno, and otherwise conspired to deprive Plaintiff of his rights and privileges under the Fourth Amendment of the United States Constitution, *inter alia*.

73. More specifically, Defendants Lehr and Greenberg conspired with Defendant Moreno to deprive Plaintiff of his right to be free from warrantless searches and seizures, in violation of the Fourth Amendment of the United States Constitution, vis-à-vis Plaintiff's confidential employment records.

74. Acting in concert with Moreno, Lehr—with the approval and assistance of Greenberg— unlawfully seized, transmitted, published, and caused to be republished, Plaintiff's

employment records: (1) without a warrant; and (2) without Plaintiff's express or implied consent by improperly and unlawfully transmitting the said employment records to Defendant Moreno.

75.    Indeed, the USAO itself could not possibly have consented to the seizure, as the records in question were on Plaintiff's *personal* laptop computer, and were not in the USAO's possession, custody, and/or control

76.    At all times relevant hereto, Defendant Moreno had actual or constructive knowledge that his acts and omissions were unlawful, *ultra vires*, not within his jurisdiction, and did not constitute acts or omissions typically performed by Article III judges—let alone prosecutors, or any reasonable person.

77.    Defendant Moreno's actions were discriminatory and in "bad faith," as they sought to discriminate against Plaintiff due to his sexual orientation, and sought to prevent Plaintiff from exercising his right to petition the judiciary for redress, as guaranteed under the First Amendment of the United States Constitution.

78.    Defendant Moreno's actions were retaliatory and *mala fide*, as they sought to retaliate against Plaintiff for properly and correctly requesting Moreno's recusal from the subject $1,600 civil credit card dispute due to Moreno's personal biases and outrageous comportment.

79.    Instead of questioning Plaintiff in chambers, Defendant Moreno called Plaintiff on his personal cell phone and ordered Plaintiff to appear in open court for a "miscellaneous hearing"—without having *any* legal counsel present—on or about April 10, 2018.

80.   As further proof of Defendant Moreno's ill will and intent to cause Plaintiff harm, during the aforesaid hearing, Defendant Moreno abused his power, title, and authority as a federal judge in order to reiterate in open court many of the defamatory representations he had previously made regarding Plaintiff during his personal telephone call with Attorney Greenberg. See generally **EXHIBIT B**.

81.   As further proof of Defendant Moreno's ill will and intent to cause Plaintiff harm, Defendant Moreno **himself** called Plaintiff at Plaintiff's personal mobile phone number on or about April 9, 2018. In his recorded voice message, Defendant Moreno—fully apprised of the fact that Plaintiff was unrepresented by legal counsel—engaged in deception by instructing Plaintiff to appear in his courtroom the following morning.

82.   Acting without jurisdiction, Defendant Moreno falsely and deceptively informed Plaintiff that the scheduled hearing pertained to the **civil** $1,600 credit card dispute, *not* a criminal matter.

83.   Defendant Moreno had actual knowledge of the fact that, in reality, the scheduled hearing pertained to a **criminal** matter.

84.   Defendant Moreno knew, or was willful in not knowing, that he was obligated to notify Plaintiff of:

    (i)     the criminal nature of the hearing; and

    (ii)    Plaintiff's constitutional right to have legal counsel present at the hearing.

85.   Defendant Moreno knew, and in fact intended, that his defamatory representations against Plaintiff made in open court would be transcribed by the court reporter.

86.  Defendant Moreno—who had been personally selected by President Trump as a leading candidate for the United States Supreme Court at the time in question—knew, or was reckless in not knowing, of the United States Supreme Court's well-known holding in Miranda v. Arizona, 384 U.S. 436 (1966), together with Plaintiff's constitutional rights promulgated through the Fourth, Fifth, Sixth, and Eighth Amendments of the United States Constitution, *inter alia*.

87.  Plaintiff was *not* free to leave during the subject April 10, 2018 hearing, as Defendant Moreno specifically threatened Plaintiff with contempt.

88.  Plaintiff was denied the right to cross-examine any witnesses, or to call any witnesses in his defense.

89.  At no time relevant hereto did Defendant Moreno apprise Plaintiff of his legal rights under Miranda, *supra*, nor of his rights under the Fourth, Fifth, Sixth, and Eighth Amendments of the United States Constitution. These rights include, without limitation, Plaintiff's right to be represented by an attorney in connection with all criminal matters (such as the matter in question), and to be free of such unreasonable "seizures" of his person within the meaning of the Fourth Amendment.

90.  In light of Defendant Moreno's manifest ill-will vis-à-vis Plaintiff, on April 13, 2018, Plaintiff had no choice but to submit a Verified Motion for Recusal for Cause seeking to remove Defendant Moreno from the subject $1,600 civil dispute. See Mullane v. Barclays Bank Delaware, Inc., Docket No. 1:18-cv-20596, ECF 39 (S.D. Fla. Feb 15, 2018).

91.  Several hours later, the same day, Defendant Moreno entered an order granting the said motion. Id. at ECF 40.

92.     Quite egregiously, instead of simply performing his professional obligations, and instead of simply addressing the merits of the subject motion—once again—Defendant Moreno took the opportunity to *further* defame Plaintiff by publishing on PACER numerous outrageous and unfounded accusations regarding Plaintiff. See **EXHIBIT C**.

93.     *Inter alia*, Defendant Moreno sought to retaliate against Plaintiff for correctly and properly requesting Moreno's recusal.

94.     Defendant Moreno had actual knowledge of the fact that the defamatory, extraneous matter contained in his April 13, 2018 order would be publicly available and visible for all to see via PACER.

95.     In addition to the foregoing, inexplicably, Moreno specifically commented on **ongoing** state court proceedings in Massachusetts—*i.e.*, matters which Moreno was not even presiding over, and had no lawful authority to interfere with.

96.     *Inter alia*, Moreno personally criticized actions which had been taken by Plaintiff's attorney in the Massachusetts state court proceedings.

97.     *Inter alia*, as demonstrated by the April 10, 2018 hearing transcript, Defendant Moreno criticized Plaintiff for filings that Plaintiff's attorney had submitted in an unrelated civil action within Massachusetts itself. At the time in question, those Massachusetts proceedings were still ongoing.

98.     Clearly unconvinced that he had caused sufficient harm to Plaintiff's personal and business reputation—in addition to the harm he *also* caused to Plaintiff's state court case in Massachusetts—Defendant Moreno thereupon proceeded to write a malicious letter to the

University of Miami School of Law, Plaintiff's law school at the time in question. See **EXHIBIT D**.

99.   Both: (i) the April 30, 2018 order [**EXHIBIT C**]; and (ii) Defendant Moreno's letter to the University of Miami [**EXHIBIT D**] were factually false, and caused Plaintiff significant harm.

100.   In addition to the foregoing, through the assistance of Greenberg and Roberts, Defendant Moreno knowingly caused *both* the USAO and SEC to sever and unilaterally breach their respective employment agreements with Plaintiff.

101.   Defendant Greenberg willfully and knowingly conspired with Moreno by agreeing to prematurely terminate Plaintiff's employment at the USAO.

102.   Although the USAO had agreed to *extend* Plaintiff's employment prior to the April 10, 2018 hearing, after the unlawful intervention of Moreno and Greenberg, Plaintiff's USAO employment was unilaterally terminated.

103.   Defendant Greenberg willfully and knowingly conspired with Moreno by agreeing to violate Plaintiff's Fourth Amendment rights, and by ordering Defendant Lehr to:

(i)     unlawfully procure Plaintiff's timesheet from Plaintiff's personal computer through the use of deception; and

(ii)     thereupon transmit Plaintiff's employment records to Defendant Moreno.

104.   Defendant Greenberg willfully and knowingly assisted Moreno by failing to warn Plaintiff—*i.e.*, his employee, to whom Greenberg owed a duty of care—of:

(i)     the underlying *criminal* nature of the April 10, 2018 hearing;

(ii)     Plaintiff's right to have legal counsel present for **all** criminal matters;

(iii)    Moreno's unlawful conduct vis-à-vis Plaintiff; and

(iv)    Lehr's unlawful conduct vis-à-vis Plaintiff.

105.    Unfortunately for Plaintiff, Defendant Moreno had not yet terminated the scheme, and had not yet ended his campaign of terrorizing, humiliating, and denigrating Plaintiff, a mere student at the time in question. After the subject April 10, 2018 hearing, Defendant Moreno—who was one of only three (3) parties who had access to the non-public transcript of the said hearing—transmitted personally or through his agents, or caused to be transmitted, a copy of the non-public transcript to Breaking Media Inc.'s *Above the Law* publication and its Chief Editor Elie Mystal in New York, New York.

106.    Subsequent to the foregoing events, on or about April 30, 2018, through their online publication *Above the Law*, Breaking Media and Mystal published an article entitled as follows:

**JUDGE DETONATES PRO SE LAW STUDENT SO HARD I NOW MUST DEFEND A DUMB KID**

107.    *Inter alia,* the aforesaid article "republished" Defendant Moreno's factually-false and bizarre accusations against Plaintiff. [**EXHIBIT E**].

108.    Defendant Moreno knew, and also specifically intended, that Defendants Breaking Media and Mystal would publish the non-public April 10, 2018 transcript on the internet, together with the defamatory representations contained therein.

109.    Defendants herein and Moreno knew, and also intended, that such a publication would harm Plaintiff's business and personal reputation.

20

110.   As a directly foreseeable consequence of Defendants' false accusations of criminal conduct against Plaintiff, together with the subsequent "republications" thereof by Defendant Roberts to the SEC's headquarters in Washington, DC, the SEC foreseeably breached the subject contract on May 3, 2018. See **EXHIBIT F.**

111.   Moreno knowingly enlisted and conspired with Roberts to interfere with Plaintiff's SEC employment agreement.

112.   Moreno knew of Plaintiff's plans to work for the SEC through his communications with Lehr—*i.e.*, Plaintiff's former supervisor and superior at the USAO.

113.   Via telephone, Defendant Roberts of the SEC unambiguously informed the University of Miami School of Law that the singular reason for her decision to cause the SEC to unilaterally breach its employment agreement with Plaintiff was the above-mentioned erroneous allegations of criminal conduct.

114.   In or around May 2018, during a telephone call with Marcelyn R. Cox, Esq. of the University of Miami School of Law, Defendant Roberts knowingly and maliciously slandered Plaintiff by "republishing" and wantonly reiterating the defamatory allegations of criminal conduct against Plaintiff that Defendant Moreno had initially made.

115.   Defendant Roberts knew, or was willful in not knowing, that the defamatory representations vis-à-vis Plaintiff which she knowingly "republished" to Cox were factually false. Indeed, as an attorney and litigator, Roberts knew that one does not need to use any deception whatsoever in order to simply request a certified copy of the record in a **public and unsealed** civil $1,600 credit card dispute.

21

116.   During the May 2018 telephone call with Cox, Roberts falsely "republished" the erroneous allegations, and falsely accused Plaintiff of having engaged in criminal conduct.

117.   During the May 2018 telephone call with Cox, Roberts falsely represented that Plaintiff had engaged in misconduct and other improper, unethical behavior.

118.   Further demonstrating Roberts' malicious intent, Roberts contacted the SEC's headquarters in Washington, DC, in connection with her efforts to terminate Plaintiff's employment agreement with the SEC's Miami, Florida office.

119.   During her communications with the SEC's headquarters in Washington, DC, Roberts once again willfully and knowingly "republished" the factually-false, defamatory allegations of criminal conduct and unethical behavior vis-à-vis Plaintiff.

120.   Roberts willfully and knowingly entered into an agreement and understanding with Moreno and Greenberg to terminate Plaintiff's employment at the SEC's Miami, Florida office.

121.   Further evidencing Roberts' malicious intent, in addition to the foregoing, Roberts thereupon ignored Plaintiff's *repeated*, numerous attempts to contact her (via telephone, voicemail, and also email correspondence) regarding his SEC employment, which was due to begin less than **two (2) weeks later**.

122.   Because Roberts successfully interfered with Plaintiff's employment agreement with the SEC just two (2) weeks before the expected start date, Plaintiff incurred *significant* economic harm and irreparable harm to his future legal career. Indeed, by that late point in time, private sector firms were no longer accepting applications.

123.   Roberts' conduct vis-à-vis Plaintiff was spiteful and malignant, and was done for an unlawful and discriminatory purpose.

124. Defendants knew, or were willful in not knowing, that their interference would foreseeably cause the SEC to unilaterally breach the subject employment agreement with Plaintiff.

125. Plaintiff incurred *significant* harm from Defendants' unethical and improper conduct as described herein.

126. *Inter alia*, in addition to the foreseeable emotional harm, Plaintiff suffered quantifiable economic damages due to the loss of work experience at both the USAO and SEC, which naturally would have provided Plaintiff with excellent and economically-advantageous employment prospects.

127. Indeed, Defendant Roberts—who had personally interviewed Plaintiff for the SEC role— had unambiguously promised Plaintiff full-time, gainful employment in the federal government in Washington, DC after the completion of his law school studies if he would agree to accept the Miami, Florida role.

128. As a result of Defendants' egregious and unethical conduct, Plaintiff—who has subsequently completed his law school studies—is now unemployed.

129. Indeed, Plaintiff was *not* offered any full-time, gainful employment in the federal government, notwithstanding Roberts' unambiguous promise to the contrary.

130. As a result of Defendants' egregious and unethical conduct, Plaintiff can no longer obtain positive work references from either the USAO or the SEC.

131. Unfortunately, as a result, Plaintiff's loss of future earnings over the course of his lifetime is substantial.

132. Plaintiff cannot secure legal employment in a position for which he is qualified as a direct result of his loss of personal and professional reputation.

133.    As a foreseeable consequence of Defendants' acts and omissions, Plaintiff has been forced to abandon his career goals of practicing law on behalf of the federal government, together with his dream of one day practicing in the field of international litigation.

134.    As a foreseeable consequence of Defendants' acts and omissions, Plaintiff was not offered any full-time employment with the federal government, nor was he able to secure alternative employment in the private sector due to his inability to complete a second-year internship in a law firm.

135.    As a foreseeable consequence of Defendants' acts and omissions, the defamatory statements were foreseeably "republished" within both Florida and Massachusetts—as well as in national legal publications on the internet—and were even relied upon by unrelated third parties. See, e.g., **EXHIBIT G**.

136.    The subsequent republications of the defamatory statements in Florida and in Massachusetts foreseeably caused Plaintiff *further* irreparable harm.

137.    As a result of Defendants' wrongdoing, Plaintiff foreseeably withdrew from the University of Miami School of Law and foreseeably moved home to Massachusetts.

138.    In addition to the substantial harm to Plaintiff's legal career, Plaintiff has foreseeably suffered from depression, severe anxiety, and thoughts of suicide.

## COUNT I

**Civil Liability pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1964(a), (c) (against all Defendants)**

139.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

140.   Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).[2]

141.   By acting in concert, Defendants created an "association-in-fact," and constitute "individual[s]" and a "group of individuals" giving rise to an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The said Enterprise consists of Moreno, Roberts, Greenberg, and Lehr collectively (hereinafter, "the Enterprise"), together with their agents.

142.   The said Enterprise was formed and employed as a tool to effectuate Defendants' pattern of racketeering activity.[3]

143.   The said Enterprise engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1), (5).

144.   Acting through the said Enterprise, Defendants committed two (2) or more of the predicate unlawful acts set forth in 18 U.S.C. § 1961(1).

145.   *Inter alia*, the Enterprise violated 18 U.S.C. § 1513(e) by retaliating against Plaintiff, a "victim" within the meaning of same.

146.   Pursuant to 18 U.S.C. § 1513(e), "[w]hoever knowingly, **with the intent to retaliate, takes any action harmful to any person, including <u>interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful</u>**

---

[2] To establish a RICO violation, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Efron v. Embassy Suites (Puerto Rico), Inc.</u>, 223 F.3d 12, 14-15 (1st Cir. 2000) (quoting <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)).

[3] To demonstrate a "pattern," a plaintiff need only show **two (2) predicate acts** of racketeering activity, from the list set forth at 18 U.S.C. § 1961(1). See <u>H.J. Inc. v. Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989).

**information relating to the commission or possible commission of any Federal offense,** shall be fined under this title or imprisoned not more than 10 years, or both."

147.    Defendants herein knowingly committed mail fraud within the meaning of 18 U.S.C. § 1341. The term "mail fraud," as used in a RICO context, is extremely "**broad** in scope and its fraudulent aspect is measured by a nontechnical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." (Emphasis supplied) United States v. Bishop, 825 F.2d 1278, 1280 (8th Cir. 1987). RICO "mail fraud" is *broader* than common law fraud or common law deceit. Iron Workers Local Union No.17 Ins. Fund v. Philip Morris, Inc., 182 F.R.D. 523, 535 (N.D. Ohio 1998).

148.    For the predicate RICO offense of "mail fraud," a Plaintiff need only demonstrate that the fraudulent scheme had as its object the deprivation of a "property interest." See Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc., 795 F. Supp. 639, 653 (S.D.N.Y. 1992). In the case at bar, these "property interests" include, without limitation, Plaintiff's contractual agreements with the USAO, SEC, and the University of Miami.

149.    *Inter alia*, the Enterprise violated 18 U.S.C. §§ 1512(b), (d) (relating to tampering with a victim).

150.    Pursuant to 18 U.S.C. § 1512(b), "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in **misleading conduct** toward another person, with intent to[] cause or induce any person to[] **withhold testimony, or withhold a record, document,** or other object, from an official proceeding [or] hinder, delay, or **prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission**

26

**of a Federal offense** [ . . . ] shall be fined under this title or imprisoned not more than 20 years, or both."

151.    Pursuant to 18 U.S.C. § 1512(d), "[w]hoever **intentionally harasses** another person and thereby hinders, delays, prevents, or **dissuades any person from[] attending or testifying in an official proceeding** [or] **reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense** [ . . . ] or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both."

152.    The said Enterprise sought to dissuade Plaintiff from reporting the numerous violations of federal law committed by the Enterprise to "law enforcement officer[s.]"

153.    The said Enterprise sought to dissuade Plaintiff from submitting verified pleadings regarding the unlawful conduct of the Enterprise in "official" federal court proceedings.

154.    Not only did Plaintiff properly and correctly report the numerous "federal offenses" to Lehr, a law enforcement officer—not knowing of her involvement in the Enterprise at the time in question—Plaintiff also reported the federal offenses to Defendants Greenberg and Roberts, who are also law enforcement officers. These "federal offenses" include, without limitation:

(i)    the constitutional violations described hereinabove, including *inter alia* all actionable conduct under <u>Bivens</u>;

(ii)    criminal violations of the Privacy Act[4] of 1974, 5 U.S.C. § 552a(i)(1);

---

[4] The Privacy Act of 1974 provides for criminal penalties as well as civil remedies. Pursuant to 5 U.S.C. § 552a(i)(1), "[a]ny officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually

    (iii)    mail fraud within the meaning of 18 U.S.C. § 1341;

    (iv)    criminal tampering with a victim within the meaning of 18 U.S.C. §§ 1512(b), (d);

    (v)    criminal intimidation and "misleading conduct" within the meaning of 18 U.S.C. § 1512(b);

    (vi)    criminal retaliation within the meaning of 18 U.S.C. § 1513(e);

    (vii)    criminal violations of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701;

    (viii)    criminal violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511;

    (ix)    criminal violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and

    (x)    criminal violations of 18 U.S.C. § 1719 ("Franking privilege") for the use of taxpayer-funded postage for personal purposes.

155.    The said Enterprise engaged in and affected interstate commerce. *Inter alia*, the Enterprise interfered with interstate employment contracts entered into between Plaintiff and the Executive Branch of the United States Government, contractual agreements between Plaintiff and the University of Miami, and other contractual agreements across state lines.

---

identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000."

156.   Plaintiff's employment agreements with the United States, *viz.* USAO and SEC, together with his contractual agreement with the University of Miami, were all entered into in the Commonwealth of Massachusetts.

157.   At all times relevant hereto, Defendants exerted full control over the said Enterprise. Each participant in the Enterprise had a systematic linkage to the other participants with a view to continue coordination of their collective activities.

158.   Through the subject Enterprise, Defendants functioned as one continuing unit with the express purpose of furthering the illegal scheme and common purposes.

159.   The unlawful acts of the subject Enterprise unfortunately remain ongoing. *Inter alia*, the Enterprise knowingly caused the USAO and SEC to withhold more than **1,400 responsive documents** from Plaintiff in connection herewith in response to Plaintiff's numerous requests under the Freedom of Information Act ("FOIA") and the Privacy Act of 1974 ("Privacy Act").

160.   By way of further example, even as of the time of writing, Defendant Moreno refuses to withdraw and/or strike *any* of the defamatory, extraneous representations contained in <u>Mullane v. Barclays Bank Delaware, Inc.</u>, Docket No. 1:18-CV-20596, ECF 39 (S.D. Fla. Feb 15, 2018), nor has he retracted any of the false statements made to the USAO vis-à-vis Plaintiff.

161.   *Inter alia*, the Defendants used interstate mails, wires, the internet, and other electronic facilities to carry out the common scheme.

162.   Plaintiff has foreseeably been injured in his property and business by reason of these violations. Without limitation, Defendants interfered with Plaintiff's current and

prospective contractual and economic relations, and caused Plaintiff to lose employment and employment opportunities, together with contracts and contractual relations.

163. Plaintiff's injuries were directly and proximately caused by the said Defendants' racketeering activities as further described hereinabove.

164. Plaintiff has a private right of action, and has standing to assert a claim for violations hereunder.

165. By reason of these violations of 18 U.S.C. § 1962(c), as a matter of law, Defendants are liable to Plaintiff for treble damages, together with reasonable attorneys' fees and costs.

## COUNT II
### Civil RICO Conspiracy
### (against all Defendants)

166. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

167. The Supreme Court of the United States has held that a RICO conspiracy claim extends even broader that RICO claims, and that any person who agrees or conspires to pursue the same unlawful objective shall be held liable for a RICO violation. See, e.g., Salinas v. United States, 522 U.S. 52, 63-64 (1997).

168. As further described hereinabove, Defendants Roberts, Lehr, and Greenberg conspired with Defendant Moreno to further an endeavor which, if completed, would satisfy all elements of a civil RICO claim. See CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d 1076, 1088 (10th Cir. 2014) (one conspires to violate RICO by adopting the goal of furthering the enterprise, "**even if the conspirator does not commit a predicate act**"); see also United States v. Godwin, 765 F.3d 1306, 1324 (11th Cir. 2014).

169.    The common scheme of Defendants was the proximate cause of Plaintiff's significant harm incurred therefrom.

## COUNT III
### Civil Conspiracy pursuant to the Common Law of the State of Florida
### (against all Defendants)

170.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

171.    As further described herein, *ante*, Defendants Greenberg, Lehr, and Roberts entered into an agreement and understanding with Moreno to engage in numerous unlawful acts and omissions, and by unlawful means.

172.    Each Defendant committed numerous overt acts in pursuance of the conspiracy, and caused Plaintiff significant harm as a foreseeable result thereof.[5]

## COUNT IV
### Slander *per se*
### (against Defendants Roberts and Moreno)

---

[5] The elements of civil conspiracy under Florida law are: "(1) an agreement between two or more parties (2) to do an unlawful act by unlawful means (3) the committing of an overt act in pursuance of the conspiracy and (4) damage to the plaintiff as a result of the act." Bankers Life Ins. Co. v. Credit Suisse First Boston Corp., 590 F. Supp. 2d 1364, 1368 (M.D. Fla. 2008) (citing Walters v. Blankenship, 931 So. 2d 137, 140 (Fla. 5th DCA 2006)). In Florida, "[t]he gist of a civil action for conspiracy is **not** the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." (Emphasis supplied) Liappas v. Augoustis, 47 So. 2d 582, 582 (Fla. 1950). Under Florida common law, "**the mere force of numbers, acting in unison, or other exceptional circumstances, gives rise to an independent wrong. In such cases the conspiracy itself becomes the gist of the action.**" Liappas, 47 So. 2d at 583; Snipes v. W. Flagler Kennel Club, Inc., 105 So. 2d 164, 165 (Fla. 1958).

173.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

174.   In or around April 10, 2018, during a personal telephone call with Defendant Greenberg, Defendant Moreno falsely accused Plaintiff of criminal conduct, *viz.* violations of 18 U.S.C. § 912.

175.   Moreno knew, or was reckless in not knowing, that his representations to Greenberg were factually false.

176.   In addition, in or around May 2018, during a telephone call with Marcelyn R. Cox, Esq. of the University of Miami School of Law, Defendant Roberts knowingly and maliciously slandered Plaintiff by "republishing" and reiterating the defamatory allegations against Plaintiff that Defendant Moreno had initially made.

177.   Defendant Roberts knew, or was willful in not knowing, that the defamatory representations vis-à-vis Plaintiff which she knowingly "republished" to Cox were factually false. Indeed, as an attorney and litigator, Roberts knew that one does not need to use any deception whatsoever in order to simply request a certified copy of the record in a **public and unsealed** civil $1,600 credit card dispute.

178.   During the May 2018 telephone call with Cox, Roberts knowingly "republished" the erroneous allegations, and falsely accused Plaintiff of having engaged in criminal conduct.

179.   During the May 2018 telephone call with Cox, Roberts falsely represented that Plaintiff had engaged in misconduct and improper, unethical behavior.

180. Further evidencing and demonstrating Roberts' malicious intent, Roberts *also* contacted the SEC's headquarters in Washington, DC, in connection with her efforts to terminate Plaintiff's employment agreement with the SEC's Miami, Florida office.

181. During her communications with the SEC's headquarters in Washington, DC, Roberts willfully and knowingly "republished" the factually-false, defamatory allegations of criminal conduct and unethical behavior vis-à-vis Plaintiff.

182. Because the subject slander entails accusations of criminal conduct, the slander is "*per se*" under the common law of the State of Florida, and Plaintiff's damages are presumed as a matter of law.

183. Because the subject slander pertains to Plaintiff's trade and profession, the slander is "*per se*" under the common law of the State of Florida, and Plaintiff's damages are presumed as a matter of law.

184. Defendants Moreno and Roberts had actual knowledge of the fact that their false representations would foreseeably harm Plaintiff's reputation, as well as his future trade and profession.

185. Defendant Roberts' representations to *both* Cox and the SEC headquarters in Washington, DC, were not protected by "absolute privilege," as they were made *ultra vires* and were personal in nature.

186. Defendant Moreno's representations to Greenberg were not protected by "absolute privilege," as they were made *ultra vires*, were personal in nature, and were made during a personal telephone call.

33

187.    The said Defendants' representations were not protected by any cloak of "qualified privilege" as the said Defendants acted with "actual malice" within the meaning of <u>New York Times v. Sullivan</u>, 376 U.S. 254 (1964) and its progeny.

188.    The said Defendants knew, or were reckless in not knowing, that the aforesaid defamatory accusations and "republications" of criminal conduct vis-à-vis Plaintiff were all factually false.

189.    *Inter alia*, Defendants Moreno and Roberts knew, or were reckless in not knowing, that Plaintiff did not need to "pretend" to be sent by the USAO merely in order to obtain copies of the publicly-available record.

190.    The defamatory statements were "republished" by Roberts to Cox and to the SEC's Washington, DC headquarters, *i.e.* third parties.

191.    Moreno's defamatory representations were "republished" to numerous third parties, including, without limitation, Greenberg.

192.    Moreno and Roberts knew, or were reckless in not knowing, of the harm their defamatory representations would cause Plaintiff. This includes, without limitation, the severe harm to Plaintiff's reputation, business opportunities, employment opportunities, social relationships, career, and health.

193.    The said Defendants' unlawful acts and omissions as described hereinabove were the proximate cause of all of the foreseeable harm incurred by Plaintiff.

**COUNT V**
**Tortious Interference with Contractual Relations**
**(against all Defendants)**

34

194.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

195.   Plaintiff had two (2) separate employment contracts with two (2) separate third parties, *viz.*, the USAO and the SEC.

196.   Defendants Greenberg and Roberts willfully and knowingly caused *both* the USAO and the SEC to breach their respective employment agreements with Plaintiff.

197.   Plaintiff also had a contractual relationship with the University of Miami, which Defendants Moreno and Roberts had actual knowledge of.

198.   Defendants Moreno and Roberts willfully and knowingly interfered with Plaintiff's contractual relationship with the University of Miami by mailing the University a malicious and factually-false letter wherein Moreno accused Plaintiff of misconduct and criminal activity, and by falsely "republishing" the defamatory and factually-false representations to Cox.

199.   As a result of Defendant Moreno's letter, Plaintiff:

   (i)   was unduly prevented from studying at the University of Miami due to being repeatedly questioned regarding Moreno's defamatory and patently-false allegations and called into numerous meetings; and

   (ii)  incurred severe depression, anxiety, nausea, headaches, and other emotional and physical ailments which foreseeably caused him to withdraw from the Law School and move home to Massachusetts.

200.   Defendants lacked any privilege to induce the said breaches.

201.   As described hereinabove, Defendants' deliberate interference was intentional, and was improper as to both motive and means.

202.   Defendants all acted with malice, as Defendants' purposes were spiteful and malignant.

203.   Defendants' intentional interference with the aforesaid contractual relationships was the proximate cause of Plaintiff's harm.

204.   All of Plaintiff's damages, as described more fully hereinabove, were the directly foreseeable result of Defendants' intentional and deliberate interference.

## COUNT VI
### Tortious Interference with Advantageous Business Relations
### (against all Defendants)

205.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

206.   Plaintiff had two (2) separate business relationships with two (2) separate third parties, to wit, the USAO and the SEC.

207.   Plaintiff enjoyed an economic benefit from each of the aforesaid business relationships, including, but not limited to: professional recommendations; the *required* work experience needed for Plaintiff's job prospects and employability; learning and development of critical legal abilities and expertise; and the important formation of professional and personal relationships with countless attorneys in the employ of the USAO and SEC.

208.   Defendants knew, or were willful in not knowing, of the aforesaid business relationships.

209.   As further described hereinabove, Defendants interfered with the two (2) separate business relationships through an improper motive and improper means.

210. Defendants acted with malice vis-à-vis Plaintiff, and their purposes were spiteful and malignant.

211. Defendants' interference was the proximate cause of Plaintiff's harm.

212. Plaintiff foreseeably lost the innumerable advantages of the two (2) business relationships as a direct and natural consequence of Defendants' conduct.

213. Defendants lacked any cognizable privilege to induce the said losses.

## COUNT VII
### Tortious Interference with Prospective Economic Advantages
### (against all Defendants)

214. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

215. Plaintiff enjoyed economic relationships between the USAO and the SEC which contained a reasonably probable future economic benefit or advantage to Plaintiff.

216. Defendants knew, or were willful in not knowing, of the existence of the two (2) aforesaid employment relationships, as well as Plaintiff's separate contractual relationship with the University of Miami.

217. Defendants knew, or were willful in not knowing, that their actions would interfere with the said relationships and cause Plaintiff to lose, in whole or in part, the highly probable future economic benefits and advantages of the relationships.

218. Defendants acted with malice, and Defendants' purposes were spiteful and malignant.

219. As further described hereinabove, Defendants "willfully" and "knowingly," either directly or indirectly, interfered with the aforesaid separate business relationships through an improper motive and improper means.

220.   Defendants acted with the sole purpose of harming Plaintiff, and acted by means that are dishonest, unfair, and otherwise improper.

221.   Defendants' interference was the proximate cause of Plaintiff's harm.

222.   Plaintiff foreseeably lost the innumerable advantages of these and countless other business and employment relationships as a direct and natural consequence of Defendants' conduct.

223.   Defendants lacked any privilege to induce the said losses.

**COUNT VIII**
**Intentional Infliction of Emotional Distress**
**(against all Defendants)**

224.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

225.   As further explained hereinabove, at all times relevant hereto, Defendants acted intentionally in their actions against Plaintiff.

226.   Defendants knew, or were willful in not knowing, that emotional distress was the likely and foreseeable result of their conduct.

227.   Defendants' conduct, as described hereinabove, was extreme, outrageous, beyond the standards of decency, and utterly intolerable in a civilized society.

228.   Defendants are the direct and proximate cause of Plaintiff's distress.

229.   Plaintiff foreseeably suffered—and continues to suffer—emotional distress as a result of Defendants' conduct.

230.   The emotional distress sustained by the Plaintiff was severe and of a nature that no reasonable person could be expected to endure it.

<u>**COUNT IX**</u>
**As and for a First Count of Deceit**
**(against Defendant Roberts)**

231.  Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

232.  Defendant Roberts willfully and knowingly caused the SEC to send Plaintiff a factually false and deceptive letter, falsely representing that Plaintiff had "failed" the SEC's background check.

233.  The said letter was factually false. By way of example only, just months earlier, Plaintiff had in fact successfully passed the *more stringent* personnel background check of the USAO for his employment in that office.

234.  The true reason for the SEC's unilateral breach of its employment agreement with Plaintiff was that Roberts had personally induced the said breach, and, in furtherance of her conspiracy with Moreno, personally caused the SEC to breach its employment relationship with Plaintiff.

235.  Through Roberts' false and deceptive representations to Plaintiff, Roberts reasonably expected to induce action or forbearance of a definite and substantial character on the part of Plaintiff.

236.  Defendant Roberts' deceitful representations did, in fact, induce such action or forbearance by Plaintiff, and prevented Plaintiff from, *inter alia*:

    (i)    timely learning of Roberts' personal involvement in the conspiracy; and

(ii)     taking the appropriate remedial measures in order to remedy the breach of contract caused by Roberts and her agents.

237.   Plaintiff incurred severe, irreparable economic and emotional harm as a result of the deceit.

## COUNT X
### As and for a Second Count of Deceit
### (against Defendant Moreno)

238.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

239.   Defendant Moreno himself called Plaintiff on his personal cell phone number and left a recorded voicemail, unambiguously ordering Plaintiff to appear in federal court the following day for a **civil** credit card matter.

240.   The said representation was deceptive, dishonest, and factually false.

241.   The true reason for Moreno's message was so that Plaintiff would not know that Defendant Moreno intended to violate Plaintiff's constitutional rights without having his attorney present.

242.   The true reason for Moreno's message was so that Defendant Moreno could verbally defame, abuse, denigrate, and publicly humiliate Plaintiff without Plaintiff's attorney being present in the courtroom.

243.   Through his false and deceptive representations to Plaintiff, Defendant Moreno reasonably expected to induce action or forbearance of a definite and substantial character on the part of Plaintiff.

244.   Defendant Moreno's false and deceptive representation did, in fact, induce such action and forbearance. Indeed, on April 10, 2018, Plaintiff appeared before Defendant Moreno without an attorney being present.

245.   Plaintiff incurred severe, irreparable emotional and economic harm as a result of the deceit.

**COUNT XI**
**Invasion of Privacy—Intrusion upon Seclusion and Solitude**
**In Violation of the Common Law of the State of Florida**
**and Fla. Const. art. I, § 23**
**(against Defendants Greenberg, Moreno, and Lehr)**

246.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

247.   The federal right to privacy extends protection in certain circumstances against disclosure of personal matters. In Florida, a person's right to privacy is independently protected by its state constitution. Rasmussen v. S. Fla. Blood Serv., Inc., 500 So. 2d 533, 535 (Fla. 1987).

248.   Fla. Const. art. I, § 23 affords individuals such as Plaintiff protection against the increasing collection, retention, and use of information relating to all facets of an individual's personal life. This includes the unlawful and unauthorized procurement of confidential employment records.

249.   As further explained hereinabove, Moreno, Lehr, and Greenberg intentionally, willfully, and knowingly invaded Plaintiff's right to privacy of a "private matter," and intruded upon Plaintiff's right to seclusion and solitude.

250.   The intrusion was unlawful, unauthorized, and undertaken by Moreno, Lehr, and Greenberg without Plaintiff's express or implied consent thereto.

251.    At all times relevant hereto, Plaintiff had a reasonable expectation that his USAO employment records would be kept private.

252.    Greenberg unreasonably intruded upon Plaintiff's solitude and seclusion, together with Plaintiff's right to be left alone, and ordered Lehr to comply with Moreno's unlawful requests.

253.    Greenberg acted without authorization, and intentionally invaded the private affairs of Plaintiff.

254.    The invasion of privacy, especially the unauthorized and unlawful access of Plaintiff's confidential employment records on his **personal** laptop through deceit, is highly offensive to any reasonable person.

255.    As a direct consequence of the invasion of privacy, Plaintiff foreseeably incurred substantial harm, including, without limitation, the foreseeable mental anguish and suffering therefrom.

256.    Defendant Greenberg was the proximate cause of Plaintiff's harm.

257.    Defendant Greenberg acted with "actual malice" and with a malignant purpose by maliciously and wantonly invading Plaintiff's right to privacy.


**COUNT XII**
**Public Disclosure of Private Facts**
**(against Defendants Greenberg, Moreno, and Lehr)**

258.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

259. *Inter alia,* on a personal telephone call, Greenberg and Moreno discussed Plaintiff's confidential employment records, which Lehr subsequently transmitted to Moreno.

260. Greenberg knew, or had reason to know, that the disclosed and "published" private matter would likely become known to countless other persons and/or the general public, including, without limitation, employees at the USAO and SEC.

261. Greenberg's disclosure of Plaintiff's confidential and unlawfully-obtained employment records to Moreno was not authorized through either a warrant or Plaintiff's consent, and was not protected by any cloak of privilege.

262. The disclosure was *ultra vires*, and Moreno, Greenberg, and Lehr acted in the absence of any jurisdiction and/or authority therefor.

263. By violating the Fourth Amendment of the United States Constitution and the Privacy Act of 1974, *inter alia*, the said Defendants willfully and knowingly violated Plaintiff's right to privacy.

264. Plaintiff reasonably expected that his employment records on his personal laptop computer would remain private.

265. This public disclosure of private facts, as well as the unauthorized access of Plaintiff's confidential employment records, is highly offensive to any reasonable person.

266. As a direct consequence of the public disclosure of private facts, Plaintiff foreseeably incurred substantial harm, including, without limitation, the foreseeable mental anguish and suffering therefrom.

267. Defendants Moreno, Greenberg, and Lehr were all the proximate cause of Plaintiff's harm.

268.    The said Defendants acted with malice by maliciously and wantonly invading Plaintiff's right to privacy and thereupon publicly disclosing and "publishing" numerous private facts therefrom.

**COUNT XIII**
**Civil Liability pursuant to**
**Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)**
**(against all Defendants)**

269.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

270.    In Bivens, *supra*, the United States Supreme Court created a private right of action for damages against federal officers such as Greenberg and Roberts who are alleged to have violated a citizen's constitutional rights. See Correctional Services Corp. v. Malesko, 534 U.S. 61, 66 (2001); Bivens, 403 U.S. 388, 91 (1971).

271.    Bivens promotes a right of action under federal common law against individual federal officials when the only alternative is a Federal Tort Claims Act (hereinafter, "FTCA") claim against the United States, which the Supreme Court has held is **insufficient to deter unconstitutional acts by individuals.** Carlson v. Green, 446 U.S. 14, 18-23 (1980); Correctional Services Corp. v. Malesko, 534 U.S. 61, 67-68 (2001); see also 28 U.S.C. §2679(b)(2).

272.    Pursuant to same, all of the constitutional violations, as described hereinabove, give rise to cognizable and justiciable claims against Defendants herein.

273.    At all times relevant hereto, Defendants acted under color of federal law.

274.   The said Defendants' acts and omissions violated, without limitation: the Fourth Amendment of the United States Constitution, and the right to be free from unreasonable searches and seizures; Plaintiff's property rights (*viz.* the USAO and SEC employment agreements); Plaintiff's right to petition the judiciary for redress; Plaintiff's constitutional right to privacy; Plaintiff's right to legal counsel in all criminal matters; and countless other wrongs in violation of Plaintiff's rights under the United States Constitution.

275.   Plaintiff foreseeably incurred irreparable harm from all of the aforesaid constitutional violations.

## COUNT XIV
### Bivens Conspiracy
### (against all Defendants)

276.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

277.   As further described herein, *ante*, Defendants entered into an agreement and understanding to violate Plaintiff's rights under the United States Constitution. These rights include, without limitation: the Fourth Amendment of the United States Constitution, and Plaintiff's right to be free from unreasonable searches and seizures; Plaintiff's property rights (*viz.* the USAO and SEC employment agreements); Plaintiff's right to petition the judiciary for redress; Plaintiff's constitutional right to privacy; Plaintiff's right to legal counsel in all criminal matters; and countless other constitutional rights which were knowingly violated by Defendants herein.

278.    Each Defendant committed numerous acts in furtherance of the conspiracy to deprive Plaintiff of his constitutional rights.

## COUNT XV

### Aiding and Abetting
### (against Defendants Roberts, Lehr, and Greenberg)

279.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

280.    Defendants Roberts, Lehr, and Greenberg all had actual knowledge of the unlawful acts and omissions committed by Moreno against Plaintiff, as more fully described hereinabove.

281.    Defendants Roberts, Lehr, and Greenberg, individually and through their agents, knowingly aided, abetted, and assisted Moreno in pursuance of the scheme, and in furtherance of the unlawful conduct vis-à-vis Plaintiff.

282.    Defendants Roberts, Lehr, and Greenberg knew, or had reason to know, that Plaintiff would be significantly harmed as a result of the scheme, as a result of their material assistance in the scheme, and as a result of the unlawful conduct of Moreno.

283.    As a result of the foregoing, and as a matter of law, Roberts, Lehr, and Greenberg are liable for all damages directly and proximately caused to Plaintiff through the unlawful conduct of Moreno.

## COUNT XVI

### Abuse of Process
### (against Defendant Moreno)

46

284. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

285. Acting *ultra vires* and without jurisdiction, Defendant Moreno unlawfully misused a civil proceeding for a purpose for which it is not designed.[6]

286. Defendant Moreno used the civil proceeding for an ulterior and illegitimate purpose.

287. *Inter alia,* Defendant Moreno used a civil $1,600 credit card dispute to discuss Plaintiff's confidential—and wholly unrelated—employment records which Defendant Moreno had unlawfully obtained without a warrant in violation of the Privacy Act of 1974 and the Fourth Amendment of the United States Constitution.

288. *Inter alia,* Defendant Moreno used a **civil** proceeding—wherein Plaintiff was *pro se*—to interrogate Plaintiff, without counsel, regarding a **criminal** matter.

289. As a direct consequence of Defendant Moreno's abuse of process, Plaintiff foreseeably incurred substantial harm, including, without limitation, the foreseeable mental anguish and suffering therefrom.

## COUNT XVII
### Aiding and Abetting of Libel *per se*
### (against Defendant Moreno)

290. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

---

[6] Courts have held that a non-party to the underlying proceeding such as Defendant Moreno may be held liable for malicious abuse of process **where the non-party was an "active participant" in the proceeding**. See, e.g., Harvey v. Thi of N.M., No. 12-CV-727 MCA/LAM, 2015 U.S. Dist. LEXIS 182695 (D.N.M. Mar. 31, 2015).

291.   At all times relevant hereto, Plaintiff was, and remains, a "private person."

292.   At all times relevant hereto, Plaintiff acted individually, and not on behalf of the United States or its agencies.

293.   Plaintiff has not actively sought any publicity, public note, or prominence outside of implementing his own business affairs in private transactions.

294.   Plaintiff is not a "public figure" or official within the meaning of <u>New York Times v. Sullivan</u>, 376 U.S. 254 (1964) and its progeny.

295.   Elie Mystal and Breaking Media intentionally published to the general public a defamatory April 30, 2018 article in writing and on the internet.

296.   The subject article directly pertained to Plaintiff, as expressly stated in its defamatory title.

297.   The subject article was defamatory in its entirety, contained numerous false representations of "fact," and "republished" all of Defendant Moreno's defamatory representations.

298.   Defendants Mystal and Breaking Media acted with "actual malice" within the meaning of <u>New York Times</u>, *supra*, because they knew, or were reckless in not knowing, that their material representations in the subject article pertaining to Plaintiff were false.

299.   In the subject Breaking Media article, the abusive and derogatory language used to describe Plaintiff, e.g., "entitled ponce," "dumb," "brat," etc., cannot possibly be construed or interpreted as anything but malevolent.

300.   As a matter of law, the written representations of Mystal and Breaking Media constitute libel *per se. Inter alia*, Mystal and Breaking Media accused Plaintiff of having violated 18 U.S.C. § 912, a criminal offense punishable by three (3) years in federal prison. Further,

the said Defendants had actual knowledge of the fact that their defamatory representations would foreseeably harm Plaintiff's future trade or profession.

301.    By transmitting the subject non-public April 10, 2018 hearing transcript to Mystal and Breaking Media for the express purpose of publication on the internet, Defendant Moreno knowingly and materially aided and abetted the publication of libel *per se*.

302.    Defendant Moreno knew, or was willful in not knowing, that the publication of libel *per se* was the foreseeable result of his acts.

303.    The unlawful acts of Mystal and Breaking Media, together with the material assistance of Moreno, were the proximate cause of the foreseeable harm incurred by Plaintiff.

## COUNT XVIII
### Republications of Libel *per se*
### (against Defendant Moreno)

304.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

305.    Numerous "republications" of the defamatory representations originally "published" by Defendant Moreno were subsequently made by third parties. See, e.g., **EXHIBIT G**.

306.    Under the common law of the State of Florida, original "publishers" of defamatory representations are liable for any and all subsequent "republications" made by third parties where republication is "reasonably foreseeable." See, e.g., Klayman v. Judicial Watch, Inc., 22 F. Supp. 3d 1240, 1251 (S.D. Fla. 2014) (Altonaga, J.)

307.   Collectively, all of the "republications" of the defamatory representations made by third
parties were "reasonably foreseeable" to Defendant Moreno, *i.e.*, the original "publisher"
of the representations.

308.   Plaintiff was foreseeably harmed as a result of the numerous "republications."

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all claims, issues, and questions of fact so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Honorable Court:

(i)    Enter judgment in favor of Plaintiff and against Defendants on all counts herein;

(ii)   Issue a mandatory injunction and order permanently barring and enjoining Defendants
from engaging in such unlawful conduct;

(iii)  Grant declaratory relief against Defendants for all of the unlawful acts and omissions as
described herein;

(iv)   Award Plaintiff all damages sustained as a result of Defendants' unlawful conduct pursuant
to all counts herein, including, but not limited to, economic damages vis-à-vis the two (2)
subject contracts; lost future earnings and economic losses; monetary compensation for
Plaintiff's loss of reputation, mental anguish, emotional distress, humiliation, depression,
embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence, and loss of
personal dignity; and damages for Plaintiff's emotional pain and suffering, together with all
other physical or mental injuries;

50

(v)     Award consequential damages in an amount to be determined at trial;

(vi)    Award expectancy damages in an amount to be determined at trial;

(vii)   Award punitive damages against Defendants as permitted pursuant to Bivens, *inter alia*, in an amount to be determined at trial;

(viii)  Grant the mandatory treble damages award against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1964(a), (c) in an amount to be determined at the time of trial;

(ix)    Award Plaintiff attorneys' fees, costs, and pre- and post-judgment interest; and

(x)     Grant such further relief as this Court may deem just and proper.

At Cambridge, Massachusetts,            Respectfully submitted,
This 26th Day of March, 2020

                                        JONATHAN MULLANE,
                                        Plaintiff *pro se*,
                                        30 Donnell Street
                                        Cambridge, MA 02138
                                        Tel.: (617) 800-6925
                                        j.mullane@icloud.com

## VERIFICATION

I, JONATHAN MULLANE, under oath, do hereby affirm and state that I have reviewed the within filing, and, based upon my own personal knowledge, hereby verify and affirm that the allegations contained therein are true and accurate, and hereby certify that no material facts have been omitted therefrom.

Signed under the pains and penalties of perjury this 26th Day of March, 2020.

JONATHAN MULLANE