## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

JONATHAN MULLANE,

      *Plaintiff,*

v.

FEDERICO A. MORENO,
ALISON W. LEHR,
BENJAMIN G. GREENBERG,
LISA T. ROBERTS, and
DOES 1 through 10, inclusive,
in their individual and official capacities,

      *Defendants.*

_____/

Docket No. 1:20-CV-21339-AKK

**TRIAL BY JURY DEMANDED**

## PLAINTIFF'S [PROPOSED] VERIFIED
## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Jonathan Mullane (hereinafter, "Plaintiff" or "Mullane"), and complaining of Defendants **FEDERICO A. MORENO** (hereinafter, "Moreno"), **ALISON W. LEHR** (hereinafter, "Lehr"), **BENJAMIN G. GREENBERG** (hereinafter, "Greenberg"), **LISA T. ROBERTS** (hereinafter, "Roberts"), and **DOES 1 through 10, inclusive** (hereinafter, "Does 1-10") (collectively, "Defendants") hereby brings this action at law and in equity for declaratory and injunctive relief, together with the appropriate monetary damages.

As and for his Verified Complaint, Plaintiff avers as follows:

## PARTIES

1.  Plaintiff Jonathan Mullane is a natural person and citizen of the Commonwealth of Massachusetts.

2.  Defendant Federico A. Moreno is a natural person and citizen of the State of Florida, and resides at 1314 Castile Avenue, Coral Gables, Florida 33134-4746.

3.  Defendant Alison W. Lehr is a natural person and citizen of the State of Florida, and resides at 109 3rd Dilido Terrace, Miami Beach, Florida 33139.

4.  Defendant Benjamin G. Greenberg is a natural person and citizen of the State of Florida, and resides at 4900 N 33rd Court, Hollywood, Florida 33021-2321.

5.  Defendant Lisa T. Roberts is a natural person and citizen of the State of Florida, and resides at 5320 N Kendall Drive, Coral Gables, Florida 33156-2126.

6.  Plaintiff is currently unaware of the true names and capacities of Does 1 through 10, inclusive, and therefore sues those parties by such fictitious names. Does 1 through 10, inclusive, are responsible in part and in some manner for the conduct described in this complaint, or other persons or entities presently unknown to Plaintiff. Plaintiff shall duly amend this complaint to reflect the true names and capacities of Does 1 through 10 when such names and capacities become known to him.


## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

8.     This Court has general personal jurisdiction as Defendants herein are all citizens of the State of Florida.

9.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391.

## MATERIAL FACTS

**I.**     **Plaintiff's employment at the Miami USAO and his timely disclosed conflicts-of-interest in connection with "Operation Money Flight" and PDVSA.**

10.    In or around July 2017, while present in Massachusetts, Plaintiff entered into a contractual employment agreement with the United States Attorney's Office (hereinafter, "USAO"). Specifically, the USAO solicited certain services by Plaintiff whereby Plaintiff agreed to work as a law clerk intern in the Miami, Florida office of the USAO.

11.    In or around December 2017, while present in Massachusetts, Plaintiff entered into a second, and entirely separate, contractual employment agreement with the United States Securities and Exchange Commission (hereinafter, "SEC"), and was interviewed and hired by Defendant Lisa T. Roberts personally. Specifically, the SEC and Roberts solicited certain services by Plaintiff whereby Plaintiff agreed to work as a law clerk intern in the Miami, Florida, office of the SEC.

12.    At the time the events described herein occurred, Plaintiff was an employee of the Miami USAO.

13.    Unbeknownst to Plaintiff during his Miami USAO internship, Defendant Benjamin G. Greenberg, who served as the acting United States Attorney for the Southern District of

Florida at the time,[1] was actively participating in "Operation Money Flight," an operation initiated by the Organized Crime Drug Enforcement Task Force ("OCDETF").[2]

14.    *Inter alia*, this operation sought to seize assets in an alleged billion-dollar international scheme to launder funds embezzled from Venezuelan state-owned oil company Petróleos de Venezuela, S.A. ("PDVSA") using Miami, Florida real estate and other complex investment schemes.

15.    The Asset Forfeiture Division of the Miami USAO was actively involved in PDVSA-related asset forfeiture proceedings throughout Plaintiff's internship in the spring of 2018. **EXHIBIT A.**

16.    Coincidently, Plaintiff's father E. Peter Mullane, Esq. served as Lead Counsel in the successful defense of an alleged co-conspirator in the PDVSA money laundering scheme in a criminal prosecution involving the Miami USAO. See **United States v. Martin Lustgarten Acherman et al.**, Case No. 15-20840-CR-COOKE/TORRES (S.D. Fla.); see also **EXHIBIT B.**

17.    Moreover, Plaintiff—who is fluent in both French and English—had previously viewed certain confidential documents relating to Lustgarten Acherman, *supra*.

18.    Plaintiff had assisted defense counsel by translating certain confidential correspondence of the Swiss Government, *viz.* confidential correspondence of the Attorney General of the *Ministère public de la République et Canton de Genève* and from the federal *Ministère public de*

---

[1] Defendant Greenberg resigned from federal employment shortly after Plaintiff brought an action in the District of Massachusetts in connection with this matter, *viz.* Mullane et al. v. Moreno et al., 1:18-CV-12618 (D. Mass. Dec. 20, 2018).

[2] See, e.g., United States Department of Justice, "TWO MEMBERS OF BILLION-DOLLAR VENEZUELAN MONEY LAUNDERING SCHEME ARRESTED" (Jul. 25, 1018) https://www.justice.gov/usao-sdfl/pr/two-members-billion-dollar-venezuelan-money-laundering-scheme-arrested

*la Confédération Helvétique* ("MPC") relating to the release of seized assets and funds in Switzerland and in certain Swiss bank accounts that had been initially seized pursuant to DOJ Mutual Legal Assistance Treaty ("MLAT") requests transmitted to the Swiss Government.

19. All of the foregoing conflicts of interest were timely disclosed by Plaintiff to his Miami USAO supervisor, Defendant Alison W. Lehr, on the very first day of Plaintiff's USAO internship in the Asset Forfeiture Division.

20. For reasons unknown to the undersigned, and notwithstanding the foregoing conflicts of interest, Defendant Lehr, together with AUSA Adrienne E. Rosen, assigned Plaintiff to work on asset forfeiture cases relating to the ongoing PDVSA money laundering scheme.

21. In addition, Defendant Lehr personally required and demanded that Plaintiff research ways in which the Miami USAO could lawfully seize legal fees paid to criminal defense attorneys who represented defendants in money laundering cases in the Southern District of Florida.


II.   **Defendants' efforts to terminate Plaintiff's federal employment; genesis of the RICO conspiracy and Defendants' unlawful acts in furtherance thereof.**

22. Fearing the foreseeable and probable professional embarrassment and/or bar discipline from having employed Plaintiff in the Asset Forfeiture Division while the PDVSA investigations were still ongoing, and fearing that Plaintiff would potentially leak confidential and/or sensitive information to his father E. Peter Mullane, Esq. (*i.e.*, Lead Counsel for Defendant Lustgarten Acherman), Defendants Lehr and Greenberg initially attempted to "quietly" terminate Plaintiff's USAO employment.

23.    *Inter alia*, Defendants' scheme included falsely informing Plaintiff that certain "personnel changes" were underway, and that there was not enough "office space" for him to remain employed at the Miami USAO.

24.    Additionally, Plaintiff also began being verbally abused in the Miami USAO in a further attempt to force him to resign.

25.    In response the foregoing, Plaintiff submitted numerous complaints to Defendant Lehr, both verbally and in writing. See, e.g., **EXHIBIT C**.

26.    By way of example only, after having received one such complaint from Plaintiff, Defendant Lehr summoned Plaintiff to her private office the following day in order to discuss:

   (i)     The inexplicable verbal abuse vis-à-vis Plaintiff;

   (ii)    The increasing hostility towards Plaintiff in the workplace; and

   (iii)   The written complaint Plaintiff had submitted to Lehr in connection with the above-mentioned serious concerns.

27.    During this meeting, Defendant Lehr unambiguously informed Plaintiff that she found his actions to be completely and utterly "inappropriate," and that he should not have made a complaint of abuse and/or harassment in written against AUSA Adrienne E. Rosen—*i.e.*, a close friend and colleague of Lehr.

28.    Defendant Lehr informed Plaintiff that, as a result of his "inappropriate" submission of a written complaint to her work email address, Defendant Lehr would subsequently face potential embarrassment should opposing counsel in any of her numerous asset forfeiture cases obtain and view such a document in discovery.

29.   At no time relevant hereto did Defendant Lehr properly report Plaintiff's complaint of abuse and harassment to the Human Resources department (something which was reasonably expected and anticipated), nor did she appropriately report it to anyone else within the Miami USAO as required of her under such circumstances.

30.   Instead, Defendant Lehr opted to unlawfully retaliate against Plaintiff by falsely stating to Defendant Greenberg that Plaintiff was the son of the Lead Counsel of Defendant Lustgarten Acherman—*i.e.*, one of the PDVSA money laundering defendants—and that Plaintiff was "leaking" and disseminating confidential and/or sensitive information to his father regarding the ongoing PDVSA criminal investigation.

31.   When Plaintiff refused to voluntarily leave his USAO employment, Defendants Lehr and Greenberg actively sought other means and measures through which they could create "good cause" to terminate Plaintiff's employment in both the USAO and also in the SEC.

32.   As a measure of last resort to unlawfully terminate Plaintiff's employment in the federal government, Defendants—who were aware that Plaintiff had an unrelated small claim civil action pending before United States District Judge Federico A. Moreno (hereinafter, "Moreno") at the time—corruptly and unlawfully requested that Defendant Moreno find a pretext to falsely accuse Plaintiff of inappropriate and/or unlawful conduct in open court in order to manufacture and fabricate "good cause" to terminate Plaintiff's federal employment.

33.   Defendant Moreno, who is Venezuelan himself and who was born and raised in Caracas, Venezuela, was apprised by Greenberg of the fact that Plaintiff's father served as Lead Counsel for one of the PDVSA Defendants.

34.  In furtherance of Defendants' scheme to terminate Plaintiff's employment agreements, Defendant Moreno *himself* (*i.e.*, not a clerk) called Plaintiff on his personal mobile number prior to the April 10, 2018 "miscellaneous hearing" which Moreno had personally scheduled.

35.  The sole purpose of Defendant Moreno's highly improper and *ex parte* telephone call to Plaintiff was to ensure that Plaintiff would be appearing alone and without counsel, while deceitfully leading Plaintiff to believe that the impromptu "miscellaneous hearing" was merely a routine motion hearing in a $1,600 civil credit card dispute.

36.  Indeed, as Defendant Moreno himself conceded in the April 10, 2018 hearing transcript [**EXHIBIT D**], Defendant Greenberg had placed numerous telephone calls to Moreno—both before and after the said hearing—in order to keep abreast with the scheme, and to be fully apprised of the manufactured allegations against Plaintiff.

37.  The sole purpose and motivation for Defendant Moreno's threats, intimidation, and false allegations of criminal conduct against Plaintiff were to assist Defendants Greenberg and Lehr by providing them with a spurious excuse and pretext to terminate Plaintiff's USAO employment, and to corruptly manufacture "good cause" therefor.

38.  *But for* Defendant Moreno's false and manufactured allegations, Defendants Greenberg and Lehr would have been unable to prematurely terminate Plaintiff's employment without publicly revealing and exposing their own wrongdoing, incompetence, and gross negligence by:

(a)    having employed the son of Lead Counsel for Defendant Lustgarten Acherman in the Miami USAO Asset Forfeiture Division while the PDVSA-related asset forfeiture proceedings and investigations were still ongoing;

(b)    having demanded that Plaintiff research ways in which the Miami USAO could lawfully seize legal fees paid to criminal defense attorneys who represented defendants in money laundering proceedings in the Southern District of Florida; and

(c)    having personally assigned Plaintiff to work on PDVSA-related cases, notwithstanding the fact that he properly disclosed his conflict of interest to Defendant Lehr on the first day of employment.

39.    Indeed, had Defendants properly terminated Plaintiff "for cause" in the usual and customary manner, they would have been required to fully disclose to the Human Resources Department and to DOJ Main Justice: (i) the context and circumstances of Plaintiff's employment in the Asset Forfeiture Division; and (ii) the fact that they had assigned Plaintiff to PDVSA-related cases.

40.    During the impromptu April 10, 2018 "miscellaneous hearing" arranged by Defendant Moreno, Moreno speciously claimed that Plaintiff had unlawfully "pretended" to have been sent on behalf of the United States government to "deceptively" obtain certified copies of publicly-available and unsealed records from a clerk in Plaintiff's personal $1,600 credit card civil case.

41. However, as Moreno was well aware, one need not be a federal employee in order to merely obtain certified copies of the record and/or filings in a publicly-accessible, unsealed $1,600 civil credit card dispute.

42. Indeed, any person, even a non-party or someone with zero connection to the unsealed civil $1,600 credit card proceeding, can lawfully (and successfully) obtain a certified copy of the public record documents without using any deception or pretense.

43. Further evidencing Defendant Moreno's improper and corrupt intentions, not only did he verbally threaten and traumatically intimidate Plaintiff, Moreno also gratuitously made numerous defamatory and insulting remarks regarding Plaintiff's father—**despite the fact that E. Peter Mullane, Esq. had never even appeared before him in any matter, and had never even heard of Moreno.**

44. At all times relevant hereto, Defendant Greenberg refused to intervene prior to the April 10, 2018 hearing with Moreno, and failed to protect and uphold the constitutional rights of Plaintiff—*i.e.*, his employee.

45. At no point prior to the said hearing was Plaintiff given a <u>Garrity</u> warning or a <u>Kalkines</u> warning, in violation of federal common law.

46. At no time relevant hereto was Plaintiff provided a <u>Loudermill</u> hearing, in violation of federal common law.

47. Defendant Greenberg additionally refused to intervene *after* the April 10, 2018 hearing with Moreno, and for good reason: it was Greenberg himself who had specifically requested that Moreno hold the said hearing.

48. Shortly after the April 10, 2018 hearing, Plaintiff complained of Defendant Moreno's unlawful and unjustifiable actions to Lehr and Greenberg (amongst numerous others) both verbally and in writing.

49. Moreover, shortly after Plaintiff's April 10, 2018 hearing with Moreno, Plaintiff contacted Greenberg in writing via electronic correspondence in order to schedule a meeting with him to discuss this serious and important matter, and to seek his guidance and advice as Plaintiff's employer.

50. Being personally involved and complicit in Moreno's unlawful scheme, Greenberg knowingly and unjustifiably refused to communicate with Plaintiff, and refused to ever meet with him.

51. At no point thereafter did Greenberg or his agents ever contact Plaintiff, nor did Greenberg ever meet with Plaintiff or agree to do so.

52. Manifestly unconvinced that he had caused sufficient harm to Plaintiff's personal, academic, social, and professional reputations in the community—in addition to the harm he *also* caused to Plaintiff's father and his state court case in Massachusetts—Defendant Moreno thereupon proceeded to write a malicious and defamatory letter to the University of Miami School of Law, Plaintiff's law school at the time in question. See **EXHIBIT E**.

53. Both: (i) the April 13, 2018 order entered shortly after the subject hearing [**EXHIBIT F**]; and (ii) Defendant Moreno's letter to the University of Miami [**EXHIBIT E**] were factually false and defamatory, and caused Plaintiff significant and irreparable harm.

54.  In furtherance of Defendants' scheme, and with a view to further retaliate against Plaintiff, Defendant Lehr also submitted a negative and factually-unsupported written evaluation report regarding Plaintiff's work performance at the Miami USAO. **EXHIBIT G**.

55.  In this written personal "evaluation" of Plaintiff, Lehr made defamatory and factually-erroneous allegations of criminal conduct and unethical behavior vis-à-vis Plaintiff to the University of Miami School of Law.

56.  By way of example only, in her written personal evaluation, Lehr misrepresented to the University of Miami that Plaintiff was professionally and academically incompetent, that Plaintiff had poor writing skills, and that Plaintiff was even unable to perform basic legal research.

57.  Even worse, Lehr knowingly and deliberately reiterated the false accusations made by Moreno and falsely represented in writing that Plaintiff had engaged in criminal conduct and unethical behavior—even referring to the defamatory April 10, 2018 hearing transcript.

58.  As an attorney herself Lehr knew, and indeed *intended*, that all such erroneous allegations would foreseeably be reported to state bar associations upon Plaintiff's graduation from law school, and would foreseeably prevent him from becoming a licensed attorney.

59.  In addition to the foregoing, Defendants knowingly interfered with Plaintiff's USAO and SEC employment opportunities, and deliberately interfered with and caused the said federal agencies to sever and unilaterally breach their respective employment agreements with Plaintiff.

60.     Although the USAO had agreed to *extend* Plaintiff's employment prior to the April 10, 2018

        hearing, after the unlawful interventions and interference of Defendants, Plaintiff's USAO

        employment was unilaterally and unlawfully terminated.


**III.    Defendants' unauthorized seizure of Plaintiff's USAO employment records.**

61.     In or around April 2018, Defendant Lehr deceptively requested that Plaintiff transmit to

        her certain personal employment records which were on his personal laptop computer.

62.     Defendant Lehr falsely and deceptively represented to Plaintiff that she needed the said

        employment records for legitimate work-related reasons.

63.     In reality, Defendant Lehr's sole purpose and motive was to transmit the information

        contained therein to Defendant Moreno in furtherance of Defendants' scheme.

64.     The transmission of Plaintiff's employment records to Defendant Moreno was done: (i)

        without a warrant; and (ii) without Plaintiff's consent.

65.     At all times relevant hereto, Plaintiff's employment records and timesheet were on

        Plaintiff's personal laptop computer—*not* in the possession, custody, or control of the

        USAO.

66.     Because the said documents were never in the possession, custody and/or control of the

        USAO, neither the USAO nor the United States Department of Justice ("DOJ") had

        standing to authorize Defendants' warrantless seizure of Plaintiff's personal electronic

        records—all of which were solely on Plaintiff's personal laptop computer at all times

        relevant hereto.

67.     No Defendant herein had any standing or lawful authority to authorize the warrantless seizure of the said personal electronic records on Plaintiff's personal laptop computer.

68.     Neither the United States nor its agencies had any standing or lawful authority to authorize the warrantless seizure of the said personal electronic records on Plaintiff's personal laptop computer.

69.     Upon Defendant Lehr's unlawful and deceptive request that Plaintiff transmit the then-current iteration of his timesheet for work-related purposes in connection with his USAO internship, Plaintiff willingly complied and transmitted the said document from his own personal laptop computer to Defendant Lehr.

70.     By knowingly failing to inform Plaintiff that the said document was being requested for a non-work-related purpose, Lehr's request was dishonest, deceitful, and fraudulent.

71.     As Plaintiff's direct superior in the USAO, Lehr had actual knowledge of the fact that the said document was on Plaintiff's personal computer only.

72.     At all times relevant hereto, Defendants Moreno and Greenberg encouraged and endorsed the forgoing actions taken by Lehr, and thus also had actual knowledge of Lehr's actions as described hereinabove.

73.     By unlawfully requesting, and successfully obtaining, Plaintiff's confidential employment records without a warrant from Plaintiff's laptop computer, Defendants' conduct, both individually and jointly:

    (i)     violated Plaintiff's Fourth Amendment Rights;

    (ii)    is violative of the Privacy Act[3] of 1974, 5 U.S.C. § 552a(i)(1);

---

[3] The Privacy Act of 1974 provides for criminal penalties as well as civil remedies. Pursuant to 5 U.S.C. § 552a(i)(1), "[a]ny officer or employee of an agency, who by virtue of his employment or official position, has possession of, or

(iii)   is violative of the criminal provisions of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701;

(iv)   is violative of the criminal provisions of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; and

(v)   further violates the criminal provisions of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

74.   All of the foregoing acts and omissions were undertaken in furtherance of Defendants' scheme, and as part of their collective efforts to retaliate against Plaintiff.

## IV.   Defendants' aiding and abetting of libel *per se*, and successful efforts to discredit Plaintiff in the press in furtherance of the RICO conspiracy.

75.   Unfortunately for Plaintiff, Defendants were nowhere close to completing their scheme, and had not ended their campaign of retaliating against, humiliating, and denigrating Plaintiff—a mere student at the time in question.

76.   After the subject April 10, 2018 hearing, Defendant Lehr transmitted or deliberately caused to be transmitted, with the knowledge and consent of the other Defendants, a copy of the non-public transcript to Breaking Media Inc.'s *Above the Law* publication and its Chief Editor Elie Mystal in New York, New York, together with other court documents referencing the April 10, 2018 hearing.

---

access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000."

77.  Defendant Lehr was able to do so while evading detection by her employer by forwarding the hearing transcript and other documents from her USAO email address to her personal email address. See, e.g., **EXHIBIT H**.

78.  Defendants knew, and also specifically intended, that Breaking Media and Mystal would publish the non-public April 10, 2018 transcript on the internet, together with the defamatory representations contained therein.

79.  Defendants knew, and also intended, that such a publication would inflict irreparable harm on Plaintiff's professional, social, academic, and personal reputations, and would foreseeably prevent him from becoming a licensed attorney and being accepted as a member of the bar.

80.  Other persons and/or entities to whom Lehr transmitted the defamatory April 10, 2018 hearing transcript, together with other court documents referencing the said hearing, included, without limitation:

   (i)   National online publication *Law360* and its Miami-based reporter Carolina Bolado;

   (ii)  Numerous Assistant United States Attorneys, including *inter alia* AUSA Michelle Alvarez [**EXHIBIT I**]; and

   (iii) Numerous University of Miami employees.

81.  Plaintiff had incurred—and currently continues to incur—significant irreparable harm from Defendants' unlawful, unethical, and improper conduct as described herein.

82.  *Inter alia*, in addition to the foreseeable emotional harm, Plaintiff suffered quantifiable economic damages due to the loss of work experience at both the USAO and SEC, which

naturally would have provided Plaintiff with excellent and economically-advantageous employment prospects.

83. Indeed, Defendant Roberts—who had personally interviewed Plaintiff for the SEC role— had unambiguously promised Plaintiff full-time, gainful employment in the federal government in Washington, DC, after the completion of his law school studies if he would agree to accept the Miami, Florida, role—which he did.

84. As a result of Defendants' egregious and unethical conduct, Plaintiff—who has subsequently completed his law school studies—has now been unemployed for **nearly fifteen (15) months** as of the time of writing, and is unable to practice law or even be accepted as a member of a state bar.

85. As a directly-foreseeable consequence, and as a result of Defendants' egregious and unlawful conduct, all of Plaintiff's job applications for full-time, paid employment within the federal government have unsurprisingly been rejected and denied.

86. As a result of Defendants' egregious and unlawful conduct, Plaintiff can no longer obtain positive work references which he is entitled to and deserves from either the USAO or the SEC.

87. Plaintiff's loss of reputation and lost future earnings over the course of his lifetime are substantial.

88. Plaintiff cannot secure legal employment in a position for which he is otherwise well-qualified as a direct result of his loss of personal and professional reputation.

89. As a foreseeable consequence of Defendants' acts and omissions, the defamatory statements were foreseeably "republished" as intended within both Florida and

Massachusetts—as well as in national legal publications on the internet—and have even been relied upon by unrelated third parties nationally and internationally.

90.     These subsequent republications of the defamatory statements in Florida and in Massachusetts—both on the internet and also in court filings—have foreseeably caused Plaintiff *further* irreparable economic and emotional harm.

91.     As a result of Defendants' wrongdoing as recited hereinabove, Plaintiff was foreseeably forced to withdraw the University of Miami School of Law and foreseeably forced to move home to Massachusetts.

92.     In addition to the substantial harm to Plaintiff's legal career, Plaintiff has foreseeably suffered from depression, severe anxiety, thoughts of suicide, and was recently diagnosed by a board-certified psychiatrist as suffering from post-traumatic stress disorder ("PTSD") as a direct result of Defendants' unlawful conduct as set forth herein.

V.     **Defendants' two (2) year-long concealment of over 4,100 pages of responsive records in this matter, in furtherance of the RICO conspiracy.**

93.     In furtherance of Defendants' unlawful scheme, Defendants and their agents knowingly interfered with Plaintiff's numerous and repeated Privacy Act and FOIA requests for an extended two (2) year period as part of their organized cover-up and *ongoing* retaliatory acts.

94.     In furtherance of the scheme, Defendants and their agents deliberately caused the above-mentioned Privacy Act and other government records to be unlawfully retained and withheld—knowing full well that the said records would be essential and highly relevant to Plaintiff's successful prosecution of his claims against Defendants herein, and also in the

RICO action he had duly filed in the District of Massachusetts, *viz.* <u>Mullane et al.</u> v. <u>Moreno et al.</u>, 1:18-CV-12618-PBS  (D. Mass. Dec. 20, 2018).

95. By way of example only, Defendant Lehr falsely and deliberately misrepresented to DOJ Main Justice and to Miami USAO colleagues tasked with Privacy Act/FOIA compliance that she had no knowledge whatsoever of the 2018 requests for responsive records such as her email correspondence.

96. By way of further example, Defendants Lehr and Greenberg both falsely stated on *numerous* USAO Litigation Hold Addenda that they had no responsive records and/or ESI on their mobile telephones—notwithstanding the fact that numerous emails sent by Defendant Lehr unambiguously state "SENT FROM MY IPHONE" below the body of the text.

97. By way of further example, Defendant Lehr unlawfully failed to disclose the numerous responsive text messages and other ESI on her mobile telephone—*i.e.*, affirmative steps undertaken with a view to deliberately interfere with Plaintiff's 2018 Privacy Act and FOIA requests.

98. Defendant Greenberg unlawfully withheld, and improperly failed to disclose, the telephone records relating to his numerous telephone calls to Moreno—notwithstanding the fact that, as confirmed by the April 10, 2018 hearing transcript, Moreno openly acknowledged that Greenberg had *personally* placed numerous telephone calls to him prior to the hearing.

## VI.    Factual allegations specific to Defendant Roberts' complicity and involvement in Defendants' scheme and enterprise.

99.   At all times relevant hereto, *not only* was Defendant Roberts fully apprised of Defendants'
unlawful conduct against Plaintiff, she willingly and knowingly adopted the unlawful goals
of Defendants' scheme.

100.   By way of example only, according to the public records of the SEC's headquarters in
Washington, DC, Plaintiff had successfully passed the SEC's stringent background check
and was fully eligible for employment in that agency. See **EXHIBIT J**.

101.   Notwithstanding the foregoing, and with a view to assist Defendants Moreno, Lehr, and
Greenberg, Defendant Roberts knowingly interfered with Plaintiff's SEC employment in
order to have him terminated from that agency.

102.   *Inter alia*, although Defendant Roberts was notified **in writing** that Plaintiff had
successfully passed the SEC's background check, she thereupon proceeded to request that
an SEC co-worker produce and transmit a fraudulent letter falsely informing Plaintiff that:
(i) he had failed the background check; and (ii) solely as a result of that failure, the SEC had
"good cause" to unilaterally terminate his employment. **EXHIBIT K**.

103.   However, this misrepresentation is utterly contradicted by the SEC's own records and
internal email correspondence [**EXHIBIT J**], which irrefutably demonstrate that Plaintiff
had, in fact, successfully passed the SEC's background check.

104.   The fraudulent SEC letter to Plaintiff—*i.e.*, a letter which was produced and transmitted
at Defendant Roberts' request—was merely part of her deliberate efforts to: (i) knowingly
assist the other named Defendants herein in their scheme against Plaintiff; and (ii)
knowingly retaliate against Plaintiff.

105.    Evidencing Defendant Roberts' intent to participate in the scheme, *not only* did Roberts

participate in the production of the fraudulent SEC letter falsely claiming that Plaintiff had

failed the background check, she also disseminated and "republished" copies of the April

10, 2018 hearing transcript, related news articles, and related court filings to numerous co-

workers in the SEC's Miami, Florida, office and in the SEC's Washington, DC, office. <u>See,

e.g.</u>, **EXHIBIT L**.

**<u>COUNT I</u>**
**Civil Liability pursuant to the Racketeer Influenced and Corrupt Organizations Act**
**("RICO"), 18 U.S.C. §§ 1964(a), (c)**
**(against all Defendants)**

106.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them

by reference as if fully restated herein.

107.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).[4]

108.    By acting in concert, Defendants created an "association-in-fact," and constitute

"individual[s]" and a "group of individuals" giving rise to an "enterprise" within the

meaning of 18 U.S.C. § 1961(4).

109.    The said Enterprise consists of Moreno, Lehr, Greenberg, Roberts, and Does 1-10

collectively (hereinafter, "the Enterprise"), together with their agents.

110.    The said Enterprise was formed and employed as a tool to effectuate Defendants' pattern

of racketeering activity.[5]

---

[4] To establish a RICO violation, a plaintiff need only show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Efron v. Embassy Suites (Puerto Rico), Inc.</u>, 223 F.3d 12, 14-15 (1st Cir. 2000) (quoting <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)).

[5] To demonstrate a "pattern," a plaintiff need only show **two (2) predicate acts** of racketeering activity, from the list set forth at 18 U.S.C. § 1961(1). See <u>H.J. Inc.</u> v. <u>Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989).

111. The said Enterprise engaged in, and continues to engage in, a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1), (5).

112. Acting through the said Enterprise, Defendants committed two (2) or more of the predicate unlawful acts set forth in 18 U.S.C. § 1961(1).

113. *Inter alia*, the Enterprise violated 18 U.S.C. § 1513(e) by retaliating against Plaintiff, a "victim" within the meaning of same.

114. Pursuant to 18 U.S.C. § 1513(e), "[w]hoever knowingly, **with the intent to retaliate, takes any action harmful to any person, including <u>interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense</u>,** shall be fined under this title or imprisoned not more than 10 years, or both."

115. Defendants herein knowingly committed mail fraud within the meaning of 18 U.S.C. § 1341. **The term "mail fraud," as used in a RICO context, is extremely "broad in scope and its fraudulent aspect is measured by a nontechnical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play."** (Emphasis supplied) <u>United States</u> v. <u>Bishop</u>, 825 F.2d 1278, 1280 (8th Cir. 1987). RICO "mail fraud" is *broader* than common law fraud or common law deceit. <u>Iron Workers Local Union No.17 Ins. Fund</u> v. <u>Philip Morris, Inc.</u>, 182 F.R.D. 523, 535 (N.D. Ohio 1998).

116. For the predicate RICO offense of "mail fraud," a plaintiff need only demonstrate that the fraudulent scheme had as its object the deprivation of a "property interest." <u>See</u> <u>Michael Anthony Jewelers, Inc.</u> v. <u>Peacock Jewelry, Inc.</u>, 795 F. Supp. 639, 653 (S.D.N.Y. 1992). In

the case at bar, these "property interests" include, without limitation, Plaintiff's contractual agreements with the USAO, SEC, and the University of Miami, together with his "property interest" and right to be accepted as a member of the Massachusetts bar (*i.e.*, in light of the fact that he holds a JD degree and has successfully passed the Massachusetts bar examination).

117. *Inter alia*, the Enterprise violated 18 U.S.C. §§ 1512(b), (d) (relating to tampering with a victim).

118. Pursuant to 18 U.S.C. § 1512(b), "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in **misleading conduct** toward another person, with intent to[] cause or induce any person to[] **withhold testimony, or withhold a record, document,** or other object, from an official proceeding [or] hinder, delay, or **prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense** [ . . . ] shall be fined under this title or imprisoned not more than 20 years, or both."

119. Pursuant to 18 U.S.C. § 1512(d), "[w]hoever **intentionally harasses** another person and thereby hinders, delays, prevents, or **dissuades any person from[] attending or testifying in an official proceeding** [or] **reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense** [ . . . ] or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both."

120.   The said Enterprise sought to dissuade Plaintiff from reporting the numerous violations of federal law committed by the Enterprise to "law enforcement officer[s.]"

121.   Not only did Plaintiff properly and correctly report the numerous "federal offenses" to Lehr, a law enforcement officer—not knowing of her involvement in the Enterprise at the time in question—Plaintiff also reported the federal offenses to Defendant Greenberg (and numerous others), who was also a law enforcement officer at the time in question. These "federal offenses" include, without limitation:

(i)    the constitutional violations described hereinabove, together with all other actionable conduct engaged in by Defendants;

(ii)   Defendants' failure to provide either a <u>Garrity</u> warning or a <u>Kalkines</u> warning prior to the April 10, 2018 hearing, in violation of federal common law and the Fourth and Fifth Amendments of the United States Constitution;

(iii)  Defendants' failure to provide a <u>Loudermill</u> hearing;

(iv)   criminal violations of the Privacy Act of 1974, 5 U.S.C. § 552a(i)(1);

(v)    "mail fraud" within the meaning of 18 U.S.C. § 1341;

(vi)   tampering with a victim within the meaning of 18 U.S.C. §§ 1512(b), (d);

(vii)  intimidation and "misleading conduct" within the meaning of 18 U.S.C. § 1512(b);

(viii) retaliation within the meaning of 18 U.S.C. § 1513(e);

(ix)   violations of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701;

(x)     violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511;

(xi)    violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and

(xii)   violations of 18 U.S.C. § 1719 ("Franking privilege") for the use of taxpayer-funded postage for personal purposes.

122.   The said Enterprise engaged in and deliberately affected interstate commerce. *Inter alia*, the Enterprise knowingly interfered with interstate employment contracts entered into between Plaintiff and the Executive Branch of the United States, contractual agreements between Plaintiff and the University of Miami, and other contractual agreements across state lines.

123.   Defendants knowingly and deliberately interfered with Plaintiff's ability to become a member of the Massachusetts bar and a practicing attorney in the Commonwealth of Massachusetts, and thus directly interfered with interstate commerce.

124.   Plaintiff's employment agreements with the United States, *viz.* USAO and SEC, together with his contractual agreement with the University of Miami, were all entered into in the Commonwealth of Massachusetts.

125.   At all times relevant hereto, Defendants exerted full control over the said Enterprise. Each participant in the Enterprise had a systematic linkage to the other participants with a view to continue coordination of their collective activities.

126.   Through the subject Enterprise, Defendants functioned as one continuing unit with the express purpose of furthering the illegal scheme and common purposes.

127. The unlawful acts of the subject Enterprise unfortunately remain ongoing. *Inter alia*, the Enterprise knowingly interfered with the legally-mandated disclosure of over 4,100 pages of responsive records in connection herewith in response to Plaintiff's numerous requests under the Freedom of Information Act ("FOIA") and the Privacy Act of 1974 ("Privacy Act") in and around 2018, and for an extended two (2) year period.

128. By way of further example, even as of the time of writing, Defendant Moreno refuses to retract any of the defamatory misrepresentations and allegations made by him in Mullane v. Barclays Bank Delaware, Inc., Docket No. 1:18-CV-20596, ECF 39 (S.D. Fla. Feb. 15, 2018).

129. *Inter alia*, Defendants and their agents used interstate mails, wires, the internet, telephone, and electronic facilities to carry out the common scheme.

130. Plaintiff has foreseeably been injured in his property and business by reason of these violations. Without limitation, Defendants knowingly interfered with Plaintiff's current and prospective contractual and economic relations, and caused Plaintiff to lose employment and employment opportunities, together with other contracts and contractual relations.

131. Plaintiff's injuries were directly and proximately caused by Defendants' racketeering activities as further described hereinabove.

132. Plaintiff has a private right of action and has standing to assert a claim for violations hereunder.

133. By reason of these violations of 18 U.S.C. § 1962(c), as a matter of law, Defendants are liable to Plaintiff for treble damages together with reasonable attorneys' fees and costs.

## COUNT II
### Civil RICO Conspiracy
### (against all Defendants)

134.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them

by reference as if fully restated herein.

135.   The Supreme Court of the United States has consistently held that a RICO conspiracy

claim extends even broader that RICO claims, and that any person who agrees or conspires

to pursue the same unlawful objective shall be held liable for a RICO violation. See, e.g.,

Salinas v. United States, 522 U.S. 52, 63-64 (1997).

136.   As further described hereinabove, Defendants all conspired to further an endeavor which,

if completed, would satisfy all elements of a civil RICO claim. See CGC Holding Co., LLC

v. Broad and Cassel, 773 F.3d 1076, 1088 (10th Cir. 2014) (**one conspires to violate RICO**

**by adopting the goal of furthering the enterprise, "even if the conspirator does not**

**commit a predicate act"**); see also United States v. Godwin, 765 F.3d 1306, 1324 (11th

Cir. 2014).

137.   The common scheme of Defendants was the proximate cause of Plaintiff's significant harm

incurred therefrom.

## COUNT III
### Civil Conspiracy pursuant to the Common Law
### of the State of Florida
### (against all Defendants)

138.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them

by reference as if fully restated herein.

139.   As further described herein, *ante*, in early 2018, Defendants entered into an agreement and

understanding to engage in numerous unlawful acts and omissions, and by unlawful means.

140.    Each Defendant committed numerous overt acts in pursuance of the conspiracy, and caused Plaintiff significant harm as a foreseeable result thereof.[6]

**COUNT IV**
**Slander *per se***
**(against Defendants Moreno, Lehr, Greenberg, and Does 1-10)**

141.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

142.    Defendant Moreno—acting *ultra vires*, without jurisdiction, and beyond the scope of his employment—willfully and knowingly slandered Plaintiff and his father E. Peter Mullane, Esq. during the April 10, 2018 hearing, which included making factually-false allegations of criminal conduct[7] and unethical behavior against Plaintiff.

143.    Moreno knew, or was willful in not knowing, that his defamatory and deleterious misrepresentations would irreparably harm Plaintiff's professional reputation, together with his ability to engage in his future profession or trade as an attorney.

144.    Because the subject slander entails accusations of criminal conduct, the slander is *"per se"* under the common law of the State of Florida, and Plaintiff's damages are therefore presumed as a matter of law.

---

[6] The elements of civil conspiracy under Florida law are: "(1) an agreement between two or more parties (2) to do an unlawful act by unlawful means (3) the committing of an overt act in pursuance of the conspiracy and (4) damage to the plaintiff as a result of the act." Bankers Life Ins. Co. v. Credit Suisse First Boston Corp., 590 F. Supp. 2d 1364, 1368 (M.D. Fla. 2008) (citing Walters v. Blankenship, 931 So. 2d 137, 140 (Fla. 5th DCA 2006)). In Florida, "[t]he gist of a civil action for conspiracy is **not** the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." (Emphasis supplied) Liappas v. Augoustis, 47 So. 2d 582, 582 (Fla. 1950). Under Florida common law, "the mere force of numbers, acting in unison, or other exceptional circumstances, gives rise to an independent wrong. In such cases the conspiracy itself becomes the gist of the action." Liappas, 47 So. 2d at 583; Snipes v. W. Flagler Kennel Club, Inc., 105 So. 2d 164, 165 (Fla. 1958).

[7] Pursuant to 18 U.S.C. § 912, "[w]hoever falsely assumes or **pretends to be an officer or employee acting under the authority of the United States or any other department, agency or officer thereof**, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be find under this title or imprisoned not more than three years, or both." (Emphasis supplied).

145. Because the subject slander pertains to Plaintiff's trade and profession, the slander is "*per se*" under the common law of the State of Florida, and Plaintiff's damages are presumed as a matter of law.

146. The said Defendants' misrepresentations and false accusations were not protected by any cloak of "qualified privilege," and at all times relevant hereto Moreno acted with "actual malice" within the meaning of New York Times v. Sullivan, 376 U.S. 254 (1964) and its progeny.

147. Moreno and the other Defendants knew, or were reckless in not knowing, of the harm their false accusations and misrepresentations would cause Plaintiff. This includes, without limitation, the severe and irreparable harm to Plaintiff's reputation, professional opportunities, employment opportunities, social relationships, career, and physical and psychological health.

148. Moreno's unlawful acts and omissions as described hereinabove were the proximate cause of all of the foreseeable irreparable harm incurred by Plaintiff.

149. At all times relevant hereto, Moreno acted on his own behalf, and also in concert with and on behalf of the other RICO conspirators and Defendants herein.

150. Under well-settled principles of agency, *inter alia*, all Defendants herein are individually and jointly liable for the slander *per se*.

### COUNT V
### Tortious Interference with Contractual Relations
### (against all Defendants)

151. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

152. Plaintiff had two (2) separate employment agreements with two (2) separate third parties, *viz.*, the USAO and the SEC.

153. Defendants willfully and knowingly caused *both* the USAO and the SEC to breach their respective employment agreements with Plaintiff.

154. Plaintiff also had a contractual relationship with the University of Miami, which each and every Defendant had actual knowledge of.

155. At all times relevant hereto, Defendants lacked any privilege to induce the said breaches.

156. As described hereinabove, Defendants' deliberate interference was intentional, and was improper as to both motive and means.

157. At all times relevant hereto, Defendants all acted with malice, as Defendants' purposes were retaliatory, spiteful, malignant, and vindictive.

158. Defendants' intentional interference with the aforesaid contractual relationships was the proximate cause of Plaintiff's harm.

159. All of Plaintiff's damages resulting from Defendants' intentional interference, as described more fully hereinabove, were the directly-foreseeable result of Defendants' intentional, knowing, and deliberate interference.

## COUNT VI
### Tortious Interference with Advantageous Business Relations
### (against all Defendants)

160. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

161. Plaintiff had enjoyed advantageous business relationships with the USAO, the SEC, the University of Miami, and numerous other individuals and entities.

162.   Plaintiff enjoyed an economic benefit from each of the aforesaid business relationships, including, but not limited to: professional recommendations; the *required* work experience needed for Plaintiff's job prospects and employability; learning and development of critical legal abilities and expertise; academic achievement and advancement; and the important formation of professional and personal relationships with countless attorneys in the employ of the USAO and SEC.

163.   Defendants had actual knowledge of all of the aforesaid business relationships.

164.   As further described hereinabove, Defendants knowingly and unlawfully interfered with each of these separate business relationships through an improper motive and improper means.

165.   Defendants acted with malice vis-à-vis Plaintiff, and their purposes were retaliatory, spiteful, malignant, and vindictive.

166.   Defendants' knowing and willful interference was the proximate cause of Plaintiff's irreparable harm.

167.   Plaintiff foreseeably lost the innumerable advantages of all of these business relationships as a direct consequence of Defendants' unlawful conduct.

168.   At all times relevant hereto, Defendants lacked any cognizable privilege to induce the said losses.

## COUNT VII
### Tortious Interference with Prospective Economic Advantages
### (against all Defendants)

169.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

170.    Plaintiff enjoyed economic and contractual relationships with the USAO and the SEC, which provided a high probability of *future* economic benefit and/or advantage to Plaintiff's professional career.

171.    Defendants had actual knowledge of the existence of the two (2) aforesaid employment relationships, together with Plaintiff's separate and highly valuable contractual relationship with the University of Miami.

172.    Defendants had actual knowledge of the fact that their actions would foreseeably interfere with the said advantageous relationships, and cause Plaintiff to lose, in whole or in part, the highly probable future economic benefits and advantages of these and other such economic relationships.

173.    Defendants acted with malice, and Defendants' purposes were retaliatory, spiteful, malignant, and vindictive.

174.    As further described hereinabove, Defendants willfully and knowingly, either directly or indirectly, intentionally interfered with the aforesaid separate business relationships through an improper motive and unlawful means.

175.    Defendants acted with the sole purpose of harming Plaintiff, and acted by means that were dishonest, unfair, unjust, and highly improper.

176.    Defendants' knowing and intentional interference was the proximate cause of Plaintiff's irreparable economic and psychological harm.

177.    Plaintiff foreseeably lost the innumerable advantages of these and countless other business and employment relationships as a direct and natural consequence of Defendants' conduct.

178.    At all times relevant hereto, Defendants lacked any privilege to induce or justify the said losses.

## COUNT VIII
### Intentional Infliction of Emotional Distress
### (against all Defendants)

179.    Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

180.    As further explained hereinabove, at all times relevant hereto, Defendants acted knowingly, intentionally, and deliberately in their unlawful actions against Plaintiff.

181.    Defendants had actual knowledge of the fact that severe emotional distress was the probable and foreseeable result of their unlawful conduct.

182.    Defendants' unlawful conduct, as described hereinabove, was extreme, outrageous, beyond the standards of decency, and utterly intolerable in a civilized society.

183.    Defendants are the direct and proximate cause of Plaintiff's psychological and significant emotional distress.

184.    Plaintiff foreseeably suffered—and continues to suffer—significant emotional distress as a result of Defendants' conduct, and was diagnosed as suffering from post-traumatic stress disorder as a direct result thereof.

185.    The emotional distress sustained by the Plaintiff was profound and severe, and of a nature that no reasonable person could be expected to endure it.

## COUNT IX
### Deceit
### (against all Defendants)

186.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

187.   As further described herein, *ante*, Defendants collectively planned and arranged the April 10, 2018 hearing in order to intimidate, threaten, and to manufacture false allegations of criminal conduct and unethical behavior against Plaintiff.

188.   In furtherance of Defendants' scheme, Defendant Moreno himself called Plaintiff on his personal cell phone number and thereupon ordered Plaintiff to appear in federal court for a civil credit card matter wherein he was unrepresented by counsel.

189.   The said misrepresentation, speciously ordering Plaintiff to appear for customary and usual court business, was deceptive, dishonest, misleading, and factually false.

190.   Through his false and deceptive misrepresentations to Plaintiff, Defendant Moreno reasonably expected to induce action or forbearance of a definite and substantial character on the part of Plaintiff.

191.   Defendant Moreno's false and deceptive misrepresentation did, in fact, induce such action and forbearance. Indeed, on April 10, 2018, Plaintiff appeared *pro se* before Defendant Moreno without an attorney being present, and without any Garrity warning and/or Kalkides warning having been provided.

192.   Plaintiff incurred severe, profound, and irreparable emotional and economic harm as a result of Defendants' deceit.

193. At all times relevant hereto, Defendants acted individually, and also in concert with and on behalf of the other Defendants herein.

194. Under well-settled principles of agency, *inter alia*, all Defendants herein are individually and jointly liable for the deceit and the irreparable harm incurred therefrom by Plaintiff.

**COUNT X**
**Invasion of Privacy—Intrusion upon Seclusion and Solitude**
**In Violation of the Common Law of the State of Florida**
**and Fla. Const. art. I, § 23**
**(against Defendants Moreno, Lehr, Greenberg, and Does 1-10)**

195. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

196. The right to privacy extends protection in certain circumstances against disclosure of personal matters. In Florida, a person's right to privacy is independently protected by its state constitution. Rasmussen v. S. Fla. Blood Serv., Inc., 500 So. 2d 533, 535 (Fla. 1987).

197. Fla. Const. art. I, § 23 affords individuals such as Plaintiff protection against the increasing collection, retention, and use of information relating to all facets of an individual's personal life. This includes the unlawful and unauthorized procurement of confidential employment records.

198. As further explained hereinabove, Moreno, Lehr, and Greenberg intentionally, willfully, and knowingly invaded Plaintiff's right to privacy of a private matter, and intruded upon Plaintiff's right to seclusion and solitude.

199. The intrusion was unlawful, unauthorized, and undertaken by Moreno, Lehr, Greenberg, and Does 1-10 without Plaintiff's express or implied consent thereto.

200.   At all times relevant hereto, Plaintiff had a reasonable expectation that his USAO employment records would be kept private.

201.   Defendants unreasonably intruded upon Plaintiff's solitude and seclusion, together with Plaintiff's right to be left alone by unlawfully obtaining the said employment records, and also through Defendants' other unlawful acts and omissions as further described hereinabove.

202.   Defendants acted without authorization, and knowingly and intentionally invaded the private affairs of Plaintiff in violation of his cognizable right to privacy.

203.   The invasion of privacy, especially the unauthorized and unlawful access of Plaintiff's confidential employment records on his personal laptop through fraud and deceit, is highly offensive and objectionable to any reasonable person.

204.   As a direct consequence of the unlawful invasion of privacy, Plaintiff foreseeably incurred substantial and irreparable harm, including, without limitation, the foreseeable mental trauma, anguish, and suffering therefrom.

205.   Defendants were the proximate cause of Plaintiff's economic and psychological harm.

206.   Defendants acted with "actual malice" and with a malignant, vindictive, and retaliatory purpose by maliciously and wantonly invading Plaintiff's right to privacy.

**COUNT XI**
**Violations of 42 U.S.C. 1985(3)**
**(against all Defendants)**

207.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

208. Plaintiff is a "citizen of the United States" and a "person" eligible for the protection of 42 U.S.C. § 1985(3).

209. Acting individually and through their agents, Defendants knowingly conspired to deprive Plaintiff of the "equal protection of the laws" and his rights under the United States Constitution.

210. As attorneys, Defendants all knew that they were violating "clearly established constitutional rights," *e.g.*, Plaintiff's right to due process of law, and to be free of unreasonable seizures.

211. Defendants entered into an agreement and/or understanding in order to unlawfully deprive Plaintiff of numerous "clearly established constitutional rights."

212. Each Defendant committed numerous overt acts in furtherance of the conspiracy.

213. The common scheme of Defendants was the proximate cause of Plaintiff's significant harm that he incurred therefrom.

214. Because Defendants knew that they were violating "clearly established constitutional rights," Defendants did not act under the cloak of any immunity, including, without limitation, absolute and qualified immunity.

215. Because Defendants violated Plaintiff's constitutional rights through the above-mentioned acts and omissions, Plaintiff is entitled to monetary and equitable relief under 42 U.S.C. § 1985(3).

## COUNT XII
### Violations of 42 U.S.C. 1986
### (against all Defendants)

216.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

217.   42 U.S.C. § 1986 provides a cause of action against anyone who, having knowledge that any of the wrongs in § 1985 that are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.

218.   Defendants all knew of the conspiracy to deprive Plaintiff of his constitutional rights within the meaning of 42 U.S.C. § 1985(3).

219.   Because each Defendant knew of the § 1985 conspiracy, and because Defendants were clearly in a position to prevent or aid in preventing the commission of the same, Defendants' failure to do so is actionable pursuant to 42 U.S.C. § 1986.

220.   As attorneys, Defendants all knew that they were violating "clearly established constitutional rights," *e.g.*, Plaintiff's right to due process of law, and to be free of unreasonable seizures.

221.   Because Defendants knew that they were violating "clearly established constitutional rights," Defendants did not act under the cloak of any immunity, including, without limitation, absolute and qualified immunity.

222.   Because Defendants failed to prevent the said § 1985 conspiracy through the above-mentioned acts and omissions, Plaintiff is entitled to monetary and equitable relief pursuant to 42 U.S.C. § 1986.

## COUNT XIII
### Civil Liability pursuant to
### Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)
### (against all Defendants)

223.  Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

224.  In Bivens, *supra*, the United States Supreme Court created a private right of action for damages against federal officers such as Defendants who are alleged to have violated a citizen's constitutional rights. See Correctional Services Corp. v. Malesko, 534 U.S. 61, 66 (2001); Bivens, 403 U.S. 388, 91 (1971).

225.  Bivens promotes a right of action under federal common law against individual federal officials when the only alternative is a Federal Tort Claims Act (hereinafter, "FTCA") claim against the United States, which the Supreme Court has held is insufficient to deter unconstitutional acts by individuals. Carlson v. Green, 446 U.S. 14, 18-23 (1980); Correctional Services Corp. v. Malesko, 534 U.S. 61, 67-68 (2001); see also 28 U.S.C. §2679(b)(2).

226.  Pursuant to same, all of the constitutional violations, as described hereinabove, give rise to cognizable and justiciable Bivens claims against each Defendant herein.

227.  At all times relevant hereto, Defendants acted under color of federal law.

228.  The said Defendants' acts and omissions violated, without limitation: the Fourth Amendment of the United States Constitution, and the right to be free from unreasonable searches and seizures; Defendants' obligation to provide a Garrity and/or Kalkines warning prior to the April 10, 2018 hearing; Defendants' obligation to provide a Loudermill hearing; Plaintiff's property rights (*viz.* the USAO and SEC employment agreements);

Plaintiff's right to petition the judiciary for redress; Plaintiff's constitutional right to privacy; Plaintiff's right to legal counsel in all criminal matters; and countless other related wrongs in violation of Plaintiff's rights under the United States Constitution.

229.   Plaintiff foreseeably incurred irreparable economic and psychological harm from all of the aforesaid constitutional violations.

## COUNT XIV
### Bivens Conspiracy
### (against all Defendants)

230.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

231.   As further described herein, *ante*, Defendants knowingly planned and entered into an agreement and understanding to violate Plaintiff's rights under the United States Constitution.

232.   Each Defendant committed numerous acts in furtherance of the conspiracy to deprive Plaintiff of numerous constitutional rights.

## COUNT XV
### Aiding and Abetting
### (against Does 1-10)

233.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

234.   Does 1-10 all had actual knowledge of the unlawful acts and omissions committed by all other Defendants against Plaintiff, as more fully described hereinabove.

235.   Does 1-10, individually and through their agents, knowingly aided, abetted, and assisted Defendants in pursuance of the scheme, and in furtherance of the unlawful conduct vis-à-vis Plaintiff.

236.   Does 1-10 knew, or had reason to know, that Plaintiff would be significantly and irreparably harmed as a result of the scheme, as a result of their material assistance in the scheme, and as a result of the unlawful conduct of Defendants.

237.   As a result of the foregoing, and as a matter of law, Does 1-10 are individually and jointly liable for all damages directly and proximately caused to Plaintiff through the unlawful conduct of Defendants.

## COUNT XVI
### Abuse of Process
### (against Defendants Moreno, Lehr, Greenberg, and Does 1-10)

238.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

239.   Acting *ultra vires* and without jurisdiction, Defendants unlawfully misused a civil proceeding for a purpose for which it is not designed.[8]

240.   Defendants misused and abused the civil credit card proceeding for an ulterior and illegitimate purpose.

241.   *Inter alia,* Defendants used a civil $1,600 credit card dispute to discuss Plaintiff's confidential—and wholly unrelated—employment matters.

---

[8] Courts have consistently held that a non-party to the underlying proceeding such as Defendants may be held liable for malicious abuse of process where the non-party was an "active participant" in the proceeding. See, e.g., Harvey v. Thi of N.M., No. 12-CV-727 MCA/LAM, 2015 U.S. Dist. LEXIS 182695 (D.N.M. Mar. 31, 2015).

242.   *Inter alia,* Defendants used a civil proceeding—wherein Plaintiff appeared alone and without counsel (as anticipated by Defendants)—in order to threaten criminal sanctions, publicly humiliate and embarrass Plaintiff, and to falsely accuse Plaintiff of criminal acts and misconduct.

243.   As a direct consequence of Defendants' abuse of process, Plaintiff foreseeably incurred profound and irreparable harm, including, without limitation, the foreseeable lost employment and professional opportunities, economic harm, loss of reputation, psychological trauma, and mental anguish.

**COUNT XVII**
**Libel *per se***
**(against all Defendants)**

244.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

245.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

246.   Defendant Lehr—acting *ultra vires* for personal purposes, without jurisdiction, and beyond the scope of her employment—willfully, knowingly, and maliciously defamed Plaintiff in writing **[EXHIBIT G]** by making factually-false allegations of criminal conduct, professional and academic incompetence, and unethical behavior against Plaintiff to the University of Miami.

247.   *In addition* to the foregoing, Defendant Moreno—acting *ultra vires* for personal purposes, without jurisdiction, and beyond the scope of his employment—willfully, knowingly, and

maliciously defamed Plaintiff in writing [**EXHIBIT E**] by making factually-false allegations of criminal conduct and unethical behavior against Plaintiff to the University of Miami.

248.  The defamatory misrepresentations were all factually false.

249.  The defamatory misrepresentations were all malevolent, vindictive, and retaliatory in nature, and were all committed for a personal and unlawful purpose.

250.  The defamatory misrepresentations were not made within the purview and/or scope of Defendants' employment in the federal government, and were not related to any of their official or professional duties.

251.  Defendants had actual knowledge of the fact that these defamatory misrepresentations would foreseeably cause substantial and irreparable harm to Plaintiff's professional reputation, and would foreseeably prevent Plaintiff from becoming a member of any state bar.

252.  Because the subject libel entailed accusations of criminal conduct, the libel is "*per se*" under the common law of the State of Florida, and Plaintiff's damages are presumed as a matter of law.

253.  Because the subject libel pertained to Plaintiff's trade and profession, the libel is "*per se*" under the common law of the State of Florida and Plaintiff's damages are presumed as a matter of law.

254.  The said libelous representations were not protected by any cloak of "qualified privilege," and Lehr acted with "actual malice" within the meaning of <u>New York Times</u> v. <u>Sullivan</u>, 376 U.S. 254 (1964) and its progeny.

255. Defendants' libel as described hereinabove was the proximate cause of all of the foreseeable harm incurred by Plaintiff.

256. At all times relevant hereto, Defendants acted on their own behalf, and also in concert with and on behalf of the other Defendants herein.

257. Under well-settled principles of agency, *inter alia*, all Defendants herein are individually and jointly liable for the libel *per se*.

### COUNT XVIII
### Republications of Libel *per se*
### (against all Defendants)

258. Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

259. Numerous "republications" of the defamatory representations originally "published" by Defendants were subsequently made by third parties.

260. Under the common law of the State of Florida, original "publishers" of defamatory representations are liable for any and all subsequent "republications" made by third parties where the republication is "reasonably foreseeable." See, e.g., Klayman v. Judicial Watch, Inc., 22 F. Supp. 3d 1240, 1251 (S.D. Fla. 2014) (Altonaga, J.)

261. Collectively, all of the "republications" of the defamatory representations made by third parties were "reasonably foreseeable" to Defendants, *i.e.*, the original "publishers" of the representations.

262. Plaintiff was foreseeably harmed as a result of the numerous defamatory "republications."

## COUNT XIX
**Breach of Fiduciary Duty**
**(against Defendant Lehr)**

263.   Plaintiff restates and re-avers all of the foregoing paragraphs, and hereby incorporates them by reference as if fully restated herein.

264.   At all times relevant hereto, Defendant Lehr was a licensed attorney in the State of Washington practicing law in the State of Florida.

265.   On April 10, 2018, immediately after the subject hearing, Defendant Lehr knowingly offered Plaintiff legal advice on how to address the issues relating to the said hearing. This legal advice included, without limitation: which persons Plaintiff should speak with and confide in about the Moreno hearing; advising Plaintiff to order a copy of the hearing transcript for Defendant Lehr to review on his behalf; advising Plaintiff to discuss the Moreno matter with Greenberg alone (as opposed to the Human Resources department) while she was present; requesting that Plaintiff confide in her in connection with the serious allegations and legal issues presented; and other related legal advice.

266.   At all times relevant hereto, Lehr knew that her advice to Plaintiff was legal in nature, and that it related directly to matters which occurred in a civil action in federal court—*i.e.*, a legal proceeding.

267.   By providing the foregoing legal advice, Lehr sought to have Plaintiff confide in her, and to provide her with confidential information which she would later use against him.

268.   By providing Plaintiff legal advice, Lehr knowingly created a conflict of interest. As evidenced by Lehr's conduct during the events in question, Lehr's personal interests were

directly contrary Plaintiff's legal interests, and were not aligned with any of Plaintiff's interests.

269. By assisting Moreno and Greenberg while *simultaneously* providing Plaintiff legal advice, Lehr had actual knowledge of the fact that Plaintiff's interests were contrary to the interests of Moreno and Greenberg—a fact which created yet another conflict of interest for Lehr.

270. By providing Plaintiff legal advice, Lehr's willful and knowing conduct gave rise to an implied-in-law fiduciary duty vis-à-vis Plaintiff.

271. As further explained herein, *ante*, all of Lehr's acts and omissions violated the implied-in-law fiduciary duty.

272. By way of example only, after Plaintiff had shown Lehr in confidence a copy of the April 10, 2018 hearing transcript—a document which she had instructed Plaintiff to order and obtain for her to "review"—Lehr unlawfully, unethically, and maliciously forwarded *all* of Plaintiff's confidential correspondence, email attachments, a copy of the hearing transcript, and other related documents to various AUSAs within the Miami USAO. See, e.g., **EXHIBIT I** (forwarding a copy of Plaintiff's email correspondence to federal prosecutors in a retaliatory and misguided effort seeking to have them "take action" against Plaintiff, and to initiate a *mala fide* criminal investigation and/or criminal prosecution against him).

273. Florida courts have consistently recognized "a cause of action for breach of fiduciary duty in different contexts when a fiduciary has allegedly disclosed confidential information to a third party." Gracey v. Eaker, 837 So. 2d 348, 353 (Fla. 2002).

274.  In addition to the foregoing, Lehr knew and/or reasonably anticipated that Plaintiff would foreseeably rely on her legal advice.

275.  Plaintiff did indeed reasonably rely on the legal advice provided to him by Lehr.

276.  Lehr's unethical and egregious breaches of her fiduciary duties as an attorney were the "but for" cause of Plaintiff's harm.


## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all claims, issues, and questions of fact so triable.


## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Honorable Court:

(i)   Enter judgment in favor of Plaintiff and against Defendants on all counts herein;

(ii)  Issue a mandatory injunction and order permanently barring and enjoining Defendants from *further* engaging in such unlawful conduct;

(iii) Grant declaratory relief against Defendants for all of the unlawful acts and omissions as described herein;

(iv)  Award Plaintiff all available damages sustained as a result of Defendants' unlawful conduct pursuant to all counts herein, including, but not limited to:

(a)  monetary compensation for Plaintiff's unemployment and inability to become a member of the bar resulting from Defendants' unlawful conduct and defamatory misrepresentations;

  (b) monetary compensation vis-à-vis all lost future earnings and/or future economic benefits;

  (c) monetary compensation for all past losses, together with ongoing losses;

  (d) monetary compensation for Plaintiff's loss of professional, social, personal, and academic reputations; and

  (e) damages for Plaintiff's medically-diagnosed post-traumatic stress disorder ("PTSD"), mental anguish, emotional distress, humiliation, depression, embarrassment, stress, anxiety, loss of self-esteem, loss of self-confidence, loss of personal dignity, emotional pain and suffering, and all other related physical or mental injuries;

(v) Award consequential damages in an amount to be determined at trial;

(vi) Award expectancy damages in an amount to be determined at trial;

(vii) Award punitive damages against Defendants as permitted pursuant to <u>Bivens</u>, *inter alia*, in an amount to be determined at trial;

(viii) Award Plaintiff treble damages as required pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1964(a), (c) in an amount to be determined at the time of trial;

(ix) Award Plaintiff attorneys' fees, costs, and pre- and post-judgment interest; and

(x) Grant such further relief as this Court may deem just and proper.

At Cambridge, Massachusetts,
This 3rd Day of August, 2020

Respectfully submitted,

_____

JONATHAN MULLANE
30 Donnell Street
Cambridge, MA 02138
Tel.: (617) 800-6925
j.mullane@icloud.com

## **VERIFICATION**

COMMONWEALTH OF MASSACHUSETTS,   )        ss.
COUNTY OF MIDDLESEX.                              )

  I, JONATHAN MULLANE, under oath, do hereby affirm and state that I have reviewed the within filing, and, based upon my own personal knowledge, hereby verify and affirm that the allegations contained therein are true and accurate, and hereby certify that no material facts have been omitted therefrom.
  SUBSCRIBED AND SWORN TO under the pains and penalties of perjury under the laws of the United States of America this 3rd Day of August, 2020.

_____

JONATHAN MULLANE

# EXHIBIT A

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

SOUTHERN DISTRICT *of* FLORIDA

U.S. Attorneys » Southern District of Florida » News

**Department of Justice**

U.S. Attorney's Office

Southern District of Florida

FOR IMMEDIATE RELEASE

Wednesday, July 25, 2018

## Two Members of Billion-Dollar Venezuelan Money Laundering Scheme Arrested

Two alleged participants in a billion-dollar international scheme to launder funds embezzled from Venezuelan state-owned oil company PDVSA using Miami, Florida real estate and sophisticated false-investment schemes were arrested yesterday and today.

U.S. Attorney Benjamin Greenberg of the Southern District of Florida, Assistant Attorney General Brian A. Benczkowski of the Justice Department's Criminal Division, and Special Agent in Charge Mark Selby of U.S. Immigration and Customs Enforcement's Homeland Security Investigations' (HSI) Miami Field Office made the announcement.

**Matthias Krull**, 44, a German national and Panamanian resident, and **Gustavo Adolfo Hernandez Frieri**, 45, a Colombian national and naturalized U.S. citizen, were charged in a criminal complaint with conspiracy to commit money laundering. The complaint also charged **Francisco Convit Guruceaga**, 40; **Jose Vincente Amparan Croquer, aka, "Chente,"** 44; **Carmelo Urdaneta Aqui**, 44; and **Abraham Eduardo Ortega**, 51, all Venezuelan nationals; and **Hugo Andre Ramalho Gois**, 39, a Portuguese national, and **Marcelo Federico Gutierrez Acosta y Lara**, 40, a Uruguayan national, for their alleged participation in the scheme. These defendants remain at large. Krull was arrested last night in Miami and had his initial court appearance earlier today before U.S. Magistrate Judge Alicia M. Otazo-Reyes in Miami. Krull is scheduled to have a pre-trial detention hearing on July 30, and a preliminary hearing on Aug. 8. Frieri was arrested today in Sicily, Italy and faces extradition proceedings.

According to the criminal complaint, the conspiracy in this case allegedly began in December 2014 with a currency exchange scheme that was designed to embezzle around $600 million from PDVSA, obtained through bribery and fraud, and the defendants' efforts to launder a portion of the proceeds of that scheme. By May 2015, the conspiracy had allegedly doubled in amount to $1.2 billion embezzled from PDVSA. PDVSA is Venezuela's primary source of income and foreign currency (namely, U.S. Dollars and Euros).

The complaint alleges that surrounding and supporting these false-investment laundering schemes are complicit money managers, brokerage firms, banks and real estate investment firms in the United States and elsewhere, operating as a network of professional money launderers.

The alleged conspirators include former PDVSA officials, professional third-party money launderers, and members of the Venezuelan elite, sometimes known as "boliburgués."

The charges contained in the complaint are merely allegations and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

This case is the result of the ongoing efforts by the Organized Crime Drug Enforcement Task Force (OCDETF) "Operation Money Flight," a partnership between and among federal, state and local law enforcement agencies.  The OCDETF mission is to identify, investigate and prosecute high-level members of drug trafficking enterprises, bringing together the combined expertise and unique abilities of federal, state and local law enforcement.

Mr. Greenberg and Mr. Benczkowski commended the investigative efforts of HSI Miami, HSI London, HSI Rome and HSI Madrid in this matter.  The case is being prosecuted by Assistant U.S. Attorney Francisco R. Maderal of the Southern District of Florida's International Narcotics and Money Laundering Section and Assistant Chief David Johnson of the Criminal Division's Fraud Section.

The Criminal Division's Office of International Affairs provided substantial assistance in this matter and U.S. Customs and Border Protection, the National Crime Agency of the United Kingdom and  Italian, Spanish and Maltese law enforcement authorities provided assistance. The Fraud Section is responsible for investigating and prosecuting all FCPA matters.  Additional information about the Justice Department's FCPA enforcement efforts can be found at www.justice.gov/criminal/fraud/fcpa.

Related court documents and information can be found on the website of the District Court for the Southern District of Florida at www.flsd.uscourts.gov or on http://pacer.flsd.uscourts.gov.

**Component(s):**
USAO - Florida, Southern

Updated July 25, 2018

# EXHIBIT B

Query    Reports    Utilities    Help    Log Out

CLOSED

# U.S. District Court
## Southern District of Florida (Miami)
### CRIMINAL DOCKET FOR CASE #: 1:15-cr-20840-MGC All Defendants

Case title: USA v. Acherman et al

Date Filed: 10/29/2015
Date Terminated: 03/20/2017

Assigned to: Judge Marcia G. Cooke

## Defendant (1)

**Martin Lustgarten Acherman**
07680-104
*TERMINATED: 12/14/2015*

represented by **E. Peter Mullane**
Email: peter@3mlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Nathan Philip Diamond**
Nathan P. Diamond, P.A.
888 Biscayne Boulevard
Suite 501
Miami, FL 33132
305-371-5300
Fax: 305-371-6966
Email: attydiamon@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

## Pending Counts

8:1325A.F IMPROPER ENTRY BY
ALIEN
(1ss)

## Disposition

PRIOR JUDGMENT: Credit for Time
Served. No supervised release to follow.
AMENDED: 1 Day Credit for Time Served.
No supervised release to follow.

## Highest Offense Level (Opening)

Felony

## Terminated Counts

18 U.S.C. § 1956(h) - Money Laundering
Conspiracy
(1)

18 U.S.C. § 1512(k) - Conspiracy to

## Disposition

Dismissed by AUSA.

Dismissed by AUSA.

# EXHIBIT C

| | |
|---|---|
| **From:** | Jonathan Mullane |
| **To:** | Lehr, Alison (USAFLS) |
| **Subject:** | Discussion today |
| **Date:** | Tuesday, February 20, 2018 6:24:25 PM |

Hi Alison,

Upon further reflection of our discussion today, I would like to request that I not be assigned any further work from Adrienne. While I certainly welcome any and all feedback from her, just as I welcome feedback from everyone else at the office (both positive and negative feedback), to be frank, I will not tolerate any comments from her or anyone else regarding my physical appearance. Not only did I find her comments to me this past Wednesday highly disrespectful, they were inappropriate and unprofessional. I did not appreciate her comment that my face looked "weird," nor did I appreciate her stating that I was "staring" at her when I was simply trying to figure out what she needed from me. She may very well think that I "think too fast," or that I am somehow impolite because I stop her to let her know that I'm struggling to follow her—nothing justifies an *ad hominem* attack between colleagues in such circumstances.

I am fully cognizant of my unique personality. However, I make every effort to treat each and every person I encounter with respect—from the cafeteria employees, to those who are in a position of authority. While I am certainly prone to *faux pas*, as you know, they are never made intentionally or maliciously.

As you know, I take a lot of pride in my work, and I work and study hard seven days a week. I truly enjoy helping others, adding value in the few ways I can, and contributing to the U.S. Attorney's Office. However, that being said, my self-respect is not something I am willing to give up for an unpaid internship.

I would like to emphasize that I have no interest in causing any problems for either you or your colleagues. Up until this past Wednesday, I genuinely enjoyed working with the Office, as it is certainly an invaluable learning opportunity for me. That being said, if the foregoing request cannot be granted, please let me know so that I can set up a meeting with the US Attorney and with the University of Miami in order to discuss my work environment.

Thank you,

Jonathan

---

Jonathan Mullane

Tel.: +1 (817) 800-6925 | j.mullane@icloud.com

*This e-mail message and any attachments are confidential and may be privileged. Emails transmitted or received shall neither constitute acceptance of conducting transactions via electronic means nor shall create a binding contract in the absence of a fully signed written agreement.*

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
### CASE NUMBER 18-20596-CV-MORENO

JONATHAN MULLANE,

        Plaintiff,            **Courtroom 13-3**

  vs.                      **Miami, Florida**

BARCLAYS BANK DELAWARE, INC.,     **April 10, 2018**

        Defendant.

---

## MISCELLANEOUS HEARING
### BEFORE THE HONORABLE FEDERICO A. MORENO
### UNITED STATES DISTRICT JUDGE

---

**APPEARANCES:**

**FOR THE PLAINTIFF:**     **JONATHAN MULLANE (PRO SE)**
                              1100 S. Miami Avenue
                              #2806
                              Miami, Florida 33130

                                       617-800-6925

**FOR THE DEFENDANT:**     **YOLANDA P. STRADER, ESQ.**
                              Carlton Fields Jorden Burt, P.A.
                              100 Southeast Second Street
                              Suite 4200
                              Miami, Florida 33131

                                     305-539-7332
                               Fax: 305-530-0055

**REPORTED BY:**              **GILDA PASTOR-HERNANDEZ, RPR, FPR**
                              Official United States Court Reporter
                              Wilkie D. Ferguson Jr. US Courthouse
                              400 North Miami Avenue - Suite 13-3
                              Miami, Florida  33128   305.523.5118
                              gphofficialreporter@gmail.com

2

1                          **TABLE OF CONTENTS**

2                                                              Page

3

4
    Reporter's Certificate .................................. 29
5

6

7

8

9                            **EXHIBITS**

10   Exhibits                  Marked for           Received
                             Identification      in Evidence
11
     Description               Page    Line     Page    Line
12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (The following proceedings were held at 9:21 a.m.)

 2          THE COURT:  Mullane versus Barclays Bank Delaware,

 3  Civil Docket Case Number 18-20596.  The plaintiff.

 4          MR. MULLANE:  Plaintiff.

 5          THE COURT:  Come over here to the lectern.  Defendant.

 6          MS. STRADER:  Yes, Your Honor, good morning.

 7          THE COURT:  Grab that other microphone, so you're all

 8  even.  There are two microphones.  No, defendant there.

 9  Plaintiff at the lectern.  Who's here for the plaintiff?  Who's

10  here for the plaintiff?

11          MR. MULLANE:  I am, Your Honor.

12          THE COURT:  What is your name?

13          MR. MULLANE:  Jonathan Mullane.

14          THE COURT:  Okay.  You're representing yourself.

15          MR. MULLANE:  I am.

16          THE COURT:  You're a law student.

17          MR. MULLANE:  I am.

18          THE COURT:  Okay.  Who's here for the defense.

19          MS. STRADER:  Good morning, Your Honor.  Yolanda

20  Strader with Carlton Fields on behalf of the defendant, Barclays

21  Bank Delaware.

22          THE COURT:  Okay.  Let me tell you why I brought you

23  here.  I know you have a hearing before Magistrate Judge Louis

24  on this case which is a case, obviously since it's an '18 case,

25  that's fairly young.  It was removed on February 15th, less than

4

1  two months ago; and then Mr. Mullane, you filed an emergency

2  motion, you filed an Amended Complaint, you filed a Judicial

3  Notice.  You're playing lawyer, huh?  You filed a Motion for

4  Clerks Entry of Default, Motion for Judgment on the Pleadings,

5  Second Motion for Judicial Notice and then a Motion for Leave to

6  Appeal, which I don't understand.

7          MR. MULLANE:  Your Honor, I believe that was the

8  defendant who filed the request, the two requests for judicial

9  notice.

10         MS. STRADER:  That's correct, Your Honor.

11         THE COURT:  Don't talk to each other.  Talk to me.

12         You're smiling, and you have no idea what's going to

13  happen to you.  All right?  And that's why I'm here to tell you.

14  Because back on March 23rd you came to my chambers.  It was the

15  Friday before the Ultra concerts, so I let almost everyone go,

16  but my career law clerk, Mariela Martinez-Cid was there,

17  opposing counsel was not there and you came into chambers.

18         Are you an intern at the United States Attorney's

19  Office?

20         MR. MULLANE:  It's my last week, correct.

21         THE COURT:  It is your last week.  It will be your last

22  week and you'll never be able to work at the U.S. Attorney's

23  again, it would be my hope, because I spoke with Mr. Greenberg

24  at the United States Attorney's Office about your outrageous

25  conduct, and I wanted to give you a chance to explain.

1          You walked in through the hallway and you told my
2    career law clerk, Mariela Martinez-Cid, that you worked at the
3    U.S. Attorney's Office, right?
4          MR. MULLANE:  I did.
5          THE COURT:  Which is true but has nothing to do with
6    this case.
7          MR. MULLANE:  Correct.
8          THE COURT:  So you had an ex-parte conversation with my
9    clerk about this case, did you not?
10          MR. MULLANE:  She asked me --
11          THE COURT:  No, no.  She went out and sought you, or
12    you went into my chambers?
13          MR. MULLANE:  I went into your chambers because --
14          THE COURT:  You went into my chambers and identified
15    yourself as working for the United States Attorney's Office,
16    which is routinely done because a lot of people, assistant
17    United States attorneys come in.  They have to drop off things
18    like wiretap applications, all things that can legally be done
19    ex parte, but you have a civil case, which you, yourself, filed.
20    So you're the party, and you came into the judge's chambers
21    without your opponent, right?
22          MR. MULLANE:  Correct.
23          THE COURT:  And you identified yourself as working for
24    the U.S. Attorney's Office --
25          MR. MULLANE:  Not with respect --

1          THE COURT:  -- when this has nothing to do with the

2    United States Attorney, does it?

3          MR. MULLANE:  Correct.

4          THE COURT:  That's outrageous.  That is so wrong that

5    now the United States Attorney has to conduct an investigation

6    on this, because you identified yourself as working for the

7    United States Attorney on a personal case.

8          MR. MULLANE:  No, with respect -- I disagree.  I never

9    said that this was --

10         THE COURT:  Well, you're going to have to deal with

11   your supervisor, and you are going to have to deal with The

12   Florida Bar eventually for this outrageous conduct.  It is

13   absolutely outrageous and you have no idea what you did which

14   shows total lack of judgment.

15         MR. MULLANE:  Your Honor, with all due respect, I made

16   it very clear that this was a personal matter and this had

17   absolutely  nothing to do with --

18         THE COURT:  How dare you go into a judge's chambers

19   without your opponent and try to conduct ex-parte communication?

20   Why would you do that?

21         MR. MULLANE:  I went -- may I explain myself?

22         THE COURT:  You better explain yourself, because I may

23   have a rule to show cause why you shouldn't be held in contempt,

24   and then you're going to need a real lawyer.

25         MR. MULLANE:  I went to the 8th floor, to the Clerk's

1  Office.  I had a question and I was directed towards --

2          THE COURT:  Who directed you?

3          MR. MULLANE:  The gentleman who sits at the --

4          THE COURT:  He said go to the judge's chambers?

5          MR. MULLANE:  Yes.

6          THE COURT:  Ty, go downstairs to the Clerk's Office at

7  the 8th floor, find out who that man is.  You identify him.

8  Take Mr. Mullane.

9          MR. MULLANE:  No problem.

10         THE COURT:  I'll wait for you and bring in that person.

11         MR. MULLANE:  Not a problem.

12         THE COURT:  Would you know his name?

13         MR. MULLANE:  Not at all.

14         THE COURT:  What did he look like, black or white?

15         MR. MULLANE:  White.

16         THE COURT:  How old?

17         MR. MULLANE:  Middle aged.

18         THE COURT:  And what did you tell him?

19         MR. MULLANE:  I said that I had a specific question

20  about the entry of default, and he said you better speak with

21  the clerk or some particular person.  I don't understand the

22  difference between -- like I said, I'm a law student.  I don't

23  understand.  I didn't realize that there are all these separate

24  clerks for the Clerk of Court.

25         THE COURT:  And he said, go talk to the judge in

1  chambers?

2      MR. MULLANE:  Yes, Your Honor.

3      THE COURT:  He said, go talk to the judge in chambers?

4      MR. MULLANE:  No, he didn't --

5      THE COURT:  So I'm going to have a hearing.  If that

6  deputy clerk comes here and denies that, I'm going to find one

7  of you two committed perjury.  So now you tell me whether that

8  clerk of court said to you, go up.  I'm a middle-aged deputy

9  clerk and I always tell all the people who come to the Clerk's

10  Office, don't bother me, go talk to the judge, because I don't

11  believe that.  I'm going to give you the opportunity to

12  cross-examine him on that.

13      MR. MULLANE:  Your Honor, with all due respect --

14      THE COURT:  Skip the "all due respect," because you

15  have shown no respect by coming to chambers on a case and now

16  blaming someone in the Clerk's Office.

17      MR. MULLANE:  No.  Your Honor, he did not say go seek

18  Judge Moreno.  He said, go speak to Judge Moreno's clerk which

19  is who I was looking for.

20      THE COURT:  And you went into chambers because you

21  don't have a phone.  You don't have a phone.

22      MR. MULLANE:  He said go upstairs and --

23      THE COURT:  He told you go upstairs and go see the

24  judge?  You're telling me that?

25      MR. MULLANE:  No, I'm not telling you --

1    THE COURT:  Do you want me to place you under oath?

2    MR. MULLANE:  That's not what I said, Your Honor.

3    THE COURT:  Okay.

4    MR. MULLANE:  He said, go speak to Judge Moreno's

5 clerk, not Judge Moreno.

6    THE COURT:  Okay.  And you went and spoke to the clerk.

7 Do you see her over there, Mariela Martinez-Cid?  Okay.  You see

8 her?

9    MR. MULLANE:  Yes, and I also recall her --

10    THE COURT:  And what did you say to her?  She tells me

11 you said you wanted to file a petition for mandamus because I

12 haven't ruled quickly enough on something on a case that's two

13 months old which shows ignorance totally.  So you wanted her to

14 help you on a petition for mandamus which is why you filed a

15 motion in forma pauperis for appeal.  So now you're acting like

16 a prisoner pro se, not a law student.  Do you realize how stupid

17 that sounds?

18    MR. MULLANE:  If I may revisit the topic of the

19 discussion with your clerk as I was --

20    THE COURT:  She's here because I want to make sure she

21 hears what you have to say.

22    MR. MULLANE:  I have nothing to hide.  I have nothing

23 to hide.

24    THE COURT:  Do you realize what trouble you're in?  Do

25 you realize it or not?  I know you've had experience in

1   Massachusetts, but do you realize what's happening here or not?

2   Do you think you should seek your own lawyer or not?

3            I know you filed a motion in forma pauperis because

4   you're a pauper.  Are you a law student at the University of

5   Miami?

6            MR. MULLANE:  Yes, I am.

7            THE COURT:  You're on full tuition I take it.

8            MR. MULLANE:  My parents pay.

9            THE COURT:  Okay.  And you don't drive a car.

10           MR. MULLANE:  I do not drive a car.  I took the train.

11           THE COURT:  How did you get here today?

12           MR. MULLANE:  Train, Metrorail.

13           THE COURT:  Okay.  Do you pay rent?

14           MR. MULLANE:  My parents pay.

15           THE COURT:  Your parents pay.  And so you dare file --

16   Your parents pay, support you.  Where did you go to college?

17           MR. MULLANE:  I went to a public institution.  I

18   studied in Switzerland.

19           THE COURT:  Okay.  Well, that doesn't sound like a

20   pauper to me.

21           MR. MULLANE:  I paid a thousand dollars a year for my

22   tuition.

23           THE COURT:  Wonderful.  And so you want me to consider

24   you in forma pauperis like the prisoners who represent

25   themselves, who are in jail, who don't have a penny to their

1  name.  Do you realize how stupid that is, do you, in addition to

2  probably being dishonest because they don't even have a suit

3  like you have and they don't have the parents who pay for rent?

4       Are you understanding what's going on and what you've

5  done or not, or you're not realizing it?

6       MR. MULLANE:  With all due respect, I did not lie to

7  your clerk when she opened the door.

8       THE COURT:  I didn't say you lied.  I said, you've

9  committed something wrong by coming into the judge's chambers,

10  identifying yourself as working for the U.S. Attorney's Office

11  and then telling her it's your own private case.  And she asked

12  you to leave, did she not?

13       MR. MULLANE:  And I left.

14       THE COURT:  And you left.

15       MR. MULLANE:  And she referred me back to the --

16       THE COURT:  And did you tell your opponent about your

17  conversation with the judge's chambers about petition for

18  mandamus?

19       MR. MULLANE:  There was no --

20       THE COURT:  Did you converse three weeks ago with your

21  opponent about the fact that you came here to chambers and spoke

22  with the career law clerk of the judge on your case?

23       MR. MULLANE:  With all due respect --

24       THE COURT:  Did you do that --

25       MR. MULLANE:  No.

1          THE COURT:  -- with all due respect?

2          MR. MULLANE:  No.

3          THE COURT:  Which mean you had an ex-parte

4  communication with my clerk and you don't even notify your

5  opponent.  Do you realize how wrong that is?

6          What if your opponent had come in?  What would you say

7  about that?  Do you think that would have been fair?

8          MR. MULLANE:  If she was looking for directions to --

9          THE COURT:  Directions to appeal the judge?  You want

10 her to say, listen, how can I rule for you?  Well, let me have

11 my law clerk help you get a ruling.  Do you realize how

12 ridiculous that is?

13         MR. MULLANE:  That's not what I was seeking.

14         THE COURT:  Did you mention the word petition for

15 mandamus?

16         MR. MULLANE:  I said I --

17         THE COURT:  Did you mention those words?

18         MR. MULLANE:  I did.

19         THE COURT:  Okay.  Do you know what a mandamus is?

20         MR. MULLANE:  Vaguely.

21         THE COURT:  Then you shouldn't even be doing this,

22 because you're getting into trouble.  You don't even understand.

23         Mandamus is to mandate, it's to tell the Court of

24 Appeals that this judge needs to be told to do something,

25 because he's sitting on his butt and not doing anything which

1   can be done.   Some prisoners do it if a judge sits on a motion

2   for months or years.

3          This case is not even two months old.   So putting aside

4   the ridiculousness of wanting to petition for mandamus -- which

5   we would expect from a prisoner pro se, okay, but not from

6   someone who wants to be a lawyer, who may never be a lawyer

7   because of what you did in this case.   That's how serious this

8   is.

9          You go to tell the judge's law clerk, help me to see

10  how I can file a petition of mandamus because there's a default

11  that I want you to enter against the opponent who incidentally

12  has filed a Motion to Dismiss which, of course, means a judge

13  can't issue a default when there's a pending Motion to Dismiss,

14  but putting aside the substantive ridiculousness of this, is the

15  fact that you are not recognizing the misconduct that you have

16  committed by coming into chambers and thinking this is no big

17  deal.

18         Do you understand now why I'm having this hearing?   The

19  magistrate is going to have a hearing on whatever was pending.

20  This case has been around for how long?

21         MR. MULLANE:   Since the end of January I believe.

22         THE COURT:   Do you understand how ridiculous it is for

23  you to ask for a quick ruling on something?   Do you understand

24  that there's a pending Motion to Dismiss?

25         MR. MULLANE:   I do understand.

1    THE COURT:  Do you understand that in a case in
2  Massachusetts you supposedly accused someone of ex-parte
3  conduct?  Did you do that?
4    MR. MULLANE:  My attorney did, yes.
5    THE COURT:  Your attorney.  What's his name?
6    MR. MULLANE:  It's my father, Peter Mullane.
7    THE COURT:  Look at that, the father who's paying for
8  you to go to law school.  So that means you know what ex parte
9  is though you probably misunderstood in Massachusetts, and here,
10  you're committing it yourself.  All right?
11    So I told the United States Attorney.  He called me on
12  something else.  I was going to wait till after today, and I
13  told him what happened.  He's flabbergasted.  He said, you mean
14  someone went into your chambers and said he works for the United
15  States Attorney's Office as an intern and it was another case?
16  You can't even do that if you get a traffic ticket and say, oh,
17  I'm going to United States Attorney's Office.  That requires an
18  investigation.  Do you realize that?
19    MR. MULLANE:  I understand.
20    THE COURT:  Did you understand before?
21    MR. MULLANE:  I understand that I stated to your clerk
22  that I was there on a personal matter and that I was looking to
23  speak with someone.
24    THE COURT:  And you didn't mention the U.S. Attorney?
25    MR. MULLANE:  Excuse me?

1    THE COURT:  Did you mention the U.S. Attorney?

2    MR. MULLANE:  She had asked me --

3    THE COURT:  Did you mention the U.S. Attorney?

4    MR. MULLANE:  Yes, I did mention the words U.S.

5    Attorney.

6    THE COURT:  You cannot do that.  That's why you're in

7    trouble.

8    Forget about the default, forget about the petition for

9    mandamus, forget about this case, forget about what you're

10    asking for.  I'm not getting into that, because it's a case that

11    is a month and a half old, two months, forget about that.  And

12    by the way, I doubt if there are too many judges in the country

13    who rule faster than I do, but you wouldn't know because you're,

14    what, a first-year law student.  So that doesn't matter to me.

15    It's kind of a joke.  Sometimes I rule too quickly but forget

16    about that.

17    It's the fact that you used the privilege that you have

18    being an intern or extern, whatever the word is, to work at the

19    United States Attorney's Office, that's the biggest no-no that

20    you can do.  Do you realize that or not?

21    MR. MULLANE:  I realize that I answered your clerk's

22    question honestly.

23    THE COURT:  Because she said, who are you.

24    MR. MULLANE:  Yes and I said --

25    THE COURT:  And you should have said, I'm the plaintiff

1    in this case.

2          MR. MULLANE:  I said, I don't understand your question.

3    That's what I originally stated.

4          THE COURT:  And then what happened?

5          MR. MULLANE:  Then she said, but who do you work for?

6    And I said -- I'm still very confused, and she insisted; who are

7    you with, who are you with?  And I said, well, I work for the

8    U.S. Attorney --

9          THE COURT:  That's the mistake.

10         MR. MULLANE:  -- but I'm here on a personal matter.

11         THE COURT:  What does the United States Attorney have

12   to do with this case?

13         MR. MULLANE:  I have no idea.  That's why I kept asking

14   her, I don't understand your question.

15         THE COURT:  Instead of backpedaling like you are now,

16   you should have said, I'm the plaintiff in this case,

17   18-20596-Civil, because that's who you are.

18         MR. MULLANE:  Correct.

19         THE COURT:  That's why you were coming to chambers.

20         MR. MULLANE:  Correct, and I stated that.

21         THE COURT:  And she would have said, I can't let you in

22   because I wouldn't let the other side in, even if she is a

23   Harvard law school graduate with 35 years experience.

24         I don't know if you went to Harvard or not, but you

25   definitely do not have 35 years experience --

1     MS. STRADER:  No, Your Honor, that's correct.

2     THE COURT:  -- based on my observation.

3     It has nothing to do with the U.S. Attorney.

4     MR. MULLANE:  Correct.

5     THE COURT:  You cannot mention the U.S. Attorney when a

6  cop stops you on a red light.  Do you understand that or not, or

7  not?

8     MR. MULLANE:  I now understand.

9     THE COURT:  Well, you should have understood before.

10  How old are you?

11     MR. MULLANE:  I'm 29.

12     THE COURT:  You should understand at 29 years old that

13  you cannot mention the U.S. Attorney in order to get some

14  advantage --

15     MR. MULLANE:  I wasn't trying --

16     THE COURT:  -- even in response to a question.

17     MR. MULLANE:  I was not trying to get any advantage.

18     THE COURT:  You would not have been allowed in.  Do you

19  understand that?

20     MR. MULLANE:  I did not know that, Your Honor.

21     THE COURT:  How can you not know that when your father

22  is a lawyer, filed something accusing someone of ex-parte

23  communication in your case?  How can you not know that, which I

24  understand was a ridiculous accusation in a closed case

25  involving a clerk and a judge?  But putting that aside, how can

1  you claim ignorance like if you were a high school dropout in a

2  prison like many pro se defendants?  You're not that kind of a

3  pro se, right?  Are you?

4          MR. MULLANE:  No, Your Honor.

5          THE COURT:  What do you want to say?

6          MR. MULLANE:  I apologize for the misunderstanding.  I

7  made no attempt to --

8          THE COURT:  It's not a misunderstanding.  It's gross

9  and absolute misconduct and what you're going to have to do now

10  is -- who's your supervisor?  Michelle Alvarez?  You don't even

11  have a supervisor?

12          MR. MULLANE:  Alison Lehr.

13          THE COURT:  Okay.  That's who you've got to see.  It's

14  going all the way up the chain and you're going to have to

15  explain yourself and it's up to them to decide what they should

16  do to you.

17          Do you understand how serious this is?  Do you?  You're

18  shaking your head.

19          MR. MULLANE:  I now understand, yes.

20          THE COURT:  How could you not understand before?

21          MR. MULLANE:  Because the simple --

22          THE COURT:  Do you think everybody walks into a judge's

23  chambers in Federal court?  You know most judges have that

24  outside door locked.  I have it open to make it easier, but this

25  door is locked, and the reason it's locked is because we don't

Miscellaneous Hearing

19

1   just have people coming in and saying, hey, let me talk to you

2   about my case, so you can talk to the judge.

3          Do you realize how wrong that is, to go into a judge's

4   chambers by yourself and talk about your case?

5          MR. MULLANE:  I wasn't trying to enter your chambers,

6   Your Honor.  I was trying to speak with your --

7          THE COURT:  Oh, what, someone forced you?

8          MR. MULLANE:  Your Honor, I was trying to speak with

9   your clerk to whom I was directed by the person on the 8th

10  floor.

11         THE COURT:  Okay.  Do you want me to bring in that

12  person on the 8th floor, so that the hole gets dug deeper?

13         MR. MULLANE:  No problem.  I've said nothing -- I've

14  said everything as it happened.

15         THE COURT:  Do you want me to bring him up?

16         MR. MULLANE:  No problem.  I've done --

17         THE COURT:  Because it may cost him the job if he told

18  someone, go to the judge's chambers, that's what I tell every

19  pro se litigant.

20         MR. MULLANE:  That's what I was told.  I have no reason

21  to lie.

22         THE COURT:  He told you to go to chambers?

23         MR. MULLANE:  Your Honor, I have no reason to lie.

24         THE COURT:  You do have a reason to lie.

25         MR. MULLANE:  What is that?

1       THE COURT:  The reason to lie -- right now you should
2   be scared.  That's when most people start lying.  You're
3   obviously not scared.  If you're not scared, it means you're not
4   recognizing how wrong you've been.  If you don't recognize how
5   wrong you've been, it shows a total lack of judgment which means
6   you probably cannot be a lawyer, let alone someone working at
7   the U.S. Attorney's Office.  Do you understand that?
8       MR. MULLANE:  I understand.
9       THE COURT:  And you're shifting the blame.  Well, I
10  only said I was working at the U.S. Attorney's Office because
11  your clerk, in order to let me in, said, who are you?  Instead
12  of saying, I'm the plaintiff, because see, if you had said, I'm
13  the plaintiff, what do you think she would have said to you?
14      MR. MULLANE:  I have no idea, Your Honor.
15      THE COURT:  By now, 9:40, you still have no idea --
16      MR. MULLANE:  No, I understand.
17      THE COURT:  -- of what she would have told you?  What
18  do you think she would have told you?
19      MR. MULLANE:  Based on this hearing, I presume she
20  would have directed me to someone else with my question.
21      THE COURT:  She would have said, file whatever you want
22  in writing with notice to the other side, which, by the way,
23  considering this case is two months old and we've got Docket
24  Entry 31, you know how to do that, because you have filed stuff.
25  That way you don't have a communication with a judge without the

1  other side, just like I cannot have a communication with your

2  opponent without you.  How would that make you feel if I had a

3  communication with your opponent without you?  Tell me how that

4  would make you feel.

5      MR. MULLANE:  If it was regarding substantive issues of

6  the case, it would make me very unhappy.

7      THE COURT:  You're right.  It would have been wrong,

8  right?

9      MR. MULLANE:  If it was regarding --

10      THE COURT:  And what else would you be talking to a

11  clerk about?

12      MR. MULLANE:  If it was regarding what time a hearing

13  takes place.

14      THE COURT:  Oh, you mean, the hearings weren't notified

15  in writing?  Things are not done in writing in Federal court?

16      MR. MULLANE:  With all due respect, Your Honor --

17      THE COURT:  Everything is with due respect.

18      MR. MULLANE:  With all due respect, Your Honor, you

19  called my personal phone yesterday, you left a voicemail on my

20  phone.

21      THE COURT:  Do you know why?

22      MR. MULLANE:  Yes, I do know why --

23      THE COURT:  Because as a pro se plaintiff, you do not

24  get the automatic email notices --

25      MR. MULLANE:  I understand.

1          THE COURT:  -- and thus, because you do not get the

2     email notices and I realized, you know what, he doesn't even

3     have notice of this, I did call to let you know and then I had

4     my other clerk in charge of this case email you --

5          MR. MULLANE:  And I appreciate it.

6          THE COURT:  -- in writing.

7          It wasn't to talk to you about the case.  It was to

8     notify you and that's the judge notifying you.  You do not call

9     judges, you do not call law clerks, you do everything in

10    writing.  You don't even go to the 8th floor, because the person

11    in the 8th floor cannot help you.

12         MR. MULLANE:  I see.  I was not aware of that.

13         THE COURT:  How can you not be aware of it?  Okay?  And

14    if you're not aware of it, talk to a lawyer, because you know

15    the old saying?  "He who represents himself" -- can you fill in

16    the rest? -- "has a fool for a client."  Have you ever heard of

17    that?  And that's what you have.

18         Now, normally, the people who want to represent

19    themselves are thrice convicted prisoners who have no money and

20    who have little hope of winning.  Those are usually the people

21    who do that, not people who have a lifetime ahead of themselves,

22    and now you're going to have to fix this mess for yourself,

23    forget about this case.  I don't even know or care what the case

24    is about, because it's one of 202 cases that I have which is the

25    second lowest caseload, I just wanted to tell you.  We all get

1  the same cases, but some of us work harder and faster, okay?

2  But I don't care about this case, and you know what my piece of

3  advice to you is?  You shouldn't care about this case either.

4  What should you care about?

5          MR. MULLANE:  My career.

6          THE COURT:  You got it and your reputation.  All of a

7  sudden, that should be more important than playing lawyer

8  because when you play lawyer, you make mistakes.  If you're pro

9  se, even a fellow who's out, he doesn't care, he's not paying

10  for a lawyer.  He has nothing and we have to bend over backwards

11  for pro se people.  We have to say, well, no, don't you

12  understand and I would have taken a different -- we wouldn't

13  even be having a hearing.

14          I would have let my new magistrate judge who's much

15  more patient than I am, much nicer, and she's new at the job, so

16  she's looking forward to resolving all these issues and she will

17  do that.  Okay?  But you, you've got a career.  You're a what,

18  first-year law student?

19          MR. MULLANE:  Second year, Your Honor.

20          THE COURT:  Second-year law student.  So you're in such

21  a heap of trouble now with the U.S. Attorney, with me, with the

22  law school's internship program.  It's just a big mess that

23  you've made.  Do you understand that?

24          MR. MULLANE:  I understand, Your Honor.

25          THE COURT:  I'm not going to hold you in contempt and

1    I'm not going to do anything on this case until the magistrate
2    and I'm not telling you to dismiss it, though that would be a
3    good idea from a personal standpoint, but for me, it's a nothing
4    case for me.  Do you understand that?
5            What's the case about?  I don't even know.  What's the
6    case about?
7            MR. MULLANE:  My credit score.
8            THE COURT:  Look at that.  Can you imagine?  Your
9    credit score.  You need your honesty score, your reputation,
10   that is much more important than your credit score.  Don't you
11   understand that, and that's what you need to reflect on.
12           Now, I've told Judge Louis that you all were going to
13   be late, so you don't have to worry about it.  I scheduled this
14   at 9:00.  I wasn't even going to come in today until later;
15   because you had a 9:30 hearing, that's why I scheduled this
16   which is why I called your number and left a message --
17           MR. MULLANE:  Thank you.
18           THE COURT:  -- myself.
19           Okay?  I would never talk about the case with anybody,
20   but see, once you come in and use the word like mandamus, you're
21   talking substance.  Do you understand?
22           MR. MULLANE:  My question pertained to filing.
23           THE COURT:  And what answer can you expect?
24           MR. MULLANE:  I was told to go down to the 8th floor
25   and that's what I did.

1          THE COURT:  Later, after you left chambers, you went

2    down to the 8th floor.

3          MR. MULLANE:  Yes.

4          THE COURT:  And what did you do?

5          MR. MULLANE:  And the gentleman will confirm that.

6          THE COURT:  No, I believe you.

7          MR. MULLANE:  And then he called his supervisor.

8          THE COURT:  Imagine all of that calling, to do what?

9          MR. MULLANE:  Very nice African-American woman came and

10   she spoke with me about my question and then the following

11   day --

12         THE COURT:  What did she say?

13         MR. MULLANE:  She said, I'll have to give you a phone

14   call, and I said, okay, thank you.

15         THE COURT:  They can't give you legal advice.

16         MR. MULLANE:  It wasn't -- okay.

17         THE COURT:  What was the question?

18         MR. MULLANE:  I can't remember exactly.  It was about

19   how to file the mandamus request or something.

20         THE COURT:  Look at that.  Mandamus is Latin.

21         MR. MULLANE:  Not to write it.

22         THE COURT:  You know, the people in the Clerk's Office

23   are magnificent.  They're wonderful people.  Latin is not their

24   forte, because we don't teach Latin anymore, which is probably a

25   good thing.  We've got enough problems learning English and

1   perhaps other languages, let alone Latin.  Okay?

2           If you don't know what you're doing, a clerk is not

3   supposed to help you.  That's why you need a lawyer to file a

4   case.  If you don't have the money to hire a lawyer, then maybe

5   you shouldn't be spending so much of your parent's money on law

6   school.  If it's a good enough case to file, you should get a

7   lawyer.  If it's not a good enough case, you shouldn't be

8   practicing law without a license.  Because that's also, though

9   it's your own case, also dumb, isn't it?  Because I don't know

10  what other judges would have done with this.  Some probably

11  would have been harsher in tone than I am, some would have been

12  mellower, to tell you the truth, but I just want you to

13  recognize.

14          MR. MULLANE:  I do and I apologize, Your Honor.

15          THE COURT:  Do you really?  Do you really?  I'm not

16  sure.

17          MR. MULLANE:  Yes.

18          THE COURT:  Because even in response to the email, you

19  even put an exclamation mark.  You were excited to come here to

20  court and I didn't want you to be excited.  I want you to be

21  remorseful and understand what's going on.

22          I don't want to hear anything from defense counsel.  I

23  just couldn't have a conversation with your opponent without

24  you, and I'll let you all decide what you want to do.  So you

25  can walk over now.  I'll call Judge Louis.  You can walk over

1    now.

2         Do you know where her chambers are and her courtroom?

3         MR. MULLANE:  I do not.

4         THE COURT:  It's in the penthouse of the Atkins

5    building I think.  It's Judge Atkins' -- Right, is that where it

6    is?

7         MS. STRADER:  Your Honor, I'm happy to walk over with

8    him to make sure.

9         THE COURT:  Walk over with him.  You can talk about

10   this case if you want.  You can do whatever you want about the

11   case.  I'm not telling you what to do with the case, and now,

12   see, what's going to happen is the U.S. Attorney is going to ask

13   my career law clerk what happened through somebody else and

14   she's going to be -- you know, I don't think there's any dispute

15   of what happened in chambers, but then what you have to do is --

16   you're going to go to the U.S. Attorney's Office today?

17        MR. MULLANE:  Most likely, yes, this afternoon.

18        THE COURT:  Oh, absolutely you should, and you should

19   come in and talk and say, this is what happened to me in front

20   of Judge Moreno today.  I really screwed up.  Let me tell you

21   what happened.  All right.  Because if you don't do that, it's

22   going to be worse, but you do whatever you want.

23        Where did you go to college?

24        MR. MULLANE:  In Europe.

25        THE COURT:  In Europe.  In Europe they do everything in

1   writing.  You don't even go to court most of the time.

2          MR. MULLANE:  I did not study law in Europe, Your

3   Honor.

4          THE COURT:  I know, but I'm just telling you so you

5   learn something from today, and in Federal court, we do almost

6   everything in writing.  In State court, people walk in and out

7   of judges' chambers, and perhaps when people get too loose,

8   that's why some judges even went to jail in my days when I was a

9   State judge.

10          So we're very careful about not having -- and even

11  though they're elected officials, and they know the lawyers on

12  both sides, it's always uncomfortable.  We have to be friendly

13  to both sides, especially a State judge because they run for

14  office but never discuss the case.  Petition for mandamus is

15  talking about the case.  Default is talking about the case, and

16  that's why you can't even cross that line --

17          MR. MULLANE:  I see.

18          THE COURT:  -- even in State court if you graduate from

19  law school.  Do you understand?

20          MR. MULLANE:  (Nodding.)

21          THE COURT:  Do everything in writing and always

22  conferring with your opponent, and then even if you mess up

23  because you're young and inexperienced, at least there won't be

24  any bad faith attributed.  It will just be a dumb thing to do as

25  opposed to a dishonest thing.

1        MR. MULLANE:  Yes, Your Honor.

2        THE COURT:  Okay.  This is a sermon.

3        MR. MULLANE:  Yes.

4        THE COURT:  You can count it for Saturday or Sunday,

5   whatever you practice.

6        Okay.  Go ahead see Judge Louis.  Good luck to you.

7   You'll need it.

8        MS. STRADER:  Thank you, Your Honor.

9        MR. MULLANE:  Thank you.

10        THE COURT:  Sorry I made you come.

11        (The hearing was concluded at 9:53 a.m.)

12

13                  C E R T I F I C A T E

14        I hereby certify that the foregoing is an accurate

15   transcription of proceedings in the above-entitled matter.

16

17   __04-13-18_____          _____
           DATE
18                              GILDA PASTOR-HERNANDEZ, RPR, FPR
                                Official United States Court Reporter
19                              Wilkie D. Ferguson Jr. U.S. Courthouse
                                400 North Miami Avenue, Suite 13-3
20                              Miami, Florida  33128    305.523.5118
                                gphofficialreporter@gmail.com
21

22

23

24

25

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CHAMBERS OF
FEDERICO A. MORENO
U.S. DISTRICT JUDGE
UNITED STATES COURTHOUSE
THIRTEENTH FLOOR
400 NORTH MIAMI AVENUE
MIAMI, FLORIDA 33128

April 19, 2018

Sajani Desai
Assistant Director and Externship Program Manager
University of Miami School of Law
1311 Miller Drive, Office A111B
Miami, Florida 33146

Re:   Jonathan Mullane

Dear Ms. Desai,

Enclosed please find materials filed in the case *Jonathan Mullane v. Barclay's Bank of Delaware, Inc.*, Case No. 18-20596-CIV-SCOLA (formerly MORENO) and also an article on Law 360 with quotes attributed to student Jonathan Mullane. Although the law suit was dismissed by Mr. Mullane, the Court is <u>still</u> concerned with the allegations made in paragraph 16 of the "Plaintiff's Verified Motions for Recusal for Cause." In that paragraph, Mr. Mullane stated: "Given Plaintiff's personal appearance at the time in question, and the simple fact that he was 'dressed for the beach,' no reasonable person could possibly conclude that a young man wearing yellow shorts and flip-flops was conducting official business on behalf of the U.S. Attorney's Office or the United States government." If you desire to view the videos of Mr. Mullane entering the Courthouse, as well as chambers, on March 23, 2018, they are available to confirm that he was properly dressed with long pants, a coat, and a tie.

I leave it to the University of Miami School of Law to decide if any other action is necessary for this blatant mistatement in a "verified pleading."

Sincerely,

Federico A. Moreno
UNITED STATES DISTRICT JUDGE

c:

Jonathan Mullane
1100 S. Miami Avenue, #2806
Miami, FL 33130

# EXHIBIT F

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 18-20596-CIV-MORENO**

JONATHAN MULLANE,

        Plaintiff,

vs.

BARCLAYS BANK OF DELAWARE, INC.,

        Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S VERIFIED MOTION FOR RECUSAL

THIS CAUSE came before the Court upon Plaintiff's Verified Motion for Recusal (**D.E. 39**), filed on **April 13, 2018**. THE COURT has considered the motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is

**ADJUDGED** that the motion is GRANTED. The undersigned Judge, to whom the cause was assigned, recuses himself and refers this cause to the Clerk of Court for reassignment pursuant to 28 U.S.C. § 455 and Local Rule 3.6.

In granting the motion, the undersigned judge is troubled by the lack of truthfulness of a future member of the bar. For example, the motion states that the Plaintiff, a second-year law student and an intern at the United States Attorney's Office was "wearing shorts and flip-flops" on the day that he entered chambers to inquire as to how he could file a "petition for mandamus" because the Court had not ruled on a motion for default.[1] However, according to the log of attendance at the United States Attorney's Office, Plaintiff reported that he worked from 11:00 AM to 5:00 PM on the day in question, Friday, March 23, the date that chambers was short-

---

[1] A motion to dismiss was filed, precluding any default in this eight-week-old case that was referred to Magistrate Judge Louis.

staffed due to traffic because of the Ultra concert in Miami. The Court will ask the United States Marshall to retrieve the surveillance tapes of the building and chambers from that date to see if in fact the Plaintiff was "in shorts and flip-flops," or was dressed as someone working at the U.S. Attorney's Office.

The undersigned judge did set a hearing to strongly advise the Plaintiff that his reputation was more important than the case because he interned at the United States Attorney's office and will be seeking admission to the Florida Bar. The undersigned judge continues to be concerned with the law student's lack of awareness of what ex-parte communications are and the importance of candor by litigants, particularly future lawyers.

Because of these concerns, the Court will grant the Plaintiff's motion to recuse. However, the Court reserves the right upon further investigation to refer the matter to the Florida Bar, the University of Miami School of Law, and the United States Attorney for any action they deem appropriate.

DONE AND ORDERED in Chambers at Miami, Florida, this ___13___ of April 2018.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Magistrate Judge Lauren F. Louis

Counsel of Record

Jonathan Mullane
1100 S. Miami Avenue
#2806
Miami, FL 33130
PRO SE

# EXHIBIT G

| | |
|---|---|
| From: | Lehr, Alison (USAFLS) |
| To: | sdesai@law.miami.edu |
| Cc: | Hampton, Cynthia (USAFLS) |
| Subject: | Evaluation for Extern Jonathan Mullane |
| Date: | Friday, May 18, 2018 9:50:00 AM |
| Attachments: | MullaneFinalEvaloxd_1.pdf |

Sajani-

Attached, please find the Final Evaluation for Extern Jonathan Mullane. I have cc:'d our Human Resources Director, Cynthia Hampton.

Thank you.

Alison

Alison W. Lehr

Assistant United States Attorney

99 NE 4th Street – 7th Floor

Miami, Florida 33132

**(b)(6)** ▓▓▓ (o)

**(b)(6)** ▓▓▓ (f)

Alison.Lehr@usdoj.gov

UNIVERSITY OF MIAMI SCHOOL OF LAW
CAREER DEVELOPMENT OFFICE

SPRING 2018 EXTERNSHIP PROGRAM – EXTERN'S FINAL EVALUATION FORM

Student Name:  Jonathan Mullane

Supervising Attorney:  Alison W. Lehr, Assistant United States Attorney

Date: 5/9/2018

1. **Please summarize the work the student performed.**
   Mr. Mullane was assigned a variety of research and writing projects in the asset forfeiture field, and was tasked with observing court proceedings when not otherwise engaged in research and writing.  His assignments included:
   a. Examination of title superiority by a pawnshop in light of 853(n) considerations;
   b. Rebuttable presumption of ownership based on bare legal title;
   c. Research on money laundering and how loss amount is calculated and what impact that loss amount has on forfeiture;
   d. Vetting of attorney's fees and implications in light of 853(n) considerations, including when is a fee "earned;"
   e. Whether, under trademark infringement case law, certain items are subject to forfeiture;
   f. Motion for reconsideration and elements thereof;
   g. Implications on warrant when "key" to bitcoin is lost; and
   h. Motion to Dismiss for failure to timely file petition in ancillary proceeding.

2. **How would you evaluate the student's research, writing and analytical skills?**
   Mr. Mullane is intelligent but his research, writing and analytical skills are not on par with that of a second year law student.

3. **Please evaluate the student's oral communication skills and ability to present legal ideas and concepts, either in meetings with you or in other settings.**
   Mr. Mullane tended to focus on issues and concepts that were important to him rather than issues pertinent to the assignment at hand.  In a few assignments, including 1.e., above, he was readily able to explain the concept at issue and help the attorney reach a conclusion regarding how the case should be handled going forward.  In most of the other assignments, however, there was little oral presentation by Mr. Mullane. In one interaction, he insisted that certain information was relevant and became agitated when a seasoned attorney told him to exclude that irrelevant information from his research paradigm.

4. **Please evaluate the student's understanding of professional responsibility and confidentiality issues.**

   There do not appear to have been any issues with confidentiality. However, Mr. Mullane's understanding of professional responsibility came into question during the latter part of his externship when his candor was questioned by a federal district court judge regarding personal litigation being conducted by the intern. *See* 18-20596-CV-Moreno, Hearing Transcript 4/10/2018.

5. **Please evaluate the student's time management skills and ability to meet deadlines.**

   Mr. Mullane usually did not have hard and fast deadlines; the deadlines were generally precatory. In one instance where there was a hard deadline, Mr. Mullane was supposed to provide a written summary by the end of business on a Friday so that the attorney could review the information during the weekend and begin related work on the Monday. Mr. Mullane met with the attorney on Wednesday, did not advise the attorney that he would be away Thursday and Friday of that week and ultimately did not turn in a written summary, either on that Friday or later on.

   There was one assignment where the deadline was moved up on Mr. Mullane. He stayed late to finish as much of the research as he could. When turning the research in, however, he failed to note for the reviewing attorney that he had worked under extreme time pressure and had not had a chance to KeyCite/Shepardize. The applicable statute had changed and what he turned in needed to be re-worked.

6. **Please evaluate the student's ability to seek and use supervision effectively. Do you have any suggestions for improvement?**

   Mr. Mullane did not understand when he needed to seek guidance and was loathe to admit that he did not understand an assignment. Sometimes, even though he believed he understood the assignment, his research was not correctly focused. When and if he did reach out to the assigning attorney, typically to "report" on his findings, he was given guidance as to how to get his research on track. Mr. Mullane should make himself more ready to listen and ask questions when he does not understand. As an intermediate step, even when he thinks he understands, he should check in with the assigning attorney to make certain he is on track before performing hours of irrelevant research.

7. **Please evaluate the student's ability to be a self-directed learner and to learn from his/her mistakes and feedback. Do you have any suggestions for improvement?**

   Mr. Mullane can learn on his own. He did not demonstrate the ability to learn from his mistakes/feedback. Until Mr. Mullane finds his footing, he should make certain to check in with his assigning attorney and get "real-time" feedback on whatever project he is working on.

8. **Please evaluate the student's ability to handle case planning, investigations, hearing preparation if applicable.**
Not applicable.

9. **Please provide a summary of the student's overall performance, highlighting strengths and areas where the student needs to improve and/or focus.**
Mr. Mullane was very good about keeping me apprised of his schedule and was willing to work late, timing and supervision permitting. Mr. Mullane needs to improve on his research and writing. The few pieces of written work turned in were either case summaries or an attempt to modify a previously-written Motion to Dismiss as applied to a similar fact pattern. No substantive research memos were turned in. Forfeiture is a complex area of the law that requires the ability to perform legal research on a variety of subjects and synthesize and analyze the implications of the case law and how statutes are interpreted. It is possible to accumulate knowledge and eventually demonstrate mastery. Mr. Mullane should try to be more willing to learn from people who have more experience than he does.

10. **Please provide any additional information that you think would be helpful as part of the extern's evaluation.**
Nothing further.

Signature: _Alain W Lehr_

Date: _5/18/2018_

EOUSA-2019-000488-00737

# EXHIBIT H

Case 1:19-cv-12379-DJC   Document 28-2   Filed 07/10/20   Page 61 of 100

*Mullane v. Department of Justice, et al., Civil Action No.: 1:19-cv-12379*

*EOUSA Vaughn Index*

| BATES NUMBER | DESCRIPTION | EXEMPTION |
|---|---|---|
| | | personal privacy," when not outweighed by a countervailing public interest.

This document contains an email address of private individuals and/or government employees acting in their official capacity, the disclosure of which could reasonably be expected to "constitute an unwarranted invasion of personal privacy." Disclosure of this information could subject him/her to harassment both in the conduct of their official duties and private life. The individuals' substantial privacy interests outweigh any purported public interest in disclosure in these circumstances. |
| 01819 | Email from AUSA Alison Lehr to Extern-Plaintiff thanking him for providing his final timesheet. | Released in Part

Exemption (b)(6) – Personal Privacy

Exemption 6 is asserted to protect from disclosure any information that could "constitute an unwarranted invasion of personal privacy," when not outweighed by a countervailing public interest. |
| 01987 – 02066 | Email forwarded from AUSA Alison Lehr's USAO email address to her personal email address. | This document contains direct telephone and facsimile numbers of private individuals and/or government employees acting in their official capacity, the disclosure of which could reasonably be expected to "constitute an unwarranted invasion of personal privacy." Disclosure of this information could subject him/her to harassment both in the conduct of their official duties and private life. The individuals' substantial privacy interests outweigh any purported public interest in disclosure in these circumstances.

Released in Part

Exemption (b)(6) – Personal Privacy |

# EXHIBIT I

| | |
|---|---|
| **From:** | Sheehan, Evelyn B. (USAFLS) |
| **To:** | Lehr, Alison (USAFLS) |
| **Cc:** | Alvarez, Michelle (USAFLS); Medetis, Maria (USAFLS) |
| **Subject:** | Re: Hearing transcript |
| **Date:** | Tuesday, April 17, 2018 7:19:29 PM |

Wow. Thanks for update.

On Apr 17, 2018, at 5:48 PM, Lehr, Alison (USAFLS) <ALehr@usa.doj.gov> wrote:

> Greetings-
> I just received this and am passing it along for your consideration and action, as may be necessary. Jonathan references speaking with the dean of the law school.
> Alison
>
> **From:** Jonathan Mullane <j.mullane@icloud.com>
> **Sent:** Tuesday, April 17, 2018 5:42 PM
> **To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
> **Subject:** Hearing transcript
> Hi Alison,
> Attached is a copy of the Moreno hearing transcript. I think you may find it interesting. It seems hard to imagine that a clerk would provide substantive help to an AUSA with writing a motion to appeal her own employer's ruling, even if that person truly was from the US Attorney's Office. If one were to believe Judge Moreno's theory, the divide between the judiciary and the government is only illusory.
> Unfortunately, because of these unfounded allegations, I have made the difficult decision not to apply to the Florida Bar. Based on my discussion of this subject with the dean of my law school, it would be very difficult for me given Judge Moreno's reputation in this state.
> Regards,
> Jonathan
>
> Jonathan Mullane
> Tel.: +1 (617) 800-6925 | j.mullane@icloud.com
> *This e-mail message and any attachments are confidential and may be privileged. Emails transmitted or received shall neither constitute acceptance of conducting transactions via electronic means nor shall create a binding contract in the absence of a fully signed written agreement.*
>
> <041018am.pdf>

# EXHIBIT J

| | |
|---|---|
| **From:** | Workflow |
| **To:** | #Interim Suitability |
| **Cc:** | Nedd, Lindsey; Bethune, Tonya; Ledezma, Alexandria; Bickel, Daniel P.; Blue, Curtis |
| **Subject:** | Interim Suitability Determination – Intern |
| **Date:** | Friday, April 20, 2018 11:49:48 AM |

Based on a favorable suitability determination the following intern is eligible for access to SEC space and/or authorized technology systems:

- Mullane, Jonathan (ENF) - NTE: 6 Months
- UPN:

Notes: NO PIV

Thanks,

Personnel Security Operations
U.S. Securities and Exchange Commission
Personnelsecurity@sec.gov

# EXHIBIT K

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF
HUMAN RESOURCES

May 3, 2018

Jonathan Mullane
1100 S. Miami Ave, Apt 2806
Miami, FL 33130

Dear Mr. Mullane:

This letter rescinds the U.S. Securities and Exchange Commission (SEC) initial invitation to participate in the Student Honors Program in the Miami Regional Office as a Student Honors Volunteer. The SEC previously sent you an invitation, dated February 28, 2018. It explained that, prior to confirming this volunteer opportunity, the SEC must perform certain clearances, including completing a satisfactory pre-appointment check and inquiry into your background, training, and suitability for the position.

Based upon our review, the SEC has decided to rescind your initial invitation, effective immediately.  I regret that you will not be joining the SEC's team at this time.

Sincerely,

Stephen Brown
Assistant Director
Talent Acquisition Group
Office of Human Resources

# EXHIBIT L

| | |
|---|---|
| **From:** | Roberts, Lisa T. |
| **To:** | Petty, Kai |
| **Cc:** | Nedd, Lindsey; Goizueta-Mendes, Ivette L.; Bustillo, Eric I. |
| **Subject:** | Summer Legal Intern - Jonathan Mullane |
| **Date:** | Thursday, April 26, 2018 2:32:37 PM |
| **Attachments:** | CourtLink_Document_US-DIS-FLSD_1_18cv20596_Idx_1613654_4.26.2018_111853933.pdf |
| | CourtLink_Document_US-DIS-FLSD_1_18cv20596_Idx_1613654_4.26.2018_111854105.pdf |
| | CourtLink_Document_US-DIS-FLSD_1_18cv20596_Idx_1613654_4.26.2018_111854245.pdf |
| | CourtLink_Document_US-DIS-FLSD_1_18cv20596_Idx_1613654_4.26.2018_111854370.pdf |
| | CourtLink_Document_US-DIS-FLSD_1_18cv20596_Idx_1613654_4.26.2018_111854495.pdf |
| | CourtLink_Document_US-DIS-FLSD_1_18cv20596_Idx_1613654_4.26.2018_111854635.pdf |
| | Transcript.pdf |
| | image001.png |

---

Hi Kai:

I left you a voice mail message earlier today. Attached are some documents with respect to MIRO Summer Legal Intern Jonathan Mullane. I would like to discuss these documents with you next week. I am not sure who else to copy on this e-mail. Please note transcript and recusal order which are attached.

Thank you.

Lisa Roberts

**Lisa T. Roberts**
**Chief, Attorney Advisor**
**U.S. Securities and Exchange Commission**
**Miami Regional Office**
**801 Brickell Avenue, Suite 1800**
**Miami, Florida 33131**
█████ *(direct dial)*

**www.sec.gov**

*B. Jonathan Mullane*

---

## VIA FIRST CLASS MAIL

August 3, 2020

Clerk of Court
United States District Court
400 North Miami Avenue
8th Floor
Miami, FL 33128

**Re:**   **Jonathan Mullane** v. **Alison W. Lehr et al.**, **1:20-CV-21339-AKK**

Dear Madam/Sir:

Please find enclosed herewith the following filings in the above-styled cause:

(i)    Plaintiff's "Stipulated Motion for Leave to File a Second Amended Complaint," together with **EXHIBIT 1** thereto as the proposed complaint; and

(ii)   Certificate of Service Dated August 3, 2020.

Kindly file same in your usual manner using **color** scanning only.

Many thanks in advance for your assistance and consideration in this matter, all of which is greatly appreciated.

Very respectfully yours,

/s/ Jonathan Mullane

Enclosures (2)

cc:    Counsel of record