IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Jonathan Mullane,　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　)　　Docket No. 1:20-cv-21339
　　　　　　　　　　　　　　　　　　　　)
Federico A. Moreno, et al.,　　　　　　　　)
　　　　Defendants.　　　　　　　　　　　)

FILED BY ___ D.C.

JAN 0 5 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**AFFIDAVIT OF E. PETER MULLANE, ESQ.
IN SUPPORT OF PLAINTIFF'S FORTHCOMING
MOTION TO AMEND COMPLAINT**

I, E. PETER MULLANE, ESQ., the undersigned affiant, being under oath, do hereby depose and state as follows:

1. I am a duly licensed attorney having been admitted to the Massachusetts state bar in 1968, and remain active in the full-time practice together with other attorneys having a law office since 1984 in Cambridge, Massachusetts.

2. I remain in good standing to practice in all state courts within the Commonwealth of Massachusetts, the United States District Court for the District of Massachusetts, and the Supreme Court of the United States.

3. The genesis of the relevant and now extensive litigation history involving my son Jonathan Mullane (hereinafter, "Jonathan") and the United States government first began on or about April 1, 2015.  That was the date of the return of a certain indictment in the United States District Court for the District of Massachusetts. One of the named defendants was defendant Martin Lustgarten Acherman, a Venezuelan and Austrian citizen (hereinafter, "Martin" or "Mr. Lustgarten"), who became my client.

4. A brief (and mostly) accurate summary of Mr. Lustgarten can be found in the attached *Phoenix News* article (**EXHIBIT 1**). Therein, *inter alia*, it announces Martin's "unanticipated," "untimely," and abrupt death while being in good health under suspicious and highly unusual circumstances.

5. While the said article presents an excellent summary of the general character of Martin, it misstates the fact that he died in the United States. In reality, Martin

was found dead in Madrid, Spain. At that point in time, he had no known health concerns whatsoever - let alone fatal ones which could have potentially resulted in his premature death.  Martin had very recently moved from Miami, Florida, and had permanently relocated to the European Union and Kingdom of Spain due to recent increasing threats on his life and physical safety.

6.   Martin had had his life threatened on numerous occasions in recent years, particularly following his being publicly outed in the media (*Miami Herald, etc.*) for having cooperated with the United States government and being an extremely valuable and highly prolific CI.  Martin's unquantifiable value to the government was indeed significant in terms of his: (a) first-hand information; (b) possession of incriminating and embarrassing documentation pertaining to high-ranking members of the government of Nicolas Maduro in the Bolivarian Republic of Venezuela, including *inter alia* certain ongoing business dealings with the Islamic Republic of Iran; and (c) his testimonial evidentiary value concerning PDVSA and other matters.

7.   Objectively, Martin was true genius in most every respect of his life.  This included his activities in the digital and financial worlds, including that of being highly organized, a computer hacker extraordinaire, *etc.*

8.   Without limitation, Martin possessed a treasure trove of valuable banking information which was of high interest to the United States government. Much of the information and documentation he obtained through hacking the computers of private banks located within the Swiss Confederation, together with countless other sources of first-hand information.  Martin had also hacked into the personal computer files of many of these high-value Venezuelan targets of the government connected to the Maduro regime. This documentary evidence and computer files included material and relevant bank account records from Switzerland, Hong Kong, Austria, Andora, Saint Vincent, Panama, and other jurisdictions.

9.   My professional involvement in representing Martin as a client first began in early April 2015.  I was retained as counsel to represent him relating to a certain indictment **(EXHIBIT 2)** brought against him and others here in Boston.  Initially

this case was assigned to United States District Judge Leo T. Sorokin and Magistrate Judge Judith G. Dein.

10. However, Martin was initially arrested on this indictment in Miami while visiting his in-laws and daughters (who were present in the United States as students). He was the owner of a condominium unit there as well. Therefore, Martin's initial detention hearing was held in the United States District Court in Miami, Florida.

11. At that initial detention hearing held in April 2015, the government was represented of record by former AUSA Cristina M. Moreno **(EXHIBIT 3)**, as accurately noted on the docket sheet. She is the daughter of Judge Federico A. Moreno. During this same period of time Judge Moreno's wife was a practicing attorney engaged in a private practice in Miami. Upon information and belief, both Judge Moreno and his wife were born and for the early period of their lives lived and were educated in Caracas, Venezuela.

12. For the purpose of this initial detention hearing in Miami, Martin was represented by local counsel Nathan Diamond, Esq. The government was successful in having Martin held without bail primarily based upon the fact he was both a Venezuelan and Austrian citizen, and Venezuela does not have an extradition treaty with the United States.

13. Over the following seven months following the initial detention hearing and Martin's removal to Boston, we became acrimoniously engaged with the government attorneys in defending this criminal case **(EXHIBIT 4)**. These encounters involved many court appearances, and many contested filings heard before Magistrate Judge Dein and Judge Sorokin.

14. These contentious and unfriendly encounters and communications with the government prosecutors took place almost daily. This case was apparently of such great importance to Main Justice that AUSAs from both the Boston and Washington offices were involved in, and attended, each and every court hearing throughout this prosecutorial process.

15. The many defense filings submitted by us on behalf of Martin included allegations of serious *Brady* violations by the AUSAs, ethical violations, prosecutorial misconduct, *etc*.

16. Frustratingly, our consistent and numerous requests for a speedy trial were always met with the standard "excusable delay" response by the court, despite Martin being detained without bail. The DOJ counsel always claimed that they were not ready for trial as they were still awaiting responses to their MLAT requests from various countries.

17. I expressed my concern that the government appeared to have intercepted privileged attorney-client communications. For instance, at Martin's first appearance and detention hearing in Boston, the government produced certain WhatsApp text communications which it had obtained *prior* to Martin's arrest and the seizure of his iPhone.

18. It was later brought to my attention that a classified NSA SIGINT targeting memorandum (**EXHIBIT 5**; cf. **EXHIBIT 27**) proved that the government had been, without limitation, intercepting both privileged and non-privileged communications of individuals such as Martin who were alleged to have been connected to Petróleos de Venezuela, S.A. (PDVSA), the Venezuelan state-owned oil company.

19. At all times relevant to Jonathan's internship the government was investigating (and later sanctioning) PDVSA, and it continues to do so to date.

20. Further, the above-referenced NSA SIGINT memorandum is additionally relevant since, as correctly noted therein, the government was also investigating alleged business dealings between PDVSA and the Islamic Republic of Iran. Compare id. at 3 ¶ 4 (specifically referencing PDVSA's alleged connections with Iran); with **EXHIBIT 6** at 5 (Martin's WhatsApp messages discussing *inter alia* his cooperation with the government's investigations relating to Iranian nationals, all of which was used by the government at Martin's initial detention hearing); cf. **EXHIBIT 7**.

21. Martin's case became increasingly contentious between defense counsel and the AUSAs over discovery, bail requests, prosecutorial misconduct, speedy trial violations and other such issues. The proceeding noticeably became an unpleasant one for Judge Sorokin. Therefore, as defense counsel had

4

requested, Judge Sorokin entered an order on November 10, 2015, transferring the entire case back to the Southern District of Florida.

22. There were many months of almost daily communications with the AUSAs, including during our numerous court appearances before Magistrate Judge Dein and Judge Sorokin. Consistently throughout these communications and interactions the AUSAs from Main Justice in Washington would discuss the topic of plea deals.  However, there was always the precondition that Martin would agree to (falsely) admit that the arbitrage of currency derived from PDVSA he allegedly was involved with included "drug trafficking money from Colombia and Venezuela."

23. Martin first became as CI for the government as early as 2012. This was the result of his being investigated for alleged involvement with a similar arbitrage/money laundering scheme (Rosemont) that resulted in the indictment of Rama K. Vyasulu (United States District Court for the District of Massachusetts, Docket No. 1:09-cr-10081).  Thereafter, as part of this cooperation arrangement the DEA had arranged for Martin him to travel to Bogota, Colombia, with the intent of his meeting with alleged cartel leaders and drug traffickers to elicit evidence to support a factual connection between the Colombian cocaine trade and the Maduro regime in Venezuela.  According to subsequent media reports, this same issue indeed remains a political reality today from the same current administration that was in office during Jonathan's 2018 law student internship and appearance before Judge Moreno.

24. Martin also stated to me that, on another occasion during this same period of time, the government had wired him up to meet in a certain restaurant with an Iranian businessman seeking to elicit additional information as to the extent of the political, financial and military involvement of Iran in the affairs of Venezuela.

25. From Martin's perspective and experiences, any facts or admissions concerning his involvement with laundering money involving drug proceeds were patently false. In fact, there was never any evidence whatsoever produced in discovery by the government to support such a fiction, specifically including his involvement with the Maduro regime or Venezuelan military in drug trafficking.

26. Consequently, I appropriately and ethically was consistent in advising Martin not to agree to any such plea deal scheme involving false testimony. At all times relevant hereto, I was crystal clear and adamant in all my communications to Martin and to the government that he not engage in their perjury scheme under any circumstances - no matter what plea deal was being offered. Even from the outset, it was always my professional opinion that this was a highly triable case, and certainly the lack of any substantive discovery being produced by the government confirmed my optimism in this regard.

27. Specifically, the government's plea offers required Martin to agree to admit that at least some of the money that he was allegedly laundering was derived from "drug proceeds" allegedly provided by certain Venezuelan targets of the United States government. The government also stated on numerous occasions that it was additionally interested in whatever knowledge Martin had regarding any Iranian financial, military and/or political involvement in Venezuela. However, it was the laundering of drug money for the targeted Venezuelan elites connected to the Maduro regime that appeared to be their main preoccupation and focus during most all of our communications.

28. Martin steadfastly denied to me any involvement with drug dealers from any country, and therefore appropriately stated that he refused to participate in the suggested perjury scheme requested by the government to admit otherwise – regardless of the consequences to himself and the prospects of a trial.

29. The limited discovery evidence produced by the government was consistent with Martin's representations to me, and corroborated his assertion that all of the monies (over $4.5 billion U.S. Dollars) that Martin had allegedly been arbitraging (Bolivars/U.S. Dollars) came directly from monies that had been misappropriated directly by certain high level individuals from the oil revenues of Petróleos de Venezuela, S.A. (PDVSA) – the Venezuelan national oil company.

30. For many years and still to date, PDVSA alone has accounted for approximately 85% of all annual revenues received by the Venezuelan government. The enormous misappropriation of these revenues takes place annually with the implied consent and direct involvement of the government, and such

misappropriation in the billions of dollars appears to have continued at all times relevant hereto and apparently remains unabated through the present date.

31. Martin's criminal case was transferred to Miami as noted and was assigned to Judge Marcia Cooke **(EXHIBIT 8)**, who unfortunately is now deceased.   During our very first appearance before Judge Cooke, she asked her clerk in open court to provide her with Judge Sorokin's telephone number so she could talk to him about what had been going on with this case in Boston. She stated that she could not understand how any court could hold someone without bail for so long and not afford him a speedy trial - which of course we had consistently been requesting since day one.  Judge Cooke humorously remarked in open court that she was not sure what planet and rules the United States District Court in Boston operates under, but in Miami, a trial date is set within seventy (70) days at the time of original arraignment for anyone held without bail.

32. Further, Judge Cooke admonished all the AUSAs in attendance that, with respect to MLATs, the time for the government to obtain and gather evidence needed to prosecute a criminal case is *before* an indictment, not after.  Consequently, on that first day appearing before Judge Cooke, over the objections of the government, she appropriately set a trial date in early December - being approximately two (2) weeks from our first appearance in Miami.

33. However, the day before I traveled to Miami for this trial, Attorney Diamond and I received a telephone call from a Washington DOJ attorney from the Main Justice office.  We had never heard of, nor ever dealt with in any capacity, this DOJ attorney at any prior time during this case.  He stated that he and another Main Justice attorney in Washington wanted to meet with us for an early breakfast in the morning before court.  The meeting was scheduled to take place at 8:00 a.m. in the courthouse cafeteria in Miami.

34. Accordingly, we met in the morning with both of these senior Main Justice attorneys as arranged.  They began the conversation by once again insisting and demanding that Martin cooperate and testify about laundering *drug* proceeds (rather than PDVSA oil proceeds) on behalf of certain undisclosed Venezuelan targets.  We gave them the same response that we had given to all of the AUSAs

involved: that this false testimony was not going to happen, and for the simple reason was that it was factually untrue.

35. At the end of our early breakfast meeting, the two DOJ attorneys surprisingly informed us that the government did not want this case to go to trial. They further stated that they were going to instruct the trial AUSAs to move to dismiss the indictment that same morning. Thereafter, the dismissal was begrudgingly requested by the AUSAs in attendance. The dismissal was duly entered by the court on this same day as requested by the government.

36. It was obvious to all that the AUSAs and the DEA agents who had been involved in preparing this case for trial were visibly upset by this last-minute intervention from Washington. It was understandable that from their perspective after all of their work and trial preparation this was unwelcome and uninvited interference from Washington at the eleventh hour before trial.

37. There had been significant media coverage since it was also viewed as a high-profile political case involving the Venezuelan government. The highly publicized news appearing in the local and national media concerning the dismissal of this case was therefore immediate. This case especially generated great interest as Miami enjoys a large Venezuelan population. This included Judge Moreno, his wife, and of course his daughter Cristina M. Moreno (former AUSA) who was directly and personally involved in prosecuting Martin (**EXHIBIT 3**).

38. The media portrayed this dismissal by the court as being a publicly embarrassing defeat for the Department of Justice. One such example of this public criticism in the national media critical of the government's competence is clearly demonstrated in the attached *VICE* article (**EXHIBIT 9** at 5).

39. These negative media articles were widely circulated within the government and the United States Attorney's Office. Indeed, a copy of this same *VICE* article was again circulated during Jonathan's internship within the same USAO forfeiture department that had been directly involved as a matter of record in Martin's case.

40. On this particular occasion, the email circulation was intentional and specifically related to the concerns that arose regarding the presence of my son Jonathan. He was then not only serving his law student internship in that USAO, but was

serving his internship within that same USAO forfeiture department (**EXHIBIT 9**) where he had been improperly and unethically assigned to PDVSA and Venezuela-related cases.

41. This dismissal of Martin's case also meant that what had been anticipated as an easy forfeiture in excess of $4.5 billion dollars by the Miami USAO would not happen. More importantly, what had been anticipated and intended to serve as a political embarrassment to members of the Maduro regime would also never occur.  The dismissal of Martin's case was a great disappointment and embarrassment to the United States government politically, and to the forfeiture department where Jonathan had been assigned to serve as a law student intern given the loss of a significant forfeiture.

42. It was therefore unfortunate that after having all of these encounters with the DOJ and government prosecutors in Martin's case, less than two years thereafter, Jonathan found himself being a second-year law school intern in this same Miami USAO being assigned to their same forfeiture department that was still actively involved with Martin. However, this time, Martin was working as their highly prized CI.

43. Throughout Jonathan's internship in early 2018 Martin was actively engaged in highly sensitive and valuable cooperation activities with the United States government. Upon information and belief, Martin became their most highly valued and productive CI allegedly beginning sometime in 2016, and certainly including throughout all of the period of time in 2018 relevant to Jonathan's subject internship.

44. The information I had later received was that the proverbial carrot the government offered Martin to incentivize him into becoming their cooperating CI was that of U.S. permanent residency and citizenship. Sometime during 2024 he told me that he flew back to the United States to be sworn in and to receive his U.S. citizenship.

45. Martin definitely was the government's top echelon and one of the most productive and knowledgeable CIs during this period of time for the government's ongoing and extensive Venezuela-related cases. This specifically included the

period of time of Jonathan's law student internship at the Miami U.S. Attorney's Office.

46. As the *Phoenix News* article **(EXHIBIT 1)** correctly states, Martin's cooperation directly led to many successful indictments and convictions of numerous elites and high-ranking Venezuelan individuals, many of whom being within the Maduro government. Further, many were involved in varying roles and capacities going back in years to the prior Venezuelan regime of Hugo Chavez, and then from 2013 to the present being involved in similar roles and involvements with the Nicolas Maduro regime.

47. Late in the summer of 2017, while on a trip to Miami to arrange for an apartment for Jonathan to attend the University of Miami School of Law, Jonathan and I met with Martin at his invitation for lunch at a local Greek restaurant. This was the first time since the dismissal of his case in December 2015 that I had met in person with Martin. However, we always continued to maintain social telephone and email communications from time to time until shortly before his untimely and sudden death in Spain.

48. The extent and depth of Martin's cooperating activities with the United States government following the dismissal of his case were never a primary topic of our conversations and communications. I presume he correctly assumed that I would never approve of his doing so out of a genuine, objective concern for his personal safety that of his family.

49. The particular Venezuelan governmental officials and elites he had been involved with over the years were well known to be highly dangerous and quite capable of harming those who crossed their paths – especially potential informants and/or witnesses. This was a period in Venezuela when, for just $500, one could hire an assassin to murder most anyone. I do not believe that much of anything has changed in this regard today.

50. Subsequent to the dismissal of Martin's case, as unbelievable as it may seem, unknown individuals within the government irresponsibly leaked confidential information to the *Miami Herald* and other national publications that involved Martin's cooperation. See, e.g., **EXHIBITS 10-11**. These unlawful disclosures

specifically included the fact that the United States government was using Martin as a top CI in their prosecutions and ongoing investigations relating to Venezuela and PDVSA.

51. It therefore came as no surprise to me when I first learned that Martin had wisely decided to relocate to Spain for his personal safety. He had indeed been unconscionably placed at extreme personal risk due to these unlawful governmental leaks, and the irresponsible publications about his cooperation by the media.

52. Coincidentally, during this period, Jonathan had been assigned to the same forfeiture department within the Miami USAO which had many related PDVSA investigations and prosecutions going on which included Martin as their CI.

53. The targets of the United States government at this period of time involved many other of their Venezuelan targets – most all of whom were connected to PDVSA, the Maduro government, and the bankers involved in alleged money laundering activities.

54. At the time immediately following Martin's indictment being dismissed in December 2015, we had several discussions regarding his plans for the rest of his life going forward. The indictment and lengthy period of time for which he was held in detention pending trial caused, *inter alia*, a divorce from his wife of many years. Initially, he told me that he wished to remain in the United States since he already owned a condominium in Miami, and because his two daughters were college students here – one of whom was attending Boston University at the time.

55. Once again, I made it crystal clear to Martin at this time that cooperating with the United States government, as they had been consistently requesting, certainly was not a good idea for his safety and well being. It would definitely keep him in harm's way with these dangerous individuals, and perhaps even expose himself as a continuing target for a retaliatory prosecution by the government.

56. As Martin had just experienced (as well as Jonathan), the United States government can always succeed in obtaining evidence for a prosecution for whatever activities that one may or may not be engaged in for whatever ulterior,

11

political, nefarious or self-serving reasons that may be on their agenda.  So, I told Martin that any involvement with the United States government going forward will always present an unknown risk for him.

57. Martin intimated that, if given the opportunity, he may agree to do a little "innocuous cooperation" to be able to lawfully remain in the United States.  I emphasized to him once again that he should not even consider cooperating in his situation, particularly since his earlier cooperation did not protect him from being indicted a *second* time.  I reminded him that all of these financially secure Venezuelan DOJ targets he has dealt with in the past come from a country where one can easily pay to have anyone harmed or murdered, and that they have the financial means to do so.

58. Additionally, I reminded him that nobody can rely on the government to protect him 24/7, even as a CI.  I gave him examples where the government has all too often unlawfully leaked out information which they believe suits their purpose for doing so (as has been experienced by Jonathan).  As Martin discovered later on, the government did exactly that in his case.  His abrupt death at such a young age and in the best of health was likely a foreseeable consequence of this.

59. Importantly, *ab initio*, I had been extremely vocal and consistent in informing the AUSAs many times – and in no uncertain terms - that I did not want Martin cooperating with them, and for all of these same reasons I had explained to him.

60. The post-dismissal tactics of the government began when I received a telephone call from Martin within several weeks after the dismissal of his criminal case. He was upset because he just received a 30-day notice from the government to self-deport based upon the fact that he failed to renew/extend his tourist visa in effect at the time of his arrest in April 2015.

61. I agreed with him that his deportation notice was unfair and inappropriate, as it made no sense.  It patently was some kind of tactic undertaken to obtain leverage against Martin to pressure him into cooperating with the government in connection with their ongoing Venezuela cases. The obvious reason he could not renew/extend his visa was the fact he was being held without bail by the

government against his will in the Wyatt Detention Center in Rhode Island for over nine months, and therefore was in no position to do so as a practical matter.

62. I told him I would call AUSA Joseph Palazzo at Main Justice in Washington who had been one of the government prosecutors to try to get him an extension of his expired tourist visa. From my conversation with AUSA Palazzo, it was clear that he was already well aware of this unjustifiable situation requiring Martin's self-deportation. He incredulously stated that he could do nothing about it since immigration matters were handled through a separate governmental agency over which they, the DOJ, supposedly "had no control over." My advice to Martin after that conversation with AUSA Palazzo was to relocate to Europe immediately since he already had an EU Passport through his Austrian dual citizenship.

63. Martin decided not to immediately follow my advice to relocate out of the country out of his desire to remain close to his daughters. I did eventually arrange for him to meet with a Miami immigration attorney. Thereafter, I never again heard about this visa issue from either of them for several years, until I received a telephone call from him in 2024. He was calling in celebration of the fact that he had just flown to the United States from Spain to be sworn in as an American citizen. Notwithstanding the foregoing, he did finally decide to permanently relocate to Madrid with his girlfriend for all of safety reasons we had discussed.

64. Therefore, it was unambiguously clear to everyone in the DOJ who was involved in Martin's prosecution that I did not, and would not, ever advise Martin to cooperate with them in any capacity, or to remain in the United States. It was far too risky from a physical safety perspective, and these were not nice people that he would be asked to inform and testify against.

65. Despite my foregoing warnings to Martin, a read of the two attached Miami Herald newspaper articles of October 4, 2020, and August 28, 2023, respectively **(EXHIBITS 10-11)**, evidences the fact that the United States government did precisely what I had warned him about. They unlawfully and unethically engaged in the highly irresponsible and reckless leaking of confidential information thereby putting Martin at great risk. This tactic was precisely what I

had warned Martin may occur, and justified my consistent advice to him that he not become a CI.

66. Therein, these media articles specifically disclosed the fact that Martin had assisted the United States government in the investigation and prosecution of many important and prominent DOJ targets connected to the Maduro regime, including those connected to PDVSA, and many other wealthy Venezuelan targets of the DOJ.

67. These media articles also demonstrate exactly how important Martin was to the United States government during the same period of time as Jonathan's tenure as a law student intern within the forfeiture department of the Miami USAO.

68. Collectively, all of the foregoing events involving Martin, together with my successful defense of him, unfortunately turned out to be the unintended consequences and catalyst for all the malicious, unnecessary and avoidable personal and professional harm that Jonathan has experienced. He has been unconscionably victimized and irreparably harmed – professionally, emotionally, physically, and financially for the last eight years.

69. First, after the government discovered that Jonathan was my son, and that he had been improperly assigned to ongoing cases related to PDVSA and senior members of the Maduro regime, they understandably went into panic mode. They apparently feared Jonathan would eventually discover that Martin was their current number one top CI, cooperator and first-hand key witness in all those ongoing PDVSA related investigations and cases. It appears that they feared Jonathan would then relay that information to his father, *i.e.*, me, and that I would then contact Martin to once again urge him to stop his cooperation immediately. Of course, my position and advice to Martin on not cooperating was something the DOJ had been well aware of since his indictment in April 2018.

70. Second, the United States government was understandably concerned about Jonathan's improper assignment to cases related to PDVSA and Venezuela as being a conflict of interest. Jonathan, being fluent in French, had previously translated certain confidential Swiss bank records and correspondence that related to Martin and PDVSA that came from the Geneva prosecutor's office. *See*

14

**EXHIBIT 9** at 4 (internal DOJ email communications disclosing that former AUSA Alison Lehr a/k/a Alison Fryd – whose government employment was subsequently terminated – was aware of Jonathan's conflict of interest when she assigned him to PDVSA-related cases). He had also met with Martin on multiple occasions.

71. Jonathan timely, ethically, and properly disclosed his conflicts of interest and connection to Martin and the Venezuela-related criminal cases in the first week of his DOJ employment to *inter alia*: (a) since-terminated AUSA Alison W. Lehr a/k/a Alison Fryd, his direct supervisor who nevertheless proceeded to unethically and unlawfully assign Jonathan to Venezuela-related cases; (b) since-resigned AUSA Joan Silverstein, who previously served as Chief of the Criminal Division for the Southern District of Florida, Chief of the Economic and Environmental Crimes Section, and Special Assistant to the Associate Attorney General at Main Justice in Washington; (c) since-transferred AUSA Adrienne Rosen; and (d) Asset Forfeiture Division AUSA Nalina Sombuntham (who even entered her appearance in Martin's criminal case).

72. After disclosing his conflicts of interest (*i.e.*, long *before* the subject April 10, 2018 Moreno hearing), Jonathan's mental health was foreseeably harmed after being degradingly subjected to a hostile work environment within the DOJ. Jonathan failed to understand what exactly he had done to warrant what appeared to be illogical, unwarranted, and gratuitous hostility towards him from his DOJ colleagues. This extreme malice and mistreatment of Jonathan is corroborated by many of the heavily-redacted FOIA records, together with the DOJ's internal circulation of the subject *VICE* article pertaining to their failed prosecution of Martin.

73. From the very first week of Jonathan's DOJ employment, his timely-disclosed conflict of interest resulted in a pattern of discomfort from numerous DOJ coworkers. At first, their reactions were subtle: surprised looks from Joan Silverstein, awkward silence from Nalina Sombuntham, and whispered conversations from Alison Lehr with other federal prosecutors that abruptly stopped whenever Jonathan walked by. Jonathan understandably began feeling

paranoid, wondering if he had done something wrong. However, as the weeks went on, his DOJ colleagues' discomfort escalated into *inter alia* overt hostility, malice, and verbal abuse from AUSA Adrienne Rosen for supposedly "ask[ing] too many questions" about the underlying allegations of the Venezuela-related cases to which he had been improperly assigned. Later, other AUSAs circulated emails in the office discussing their desire to "spit" on Jonathan, their intern. **EXHIBIT 9** at 4 ("Spit spit spit to INFINITY").

74. The effect of the foregoing was cumulative, and over time, the DOJ's (and, later on, the federal judiciary's) degrading mistreatment of Jonathan foreseeably took a toll on his mental health. Collectively, these deliberate, calculated efforts of both the Executive Branch and federal judiciary – acting jointly and in concert – to knowingly harm Jonathan's psychological health is particularly egregious and unacceptable given that Jonathan was merely a second-year law school in his twenties at the time.

75. The United States government's retaliation against Jonathan for merely having been a whistleblower in connection with the improper conflicts of interest he properly reported – together with the significant other unlawful conduct vis-à-vis its Venezuela-related prosecutions, forfeitures, unilateral sanctions, and executive orders (so-called "lawfare" against a foreign nation, which is unlawful and expressly prohibited under international law) – is obvious even from merely perusing the few unredacted documents dilatorily and belatedly produced pursuant to his 2018 FOIA request.

76. Their fear appears to also have been that, had this situation involving Jonathan been discovered by defense counsel representing other PDVSA defendants (in the approximately 50 or so other contemporaneous PDVSA-related cases pending in various districts across the United States), this situation: (a) could somehow be used against the government in those proceedings; (b) could cause the United States government substantial embarrassment; (c) could have a detrimental affect on the United States government's credibility and reputation; and (d) could have potentially provided the other PDVSA a legal basis to seek dismissals or vacating convictions on Sixth Amendment and other legal grounds

(see United States v. Pisoni, Case No. 1:15-cr-20339-DPG, D.E. 767 (S.D. Fla. Nov. 18, 2022) (vacating convictions on Sixth Amendment grounds under similar facts)).

77. Jonathan had properly continued to refuse their requests and demands that he "voluntarily" resign since he was receiving academic credit for this internship and was concerned about losing academic credit if he did not to complete the full period of employment as required by the University of Miami School of Law. Additionally, all of these efforts were illogical in view of the fact that Jonathan's semester internship was already ending at the end of that month in a matter of just a few more weeks.

78. Therefore, having been unsuccessful at soliciting Jonathan's "voluntary" cooperation, as their Plan B, the Executive Branch then sought out and enlisted the cooperation of Judge Moreno as their final gambit to place even more pressure on him in order to extract his "voluntary" resignation and terminate his internship.

79. In making their decision to enlist the support and cooperation of Judge Moreno, the Executive Branch was well aware of the likelihood he would agree to assist them in this task. They knew the Venezuelan background of the Moreno family, and that Judge Moreno's daughter—AUSA Cristina M. Moreno – was the lead AUSA of record for the initial detention hearing in Miami for Martin's criminal case. Furthermore, at that precise moment in time, Judge Moreno, a friend of President Trump, was being considered for a position on the United States Supreme Court and was on President Trump's "top 20" list.

80. Additionally, they were also well aware at the time that, coincidentally, Judge Moreno had been assigned to a minor personal credit score civil lawsuit that Jonathan, as the plaintiff, had pending before him *pro se*. Indeed, Jonathan had disclosed to his Miami USAO supervisor, former AUSA Lehr – a close friend and coworker of AUSA Cristina M. Moreno – that he had a personal case pending before Judge Moreno at the time. Consequently, Judge Moreno, AUSA Moreno's father, became their perfect co-conspirator to falsely accuse Jonathan of criminal

conduct as a pretext to "lawfully" and quietly terminate Jonathan's USAO employment.

81. The timing of the subject Judge Moreno hearing on April 10, 2018 followed just a few weeks *after* the personnel in the Miami U.S. Attorney's Office (where Judge Moreno's daughter worked) had acknowledged their failure in their efforts to coerce him to resign "voluntarily."  The extraordinary daily and relentless efforts by the USAO personnel undertaken and preceding the hearing before Judge Moreno included without limitation informing Jonathan of a fictitious and implausible pretext that there suddenly was "not enough office space" for him anymore and that they had "run out of desks," and he therefore "could not work there any longer."

82. During this orchestrated court hearing Judge Moreno performed his assigned role. He engaged in an academy-award judicial performance, theatrically accusing Jonathan in open court of having engaged in "misconduct" involving a communication with one of his clerks. He also inexplicably made defamatory negative comments to him about me, his father, during this hearing – and I had never met nor ever appeared before this particular judge.

83. In reality the subject hearing was merely the *continuation* of the prior orchestrated hostile efforts within the Executive Branch to pressure Jonathan to resign "voluntarily" from his law student internship. Their motivation was based upon their foregoing misguided perceptions and concerns about Jonathan's connection to Martin and of course Martin's ongoing extremely valuable and productive cooperation with the United States government.

84. That this hearing before Judge Moreno was indeed an orchestrated contrivance is obvious as evidenced by the undisputed fact that Judge Moreno had even **personally called Jonathan on his cell phone - directly and *ex parte*** - the day before this hearing took place.  In my 57 years of law practice I have never heard of even a single instance where a federal judge personally made *ex parte* calls to a *pro se* party for any reason whatsoever. Also, Judge Moreno knew full well that Jonathan was only a second year law student who was not being represented by counsel – he even said so in his recorded voicemail.

85. Thus, Judge Moreno personally and improperly ordered Jonathan to appear in court that following day knowing and anticipating that he would appear without counsel.

86. In addition to all of these unusual and objectively improper events, during this relevant period, my law office was broken into over three separate occasions. This involved a high level of technical sophistication and experience since it entailed remotely disactivating the CCTV cameras specifically serving our office space in our building just minutes before these break-ins occurred. Also, each time these break-ins occurred the intruders stole only our Apple computers, and nothing else.

87. Coincidentally, Martin's valuable treasure trove of inculpatory information, Swiss bank records, documents and data implicating other DOJ targets all resided on the hard drive of his personal Apple laptop computer. This was understandably of great concern to the government, and to any potential targets of theirs during this period. Fortunately, during the relevant period while Martin was residing in pre-trial detention at Wyatt, and until his case was ultimately dismissed, his personal laptop remained in my possession at all times at my home for safekeeping. In retrospect, he had wisely requested that out of caution.

88. Also, and quite "coincidentally," during this relevant period of time Nathan Diamond, Esq. (Martin's local Miami attorney) and myself were both victims of bicycle accidents from automobiles while riding our bicycles. I was the victim of a hit-and-run from behind, and was brought unconscious to a hospital emergency room with sustained head injuries and a severe concussion.  Shortly thereafter, Martin was found dead in Madrid, Spain.

89. Another unusual "coincidence" involved former AUSA Michael Nadler (one of the AUSAs prosecuting the related PDVSA defendants arising out of Martin's cooperation, see, e.g., **EXHIBITS 12-17**) who had left the U.S. Attorney's Office sometime following Jonathan's departure.  During one of my last telephone conferences with Martin, he informed me that Mr. Nadler had contacted him via telephone and curiously requested that Martin meet with one of the alleged co-conspirators whom he had been cooperating against, together with Mr. Nadler.

This was the Swiss banker Matthias Krull who allegedly played one of the most significant key roles in laundering money for the Venezuelan elite for a lengthy period of time. He was indicted in July 2018 – just three months after Jonathan was forced to end his internship by Judge Moreno and the Executive Branch – and Mr. Nadler was the prosecutor of record in the Krull case.

90. Consistent throughout my prior representation of Martin, I strongly advised him not to attend any such meeting as there was no perceived benefit for him to do so – only unknown risk. Since at that point in time Mr. Nadler had already left government employment, there was no logical reason for him to be meeting with Martin at all. I have no personal knowledge, and never inquired thereafter, as to whether or not such a meeting ever took place, although I would guess that it most likely took place knowing Martin's curiosity and desire to remain active in the Maduro-related cases being undertaken to effectuate regime change.

91. Equally disturbing is the fact that President Trump's personal attorney during the period in question, Rudy Giuliani, Esq., was representing both President Trump (the head of the Executive Branch) while, at the same time, representing one of the Venezuelan defendants being prosecuted by the Executive Branch. To state that such an unethical and improper situation gives rise to a "conflict of interest" is to engage in understatement.

92. Throughout the period of Jonathan's DOJ internship in 2018, Martin, as a government CI, was providing the Executive Branch with incriminating information relating to the financial dealings of Alejandro Betancourt, Attorney Giuliani's client. At the same time, Attorney Giuliani – contemporaneously serving as President Trump's personal lawyer – was meeting with President Trump and high-ranking DOJ officials at Main Justice in Washington regarding the exact same Venezuelan arbitrage and money laundering scheme which both Jonathan and I had worked on. **EXHIBIT 18-19**.

93. During one such meeting, Attorney Giuliani represented that Martin and Betancourt's Venezuelan arbitrage case was a matter of "national security" to the United States government. **EXHIBIT 20**.

94. To this day, criminal proceedings against Betancourt remain ongoing and pending in the courts of the Swiss Confederation, and the Swiss government recently effectuated his arrest in the United Kingdom via Interpol on November 3, 2025. **EXHIBITS 15-16, 21-26**.

95. The following chart illustrates the web of unlawful and disturbing conflicts of interest and relationships in this case:

Figure 1:

Web Of Improper Conflicts Of Interest Created By the
United States Government and Relationships Between the Parties



96. Unfortunately, the Executive Branch and federal judiciary, acting together and jointly (and in violation of the constitutional separation of powers), ultimately succeeded in carrying out their unlawful scheme which included, without limitation: (a) falsely accusing Jonathan of having engaged in criminal conduct in connection with the orchestrated April 10, 2018, hearing before Judge Moreno, which they and he had arranged and planned ahead of time (as proven by several of the unredacted FOIA records);  (b) using Judge Moreno's theatrical performance together with unverified, uncorroborated, and defamatory accusations of misconduct as contained in the hearing transcript, being a malicious pretext for terminating Jonathan's opportunities for DOJ, SEC, and CIA internships and permanent employment opportunities; (c) for *over eight years*, and even still continuing to date, the unlawful refusal to provide *any* due-process hearing whatsoever to allow Jonathan to clear his name regarding the April 10, 2018, hearing, all in violation of the Due Process Clause and Bill of Attainder Clause of the United States Constitution – apparently because Jonathan merely happens to be my son; and (d) discrediting, defaming, and embarrassing Jonathan publicly and in the media, with the specific intent of harming Jonathan's psychological and physical health, to prevent his ability to ever become a member of the bar, and to prevent him from obtaining gainful employment. Tragically for Jonathan, the Executive Branch and federal judiciary have indeed succeeded in all of their unconscionable and unconstitutional goals against him to date.

97. All of this harm could and should have easily have been avoided through:  (a) a timely (and routine) due-process hearing and routine discovery having been allowed by the court, in the usual and customary course, as Jonathan has requested many times; (b) by the DOJ agreeing to mediation or engaging in settlement discussions years ago, as had been appropriately suggested to them early on in the litigation process by Magistrate Judge Dein; and (c) by the federal judiciary having properly applied Rule 1 of the Federal Rules of Civil Procedure mandating that all of these procedural rules "be construed and administered to secure the just, *speedy,* and inexpensive determination of every action and

proceeding" in the ordinary course – not the eight plus years this litigation has been going on with no end in sight; (d) by the courts not having slow-walked this litigation throughout all of these years, including for example, frequently waiting more than an entire year for a decision or hearing on even routine motions; and (e) by the courts knowingly allowing the government to improperly delay (almost 15 months), hinder and substantially redact nearly all documents which they belatedly submitted in reply Jonathan's request under FOIA - which involved only a very short four month period of time in which Jonathan had served his internship.

98. Collectively, it is all of these aforesaid facts, background, and context upon which one can try to explain, but certainly not justify, the motivation and intent behind the hostile and retaliatory actions against Jonathan that have been undertaken by the United States government and which continue on to this day. Additionally, the ongoing delays of the federal courts through their deliberate, unmistakable slow-walking that has taken place throughout the entire litigation process over the past eight years and counting, have also foreseeably contributed to causing the permanent psychological, physical, professional and economic harm experienced by Jonathan – as well as our entire family, countless other victims in the United States, Spain, and of course Venezuela. Cf. Prosecutor v. United States of America (Venezuela II), ICC-01/20 (2020).

SUBSCRIBED AND SWORN TO under the pains and penalties of perjury under the laws of the Commonwealth of Massachusetts and the United States of America this 30th day of December, 2025.



E. Peter Mullane, Esq.

COMMONWEALTH OF MASSACHUSETTS,   )
COUNTY OF MIDDLESEX, ss.                              )

On this 30th day of December, 2025, before me, the undersigned notary public, personally appeared E. Peter Mullane, Esq., who proved to me through my own personal knowledge and satisfactory evidence of being identification by a government-issued driver's license, to be the person who signed the preceding and/or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

> **QIN ZHOU**
> NOTARY PUBLIC
> Commonwealth of Massachusetts
> My Commission Expires On
> September 20, 2030

Notary Public:   Qin Zhou, Esq.
My commission expires: September 20, 2030

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 31, 2025, he caused to be transmitted a true copy of the foregoing filing to counsel for Defendants, and via electronic correspondence specifically addressed as follows: Anthony.pogorzelski@usdoj.gov.

/s/ Jonathan Mullane
Jonathan Mullane

DATED:          December 31, 2025

# EXHIBIT 1



# PHOENIX
# NEWS

Home page / Venezuela / Martín Lustgarten Acherman, a Venezuelan involved in complex financial scandals, has died.

USA  Venezuela

## Martín Lustgarten Acherman, a Venezuelan involved in complex financial scandals, has died.


by avefenixnoticias.com   ● August 14, 2024



On August 1, 2024, at the age of 59, Martín Lustgarten Acherman passed away in Miami, Florida. His passing marks the end of a life intertwined with the financial world, but also marked by controversy. While his loved ones gathered on August 9 at the cemetery located at 1125 NW 137th St, Miami, FL 33168 for a graveside service, Lustgarten Acherman's memory remains alive because of the murky waters he navigated during his career in the financial sector.

Born on June 4, 1965, Lustgarten Acherman, a Venezuelan of Austrian descent, built a reputation as an expert on Venezuela's complex financial system. However, his name resurfaced in the halls of the U.S. justice system in 2015 when he was accused of laundering millions of dollars in drug money. Despite the accusations against him, Lustgarten Acherman managed to avoid conviction, thanks to a series of events that led the U.S. Department of Justice to dismiss the case.

The story of Martín Lustgarten Acherman is a labyrinth of light and shadow. A man who, like a chameleon, knew how to navigate between the opulence of Biscayne Bay and the frigidity of a federal jail cell. His life, a

Look for

| Look |
| for |

Sections

Present

Colombia

Curaçao

Spain

USA

Latin America

International

Mexico

Panama

Dominican Republic

Venezuela

**Recent stories**

Third arrest in the Plus Ultra case: a businessman linked to the airline

The United States sanctioned the nephews of dictator Nicolás Maduro and several shipping companies linked to the transport of Venezuelan crude oil.

A "terrorist organization" without any organization: the Cartel of the Suns is not what you imagine

Amnesty and a Delcy Rodríguez government: what Maduro proposed to Trump in exchange for leaving

It crashed and exposed an air bridge between dictators

crucible of financial success and money laundering accusations, invites us to explore the complexities of a figure who, to this day, continues to raise questions. Here we take a brief look at the life of a financial expert who, like Icarus, flew too close to the sun and ended up with his wings singed by the flames of controversy.

## From prison to cooperation: The metamorphosis of Martín Lustgarten Acherman

Martín Lustgarten Acherman's life took an unexpected turn after his release. Despite having been on the verge of spending the rest of his days behind bars, the Venezuelan financial expert not only regained his freedom but also forged a new path, one that would lead him to collaborate with the very authorities who had accused him.

After admitting to violating the terms of his visa in late 2015, Lustgarten Acherman began to forge a network of cooperation with federal prosecutors in Miami. His knowledge of the Venezuelan financial system, like an intricate map etched in his mind, became an invaluable tool for U.S. authorities seeking to unravel a vast money laundering scheme.

The investigation focused on a former French banker, Charles Henry De Beaumont, who operated from Switzerland and maintained ties with businessmen and officials of the Venezuelan regime. Lustgarten Acherman delved deep into the corruption network, providing key information that led investigators to uncover a Pandora's box of illicit finances.

## The hard drive at the heart of the controversy: Explosive revelations in the De Beaumont case

Martín Lustgarten Acherman's cooperation with U.S. authorities was not limited to providing verbal information. The financial expert handed over to investigators a hard drive containing crucial information about the activities of Charles De Beaumont, the former French banker at the center of the investigation.

The hard drive contained documents detailing De Beaumont's financial transactions with key figures in the Chavista regime, including Raúl Gorrín and the brothers Luis and Ignacio Oberto. These names revealed the magnitude of the corruption network that extended from Venezuela to the highest echelons of international financial power.

The information on the hard drive was a goldmine for investigators. Like a puzzle finally coming together, the pieces fell into place to reveal the full picture of a money-laundering scheme involving businessmen, government officials, and international bankers. Lustgarten Acherman had thus turned his knowledge of the system into a tool to dismantle the corruption network he himself had helped to build.

## The wizard of finance: Martín Lustgarten Acherman and the dance of millions

Investigations by U.S. authorities revealed that Martín Lustgarten Acherman was not merely a bystander in the corruption scheme, but an active player who moved vast sums of money for his Venezuelan clients. Suspicious Activity Reports (SARs) illuminated the transactions carried out by Lustgarten Acherman's companies, revealing a flow of money that reached astronomical figures.

HSBC Bank USA reported transactions totaling $402 million between 2010 and 2016. Standard Chartered Bank, for its part, identified movements of at least $346 million between 2007 and 2015. These figures, like drifting icebergs, represented only a fraction of the fortune that Lustgarten Acherman managed for his clients, including those who were now under investigation by the authorities.

Lustgarten Acherman's ability to move money through the international financial system was like a symphony of transactions, a dance of millions flowing through bank accounts, shell companies, and tax havens. His knowledge of the system, like an orchestra conductor who masters every instrument, allowed him to orchestrate complex financial operations that concealed the illicit origin of the money.

## The FinCEN Files: A Window into the Hidden World of Illicit Finance

The story of Martín Lustgarten Acherman took a new turn in 2020 when his name emerged from the depths of the FinCEN Files, a massive leak of documents that exposed money laundering practices in the global

Look for
_____

**Sections**
_____

Present

Colombia

Curaçao

Spain

USA

Latin America

International

Mexico

Panama

Dominican Republic

Venezuela

**Recent stories**
_____

Third arrest in the Plus Ultra case: a businessman linked to the airline

The United States sanctioned the nephews of dictator Nicolás Maduro and several shipping companies linked to the transport of Venezuelan crude oil.

A "terrorist organization" without any organization: the Cartel of the Suns is not what you imagine

Amnesty and a Delcy Rodríguez government: what Maduro proposed to Trump in exchange for leaving

It crashed and exposed an air bridge between dictators

financial system. These files, like a bolt of lightning illuminating the night, revealed the magnitude of the problem and the ease with which dirty money moved through the world's largest banks.

The FinCEN Files confirmed what US authorities already suspected: Martín Lustgarten Acherman had been involved in suspicious transactions with companies linked to Raúl Gorrín and the Oberto brothers. The leaked documents showed the money's journey from Venezuela to bank accounts in tax havens, passing through shell companies and complex financial operations.

Lustgarten Acherman's involvement in the money laundering scheme was uncovered through Suspicious Activity Reports (SARs) filed by HSBC Bank USA. These reports revealed the connection between Lustgarten Acherman's companies and Panamanian companies owned by Gorrín and the Oberto brothers, including Bellsite Overseas SA and Violet Advisors SA.

## The Barter Market: A Legal Mechanism with Potential for Illegality

Martín Lustgarten Acherman's experience in the swap market, a financial mechanism that allowed the purchase of bonds in bolivars and their subsequent sale in dollars abroad, was key to his success in the world of finance. However, this knowledge also allowed him to navigate the murky waters of money laundering, using swaps as a tool to conceal the illicit origin of his clients' fortunes.

The currency controls imposed in Venezuela during Hugo Chávez's presidency created fertile ground for the development of the currency swap market. This mechanism, like a shortcut on a winding road, allowed companies to obtain dollars legally, but it also became a gateway for money laundering. Kleptocrats and drug traffickers, like wolves in sheep's clothing, used currency swaps to launder their illicit profits, injecting dirty money into the international financial system.

Lustgarten Acherman, like a skilled navigator on a stormy sea, knew the routes and mechanisms to maximize his profits in the barter market. His ability to carry out complex financial operations allowed him to conceal the trail of dirty money, transforming it into seemingly legitimate gains.

## An ambivalent legacy: Martín Lustgarten Acherman, between genius and darkness

The life of Martín Lustgarten Acherman, like a complex tapestry woven with threads of gold and shadows, leaves us with an ambivalent legacy. His financial genius, like a double-edged sword, allowed him to achieve success in the world of finance, but also led him down the path of illegality.

Lustgarten Acherman's collaboration with U.S. authorities, though motivated by self-interest, helped dismantle a corruption network that stretched from Venezuela to the highest echelons of international financial power. His knowledge of the system, like a map guiding investigators through a labyrinth, was crucial in unmasking those hiding behind a veil of opulence and power.

However, Martín Lustgarten Acherman's story is also a cautionary tale about the dangers of unchecked ambition and the temptation to cross the line between legal and illegal. His life, like a mirror reflecting the light and shadow of the financial world, reminds us that even the brightest minds can be seduced by the dark side of money.

As of August 14, 2024, the name of Martín Lustgarten Acherman remains etched in the collective memory as a symbol of the complexity of human nature, capable of both the best and the worst. His legacy, like an unsolved enigma, invites us to reflect on the fine line between success and corruption, and on the importance of ethics in the world of finance.

**Look for**

**Sections**

Present

Colombia

Curaçao

Spain

USA

Latin America

International

Mexico

Panama

Dominican Republic

Venezuela

**Recent stories**

Third arrest in the Plus Ultra case: a businessman linked to the airline

The United States sanctioned the nephews of dictator Nicolás Maduro and several shipping companies linked to the transport of Venezuelan crude oil.

A "terrorist organization" without any organization: the Cartel of the Suns is not what you imagine

Amnesty and a Delcy Rodríguez government: what Maduro proposed to Trump in exchange for leaving

It crashed and exposed an air bridge between dictators

# EXHIBIT 2



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.   15-10046-LTS |
| | ) | |
| MARTIN LUSTGARTEN ACHERMAN, | ) | VIOLATIONS: |
| SALOMON BENDAYAN, a.k.a. "Salo," | ) | |
| ANDRES URICOECHEA-WILLAMSON, | ) | 18 U.S.C. § 1956(h) – Conspiracy |
| | ) | to Launder Monetary Instruments |
| ███████████████████ | ) | |
| | ) | 18 U.S.C. § 1512(k) – Conspiracy to |
| Defendants. | ) | Obstruct an Official Proceeding |
| | ) | |
| | ) | 18 U.S.C. § 1512(c)(2) – Obstruction of an |
| | ) | Official Proceeding |
| | ) | |
| | ) | 18 U.S.C. §§ 982(a)(1), 981(a)(1)(C) and |
| | ) | 28 U.S.C. § 2461(c) |
| | ) | – Criminal Forfeiture Allegation |
| | ) | |

**FIRST SUPERSEDING INDICTMENT**

**COUNT ONE**

**(Title 18, United States Code, Section 1956(h) - Money Laundering Conspiracy)**

The Grand Jury charges that:

**INTRODUCTION**

At all times relevant to this First Superseding Indictment:

1.     Since at least 2007, and continuing until the present time, the government of Venezuela has maintained strict control over the availability of U.S. dollars in Venezuela, which has led to the creation of an unregulated black or parallel market for U.S. dollars in Venezuela. The price or exchange rate for U.S. dollars on the black or parallel market varies, but is generally substantially higher than the official exchange rate for U.S. dollars.   The demand for U.S. dollars in Venezuela is often met by money brokers who obtain U.S. dollars generated from illegal

sources including the importation and sale of illegal drugs into the United States from Colombia and Mexico.

2.     Defendant MARTIN LUSTGARTEN ACHERMAN ("LUSTGARTEN") was a resident of Venezuela, Panama, and Florida.  LUSTGARTEN controlled and was a director of several companies incorporated in various locations including Hong Kong, Singapore, Panama, and elsewhere. These businesses were known at various times as Denton Business Inc. ("Denton"), Clifton Capital S.A. ("Clifton"), Arbitrage & Lending Inc. ("Arbitrage & Lending"), ANL Services Ltd., A L Services Inc., A&L Services Inc., Andan Ltd., ESL Services, Inc., ESL Portfolio Holdings PTE Ltd., Avintel International Ltd., Henlux Inc., Henlux Ltd., and Henlux PTE Ltd.

3.     According to the website for one of LUSTGARTEN's companies (Henlux.com), Henlux Inc. is headquartered in Panama and offers services in the procurement of durable and consumer goods, venture capital investment, and "purchase order financing."  The website for Henlux Inc. also purports that Henlux Inc. has a division in Hong Kong under the name Henlux Ltd. and in Singapore under the name Henlux PTE Ltd.

4.     Beginning by at least March 2008, LUSTGARTEN had control over and routinely used three different bank accounts at Bank of America in Doral, Florida, under the names Rosemont K d/b/a Denton Business Inc. ("the Denton Rosemont Account"), Rosemont Q Corporation d/b/a Clifton Capital S.A. ("the Clifton Rosemont Account"), and Rosemont Q Corporation d/b/a Arbitrage & Lending Inc. ("the Arbitrage Rosemont Account").   The various Florida corporations in the name of "Rosemont" were "doing business as" ("d/b/a") LUSTGARTEN's shell-companies.

2

5.     The three bank accounts that LUSTGARTEN held under the name of Rosemont Corporation at Bank of America in Doral, Florida, were among 59 bank accounts held by LUSTGARTEN's companies and other entities also held in the name of Rosemont Corporation ("the Rosemont Accounts").   On or about March 25, 2009, the U.S. Drug Enforcement Administration ("DEA") in Boston, Massachusetts, seized these approximately 59 bank accounts held at Bank of America.

6.     Defendant SALOMON BENDAYAN, a.k.a. "Salo" ("BENDAYAN") resided in New York.   BENDAYAN was the President of and controlled a company incorporated in Hong Kong called Maxfield International Holding Ltd ("Maxfield") that purported to be located in New York and Miami as well as Panama City, Bogotá, Sao Paulo, Montevideo, London and Hong Kong. According to Maxfield's website the company specialized in "Asian supply chain solutions, trading of commodities, consumer and industrial goods for mass markets, and trade representation."

7.     BENDAYAN was also the President of and controlled Globex Capital Limited and its holding company, Globex Holdings LLC, which was purportedly located in Hong Kong and Singapore.   According to its website, Globex Capital Limited was focused on "purchase order financing" for small to medium sized companies in Latin America. BENDAYAN was also associated with several companies in Colombia including SBT S.A. ("SBT"), CI DEL ISTMO S.A. ("ISTMO"), and Agrotek Equities Ltd ("Agrotek").





## OBJECT OF CONSPIRACY

9.     The object of the conspiracy was to earn substantial sums of money on the black market or parallel market in Venezuela by obtaining U.S. dollars from illegal sources, including the proceeds of drug trafficking, at a lower price or exchange rate, and exchanging or selling these U.S. dollars from illegal sources for Venezuelan bolivars at a substantially higher price or exchange rate on the black or parallel market in Venezuela.   It was also the object of the conspiracy to conceal the wiring and movement of U.S. dollars derived from illegal sources, including drug trafficking, by falsely representing them to be loan repayments and capital investments through multiple international companies and bank accounts in Florida, New York, Panama, Hong Kong, and Singapore.

## MANNER AND MEANS OF CONSPIRACY

Among the manner and means by which the conspirators would and did carry out the conspiracy were the following:

10.     Between approximately 2008 and continuing up to on or about March 25, 2009, LUSTGARTEN used bank accounts under the name of Rosemont Corporation doing business as Denton, Clifton, and Arbitrage & Lending in Florida, each of which LUSTGARTEN controlled, to receive millions of U.S. dollars that were the proceeds of drug trafficking in the United States. LUSTGARTEN purchased drug money in U.S. dollars on the black or parallel market and sold

4

the U.S. dollars to legitimate companies in Venezuela in exchange for Venezuelan bolivars. LUSTGARTEN received drug proceeds from Mexico and Colombia including millions of U.S. dollars in drug proceeds that others known and unknown to the grand jury caused to be transferred to LUSTGARTEN's Rosemont accounts in Florida from bank accounts associated with two companies in Colombia known as SBT S.A. ("SBT") and CI DEL ISTMO S.A. ("ISTMO").

11. Following the seizure of the Rosemont Accounts in Florida on or about March 25, 2009, including LUSTGARTEN's accounts at Denton, Clifton, and Arbitrage & Lending, from in or about June 2009 and continuing until at least in or about November 2010, LUSTGARTEN provided materially false information to the United States Attorney's Office and the DEA in Boston, Massachusetts, about the nature of his financial transactions, including but not limited to his transactions with SBT and ISTMO.

12. Following the seizure of the Rosemont Accounts and LUSTGARTEN's accounts at Denton, Clifton, and Arbitrage & Lending in Florida on or about March 25, 2009, LUSTGARTEN opened accounts in Hong Kong and Singapore and used those accounts to receive millions of U.S. dollars that were the proceeds of drug trafficking in the United States. LUSTGARTEN concealed the nature, source, and ownership of this drug money by falsely claiming that the money was a repayment of a loan from his purchase order financing business.

13. Beginning in approximately 2010, LUSTGARTEN falsely told others that the DEA in Boston, Massachusetts had authorized his financial transactions. LUSTGARTEN also falsely claimed that he had conducted "due diligence" on each of his clients and had verified the source of the U.S. dollars he was receiving into his bank accounts in both Florida and Hong

Kong.

14.   Between in or about January 2012 and February 2014, LUSTGARTEN concealed the nature of his relationship with BENDAYAN and his transactions with SBT and ISTMO and provided materially false information to the DEA in Boston, Massachusetts and Puerto Rico.

15.   From in or about November 2013 and continuing until in or about June 2014, BENDAYAN, URICOECHEA, ███████████ used their shell-companies and bank accounts in Hong Kong and Colombia to transfer millions in the proceeds of drug trafficking to bank accounts in the United States. ████████████████

████████████████████████████████████

BENDAYAN used his bank account at Globex in Hong Kong to transfer drug proceeds from Hong Kong to the United States.

## THE CONSPIRACY

16.   From a date unknown, but at least by in or about 2007, and continuing up to and including the date of the filing of this First Superseding Indictment, at Boston and elsewhere in the District of Massachusetts, in the Southern District of New York, the Eastern District of New York, the Southern District of Florida and elsewhere in the United States, and in Colombia, Venezuela, Brazil, Argentina, Panama, the United Kingdom, Hong Kong, Singapore and elsewhere,

**MARTIN LUSTGARTEN ACHERMAN,**
**SALOMON BENDAYAN, a.k.a. "Salo,"**
**ANDRES URICOECHEA-WILLIAMSON, and**
████████████████

defendants herein, knowing that the property involved represented the proceeds of some form of unlawful activity, did knowingly and intentionally combine, conspire, confederate and agree with

6

each other and other individuals known and unknown to the grand jury:

(a)        to conduct financial transactions affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance, and, with respect to financial transactions occurring in whole and in part in the United States, an offense against a foreign nation involving the manufacture, importation, sale, and distribution of a controlled substance, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

(b)        to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(c)        knowingly to engage and attempt to engage in monetary transactions by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling, and

otherwise dealing in a controlled substance, and, with respect to financial transactions occurring in whole and in part in the United States, an offense against a foreign nation involving the manufacture, importation, sale, and distribution of a controlled substance, knowing that the property was derived from some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

8

## COUNT TWO

### (Title 18, United States Code, Section 1512(k) – Conspiracy to Obstruct an Official Proceeding)

The Grand Jury further charges that:

1.    The allegations set forth in paragraphs one through fifteen of Count One are re-alleged and incorporated in this Count by reference.

2.    From a date unknown but at least by in or about 2009, and continuing up to in or about May 2014, at Boston and elsewhere in the District of Massachusetts, the Southern District of Florida and elsewhere in the United States, and in Colombia, Panama and elsewhere,

### MARTIN LUSTGARTEN-ACHERMAN,

defendant herein, did knowingly and intentionally combine, conspire, confederate and agree with other individuals known and unknown to the grand jury to corruptly obstruct, influence, and impede, and attempt to obstruct, influence, and impede an official proceeding, namely federal grand jury investigations in the District of Massachusetts investigating the Rosemont Accounts and the laundering of drug proceeds and the related forfeiture proceedings involving the Rosemont Account as described herein, by providing materially false information and documents to the DEA and the U.S. Attorney's Office in the District of Massachusetts at Boston regarding LUSTGARTEN's financial transactions relating to the Rosemont Accounts, in violation of Title 18, United States Code, Section 1512(c)(2).

All in violation of Title 18, United States Code, Section 1512(k).

## COUNT THREE

### (Title 18, United States Code, Section 1512(c)(2) – Obstruction of an Official Proceeding)

The Grand Jury further charges that:

1.      The allegations set forth in paragraphs one through fifteen of Count One are re-alleged and incorporated in this Count by reference.

2.      On or about February 7, 2014, at Boston and elsewhere in the District of Massachusetts and elsewhere,

### MARTIN LUSTGARTEN-ACHERMAN,

defendant herein, did knowingly, intentionally, and corruptly obstruct, influence, and impede, and attempt to obstruct, influence, and impede an official proceeding, namely federal grand jury investigations in the District of Massachusetts investigating the Rosemont Accounts and the laundering of drug proceeds and the related forfeiture proceedings involving the Rosemont Accounts as described herein, by providing false information about, and concealing from, the U.S. Drug Enforcement Administration and the Department of Homeland Security, Homeland Security Investigation the complete nature and scope of LUSTGARTEN's involvement with SALOMON BENDAYAN.

All in violation of Title 18, United States Code, Section 1512(c)(2).

## FORFEITURE ALLEGATIONS

**(Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(C)
and Title 28, United States Code, Section 2461(c))**

The Grand Jury further charges that:

1.   Upon conviction of the offense alleged in Count One of this First Superseding

Indictment,

**MARTIN LUSTGARTEN ACHERMAN,
SALOMON BENDAYAN, a.k.a. "Salo,"
ANDRES URICOECHEA-WILLIAMSON, and**

██████████████████

defendants herein, jointly and severally, shall forfeit to the United States, pursuant to Title 18,

United States Code, Section 982(a)(1), any property, real or personal, involved in the offense, and

any property traceable to such property.   The property to be forfeited includes, but is not limited to:

(A)   a sum of money equal to the total amount of money involved in the offense,
which may be entered in the form of a joint and several forfeiture money
judgment;

(B)   all funds on deposit in HSBC (Hong Kong) account number 614009967838,
held in the name of A and L Services Ltd.;

(C)   all funds on deposit in HSBC (Hong Kong) account number 491661492838,
held in the name of Andan Ltd.;

(D)   all funds on deposit in HSBC (Hong Kong) account number 411781446838,
held in the name of ESL Services Ltd.;

(E)   all funds on deposit in HSBC (Hong Kong) account number 817342074838,
held in the name of Henlux Ltd.;

(F)   all funds on deposit in HSBC (Hong Kong) account number 491680559888,
held in the name of Martin A. Lustgarten;

(G)   all funds on deposit in Standard Chartered Bank (Hong Kong) Limited
account number 36811380986, held in the name A L Services Ltd.;

11

(H)    all funds on deposit in Standard Chartered Bank (Hong Kong) Limited account number 36811375230, held in the name of ESL Services Ltd.;

(I)    all funds on deposit in DBS Bank (Hong Kong) Limited account number 4736093780, held in the name of Avintel International Ltd.;

(J)    all funds on deposit in DBS Bank (Hong Kong) Limited account number 7884585410, held in the name of Henlux Ltd.;

(K)    all funds on deposit in Bank of China (Hong Kong) Limited account number 01287592427662, held in the name of ANL Services Limited;

(L)    all funds on deposit in HSBC (Hong Kong) account number 491783619838, held in the name of RAM Technologies Limited;

(M)    all funds on deposit on HSBC (Hong Kong) account number 491783635838, held in the name of Torsten Management Corporation Limited;

(N)    all funds on deposit in DBS Bank (Singapore) Limited account number 0003010612016, held in the name of ESL Portfolio Holdings Pte Ltd.;

(O)    all funds on deposit in DBS Bank (Singapore) Limited account number 003008269014, held in the name of Henlux Pte Ltd, previously held in the name of AL Global Portfolio Ptd Ltd.;

(P)    all funds on deposit in Oversea Chinese Banking Corporation (Singapore) Limited account number 503083628301, held in the name of AL Global Portfolio PTE Ltd.;

(Q)    all funds on deposit in Australia and New Zealand Banking Group Limited (Singapore) account number 7931050741033USD00001, held in the name of ESL Portfolio Holdings Pte Ltd.;

(R)    all funds on deposit in HSBC Bank (Panama) account number 108978728, held in the name of A L Services Inc.;

(S)    all funds on deposit in HSBC Bank (Panama) account number 100384453, held in the name of Martin Lustgarten Acherman;

(T)    all funds on deposit in Totalbank Curacao NV (Panama) account number 93663, held in the name of A & L Services Inc. (Panama);

12

(U)     all funds on deposit in Banesco S.A. (Panama) account number 120000069931, held in the name of Martin Lustgarten;

(V)     all funds on deposit in CBH Compagnie Bancaire Helvetique S.A. (Switzerland) account number 0021000B000C, held in the name of A L Services Inc.;

(W)     all funds on deposit in CBH Compagnie Bancaire Helvetique S.A. (Switzerland) account number 0021066B000C, held in the name of Andan Ltd.;

(X)     all funds on deposit in Berenberg Bank Schweiz AG (Switzerland) account number 000104100200, held in the name of Andan Ltd;

(Y)     all funds on deposit in CBH Compagnie Bancaire Helvetique S.A. (Switzerland) account number 0020999B000C, held in the name of ESL Services Inc.;

(Z)     all funds on deposit in CBH Compagnie Bancaire Helvetique S.A. (Switzerland) account number 0021088B000C, held in the name of Henlux Inc.;

(AA)    all funds on deposit in Andbanc Luxembourg S.A. account number 6002420001000, held in the name of Andan Ltd.;

(BB)    all funds on deposit in HSBC (Hong Kong) account number 808631170838, held in the name of Globex Capital Limited;

(CC)    all funds on deposit in HSBC (Hong Kong) account number 808631949838, held in the name of Maxfield International Holdings Limited;

(DD)    all funds on deposit in Standard Chartered Bank (Hong Kong) account number 44700839693, held in the name of Globex Capital Limited;

(EE)    all funds on deposit in DBS Bank Ltd. (Hong Kong) account number 9080009222, held in the name of Globex Capital Limited;

(FF)    all funds on deposit in DBS Bank Ltd. (Hong Kong) account number 016190788443684, held in the name of Tradesphere International Limited;

(GG)    all funds on deposit in DBS Bank Ltd. (Hong Kong) account number 9080006027, held in the name of Capitol Enterprises Limited;

13

(HH)    all funds on deposit in Unibank SA (Panama) account number 31153, held in the name of Maxfield Panama Ltda SA;

(II)    all funds on deposit in Banco Bogota account number 077369973, held in the name of Comercializadora Internacional de Mercados Bolivarianos, d/b/a CIM & B Traders De Colombia Ltda;

(JJ)    all funds on deposit in Banco Davivienda account number 009700127526, held in the name of Econometria y Servicios Especiales SAS;

(KK)    all funds on deposit in Banco Davivienda account number 008700413670, held in the name of Tecnologia de Inversion Intek SAS;

(LL)    all funds on deposit in Banco Davivienda account number 009700126171, held in the name of Comercializadora Internacional de Mercados Bolivarianos, d/b/a CIM & B Traders De Colombia Ltda;

(MM)    all funds on deposit in Banco Davivienda, account number 475100045849, held in the name of Andres Gomez-Torres;

(NN)    all funds on deposit in Citibank N.A. account number 9997280649, held in the name Bedrock Holdings America Ltd c/o Salomon Bendayan;

(OO)    all funds on deposit in BMO Harris Bank account number 3010077580, held in the name of Mair M Bendayan Trustee, Salomon Bendayan Beneficiary, c/o Holand Chrysler;

(PP)    The real property located at 300 Corlies Avenue, Allenhurst, New Jersey 07711, including all buildings, appurtenances and improvements thereon;

(QQ)    The real property located at 400 Avenue U, #307, Brooklyn, New York 11223, including all buildings, appurtenances and improvements thereon;

(RR)    The real property located at 400 Avenue U, #308, Brooklyn, New York 11223, including all buildings, appurtenances and improvements thereon; and

(SS)    The real property located at 9801 Collins Avenue, Unit 6L, Bal Harbour, Florida 33154, including all buildings, appurtenances and improvements thereon.

2.   Upon conviction of the offense alleged in Count Two of this First Superseding

Indictment,

### MARTIN LUSTGARTEN ACHERMAN,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal,

which constitutes or is derived from proceeds traceable to the violation.

3.   If any of the property described in paragraphs 1 and 2 above, as a result of any act or

omission of the defendants,

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21 United States Code, Section 853(p), as

incorporated by Title 18 United States Code, Section 982(b)(1) and Title 28, United States Code,

Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the

property described in paragraphs 1 and 2.

All pursuant to Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c).

15

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

Neil J. Gallagher, Jr.
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS; April 1, 2015

Returned into the District Court by the Grand Jurors and filed,

DEPUTY CLERK        4/1/2015 @ 2:14pm

16

# EXHIBIT 3

Query    Reports    Utilities    Help    Log Out

**U.S. District Court**
**Southern District of Florida (Miami)**
**CRIMINAL DOCKET FOR CASE #: 1:15-mj-02465-CMM-1**

Case title: USA v. Acherman

Date Filed: 04/08/2015

Date Terminated: 04/13/2015

---

Assigned to: Magistrate Judge Chris M. McAliley

**Defendant (1)**

**Martin Lustgarten Acherman**
07680-104
*YOB: 1965; English*
*TERMINATED: 04/13/2015*

represented by **Nathan Philip Diamond**
Nathan P. Diamond, P.A.
888 Biscayne Boulevard
Suite 501
Miami, FL 33132
305-371-5300
Fax: 305-371-6966
Email: attydiamon@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**                                    **Disposition**
None

**Highest Offense Level (Opening)**
None

**Terminated Counts**                                 **Disposition**
None

**Highest Offense Level (Terminated)**
None

**Complaints**                                        **Disposition**
ARREST WARRANT ON SUPERSEDING INDICTMENT
FROM THE DISTRICT OF MASSACHUSETTS; MONEY
LAUNDERING CONSPIRACY

---

**Plaintiff**
**USA**                                               represented by **Cristina M. Moreno**
U.S. Attorney's Office
99 NE 4th Street
Miami, FL 33132
305-961-9180
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/08/2015 | | Arrest of Martin Lustgarten Acherman (aw) (Entered: 04/09/2015) |
| 04/08/2015 | 1 | Magistrate Removal of Indictment from District of Massachusetts, Case number in the other District 15-10046-LTS as to Martin Lustgarten Acherman. (aw) (Entered: 04/09/2015) |
| 04/08/2015 | 2 | Report Commencing Criminal Action as to Martin Lustgarten Acherman - YOB: **/**/1965 Prisoner #: 07680-104 (aw) (Entered: 04/09/2015) |
| 04/08/2015 | 3 | Minute Order for proceedings held before Magistrate Judge Chris M. McAliley: Initial Appearance in Rule 5(c)(3)/Rule 40 Proceedings as to Martin Lustgarten Acherman held on 4/8/2015. as to Martin Lustgarten Acherman (1) Temporary Pretrial Detention. Detention Hearing set for 4/13/2015 10:00 AM in Miami Division before MIA Duty Magistrate. Removal Hearing set for 4/13/2015 10:00 AM in Miami Division before MIA Duty Magistrate. Attorney added: Nathan Philip Diamond for Martin Lustgarten Acherman (Digital 14:30:39.) Signed by Magistrate Judge Chris M. McAliley on 4/8/2015. (aw) (Entered: 04/09/2015) |

| 04/08/2015 | 4 | NOTICE OF ATTORNEY APPEARANCE: Nathan Philip Diamond appearing for Martin Lustgarten Acherman (aw) (Entered: 04/09/2015) |
|---|---|---|
| 04/13/2015 | 5 | Minute Entry for proceedings held before Magistrate Judge Edwin G. Torres: Detention Hearing as to Martin Lustgarten Acherman held on 4/13/2015; Witness HSI S/A PHILIP LAVOIE testified. Status Conference re: removal as to Martin Lustgarten Acherman held on 4/13/2015. (Digital 11:51:03.) (cg1) (Entered: 04/14/2015) |
| 04/13/2015 | 6 | WAIVER of Rule 5(c)(3)/Rule 40 Hearing by Martin Lustgarten Acherman (cg1) (Entered: 04/14/2015) |
| 04/13/2015 | 7 | COMMITMENT TO ANOTHER DISTRICT as to Martin Lustgarten Acherman. Defendant committed to District of District of Massachusetts. Closing Case for Defendant. Signed by Magistrate Judge Edwin G. Torres on 4/13/2015. (cg1) **NOTICE: If there are sealed documents in this case, they may be unsealed after 1 year or as directed by Court Order, unless they have been designated to be permanently sealed. See Local Rule 5.4 and Administrative Order 2014-69.** (Entered: 04/14/2015) |
| 04/14/2015 | 8 | Notice of Criminal Transfer to District of Massachusetts of a Rule 5 or Rule 32 Initial Appearance as to Martin Lustgarten Acherman. Your case number is: 15-10046-LTS. Docket sheet and documents attached. If you require certified copies of any documents, please call our Records Section at 305-523-5210. *Attention Receiving Court: If you wish to designate a different email address for future transfers, send your request to TXND at: InterDistrictTransfer_TXND@txnd.uscourts.gov.* (cg1) (Entered: 04/14/2015) |
| 04/16/2015 | 9 | ORDER OF DETENTION as to Martin Lustgarten Acherman. Signed by Magistrate Judge Edwin G. Torres on 4/16/2015. (abk) (Entered: 04/16/2015) |
| 05/02/2015 | 10 | TRANSCRIPT of Detention Hearing as to Martin Lustgarten Acherman held on 4/13/15 before Magistrate Judge Edwin G. Torres, 1-29 pages, Court Reporter: Bonnie J. Lewis, 305-523-5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/29/2015. Redacted Transcript Deadline set for 6/5/2015. Release of Transcript Restriction set for 8/3/2015. (Attachments: # 1 Designation Access Form)(hh) (Entered: 05/04/2015) |
| 05/02/2015 | 11 | TRANSCRIPT of Detention Hearing as to Martin Lustgarten Acherman held on 4/8/15 before Magistrate Judge Chris M. McAliley, 1-5 pages, Court Reporter: Bonnie J. Lewis, 305-523-5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/29/2015. Redacted Transcript Deadline set for 6/5/2015. Release of Transcript Restriction set for 8/3/2015. (Attachments: # 1 Designation Access Form)(hh) (Entered: 05/04/2015) |
| 05/04/2015 | 12 | Corrected Transcript and Notice of Correction of Detention Hearing as to Martin Lustgarten Acherman held on 4/8/15 before Magistrate Judge Chris M. McAliley, 1-5 pages, re: 11 Transcript,, Court Reporter: Bonnie J. Lewis, 305-523-5635. (Attachments: # 1 Designation Access Form)(hh) (Entered: 05/05/2015) |
| 05/04/2015 | 13 | Corrected Transcript and Notice of Correction of Detention Hearing as to Martin Lustgarten Acherman held on 4/13/15 before Magistrate Judge Edwin G. Torres, 1-29 pages, re: 10 Transcript,, Court Reporter: Bonnie J. Lewis, 305-523-5635. (Attachments: # 1 Designation Access Form)(hh) (Entered: 05/05/2015) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/06/2023 04:57:18 | | |
| PACER Login: | bjm91008 | Client Code: |
| Description: | Docket Report | Search Criteria: 1:15-mj-02465-CMM |
| Billable Pages: | 3 | Cost: 0.30 |

# EXHIBIT 4

11/17/2015                     CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:15-cr-10046-LTS-1

Case title: USA v. Acherman

Date Filed: 03/11/2015
Date Terminated: 11/10/2015

Assigned to: District Judge Leo T.
Sorokin
Referred to: Magistrate Judge Judith G.
Dein

### Defendant (1)

**Martin Lustgarten Acherman**
*TERMINATED: 11/10/2015*

represented by **Nathan P. Diamond**
Nathan P. Diamond, P.A.
888 Biscayne Boulevard
Suite 501
Miami, FL 33132
305-371-5300
Fax: 305-371-6966
Email: attydiamon@aol.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**E. Peter Mullane**
Mullane, Michel & McInnes
6 Bennett Street
Cambridge, MA 02138-5736
617-661-9000
Fax: 617-661-3000
Email: peter@3mlaw.com
*ATTORNEY TO BE NOTICED*
Designation: Retained

### Pending Counts

None

### Highest Offense Level (Opening)

None

### Terminated Counts

18:1956(h) - MONEY LAUNDERING
CONSPIRACY

### Disposition

### Disposition

### Disposition

Order transferring of Count 1, 1s Under
Rule 21 to the Southern District of

| | |
|---|---|
| (1) | Florida. |
| 18:1956(h)...MONEY LAUNDERING CONSPIRACY (1s) | Order transferring of Count 1, 1s Under Rule 21 to the Southern District of Florida. |
| 18:1512(k)...CONSPIRACY TO OBSTRUCT AN OFFICIAL PROCEEDING (2s) | Order transferring of Count 2s Under Rule 21 to the Southern District of Florida. |
| 18:1512(c)(2)...OBSTRUCTION OF AN OFFICIAL PROCEEDING (3s) | Order transferring of Count 3s Under Rule 21 to the Southern District of Florida. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA**                              represented by  **Christopher R. Donato**
                                                     United States Attorney's Office
                                                     1 Courthouse Way
                                                     Suite 9200
                                                     Boston, MA 02210
                                                     617-748-3303
                                                     Fax: 617-748-3972
                                                     Email: chris.donato@USDOJ.GOV
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Katherine H. Ferguson**
                                                     United States Attorney for the District of
                                                     Masssachussetts
                                                     John Joseph Moakley US Federal
                                                     Courthouse
                                                     One Courthouse Way
                                                     Suite 9200
                                                     Boston, MA 02210
                                                     617-748-3555
                                                     Email: katherine.ferguson@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Assistant US Attorney*

                                                     **Linda M. Ricci**
                                                     United States Attorney's Office MA

CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

1 Courthouse Way
Boston, MA 02210
617-748-3395
Fax: 617-748-3965
Email: linda.ricci@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neil J. Gallagher , Jr.**
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3397
Email: neil.gallagher@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Joseph Palazzo**
United States Department of Justice
1400 New York Ave., NW - 10th Floor
Washington, DC 20005
(202) 445-7910
Email: joseph.palazzo@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2015 | 5 | ELECTRONIC NOTICE of Case Assignment as to Martin Lustgarten Acherman; District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Abaid, Kimberly) (Entered: 03/11/2015) |
| 03/12/2015 | 6 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge Judith G. Dein Reason for referral: Full Pretrial Proceedings as to Martin Lustgarten Acherman (Alves-Baptista, Antonia) (Entered: 03/12/2015) |
| 04/08/2015 | 15 | MOTION to Unseal Case as to Martin Lustgarten Acherman, Salomon Bendayan by USA. (Alves-Baptista, Antonia) (Entered: 04/08/2015) |
| 04/08/2015 | 16 | REDACTED FIRST SUPERSEDING INDICTMENT as to Martin Lustgarten Acherman, Salomon Bendayan. (Alves-Baptista, Antonia) (Entered: 04/08/2015) |
| 04/08/2015 | 17 | Magistrate Judge Judith G. Dein: ELECTRONIC ORDER entered granting 15 Motion to Unseal Case as to Martin Lustgarten Acherman (1), Salomon Bendayan (2) (Alves-Baptista, Antonia) (Entered: 04/08/2015) |
| 05/04/2015 | 27 | NOTICE OF ATTORNEY APPEARANCE: E. Peter Mullane appearing for |

|  |  | Martin Lustgarten Acherman. Type of Appearance: Retained. (Mullane, E. Peter) (Entered: 05/04/2015) |
|---|---|---|
| 05/05/2015 | 28 | MOTION for Leave to Appear Pro Hac Vice by Nathan P. Diamond Filing fee $ 100, receipt number 0101-5543370. as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Main Document 28 replaced on 5/6/2015) (Montes, Mariliz). (Additional attachment(s) added on 5/6/2015: # 1 Certification of Nathan P. Diamond in Support of Motion for Leave to Appear Pro Hac Vice) (Montes, Mariliz). (Entered: 05/05/2015) |
| 05/05/2015 | 29 | ELECTRONIC NOTICE OF HEARING as to Martin Lustgarten Acherman Arraignment set for 5/7/2015 11:00 AM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Quinn, Thomas) (Entered: 05/05/2015) |
| 05/06/2015 | 31 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 28 Motion for Leave to Appear Pro Hac Vice Added Nathan P. Diamond. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Martin Lustgarten Acherman (1) (Montes, Mariliz) (Entered: 05/06/2015) |
| 05/06/2015 | 32 | NOTICE OF ATTORNEY APPEARANCE Linda M. Ricci appearing for USA. (Ricci, Linda) (Entered: 05/06/2015) |
| 05/06/2015 | 35 | MOTION for Order *for Interlocutory Sale of Bar Harbour Florida Property* as to Martin Lustgarten Acherman, Salomon Bendayan by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Text of Proposed Order for Interlocutory Sale of Bar Harbour Property)(Lei, Veronica) (Entered: 05/06/2015) |
| 05/06/2015 | 36 | MOTION to Vacate *in Part, Amended Restraining Order (Bal Harbour Florida Property Only)* as to Martin Lustgarten Acherman, Salomon Bendayan by USA. (Attachments: # 1 Text of Proposed Order)(Lei, Veronica) (Entered: 05/06/2015) |
| 05/07/2015 | 37 | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Judith G. Dein:Arraignment as to Martin Lustgarten Acherman (1) Count 1s,2s,3s held on 5/7/2015, Plea entered by Martin Lustgarten Acherman (1) Count 1,1s,2s,3s. by Martin Lustgarten Acherman Not Guilty on all counts. USMJ Dein informs the Dft. of his rights and charges; Dft has retained counsel; Govt. states maximum penalties and informs the court a detention hearing was held in the arresting district and the court has detained Dft. USMJ Dein orders the Dft. remanded to custody of US Marshal and sets 1st conference for 6/18/15 @ 11:00am. (Attorneys present: Ricci and Diamond. )Court Reporter Name and Contact or digital recording information: Digital Recording - For transcripts or CDs contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Quinn, Thomas) (Entered: 05/07/2015) |
| 05/07/2015 | 38 | District Judge Leo T. Sorokin: ORDER FOR INTERLOCUTORY SALE entered as to Martin Lustgarten Acherman (1), Salomon Bendayan (2) re 35 Motion for Order; 36 Motion to Vacate as to Martin Lustgarten Acherman (1), Salomon Bendayan (2) (Simeone, Maria) (Entered: 05/07/2015) |
| 05/07/2015 | 39 | Magistrate Judge Judith G. Dein: ORDER entered. SCHEDULING ORDER as to |

| | | |
|---|---|---|
| | | Martin Lustgarten Acherman Status Conference set for 6/18/2015 11:00 AM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Quinn, Thomas) (Entered: 05/07/2015) |
| 05/07/2015 | 40 | Magistrate Judge Judith G. Dein: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Martin Lustgarten Acherman. Time excluded from 5/7/15 until 6/18/15. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Quinn, Thomas) (Entered: 05/07/2015) |
| 05/14/2015 | 58 | REDACTED FIRST SUPERSEDING INDICTMENT as to Martin Lustgarten Acherman, Salomon Bendayan, Andres Uricoechea-Williamson. (Simeone, Maria) (Entered: 06/16/2015) |
| 05/15/2015 | 42 | MOTION to Modify Conditions of Release as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 05/15/2015) |
| 05/15/2015 | 43 | NOTICE OF ATTORNEY APPEARANCE Katherine H. Ferguson appearing for USA. (Ferguson, Katherine) (Entered: 05/15/2015) |
| 05/20/2015 | 46 | Opposition by USA as to Martin Lustgarten Acherman re 42 MOTION to Modify Conditions of Release (Ricci, Linda) (Entered: 05/20/2015) |
| 05/29/2015 | 47 | MOTION for Leave to File *Motion Under Seal* as to Martin Lustgarten Acherman. (Attachments: # 1 Text of Proposed Order)(Diamond, Nathan) (Entered: 05/29/2015) |
| 06/01/2015 | 48 | Magistrate Judge Judith G. Dein: ELECTRONIC ORDER entered granting 47 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to Martin Lustgarten Acherman (1) (Quinn, Thomas) (Entered: 06/01/2015) |
| 06/02/2015 | 50 | ELECTRONIC NOTICE OF HEARING as to Martin Lustgarten AchermanHearing set for 6/3/2015 11:00 AM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Quinn, Thomas) (Entered: 06/02/2015) |
| 06/03/2015 | 51 | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Judith G. Dein:Hearing as to Martin Lustgarten Acherman held on 6/3/2015;Case called; Dft. was present for hearing; USMJ Dein hears arguments from Dft. and Govt. on Dft's request to reopen detention matter. Govt. also informs the court of possible conflict of interest in representation by Attorney Diamond. USMJ Dein will grant Dft. further detention hearing. Counsel shall contact deputy clerk Quinn to schedule hearing. (Attorneys present: Furgerson Diamond. )Court Reporter Name and Contact or digital recording information: Digital Recording - For transcripts or CDs contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Quinn, Thomas) (Entered: 06/03/2015) |
| 06/08/2015 | 52 | NOTICE OF ATTORNEY APPEARANCE Joseph Palazzo appearing for USA. (Palazzo, Joseph) (Main Document 52 replaced on 6/9/2015) (Montes, Mariliz). Modified on 6/9/2015 to replace document in PDF Format (Montes, Mariliz). (Entered: 06/08/2015) |
| 06/10/2015 | 53 | ELECTRONIC NOTICE OF HEARING as to Martin Lustgarten Acherman Detention Hearing set for 6/12/2015 10:00 AM in Courtroom 15 before Magistrate |

11/17/2015                          CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

| | | Judge Judith G. Dein. (Quinn, Thomas) (Entered: 06/10/2015) |
|---|---|---|
| 06/12/2015 | 54 | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Judith G. Dein:Detention Hearing as to Martin Lustgarten Acherman held on 6/12/2015; Case called; Counsel have agreed to proceed via proffer; Govt. makes proffer for detention and submits exhibits 1-3; Dft. makes proffer on conditions for release; USMJ Dein orders the Dft detained and remanded to custody of US Marshal. (Attorneys present: Palazzo, Ferguson and Diamond. )Court Reporter Name and Contact or digital recording information: Digital Recording - For transcripts or CDs contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Quinn, Thomas) (Entered: 06/12/2015) |
| 06/16/2015 | 59 | Magistrate Judge Judith G. Dein: ORDER entered. ORDER OF DETENTION as to Martin Lustgarten Acherman (Quinn, Thomas) (Entered: 06/17/2015) |
| 06/18/2015 | 60 | STATUS REPORT *Initial Status Report* by USA as to Martin Lustgarten Acherman (Ricci, Linda) (Entered: 06/18/2015) |
| 06/18/2015 | 61 | ELECTRONIC NOTICE OF HEARING as to Martin Lustgarten Acherman, Salomon Bendayan, Andres Uricoechea-Williamson. The court has set an initial Status Conference in this matter for 6/26/2015 02:00 PM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 06/18/2015) |
| 06/18/2015 | 63 | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Judith G. Dein: Status Conference as to Martin Lustgarten Acherman held on 6/18/2015; Initial conference was held in lobby with Attorney Diamond via telephone and the court summarized what was reported to the court. The Govt. reports there is voluminous discovery, it has produced discovery on a rolling basis to date and requests the court find this is a complex case. Dft. objects to complex case classification and any time exclusion from speedy trial. USMJ Dein finds this is a complex case and sets July 6, 2015 for Dft. to request additional discovery and the Govt. will identify any outstanding automatic discovery to be produced and date they will produce any outstanding discovery. Next conference is set for 7/31/15 @ 11:00am. (Attorneys present: Ricci, Ferguson, Mullane and Diamond via telephone. )Court Reporter Name and Contact or digital recording information: Digital Recording - For transcripts or CDs contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Quinn, Thomas) (Entered: 06/19/2015) |
| 06/18/2015 | 64 | Magistrate Judge Judith G. Dein: ORDER entered. STATUS REPORT as to Martin Lustgarten Acherman Status Conference set for 7/31/2015 11:00 AM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Quinn, Thomas) (Entered: 06/19/2015) |
| 06/18/2015 | 65 | Magistrate Judge Judith G. Dein: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Martin Lustgarten Acherman. Time excluded from 6/18/15 until 7/31/15. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Quinn, Thomas) (Entered: 06/19/2015) |
| 06/19/2015 | 62 | MOTION to Seal Document *Appeal of Pre-Trial Detention Order* as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 06/19/2015) |
| 06/22/2015 | 66 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. The Government shall respond to the defendants motion to seal by close of business Wednesday 6/24/15. as to Martin Lustgarten Acherman re 62 MOTION to Seal Document |

CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

| | | |
|---|---|---|
| | | *Appeal of Pre-Trial Detention Order* filed by Martin Lustgarten Acherman, ( Responses due by 6/24/2015) (Simeone, Maria) (Entered: 06/22/2015) |
| 06/23/2015 | 67 | Transcript of Detention Hearing as to Martin Lustgarten Acherman held on June 12, 2015, before Magistrate Judge Judith G. Dein. Court Reporter Name:No Reporter Used. Digital Recording transcribed by Maryann Young. The Transcript may be purchased through Maryann Young at 508-384-2003, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 7/14/2015. Redacted Transcript Deadline set for 7/24/2015. Release of Transcript Restriction set for 9/21/2015. (Scalfani, Deborah) (Entered: 06/23/2015) |
| 06/23/2015 | 68 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 06/23/2015) |
| 06/23/2015 | 69 | set Hearings as to Martin Lustgarten Acherman. Status Conference set for 6/26/2015 02:00 PM in Courtroom 13 before District Judge Leo T. Sorokin. Status Conference set for 7/31/2015 11:00 AM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Simeone, Maria) (Entered: 06/23/2015) |
| 06/24/2015 | 70 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. The Motion to Seal is ALLOWED AS UNOPPOSED in light of the government counsel's report to the Clerk that the government does not oppose the motion. Defendant may file the documents under seal, however, defendant must file redacted copies on the public docket redacting only those portions of the documents subject to sealing. re 62 Motion to Seal Document as to Martin Lustgarten Acherman (1) (Simeone, Maria) (Entered: 06/24/2015) |
| 06/24/2015 | 71 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Martin Lustgarten Acherman (Mullane, E. Peter) (Entered: 06/24/2015) |
| 06/26/2015 | 76 | ELECTRONIC Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Status Conference as to Martin Lustgarten Acherman, Salomon Bendayan, Andres Uricoechea-Williamson held on 6/26/2015. Counsel state the status of the case. Defendant Bendayan is in Florida and will be set up for arraignment before Judge Dein. Defendant Williamson is currently in South America. Counsel discuss discovery and various documents needed from other countries and hope to be done and ready to proceed by the end of the summer. Some Discovery will be provided by 7/6/15. counsel anticipate a 3-4 week trial. The government will respond to the Lustgarten appeal by 7/8/15 and proposes ruling on the papers, defense counsel requests oral argument with 2 DEA agent witnesses. The government objects to the DEA agents as witnesses. The court will take the matter under advisement. The court sets the hearing on appeal for 7/10/15 at 11:30 AM.Court Reporter Name and Contact or digital recording information: Rachel Lopez at raeufp@gmail.com. (Simeone, Maria) (Entered: 06/30/2015) |
| 07/03/2015 | 77 | MOTION for Leave to File *Supplemental Memorandum Under Seal* as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 07/03/2015) |
| 07/06/2015 | 79 | ELECTRONIC NOTICE OF HEARING ON MOTION. The hearing on appeal as to Martin Lustgarten Acherman has been set for 7/10/2015 11:30 AM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: |

| | | 07/06/2015) |
|---|---|---|
| 07/08/2015 | 81 | Government's BRIEF as to Martin Lustgarten Acherman (Palazzo, Joseph) (Main Document 81 replaced on 7/9/2015) (Montes, Mariliz). (Additional attachment(s) added on 7/9/2015: # 1 Exhibit 1, # 2 Exhibit 2) (Montes, Mariliz). (Entered: 07/08/2015) |
| 07/09/2015 | 83 | ELECTRONIC NOTICE as to Martin Lustgarten Acherman. The Motion Hearing set for 7/10/2015 will be held at 10:30 AM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 07/09/2015) |
| 07/10/2015 | 85 | ELECTRONIC Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:Motion Hearing as to Martin Lustgarten Acherman held on 7/10/2015; re *Appeal of Pre-Trial Detention Order* filed by Martin Lustgarten Acherman. The court hears from defense counsel regarding issues with the conditions of confinement. The court advises counsel to discuss confinement issues with the Marshals. Counsel discuss discovery, the Government still has groups of information to turn over consisting of agent notes, international materials, DEA reports from Columbia, and the MLAT file. Defense counsel claims the discovery period has ended on 7/6 and request the government be held to that date. The court hears the oral argument of counsel regarding the detention appeal. Government Counsel discuss the alleged scheme, source of funds and information, Evidence regarding Money laundering, and knowledge of drug proceeds. Defense counsel argues the government cannot prove their case and will be invoking a defense of public authority. Defense counsel proffers home detention with posting of family properties, a private security firm and the family passports. The court conveys its concern regarding risk of flight and is unsure conditions of release can be fashioned to mitigate that risk. The court will allow counsel to supplement the conditions, by close of business 7/17/15 the government shall inform the court as to whether or not they wish to respond to the supplement. The court will take the matter under advisement and absent any supplemental filings the court will decide the motion. Court Reporter Name and Contact or digital recording information: Catherine Handel at hhcatherine2@yahoo.com. (Simeone, Maria) Modified on 7/14/2015 (Simeone, Maria). Modified on 7/21/2015 (Scalfani, Deborah). (Entered: 07/14/2015) |
| 07/15/2015 | 86 | MOTION for Bill of Particulars as to Martin Lustgarten Acherman. (Diamond, Nathan) (Entered: 07/15/2015) |
| 07/16/2015 | 90 | NOTICE *of Filing* by Martin Lustgarten Acherman re 85 Motion Hearing, Set/Reset Motion and R&R Deadlines/Hearings,,,,,,,,,,,,,,, (Attachments: # 1 Exhibit)(Diamond, Nathan) (Entered: 07/16/2015) |
| 07/17/2015 | 93 | NOTICE *of Filing* by Martin Lustgarten Acherman re 90 Notice (Other) (Attachments: # 1 Exhibit Contract, # 2 Exhibit Resume, # 3 Exhibit Resume, # 4 Exhibit Resume, # 5 Exhibit Resume)(Diamond, Nathan) (Attachment 2 replaced on 7/20/2015) (Montes, Mariliz). (Entered: 07/17/2015) |
| 07/17/2015 | 94 | MOTION for Exculpatory Evidence as to Martin Lustgarten Acherman. (Diamond, Nathan) (Entered: 07/17/2015) |
| 07/17/2015 | 95 | RESPONSE TO COURT ORDER by USA as to Martin Lustgarten Acherman (Ricci, Linda) (Entered: 07/17/2015) |

| 07/19/2015 | 96 | MOTION to Inspect *Grand Jury Minutes* as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 07/19/2015) |
| 07/20/2015 | 97 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. The Government shall file its supplemental response to the appeal of the detention order by July 24, 2015, as requested. re 74 Appeal of Magistrate Judge Decision to District Court - Magistrate Judge Order, filed by Martin Lustgarten Acherman (Responses due by 7/24/2015) (Simeone, Maria) (Entered: 07/20/2015) |
| 07/23/2015 | 99 | Transcript of Motion Hearing as to Martin Lustgarten Acherman held on July 10, 2015, before Judge Leo T. Sorokin. Court Reporter Name and Contact Information: Catherine Handel at hhcatherine2@yahoo.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/13/2015. Redacted Transcript Deadline set for 8/24/2015. Release of Transcript Restriction set for 10/21/2015. (Scalfani, Deborah) (Entered: 07/23/2015) |
| 07/23/2015 | 100 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 07/23/2015) |
| 07/24/2015 | 101 | Response as to Martin Lustgarten Acherman: 90 Notice (Other) filed by Martin Lustgarten Acherman. (Palazzo, Joseph) (Entered: 07/24/2015) |
| 07/26/2015 | 102 | MEMORANDUM in Support by Martin Lustgarten Acherman re 62 MOTION to Seal Document *Appeal of Pre-Trial Detention Order* (Mullane, E. Peter) (Entered: 07/26/2015) |
| 07/28/2015 | 103 | Motion of Defendant Martin Lustgarten Acherman to File Under Seal a Brief Addendum to His Second Supplemental Memorandum re 62 MOTION to Seal Document *Appeal of Pre-Trial Detention Order Motion to file addendum under seal* (Mullane, E. Peter) Modified on 7/29/2015 (Montes, Mariliz). (Entered: 07/28/2015) |
| 07/28/2015 | 104 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. as to Martin Lustgarten Acherman. The Court has before it Defendant's Second Supplemental Memorandum (#102). Now, Defendant Acherman has filed a document styled as a Motion to File Under Seal a Brief Addendum to this Second Supplement Memorandum. This pleading is Docket #103. Defendant Acherman may file such a brief addendum and may file it under seal provided (1) any further memorandum is limited to five pages and (2) Defendant files this addendum within one business day. (Sorokin, Leo) (Entered: 07/28/2015) |
| 07/30/2015 | 106 | District Judge Leo T. Sorokin: ORDER ON DEFENDANTS APPEAL FROM ORDERS OF DETENTIONAND RELATED SCHEDULING ORDERS entered as to Martin Lustgarten Acherman Achermans appeal, Doc. No. 71, is DENIED and the Order of Detentionissued by Judge Dein, Doc. No. 59, is AFFIRMED.The time period from May 15 to June 16, 2015 is EXCLUDED under the Speedy Trial Act due to the pendency of Achermans Motion for Reconsideration. 18 U.S.C. § 3161(h)(1)(D). The time period from June 24 to July 29, 2015 is EXCLUDED under the Speedy Trial Act due to the pendency of Achermans appeal seeking review of the order of detention. The Government proposed commencing trial in |

| | | |
|---|---|---|
| | | early December, while Acherman seeks a trial date in August. Seventy days remainbeginning July 31, 2015under the Speedy Trial Act within which to commence trial of this matter in light of prior exclusion orders. The Government shall make a filing, within seven days, setting forth its reasons to delay the trial until December. The filing shall also include an articulation of the grounds supporting the exclusionof time from July 31, 2015 to the proposed trial date, the first Monday in December. Acherman may respond to the Governments submission within seven days of its filing. The Court will review those filings and establish a firm date for the trial of this matter. (Montes, Mariliz) (Entered: 07/30/2015) |
| 07/31/2015 | 107 | MOTION for Leave to File *Out of Time* as to Martin Lustgarten Acherman by USA. (Ferguson, Katherine) (Entered: 07/31/2015) |
| 07/31/2015 | 108 | Opposition by USA as to Martin Lustgarten Acherman re 86 MOTION for Bill of Particulars (Ferguson, Katherine) (Entered: 07/31/2015) |
| 07/31/2015 | 109 | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Judith G. Dein: Status Conference as to Martin Lustgarten Acherman held on 7/31/2015; Govt. reports on current case status, pending motions and leave to file opposition late; USMJ Dein hears from defense counsel on problems encountered with Dft. being detained and reviewing discovery; USMJ Dein allows Govt. motion to file opposition late and sets next conference for 9/11/15 @ 10:00am. Defense counsel shall inform the court if they seek a hearing on pending discovery motions once the oppositions are filed. (Attorneys present: Ricci, Ferguson, Diamond and Mullane. )Court Reporter Name and Contact or digital recording information: Digital Recording - For transcripts or CDs contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Quinn, Thomas) (Entered: 07/31/2015) |
| 07/31/2015 | 110 | Opposition by USA as to Martin Lustgarten Acherman re 94 MOTION for Exculpatory Evidence (Ferguson, Katherine) (Entered: 07/31/2015) |
| 07/31/2015 | 111 | Magistrate Judge Judith G. Dein: ELECTRONIC ORDER entered granting 107 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to Martin Lustgarten Acherman (1) (Quinn, Thomas) (Entered: 08/03/2015) |
| 07/31/2015 | 112 | Magistrate Judge Judith G. Dein: ORDER entered. STATUS REPORT as to Martin Lustgarten Acherman Status Conference set for 9/11/2015 10:00 AM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Quinn, Thomas) (Entered: 08/03/2015) |
| 07/31/2015 | 113 | Magistrate Judge Judith G. Dein: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Martin Lustgarten Acherman. Time excluded from 7/31/15 until 9/11/15. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Quinn, Thomas) (Entered: 08/03/2015) |
| 08/03/2015 | 114 | Opposition by USA as to Martin Lustgarten Acherman re 96 MOTION to Inspect *Grand Jury Minutes* (Ricci, Linda) (Entered: 08/03/2015) |
| 08/04/2015 | 115 | ELECTRONIC NOTICE OF HEARING as to Martin Lustgarten Acherman; At the defendant's request a Hearing on the pending discovery motions is set for |

| | | 9/8/2015 02:00 PM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Quinn, Thomas) (Entered: 08/04/2015) |
|---|---|---|
| 08/06/2015 | 116 | Memorandum regarding Scheduling of Trial Date as to Martin Lustgarten Acherman, Salomon Bendayan, Andres Uricoechea-Williamson (Ferguson, Katherine) (Entered: 08/06/2015) |
| 08/11/2015 | 119 | Memorandum regarding Scheduling Speedy Trial Date as to Martin Lustgarten Acherman (Diamond, Nathan) (Entered: 08/11/2015) |
| 08/22/2015 | 122 | First MOTION to Sever as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 08/22/2015) |
| 08/24/2015 | 124 | MOTION to Dismiss as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 08/24/2015) |
| 08/25/2015 | 125 | NOTICE OF ATTORNEY APPEARANCE Christopher R. Donato appearing for USA. (Donato, Christopher) (Entered: 08/25/2015) |
| 08/25/2015 | 126 | BILL OF PARTICULARS as to Martin Lustgarten Acherman *(for Forfeiture of Assets)* (Donato, Christopher) (Entered: 08/25/2015) |
| 08/25/2015 | 127 | NOTICE of Withdrawal of Appearance by Government Attorney Veronica M. Lei as to Martin Lustgarten Acherman, Salomon Bendayan, Andres Uricoechea-Williamson (Lei, Veronica) (Entered: 08/25/2015) |
| 08/25/2015 | 128 | NOTICE *of a Public Authority Defense* by Martin Lustgarten Acherman (Diamond, Nathan) (Entered: 08/25/2015) |
| 08/28/2015 | 129 | MOTION for Reconsideration re 106 Order,,,,, as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 08/28/2015) |
| 09/02/2015 | 130 | District Judge Leo T. Sorokin: ORDER ON MOTION FOR RECONSIDERATION, SCHEDULING OF HEARING AND REFERRAL OF DISCOVERY MOTIONS entered. The Court will hold a hearing on September 22, 2015 at 3:00 p.m. on the following motions: (1) Achermans Motion to Sever (#122); and (2) Achermans Motion to Dismiss(#124). Defendant Bendayan has filed a document (#120) styled as Notice of Omnibus Motions. The Motion for Reconsideration of Pretrial Detention (#129) is DENIED. Insofar as theMotion addresses the date of the trial, the Court will consider it in establishing the date of the trial. The Clerk shall terminate Docket #121 as a motion as it is a memorandum addressing the trial date, not a motion. The Court will consider it regarding the scheduling of the trial. The Motion for Bill of Particulars (#86), the Motion for Exculpatory Evidence (#94), and the Motion to Inspect Grand Jury Minutes (#96) are referred to Magistrate Judge Dein. (Simeone, Maria) (Entered: 09/02/2015) |
| 09/02/2015 | 131 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Martin Lustgarten Acherman, Salomon Bendayan. The court will hold a hearing on the following motions: 124 MOTION to Dismiss , 122 First MOTION to Sever , 120 First MOTION to Dismiss *the indictment* :The Motion Hearing has been set for 9/22/2015 03:00 PM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 09/02/2015) |
| 09/02/2015 | 132 | District Judge Leo T. Sorokin: ORDER REFERRING MOTIONS entered as to |

| | | |
|---|---|---|
| | | Martin Lustgarten Acherman 96 MOTION to Inspect *Grand Jury Minutes* filed by Martin Lustgarten Acherman, 94 MOTION for Exculpatory Evidence filed by Martin Lustgarten Acherman, 86 MOTION for Bill of Particulars filed by Martin Lustgarten Acherman (Simeone, Maria) Motions referred to Judith G. Dein. (Entered: 09/02/2015) |
| 09/03/2015 | 133 | MOTION for Hearing *Rescheduling* as to Martin Lustgarten Acherman, Salomon Bendayan by Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 09/03/2015) |
| 09/04/2015 | 134 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 133 Motion for Hearing as to Martin Lustgarten Acherman (1), Salomon Bendayan (2)The hearing has been rescheduled for 10/1/15 at 2:00pm. (Simeone, Maria) (Entered: 09/04/2015) |
| 09/04/2015 | 135 | ELECTRONIC NOTICE as to Martin Lustgarten Acherman, Salomon Bendayan, Resetting Hearing on Motion 124 MOTION to Dismiss , 120 First MOTION to Dismiss *the indictment* :The Motion Hearing has been reset for 10/1/2015 02:00 PM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 09/04/2015) |
| 09/08/2015 | 136 | ELECTRONIC Clerk's Notes for proceedings held before Magistrate Judge Judith G. Dein:Motion Hearing as to Martin Lustgarten Acherman held on 9/8/2015 re 96 MOTION to Inspect *Grand Jury Minutes* filed by Martin Lustgarten Acherman, 94 MOTION for Exculpatory Evidence filed by Martin Lustgarten Acherman, 86 MOTION for Bill of Particulars filed by Martin Lustgarten Acherman; Case called;Dft. Acherman present in courtroom; USMJ Dein hears arguments from the Dft. and the Govt. and makes rulings and will issue order. Status conference set for 9/11/15 is cancelled, counsel to file status report. (Attorneys present: Ricci,Ferguson,Palazzo,Diamond and Mullane. )Court Reporter Name and Contact or digital recording information: Digital Recording - For transcripts or CDs contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Quinn, Thomas) (Entered: 09/08/2015) |
| 09/08/2015 | 137 | Magistrate Judge Judith G. Dein: ORDER entered denying 86 Motion for Bill of Particulars as to Martin Lustgarten Acherman (1); granting in part and denying in part 94 Motion for Exculpatory Evidence as to Martin Lustgarten Acherman (1); taking under advisement 96 Motion to Inspect as to Martin Lustgarten Acherman (1) (Quinn, Thomas) (Entered: 09/08/2015) |
| 09/08/2015 | 138 | MOTION to Continue to September 15, 2015 to File Government's Response to Defendant's Motion to Sever (#122) and Motion to Dismiss (#124) as to Martin Lustgarten Acherman by USA. (Ricci, Linda) (Entered: 09/08/2015) |
| 09/09/2015 | 139 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 138 Motion to Continue as to Martin Lustgarten Acherman (1) to respond to the Motion to Dismiss or to sever by 9/15/15 (Simeone, Maria) (Entered: 09/09/2015) |
| 09/10/2015 | 141 | ELECTRONIC NOTICE CANCELING STATUS CONFERENCE for 9/11/15 @ 10:00am.as to Martin Lustgarten Acherman, Salomon Bendayan. (Quinn, Thomas) (Entered: 09/10/2015) |
| 09/10/2015 | 142 | STATUS REPORT *Joint Status Report of the Parties* by USA as to Martin Lustgarten Acherman, Salomon Bendayan (Ricci, Linda) (Entered: 09/10/2015) |

| 09/11/2015 | 143 | STATUS REPORT *in Response to Document 130* by USA as to Martin Lustgarten Acherman, Salomon Bendayan (Palazzo, Joseph) (Entered: 09/11/2015) |
| 09/15/2015 | 144 | Magistrate Judge Judith G. Dein: ORDER entered. STATUS REPORT as to Martin Lustgarten Acherman, Salomon Bendayan Status Conference set for 10/26/2015 10:00 AM in Courtroom 15 before Magistrate Judge Judith G. Dein. (Quinn, Thomas) (Entered: 09/15/2015) |
| 09/15/2015 | 145 | Magistrate Judge Judith G. Dein: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Martin Lustgarten Acherman, Salomon Bendayan. Time excluded from 9/11/15 until 10/26/15. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Quinn, Thomas) (Entered: 09/15/2015) |
| 09/15/2015 | 146 | Opposition by USA as to Martin Lustgarten Acherman re 124 MOTION to Dismiss (Palazzo, Joseph) (Entered: 09/15/2015) |
| 09/16/2015 | 147 | Opposition by USA as to Martin Lustgarten Acherman, Salomon Bendayan re 120 First MOTION to Dismiss *the indictment*, 122 First MOTION to Sever (Ferguson, Katherine) (Entered: 09/16/2015) |
| 09/18/2015 | 148 | STATUS REPORT *Reply to Govt. Submission #143* by Salomon Bendayan as to Martin Lustgarten Acherman, Salomon Bendayan, Andres Uricoechea-Williamson (Brownstein, Howard) (Entered: 09/18/2015) |
| 09/19/2015 | 149 | SUR-REPLY to Motion by Martin Lustgarten Acherman re 124 MOTION to Dismiss (Mullane, E. Peter) (Entered: 09/19/2015) |
| 09/21/2015 | 150 | RESPONSE TO COURT ORDER by Martin Lustgarten Acherman (Mullane, E. Peter) (Entered: 09/21/2015) |
| 09/23/2015 | 152 | STATUS REPORT *Regarding Exculpatory Evidence* by USA as to Martin Lustgarten Acherman, Salomon Bendayan (Ricci, Linda) (Entered: 09/23/2015) |
| 09/24/2015 | 153 | MOTION to Continue *Deadline* to September 25, 2015 to File Affidavit and Memorandum as to Martin Lustgarten Acherman by USA. (Ferguson, Katherine) (Entered: 09/24/2015) |
| 09/24/2015 | 155 | Objection as to Martin Lustgarten Acherman: 152 Status Report filed by USA. (Mullane, E. Peter) (Entered: 09/24/2015) |
| 09/28/2015 | 159 | Supplemental MEMORANDUM in Support by Martin Lustgarten Acherman re 124 MOTION to Dismiss (Mullane, E. Peter) (Entered: 09/28/2015) |
| 09/28/2015 | 160 | Transcript of Motion Hearing as to Martin Lustgarten Acherman held on September 8, 2015, before Magistrate Judge Judith G. Dein. Court Reporter Name: No Reporter Used. Digital Recording transcribed by Maryann Young. The Transcript may be purchased through Maryann Young at 508-384-2003, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/19/2015. Redacted Transcript Deadline set for 10/29/2015. Release of Transcript Restriction set for 12/28/2015. (Scalfani, Deborah) (Entered: 09/28/2015) |
| 09/28/2015 | 161 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at |

| | | |
|---|---|---|
| | | http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 09/28/2015) |
| 09/30/2015 | 163 | Transcript of Arraignment as to Martin Lustgarten Acherman held on May 7, 2015, before Magistrate Judge Judith G. Dein. Court Reporter Name: No Reporter Used. Digital Recording transcribed by Maryann Young. The Transcript may be purchased through Maryann Young at 508-384-2003, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/21/2015. Redacted Transcript Deadline set for 11/2/2015. Release of Transcript Restriction set for 12/29/2015. (Scalfani, Deborah) (Entered: 09/30/2015) |
| 09/30/2015 | 164 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 09/30/2015) |
| 10/01/2015 | 166 | ELECTRONIC Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:Motion Hearing as to Martin Lustgarten Acherman, Salomon Bendayan held on 10/1/2015. The court hears counsel on the motions to dismiss. The court hears the oral argument regarding the similarities and differences between the Governments case here in Boston and the case in Miami and where proper venue would be. Counsel discuss alleged agreements and disagreements between the offices. Counsel discuss R21(b) regarding transfers. Defense counsel for defendant Bendayan request the Boston indictment be dismissed and or severance to send the case back to Florida. The Government objects to the change of venue as the indictment is alleged to be true by the grand jury and the indictment on its face creates venue in Boston. Counsel discuss the whereabout of Defendant Uricoechea-Williamson. The Government reports Columbia. The court discusses trial dates. Counsel for defendant Acherman request a prompt trial date. The government proposes June 2016 for trial. The court will take these matters under advisement re 120 First MOTION to Dismiss *the indictment* filed by Salomon Bendayan, 124 MOTION to Dismiss filed by Martin Lustgarten Acherman Court Reporter Name and Contact or digital recording information: Rachel Lopez at raeufp@gmail.com. (Simeone, Maria) (Entered: 10/06/2015) |
| 10/07/2015 | 168 | STATUS REPORT by USA as to Martin Lustgarten Acherman (Ferguson, Katherine) (Entered: 10/07/2015) |
| 10/10/2015 | 171 | Transcript of Motion Hearing as to Martin Lustgarten Acherman, Salomon Bendayan held on October 1, 2015, before Judge Leo T. Sorokin. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2015. Redacted Transcript Deadline set for 11/10/2015. Release of Transcript Restriction set for 1/8/2016. (Scalfani, Deborah) (Entered: 10/10/2015) |
| 10/10/2015 | 172 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 10/10/2015) |

CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

| 10/14/2015 | 173 | STATUS REPORT *Regarding Exculpatory Evidence* by USA as to Martin Lustgarten Acherman (Ricci, Linda) (Entered: 10/14/2015) |
|---|---|---|
| 10/16/2015 | 174 | District Judge Leo T. Sorokin: ORDER entered Order on Defendants' Motion to Dismiss for Improper Venue, or, in the Alternative to Transfer Venue to the Southern District of Florida under Federal Rule of Criminal Procedure 21 (B) For the foregoing reasons, the Court ALLOWS Lustgartens (Doc. No. 124) andBendayans (Doc. No. 120) motions in the alternative for transfer of venue, pursuant to Federal Rule of Criminal Procedure 21(b), of Count I to the Southern District of Florida. (Joint Status Report due by 10/23/2015) (Montes, Mariliz) (Entered: 10/16/2015) |
| 10/16/2015 | 175 | Magistrate Judge Judith G. Dein: ORDER entered. MEMORANDUM OF DECISION AND ORDER denying 96 Motion to Inspect Grand Jury Minutes as to Martin Lustgarten Acherman. (Dambrosio, Jolyne) (Entered: 10/16/2015) |
| 10/16/2015 | 178 | ORDER OF TRANSFER (Rule 21) as to Count 1 only to Southern District of Florida as to Martin Lustgarten Acherman (Montes, Mariliz) (Entered: 10/19/2015) |
| 10/16/2015 | 180 | District Judge Leo T. Sorokin: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Martin Lustgarten Acherman. Time excluded from 8/11/15 until 10/14/15. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Simeone, Maria) (Entered: 10/23/2015) |
| 10/22/2015 | 179 | MOTION for Protective Order as to Martin Lustgarten Acherman by USA. (Attachments: # 1 Exhibit Proposed Order)(Ferguson, Katherine) (Entered: 10/22/2015) |
| 10/23/2015 | 182 | STATUS REPORT *Trial Date* by Martin Lustgarten Acherman (Mullane, E. Peter) (Entered: 10/23/2015) |
| 10/23/2015 | 183 | STATUS REPORT *Government Status Report Regarding Trial Date on Counts Two and Three* by USA as to Martin Lustgarten Acherman (Ricci, Linda) (Entered: 10/23/2015) |
| 10/26/2015 | 184 | STATUS REPORT *Government's Status Report* by USA as to Martin Lustgarten Acherman (Ricci, Linda) (Entered: 10/26/2015) |
| 10/26/2015 | 185 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Judith G. Dein: Final Status Conference as to Martin Lustgarten Acherman held on 10/26/2015; Counsel report discovery status and pending motion for protective order. USMJ Dein will issue report and return file to the district court. (Attorneys present: Ricci, Ferguson,Palazzo and Mullane. )Court Reporter Name and Contact or digital recording information: Digital Recording - For transcripts or CDs contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Quinn, Thomas) (Entered: 10/26/2015) |
| 10/26/2015 | 186 | Magistrate Judge Judith G. Dein: ELECTRONIC ORDER entered granting 179 Motion for Protective Order as to Martin Lustgarten Acherman (1) (Quinn, Thomas) (Entered: 10/26/2015) |
| 10/26/2015 | 187 | Magistrate Judge Judith G. Dein: ELECTRONIC ORDER entered finding as moot 153 Motion to Continue as to Martin Lustgarten Acherman (1) (Quinn, Thomas) (Entered: 10/26/2015) |

11/17/2015                                   CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

| 10/26/2015 | 188 | Magistrate Judge Judith G. Dein: ORDER entered. PROTECTIVE ORDER as to Martin Lustgarten Acherman (Quinn, Thomas) (Entered: 10/26/2015) |
| 10/26/2015 | 189 | Magistrate Judge Judith G. Dein: ORDER entered. REPORT AND ORDER on Final Status Conference as to Martin Lustgarten Acherman (Quinn, Thomas) (Entered: 10/26/2015) |
| 10/26/2015 | 190 | Magistrate Judge Judith G. Dein: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Martin Lustgarten Acherman. Time excluded from 10/26/15 until 11/6/15. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Quinn, Thomas) (Entered: 10/26/2015) |
| 10/27/2015 | 191 | ELECTRONIC NOTICE OF HEARING as to Martin Lustgarten Acherman. The Initial Pretrial Conference has been set for 11/6/2015 09:30 AM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 10/27/2015) |
| 10/27/2015 | 192 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered acknowledging 189 Report and Order on Final Status Conference by Magistrate Judge as to Martin Lustgarten Acherman (1) (Simeone, Maria) (Entered: 10/27/2015) |
| 10/27/2015 | 193 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Martin Lustgarten Acherman Appeal of order: 190 Order on Excludable Delay, (Mullane, E. Peter) (Entered: 10/27/2015) |
| 10/27/2015 | 194 | MOTION for Hearing *Pretrial Conference Rescheduling* as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 10/27/2015) |
| 10/28/2015 | 195 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. Previously, the Court understood that both defendant and defense counsel preferred not to have hearings into the afternoon on Fridays due to the Sabbath. Counsel shall confirm whether he does seek a hearing on Friday at 2:00 p.m. In any event, the Government shall respond to the Motion by close of business today including in its response any updated information on the timing of a status in Florida as the Court originally selected November 6, 2015 because it followed by two days the anticipated conference in the Southern District of Florida. ( Responses due by 10/28/2015) (Montes, Mariliz) (Entered: 10/28/2015) |
| 10/28/2015 | 196 | ADDENDUM by Martin Lustgarten Acherman re 194 MOTION for Hearing *Pretrial Conference Rescheduling* (Mullane, E. Peter) (Entered: 10/28/2015) |
| 10/28/2015 | 197 | MOTION to Continue *Initial Pretrial Conference* as to Martin Lustgarten Acherman by USA. (Palazzo, Joseph) (Entered: 10/28/2015) |
| 10/29/2015 | 198 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered The Motion to Continue the Initial Pretrial Conference 197 is ALLOWED. The Motion for Hearing Rescheduling the Initial Pretrial Conference 194 is DENIED. In light of the statements by the parties in their respective status reports, by November 5, 2015, Defendant Acherman shall file a report with the Court stating whether he intends to file a motion to transfer under Fed. R. Crim. P 21 Counts II and III to the Southern District of Florida. The Government shall attend the November 9, 2015 conference prepared to explain its response to the position of Defendant as well as whether it intends to supercede in Florida to allege Counts II and III there. The Court hereby EXCLUDES under the Speedy Trial Act (1) the period from October 27, 2015 to October 28, 2015, inclusive under 18 U.S.C. section 3161(h) |

11/17/2015                                        CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

| | | |
|---|---|---|
| | | (1)(D); (2) the period from October 28, 2015 to November 9, 2015, so as to permit the parties a reasonable period of time to evaluate how to proceed expeditiously and reasonably in light of the Court's prior ruling under Rule 21. For these reasons, the Court finds that the interests of justice warranting delay outweigh the defendant's and the public's separate interests in a speedy trial and the exclusion is warranted under 18 U.S.C. section 3161(h)(7)(A). (Montes, Mariliz) (Entered: 10/29/2015) |
| 10/29/2015 | 199 | Set Deadlines as to Martin Lustgarten Acherman: Defendant, Acherman's Status Report due by 11/5/2015. (Montes, Mariliz) (Entered: 10/29/2015) |
| 10/29/2015 | 200 | ELECTRONIC NOTICE OF HEARING as to Martin Lustgarten Acherman. The Initial Pretrial Conference has been set for 11/9/2015 11:00 AM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 10/29/2015) |
| 10/29/2015 | 201 | District Judge Leo T. Sorokin: ORDER ON EXCLUDABLE DELAY entered as to Martin Lustgarten Acherman Time excluded from 10/27/15 until 10/28/15. Time excluded from 10/28/15 until 11/9/15. (Simeone, Maria) (Entered: 10/29/2015) |
| 11/02/2015 | 202 | MOTION to Transfer Case *Rule 21(b)* as to Martin Lustgarten Acherman. (Mullane, E. Peter) (Entered: 11/02/2015) |
| 11/05/2015 | 203 | First ADDENDUM by Martin Lustgarten Acherman re 202 MOTION to Transfer Case *Rule 21(b)* (Mullane, E. Peter) (Entered: 11/05/2015) |
| 11/09/2015 | 204 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Initial Pretrial Conference as to Martin Lustgarten Acherman held on 11/9/2015. The government states its position on the motion to transfer and informs the court that they will not be opposing the transfer of counts 2 and 3 to Miami. The defendant waives in open court any further issues regarding venue in Miami. Defendant remanded to the custody of the US Marshal and will be transferred to Miami. The court allows the motion as unopposed in open court re 202 Motion to Transfer Case as to Martin Lustgarten Acherman (1)Court Reporter Name and Contact or digital recording information: Rachel Lopez at raeufp@gmail.com. (Simeone, Maria) (Entered: 11/09/2015) |
| 11/09/2015 | 205 | District Judge Leo T. Sorokin: ORDER ON MOTION OF DEFENDANT MARTIN LUSTGARTEN-ACHERMAN TO TRANSFER COUNTS TWO AND THREE PURSUANT TO RULE 21(b) TO THE U.S.DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA (NO. 202) entered. This Motion to Transfer, Doc. No. 202, is ALLOWED AS UNOPPOSED. The time from November 2, 2015 to November 9, 2015, inclusive, is hereby EXCLUDED under 18 U.S.C. § 3161(h)(1)(D). The Court hereby Orders the Clerk of the United States District Court for the District of Massachusetts to transfer to the Southern District of Florida Counts II and III of the Superseding Indictment as against Defendant Lustgarten as to Martin Lustgarten Acherman re 202 MOTION to Transfer Case *Rule 21(b)* filed by Martin Lustgarten Acherman (Simeone, Maria) (Entered: 11/09/2015) |
| 11/09/2015 | 206 | District Judge Leo T. Sorokin: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Martin Lustgarten Acherman. Time excluded from 11/2/15 until 11/9/15. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Simeone, Maria) (Entered: 11/09/2015) |

11/17/2015                                    CM/ECF - USDC Massachusetts - Version 6.1 as of 03/11/2013

| 11/10/2015 | 207 | ORDER OF TRANSFER (Rule 21) to Southern District of Florida as to Martin Lustgarten Acherman (adminn, ) (Entered: 11/10/2015) |
|------------|-----|------------------------------------------------------------------------------------------------------------------------------|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/17/2015 11:42:09 | | | |
| **PACER Login:** | mm1936:2731784:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cr-10046-LTS |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

EXHIBIT 5

DYNAMIC PAGE -- HIGHEST POSSIBLE CLASSIFICATION
IS
TOP SECRET // SI / TK // REL TO USA AUS CAN GBR NZL

Welcome! Saturday, 10 Nov 2012

- Web search
- Agency-all Emails
- SID-all Emails
- NSA Rolodex
- SCQAWK: The SID
  Mailbag
- SIDtoday Blog
- SIDtoday Series
- SIGINT Worldwide VTC

- SIDtoday Article
- Letter to the Editor
- SIGINT-y Social Media

Page

## (U) SIGDEV: Is It Time for a 'Target Reboot'?

FROM: (U//FOUO) ███████████
Transnational & Strategic Partnerships SIGDEV Branch (S2C13)
Run Date: 03/23/2011

> (S//REL) Introduction: This is the story of how a "target reboot" (i.e., taking a fresh look at opportunities for collection) by a SIGDEV branch ended up providing the target office with new collection and breathed new life into a stagnant situation.

(TS//SI//REL) A year-end review of our SIGDEV-supported targets in late 2010 showed telltale signs that things were getting stagnant on the Venezuelan Energy target set. Most reporting was coming from warranted collection, and what little was coming from other collectors was pretty sparse. Rather than think my way out of this box, I opted to do a "reboot" of the whole target. Turns out, I couldn't have made a better choice.

> (S//SI//REL) **Background:** Venezuela has some of the largest oil and natural gas reserves in the world and consistently ranks among the top ten crude oil producers. Its economy is dominated by the petroleum sector, which accounts for roughly one third of GDP, 80% of exports, and more than half of all government revenues. In the first half of the twentieth century, US oil companies were heavily involved in Venezuela, but in 1973, Venezuela voted to nationalize its oil industry outright, and effective 1 January 1976, Petróleos de Venezuela (PdVSA) took over as the primary oil producer in Venezuela. To understand PdVSA is to understand the economic heart of Venezuela.

(TS//SI//REL) I started out by reviewing the Information Needs (INs) and SURREY requirements to make sure that everything matched and was up to date, and then I met with the target office (TOPI) to re-assure myself that we were both on the same page in regards to our goals.

(S//SI//REL) The TOPI analyst stated that he didn't have time to invest an extensive target development effort, so anything that came to him had to be useable "out of the box." Plainly speaking, he wanted PdVSA information at the highest possible levels of the corporation -- namely, the president and members of the Board of Directors. He wanted as much of it as possible to be in the form of DNI data, to reduce the need to transcribe and piece together conversations.

(TS//SI//REL) I began my "reboot" by visiting the PdVSA website, where I clicked on "Leadership" and wrote down the names of the principals who would become my target list:



(S//SI//REL) Determined to follow the "document as you go" model this time around, I fired up Analyst's Notebook, opened a blank document, and dumped the names into it. Now for some SIGINT! My first stop was PINWALE, where I ran a few queries with mixed results. I had a lot of traffic "cc-ing" most of my target set, but very little info from the actual communicants. I did recover some (actually already known) email addresses, which I entered into Analyst Notebook and bounced against CADENCE and UTT to see if they were tasked. Since my TOPI didn't have time to do development, my plan was to document everything and take it to him like dessert on a tray, and let him choose whatever he wanted.

(TS//SI//REL) One thing that kept popping up in PINWALE was a type of entry which can best be likened to a "SEARCHLIGHT" entry here at NSA. A little pro-forma piece that, upon analysis, showed that it was hitting on the names of the target set as strong selectors. What's more, I discovered that while some of them were "SEARCHLIGHT entries" for the personnel on my set, others showed those same personnel names as the supervisors of other PdVSA employees. "Cool!" I thought, and began entering them into my PdVSA notebook file. A few HUNDRED employees later, I had a pretty substantial document.

(TS//SI//REL) I thought this would be a good place to stop data collection for a while and focus on data analysis.

(TS//SI//REL) Here's a PdVSA "SEARCHLIGHT" entry showing the President of PdVSA, Rafael Ramirez (*pictured meeting with Iranian President Ahmadinejad in 2009*):

Nombre RAMIREZ RAFAEL DARIO
Código Único RAMIREZRGE
Correo PDVSA RAMIREZRGE@PDVSA.COM
Correo Personal RRAMIREZ@MEM.GOV.VE
Conocido Como SIN INFORMACIÓN
Tipo de Empleado EFECTIVO PERMANENTE
Empresa INTEVEP S.A.
Gerencia GCIA.GRAL.REFINACIÑN E
INDUSTRIALIZACIÑN
Supervisor RAMIREZ RAFAEL DARIO
Localidad CARACAS
Edificio LA CAMPINA TORRE ESTE
Torre TORRE OESTE
Piso PH
Oficina PH
Tlfno. Interno
Tlfno. Interno
Teléfono Externo
Fax Interno



Fax Externo SIN INFORMACIÓN
Busca Persona SIN INFORMACIÓN
Clave Busca Persona SIN INFORMACIÓN
Celular SIN INFORMACIÓN
Tlfno. Habitación SIN INFORMACIÓN
Otro Teléfono SIN INFORMACIÓN

...and here is one showing Ramirez as the supervisor of one of the PdVSA board members, Luis Vierma:

Nombre VIERMA PEREZ LUIS FELIPE
Código Único VIERMAL
Correo PDVSA SIN INFORMACIÓN
Correo Personal SIN INFORMACIÓN
Conocido Como SIN INFORMACIÓN
Tipo de Empleado JUBILADO
Empresa HOLDING PDVSA
Gerencia
Supervisor RAMIREZ RAFAEL DARIO
Localidad CARACAS
Edificio LA CAMPINA TORRE ESTE
Torre TORRE ESTE
Piso PH
Oficina PH
Tlfno. Interno
Tlfno. Interno
Teléfono Externo
Fax Interno
Fax Externo
Busca Persona SIN INFORMACIÓN
Clave Busca Persona SIN INFORMACIÓN
Celular
Tlfno. Habitación
Otro Teléfono SIN INFORMACIÓN

(TS//SI//REL) Now, even my old eyes could see that these things were a goldmine of valid selectors, to include work, home, and cell phones, email addresses, LOTS! I had so much data that I was even able to make a chart with which I could "normalize" internal PdVSA numbers so that they could be tasked via OCTAVE. I put all of this together into one spreadsheet, taking only the top personnel, which I knew my TOPI wanted, and presented my TOPI analyst with this package. He was thrilled! That by itself would have been enough to warrant writing this story, but it is what happened next that really made our day.

(TS//SI//REL) As I was analyzing the metadata in PINWALE, I clicked on the "From IP" column and noticed something peculiar -- every single "SEARCHLIGHT entry," over 10,000 of them, came from the same IP!!! I ran several more queries, and every time I came up with the same result. Then, I looked at the "To IP's"... 167.134.x.x, yeah, that's PEQUIVEN (a subsidiary of PdVSA), but wait... 10.x.x.x and 172.18.x.x WTHeck??? Yep, seems I had been looking at internal PdVSA comms all this time!!! I fired off a few emails to F6 here and in Caracas, and they confirmed it!

(TS//SI//REL) Since then, I have been coordinating with Caracas, who have been surveying their environment and sticking the results into XKEYSCORE. I have been lucky enough to find several juicy pdf documents in there, one of which has just been made into a report!

SERIAL: 3/OO/505480-11

SUBJ: Venezuela\Energy: Venezuela State-Owned Oil Company
Information Shows a Decrease in Overall Oil Thefts and
Losses, January 2011 (S//REL TO USA, FVEY)

(TS//SI//REL) In addition, I have discovered a string that carries user ID's and their passwords, and have
recovered over 900 unique user/password combinations which I have forwarded to TAO (Tailored Access
Operations -- S32), along with other enabling data and a targeting request to see if we can pwn this network
and especially, the boxes of PdVSA's leadership. Wouldn't my TOPI be happy then?

(TS//SI//REL) So, by sheer luck, (and a ton of hard work) I discovered an important new access to an
existing target and am working with TAO to leverage a new mission capability.

(U//FOUO) ███████████, S2C13, ███████s



*(U) Offshore Venezuelan oil rig (Jane's)*

Comments/Suggestions about this
article?

**"(U//FOUO) SID today articles may not be republished or reposted outside NSANet
without the consent of S0121 (DL sid_comms)."**

Information Owner: ████████, S0121, ██████, (email)
Page Publisher: ██████████, S0121, ██████, (email)

Last Modified: 11/10/2012  /  Last Reviewed: 11/10/2012

DYNAMIC PAGE -- HIGHEST POSSIBLE CLASSIFICATION IS
TOP SECRET // SI / TK // REL TO USA AUS CAN GBR NZL
DERIVED FROM: NSA/CSSM 1-52, DATED 08 JAN 2007 DECLASSIFY ON: 20320108

# EXHIBIT 6

**Subject:**
**From: Martin Lustgarten <mla@henlux.com>**
**Date: 4/21/2014 6:52 PM**
**To: Martin Lustgarten <mlustgarten@me.com>**

```
Ch de Beaumont Too: Is your handwriting
MLA: I know. I gave them to you
Ch de Beaumont Too: Primera operacion segun banco local a bs 55 por cada $
MLA: Looks that way. Market dropoing fast, however there is no guiso
if they do it that way
Ch de Beaumont Too: Did you input the last instructions of the bolis?
Ch de Beaumont Too: I mean the beneficiary I sent you?
MLA: Yes. Done already
MLA: Do you need to change it?
Ch de Beaumont Too: No they were checking since I told them it took 2 days
MLA: I put them on the system on friday Evening which was Sat in HKG.
they will be ready for transfer tomorrow evening. But the funds have
not arrived. Question: do we transfer EUR or USO?
Ch de Beaumont Too: I think they will send EUR and we send USO
Ch de Beaumont Too: Like that we charge on forex...
MLA: If we send them EUR, they will get killed on the Forex in Panama.
Ch de Beaumont Too: What you mean?
Ch de Beaumont Too: ???
MLA: If I transfer EUR for a USO account the exchange rate in Panama
kills them. Like 1.32. If I do the conversion in HKG, we will have the
interbank rate for EUR/USO and then we send $
Ch de Beaumont Too: You mean the bank kills them or we kill them?
MLA: The receiving bank kills them
MLA: We exchange at whatever rate HSBC gives us
Ch de Beaumont Too: HSBC HK
Ch de Beaumont Too: I know but they are really bad on forex
MLA: No gordo. The money goes to Panama. To a USO account. If we send
Euros, the receiving bank in Panama will kill them on the exchange
because we sent EUR to a USO account. If we convert those EUR at the
system rate that HSBC gives me, then we got them a better rate and we
send USO
MLA: And in any event, because its more than USO 2.5mm we need to send
it in 2 tranches
Ch de Beaumont Too: Ok
MLA: I created them in EUR and USO. that way we dont get in the middle
of the Interbank Exchange Rate. Wether it is HSBC or the receiving
bank in Panama
MLA: Btw. They put the name as Servicaucho and I think its
Servicaucho ..... Please double check
Ch de Beaumont Too: So with instructions you put we can do usd or eur?
MLA: yes. As I wasnt sure, i created the same beneficiary with same
account in USO and EUR
MLA: Its standard with HSBC. since the account is multicurrency with
the same number, when you input designated beneficiaries you have to
choose the currency.
Ch de Beaumont Too: Is servicaucho
Ch de Beaumont Too: Can you call your Rolex guy?
MLA: Shit. I need to change it at HSBC.
MLA: What do you need from Rolex?
Ch de Beaumont Too: Can you check for a SS daytona white face and a black face
Ch de Beaumont Too: Yes. Let me see if they have it.
MLA: He has them. Checking on price and will get back to me
MLA: You want both?
Ch de Beaumont Too: Ok perfect yes both
Ch de Beaumont Too: Tell me the price and we apply a decent margin
MLA: Its difficult to get discounts on these watches. They are
```

I of 8                                                          4/29/2015 10:-

Case 1:15-cr-10046-TS   Document 81-2   Filed 07/06/15   Page 20 of 26

currency. But will try my best
MLA: Retail price US is 12,295 + tax. Retail Price in Panama is 12,800
+ tax. My price is 11,000 each no tax. Works?
MLA: They cant discount more. He sells them left and Right at 12,800.
MLA: What do I do?
MLA: Ping
Ch de Beaumont Too: I am going to try 36,000 for both
MLA: Too much !!! You could try $26,500 for both
Ch de Beaumont Too: My friend I just learned I lost USO 2,500,000
today so no more gist
Ch de Beaumont Too: Gifts
MLA: But you can get them at 13-14k in the US
MLA: Its not a question of gifts. Its market price
Ch de Beaumont Too: The guy is in london
MLA: Ahhhh still too much. Try $15,000. Its just not the price
Ch de Beaumont Too: I asked 36K waiting for reply
Ch de Beaumont Too: Are you done with accting?
MLA: Yes
Ch de Beaumont Too: Shall we resume now
MLA: Sure call me on Vonage
Ch de Beaumont Too: 1,870,503 EUR
Ch de Beaumont Too: That is the amount that has to be on the contract
Ch de Beaumont Too: Can you send it to me as soon as you have done
Ch de Beaumont Too: With BC company sending us the funds
MLA: I am not worried about the receiving part on our end. I am more
worried about the one we are sending to...
Ch de Beaumont Too: Sure I have asked the question already
Ch de Beaumont Too: Will let you know as soon as I get the answer
MLA: Whats the complete name of sender, Kayland ....?
Ch de Beaumont Too: Kayland Holdings; po box 556 Main Street charleston Nevis
MLA: Perfect. That is for the incoming
Ch de Beaumont Too: Yes
Ch de Beaumont Too: The outgoing you already have
MLA: I dont know who the directors/poa are.
Ch de Beaumont Too: Alejandro B
MLA: No schmock. The directors/poa of the Venezuelan ....
Ch de Beaumont Too: Of Kayland
Ch de Beaumont Too: You mean for your record?
Ch de Beaumont Too: Basically is a company Derwick has been
contracting with and with whom they have an outstanding debt
Ch de Beaumont Too: They are settling it
Ch de Beaumont Too: They told me the guys were very clean and no worry to have
MLA: Ok. Just in case the transfer gets back or if HSBC asks any
questions on the payment we send
Ch de Beaumont Too: Can you please send me the contract
Ch de Beaumont Too: I have to go to bed am exhausted
Ch de Beaumont Too: Just sent you the docs
MLA: You will have it tom morning
Ch de Beaumont Too: Did you see the RNC I sent?
MLA: Yes perfect. Will send you the contract for kayland
MLA: Tks gordo
Ch de Beaumont Too: Thanks gordo lindo
MLA: Did you receive the contract ok?
Ch de Beaumont Too: Perfect and forwarded it this morning
Ch de Beaumont Too: Am in the airport security call you in 5
MLA: If we get the Euros tonite, what do you want me to do? Do I
exchange everything into $ prior to sending or do I only exchange the
half I would be sending tonite? Or do I send Euros?
Ch de Beaumont Too: Send EUR
Ch de Beaumont Too: Direct no question
MLA: Ok. Will send 1/2 and 1/2. They are going to get killed on the
exchange .....
Ch de Beaumont Too: No worry their problem

-20-

MLA: Do I deduct our 1% and send the balance?
Ch de Beaumont Too: No send all amount and deduct the 1% from the
excess they sent last time
MLA: Perfect
MLA: Hola Gordito. The remaining balance of the BC was sent last nite.
You should have the payment advice in gunvor
Ch de Beaumont Too: Got it thanks and forwarded to the BCs already
MLA: I would like to know if they were credited correctly at the Panama bank....
Ch de Beaumont Too: Have no clue I asked them yesterday and am still
waiting for their answer...
MLA: Did you see the new lawsuit of the BC?
Ch de Beaumont Too: Is bullshit AGAIN
MLA: I know. But this time they mention an ex employee that says they
paid Diosdado 50m in Banesco Panama. That is heavy shit
MLA: Hola Gordo. Good morning
Ch de Beaumont Too: Good morning Gordo Lindo
MLA: How was your weekend?
Ch de Beaumont Too: Shit
MLA: Why?
Ch de Beaumont Too: I will call you in 5
MLA: I received a set of instructions for HSBC.... What are they for?
Ch de Beaumont Too: 1 palo for Jo you can send from where ever you want
MLA: The company that Jo sent you does not appear in the HK company
registry. Is it registered in HKG?
Ch de Beaumont Too: No clue
Ch de Beaumont Too: I believe is an offshore
MLA: The one that appears is PointRF Sourcing Limited. The parent
company is an Israeli one....
Ch de Beaumont Too: That must be it
MLA: How are you?
Ch de Beaumont Too: Not great working hard for compliance as usual
MLA: Let me know if you need anything
Ch de Beaumont Too: I have been scanning shit all afternoon and am
still at it...
Ch de Beaumont Too: Am on the phone with Leandre for the past 4
hours... doing compliance shit
Ch de Beaumont Too: Will call you as soon as am done
MLA: Dont worry. Just wanted to know if you received the advice for
payment. Will talk tomorrow.
Ch de Beaumont Too: Thanks got it and forwarded immediatly to Jos
private email...
Ch de Beaumont Too: By the way in my conversation with Leandre (around
30 since 9AM) he kept asking about your declarationA
MLA: Forgot about it but sent it today. Will have it monday
Ch de Beaumont Too: Will tell him now he will be delighted to hear...
MLA: Oh! tracking number es 36 3340 9334
MLA: How are you?
Ch de Beaumont Too: Not great
Ch de Beaumont Too: Loads of paperwork and shit falling on me
Ch de Beaumont Too: And you?
MLA: Trying to do something in the spot market but not many customers
around. Activity really stopped.
MLA: I have a customer looking for $2m   I thing he will go for it
this week. 5% on it is not bad....
MLA: Wont bother you. Call me whenever you want. Kisses to Alex and Max
Ch de Beaumont Too: Good morning
MLA: Hola Gordito
Ch de Beaumont Too: Can you please ask Leandre to send you 1.4 to HK?
MLA: Sure
Ch de Beaumont Too: We need to make another one for Jo same
beneficiary before friday...
MLA: No problem. Let me prepare the instructions
Ch de Beaumont Too: Thanks=' (

3 of 8                                                         4/29/2015 10:46 AM

-21-

Ch de Beaumont Too: Transfer will be value date friday any chance you
can wire same day?
Ch de Beaumont Too: Or even thursday?
Ch de Beaumont Too: He is bursting my balls already...
MLA: Same day. Its internal transfer. I can do it at any time of the day
Ch de Beaumont Too: What I mean is because of your fiduciary deposits
will be like last time money will never get there on time...
MLA: Dont worry
Ch de Beaumont Too: Your spreadsheet is good but he went to a meeting
with visitors from V...
Ch de Beaumont Too: I will let you know as soon as he is back
MLA: Dont worry. I hope is very clear he went above what he had. He
will have no problem repaying. And with the transfer, dont worry. It
will be done on friday wether the finds arrive or not
Ch de Beaumont Too: I just tried calling you twice
Ch de Beaumont Too: But went straight to your voicemail
Ch de Beaumont Too: Listen I have good and bad news
Ch de Beaumont Too: Good news is that am closing the house on Friday
hence the bad news I need to do the transfer
Ch de Beaumont Too: I have done the maths there is USO 2,078,446.95
and please convert as well the EUR from the BC
Ch de Beaumont Too: I will receive the instructions tomorrow I think
Ch de Beaumont Too: Anyhow we talk tomorrow
MLA: Dont worry we will talk tomorrow
MLA: Mazal Tov on the house!!!!!
Ch de Beaumont Too: The Balance includes what el compa owes....
MLA: I already spoke to Leandre. I tried to liquidate some of my
portfolio but he told me was a mandate. So I asked for a Loan. I will
send him instructions for transfer later
MLA: I am going for a run. We will speak later
Ch de Beaumont Too: Ok thanks I spoke to him and got him to reduce
loan to minimum rate
MLA: I am giving the Obartos until may 27 to come up for a way to make
it up to us. I am tired of losing money and being taken on bad faith
by megalomaniacs ...it is exactly one year since
Ch de Beaumont Too: Martin please send me the transfer confirmation
for Jo he already called me 5 times=-)
Ch de Beaumont Too: As well as the total amount you have for me I had
to finetune the maths for the wires today
MLA: 1.334.854,oo
Ch de Beaumont Too: Hey Martin House is signed!!! Finally... I dropped
you an email with the instructions
MLA: Mazal Tov my friend!!!! You are going to be very happy there
Ch de Beaumont Too: For sure more than in Marbella ...
MLA: Well my friend I am oficially at the bottom of the Totem pole.
Ch de Beaumont Too: Where would that be?
MLA: At the bottom. I always told you this was a very small market.
There are players who have final customers and there are players who
have intermediaries as a customer. In the end, all goes to the ones
who have final customers
Ch de Beaumont Too: You do have the final customers
MLA: Yes. Thats why its so hard to understand people selling to an
intermediary for a lower price when the ones with the final customers
pay higher. In the end it comes back to me thru the intermediary. And
when that happens you realize you have fallen to the bottom of the
totem pole
MLA: Been here before. And will be here after everybody leaves .....I
always bounce back. And every time I bounce back, I bounce back
stronger
MLA: Just an observation. I am in an observation mood this morning
Ch de Beaumont Too: My friend remember once your dear friends, your
partners dropped you like a piece of shit you were the radioactive man
Ch de Beaumont Too: The informant

-22-

Ch de Beaumont Too: The one nobody should work with
Ch de Beaumont Too: And I was the one who fought for your ass
Ch de Beaumont Too: True or not
Ch de Beaumont Too: Then again who moves your Bs to this day...
Ch de Beaumont Too: I have always been there in the worst times
Ch de Beaumont Too: One could accuse me of bringing you bad luck but never of fucking around with you
MLA: I know. I keep saving everybody's ass. When they thought I was radioactive I was hiding their profits from the IRS and I established their structures. They thought a couple of millions were more important....soon after they realized that the "informant" was their protector and the asshole who saved them the money that was seized in the Rosemont case....by striking a deal with the US government, I leave it on their conscience
MLA: In any event I will never understand human nature. I am flat in FX position. However, my brother has about 7mm bs in the account and Marco Zeitoune has 32mm in the account because he is short. A total of 39mm in the account managed by Rondon. Yet DOG needs some Bs and goes to Willy, who in turn turns around and sells them to me for a profit, which could have been DOG.....instead of asking first If I had any Bs in an account managed by him.
Ch de Beaumont Too: Those are the people who fucked you. And whom you let go with it
Ch de Beaumont Too: And am the one who pays...
Ch de Beaumont Too: He is his ex brother in law
MLA: I found out only by coincidence. I had Rondon deposits some checks and he let it slip that he had to go to Willy to pick some checks for DOG, Willy was calling me on the other line pressuring me for a deposit so he could cover DOG checks.....you see now why I am puzzled? By asking me he would have solved it in one second and gotten a much better prize....I was happy to buy at 68 from Willy or DOG. The difference is that DOG would have goten them at a better prize. Or if he would have sold them
MLA: At the same prize as to Willy, then both of us would have made better .... And we need it.
MLA: By the way....i am not letting them go. At the last meeting they asked me about them and their taxes ...,I told them they where doing things I did not agree with... sooner or later they will catch up with them. It is not up to me. I always have a choice.....if they ask me again at the May 12 meeting , I will tell the truth. Thats with respect to those morons. With the totem pole subject, I really dont care. Not much people can do what I do and how I do it. And I enjoy a very high level of protection because I have delivered already a couple of drug dealers and a guy who wanted to skip trading with Iran. The drug dealers because I had no choice, the Iran guy just for fun
MLA: And all this spiel, to let you know that I appreciate the friendship and I value you, Alex and Max as family. But it hurts finding out....
MLA: Not from you. You did nothing wrong.
Ch de Beaumont Too: I surely have not done anything wrong
MLA: But it hurts being skipped over. Makes you feel really like crap. And you cant do much about it. But listen to it
Ch de Beaumont Too: I have always been there for you and for your family
Ch de Beaumont Too: And there I things I cannot do anything about
Ch de Beaumont Too: Was I aware of this transaction NO
Ch de Beaumont Too: How much it was for NO IDEA
MLA: Nobody is exclusive to anybody. But in equal conditions not having a chance to compete?
Ch de Beaumont Too: You asked me about Willy the other day I told you he does not use the account he has with me
MLA: Its not your fault. Just letting you know that all finds a way of coming back to my ears. Call it chance, good or bad luck it doesnt matter. It was nothing big. Merely $100,000

-23-

Ch de Beaumont Too: You even told me he had an account with Portugal
MLA: And Willy never told me. I just put 2 and 2 together. It may not
even been true or a figment of my imagination even....
MLA: Anyway thats what I think
Ch de Beaumont Too: I have no clue and Danilo was in Madrid and now in
Paris so am not going to buzzer him
MLA: Nooooooo dont even tell me anything. I wrote to him yesterday and
I told him that even though I am flat the account had 39mm at his
disposal and if he needed them he should let me know and we would work
out an exchange rate that works for both....he replied Thanksssss
MLA: Its funny how this works ...after a year that I broke with Soto,
his clients and a couple of banks have approached me to use my
accounts in HKG and SGP...they found out he was full of shit and all
the banks have progressevely closed his accounts. He now only has an
account at EFG for savings and one account at HSBC. And I know because
he asked me to help him with compliance. I refused... So the world
does turn around =))
MLA: I wanted to tell you yesterday , but i was very upset. Thats why
I cut out our conversation ....you had nothing to do with it and I
didnt wanted to bring my bad humor to you
Ch de Beaumont Too: Thanks!
Ch de Beaumont Too: Hi Gordo
Ch de Beaumont Too: Just landed in gva
Ch de Beaumont Too: We're you able to make the wire?
MLA: Its ready for tonite
MLA: Just tried to call u
MLA: Gordito ...did you receive the payment advice?
Ch de Beaumont Too: Sorry Gordo I did not have a second today
Ch de Beaumont Too: I don t know will tell you when am back to the hotel
MLA: Dont worry. Just checking. Let me know if they received
everything ok so I can cross it out of my pending list...
MLA: I can now pull the MT103 from the system
Ch de Beaumont Too: Will let you know as soon as I am back after dinner
MLA: Ok.
MLA: How was GVA?
Ch de Beaumont Too: Long, exhausting and too much food and so was Paris...
Ch de Beaumont Too: Just got to CdC
MLA: Are you back in cdc? For how long?
Ch de Beaumont Too: For 3 days then off to Miami then Nappa then CdC
then back to Spain
MLA: Long trip. You with Alex?
Ch de Beaumont Too: She joined friday in Paris
MLA: Nice. Enjoy. I am off to Buenos Aires on Sat for a week and then
New York and Boston on the 7
Ch de Beaumont Too: Enjoy vacations
MLA: Argentina was planned a long time ago. NYC i am meeting Daniela
and Boston I have my quaterly meeting with those guys
Ch de Beaumont Too: Nice
MLA: Are you staying at your house?
Ch de Beaumont Too: Off course
MLA: Hola Gordo
Ch de Beaumont Too: What's up
MLA: Just checking on you. How is the remodelation going?
Ch de Beaumont Too: Well not that great my friend
Ch de Beaumont Too: I have to cancel most I had planned
MLA: You only had to do the main bedroom....
Ch de Beaumont Too: I had to change the AC system redo the kitchen put
solar panels do my bedroom ...
Ch de Beaumont Too: But am fucked
Ch de Beaumont Too: And let's not talk about Miami
MLA: We are all fucked ...lets hope for better times.
Ch de Beaumont Too: No Martin
Ch de Beaumont Too: I don t see those coming any time soon

-24-

Ch de Beaumont Too: And please tell Soto I don t need friends so he does not need to add me on bbm I will not accept him
Ch de Beaumont Too: And if you feel like giving my name to your friends in may please do
Ch de Beaumont Too: I do not tolerate to be threatened
MLA: I dont speak to him anymore. Only on pending items
MLA: What do you mean threatened? Are you nuts?
Ch de Beaumont Too: This is what happened in the darkest times of the human history and what all are still blaming the Germans for
Ch de Beaumont Too: Giving up people to your friends and so on
Ch de Beaumont Too: Like in may
Ch de Beaumont Too: Like you are protected and so on
Ch de Beaumont Too: I really do not appreciate that at all
MLA: You have to be kidding me!!! I would never turn on you!!!!
MLA: Your view of me is very very low.
Ch de Beaumont Too: Well Martin just review what you wrote me in our BlackBerry thread and analyse
Ch de Beaumont Too: Giving up people for "fun"
Ch de Beaumont Too: Do you realise what you wrote for one second
MLA: I told you in Feb they asked me about the Obertos and about Gorrin. And I have kept my mouth shut. They ask about what they read. And last time i told you I dont feel like protecting the Obertos anymore. What has that to do with you?
MLA: Yes. The fuckers that fucked us!!! Not you, asshole!!!
Ch de Beaumont Too: Well am just different Martin I let God decide whether people need to be punished or not
Ch de Beaumont Too: I never gave anyone and will never do
Ch de Beaumont Too: I don't sleep at night because I got fucked but I have my conscience for myself
Ch de Beaumont Too: And I really think as a FRIEND you should stop talking to those people Martin
Ch de Beaumont Too: That is why no one wanted to do anything with you and I pledged for you
Ch de Beaumont Too: Everyone is free to do what they want ... am just giving you an advice here
Ch de Beaumont Too: A friendly advice
MLA: That may be the reason, but sometimes you are between a rock and a hard place. When I got into a relationship with them, they had seized all of our money and would only release it in exchange for information on a client of Soto who was money laundering thru our accounts.
Ch de Beaumont Too: Now I believe your business is done with them
MLA: From that moment on, every 3 months they meet with me and give me a list of people who they deemed of interest. I just have to be alert. Last meeting they asked about Soto and why we parted. I told them I was not in agreement on how he handles things. They asked about the Obertos and I kept quiet. And I told you. Now, I dont know what they are going to ask. They keep going back to Maffi (the money launderer) and drop questions out of the blue. I am very bitter about the Obertos and I dont recognize myself. Now, between a conversation with my friend and doing something about it is a very long way.... You should know me better by now... But your opinion of me is very very low...its unfair and unwarranted, and outright offensive
Ch de Beaumont Too: Don t you think I have all the reasons to be bitter????
MLA: Of course I am done with them!!! But if they call me and I am in town, which by the way they know, I go and listen.
MLA: We all have reasons to be bitter. Threatened is another story.
Ch de Beaumont Too: Martin next time we are around I want to sit down with you and give you what I feel in the bottom of my heart
MLA: And even thinking that I may betray you?
Ch de Beaumont Too: But not over the phone or a bbm
MLA: Well I look forward to it.
Ch de Beaumont Too: I think the 2.5 was not your idea or otherwise I

was a fool and never judged you well I think you were pushed into that
Ch de Beaumont Too: But when we sit down I will give you all I have on my heart
Ch de Beaumont Too: Enjoy Argentina and your daughters
MLA: My concept of friendship is different. I need my friends to hear
me out or advice me. Be with me in times of need. Somebody to confide
in. At every level. For parties, going out, etc, I have all the
"friends" I need. And when I tell you how I feel or all the crazy shit
that goes thru my mind, i am looking for a friend. Not somebody who
feels threatened.....
Ch de Beaumont Too: Not to me Martin no drama queen PLEASE
MLA: I wasnt pushed into anything...and you judged me well. But we
will talk about it in person.
Ch de Beaumont Too: Remember your partner dropped you like a piece of
s... I pledged for you
MLA: We are responding out of order. The messages dont leave when they
suppose to
Ch de Beaumont Too: Your funds were getting frozen I found you the solution
Ch de Beaumont Too: Martin I have ALWAYS been there in the WORST times
as well even when you were to commit suicide
Ch de Beaumont Too: And I do not regret anything I did for you
MLA: Neither do I.
MLA: But just to be clear, Soto told the Obertos he was dropping me,
he never did. He kept me hidden. And I dropped him for You. The funds
were never going to be frozen, thats the excuse these assholes gave
you when they tricked us into the op and then pulled the money from
CBH. A month later Nacho sold us some $ and the money went to the same
account that was going to be frozen. And on the Suicide theme, i
sometimes toy with the idea, but I know its not the solution and I
thank you for always being there for me. That is what friends are for
and I will always be there for you. With respect to the reason they
didnt want to do anything with me, it was unwarranted. And when I
vented with you, it was toying with the idea of really give them a
reason not to.......and always remember there is a very long way
between saying and doing
MLA: Enjoy Napa and Cdc. Kisses to Alex and Max.
Ch de Beaumont Too: Thanks


Martin Lustgarten
Henlux Inc.

Email: mla@henux.com

Panama Headquarters          Hong Kong Office
Tel  + (507) 205-3588          Tel + 852 8190-5144
Fax + (507) 205-3589          Fax + 852 2861-2266

The information contained in this transmission may contain privileged
and confidential information. It is intended only for the use of the
person(s) named above. If you are not the intended recipient, you are
hereby notified that any review, dissemination, distribution or
duplication of this communication is strictly prohibited. If you are
not the intended recipient, please contact the sender by reply email
and destroy all copies of the original message.

4/29/2015 10:46 AM

-26-

# EXHIBIT 7

Americas   Conflict   Corruption   Latin America   National Security   Terrorism   Venezuela   Weapons Trafficking

Issue Brief  |  October 7, 2020

## The Maduro-Hezbollah Nexus: How Iran-backed Networks Prop up the Venezuelan Regime

By Joseph M. Humire

### Key Points

Too often, Hezbollah in Venezuela is characterized as only a potential terrorist threat. In reality, the Lebanese terrorist group has helped to turn Venezuela into a hub for the convergence of transnational organized crime and international terrorism.

Hezbollah's crime-terror network in Venezuela has facilitated Iran's cooperation with the Maduro regime.

The United States, allies, and international institutions must ramp up regional counterterrorism collaboration, crack down on illicit financial networks, and build stronger ties with Lebanese and other Arab communities in Latin America.

### Introduction

In the face of another failed sham election in Venezuela, countries throughout the Americas and Europe are focusing on the many illicit tactics Nicolás Maduro uses to hold on to power. Top among them: the far-reaching illicit networks that prop up the Maduro regime. This includes armed groups that control vast swaths of territory, establishing a parallel state structure that conjoins the Maduro regime to international terrorism and transnational organized crime. In this environment, US policy shifted from "incrementalism" to "maximum pressure" in 2019, in an effort to constrain Nicolás Maduro's grip on power in Venezuela.

This approach led to a March 2020 US Department of Justice (DOJ) announcement of multiple narcoterrorism indictments against the Maduro regime, including charges against Nicolás Maduro himself.[1] Two months later, the DOJ indicted a former member of Venezuela's National Assembly, the Syrian-Venezuelan dual national Adel El Zabayar, for allegedly working with Maduro and several top regime leaders in Venezuela on a narcoterrorism conspiracy that involved dissidents of the Revolutionary Armed Forces of Colombia (FARC), drug cartels in Mexico, the Islamic Republic of Iran, Syria, and the Lebanese terrorist group Hezbollah.[2]

These actions by the DOJ highlight a debate in the United States and Europe about the presence and role of Hezbollah in Venezuela and Latin America overall. Too often this debate is characterized by simplistic views that see Hezbollah in Venezuela as only a potential terrorist threat. Equally, other views diminish the role and relationship between Hezbollah and the Maduro regime altogether. Neither position captures the nuance of how Hezbollah operates in Venezuela and neighboring countries, nor does it establish a baseline for understanding how Hezbollah fits into the larger strategic picture of the illicit networks propping up the Maduro regime, and its relationship with Iran.

Adding to this deficit of knowledge is that, for many Latin American policymakers, Hezbollah is viewed as a distant problem far from local concerns. Likewise, for US and European policymakers, Latin America is not a top priority for counterterrorism efforts focused mostly on the Middle East and North Africa. This state of affairs has allowed legal and policy vacuums to arise regionwide, which the Maduro regime and Hezbollah have exploited to turn Venezuela into a central hub for the convergence of transnational organized crime and international terrorism.[3]

**DOWNLOAD PDF**



"...the Maduro regime and Hezbollah have exploited [legal and policy vacuums] to turn Venezuela into a central hub for the convergence of transnational organized crime and international terrorism."

X

Hezbollah is responsible for carrying out terrorist attacks in Israel, Lebanon, Kuwait, Argentina, Panama, United Kingdom, Saudi Arabia, and Bulgaria,[4] in Latin America. It is infamously known for the bombings of the Israeli embassy in 1992 and the Asociación Mutual Israelita Argentina (AMIA) Jewish community center in 1994, both in Buenos Aires, collectively killing one hundred and fourteen people and injuring hundreds more. The AMIA attack shocked many counterterrorism analysts at the time because it was the first terrorist attack by Hezbollah outside of Lebanon or the Middle East. The long arm of Iran and Hezbollah's terror networks is also suspected of downing the Alas Chiricanas Flight 00901 in Panama the day after the 1994 bombing in Buenos Aires, killing all twenty-one passengers aboard.

The Hezbollah terror network that moved from Lebanon to Colombia to the Tri-Border Area, between Paraguay, Brazil, and Argentina—to carry out the 1994 AMIA attack—is still active today. The work of the late Argentine special prosecutor Alberto Nisman ensured that Latin America remembers this fact.[5] Since the AMIA attack, Hezbollah's External Security Organization (ESO) or "Unit 910," responsible for its extraterritorial operations, has successfully co-opted many Lebanese families throughout Central and South America, as well as the Caribbean.



Members of the Argentine Jewish community hold up pictures of the victims of the 1994 AMIA Hezbollah attack during the commemoration of the 14th anniversary of the attack in Buenos Aires. The AMIA attack was the first terrorist attack by Hezbollah outside of Lebanon or the Middle East. Since then, Hezbollah terror networks in Latin America have morphed into transnational criminal organizations, with important operations in Venezuela. Picture taken on July 18, 2008.

Throughout the years, Hezbollah's ESO has morphed from merely a terrorist network in Latin America to engage in the region's most lucrative illicit enterprise: narcotics. Of the more than two thousand individuals and entities around the world designated by the US government as foreign narcotics kingpins, almost two hundred are affiliated with or connected to Hezbollah.[6] Its growing involvement in massive money-laundering schemes and multi-ton shipments of cocaine led the Drug Enforcement Administration (DEA) to name a subunit of Hezbollah's ESO that is sometimes referred to as the "Business Affairs Component," or BAC.[7]

Hezbollah's involvement in drug trafficking is not new. Its criminal activities were established by the same founder as the ESO, Imad Mugniyah, the deceased Hezbollah leader who is also implicated in the AMIA terrorist attack in Argentina. Hezbollah's transnational crime portfolio is currently led by the secretary general's cousin and Hezbollah's envoy to Iran, Abdallah Safieddine, who shares this portfolio with Adham Hussein Tabaja.[8] A prominent Hezbollah member who owns its media propaganda arm, Tabaja has set up many investment mechanisms and cash- and credit-intensive businesses to launder Hezbollah's illicit proceeds. The most notable is Al-Inmaa Engineering and Contracting, based in Lebanon and Iraq, whose financial manager, Jihad Muhammad Qansu, has a Venezuelan passport.[9] Together, Tabaja and Safieddine are tied to a vast transnational criminal network that includes an array of businesses in Latin America—namely in textiles, beef, charcoal, electronics, tourism, real estate, and construction—used to launder Hezbollah's illicit funds. In October 2018, the Justice Department elevated Hezbollah's status in the United States by listing it as one of the top five transnational criminal organizations (TCO).[10] Naming Hezbollah alongside three major Mexican cartels and the Central American gang MS-13 was a wake-up call for Latin America to realize that, in today's age, Hezbollah is equal to the cartels in organized crime and terror.

The National Defense University (NDU) has been ahead of the curve in assessing the convergence of organized crime and terrorism. In the foreword to NDU's seminal 2013 publication on the topic, the former NATO Supreme Allied Commander and Atlantic Council board member Admiral James Stavridis described the convergence.[11]

[Transnational] organizations are a large part of the hybrid threat that forms the nexus of illicit drug trafficking—including routes, profits, and corruptive influences—and terrorism, both homegrown as well as imported Islamic terrorism...They have achieved a degree of globalized outreach and collaboration via networks, as well as horizontal diversification.

This description is apt for Hezbollah, which inherently has a multidimensional model for its organizational structure with foreign relations and social-service sectors, a political party, and media groups—but blends these legitimate activities with its clandestine illicit networks, both in Lebanon and worldwide. Most of the Lebanese diaspora worldwide is not involved in these criminal or terrorist activities; however, given that approximately 14 percent of Lebanon's gross domestic product (GDP) comes from remittances, Hezbollah's ESO is actively infiltrating these communities to build financial support networks abroad.[12] In Latin America, these support networks are nested primarily in Lebanese and Arab communities, of which the largest in the region reside in Brazil, Argentina, Colombia, and Venezuela.

**Hezbollah's Support Network in Venezuela and Ties to the Maduro Regime**

For more than one hundred and fifty years, waves of mass migration arrived from Lebanon, Syria, and Armenia to Venezuela. The first wave arrived in the late nineteenth century, during the Ottoman era.[13] In the early twentieth century, another wave of mass migration arrived in Venezuela from Lebanon, mostly Maronite Christians, who settled largely in Margarita Island, Puerto Cabello, Punto Fijo, and La Guaira.[14] In 1975, at the onset of the Lebanese civil war, Venezuela became well known as a prominent destination for those seeking to escape the harsh conditions of the war.

Venezuela's vibrant economy and relatively high standard of living at the time offered a beacon for many Lebanese. While many in the Lebanese-Venezuelan community have made significant contributions to society, this historic refugee route to Venezuela was exploited by Hezbollah to build support networks. Often without the larger Lebanese community aware of this clandestine activity, an "army" of logistical professionals—entrepreneurs, lawyers, accountants, and others—emerge within the diaspora who help to raise, conceal, move, and launder illicit funds for Hezbollah, some of which is used to advance its terror operations worldwide (as shown in the "Saleh Clan" subsection below).

In Venezuela, Hezbollah's support network operates through compartmentalized, familial clan structures that embed into the Maduro regime-controlled illicit economy and the regime's political apparatus and bureaucracy. Many of the clans are assimilated within the Venezuelan state and society through the robust Lebanese and Syrian communities that extend to neighboring Colombia.



### The Saleh Clan

Hezbollah's crime-terror network in Colombia and Venezuela was revealed in 2011 after a two-year investigation that resulted in one hundred and thirty arrests and the seizure of $23 million of illicit funds moved through West Africa into Lebanon through the Lebanese Canadian Bank. [94] In one of the most significant cases on trade-based money laundering, Operation Titan took down a transregional cocaine-trafficking and mass money-laundering ring run by Hezbollah through local facilitators in Colombia, led by Ayman Saied Joumaa. A Colombian-Lebanese drug kingpin, Ayman Joumaa, was indicted in the United States by a federal grand jury for trafficking cocaine with Los Zetas in Mexico and, according to the Treasury Department, runs an extensive maritime shipping network tied to Hezbollah. [95]

Operation Titan started in 2008 when US and Colombian investigators were targeting a Medellín-based cartel called *La Oficina de Envigado*, or "*La Oficina*." [97] Over the two-year investigation, authorities unraveled the many connections *La Oficina* had with the large Lebanese community along the Caribbean coast in Colombia. [95] These connections were strengthened by Hezbollah facilitators who established a complex maze of cross-border trade and bulk-cash couriers between Colombia and Venezuela.

A prominent Shia businessman and Hezbollah operative, Ali Mohamad Saleh, led the cross-border crime-terror network in Colombia and Venezuela uncovered during Operation Titan. Ali Mohamad and his brother, Kassem Mohamad Saleh, were designated as terror financiers in 2012 by Treasury's Office of Foreign Assets Control (OFAC), while Ali Mohamad Saleh was also designated as a narcotics kingpin a year earlier. For many years, the Saleh clan controlled the illicit markets for drugs, weapons, contraband, bulk-cash smuggling, and money laundering in Maicao, Colombia (see below for more on Maicao) close to the northern border with Venezuela. Local drug cartels in western Venezuela controlled by members of the Maduro regime, prominently in Zulia State, benefit from this illicit cross-border trade once managed by the Saleh clan. [98] According to shopkeepers in Maicao, the Saleh brothers fled overnight to Venezuela after being sanctioned in 2012, and are now reportedly in Maracaibo working with another prominent Lebanese clan embedded into the Maduro regime bureaucracy. [99]



### The Nassereddine Clan

Ghazi Nassereddine was sanctioned by OFAC in 2008 for his ties to Hezbollah and listed as a person of interest by the Federal Bureau of Investigation (FBI) in 2015.[31] Ghazi's older brother, Abdallah Nassereddine, is a prominent businessman on Margarita Island who owns several real-estate properties and commercial centers on the once-popular vacation destination in Venezuela.[32] Originally from Lebanon, the Nassereddine clan rose to political prominence in Venezuela once Hugo Chávez became president. Ghazi entered the Foreign Ministry in Venezuela, attaining official diplomatic status, and Abdallah became an important, although low-profile, figure in the United Socialist Party of Venezuela (PSUV), serving as a regional coordinator for Nueva Esparta State.[33]

While stationed at the Bolivarian Republic's embassy in Damascus, Syria, Ghazi Nassereddine helped arrange meetings between senior Venezuelan officials and high-ranking Hezbollah operatives. According to DEA informants, in or about 2009, Ghazi fixed a meeting in Syria between Hezbollah and Venezuela's then-interior Minister Tareck El Aissami, and the Venezuelan military counterintelligence chief, Hugo Carvajal Barrios.[34] The meeting allegedly prompted a cocaine-for-weapons scheme between the FARC and Hezbollah that materialized in 2014 when a Lebanese cargo plane full of small arms (AK-103s, rocket-propelled grenade launchers, etc.) arrived at the presidential hangar (ramps 4) of the Maiquetía International Airport in Caracas.[35] The weapons were reportedly a partial payment for the cocaine the FARC provided to the Maduro regime, and was transferred to a military base in Guárico, Venezuela.

Still a close associate of Nicolás Maduro, the former diplomat Ghazi Nassereddine currently runs the Venezuelan think tank Global AZ and has taken several trips to France, Germany, and Italy since leaving Syria in 2011.[36] Other members of the Nassereddine clan are suspected of running political indoctrination, paramilitary training, and weapons and drug smuggling in Venezuela. One Nassereddine clan member is also believed to be in charge of security for Venezuela's current Minister of Petroleum and former Vice President Tareck El Aissami.[37]

In the counterterrorism lexicon, the Nassereddine clan would be characterized as "fixers"—or, in the case of Ghazi, a "super fixer"—because the members aren't part of Hezbollah's hierarchical chain of command, but are integral to organizing support networks in Venezuela that connect Hezbollah to the Maduro regime. These fixers provide distance and a measure of deniability for Hezbollah leaders to hide their connection to the Maduro regime, and establish pathways to the regime's bureaucracy and political apparatus in Venezuela.

### The Rada Clan

The city of Maicao is a historic commercial hub in La Guajira department in Colombia, with a large concentration of Lebanese immigrants dating back to the nineteenth century. In 2017, Colombian immigration authorities deported one of its residents, a Hezbollah financier and Venezuelan-Lebanese dual national, Abdala Rada Ramel, who was suspected of running a drug-trafficking and contraband-smuggling ring from Maicao to Cartagena.[38]

He is a prominent member of the Rada clan, known to have close ties to a high-level Hezbollah leader. According to Semana, a well-known Colombian magazine, in his initial interrogation, Abdala Rada Ramel revealed that his illicit activities in Colombia were in coordination with his "supervisor" Salman Raouf Salman, a shadowy Hezbollah ESO leader who has been implicated in numerous terrorist operations worldwide.[39]

Cutting his teeth in Argentina as Hezbollah's on-the-ground coordinator for both bombings in Buenos Aires in 1992 and 1994, Salman Raouf Salman—whose alias is Samuel Salman El Reda El Reda—continues to direct Hezbollah's ESO crime-terror network in Latin America, including in Venezuela.[40] With an international arrest warrant issued by Argentina in 2009, an OFAC terrorist designation in 2019, and a $7 million reward for information leading to his capture, Salman Raouf Salman, along with his brother Jose Salman El Reda El Reda, is credited with building Hezbollah's support networks in Latin America.[41]

Salman Raouf Salman's ties to the Rada clan date back to the 1994 AMIA attack. Argentine authorities suspect a Venezuelan-Lebanese dual national named Amer Mohamed Akil Rada of being involved in the Hezbollah attack of the AMIA building.[42] Amer Mohamed, who is also suspected of being involved in the 1992 terrorist bombing of the Israeli embassy in Buenos Aires, is alleged to have worked closely with Salman Raouf Salman throughout the 1990s to case various targets for Hezbollah's ESO in Argentina, Brazil, Colombia, and Venezuela.

Decades later, a fifty-three-year-old Amer Mohamed Akil Rada, has set up small import-export businesses in Panama, sending textiles to Colombia and charcoal to Lebanon, with as much as 80 percent of the proceeds used to support Hezbollah.[43] In counternarcotics circles, charcoal is often called "black cocaine" because it is frequently used to disguise the transfer of cocaine.[44] Akil Rada's relatives continue to operate in Venezuela and are involved in the cryptocurrency industry, which is controlled by the Maduro regime.[45] Joselit de la Trinidad Ramírez Camacho, the Maduro regime's crypto chief responsible for the state-backed petro, was recently indicted by DOJ and has a $5-million bounty for helping regime officials evade OFAC sanctions.[46] The indictment states that Ramírez Camacho has "deep political, social, and economic ties to multiple alleged narcotics kingpins, including Tareck El Aissami."[47] The Rada clan connections to the Maduro regime are nested in this relationship with Tareck El Aissami.

The Rada, Saleh, and Nassereddine clans are part of a much larger global illicit network of fixers, financiers, and facilitators for Hezbollah, operating out of Venezuela with protection from the Maduro regime. Members of two of the three clans have been designated by the US Treasury Department as global terrorists for their ties to Hezbollah.[48] Unlike the Nassereddine clan, members of the Rada clan and Saleh clan are not formally a part of the Maduro regime; however, they each manage aspects of the illicit economies of drugs, weapons, contraband, smuggling, and money laundering between Venezuela, Lebanon, and Syria. Each provides a specific service and comparative advantage for connecting Hezbollah to the Maduro regime, acting as "convergence points"to the regime-controlled illicit economy and specific sectors of its licit economy, establishing a degree of plausible deniability for both the Maduro regime and Hezbollah's leadership, which both deny any direct cooperation.[49]

The US-Colombia joint Operation Titan, which, by 2014, led to ten separate but interrelated kingpin designations by OFAC and three federal indictments by DOJ, described some of these convergence points that established air and sea bridges between Venezuela, Iran, and Hezbollah.[50] As the US "maximum pressure" campaign ensues, this bridge becomes increasingly important to maintain a transregional threat network that enables Iran and Hezbollah to prop up the Nicolás Maduro regime in Venezuela and the Bashar al-Assad regime in Syria.



**From Syria to Venezuela**

Iran and Hezbollah's support to the Maduro regime in Venezuela follows the strategy of its support to Bashar al-Assad in Syria to protect the logistical foothold of Iran's land bridge through the Levant. In Venezuela, the logistical air bridge between Caracas, Damascus, and Tehran is what Maduro protects and has served profitable for Hezbollah and Iran.

In southwestern Syria, more than three hundred thousand Venezuelans reside in a city called As-Suwayda.[41] Many of them dual nationals, comprising almost two thirds of the primarily Druze governorate in Syria also called As-Suwayda, Known in Syria as "little Venezuela," As-Suwayda is currently occupied by Russian military forces, Iran's Islamic Revolutionary Guard Corps (IRGC), and Hezbollah militants that are affiliated with 60 percent of all armed groups in the province defending Bashar al-Assad.[42]

Hezbollah's defense of the Assad regime in Syria is controversial in Lebanon. Since Hezbollah's inception, Secretary General Hassan Nasrallah insists on denying the group's growing global footprint in the world of transnational organized crime in order to maintain legitimacy in Lebanon—even to the point of admitting Hezbollah's financial support from Iran in order to distract from its other illicit sources of revenue.[43] Along these same lines, Nasrallah repeatedly emphasized that Hezbollah has no interests outside of Lebanon. But, in 2013, he publicly confirmed Hezbollah's support of the Assad regime, in a speech in which he called Syria the "backbone" of the axis of resistance.[44] This public support broke with decades of denial, and laid bare Hezbollah's global interests outside of Lebanon.

Across the Atlantic, similar support is mounting by Iran and Hezbollah for the Maduro regime in Venezuela.[45] Venezuela's strategic location in South America and at the crossroads of the Caribbean provides Iran and Hezbollah with an ability to diminish their geographic disadvantage against the United States. To hide this relationship, Chávez, and then the Maduro regime, provided dual identities to some Middle Easterners, building a clandestine network that provides intelligence, training, funds, weapons, supplies, and know-how to both the Maduro and Assad regimes.[46]



Iran's Foreign Minister Mohammad Javad Zarif and Jorge Arreaza shake hands and pose for a photo during the Ministerial Meeting of the Non-Aligned Movement Coordinating Bureau in Caracas, Venezuela. The dual-use nature of Iran's cooperation with the Maduro regime, layered with the illicit finance connections of its facilitators and Hezbollah's established crime-terror network in Venezuela requires a robust response from the international community. Picture taken July 20, 2019.

The aforementioned Lebanese-Venezuelan-Colombian clans are part of this transregional threat network that provides support to Hezbollah's illicit activities and, equally, establishes a logistical base in Venezuela that allows the Maduro regime and associated criminal groups, including FARC dissidents and ELN guerrillas, to expand their operations.[47] The Maduro regime's reliance on illicit networks is enhanced by Hezbollah's transregional nature, while the Lebanese terror group benefits from state support in Venezuela to move its illicit funds and personnel in and out of the region. Combined, Hezbollah has helped the Maduro regime become the central hub for the convergence of transnational organized crime and international terrorism in the Western Hemisphere, multiplying the logistical and financial benefits for both.

**IRAN-HEZBOLLAH NETWORKS IN VENEZUELA**

★  Hezbollah support cells and clans

⚓  National Iranian Oil Company (NIOC)

✈  Mahan Air



Created by: The Center for a Secure Free Society. Designed by: The Atlantic Council.

### Pariah States: Iran and Venezuela

Recent nationwide shortages of gasoline have added to the complexity of the crisis in Venezuela. Despite having the largest reserves of petroleum in the world, the state-owned oil enterprise, Petróleos de Venezuela (PDVSA), cannot refine its heavy crude due to mismanagement and corruption, leading to mass shortages and pent-up demand. In April 2020, the Maduro regime turned to Iran to partner in helping fix the oil refineries on the Paraguaná peninsula, and to provide much-needed fuel to Venezuela. The newly named oil minister, Tareck El Aissami, and the regime's special envoy to Iran, Lebanese-Colombian businessman Alex Saab, seemingly worked out a gold-for-gas deal with Tehran.[48]

Shortly after, in a period of a month and a half, the Iranian airline, Mahan Air, flew seventeen flights and the National Iranian Oil Company (NIOC) sailed five tankers from Iran to Venezuela to provide parts from China, Iranian technicians, and approximately 1.5 million barrels of gasoline to the fuel-starved Maduro regime.[49] Months later, the refineries on the Paraguaná peninsula still do not operate, and Venezuela is once again facing fuel shortages. But, according to Bloomberg, the Islamic Republic received almost half a billion dollars' worth (nine tons) of gold bars as payment.[50]

The Iranian entities involved in this reported gold-for-gas scheme—namely Mahan Air, NIOC, and the Islamic Republic of Iran Shipping Lines (IRISL)—are all sanctioned by OFAC for connections to Iran's tiered clerical army, the Islamic Revolutionary Guard Corps (IRGC). The nature of the IRGC and these state-owned or controlled entities raises a concern for potential dual-use operations, which have less of a commercial or humanitarian intent and are more militaristic in their emotions.[51] A civil-forfeiture complaint filed in a district court in Washington, DC, suggests that the IRGC is behind the fuel shipments to Venezuela, citing the corporate records of four additional Liberian-flagged tankers from Iran that were stopped from arriving in Venezuela.[52] The contents of these tankers were seized by the United States in what has been described as the "largest U.S. seizure of Iranian fuel" to date.[53]



Much like in Syria, the IRGC's ability to operate in Venezuela is due to the heightened capability of Hezbollah's support network. Hezbollah's influence within, and infiltration of, Lebanese expat communities gives Iran a gateway to grow its footprint in Venezuela. Prominent businessmen, such as Alex Saab, are needed to facilitate this relationship with Iran because of their language, culture, and in-depth understanding of the Middle East. The June 2020 arrest in Cape Verde, off the coast of West Africa, and possible extradition of Saab to the United States for eight counts of money laundering has forced the Maduro regime to turn to other facilitators to manage the Iran portfolio.

One likely candidate is Lebanese-Venezuelan businessman Majed Khalil Majoub, who, along with his brother, Khaled, has amassed an empire in the shadows of the Chávez and Maduro regimes.[54] The Khalil Majoub brothers also reportedly received many preferential business deals from the Evo Morales regime in Bolivia, according to a 2017 legislative investigation by a Bolivian senator.[55] Immigration records from Bolivia show that Khaled Khalil Majoub traveled to La Paz at least seven times in the last five years, including a trip to Bolivia with his brother in 2016.[56] A close relative of the Khalil Majoub brothers in Lebanon, former Lebanese Finance Minister Ali Hassan Khalil, was recently sanctioned by OFAC for his "material support to Hezbollah" and other corruption charges.[57] A master of Middle Eastern networking with intimate knowledge of Venezuelan kleptocracy, Majed Khalil Majoub has the trust, access, and placement in Venezuela to help Iran and the Maduro regime continue their strategic cooperation should Alex Saab be sent to a US prison.

> The dual-use nature of Iran's cooperation with the Maduro regime, layered with the illicit finance connections of its facilitators and Hezbollah's established crime-terror network in Venezuela, creates a tier-one national security concern for the United States —one that is multifaceted and requires a robust response.

X

Part of this cooperation is a new Iranian supermarket called "Megasis," launched in Caracas in July. According to the *Wall Street Journal*, the supermarket is an offshoot of an Iranian retail chain, Etka, that is a subsidiary of the Ministry of Defense and Armed Forces Logistics (MODAFL) in Iran.[68] For the last fourteen years, the MODAFL has partnered with Venezuela's defense-logistics agency, the Venezuelan Company of Military Industries (CAVIM), setting up opaque military projects and shielding financial transfers through PDVSA's commercial exchange with China.[69]

The dual-use nature of Iran's cooperation with the Maduro regime, layered with the illicit finance connections of its facilitators and Hezbollah's established crime-terror network in Venezuela, creates a tier-one national security concern for the United States—one that is multifaceted and requires a robust response.

**Policy Recommendations**

The United States' "maximum pressure" policy, in effect since January 2019, has focused on eroding the political and economic support of the Maduro regime. Still, the regime has proven resilient because it relies on external state and non-state actors. Unlike Colombia's FARC or ELN, Hezbollah is one of the less visible non-state actors helping the Maduro regime, but an important one nonetheless.

Understanding the nature of how Hezbollah operates in Venezuela, through the lens of threat-convergence theory, is critical for US, European, and Latin American efforts focused on finding a solution to the crisis in Venezuela. In order to neutralize the threat, the United States must engage in a counter-threat network approach that equally attacks convergence points throughout the world from which Iran, Hezbollah, and the Maduro regime benefit. However, the international community should combine these targeted actions with a global narrative that delegitimizes Hezbollah's presence in the region, with the goal of diminishing the terrorist group's influence in the larger Lebanese communities in Latin America.

Any strategy that aims to diminish Hezbollah's influence in Latin America must work with the Lebanese diaspora that is as much a victim as it is the target of Hezbollah's illicit activities. The following actions follow this strategy.

1. The United States has been helping to boost regional counterterrorism cooperation in recent years through hemispheric ministerial forums that have led to the first four Hezbollah terror designations in Latin America.[60] Under current conditions of COVID-19, the momentum for these forums has stalled, but the importance of the designations remains. The designation of Hezbollah as a terrorist organization is critical to ensuring that each country criminalizes the act of membership or support of Hezbollah, so that local authorities can prevent potential terrorist actions before they take place. **Thus, continuing with these Hemispheric Counterterrorism Ministerial Conferences will help to ensure that the regional counterterrorism coalition strengthens.**

   The hemispheric ministerial forums were essential in building a broader coalition of countries in Latin America that supports these terror designations. Through a total of three forums from December 2018 to January 2020, this effort has grown a coalition of eighteen participating and four observing nations, as well as the participation of the United Nations (UN), the Organization of American States (OAS), the International Criminal Police Organization (INTERPOL), and the Police Community of the Americas (AMERIPOL). Each forum built on the success of the last to establish a regional consensus on the concern of the Hezbollah network's activities in Latin America, officially declared through a joint communiqué.[61] This document helped reinforce existing terror designations of Hezbollah in Latin America and catalyze new countries to consider doing the same.

2. A primary conduit of the convergence of organized crime and international terrorism is illicit finance. Financial-intelligence units (FIUs) are the nerve center of a government's ability to collect, analyze, and report on suspicious activity related to money laundering, corruption, terror finance, and other financial crimes. FIUs have played an outsized role in helping to shut down the illicit financial networks of Hezbollah and its sympathizers worldwide. In the absence of adequate antiterrorism legislation in Latin America, the FIUs have established many mechanisms to cooperate on regional counter-terror-finance efforts. **This FIU cooperation in the Americas should be expanded to Gulf states in the Middle East—namely the United Arab Emirates (UAE), Bahrain, Kuwait, and Oman—that oversee well-known money-laundering jurisdictions widely and constantly used by Iran and Hezbollah.** United Nations Security Council Resolution 2462 provides an impetus for this cooperation.

3. **The US State Department (and Commerce Department), in coordination with the Department of Homeland Security International Trade Office, should establish a robust public-diplomacy campaign with Lebanese and other Arab communities throughout Latin America, to build partnerships aimed at weeding out Hezbollah's malign influence.** Such partnerships would need to be multifaceted, with commercial cooperation, cultural exchange, customs enforcement, and media partnerships aimed at anti-corruption initiatives that help legitimate businessmen stay away from the perverse incentives that Hezbollah or any other illicit actors could offer. Many in the broader Lebanese communities in Latin America are eager to participate in efforts that help build credibility to reduce the reputational risk of their commercial activity.

4. **The Organization of American States could adopt a convergence task force that works on identifying convergence points where Hezbollah and other crime-terror networks operate in Latin America and the Caribbean.** This could be part of the OAS Inter-American Network on Counterterrorism, a project created in 2019 and aimed at strengthening cooperation to prevent and address terrorist threats in the Western Hemisphere. The goal of the convergence task force should be to share real-time information on the logistical networks (persons and entities) that help both the Maduro regime and Hezbollah.

The Iran and Hezbollah nexus in Venezuela, first under Chávez and now with Maduro, has been underestimated by the international community for far too long. The findings in this report demonstrate that these connections exist and are mutually beneficial, allowing Hezbollah a safe space to conduct its global crime-terror operations and providing the Maduro regime with increased illicit support from the Middle East. Curtailing the Maduro-Iran-Hezbollah cooperation is a critical step in stemming illicit networks that are helping to sustain the Maduro regime and prolonging the Western Hemisphere's worst humanitarian crisis.

**DOWNLOAD PDF**

Image: Venezuela's Nicolás Maduro next to Iranian President Hassan Rouhani during the 18th Summit of Heads of State and Government of the Non-Aligned Movement in Baku, Azerbaijan. Iran-backed Hezbollah operates clandestine networks of cleric in Venezuela with financiers, fixers, and facilitators connected to the Maduro regime. Picture taken on October 25, 2019.

EXHIBIT 8

10/31/2020                                CM/ECF - Live Database - flsd

<u>Q</u>uery   Reports   <u>U</u>tilities   Help   Log Out

# U.S. District Court
## Southern District of Florida (Miami)
## CRIMINAL DOCKET FOR CASE #: 1:15-cr-20840-MGC-1

Case title: USA v. Acherman et al                    Date Filed: 10/29/2015
                                                     Date Terminated: 12/14/2015

---

Assigned to: Judge Marcia G. Cooke

**Defendant (1)**

**Martin Lustgarten Acherman**              represented by **E. Peter Mullane**
07680-104                                                   Email: peter@3mlaw.com
*TERMINATED: 12/14/2015*                                    *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Retained*

                                                            **Nathan Philip Diamond**
                                                            Nathan P. Diamond, P.A.
                                                            888 Biscayne Boulevard
                                                            Suite 501
                                                            Miami, FL 33132
                                                            305-371-5300
                                                            Fax: 305-371-6966
                                                            Email: attydiamon@aol.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Retained*

**Pending Counts**                          **Disposition**

8:1325A.F IMPROPER ENTRY BY                 PRIOR JUDGMENT: Credit for Time
ALIEN                                       Served. No supervised release to follow.
(1ss)                                       AMENDED: 1 Day Credit for Time Served.
                                            No supervised release to follow.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                       **Disposition**

18 U.S.C. § 1956(h) - Money Laundering
Conspiracy                                  Dismissed by AUSA.
(1)

18 U.S.C. § 1512(k) - Conspiracy to
Obstruct an Official Proceeding             Dismissed by AUSA.
(2s)

10/31/2020                                        CM/ECF - Live Database - flsd

18 U.S.C. § 1512(c)(2) - Obstruction of an
Official Proceeding                                   Dismissed by AUSA.
(3s)


**Highest Offense Level (Terminated)**

Felony


**Complaints**                                        **Disposition**

None

---

**Plaintiff**

USA                                 represented by   **Noticing AUSA CR TP/SR**
                                                     Email: Usafls.transferprob@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Retained*

                                                     **Joseph Palazzo**
                                                     U.S. Department of Justice
                                                     Asset Forfeiture and Money Laundering
                                                     Section
                                                     Bond Building, 10th Floor
                                                     1400 New York Avenue, N.W.
                                                     Washington, DC 20530
                                                     202-514-1263
                                                     Email: joseph.palazzo@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Katherine Ferguson**
                                                     U.S. Attorney's Office
                                                     One Courthouse Way, Suite 9200
                                                     Boston, MA 02210
                                                     617-748-3555
                                                     Email: katherine.ferguson@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Annika Marie Miranda**
                                                     United States Attorney's Office - SDFL
                                                     99 N.E. 4th Street
                                                     7th Floor
                                                     Miami, FL 33132
                                                     305-961-9303
                                                     Email: annika.miranda@usdoj.gov
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Linda M. Ricci**
                                                     U.S. Attorney's Office , MA
                                                     617-748-3395

10/31/2020

CM/ECF - Live Database - flsd

Email: linda.ricci@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Michael Brian Nadler**
Stumphauzer, Foslid, Sloman, Ross, and
Kolaya
2 S. Biscayne Blvd
Suite 1600
Miami, FL 33131
305-614-1400
Email: michael.nadler@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Nalina Sombuntham**
US Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
305-961-9224
Email: nalina.sombuntham2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/14/2015 | 2 | INDICTMENT as to Martin Lustgarten Acherman (1) count(s) 1, Salomon Bendayan (2) count(s) 1. (Indictment originally filed in District of Massachusetts) (rby) (Main Document 2 replaced on 11/9/2015) (rby). (Entered: 10/29/2015) |
| 10/29/2015 | 1 | ORDER OF TRANSFER (Rule 21) from District of Massachusetts (Boston) as to Martin Lustgarten Acherman, Salomon Bendayan. (rby) (Entered: 10/29/2015) |
| 10/29/2015 | 3 | Copy of Docket Sheet from the District of Massachusetts as to Martin Acherman. (rby) (Entered: 10/29/2015) |
| 11/03/2015 | | SYSTEM ENTRY - Docket Entry 5 restricted/sealed until further notice. (nc) (Entered: 11/03/2015) |
| 11/03/2015 | 6 | NOTICE OF ATTORNEY APPEARANCE: Nathan Philip Diamond appearing for Martin Lustgarten Acherman (Diamond, Nathan) (Entered: 11/03/2015) |
| 11/03/2015 | 8 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for E. Peter Mullane. Filing Fee $75.00. Receipt # 110978. Responses due by 11/20/2015 (ksa) (Entered: 11/04/2015) |
| 11/04/2015 | 9 | Paperless Minute Entry for proceedings held before Judge Marcia G. Cooke: Status Conference as to Martin Lustgarten Acherman, Salomon Bendayan held on 11/4/2015. Appearances: Michael Nadler, AUSA; Nathan Diamond, Esq; Howard Brownstein, Esq. Court sets motion hearing for 11/20/15 at 1:30 pm. New trial order to follow. Both defendants must be present for the motion hearing. Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. (im) (Entered: 11/05/2015) |
| 11/05/2015 | 10 | Writ of Habeas Corpus ad Prosequendum Issued as to Martin Lustgarten Acherman. Signed by Judge Marcia G. Cooke on 11/5/2015. Motion Hearing set for 11/20/2015 01:30 PM in Miami Division before Judge Marcia G. Cooke. Status Conference Re: Bond/Detention/Discovery Matters set for 11/20/2015 01:30 PM in Miami Division |

| | | |
|---|---|---|
| | | before Judge Marcia G. Cooke. All counsel and defendant must appear. (im) (Entered: 11/05/2015) |
| 11/05/2015 | 11 | NOTICE OF HEARING as to Martin Lustgarten Acherman, Salomon Bendayan Motion Hearing and Status Conference re: Discovery and Detention matters set for 11/20/2015 01:30 PM in Miami Division before Judge Marcia G. Cooke. All counsel and defendants must be present.(im) (Entered: 11/05/2015) |
| 11/05/2015 | 12 | SCHEDULING ORDER as to Martin Lustgarten Acherman, Salomon Bendayan Calendar Call set for 12/9/2015 03:00 PM in Miami Division before Judge Marcia G. Cooke. Jury Trial set for 12/14/2015 09:30 AM in Miami Division before Judge Marcia G. Cooke. Signed by Judge Marcia G. Cooke on 11/5/2015. (im) (Entered: 11/05/2015) |
| 11/10/2015 | 13 | NOTICE OF ATTORNEY APPEARANCE Joseph Palazzo appearing for USA. . Attorney Joseph Palazzo added to party USA(pty:pla). (Palazzo, Joseph) (Entered: 11/10/2015) |
| 11/13/2015 | 14 | ENDORSED ORDER (No PDF Attached) granting 8 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing as to Martin Lustgarten Acherman (1). Signed by Judge Marcia G. Cooke on 11/13/2015. (im) (Entered: 11/13/2015) |
| 11/13/2015 | 17 | ORDER OF TRANSFER (Rule 21) from District of Massachusetts (Boston) as to Martin Lustgarten Acherman. (Counts 2 and 3) (rby) (Entered: 11/17/2015) |
| 11/17/2015 | | Counts added: Martin Lustgarten Acherman (1) count(s) 2s, 3s (rby) (Entered: 11/17/2015) |
| 11/17/2015 | 19 | NOTICE OF ATTORNEY APPEARANCE Linda M. Ricci appearing for USA. . Attorney Linda M. Ricci added to party USA(pty:pla). (Ricci, Linda) (Entered: 11/17/2015) |
| 11/18/2015 | | SYSTEM ENTRY - Docket Entry 20 restricted/sealed until further notice. (nc) (Entered: 11/18/2015) |
| 11/18/2015 | | SYSTEM ENTRY - Docket Entry 21 restricted/sealed until further notice. (nc) (Entered: 11/18/2015) |
| 11/19/2015 | 22 | MOTION to Continue Trial *to February 2016* by USA as to Martin Lustgarten Acherman, Salomon Bendayan. Responses due by 12/7/2015 (Attachments: # 1 Exhibit Proposed Order, # 2 Exhibit Hong Kong MLAT, # 3 Exhibit Singapore MLAT, # 4 Exhibit Switzerland MLAT, # 5 Exhibit Luxembourg MLAT)(Ricci, Linda) (Entered: 11/19/2015) |
| 11/19/2015 | 23 | NOTICE OF ATTORNEY APPEARANCE Katherine Ferguson appearing for USA. . Attorney Katherine Ferguson added to party USA(pty:pla). (Ferguson, Katherine) (Entered: 11/19/2015) |
| 11/19/2015 | 25 | MEMORANDUM OF DECISION AND ORDER ON MOTION FOR PRODUCTION OF LEGAL INSTRUCTIONS TO GRAND JURY as to Martin Lustgarten Acherman. Issued on 10/16/15 by the U.S. District Court of Massachusetts. Signed by Judge Other Court MDL (rby) (Entered: 11/19/2015) |
| 11/19/2015 | 26 | RESPONSE in Opposition by Martin Lustgarten Acherman as to Martin Lustgarten Acherman, Salomon Bendayan re 22 MOTION to Continue Trial *to February 2016* Replies due by 11/30/2015. (Attachments: # 1 Exhibit Letter) (Diamond, Nathan) (Entered: 11/19/2015) |
| 11/20/2015 | | SYSTEM ENTRY - Docket Entry 30 restricted/sealed until further notice. (nc) (Entered: |

| | | 11/20/2015) |
|---|---|---|
| 11/20/2015 | | SYSTEM ENTRY - Docket Entry 31 restricted/sealed until further notice. (nc) (Entered: 11/20/2015) |
| 11/20/2015 | 32 | Clerk's Notice of Filing Deficiency Re: 30 Sealed Document, 31 Sealed Document Document(s) missing required signature(s) (Fed.R.Cr.P 49(d)). (nc) (Entered: 11/20/2015) |
| 11/20/2015 | 34 | Paperless Minute Entry for proceedings held before Judge Marcia G. Cooke: Motion Hearing as to Martin Lustgarten Acherman, Salomon Bendayan held on 11/20/2015 re 22 MOTION to Continue Trial *to February 2016* filed by USA, 21 SEALED MOTION to Dismiss Indictment for Violations, and Reckless Disregard, of Brady and Other Discovery Obligations, or In The Alternative to Prohibit the Use of Government's Discovery As Provided for And Pursuant to F.R.Crim.P. 16(d)(2)(C) by Ma. Appearances: Joseph Palazzo, AUSA; Michael Nadler, AUSA; Nathan Diamond, Esq.; Howard Brownstein, Esq. Defendant's motion to dismiss is denied without prejudice. Government's motion for continuance of trial is denied. The Court sets Status Conference Re: Discovery Matters for 12/3/2015 03:30 PM in Miami Division before Judge Marcia G. Cooke. Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. (im) (Entered: 11/24/2015) |
| 11/24/2015 | 35 | NOTICE OF HEARING ON MOTION in case as to Martin Lustgarten Acherman, Salomon Bendayan 33 MOTION for Hearing : Motion Hearing and Status Conference re: Discovery Matters set for 12/3/2015 03:30 PM in Miami Division before Judge Marcia G. Cooke. (im) (Entered: 11/24/2015) |
| 11/24/2015 | 36 | WAIVER of the right of the defendant to personally appear for Status and Pretrial Conferences by Martin Lustgarten Acherman. (im) (Entered: 11/24/2015) |
| 11/25/2015 | 38 | MOTION for Release from Custody *and Setting of Bond Conditions* by USA as to Martin Lustgarten Acherman, Salomon Bendayan. Responses due by 12/14/2015 (Ricci, Linda) (Entered: 11/25/2015) |
| 11/27/2015 | 39 | Renewed MOTION to Continue Trial by USA as to Martin Lustgarten Acherman, Salomon Bendayan. Responses due by 12/14/2015 (Ricci, Linda) (Entered: 11/27/2015) |
| 11/27/2015 | 40 | RESPONSE in Opposition by Martin Lustgarten Acherman as to Martin Lustgarten Acherman, Salomon Bendayan re 15 MOTION to Dismiss 2 Indictment , 18 MOTION to Dismiss 2 Indictment, 15 MOTION to Dismiss 2 Indictment Replies due by 12/7/2015. (Diamond, Nathan) (Entered: 11/27/2015) |
| 11/28/2015 | 41 | Memorandum in Opposition by Martin Lustgarten Acherman re 38 MOTION for Release from Custody *and Setting of Bond Conditions* Replies due by 12/10/2015. (Diamond, Nathan) (Entered: 11/28/2015) |
| 11/29/2015 | 42 | RESPONSE in Opposition by Martin Lustgarten Acherman re 39 Renewed MOTION to Continue Trial Replies due by 12/10/2015. (Diamond, Nathan) (Entered: 11/29/2015) |
| 12/01/2015 | 43 | REPLY TO RESPONSE to Motion by USA as to Martin Lustgarten Acherman re 38 MOTION for Release from Custody *and Setting of Bond Conditions* (Palazzo, Joseph) (Entered: 12/01/2015) |
| 12/01/2015 | 44 | MOTION for Clarification *of Public Authority Defense and Touhy Compliance* by USA as to Martin Lustgarten Acherman. Responses due by 12/18/2015 (Attachments: # 1 Appendix, # 2 Appendix)(Palazzo, Joseph) (Entered: 12/01/2015) |
| 12/02/2015 | 45 | SUPPLEMENT by Martin Lustgarten Acherman as to Martin Lustgarten Acherman, Salomon Bendayan *Memorandum in Support of Motion to Dismiss (DK #18 and 21)* |

CM/ECF - Live Database - flsd

| | | (Diamond, Nathan) (Entered: 12/02/2015) |
|---|---|---|
| 12/02/2015 | 46 | MOTION to Adopt/Join 37 Motion for Hearing, 15 MOTION to Dismiss 2 Indictment by Martin Lustgarten Acherman as to Martin Lustgarten Acherman, Salomon Bendayan. Responses due by 12/21/2015 (Diamond, Nathan) (Entered: 12/02/2015) |
| 12/03/2015 | 47 | RESPONSE to Standing Discovery Order by USA as to Martin Lustgarten Acherman, Salomon Bendayan (Ferguson, Katherine) (Entered: 12/03/2015) |
| 12/03/2015 | 48 | Paperless Minute Entry for proceedings held before Judge Marcia G. Cooke: Status Conference and Motion Hearing as to Martin Lustgarten Acherman, Salomon Bendayan held on 12/3/2015 re 38 MOTION for Release from Custody *and Setting of Bond Conditions* filed by USA. Appearances: Kate Ferguson, AUSA; Lynn Kirkpatrick, AUSA; Michael Nadler, AUSA; Nathan Diamond, Esq; Howard Brownstein, Esq; Both Defendants present. The Court grants the Government's motion and defendant Martin Lustgarten Acherman shall be released on $50,000.00 PSB. Both defendants are set for Change of Plea hearing on 12/14/2016 at 1:30PM. Court Reporter: Patricia Sanders, 305-523-5548 / Patricia_Sanders@flsd.uscourts.gov. (im) (Entered: 12/06/2015) |
| 12/03/2015 | 49 | NOTICE OF HEARING as to Martin Lustgarten Acherman, Salomon Bendayan Change of Plea Hearing set for 12/14/2015 01:30 PM in Miami Division before Judge Marcia G. Cooke. (im) (Entered: 12/06/2015) |
| 12/03/2015 | 50 | $50,000.00 PSB Bond Entered as to Martin Lustgarten Acherman. Approved by Judge Marcia G. Cooke. *Please see bond image for conditions of release.* (ar2) (Entered: 12/08/2015) |
| 12/14/2015 | 52 | SUPERSEDING INFORMATION as to Martin Lustgarten Acherman (1) count 1ss. (ar2) (Entered: 12/14/2015) |
| 12/14/2015 | 55 | Minute Entry for proceedings held before Judge Marcia G. Cooke: Change of Plea Hearing as to Martin Lustgarten Acherman held on 12/14/2015 Martin Lustgarten Acherman (1) Guilty Count 1ss. Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. (im) (Entered: 12/15/2015) |
| 12/14/2015 | 56 | Minute Entry for proceedings held before Judge Marcia G. Cooke: Sentencing held on 12/14/2015 as to Martin Lustgarten Acherman. Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. (im) (Entered: 12/15/2015) |
| 12/14/2015 | 57 | JUDGMENT as to Martin Lustgarten Acherman (1), Counts 1, 2s, 3s, Dismissed by AUSA.; Count 1ss, Credit for Time Served. No supervised release to follow. Assessment: $10.00 (misdemeanor) Fine: $5,000.00 Closing Case for Defendant. Signed by Judge Marcia G. Cooke on 12/14/2015. (im) <br><br> **NOTICE: If there are sealed documents in this case, they may be unsealed after 1 year or as directed by Court Order, unless they have been designated to be permanently sealed. See Local Rule 5.4 and Administrative Order 2014-69.** (Entered: 12/15/2015) |
| 12/16/2015 | | SYSTEM ENTRY - Docket Entry 59 restricted/sealed until further notice. (nc) (Entered: 12/16/2015) |
| 12/16/2015 | | SYSTEM ENTRY - Docket Entry 60 restricted/sealed until further notice. (nc) (Entered: 12/16/2015) |
| 12/22/2015 | 64 | ORDER OF DISMISSAL as to Martin Lustgarten Acherman. Signed by Judge Marcia G. Cooke on 12/30/2015. (tpl) (Entered: 12/31/2015) |
| 12/23/2015 | 63 | TRANSCRIPT of Sentencing Hearing as to Martin Lustgarten Acherman, Salomon |

CM/ECF - Live Database - flsd

| | | |
|---|---|---|
| | | Bendayan held on December 14, 2015 before Judge Marcia G. Cooke, 1-28 pages, Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/19/2016. Redacted Transcript Deadline set for 1/28/2016. Release of Transcript Restriction set for 3/25/2016. (gps) (Entered: 12/23/2015) |
| 01/13/2016 | 65 | MOTION to Vacate *Amended Restraining Order* by USA as to Martin Lustgarten Acherman. (Attachments: # 1 Exhibit Restraining Order, # 2 Text of Proposed Order Proposed Order)(Ferguson, Katherine) (Entered: 01/13/2016) |
| 01/19/2016 | 66 | NOTICE OF ATTORNEY APPEARANCE Nalina Sombuntham appearing for USA. *Re: Forfeiture*. Attorney Nalina Sombuntham added to party USA(pty:pla). (Sombuntham, Nalina) (Entered: 01/19/2016) |
| 01/26/2016 | 67 | ORDER granting 65 Motion to partially Vacate Amended Post-Indictment Restraining Order as to Martin Lustgarten Acherman (1). Signed by Judge Marcia G. Cooke on 1/26/2016. (im) (Entered: 01/26/2016) |
| 06/07/2016 | 75 | ORDER TO VACATE, IN PART, AMENDED POST-INDICTMENT RESTRAINING ORDER granting 74 Motion to Vacate as to Salomon Bendayan (2). Signed by Judge Marcia G. Cooke on 6/7/2016. (im) (Entered: 06/07/2016) |
| 03/21/2017 | 102 | MOTION for Clarification 57 Judgment,, by Martin Lustgarten Acherman. Responses due by 4/4/2017 (Diamond, Nathan) (Entered: 03/21/2017) |
| 04/07/2017 | 103 | NOTICE OF HEARING ON MOTION in case as to Martin Lustgarten Acherman 102 MOTION for Clarification 57 Judgment,, : Motion Hearing set for 4/13/2017 10:00 AM in Miami Division before Judge Marcia G. Cooke. (im) (Entered: 04/07/2017) |
| 04/07/2017 | 104 | ENDORSED ORDER (No PDF Attached) Cancelling Hearing previously scheduled for 4/13/2017 at 10:00 a.m. as to Martin Lustgarten Acherman re 103 Notice of Hearing on Motion. Signed by Judge Marcia G. Cooke on 4/7/2017. (im) (Entered: 04/07/2017) |
| 04/10/2017 | 105 | AMENDED JUDGMENT as to Martin Lustgarten Acherman (1), Counts 1, 2s, 3s, Dismissed by AUSA.; Count 1ss, PRIOR JUDGMENT: Credit for Time Served. No supervised release to follow. AMENDED: 1 Day Credit for Time Served. No supervised release to follow. Signed by Judge Marcia G. Cooke on 4/10/2017. (im) (Entered: 04/10/2017) |
| 04/10/2017 | 106 | ENDORSED ORDER (No PDF Attached) granting 102 Motion for Clarification as to Martin Lustgarten Acherman (1). *See Amended Judgment (ECF No.105). Signed by Judge Marcia G. Cooke on 4/10/2017. (im) (Entered: 04/10/2017) |
| 07/20/2018 | | SYSTEM ENTRY - Docket Entry 112 restricted/sealed until further notice. (nc) (Entered: 07/20/2018) |
| 08/06/2018 | | SYSTEM ENTRY - Docket Entry 113 restricted/sealed until further notice. (im) (Entered: 08/06/2018) |
| 02/03/2020 | 117 | NOTICE OF ATTORNEY APPEARANCE Annika Marie Miranda appearing for USA. *as Co-Counsel Regarding Forfeiture*. Attorney Annika Marie Miranda added to party USA(pty:pla). (Miranda, Annika) (Entered: 02/03/2020) |

| PACER Service Center |
|---|
| Transaction Receipt |

# EXHIBIT 9

**From:** Sheehan, Evelyn B. (USAFLS)
**To:** Lehr, Alison (USAFLS)
**Subject:** RE: Call earlier
**Date:** Tuesday, April 10, 2018 8:53:22 AM



**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, April 10, 2018 8:48 AM
**To:** Sheehan, Evelyn B. (USAFLS)
**Subject:** Fwd: Call earlier

Sent from my iPhone

Begin forwarded message:

> **From:** Jonathan Mullane <j.mullane@icloud.com>
> **Date:** April 9, 2018 at 3:42:40 PM EDT
> **To:** Alison Lehr <alison.lehr@usdoj.gov>
> **Subject: Call earlier**
>
> Hi Alison,
> Thank you for speaking with me earlier. To be honest, I was somewhat surprised by your request that I complete my internship by the end of this week.
> Coincidently I ran into Lesnay Vazquez in the HR department a week or two ago. Not only did she state that it would be more than ok for me to extend my internship to May, there was curiously no mention of any "personnel changes" or any other conditions precedent to staying on. If you could please clarify this misunderstanding, I would appreciate it.
> Unfortunately I am now in an uncomfortable position vis-à-vis HR, as they previously asked that I provide at least two (2) weeks' notice prior to completing my internship. I will need to speak with them when I go into the office tomorrow to see how I can finish the internship by this Friday.
> Regards,
> Jonathan
>
> _____
> **Jonathan Mullane**
> Tel.: +1 (617) 800-6925 | j.mullane@icloud.com
> *This e-mail message and any attachments are confidential and may be privileged. Emails transmitted or received shall neither constitute acceptance of conducting transactions via electronic means nor shall create a binding contract in the absence of a fully signed written agreement.*

EOUSA-2019-000468-01212

| From: | Sheehan, Evelyn B. (USAFLS) |
|---|---|
| To: | Lehr, Alison (USAFLS) |
| Subject: | RE: Call earlier |
| Date: | Tuesday, April 10, 2018 9:22:19 AM |

Ok. sounds good.

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, April 10, 2018 9:22 AM
**To:** Sheehan, Evelyn B. (USAFLS)
**Subject:** Re: Call earlier

E-

██████████████████████████████████████████

Sent from my iPhone

On Apr 10, 2018, at 8:53 AM, Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov> wrote:

██████████████████████

**From:** Sheehan, Evelyn B. (USAFLS)
**Sent:** Tuesday, April 10, 2018 8:53 AM
**To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
**Subject:** RE: Call earlier

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, April 10, 2018 8:48 AM
**To:** Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov>
**Subject:** Fwd: Call earlier

Sent from my iPhone

Begin forwarded message:

> **From:** Jonathan Mullane <j.mullane@icloud.com>
> **Date:** April 9, 2018 at 3:42:40 PM EDT
> **To:** Alison Lehr <alison.lehr@usdoj.gov>
> **Subject: Call earlier**
>
> Hi Alison,
> Thank you for speaking with me earlier. To be honest, I was
> somewhat surprised by your request that I complete my internship by
> the end of this week.

**From:** Sheehan, Evelyn B. (USAFLS)
**To:** Lehr, Alison (USAFLS)
**Subject:** RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE
**Date:** Tuesday, May 15, 2018 10:59:58 AM

Spit spit spit to INFINITY.

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:59 AM
**To:** Sheehan, Evelyn B. (USAFLS)
**Subject:** RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE
**Very** sorry.
I will make certain (should there be a next time) spit spit spit

**From:** Sheehan, Evelyn B. (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:57 AM
**To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
**Subject:** RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE
We're all super busy. If I was told it didn't quite register during one of my ADD moments. You need to hit me over the head with it
I'm having heartburn bc of my notes, etc. I wasn't careful with papers etc

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:55 AM
**To:** Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov>
**Subject:** RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE
E-
Apologies. I really thought I had told you. I know I discussed it with Nalina and Adrienne and, based on our discussions, we took away an assignment he was given initially.
A

**From:** Sheehan, Evelyn B. (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:40 AM
**To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
**Subject:** FW: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE
Hey
Until last night I did NOT know that our infamous intern's father represented one of these targets/current cooperator in the VZ matter. If you find out about stuff like this for future interns, pls be sure to share with me and others to make sure we wall that person off completely. Quite unnerving bc I usually take extra precautions with my papers, discussions, research assignments, etc. What are the chances!?!
E

**From:** Evelyn Baltodano-Sheehan < ███████████████ >
**Sent:** Monday, May 14, 2018 9:07 PM
**To:** Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov>

**Subject:** How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE

https://www.vice.com/en_us/article/8gk7xx/how-the-feds-blew-a-case-against-an-alleged-south-american-drug-money-launderer

# How the Feds Blew a Case Against an Alleged South American Drug Money Launderer

## Experts and former drug warriors say the debacle represents a stunning blow against the US government's efforts to punish those who profit from the global drug trade.

For federal law enforcement officials, Martin Lustgarten Acherman was a prize catch in the war on drugs. Since 2007, investigators had been keeping tabs on the Miami-based businessman who maintains dual citizenship in Austria and Venezuela, methodically gathering evidence that Lustgarten was laundering tens of millions of dollars for Colombian and Mexican drug traffickers, as well as paramilitary groups, according to court documents obtained by VICE.

On April 8, 2015, authorities arrested Lustgarten in Miami after a grand jury indictment charged him with conspiracy to commit money laundering, obstruction of an official proceeding, and conspiracy to obstruct an official proceeding. His bust generated headlines heralding the dirty drug money nexus between Miami and Venezuela.

But nine months later, the case against Lustgarten suddenly unraveled as prosecutors dismissed the charges against him in what money laundering experts and former drug warriors say represents a stunning blow against the US government's efforts to punish those who profit from the narcotics trade.

"It is very unusual for a case like this to get dismissed," Michael Levine, a New York-based trial consultant who worked for a quarter-century as a Drug Enforcement Administration (DEA) special agent, told VICE. "It suggests to me that something was unearthed by the prosecutors that they decided to stop

and not go any further with it."

"It is a steep fall for the government to dismiss a case like this one so abruptly and so quickly,"added Charles A. Intriago, a former Miami federal prosecutor who founded the Association of Certified Anti-Money Laundering Specialists.

Calls to the lead federal prosecutor, Joseph Palazzo, were referred to a US Department of Justice spokesman in Washington DC, who did not respond to VICE's requests for comment. A spokesman for the DEA's New England division, which handled the criminal investigation, likewise did not return phone calls seeking comment.

Of course, E. Peter Mullane, the lead attorney for Lustgarten, says the case was dropped for a simple reason: his client is innocent. "From day one we had vigorously protested the fact that this person had been indicted for alleged offenses that he did not commit," Mullane said in an interview. "It took approximately nine months of extensive discovery and aggressive pleadings to make this point."

According to the feds' indictment, Lustgarten operated companies in Hong Kong, Singapore, and Panama that provided capital loans and purchase-order financing to Venezuelan firms involved in the international trade. In Venezuela, companies like Lustgarten's allegedly took advantage of that country's strict controls regarding the availability of US dollars by exchanging American currency in the black market for Venezuelan bolivars at a higher rate than normal. By striking deals with Lusgarten's companies, Venezuelan importers would have access to American cash in order to pay for consumer goods coming from outside the country.

Prosecutors argued Lustgarten was obtaining the US dollars from drug traffickers and paramilitary groups. The indictment details how the DEA Boston office seized accounts in March 2009 tied to Lustgarten's firms at a Bank of America branch in Doral, a city largely populated by Venezuelans in Miami-Dade County. Yet Lustgarten continued to launder drug proceeds through banks in Hong Kong, Singapore, and Switzerland, according to the feds. During an April 13 detention hearing in Miami, Palazzo accused the Venezuelan-Austrian businessman of laundering between $40 million and $100 million.

"The government's case is also very strong," Palazzo said at the time, according

to a transcript of the hearing. "Mr. Lustgarten's arrest was the culmination of
several years of investigation by a joint task force in the District of
Massachusetts... Extensive wiretaps were conducted in the US and in Colombia
and several search warrants were executed on Mr. Lustgarten's emails. So there
is plenty of documentary evidence supporting the charges as well."

Palazzo also accused Lustgarten of being an unreliable confidential informant
who routinely passed false information to the Boston task force investigators.
"Mr. Lustgarten is basically a professional liar that has been lying to the DEA
and Homeland Security and to the US Attorney's Office in Boston for several
years," Palazzo told magistrate Judge Edwin G. Torres.

The indictment went on to name a man named Salomon Bendayan, whom
Palazzo alleged controlled shell companies that worked in concert with
Lustgarten's supposedly shady businesses. Bendayan was arrested one month
after Lustgarten.

While Lustgarten was held without bail for nine months, his defense team went
to work taking apart the prosecution's case against their client. On November
19, Lustgarten's other lawyer Nathan P. Diamond filed a motion against
Palazzo's request to delay the trial date until February, accusing the prosecutor
of stall tactics and failing to produce evidence against his client. In essence,
Diamond argued Lustgarten was being denied his right to a speedy trial,
pointing out that the prosecutorial team had not provided documents detailing
their client's banking transactions in seven countries.

That's because prosecutors never obtained the documents, according to
Diamond. In order for prosecutors to obtain evidence in other countries, they
must first obtain permission from foreign governments to do so under what is
known as a mutual legal assistance treaty agreement.

That process appears to have helped derail the feds.

In Lustgarten's case, a request to gather evidence in Colombia was sent to that
country's government in February, but US prosecutors did not receive a
response until August, five months after he had been arrested, according to
Diamond's motion, which cites a DOJ memo he apparently obtained.
Prosecutors sent requests to Hong Kong officials in February, July and
September, but said they did not get a reply at all, the motion states, and a
request to Switzerland's government was made in July, three months after

Lustgarten's arrest.

On November 20, Miami federal judge Marcia G. Cooke denied Palazzo's request to delay the trial, according to Lustgarten's court docket. About a month later, it seems like Palazzo gave up. On December 14, the US Attorney's Office dismissed the more serious charges when Lustgarten agreed to plead guilty to a misdemeanor charge of illegally entering the US on October 12, 2011, according to court documents obtained by VICE.

Bendayan, the other man charged in the indictment, also had money laundering charges dismissed against him when he pleaded guilty to a felony count of operating an unlicensed money transmitting business.

Andrew Ittleman, a partner in the Miami law firm at Fuerst Ittleman David & Joseph who specializes in money laundering cases, said Lustgarten's ordeal shows how difficult it is for the US government to prosecute international money laundering crime cases.

"It places a high burden on the government," Ittleman told me. "His defense attorneys did a masterful job of holding the government to its burden of not only proving beyond a reasonable doubt, but that government would also have to do it quickly."

The turning point in Lustgarten's case was the prosecutor's inability to secure cooperation from foreign countries, according to Ittleman.

"An assistant US attorney can't just make a phone call to another country to get permission," Ittleman said. "You need to abide by certain rules. In this case, the US government was not getting the cooperation it needed from Hong Kong, Argentina, Colombia, etc."

Gregory D. Lee, a retired supervisory DEA agent who also provides expert witness testimony, said he was surprised investigators and prosecutors did not attempt to retrieve Lustgarten's foreign banking documents prior to the indictment.

"Once you have somebody in custody, the clock starts ticking to go to trial," Lee explained. "You have to anticipate these type of problems so you avoid them. When you don't have the documents to turn over to the defense, it turns into a house of cards and it all comes tumbling down. Apparently that is what

EOUSA-2019-000468-01445

happened here."

*Follow Francisco Alvarado on Twitter.*

EOUSA-2019-000468-01446

| | |
|---|---|
| **From:** | Peoples, Gera (USAFLS) |
| **To:** | Greenberg, Benjamin (USAFLS); Hummel, Randy (USAFLS); Sanchez, Eduardo (USAFLS) |
| **Subject:** | FW: Follow-up on Intern Jonathan Mullane |
| **Date:** | Thursday, April 19, 2018 3:55:04 PM |

Please see email from UM School of Law Assistant Dean Cox regarding intern Jonathan Mullane.

**From:** Cox, Marcelyn R. <mcox@law.miami.edu>
**Sent:** Wednesday, April 18, 2018 6:30 PM
**To:** Peoples, Gera (USAFLS) <GPeoples@usa.doj.gov>
**Subject:** RE: Follow-up on Intern Jonathan Mullane

Dear Gera,

Thank you for reaching out about this matter. I have shared your email with the dean, dean of students and dean of experiential learning. We are all disappointed and disturbed by Jonathan's behavior. I will let you know what action the school plans to take as soon as I have an opportunity to meet with the deans listed above.

Sincerely,

Marcy

Marcelyn R. Cox, Assistant Dean
University of Miami School of Law
Career Development Office
1311 Miller Drive, Rm. A112
Coral Gables, Florida 33146
305-284-5301 tel
305-284-5160 fax



**From:** Peoples, Gera (USAFLS) [mailto:Gera.Peoples@usdoj.gov]
**Sent:** Wednesday, April 18, 2018 9:15 AM
**To:** Cox, Marcelyn R.
**Subject:** Follow-up on Intern Jonathan Mullane

Dean Cox,

Thanks for the taking the time this morning to talk regarding University of Miami School of Law student Jonathan Mullane who was a volunteer intern at the United States Attorney's Office – Southern District of Florida this spring. As promised, attached are the publicly filed court documents and publicly available article regarding Jonathan Mullane and his case, *Jonathan Mullane v. Barclays Bank Delaware, Inc.*, 18-20596-CV-Moreno, which we discussed. Again, if you have any questions, please feel free to contact me. Gera.

Gera R. Peoples
Special Counsel to the U.S. Attorney
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, Florida 33132
Phone: (305) 961-9314
Cell: (786) 564-9107
E-mail: gera.peoples@usdoj.gov

| | |
|---|---|
| **From:** | Greenberg, Benjamin (USAFLS) |
| **To:** | Sanchez, Eduardo (USAFLS); Medetis, Maria (USAFLS); Alvarez, Michelle (USAFLS) |
| **Subject:** | Fwd: Follow-up on Intern Jonathan Mullane |
| **Date:** | Wednesday, April 18, 2018 9:25:46 AM |
| **Attachments:** | 360Article.pdf<br>ATT00001.htm<br>NoticeofVoluntaryDismissal.pdf<br>ATT00002.htm<br>OrderGrantingPlaintiffMotionforRecusal.pdf<br>ATT00003.htm<br>PlaintiffMotionforRecusalforCause.pdf<br>ATT00004.htm |

I'll call Judge Moreno today.


Begin forwarded message:


> **From:** "Peoples, Gera (USAFLS)" <GPeoples@usa.doj.gov>
> **Date:** April 18, 2018 at 9:20:08 AM EDT
> **To:** "Greenberg, Benjamin (USAFLS)" <BGreenberg@usa.doj.gov>, "Hummel,
> Randy (USAFLS)" <RHummel@usa.doj.gov>
> **Subject: FW: Follow-up on Intern Jonathan Mullane**


Ben, I spoke with Dean Cox's this morning. I will write a memorandum re: the call.

**From:** Peoples, Gera (USAFLS)
**Sent:** Wednesday, April 18, 2018 9:15 AM
**To:** 'Cox, Marcelyn R.' <mcox@law.miami.edu>
**Subject:** Follow-up on Intern Jonathan Mullane

Dean Cox,

Thanks for the taking the time this morning to talk regarding University of Miami School of Law student Jonathan Mullane who was a volunteer intern at the United States Attorney's Office – Southern District of Florida this spring. As promised, attached are the publicly filed court documents and publicly available article regarding Jonathan Mullane and his case, *Jonathan Mullane v. Barclays Bank Delaware, Inc.*, 18-20596-CV-Moreno, which we discussed. Again, if you have any questions, please feel free to contact me. Gera.

Gera R. Peoples
Special Counsel to the U.S. Attorney
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, Florida 33132
Phone: (305) 961-9314
Cell: (786) 564-9107
E-mail: gera.peoples@usdoj.gov

| | |
|---|---|
| **From:** | Sheehan, Evelyn B. (USAFLS) |
| **To:** | Medetis, Maria (USAFLS) |
| **Subject:** | Fwd: Meeting |
| **Date:** | Tuesday, April 10, 2018 12:55:25 PM |

About to meet with Michelle to find out what happened in court

Begin forwarded message:

> **From:** "Lehr, Alison (USAFLS)" <ALehr@usa.doj.gov>
> **Date:** April 10, 2018 at 12:53:06 PM EDT
> **To:** "Sheehan, Evelyn B. (USAFLS)" <esheehan@usa.doj.gov>
> **Subject: RE: Meeting**
>
> Nope. I spoke with her before I spoke with Jonathan.
>
> ---
>
> **From:** Sheehan, Evelyn B. (USAFLS)
> **Sent:** Tuesday, April 10, 2018 12:42 PM
> **To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
> **Subject:** Re: Meeting
>
> Is Maria aware of all this
>
> On Apr 10, 2018, at 12:32 PM, Lehr, Alison (USAFLS) <ALehr@usa.doj.gov> wrote:
>
>> Where are you?
>>
>> ---
>>
>> **From:** Sheehan, Evelyn B. (USAFLS)
>> **Sent:** Tuesday, April 10, 2018 12:32 PM
>> **To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
>> **Cc:** Alvarez, Michelle (USAFLS) <MAlvarez@usa.doj.gov>
>> **Subject:** Re: Meeting
>>
>> Wait what? Why?
>>
>> On Apr 10, 2018, at 12:28 PM, Lehr, Alison (USAFLS) <ALehr@usa.doj.gov> wrote:
>>
>>> fyi
>>>
>>> ---
>>>
>>> **From:** Mullane, Jonathan (USAFLS)
>>> **Sent:** Tuesday, April 10, 2018 12:24 PM
>>> **To:** Greenberg, Benjamin (USAFLS) <BGreenberg@usa.doj.gov>

now or after you've reviewed the agreement.  Thanks.

Laz Feliciano
Administrative Officer
U.S Attorney's Office
Southern District of Florida
███████ (office)
███████ (cell)

**From:** Mayer, Rebecca (USAEO)
**Sent:** Tuesday, April 10, 2018 4:38 PM
**To:** Feliciano, Lazaro (USAFLS) <LFeliciano@usa.doj.gov>
**Subject:** Intern Issue

Hi Laz,

I just wanted to make sure you had my email to send me the paperwork you have on Jonathan Mulane's internship with your office.  I will probably be working for about another hour if you all wanted to try to talk today. Otherwise, we may not be able to speak until Monday given my travel. I will have some layover time tomorrow and Friday, too, where we could try to speak.

Thanks,
Becca

Rebecca Mayer
Assistant General Counsel
Executive Office for U.S. Attorneys / General Counsel's Office
175 N Street NE, Suite 5.100 3CON
Washington, D.C. 20530
Telephone - ██████████
Facsimile - ██████████

**Attorney Work Product Privileged Document/ Attorney-Client Privileged Communication**  This electronic transmission is intended only for the person(s) named above. It may contain information that is confidential and protected from disclosure by the attorney-client privilege and/or work product doctrine or exempt from disclosure under other applicable laws. Any use, distribution, copying or other disclosure by any other person is strictly prohibited. Do not forward or re-transmit without the permission of the sender or the General Counsel's Office, Executive Office for U.S. Attorneys, U.S. Department of Justice.  If you have received this transmission in error, please notify the sender at the number or e-mail address above.

# EXHIBIT 10

https://www.miamiherald.com/news/nation-world/world/americas/article245623340.html

***As Venezuela spiraled into impoverished hellscape, rich expats cashed in, records reveal ICIJ***

Marta Oliver Craviotto

By Jay Weaver and Antonio Maria Delgado

Updated October 4, 2020 8:53 AM

He used to help Latin American elites and drug traffickers launder money. Now he's helping US agents in Miami target officials in Venezuela's Maduro regime.

A massive leak of bank documents connects the dots between money laundering, the pilfering of public funds, terror-financing and ponzi schemes. The documents were leaked to BuzzFeed News, which shared them with the International Consortium of Investigative Journalists. ICIJ recruited a global team of journalists, including reporters from the Miami Herald, el Nuevo Herald and McClatchy.

A few years ago, Venezuelan money maven Martin Lustgarten was stuck in a federal lockup on charges of laundering millions of dollars for Latin American drug traffickers as he confronted the grim reality of spending the rest of his life in prison. Today, Lustgarten is a free man living in a $1 million Miami high-rise unit overlooking Biscayne Bay in a building aptly called Blue Condo — his criminal case dismissed because federal prosecutors mishandled it and couldn't even take him to trial. Lustgarten continues to count the money he amassed as a currency broker for Venezuelan business elites suspected of stealing billions and moving their fortunes to bank accounts in Switzerland, Hong Kong, Panama and Miami, according to sources familiar with his history. But behind the scenes, he has also been helping the federal government build criminal cases against his former compatriots. Since pleading guilty to a minor visa violation in late 2015, Lustgarten has been assisting federal investigators and prosecutors in a sprawling Miami money-laundering probe targeting a former Swiss banker, a handful of connected Venezuelan businessmen and high-ranking government officials. They are suspected of paying hefty bribes while enriching themselves off the regimes of President Nicolás Maduro and his predecessor, Hugo Chávez, the late leader of the country's socialist revolution. In his cooperating role, Lustgarten's value has been in pointing U.S. authorities in the right direction. He gave them a computer hard drive that he had obtained from a former Swiss banker, Charles De Beaumont, who became a business partner with Lustgarten after he left his bank, Compagnie Bancaire Helvetique, at the end of 2012, several sources familiar with his assistance said. The hard drive, which De Beaumont shared with Lustgarten, detailed the money manager's and the Swiss banker's dealings with Venezuelan TV mogul Raul Gorrín and Venezuelan brothers Luis and Ignacio Oberto, both suspected kleptocrats close to the Venezuelan presidents, those sources said. The cadre of people close to Chávez and Maduro who have gotten rich under their regimes have their own class label: boliburgueses, a variation of bourgeoisie. A source described Martin Lustgarten as a 'pioneer in what later became the regular usage of the Venezuelan foreign

1

exchange market to launder drug and corruption proceeds.' A Miami resident, Lustgarten has
managed to avoid prison and maintain a lavish lifestyle by dishing on his former associates to
federal prosecutors. According to a "Suspicious Activity Report," or SAR, filed by HSBC Bank
USA with the Treasury Department, Lustgarten's various companies transmitted and received at
least $402 million through banking accounts for Venezuelan and other business clients around
the world between 2010 and 2016. Another SAR filed by Standard Chartered Bank shows that
Lustgarten's businesses did at least $346 million in transactions with global customers, including
in Miami, between 2007 and 2015.

The amounts, reported by just two of the banks used by Lustgarten, are striking. They represent
seven times as much money as the $100 million he was accused of laundering through U.S. bank
accounts for Colombian and Mexican drug cartels in his criminal case, which was originally filed
by federal prosecutors in Boston where Lustgarten had been an informant for the Drug
Enforcement Administration. Their case was eventually transferred to Miami, where most of the
alleged laundering took place, but it was eventually dismissed because Boston prosecutors were
unable to obtain Swiss bank evidence in a timely way to go to trial. The full panorama of
Lustgarten's machinations is highlighted in a massive leak of documents consisting of SARs —
documents filed mostly by bank compliance officers when it appears transactions show a pattern
of potential money laundering or other possible illegality. By offering drug cartels and
kleptocrats the means to clean their profits through shell companies and legitimate banks, money
launderers prop up corruption and facilitate the criminal underworld, U.S. authorities say. In the
case of Venezuela, money laundering has allowed elites to drain the country of its wealth,
turning it into a hellscape of hyperinflation, malnutrition and rampant violence despite vast oil
reserves. Millions of Venezuelans have fled the country to neighboring Colombia, South Florida
and elsewhere. The leaked documents — the financial equivalent of unverified intelligence
reports — were obtained by the online news site BuzzFeed News and shared with the
International Consortium of Investigative Journalists. ICIJ assembled a global team of news
organizations to analyze the records, including, in the United States, the Miami Herald, el Nuevo
Herald and their parent, McClatchy. Their stories are being published as part of a series called
The FinCEN Files. The project is based on more than 2,100 unique SARs, involving flagged
transactions exceeding $2 trillion in total. Some 110 news outlets from 88 countries pored over
the documents, which include reports sent not just by banks, but other financial companies to the
Treasury Department's intelligence unit and the Financial Crime Enforcement Network, or
FinCEN.

FinCEN has declined to comment on any of the specifics in the leaked documents. It has,
however, posted a notice on its website warning about any further leaks. "The unauthorized
disclosure of SARs is a crime that can impact the national security of the United States,
compromise law enforcement investigations, and threaten the safety and security of the
institutions and individuals who file such reports," the warning says in part. "FinCEN has
referred this matter to the U.S. Department of Justice and the U.S. Department of the Treasury's
Office of Inspector General." The SARs underscore how four years after publication of the
Panama Papers, the groundbreaking journalistic series that exposed the full scope of dirty money
hopscotching around the globe through offshore shell companies, money laundering still
flourishes — with Miami an essential outpost. Lustgarten, who before owning a residence in
Miami had bought an Aventura high-rise apartment in 2010, is recognized as a financial wizard

2

by his allies and enemies alike. He grew wealthy by earning millions in fees as a broker in thousands of global financial transactions — many described as suspicious money-laundering activity in federal court records and in reports by the banks that handled his accounts. Once a confidential informant for the DEA, court records show, Lustgarten was able to curry favor with the feds because of his extraordinary insider knowledge. His field of expertise was collecting U.S. dollars from various global sources and transferring the money through shell companies to all sorts of clients — including Venezuelan business people who needed the valuable currency to operate their companies or capitalize on the country's bolivar exchange system. That system allows a privileged few to trade bolivars for dollars at a highly favorable rate. In his own words, Lustgarten described his relationship with business clients and federal investigators in electronic messages that were filed as evidence in his original money-laundering case. "Not [many] people can do what I do and how I do it," Lustgarten told the Swiss banker De Beaumont in a series of April 2014 email chats, a year before Lustgarten was arrested on money-laundering charges linked to cocaine traffickers. "And I enjoy a very high level of protection because I have delivered already a couple of drug dealers and a guy ... trading with Iran. The drug dealers because I had no choice, the Iran guy just for fun." De Beaumont took note of the "giving up people just for fun" language, and asked: "Do you realize what you wrote for one second?"

Lustgarten responded: "I told you in Feb they asked me about the Obertos and about Gorrín. And I have kept my mouth shut. ... And last time I told you I don't feel like protecting the Obertos anymore. What has that to do with you?" At one point, De Beaumont urged Lustgarten not to talk with the federal investigators: "I really think as a FRIEND you should stop talking to those people, Martin." Lustgarten wrote that he appreciated the "friendly advice," but "sometimes you are between a rock and a hard place. ... When I got into a relationship with them, they had seized all of our money and would only release it in exchange for information on a client who ... was money laundering thru our accounts. ... Every 3 months they meet with me and give me a list of people who they deemed of interest. I just have to be alert." After his arrest in April 2015, Lustgarten would turn on De Beaumont, the Oberto brothers and Gorrín in an effort to regain his freedom and the millions that the feds had frozen in his U.S. and Swiss bank accounts, according to sources familiar with the money broker's assistance to federal authorities. Gorrín was eventually indicted in 2018 on foreign corruption and money-laundering charges stemming from hundreds of millions of dollars that prosecutors say he paid in bribes to former Venezuelan national treasurer Alejandro Andrade, who pleaded guilty in South Florida and is serving a 10-year sentence. Authorities froze all of Gorrín's U.S. assets, including 24 luxury properties in Miami and New York. His lawyer, Howard Srebnick, did not respond to a request for comment. De Beaumont, who worked for CBH bank in Switzerland and later as an independent financial broker, has not been charged. His attorney, George Yoss, did not respond to a request for comment, either. Raul Gorrín, the Venezuelan media magnate tied to Martin Lustgarten, was charged with paying bribes to then-Venezuelan national treasurer Alejandro Andrade, shown here. Andrade pleaded guilty in South Florida and is serving a 10-year sentence. Miami Herald Archive While living in their waterfront Miami Beach condos the past four years, Luis and Ignacio Oberto turned over their Venezuelan passports to U.S. authorities to demonstrate that they would not leave the country during the U.S. investigation into their business affairs, according to sources familiar with the probe. Their purpose was to show that if they ever were charged with money laundering in Miami, the brothers would qualify for a bond because they stayed put during the probe. But in July, they requested and obtained their passports from U.S.

authorities in order to visit the Dominican Republic and possibly other countries. Still under investigation, the brothers are not expected to return to South Florida, said sources familiar with the Obertos' movements. The sources questioned why federal authorities did not try to persuade the brothers, the scions of a prominent Venezuelan banker, to stay in the United States. Asked why authorities returned the Obertos' passports, the U.S. Attorney's Office in Miami declined to comment. Legally, prosecutors did not have a basis for keeping their passports, sources said, despite the ongoing investigation. The Obertos' defense attorneys, Ed Shohat and David O. Markus, issued a statement condemning the Miami Herald and el Nuevo Herald for engaging in "a sustained effort to portray them as unethical persons involved in criminal activities, bending and stretching the truth and facts in a totally unsubstantiated fashion."

The lawyers added: "The Obertos have been charged with nothing and are not cooperating with U.S. authorities. Your articles have only served to feed the political screed against them in their native country." According to a Suspicious Activity Report filed by HSBC Bank USA with the Treasury Department, Lustgarten's companies conducted hundreds of millions of dollars in global transactions with business customers — including several with Panamanian companies owned by Gorrín and the Oberto brothers. The secret bank documents often draw a straight line between the failure of financial institutions to stop the illicit flow of money and often-unchecked criminal activity on a global scale. In Lustgarten's case, a handful of major banks that did transactions with his companies filed their Suspicious Activity Reports with the Treasury Department's FinCEN division after he was indicted on money-laundering charges in 2015, confidential records show. Among the reports filed by HSBC and other international banks with FinCEN:

▪ Gorrín's Panamanian company, Bellsite Overseas S.A., originated nine "suspicious" wire transfers totaling $55.5 million to Lustgarten's company, ANL Services Ltd., from 2010 to 2012, according to HSBC. Its report noted that the Bellsite transfers to ANL Services were for either "purchase order financing" or "repayment of loan." The report also related that "Bellsite was found to be a Mossack Fonseca/Panama Papers registered entity," a reference to the now-defunct Panamanian law firm that set up offshore shell companies in South Florida, Switzerland and other parts of the world for wealthy clients in order to hide their bank transactions and investments. Mossack Fonseca specialized in establishing offshores for the world's rich and powerful — including some of Lusgarten's companies. The Miami Herald, el Nuevo Herald, McClatchy and the International Consortium of Investigative Journalists, among scores of others, reported on Mossack Fonseca in the Panama Papers in April 2016.

▪ The Oberto brothers' Panamanian company, Violet Advisors S.A., transferred $6 million in one wire transaction to Lustgarten's AL Services Ltd., which had a similar name to his other business ANL Services, between 2010 and 2016. The HSBC report notes the following: "A review of the counterparties found that Violet Advisors S.A. is linked to PDVSA, a state-owned Venezuelan petroleum company, scheme to assign U.S. dollars to entities wanting to offload Venezuelan Bolivares — Violet Advisors was noted as one of these entities."

▪ The Obertos' Violet Advisors transferred $4 million in one wire transaction to Lustgarten's AL Services Ltd. on March 22, 2012, using an account at UBS AG branch in Stamford, Connecticut, according to a report filed by Standard Chartered Bank. HSBC officials said in a 2017 report

4

filed with FinCEN that the "suspicious transactions" by Lustgarten's businesses appeared to match the scheme detailed in the indictment" brought against him in 2015. Lustgarten, 55, who was born in Venezuela and has citizenship in that country and Austria, declined to be interviewed for this story. His defense attorney, Nathan Diamond, also declined to comment.

In electronic communications in the possession of prosecutors, Swiss banker Charles Henry De Beaumont urged Lustgarten not to cooperate with authorities 'I really think as a FRIEND you should stop talking to those people, Martin,' De Beaumont said in one email chat. The banker has not been charged. Diamond was successful in getting his client's money-laundering case dismissed in late 2015 after he persuaded a federal judge in Miami to order Boston prosecutors to go to trial under a "speedy trial" rule. But because those prosecutors had not obtained critical banking evidence from Swiss authorities, they left themselves unprepared to make their case against Lustgarten at trial — so they were forced to drop the money-laundering charges. Before his arrest that year, Lustgarten was known as a go-to financial expert during the Chávez presidency when the socialist leader implemented strict foreign currency controls. Lustgarten advised business clients on the highly lucrative "permuta" market, where dollar-denominated bonds were purchased in bolivars and oftentimes sold abroad in dollars. These instruments became a useful source of hard currency for multinationals and large Venezuelan companies finding it difficult to exchange their bolivars for dollars inside Venezuela. The permuta market, however, also became an ideal money-laundering instrument, according to U.S. investigators, allowing kleptocrats and drug traffickers to clean their dirty dollars by selling them for bolivars in the Venezuelan black market and then using those bolivars to purchase government-issued bonds that could later be swapped in Panama or other countries for clean dollars. Lustgarten excelled at these complex international transactions. But he also generated his share of enemies in bad financial dealings, and he became a one-time suspect in the murders of two business associates in Venezuela, according to news accounts and police investigators in the South American country. A decade ago, Lustgarten expanded his financial enterprise when he became partners with a Venezuelan money broker, Eduardo Enrique Soto Wannoni. Together, they set up a network of companies in Panama under ANL Services, which handled hundreds of millions of dollars in transactions — including with businesses controlled by Gorrín and the Obertos, according to Suspicious Activity Reports filed with FinCEN. In an interview, Soto said he had a 50-50 partnership with Lustgarten in ANL Services until early 2013, when Soto's family bought out the entire company and its similarly named affiliates. Soto has also owned a business called Arbitrage and Lending Services Corp. in Boca Raton, but said it's unrelated to his other companies in Panama. The pair's businesses flourished from 2010 through 2012, as Lustgarten, the rainmaker, developed relationships with CBH's De Beaumont, Gorrín and the Oberto brothers, said sources familiar with the money broker's history. Lustgarten's success with Soto was built on their access to U.S. dollars that were exchanged for Venezuelan bolivars. Until Venezuela's collapse, it was a lucrative trade in which officials with the national treasury and the state-controlled oil company, PDVSA, dominated the economy. Senior government officials collaborated with a circle of Venezuelan businessmen who paid bribes in schemes involving bonds, contracts, loans and currency exchanges, said sources familiar with the money-laundering investigations in Miami. "They initially began doing business with legitimate companies," said one source familiar with the partners' history. "But Lustgarten is very ambitious and wanted more. ... [Lustgarten] is a pioneer in what later became the regular usage of the Venezuelan foreign exchange market to launder drug and corruption proceeds." In addition to the ANL

5

Services holding company, Lustgarten owned dozens of other financial businesses unrelated to his partnership with Soto, several SARs filed with FinCEN indicate. A wealthy and politically connected media mogul in Venezuela, Raul Gorrín shook hands with Vice President Mike Pence. This was before Gorrín's legal troubles metastasized. He was indicted in Miami on bribery charges in connection with his activities in Venezuela. Miami Herald file Soto, who owns a home in Boca Raton, said he committed no wrongdoing and that he spoke with federal investigators in Boston in 2013 and with prosecutors in Miami two years later. The Miami prosecutors were starting to develop their Venezuelan money-laundering investigations into Lustgarten's network of clients. "At all times we did things by the book," Soto told the Miami Herald and el Nuevo Herald, adding that he saw himself as a "facilitator" in helping clients move money to and from their companies through international and U.S. bank accounts. Soto said he never paid any money to Venezuelan government officials or third parties in any of his dealings with Lustgarten, Gorrín and the Oberto brothers. Soto said ANL Services was involved in hundreds of millions of dollars in transactions with the Oberto brothers and their Swiss banks, EFG Bank AG and Compagnie Helvetique Bancaire, some of which are cited in Suspicious Activity Reports. Soto added that he traveled to Geneva in 2012 to meet with CBH's banker, De Beaumont, and that Luis Oberto made the introductions. A CBH spokesman declined to comment on whether it had a banking relationship with Lustgarten or any of his associates, but the bank denied any wrongdoing and said it has cooperated with both Swiss and U.S. authorities. The spokesman also said De Beaumont left the bank at the end of 2012. What is striking about the SARs filed by HSBC and other global banks and reviewed by the Miami Herald and el Nuevo Herald is that they cite several companies that Lusgarten owned with Soto — but they don't mention Soto by name. The reason: The banks that did business with their companies before Lustgarten was indicted in April 2015 were focused on Lustgarten — not Soto. Even after his money-laundering case was dismissed that December, global banks continued to file reports of suspicious activity on Lustgarten, his companies and his clients. The federal investigation in Miami has taken years to develop in part because prosecutors needed to obtain records from their Swiss counterparts on various accounts held by the Oberto brothers and a handful of other Venezuelans at EFG, CBH and seven other banks, according to Justice Department lawyers' correspondence with Swiss authorities. Martin Lustgarten has been assisting federal investigators and prosecutors in a sprawling Miami money-laundering probe targeting, among many others, Venezuelan media mogul Raul Gorrín, shown here, who was indicted by U.S. authorities in 2018. In January of this year, Switzerland's highest court ordered the banks to turn over the evidence. Now — with the coronavirus pandemic halting the federal grand jury through the end of the year — prosecutors must decide whether to file a long-planned indictment charging the Obertos and other members of Venezuela's young business elite and former high-ranking officials in the government's oil sector, along with the ex-Swiss banker at the center of the alleged $4.5 billion money-laundering racket, De Beaumont. De Beaumont, a French citizen believed to be living in Portugal, also owns luxury residences in the Dominican Republic and Miami Beach. The Venezuelan business elites are suspected of paying substantial bribes to government officials in exchange for making loans in bolivars to PDVSA and then receiving repayments in dollars — with the proceeds washed through the government's favorable currency-exchange system to magnify profits. The majority of that tainted money was allegedly transferred into accounts held in shell companies by the Obertos at CBH, and the rest into their accounts at EFG and seven other Swiss financial institutions in the massive fraud scheme, U.S. authorities say in official correspondence with their Swiss counterparts. The Justice

6

Department's money-laundering case is the largest of three distinct Miami-based probes by Homeland Security Investigations targeting suspected Venezuelan kleptocrats and their associates. So far, more than a dozen defendants have been charged in South Florida. The reports that banks file with FinCEN cannot be used as evidence before a federal grand jury or at trial — they are not criminal reports and they do not require probable cause. However, they can provide critical data for investigators zeroing in on customers suspected of moving money from suspected illicit activity, such as corruption or drug trafficking, that lacks a credible, logical explanation. "Suspicious Activity Reports are the most important data point in the anti-money-laundering world," said John Byrne, vice chairman of AML RightSources, a national consulting firm. "You're getting information of some note to law enforcement as quickly as possible, so they can slice and dice the data to see where it fits and might not fit. It enhances investigations and overall anti-money laundering programs." Byrne said SARs can play an important part in stopping the outward flow of a foreign country's wealth. "The fact they are taking money and food and resources out of the mouths of the poor is heartbreaking," Byrne said. "Whether it's Venezuela or Eastern Europe, it's something that our community can do more to stop." McClatchy Washington Bureau's Shirsho Dasgupta and Kevin G. Hall contributed to this story.

7

# EXHIBIT 11

https://www.miamiherald.com/news/local/article278700619.html

***Miami federal judge rules in favor of close ally to Venezuelan strongman Nicolas Maduro***

By Antonio Maria Delgado August 28, 2023 5:22 PM

Martin Lustgarten has been assisting federal investigators and prosecutors in a sprawling Miami money-laundering probe targeting, among many others, Venezuelan media mogul Raul Gorrín, shown here, who was indicted by U.S. authorities in 2018. In a legal victory for businessman Raul Gorrín, a close ally to Venezuelan strongman Nicolás Maduro, a judge in the Southern District of Florida ruled that two Miami luxury properties belonging to him could not be seized as compensation by the family of a Colombian guerrilla kidnapping victim. The ruling issued on Monday by U.S. District Judge Kevin Michael Moore protects a $34 million Fisher Island mansion and a $14.3 million Collins Avenue property from the efforts of Antonio Caballero to collect on a $140 million, plus interest, settlement awarded for the death of his father at the hands of the Fuerzas Armadas Revolucionarias de Colombia (FARC) two decades ago. Caballero had claimed that Gorrín and his brother-in-law and business partner, Gustavo Perdomo, had been laundering money for the FARC.

Gorrín belongs to a small number of Venezuelan businessmen suspected by U.S. officials of earning billions of dollars through their close ties to Maduro and other top dignitaries of the Caracas Socialist regime. Sanctioned by the Department of Treasury's Office of Foreign Assets Control (OFAC), Gorrín, the main owner of Venezuelan TV network Globovision was charged in a South Florida federal court for his alleged role in a billion dollar corruption and money laundering scheme in Venezuela and is considered a fugitive by U.S. officials. While Caballero alleged that Gorrin provided assistance to the FARC, Moore said in his ruling that the plaintiff failed to provide evidence supporting that claim. The judge found that there "were no facts" suggesting that Gorrín and Perdomo laundered money for Maduro or for the benefit of the FARC, Gorrin's lawyers said. "The Court rejected Caballero's six-degrees-of-separation theory that threatened to label as a terrorist-agent anyone who ever did business with Venezuela," lawyers Lisandra Guerrero and Howard Srebnick said in the press release.

According to the ruling, Caballero failed to offer evidence about the amount of financial support the FARC allegedly received — directly or indirectly — from Gorrín and Perdomo and also failed to demonstrate how the businessmen assisted the FARC. "Instead of bolstering his statements with factual support, Plaintiff merely cites numerous pages in expert reports. Yet the expert reports are also full of conclusory statements with little to no factual basis," the ruling says. Caballero, who lives in the United States, has been struggling to collect the settlement awarded to him in 2014 for the death of his father in 1999 after he was kidnapped by the FARC. Gorrín has been among a group of Venezuelan businessmen under investigation by U.S. authorities in Miami since 2016 for allegedly paying millions of dollars in bribes to senior government officials in Venezuela's state oil company PDVSA and the national treasury in exchange for access to energy contracts and currency exchanges that produced massive profits. He allegedly played a central role in a $1.2 billion corruption scheme involving loans in bolivars acquired by PDVSA from companies allegedly controlled by Venezuelan businessman Francisco

1

Convit and that were repaid almost immediately by the oil company using the highly favorable and exclusive official exchange rate, which granted huge profits, according to the indictment in the case introduced by the U.S. Attorney for the Southern District of Florida. But the main case against Gorrín involves accusations that he allegedly participated in a massive money-laundering racket to drain more than $1 billion from Venezuela's government and launder the illicit money through U.S. banks and luxury real estate investments in New York and South Florida, according to court documents introduced in relation to this second case. The money-laundering scheme was carried out during a period of extreme economic hardship for many Venezuelans, who have struggled to afford basic necessities such as housing and food under the socialist government.

# EXHIBIT 12

BNDDUTY,CLOSED,

**U.S. District Court**
**Southern District of Florida (Miami)**
**CRIMINAL DOCKET FOR CASE #: 1:18-cr-20682-CMA-7**

Case title: USA v. Krull                                                Date Filed: 08/16/2018

Magistrate judge case number: 1:18-mj-03119-EGT                         Date Terminated: 10/29/2018

Assigned to: Chief Judge Cecilia M. Altonaga

**Defendant (7)**
**Matthias Krull**
17619-104
*YOB 1973 English*
*TERMINATED: 10/29/2018*

represented by **Jeffrey Adam Neiman**
Marcus Neiman & Rashbaum LLP
100 Southeast Third Avenue
Suite 805
Fort Lauderdale, FL 33394
954 462 1200
Fax: 9546892492
Email: jneiman@nmfalawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Levine Cooperman**
Carlton Fields
700 NW 1st Avenue
Suite 1200
Miami, FL 33136
305-347-6930
Email: jlevine@mnrflawfirm.com
*ATTORNEY TO BE NOTICED*

**Oscar J. Rodriguez**
Oscar J. Rodriguez, P.A.
4500 S. Rodriguez Road
Coral Gables, FL 33146
305-442-1991
Fax: 305-445-9007
Email: orodriguez@ojrlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Temporary*

**Oscar Santiago Rodriguez**
Oscar Rodriguez, PA
4500 S. LeJeune Road
Coral Gables, FL 33146
305-445-2000
Fax: 305-445-9007
Email: osrlaw@aol.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**                                                      **Disposition**
18:1956-7477.F CONSPIRACY TO COMMIT MONEY LAUNDERING AND                Imprisonment for a term of 120 months, supervised release for 3 years, $50,000 fine, and
FORFEITURE COUNT                                                        $100 special assessment.
(1)

**Highest Offense Level (Opening)**
Felony

**Terminated Counts**                                                   **Disposition**
None

**Highest Offense Level (Terminated)**
None

**Complaints**                                                          **Disposition**
18:1956(h) & 1956(a)(2) Conspiracy to Commit Money Laundering; 18:1952 Interstate
and Foreign Travel in Aid of Racketeering Enterprises.

**Plaintiff**
**USA**

represented by **Francisco Raul Maderal , Jr.**
Maderal Byrne PLLC
Southern District of Florida
2525 Ponce DE Leon Blvd
Ste 9th Floor
Coral Gables, FL 33134
305-520-5690
Fax: 305-520-5698
Email: frank@maderalbyrne.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Paul A. Hayden**
US Department of Justice
Criminal Division Fraud Section
1400 New York Avenue NW
Washington, DC 20005
202-353-9370
Email: paul.hayden2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Gwendolyn A. Stamper**

US Department of Justice
1400 New York Avenue NW, 11th floor
Washington, DC 20005
(202) 598-2335
Email: gwendolyn.stamper@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Kurt K. Lunkenheimer**
US Attorney's Office
99 NE 4th Street
Miami, FL 33132
(305) 961-9008
Email: kurt.lunkenheimer@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael Brian Nadler**
Stumphauzer, Kolaya, Nadler & Sloman, PLLC
2 S. Biscayne Blvd
Suite 1600
Miami, FL 33131
305-614-1400
Email: mnadler@sknlaw.com
*TERMINATED: 03/18/2021*
*ATTORNEY TO BE NOTICED*

**Nalina Sombuntham**
US Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
305-961-9224
Email: nalina.sombuntham2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/23/2018 | 1 | MOTION to Seal Complaint, arrest warrant, and any resulting order by USA as to Francisco Convit Guruceaga, Jose Vincente Amparan Croquer, Carmelo Urdaneta Aqui, Abraham Edgardo Ortega, Gustavo Adolfo Hernandez Frieri, Hugo Andre Ramalho Gois, Matthias Krull, Marcelo Federico Gutierrez Acosta y Lara. Responses due by 8/6/2018 (ra) [1:18-mj-03119-EGT] (Entered: 07/24/2018) |
| 07/23/2018 | 2 | ORDER granting 1 Motion to Seal Complaint, arrest warrant, and any resulting order as to Francisco Convit Guruceaga (1), Jose Vincente Amparan Croquer (2), Carmelo Urdaneta Aqui (3), Abraham Edgardo Ortega (4), Gustavo Adolfo Hernandez Frieri (5), Hugo Andre Ramalho Gois (6), Matthias Krull (7), Marcelo Federico Gutierrez Acosta y Lara (8). Signed by Magistrate Judge Edwin G. Torres on 7/23/2018. *See attached document for full details.* (ra) [1:18-mj-03119-EGT] (Entered: 07/24/2018) |
| 07/23/2018 | 3 | CRIMINAL COMPLAINT as to Francisco Convit Guruceaga (1), Jose Vincente Amparan Croquer (2), Carmelo Urdaneta Aqui (3), Abraham Edgardo Ortega (4), Gustavo Adolfo Hernandez Frieri (5), Hugo Andre Ramalho Gois (6), Matthias Krull (7), Marcelo Federico Gutierrez Acosta y Lara (8). (ra) [1:18-mj-03119-EGT] (Entered: 07/24/2018) |
| 07/24/2018 | | Arrest of Matthias Krull (at) [1:18-mj-03119-EGT] (Entered: 07/26/2018) |
| 07/25/2018 | 12 | Order to Unseal as to Francisco Convit Guruceaga, Jose Vincente Amparan Croquer, Carmelo Urdaneta Aqui, Abraham Edgardo Ortega, Gustavo Adolfo Hernandez Frieri, Hugo Andre Ramalho Gois, Matthias Krull, Marcelo Federico Gutierrez Acosta y Lara Signed by Magistrate Judge Alicia M. Otazo-Reyes on 7/25/2018. (ch1) [1:18-mj-03119-EGT] (Entered: 07/25/2018) |
| 07/25/2018 | 13 | NOTICE OF TEMPORARY ATTORNEY APPEARANCE: Oscar J. Rodriguez appearing for Matthias Krull (ch1) [1:18-mj-03119-EGT] (Entered: 07/25/2018) |
| 07/25/2018 | 14 | NOTICE OF ATTORNEY APPEARANCE Nalina Sombuntham appearing for USA. *Re: Forfeiture.* Attorney Nalina Sombuntham added to party USA(pty:pla). (Sombuntham, Nalina) [1:18-mj-03119-EGT] (Entered: 07/25/2018) |
| 07/25/2018 | 15 | Minute Order for proceedings held before Magistrate Judge Alicia M. Otazo-Reyes: Initial Appearance as to Matthias Krull held on 7/25/2018. Arraignment set for 8/8/2018 AT 10:00 AM in Miami Division before MIA Duty Magistrate. Detention Hearing set for 7/30/2018 AT 10:00 AM in Miami Division before MIA Duty Magistrate. Preliminary Examination set for 8/8/2018 AT 10:00 AM in Miami Division before MIA Duty Magistrate. Report Re: Counsel Hearing set for 8/8/2018 AT 10:00 AM in Miami Division before MIA Duty Magistrate. (Digital 14:23:54) (Signed by Magistrate Judge Alicia M. Otazo-Reyes on 7/25/2018) (at) [1:18-mj-03119-EGT] (Entered: 07/26/2018) |
| 07/26/2018 | 16 | NOTICE OF HEARING as to Matthias Krull. Detention Hearing set for 7/27/2018 10:00 AM in Miami Division before MIA Duty Magistrate. (mdc) [1:18-mj-03119-EGT] (Entered: 07/26/2018) |
| 07/26/2018 | 17 | NOTICE OF ATTORNEY APPEARANCE: Oscar Santiago Rodriguez appearing for Matthias Krull . Attorney Oscar Santiago Rodriguez added to party Matthias Krull(pty:dft). (Rodriguez, Oscar) [1:18-mj-03119-EGT] (Entered: 07/26/2018) |
| 07/27/2018 | 18 | NOTICE OF LIS PENDENS as to Francisco Convit Guruceaga, Jose Vincente Amparan Croquer, Carmelo Urdaneta Aqui, Abraham Edgardo Ortega, Gustavo Adolfo Hernandez Frieri, Hugo Andre Ramalho Gois, Matthias Krull, Marcelo Federico Gutierrez Acosta y Lara for property located at 18555 Collins Avenue, Unit 2205 Sunny Isles Beach, Florida 33160. Grantees: PALADIUM REAL ESTATE GROUP LLC. (Sombuntham, Nalina) [1:18-mj-03119-EGT] (Entered: 07/27/2018) |
| 07/27/2018 | 19 | Minute Entry for proceedings held before Magistrate Judge Alicia M. Otazo-Reyes: Status Conference re: detention/bond hearing as to Matthias Krull held on 7/27/2018. Bond set as to Matthias Krull (7) Stipulated $1,000,000 Csb/Nebbia. (Digital 10:22:65) (cg1) [1:18-mj-03119-EGT] (Entered: 07/30/2018) |
| 08/03/2018 | 20 | TRANSCRIPT of Hearing as to Matthias Krull held on 7/27/18 before Magistrate Judge Alicia M. Otazo-Reyes, 1-4 pages, Court Reporter: Joanne Mancari, 305-523-5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/24/2018. Redacted Transcript Deadline set for 9/4/2018. Release of Transcript Restriction set for 11/1/2018. (hh) [1:18-mj-03119-EGT] (Entered: 08/03/2018) |
| 08/07/2018 | | Terminate Deadlines and Hearings as to Matthias Krull RRC - Oscar Rodriguez, Esq. filed notice of permanent counsel (br) [1:18-mj-03119-EGT] (Entered: 08/07/2018) |
| 08/08/2018 | 21 | Minute Entry for proceedings held before Ch. Magistrate Judge Andrea M. Simonton: Status Conference re: Preliminary/Arraignment as to Matthias Krull held on 8/8/2018. (Arraignment reset for 10/5/2018 10:00 AM in Miami Division before MIA Duty Magistrate. Preliminary Examination reset for 10/5/2018 10:00 AM in Miami Division before MIA Duty Magistrate.) (Digital 10:16:14) (yha) [1:18-mj-03119-EGT] (Entered: 08/08/2018) |
| 08/08/2018 | | Attorney update in case as to Matthias Krull. Attorney Oscar J. Rodriguez terminated. (yha) [1:18-mj-03119-EGT] (Entered: 08/08/2018) |
| 08/08/2018 | 22 | WAIVER of Preliminary Hearing by Matthias Krull (yha) [1:18-mj-03119-EGT] (Entered: 08/08/2018) |
| 08/16/2018 | 23 | INFORMATION as to Matthias Krull (7) count 1 AND FORFEITURE COUNT. (cg1) (Entered: 08/16/2018) |
| 08/16/2018 | 24 | PAPERLESS NOTICE OF HEARING as to Matthias Krull: Arraignment set for 8/22/2018 12:30 PM in Miami Division before Judge Cecilia M. Altonaga. Change of Plea Hearing set for 8/22/2018 12:30 PM in Miami Division before Judge Cecilia M. Altonaga. (ps1) (Entered: 08/16/2018) |
| 08/16/2018 | 25 | NOTICE OF ATTORNEY APPEARANCE Michael Brian Nadler appearing for USA. . Attorney Michael Brian Nadler added to party USA(pty:pla). (Nadler, Michael) (Entered: 08/16/2018) |
| 08/17/2018 | 26 | NOTICE OF ATTORNEY APPEARANCE Nalina Sombuntham appearing for USA. *Re: Forfeiture.* Attorney Nalina Sombuntham added to party USA(pty:pla). (Sombuntham, Nalina) (Entered: 08/17/2018) |
| 08/21/2018 | 27 | PAPERLESS NOTICE OF HEARING **TIME CHANGE ONLY** as to Matthias Krull: Arraignment and Change of Plea Hearing reset for 8/22/2018 01:00 PM before Judge Cecilia M. Altonaga. (ps1) (Entered: 08/21/2018) |
| 08/22/2018 | 28 | PAPERLESS Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Change of Plea Hearing held on 8/22/2018. Matthias Krull (7) Guilty Count 1. Total time in court: 45 minutes. Attorney Appearance(s): Francisco Raul Maderal, Jr, Oscar Santiago Rodriguez, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. (ps1) (Entered: 08/22/2018) |
| 08/22/2018 | 29 | PLEA AGREEMENT as to Matthias Krull (ps1) (Entered: 08/22/2018) |
| 08/22/2018 | 30 | FACTUAL PROFFER as to Matthias Krull (ps1) (Entered: 08/22/2018) |
| 08/22/2018 | 31 | WAIVER OF INDICTMENT as to Matthias Krull (ps1) (Entered: 08/22/2018) |
| 08/22/2018 | 32 | PAPERLESS NOTICE OF SENTENCING HEARING as to Matthias Krull. Sentencing set for 10/29/2018 09:30 AM in Miami Division before Judge Cecilia M. Altonaga. If more than 30 minutes will be required, please contact the courtroom deputy to arrange. Defense counsel shall report immediately to the United States Probation Office for further instructions. (ps1) (Entered: 08/22/2018) |
| 08/23/2018 | 33 | NOTICE OF ATTORNEY APPEARANCE Gwendolyn A. Stamper appearing for USA. . Attorney Gwendolyn A. Stamper added to party USA(pty:pla). (Stamper, Gwendolyn) (Entered: 08/23/2018) |
| 08/23/2018 | 34 | Notice of Presentence Investigation Assignment of Matthias Krull to US Probation Officer Elizabeth Robbert in the Miami Wilkie D. Ferguson, Jr. U.S. Courthouse and she can be contacted at (305)523-5372 or Elizabeth_Robbert@flsp.uscourts.gov. (lrn) (Entered: 08/23/2018) |
| 09/05/2018 | 35 | Unopposed MOTION to Modify Conditions of Release by Matthias Krull. Responses due by 9/19/2018 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 09/05/2018) |

| Date | # | Description |
|---|---|---|
| 09/05/2018 | 36 | ORDER granting 35 Motion to Modify Conditions of Release as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 9/5/2018. *See attached document for full details.* (ps1) (Entered: 09/05/2018) |
| 09/11/2018 | 37 | $5,000.00 PSB Bond Entered as to Matthias Krull Approved by Magistrate Judge Chris M. McAliley. *Please see bond image for conditions of release.* (ra) (Additional attachment(s) added on 9/11/2018: # 1 Restricted Bond with 5th Page) (ch1). (Entered: 09/11/2018) |
| 09/14/2018 | 38 | TRANSCRIPT of the Arraignment and Change of Plea as to Matthias Krull held on 08/22/18, before Judge Cecilia M. Altonaga, 1-25 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request is due 10/15/2018. Redacted Transcript Deadline set for 10/15/2018. Release of Transcript Restriction set for 12/13/2018. (smn) (Entered: 09/14/2018) |
| 09/25/2018 | 39 | DRAFT Disclosure of Presentence Investigation Report of Matthias Krull. This is a limited access document. Report access provided to attorneys Michael Brian Nadler, Gwendolyn A. Stamper, Oscar Santiago Rodriguez by USPO (Attachments: # 1 Position of Parties)(wsz) (Entered: 09/25/2018) |
| 10/03/2018 | 40 | Unopposed MOTION to Modify Conditions of Release by Matthias Krull. Responses due by 10/17/2018 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 10/03/2018) |
| 10/03/2018 | 41 | ORDER granting 40 Motion to Modify Conditions of Release as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 10/3/2018. *See attached document for full details.* (ps1) (Entered: 10/03/2018) |
| 10/08/2018 | 42 | Agreed MOTION to Continue Sentencing Hearing *and for Additional Time to Respond to P.S.I.* by Matthias Krull. Responses due by 10/22/2018 (Attachments: # 1 Text of Proposed Order Proposed Order) (Rodriguez, Oscar) (Entered: 10/08/2018) |
| 10/08/2018 |  | Attorney update in case as to Matthias Krull. Attorney Oscar J. Rodriguez Activated. (Rodriguez, Oscar) (Entered: 10/08/2018) |
| 10/08/2018 | 43 | NOTICE OF ATTORNEY APPEARANCE: Oscar J. Rodriguez appearing for Matthias Krull *as Co-Counsel* (Rodriguez, Oscar) (Entered: 10/08/2018) |
| 10/09/2018 | 44 | ORDER denying 42 Motion to Continue Sentencing Hearing as to Matthias Krull (7). Objections to PSI Report due by 10/24/2018 Signed by Judge Cecilia M. Altonaga on 10/9/2018. *See attached document for full details.* (ps1) (Entered: 10/09/2018) |
| 10/18/2018 | 45 | FINAL Addendum 1 Disclosure of Presentence Investigation Report of Matthias Krull. This is a limited access document. Report access provided to attorneys Michael Brian Nadler, Gwendolyn A. Stamper, Oscar Santiago Rodriguez by USPO (Attachments: # 1 Addendum)(wsz) (Entered: 10/18/2018) |
| 10/24/2018 |  | Attorney update in case as to Matthias Krull. Attorney Oscar J. Rodriguez Activated. (Rodriguez, Oscar) (Entered: 10/24/2018) |
| 10/24/2018 | 46 | OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT by Matthias Krull (Rodriguez, Oscar) (Entered: 10/24/2018) |
| 10/25/2018 | 47 | TRANSCRIPT of Hearing as to Matthias Krull held on 7/25/2018 before Magistrate Judge Alicia M. Otazo-Reyes, 1-3 pages, Court Reporter: Other, 305-523-5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/15/2018. Redacted Transcript Deadline set for 1/23/2019. (apz) (Entered: 10/25/2018) |
| 10/25/2018 | 48 | TRANSCRIPT of Hearing as to Matthias Krull held on 8/8/2018 before Ch. Magistrate Judge Andrea M. Simonton, 1-6 pages, Court Reporter: Other, 305-523-5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/15/2018. Redacted Transcript Deadline set for 1/23/2019. (apz) (Entered: 10/25/2018) |
| 10/26/2018 | 49 | Unopposed MOTION for Forfeiture of Property *Order of Forfeiture* by USA as to Matthias Krull. Responses due by 11/9/2018 (Attachments: # 1 Exhibit Attachment A - Consent to Forfeiture, # 2 Text of Proposed Order)(Sombuntham, Nalina) (Entered: 10/26/2018) |
| 10/26/2018 | 50 | ORDER granting 49 Motion for Forfeiture of Property as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 10/26/2018. *See attached document for full details.* (ps1) (Entered: 10/26/2018) |
| 10/26/2018 | 51 | FINAL Addendum 2 Disclosure of Presentence Investigation Report of Matthias Krull. This is a limited access document. Report access provided to attorneys Michael Brian Nadler, Gwendolyn A. Stamper, Oscar Santiago Rodriguez by USPO (Attachments: # 1 First Addendum, # 2 Second Addendum)(wsz) (Entered: 10/26/2018) |
| 10/26/2018 | 52 | Unopposed MOTION to Delay Surrender by Matthias Krull. Responses due by 11/9/2018 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 10/26/2018) |
| 10/26/2018 | 53 | ORDER granting 52 Motion to Delay Defendants Surrender as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 10/26/2018. *See attached document for full details.* (ps1) (Entered: 10/26/2018) |
| 10/26/2018 | 54 | SENTENCING MEMORANDUM by Matthias Krull (Attachments: # 1 Exhibit Letters of Support) (Rodriguez, Oscar) (Entered: 10/26/2018) |
| 10/29/2018 | 55 | PAPERLESS Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Sentencing held on 10/29/2018 as to Matthias Krull. Defendant sentenced to imprisonment for a term of 120 months; supervised release for 3 years, $50,000 fine; and $100 special assessment. Special conditions include surrendering for removal proceedings, financial disclosure, and unpaid restitution/fines requirement. Total time in court: 25 minutes. Attorney Appearance(s): Michael Brian Nadler, Nalina Sombuntham, Gwendolyn A. Stamper, Oscar Santiago Rodriguez, Oscar J. Rodriguez, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. (wc) (Entered: 10/29/2018) |
| 10/29/2018 | 56 | JUDGMENT as to Matthias Krull, Count 1: Imprisonment for a term of 120 months, supervised release for 3 years, $50,000 fine, and $100 special assessment. Closing Case for Defendant. Signed by Judge Cecilia M. Altonaga on 10/29/2018. *See attached document for full details.* (ps1) (Entered: 10/29/2018) |
| 01/30/2019 | 57 | NOTICE *of Satisfaction of Forfeiture Money Judgment* by USA as to Matthias Krull re 50 Order on Motion for Forfeiture of Property (Sombuntham, Nalina) (Entered: 01/30/2019) |
| 02/07/2019 | 58 | Unopposed MOTION to Modify Conditions of Release by Matthias Krull. Responses due by 2/21/2019 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 02/07/2019) |
| 02/07/2019 | 59 | ORDER granting 58 Unopposed Motion to Modify Conditions of Release as to Matthias Krull (7). Mr. Krull's conditions of bond will be modified to change the conditions of his home confinement from home detention to the imposition of a curfew. Mr. Krull is restricted to his residence between the hours of 7:30 p.m. and 7:30 a.m., or as otherwise ordered by the Court and/or U.S. Probation. Signed by Judge Cecilia M. Altonaga on 2/7/2019. *See attached document for full details.* (wc) (Entered: 02/07/2019) |
| 03/18/2019 | 60 | Unopposed MOTION to Delay Surrender by Matthias Krull. Responses due by 4/1/2019 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 03/18/2019) |
| 03/18/2019 | 61 | ORDER granting 60 Motion to Delay Defendant's Surrender as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 3/18/2019. *See attached document for full details.* (ps1) (Entered: 03/18/2019) |
| 05/14/2019 | 62 | Unopposed MOTION to Modify Conditions of Release *to allow attendance at religious retreat* by Matthias Krull. Responses due by 5/28/2019 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 05/14/2019) |
| 05/15/2019 | 63 | ORDER granting 62 Motion to Modify Conditions of Release as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 5/15/2019. *See attached document for full details.* (ps1) (Entered: 05/15/2019) |
| 07/16/2019 | 64 | Unopposed MOTION to Delay Surrender by Matthias Krull. Responses due by 7/30/2019 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 07/16/2019) |
| 07/16/2019 | 65 | ORDER granting 64 Unopposed Motion to Delay Defendant's Surrender as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 7/16/2019. *See attached document for full details.* (wc) (Entered: 07/16/2019) |
| 08/28/2019 | 66 | PAPERLESS NOTICE OF HEARING as to Matthias Krull: Status Conference set for 9/13/2019 08:30 AM in Miami Division before Judge Cecilia M. Altonaga. (ps1) (Entered: 08/28/2019) |
| 08/30/2019 | 67 | NOTICE *of satisfaction regarding assessment/fine* by USA as to Matthias Krull (Rosado, Vivian) (Entered: 08/30/2019) |
| 09/13/2019 | 68 | PAPERLESS Minute Entry for proceedings held before Judge Cecilia M. Altonaga: Status Conference as to Matthias Krull held on 9/13/2019. Defendant's surrender date is extended to March 6, 2020. Order to follow. Total time in court: 6 minutes. Attorney Appearance(s): Michael Brian Nadler, Oscar Santiago Rodriguez, Oscar J. Rodriguez. Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. (wc) (Entered: 09/13/2019) |
| 09/13/2019 | 69 | ORDER granting ore tenus motion to continue surrender date to March 6, 2020 as to Matthias Krull. Signed by Judge Cecilia M. Altonaga on 9/13/2019. *See attached document for full details.* (wc) (Entered: 09/13/2019) |
| 09/23/2019 | 70 | TRANSCRIPT of the Sentencing Hearing as to Matthias Krull held on 10/29/18, before Judge Cecilia M. Altonaga, 1-15 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (smn) (Entered: 09/23/2019) |
| 09/23/2019 | 71 | TRANSCRIPT of the Status Conference as to Matthias Krull held on 09/13/19, before Judge Cecilia M. Altonaga, 1-7 pages, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (smn) (Entered: 09/23/2019) |
| 09/24/2019 | 72 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 09/24/2019) |
| 09/25/2019 | 73 | ORDER granting 72 Motion to Travel as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 9/25/2019. *See attached document for full details.* (ps1) (Entered: 09/25/2019) |
| 12/06/2019 | 74 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 12/06/2019) |
| 12/06/2019 | 75 | ORDER granting 74 Motion to Travel as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 12/6/2019. *See attached document for full details.* (ps1) (Entered: 12/09/2019) |
| 02/20/2020 | 76 | Unopposed MOTION to Delay Surrender by Matthias Krull. Responses due by 3/5/2020 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 02/20/2020) |
| 02/20/2020 | 77 | Unopposed MOTION to Modify Conditions of Release by Matthias Krull. Responses due by 3/5/2020 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 02/20/2020 |

| Date | # | Description |
|---|---|---|
| 02/21/2020 | 79 | ORDER granting 77 Motion to Modify Conditions of Release as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 2/21/2020. See attached document for full details. (ps1) (Entered: 02/21/2020) |
| 02/21/2020 | 80 | Clerks Notice of Docket Correction re 78 Order on Renewed Unopposed Motion to Delay Defendant's Surrender. Document Restricted Due to Error; The correct document has been attached to this notice. (ps1) (Entered: 02/21/2020) |
| 02/21/2020 | | SYSTEM ENTRY - Docket Entry 78 restricted/sealed until further notice. (ps1) (Entered: 02/21/2020) |
| 04/21/2020 | 81 | Unopposed MOTION Motion to Delay Surrender by Matthias Krull. Responses due by 5/5/2020 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 04/21/2020) |
| 04/21/2020 | 82 | ORDER granting 81 Unopposed Motion to Delay Defendant's Surrender as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 4/21/2020. See attached document for full details. (kpe) (Entered: 04/21/2020) |
| 07/29/2020 | 83 | Unopposed MOTION to Modify Conditions of Release (Change of Address) by Matthias Krull. Responses due by 8/12/2020 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 07/29/2020) |
| 07/29/2020 | 84 | ORDER granting 83 Unopposed Motion to Bond Modify Conditions as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 7/29/2020. See attached document for full details. (wc) (Entered: 07/29/2020) |
| 08/27/2020 | | SYSTEM ENTRY - Docket Entry 85 restricted/sealed until further notice. (nc) (Entered: 08/27/2020) |
| 08/27/2020 | | SYSTEM ENTRY - Docket Entry 86 restricted/sealed until further notice. (nc) (Entered: 08/27/2020) |
| 08/27/2020 | | SYSTEM ENTRY - Docket Entry 87 restricted/sealed until further notice. (nc) (Entered: 08/27/2020) |
| 08/27/2020 | 88 | ORDER granting 85 Motion to Seal as to Matthias Krull (7). The documents are permitted to be filed under seal and shall remain under seal until August 27, 2021. This Order shall not be filed under seal. Signed by Judge Cecilia M. Altonaga on 8/27/2020. See attached document for full details. (wc) (Entered: 08/27/2020) |
| 08/27/2020 | 89 | NOTICE OF ATTORNEY APPEARANCE Paul A. Hayden appearing for USA. . Attorney Paul A. Hayden added to party USA(pty:pla). (Hayden, Paul) (Entered: 08/27/2020) |
| 09/01/2020 | 90 | Unopposed MOTION Delay Surrender & Modify Bond Conditions by Matthias Krull. Responses due by 9/15/2020 (Attachments: # 1 Text of Proposed Order Proposed Order)(Rodriguez, Oscar) (Entered: 09/01/2020) |
| 09/01/2020 | 91 | ORDER granting 90 Unopposed Motion to Delay Defendants Surrender and for Removal of Home Confinement and Electronic Monitoring as Conditions of Release as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 9/1/2020. See attached document for full details. (wc) (Entered: 09/01/2020) |
| 09/02/2020 | 92 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 09/02/2020) |
| 09/02/2020 | 93 | ORDER granting 92 Unopposed Motion for Permission to Travel as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 9/2/2020. See attached document for full details. (wc) (Entered: 09/02/2020) |
| 09/03/2020 | 94 | ORDER Granting 86 Rule 35 Motion for Sentence Reduction as to Matthias Krull. Signed by Judge Cecilia M. Altonaga on 9/3/2020. See attached document for full details. (nc) Modified on Unsealing Document per 107 Order on 3/23/2021 (nc). (Entered: 09/03/2020) |
| 11/03/2020 | 95 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 11/03/2020) |
| 11/03/2020 | 96 | ORDER granting 95 Motion to Travel as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 11/3/2020. See attached document for full details. (ps1) (Entered: 11/03/2020) |
| 11/23/2020 | 97 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 11/23/2020) |
| 11/23/2020 | 98 | ORDER granting 97 Unopposed Motion for Permission to Travel to Naples, Florida as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 11/23/2020. See attached document for full details. (wc) (Entered: 11/23/2020) |
| 12/18/2020 | 99 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 12/18/2020) |
| 12/18/2020 | 100 | ORDER granting 99 Unopposed Motion to Travel as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 12/18/2020. See attached document for full details. (wc) (Entered: 12/18/2020) |
| 02/22/2021 | 101 | Unopposed MOTION to Delay Defendants Surrender by Matthias Krull. Responses due by 3/8/2021 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 02/22/2021) |
| 02/22/2021 | 102 | ORDER granting 101 Unopposed Motion for Delay Defendant's Surrender as to Matthias Krull (7). Signed by Judge Cecilia M. Altonaga on 2/22/2021. See attached document for full details. (wc) (Entered: 02/22/2021) |
| 03/17/2021 | 103 | MOTION/NOTICE of Substitution of Counsel Kurt K. Lunkenheimer appearing for USA. . Attorney Kurt K. Lunkenheimer added to party USA(pty:pla). (Lunkenheimer, Kurt) Modified to convert document into a motion on 3/18/2021 (npe). (Entered: 03/17/2021) |
| 03/23/2021 | | SYSTEM ENTRY - Docket Entry 104 restricted/sealed until further notice. (nc) (Entered: 03/23/2021) |
| 03/23/2021 | | SYSTEM ENTRY - Docket Entry 105 restricted/sealed until further notice. (nc) (Entered: 03/23/2021) |
| 03/23/2021 | 106 | ORDER granting 104 Motion to Seal as to Matthias Krull (7). Unsealing due by 3/23/2022. Signed by Judge Cecilia M. Altonaga on 3/23/2021. See attached document for full details. (ps1) (Entered: 03/23/2021) |
| 03/23/2021 | 107 | ORDER granting 105 Motion to Unseal as to Matthias Krull (7). The Clerk is directed to UNSEAL Docket Entry 94. Signed by Judge Cecilia M. Altonaga on 3/23/2021. See attached document for full details. (ps1) (Entered: 03/23/2021) |
| 03/23/2021 | 108 | CLERK'S NOTICE of Compliance by Unsealing 94 pursuant to 107 Order as to Matthias Krull (nc) (Entered: 03/23/2021) |
| 06/28/2021 | 109 | MOTION to Delay Defendants Surrender by Matthias Krull. Responses due by 7/12/2021 (Attachments: # 1 Exhibit EXHIBIT 1, # 2 Exhibit EXHIBIT 2)(Rodriguez, Oscar) (Entered: 06/28/2021) |
| 06/29/2021 | 110 | RESPONSE in Opposition by USA as to Matthias Krull re 109 MOTION Motion to Delay Defendants Surrender Replies due by 7/6/2021. (Hayden, Paul) (Entered: 06/29/2021) |
| 07/06/2021 | 111 | PAPERLESS ORDER denying 109 Motion as to Matthias Krull. Signed by Chief Judge Cecilia M. Altonaga (CMA) (Entered: 07/06/2021) |
| 07/06/2021 | 112 | Unopposed MOTION for Disbursement of Bond by Matthias Krull. Responses due by 7/20/2021 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 07/06/2021) |
| 07/06/2021 | 113 | ORDER granting 112 Unopposed Motion for Discharge of Bond as to Matthias Krull (7). Both the $2,500,000 the personal surety bond and condominium unit 3903, at 1300 Brickell Bay Drive, Miami, Florida, 33136, are discharged. Signed by Chief Judge Cecilia M. Altonaga on 7/6/2021. See attached document for full details. (wc) (Entered: 07/06/2021) |
| 11/14/2022 | | SYSTEM ENTRY - Docket Entry 114 restricted/sealed until further notice. (pes) (Entered: 11/14/2022) |
| 11/14/2022 | | SYSTEM ENTRY - Docket Entry 115 restricted/sealed until further notice. (pes) (Entered: 11/14/2022) |
| 11/14/2022 | 116 | ORDER granting 114 Motion to Seal as to Matthias Krull (7). Unsealing due by 11/14/2023. Signed by Chief Judge Cecilia M. Altonaga on 11/14/2022. See attached document for full details. (ps1) (Entered: 11/14/2022) |
| 11/14/2022 | 117 | NOTICE OF ATTORNEY APPEARANCE: Julie Ann Levine appearing for Matthias Krull . Attorney Julie Ann Levine added to party Matthias Krull(pty:dft). (Levine, Julie) (Entered: 11/14/2022) |
| 11/15/2022 | 118 | NOTICE OF ATTORNEY APPEARANCE: Jeffrey Adam Neiman appearing for Matthias Krull . Attorney Jeffrey Adam Neiman added to party Matthias Krull(pty:dft). (Neiman, Jeffrey) (Entered: 11/15/2022) |
| 11/15/2022 | | SYSTEM ENTRY - Docket Entry 119 restricted/sealed until further notice. (kpe) (Entered: 11/15/2022) |
| 11/15/2022 | | SYSTEM ENTRY - Docket Entry 120 restricted/sealed until further notice. (kpe) (Entered: 11/15/2022) |
| 11/15/2022 | 121 | ORDER granting 119 Motion to Seal as to Matthias Krull (7) Unsealing due by 11/15/2023. Signed by Chief Judge Cecilia M. Altonaga on 11/15/2022. See attached document for full details. (ps1) Modified text re unsealed deadline on 11/22/2022 (kpe). (Entered: 11/15/2022) |
| 11/28/2022 | 122 | ORDER granting 115 Motion as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga on 11/28/2022. See attached document for full details. (ps1) (Entered: 11/28/2022) |
| 01/03/2023 | 123 | MOTION to Travel by Matthias Krull. (Attachments: # 1 Order granting Motion to travel)(Rodriguez, Oscar) (Entered: 01/03/2023) |
| 01/03/2023 | 124 | ORDER denying 123 Motion to Travel as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga on 1/3/2023. See attached document for full details. (ps1) (Entered: 01/03/2023) |
| 01/04/2023 | 125 | Amended MOTION to Travel by Matthias Krull. (Attachments: # 1 Order)(Rodriguez, Oscar) (Entered: 01/04/2023) |
| 01/05/2023 | 126 | ORDER granting 125 Motion to Travel as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga on 1/5/2023. See attached document for full details. (ps1) (Entered: 01/05/2023) |
| 03/24/2023 | 127 | Unopposed MOTION to Modify Conditions of Release Modification of Conditions of Supervision by Matthias Krull. Responses due by 4/7/2023 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 03/24/2023) |
| 03/24/2023 | 128 | ORDER granting 127 Motion to Modify Conditions of Release as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga on 3/24/2023. See attached document for full details. (ps1) (Entered: 03/24/2023) |
| 04/27/2023 | 129 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 04/27/2023) |
| 04/27/2023 | 130 | ORDER granting 129 Motion to Travel as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga on 4/27/2023. See attached document for full details. (ps1) (Entered: 04/27/2023) |
| 07/07/2023 | 131 | Unopposed MOTION to Travel by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 07/07/2023) |

| 07/07/2023 | 132 | PAPERLESS ORDER granting 131 Motion to Travel as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga (CMA) (Entered: 07/07/2023) |
| 08/03/2023 | 133 | MOTION to Travel *Motion to travel outside the Southern District of Florida* by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 08/03/2023) |
| 08/04/2023 | 134 | ORDER granting 133 Defendant, Matthias Krull's Unopposed Motion to Travel One Day Outside the Southern District of Florida for Purposes of Picking up his Children at Summer Camp. Signed by Chief Judge Cecilia M. Altonaga on 8/3/2023. *See attached document for full details.* (wc) (Entered: 08/04/2023) |
| 08/28/2023 | 135 | Unopposed MOTION to Travel *Outside the Southern District of Florida* by Matthias Krull. (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 08/28/2023) |
| 08/28/2023 | 136 | PAPERLESS ORDER granting 135 Motion to Travel as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga (CMA) (Entered: 08/28/2023) |
| 12/07/2023 | 137 | MOTION for Early Termination of Supervised Release by Matthias Krull. Responses due by 12/21/2023 (Attachments: # 1 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 12/07/2023) |
| 12/08/2023 | 138 | Amended MOTION for Early Termination of Supervised Release by Matthias Krull. Responses due by 12/22/2023 (Attachments: # 1 Exhibit Sentence monitoring computation, # 2 Text of Proposed Order)(Rodriguez, Oscar) (Entered: 12/08/2023) |
| 12/11/2023 | 139 | ORDER granting 138 Motion for Early Termination of Supervised Release as to Matthias Krull (7). Signed by Chief Judge Cecilia M. Altonaga on 12/11/2023. *See attached document for full details.* (ps1) (Entered: 12/11/2023) |

**PACER Service Center**

**Transaction Receipt**

12/14/2023 10:00:02

| PACER Login: | epmullane | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:18-cr-20682-CMA |
| Billable Pages: | 11 | Cost: | 1.10 |

# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. 18-MJ-03119-TORRES

UNITED STATES OF AMERICA

v.

FRANCISCO CONVIT GURUCEAGA, et al.,

Defendants.

_____/

**CRIMINAL COVER SHEET**

1.   Did this matter originate from a matter pending in the Northern Region of the United
     States Attorney's Office prior to October 14, 2003? _____ Yes _X_ No

2.   Did this matter originate from a matter pending in the Central Region of the United States
     Attorney's Office prior to September 1, 2007? _____ Yes _X_ No

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

BY:   _____
      FRANCISCO R. MADERAL
      ASSISTANT UNITED STATES ATTORNEY
      Fla. Bar. No. 41481
      99 N. E. 4th Street
      Miami, Florida 33132-2111
      TEL (305) 961-9159
      FAX (305) 530-7976
      francisco.maderal@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 18-MJ-03119-TORRES |
| FRANCISCO CONVIT GURUCEAGA, et al., | ) |
| | ) |
| | ) |
| _____ | ) |
| Defendant(s) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____12/2014-7/2018_____ in the county of _____Miami-Dade_____ in the

_____Southern_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1956(h) & 1956(a)(2) | Conspiracy to Committ Money Laundering |
| Title 18, United States Code, Section 1952 | Interstate and Foreign Travel in Aid of Racketeering Enterprises |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

George F. Fernandez, S/A, HSI
Printed name and title

Sworn to before me and signed in my presence.

Date: _____July 23, 2018_____

_____
Judge's signature

City and state: _____Miami, Florida_____

Edwin G. Torres, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, GEORGE F. FERNANDEZ, Special Agent with Homeland Security Investigations ("HSI"), having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. That is, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1).

2.    I have not necessarily included in the affidavit each and every fact known to me about the matters set forth herein, but only those facts and circumstances that I believe are sufficient to establish probable cause for the Court to sign a criminal complaint.

3.    The statements contained in this affidavit are based upon my investigation, information provided by other individuals, including sworn law enforcement officers and confidential sources, and upon my experience and training as a federal agent and the experience and training of other federal agents.

4.    All dates, times, and amounts stated herein are approximate. Quotations and summaries of recorded conversations are based on transcriptions with side-by-side Spanish-to-English translations or the actual Spanish-language recordings. In reviewing the transcripts, I relied on both the translations and my knowledge of Spanish, as well as that of others.

5.    This affidavit is made in support of a criminal complaint charging the following defendants, with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), and violations of the Travel Act, in violation of Title 18, United States Code, Section 1952.

### Defendants & Others Involved

6.      **Francisco CONVIT Guruceaga** is a Venezuelan national. CONVIT, along with CONSPIRATOR 2, is often referred to as a "Bolichico" or member of the "boliburgués."

7.      **Jose Vincente AMPARAN Croquer, a.k.a., "Chente"** is a Venezuelan national and professional money launderer. AMPARAN is associated, along with CONSPIRATORS 5 and 6, with "European Company 1" in Spain, which is a money laundering front operating as a real estate investment firm. AMPARAN also maintains relationships with "European Financial Institution 1" in Malta, a private investment firm, which he uses to launder money.

8.      **Carmelo URDANETA Aqui** is a Venezuelan national and former Legal Counsel to the Venezuelan Ministry of Oil and Mining.

9.      **Abraham Edgardo ORTEGA** is a Venezuelan national and former Executive Director of Finance at Venezuelan state-owned oil company, Petróleos de Venezuela, S.A. (PDVSA).

10.     **GUSTAVO Adolfo Hernandez Frieri** is a Colombian national by birth and naturalized U.S. citizen (as of May 2013). GUSTAVO is a professional money launderer who uses his financial firms, Global Security Advisors (GSA) and Global Strategic Investments, in Miami, Florida, to launder money with false-mutual-fund investments.

11.     **Hugo Andre Ramalho GOIS** is a Portuguese national and professional money launderer associated with AMPARAN.

12.     **Matthias KRULL** is a German national and Panamanian resident. KRULL was a high-level banker at a large Swiss bank, specializing in Venezuelan clients. KRULL is the personal banker of CONSPIRATOR 7 and others. KRULL manages "banking" activities for numerous Venezuelan officials and kleptocrats.

13.    **Marcelo Federico GUTIERREZ Acosta y Lara** is a Uruguayan national. GUTIERREZ is part of an ownership group of at least one U.S. bank that facilitates money laundering and is associated with GUSTAVO.

14.    **CONSPIRATORS 1 – 9** are some of the additional uncharged members of the conspiracy along with others. CONSPIRATORS 1 – 9 include other former PDVSA officials, individuals associated with CONVIT, reported members of the "boliburgués," and professional third-party money launderers.

15.    **VENEZUELAN OFFICIALS 1 – 3** are foreign officials.

**PROBABLE CAUSE**

16.    In 2016, a Confidential Source (CS) approached the HSI Miami Office (HSI-Miami) regarding 78 million in Euros the CS received, which originated from a loan contract with PDVSA. The CS was involved in a money laundering conspiracy and wanted to surrender the money and cooperate. HSI-Miami thereafter began an undercover investigation: Organized Crime and Drug Enforcement Task Force (OCDETF) Operation Money Flight.

17.    The CS agreed to wear a recording device and Operation Money Flight proceeded proactively with an initial focus on the defendants' efforts to launder a portion of the 78 million in Euros (the "PDVSA funds") in and through South Florida.

18.    Two years and over one hundred recordings later, Operation Money Flight revealed an international conspiracy to launder the PDVSA funds through Miami and several large-scale, international third-party money-laundering organizations. More specifically, the investigation revealed the use of Miami real estate and sophisticated false-investment schemes to launder hundreds of millions of U.S. Dollars.

3

### Venezuelan Corruption & Miami Laundering

19.     Venezuela has a foreign-currency exchange system under which the government
will exchange local currency (Bolivars) at a fixed rate for U.S. Dollars.  The fixed exchange rate
has been well below the true economic rate by a substantial factor for several years. For example,
in 2014, the Venezuelan government fixed exchange rate was approximately six Bolivars to one
U.S. Dollar. By contrast, the true economic exchange rate was approximately sixty Bolivars to one
U.S. Dollar.

20.     The  difference  between  the  fixed  rate  and  the  true  economic  rate  creates
opportunity for fraud and abuse.

21.     For example, in 2014, an individual could exchange 10 million U.S. Dollars
for 600 million Bolivars at the true economic rate. Then, if that individual had access to the
government fixed rate, he could convert that same 600 million Bolivars into 100 million U.S.
Dollars. Essentially, in two transactions, that person could buy 100 million U.S. Dollars for 10
million U.S. Dollars.

22.     Massive fraud and corruption is rampant throughout Venezuela's government-run
foreign-exchange system. Estimates of the fraud range as high as $20 billion a year, and reports
indicate that corrupt government officials take kickbacks to authorize exchanges at the fixed
rate.[1]

23.     Embezzlement of Venezuela's dwindling foreign currency reserves is the fuel for
these corrupt exchange schemes. PDVSA is Venezuela's primary source of income and foreign
currency (namely, U.S. Dollars and Euros), and serves as the source of foreign currency used to

---

[1] Reuters, *Venezuela Says 40 Percent of Dollar Buyers Are Shell Companies,* Dec. 12, 2013,
available at http://www.reuters.com/article/us-venezuela-economy-idUSBRE9BBOT820131212

fund corrupt foreign exchange embezzlement schemes. As with Venezuela in general, fraud and corruption is reportedly common at PDVSA.

24.     Venezuela's state of social, political, and economic crisis in which multi-billion-Dollar corrupt and criminal ecosystems thrive drives rivers of criminal proceeds through South Florida, which has become an international money-laundering hub and a desirable destination for well-to-do foreign criminals and kleptocrats.

**False-Investment Money Laundering**

25.     Most of the defendants are sophisticated operators with respect to the international banking system and are aware of banks' general due diligence and anti-money laundering practices, including know-your-customer (KYC) requirements.

26.     Importantly, for one party to wire funds to a third party, there must be some legitimate business justification provided to the bank; for instance, a payment for the purchase of real estate or equipment. Moreover, a bank will ask for documents supporting the justification, which—depending on the transaction—can be difficult to manufacture; for instance, a bank may be able to verify whether a supposed real estate transaction took place. This verification poses a problem for money laundering transactions in which large sums of criminal proceeds must be moved around the financial system from one person to another as bribes, kickbacks, transfers, or exorbitant expenditures, for instance.

27.     Accordingly, false investments in fake securities are convenient justifications in that they are more difficult for a bank to investigate and verify. By way of example, one party might wire 30 million U.S. Dollars to a third party with the justification that the amount is a loan to the third party, supported by a 30 million U.S. Dollar promissory note due at some point in the

future, which neither party actually intends to honor. For the bank, ascertaining the true intent of the parties and the fraudulent nature of the investment is difficult.

28.     Sophisticated false-investment money laundering schemes are used throughout this conspiracy, ranging from individual false securities (promissory notes and bonds) to entire false-investment funds, which can be subscribed to as needed to justify transactions.

29.     Surrounding and supporting these false-investment laundering schemes are complicit money managers, brokerage firms, banks, and real estate investment firms in the United States and elsewhere, operating as a network of professional money launderers.

## Money Laundering Conspiracy

30.     The conspiracy in this case began in December 2014 with a currency exchange scheme to embezzle approximately 600 million U.S. Dollars from PDVSA, obtained through bribery and fraud, and the defendants' efforts to use the CS to launder a portion of the proceeds of that scheme (the PDVSA funds).  By May of 2015, the conspiracy had doubled in amount to 1.2 billion U.S. Dollars embezzled from PDVSA.

31.     The facts of the conspiracy set forth below are evidenced by electronic communications and documents, government records, financial records, recordings of phone conversations and in-person meetings, and CS statements.

## CONVIT & URDANETA Approach the CS

32.     In 2014, URDANETA and CONVIT approached the CS with an offer to sell 100 million U.S. Dollars at a favorable Bolivar exchange rate and without the CS having to front the Bolivars.

33.    The CS agreed because the CS had clients in Venezuela to whom the CS could sell the U.S. Dollars. From previous business dealings, the CS knew CONVIT obtained U.S. Dollars from exchange contracts with PDVSA.

34.    The CS expected to receive a simple buyer-seller foreign exchange ("forex") contract to memorialize the agreement with CONVIT and URDANETA.

35.    Over the course of the next month, January 2015, CONVIT, URDANETA, and the CS continued to discuss and facilitate the supposed forex transaction, often via BlackBerry Messenger (BBM) chats and while CONVIT was present in the Southern District of Florida, according to U.S. travel and other records.[2]

36.    During this time, CONVIT delayed providing the forex contract to the CS, but this did not overly concern the CS because the funds were coming from a regulated asset management firm, "European Financial Institution 1," which the CS could explain to the receiving bank.

37.    The CS instructed CONVIT to wire the funds from European Financial Institution 1 to an account belonging to a trust, of which the CS was the ultimate beneficiary. CONVIT agreed and informed the CS that the funds would arrive in Euros and not U.S. Dollars.

38.    By February 12, 2015, the CS had received approximately 78.8 million Euros into the trust from European Financial Institution 1 in four separate wire transfers beginning on January 14, 2015.

39.    After receiving the initial 36 million Euros in mid-January, the CS asked CONVIT via BBM chat on January 13, 2015 if the CS could sell about 20 million Euros to a client, but CONVIT replied "no." CONVIT explained that he had already paid for the Bolivars on his end

---

[2] According to these records, CONVIT arrived in the Southern District of Florida on December 20, 2014 and departed on January 18, 2015.

7

Case 1:20-cv-21339-AKK   Document 116   Entered on FLSD Docket 01/06/2026   Page 143 of
246
Case 1:18-cr-20682-CMA   Document 3   Entered on FLSD Docket 07/24/2018   Page 10 of 33

(meaning he had no immediate need for Bolivars), and that the CS would have to wait about a
month to sell the Euros further.

40.     On February 6, 2015, the CS informed CONVIT that the CS urgently needed the
forex contract between the CS and European Financial Institution 1 for the CS's bank's compliance
department. The CS asked CONVIT for a form draft so that the CS could prepare it.

41.     That same day, CONVIT finally sent the CS a (PDF) document to justify the
transfer between European Financial Institution 1 and the CS's trust. What CONVIT sent,
however, was a false joint venture contract between a Hong Kong shell company, Eaton Global
Services Limited, and the CS's trust, with a forged signature on behalf of the CS's trustee. The CS
had never seen this contract before.

42.     The fake joint venture contract, dated December 17, 2014, contemplated a fictitious
600 million U.S. Dollar joint venture between Eaton Global and the CS's trust; the supposed
business of the joint venture was the making of loans to PDVSA.

43.     On February 9, 2015, the CS told CONVIT that the fake joint venture contract could
not be used. CONVIT and URDANETA assured the CS that the fake contract had not been used
or provided to any bank.

44.     The CS also requested the original underlying exchange contracts and CONVIT
responded that URDANETA had physical copies and would deliver them. Days later in Venezuela,
the CS received the documents in-person from URDANETA, who explained that he obtained the
documents from "CONSPIRATOR 1," a former PDVSA official.

45.     These documents, which the CS provided to HSI-Miami, reveal the source of the
PDVSA funds and the nature of the scheme.

Case 1:20-cv-21339-AKK   Document 116   Entered on FLSD Docket 01/06/2026   Page 144 of
246
Case 1:18-cr-20682-CMA   Document 3   Entered on FLSD Docket 07/24/2018   Page 11 of 33

### PDVSA Bribery & Embezzlement Scheme Revealed

46.     The source of the PDVSA funds was a PDVSA foreign-currency exchange scheme benefitting Eaton Global. The exchange scheme was disguised as a "financing" arrangement using the following three documents (provided by URDANETA) in an artless attempt to hide what was ultimately revealed as an embezzlement:

   a.     First, a <u>loan contract</u>, dated December 17, 2014, between PDVSA and Rantor Capital C.A., a Venezuelan shell company, in which Rantor agreed to loan 7.2 billion Bolivars to PDVSA. The loan contract was executed by "VENEZUELAN OFFICIAL 1" as Vice President of PDVSA;

   b.     Second, an <u>assignment contract</u>, dated December 23, 2014, between Rantor and Eaton Global, in which Rantor assigns its rights as PDVSA's creditor under the loan contract to Eaton Global and in which it is contemplated that PDVSA is given the right to cancel the debt within 180 days by paying 600 million U.S. Dollars; and

   c.     Third, a <u>notice of assignment letter</u>, dated December 23, 2014, in which Eaton Global informs PDVSA (VENEZUELAN OFFICIAL 1) of the assignment and suggests that PDVSA repay the 7.2 billion Bolivar loan in the Euro equivalent of 600 million U.S. Dollars. The letter included instructions for PDVSA to wire the funds to European Financial Institution 1 accounts for the benefit of Eaton Global.

47.     In short, Eaton Global ended up with the right to pay PDVSA about 7.2 billion Bolivars (worth around 35 million Euros) and receive about 510 million Euros, of which about 78.8 million Euros was sent to the CS.

48.     While the CS continued to wait for a forex contract from CONVIT and URDANETA, the CS began to conduct third-party transactions on their and CONSPIRATOR 1's behalf. Ultimately, the CS learned that the CS was not involved in a forex transaction, but rather a money laundering operation in which the CS was expected to launder the proceeds of the embezzlement and make cash kickback payments to VENEZUELAN OFFICIAL 1.

49.     In April 2015, the CS began making cash payments in Venezuela at URDANETA and CONSPIRATOR 1's direction, including to URDANETA, CONSPIRATOR 1, and VENEZUELAN OFFICIAL 1, which would ultimately total over 1 million U.S. Dollars.

50.     In all, the CS conducted approximately 15 million Euros-worth of transactions through the summer of 2015, including several U.S.-Dollar wire transactions at the defendants' direction,[3] until the CS began to resist making further payments. Around that time, the CS used the liquidation of the CS's trustee as an excuse to halt payments; the CS claimed that the CS could not continue without the forex contract. CONVIT and URDANETA continued to pressure the CS. The ensuing impasse led to a meeting around November 2015 at CONVIT's office in Venezuela.

51.     Around November 2015, CONVIT summoned the CS to a meeting at CONVIT's office in Caracas, Venezuela. Prior to the meeting, CONVIT explained to the CS that the CS would meet AMPARAN, who was in charge of the financial documents.

52.     At the meeting, CONVIT, URDANETA, AMPARAN, and the CS sat around a table. CONVIT had a handgun on the table. Next to CONVIT was a German Shepard with a shock collar. CONVIT held the remote for the collar, and commented that he could not always control

---

[3] Based upon my training and experience, I know that international U.S.-Dollar wire transactions are routed and processed through banks located in the United States.

the dog. The meeting took place at CONVIT's office with numerous security guards; according to the CS, the mood was one of intimidation by CONVIT.

53.     AMPARAN told the CS that the fake joint venture contract had in fact been provided to European Financial Institution 1's banks in Canada and Malta. Accordingly, AMPARAN explained that it would be impossible to replace the contract with a simple forex contract and additional fake contracts were needed. The CS asked to return the PDVSA funds and reverse the transactions, but was told a reversal was impossible.

**The CS Records the Defendants**

54.     Beginning in February 2016, the CS recorded conversations with the defendants and other conspirators in which they explicitly acknowledged the money laundering conspiracy and underlying embezzlement. As evidence by the following recordings, during this time, the CS worked with URDANETA, ORTEGA, and CONSPIRATOR 1 to account for and distribute the PDVSA funds to themselves and others and to ensure that AMPARAN supplied the additional fake contracts necessary to do so.

55.     In a February 19, 2016 recorded meet with URDANETA, the CS complained that the CS needed additional documents from AMPARAN.  URDANETA agreed and said that he would write to AMPARAN, CONVIT and "CONSPIRATOR 2" to "bug them" about the contracts. URDANETA also stated that they (CONVIT, et al.) are being "hit right now" by people in the "assembly" and joked that it is not a "piñata," in an apparent reference to corrupt Venezuelan officials hitting the defendants up for bribes. URDANETA also stated that he would not go to the United States because the last time he was searched at the border and "they took away [his] phone. [And t]hank God [he] didn't have [his] phone, but a new phone."

56.     In a February 22, 2016 recorded meet with ORTEGA, ORTEGA and the CS
discussed how to move ORTEGA's money from the CS to ORTEGA. The CS explained that it is
not simple, and ORTEGA, regarding the source of his portion of the PDVSA funds, stated:

> So we can be frank and open with each other. Now. You know the origin of that.
> And that comes from… from something that is still making noise and it's still
> making noise and it's still making noise. It's going to explode one day. I mean,
> maybe not tomorrow, and also, it's not the… our friend, the leader in all this, he is
> everywhere every day

ORTEGA also acknowledged CONSPIRATOR 1's[4] role in assigning him a portion of the PDVSA
funds and fretted aloud:

> It's all that shit they've been talking about, investigations and shit. Or the
> Americans going into all this, is that true? How far does that reach?

> But, how far could they get, in your opinion? If you get to the Swiss and they tell
> them, "I want, I want this information." Do they have to give it to them?

Finally, the CS and ORTEGA walked through some account opening forms and discussed how
ORTEGA could avoid declaring himself as a politically exposed person (also known as a PEP) on
bank KYC documents.

57.     In a February 23, 2016 recorded conversation with "CONSPIRATOR 3"
(CONSPIRATOR 1's brother), the CS explained that the CS's trustee is liquidating and
"eventually there's a risk of the trustee checking the operation" and finding that the "the guys did
a fake deal, falsifying the signatures of these guys who are there." The CS explained that the CS
called URDANETA and CONSPIRATOR 1 and told them that they have to set the documentation
straight. The CS and CONSPIRATOR 3 also discussed a meeting in Caracas between the CS,
URDANETA, and AMPARAN about fixing the document, and CONSPIRATOR 3 noted that he
has a "payment for [VENEZUELAN OFFICIAL 1]."

---

[4] CONSPIRATOR 1 is a former PDVSA official.

58.     In a March 7, 2016 recorded meet with URDANETA, the CS and URDANETA recounted the receipt and expenditure of the PDVSA funds to date ("seventy eight million eight hundred and something"). They recounted how much belonged to CONSPIRATOR 1 ("fourteen million five hundred forty thousand six hundred twenty-five") and other expenditures, including a list of cash payments to include payments to VENEZUELAN OFFICIAL 1 who authorized the underlying PDVSA loan agreement. The CS recounted the cash kickbacks to VENEZUELAN OFFICIAL 1 as follows:

> [VENEZUELAN OFFICIAL 1], I gave him… to the boy he sent in one occasion two hundred thousand [200,000], June fourth [4th] and in another occasion one hundred thousand [100,000], on June twenty sixth [26th].

URDANETA agreed. URDANETA and the CS then discussed AMPARAN's plan to make new fake contracts justifying the transaction (the CS noted to URDANETA that AMPARAN is flying to Miami in several days). URDANETA was concerned that he didn't want to leave a trail of "breadcrumbs" with respect to the accounts. URDANETA again acknowledged CONVIT's involvement and CONSPIRATOR 1's arrangement with ORTEGA. CONSPIRATOR 1 joined the meeting and discussed with URDANETA and the CS the fake joint venture contract, who was responsible for it, and how to divide up the PDVSA funds.

59.     Importantly, at this meeting, URDANETA and CONSPIRATOR 1 reviewed a spreadsheet of all the cash payments and expenditures created by the CS; each acknowledged the contents of the document, wrote notes on it, checked off transactions, and, ultimately, dated it. The CS provided a copy of this document to HSI-Miami with both URDANETA and CONSPIRATOR 1's handwritten notes; included on the spreadsheet are the kickback payments to VENEZUELAN OFFICIAL 1.

60.     In a March 9, 2016 recorded meet with AMPARAN and URDANETA, AMPARAN ran through the plan to replace the fake joint venture agreement with new documents.

AMPARAN explained that the fake agreement could be replaced with the new (better) fake ones in the compliance file at the Canadian bank and added to the file at European Financial Institution 1, and further that the "Accounting Firm 1" auditors are on board. AMPARAN explained that he is flying to Miami the next day and from there he will print out and provide the CS with the new fake contracts.

61.     In a March 15, 2016 recorded meet with ORTEGA, ORTEGA explained to the CS that he has found a "person" (GUSTAVO) with a "structure" to transfer his PDVSA funds to ORTEGA, and asks the CS to meet with the person in New York, Miami, or Panama. ORTEGA asked the CS what the CS's story is and why the CS is acting differently "overnight" and whether it is "an investigation"; the CS explained that everyone is "making messes," that the CS has "start[ed] to find out about stuff … the [CS] didn't know," and that the CS is stopping because the CS doesn't want to get into trouble. ORTEGA explained that the rumor is that the "Americans are investigating you, that you are in big trouble" and asked the CS whether the CS is under investigation and what the banks have asked the CS.

62.     In an April 2, 2016 recorded meet with ORTEGA and GUSTAVO in Panama, ORTEGA introduced the CS to GUSTAVO, who explained how he can launder money using his brokerage firm and private mutual fund. Specifically, GUSTAVO explained that his brokerage firm, GSA, operates from the United States, but primarily does business in Latin America and manages $2 billion.[5] Regarding GSA's reputation, GUSTAVO explained:

> I would say that our profile, would be by-by nature a business that we prioritized
> the type of client with which we deal, uh…let's say if it is a low profile, we go even

---

[5] I am further aware, that GSA is affiliated with Global Strategic Investments, LLC (GSI), which is a broker/dealer headquartered in Miami, Florida. GUSTAVO and the CS would later conduct numerous meetings at GSI's office in Miami.

lower, that way they will never talk about us, or any advertising, or any cocktail parties.

GUSTAVO explained that they operate a fake mutual fund which receives money from a payment made to look like an investment into the fund, but is actually laundered out of the fund. GUSTAVO explained that "we'll make the transactions in such a way that the purchase will look legitimate" and that the money can be directed anywhere on the back-end using "cards" or "checks" or even "wire transfers," but as to the latter he (GUSTAVO) will "always be on the lookout to see the transfer and who's receiving it, because…[l]ike the saying goes, the fish dies by its mouth. …they have their eyes on everyone." GUSTAVO went on to explain how he can avoid being tracked by the authorities such as Interpol and acknowledged that ORTEGA and the CS's situation is a "time bomb." Finally, GUSTAVO insisted that they use WhatsApp to communicate and avoid emails.[6]

### Cooperation Begins & Conspiracy Continues in Miami

63.     In April 2016, the CS began cooperating with HSI-Miami and continued making consensual recordings with the defendants and other conspirators.

64.     The conspiracy continued in four primary aspects. First, AMPARAN worked to replace the fake joint venture contact with better fake contracts to justify the initial transfers to the CS. Second, AMPARAN worked to launder URDANETA's portion of the PDVSA funds from the CS using false investments. Third, GUSTAVO worked to launder ORTEGA's portion of the PDVSA funds from the CS, also using false investments. And fourth, KRULL and GUSTAVO worked to launder additional PDVSA funds that did not originally flow through the CS.

---

[6] Based on my training and experience, encrypted peer-to-peer chat services, such as WhatsApp, are preferred by individuals engaged in criminal activity because law enforcement is generally unable to obtain the content of the communications from the service provider.

65.    During the course of this conspiracy, GUSTAVO also laundered funds as part of a scheme to promote international narcotics trafficking. KRULL also contacted the CS with several separate plans to launder money from at least one foreign bribery scheme, all as set forth below.

<u>AMPARAN's Replacement of the Fake Joint Venture Contract</u>

66.    In a recorded April 27, 2016 meet with AMPARAN at the Miami, Florida office of Solar Cargo, Inc.,[7] AMPARAN and the CS discussed the fake joint venture contract and AMPARAN acknowledged that it was meant to justify the movement of the PDVSA funds to the CS and that CONVIT was involved. AMPARAN assured the CS not to worry about European Financial Institution 1 and the fake contract because European Financial Institution 1 will let him know if there is an investigation and AMPARAN "can manipulate that." AMPARAN and the CS discussed supplemental fake contracts AMPARAN had previously prepared and provided. AMPARAN also began to explain how he will launder URDANETA's portion of the PDVSA funds using fake bonds.

67.    On or around May 26, 2016, the CS received a BBM chat from AMPARAN instructing him where in Venezuela to pick up the proposed fake contracts. The CS had an assistant pick up the replacement fake contracts from AMPARAN and provided them to HSI-Miami.

68.    On May 25, 2016, URDANETA sent a BBM chat to the CS stating that "['CONSPIRATOR 4'[8]] ... has an offer and I prefer you to speak directly with him." On May 27, 2016, the CS had a recorded call with CONSPIRATOR 4, and explained to CONSPIRATOR 4 that the CS was working with AMPARAN to fix things and that the CS had explained to the bank

---

[7] AMPARAN explained in the recorded meet that he works for Solar Cargo, that it has six planes operating, and that he had recently been hired by PDVSA to move medicine from Iran to Venezuela.

[8] CONSPIRATOR 4 is associated with CONVIT and formerly with PDVSA .

that the PDVSA funds were from an exchange transaction. CONSPIRATOR 4 responded "Oh they

made it up" and the following conversation ensued:

CONSPIRATOR 4:     This is bad. This is bad when not-not-not... The truth is not
                   spoken and can't-can't-can't even do [unintelligible]
                   regarding it since it never happened.

CS:                Uh-huh. But...the truth was a foreign exchange transaction,
                   correct?

CONSPIRATOR 4:     The truth it was, was, was not a foreign exchange
                   transaction. It does not exist in Bolivars. Not at all, it was
                   a payment [unintelligible]

CONSPIRATOR 4 suggested a meeting in Venezuela with everyone who has "an interest" to sort

things out and fix "the papers" before things get bad when it is too late.

69.     On June 13, 2016, the CS met with AMPARAN in Venezuela and they executed

replacement fake contracts. The replacement fake contracts (later provided to HSI-Miami by the

CS) included a complex array of bogus financing and trust documents involving Rantor, the CS's

trust, and other entities.

70.     On June 22, 2016, AMPARAN sent the CS an email with a fake loan agreement

between Solar Cargo and Rantor meant to supplement the replacement fake contracts. In BBM

chats between AMPARAN and the CS in August 2016, AMPARAN asked if the CS received the

latest contract, and the CS responded yes. On September 5, 2016, AMPARAN sent the final fake

contract between Solar Cargo and a company belonging to the CS. All of these replacement fake

contracts were backdated to early 2014.

<u>AMPARAN and URDANETA's Efforts to Continue Laundering PDVSA Funds</u>

71.     As mentioned above, in an April 27, 2016 recorded meet with AMPARAN in

Miami, the efforts to launder URDANETA's portion of the PDVSA funds from the CS occurred

simultaneously to AMPARAN's efforts to replace or supplement the fake joint venture contract.

During that meet, AMPARAN explained how he would launder URDANETA's portion of the

PDVSA funds using the purchase of a fraudulent bond designed to default to conceal the transfer:

> we are now working through a mechanism, through which, we issue a bond through
> a bank, from which we have, eh, on which we have a lot of influence, or several
> banks, but one in particular that is the one, we are working with right now, we issue
> a bond. ... That you on that side would buy, you would make an investment in that
> bond, we receive, um, that, eh, receive that money for the purchase of that bond
> and you keep the bond on that side. In the term of, a number of months, that bond
> starts going down in price, ... until there comes a moment when it flips, ... but the
> account is never closed, nor, nor are funds transferred, the funds never leave, and
> an investment is made.

72.    In a May 12, 2016 recorded call with URDANETA, URDANETA and the CS

recounted the CS's meeting with AMPARAN and the defaulting-bond laundering plan.

URDANETA brought up an apartment "over there" in Miami for which he paid a significant

deposit that he is being pressured to close on in 60 days by the developer and agreed to send the

CS the notice from the developer.

73.    URDANETA later sent the CS an image of a May 10, 2016 email from the

developer of the Porsche Design Tower in Miami, informing him of the upcoming closing on the

unit. The email included "Pre Closing Questionnaire" provided by the developer contains the

following warning: "Note: taking title under a company or trust may trigger FinCEN reporting

requirements." In a follow up chat with the CS, URDANETA explained that he was worried about

the FinCEN reporting requirement and discussed ways to minimize the risk; URDANETA

suggested forming a new company with his wife as the beneficial owner.

74.    In a May 17, 2016 recorded call with URDANETA, URDANETA discussed the

transfer of the Miami condominium with the equity of URDANETA's down payment to

AMPARAN as a fee for AMPARAN's laundering services. And, in a May 18, 2016 recorded meet

with AMPARAN at Solar Cargo in Miami, AMPARAN and the CS discussed using the Miami condominium as a fee[9] and moving forward with the defaulting-bond laundering plan.

75.     In a November 21, 2016 BBM chat, AMPARAN provided the details of an additional fraudulent bond purchase to launder URDANETA's PDVSA funds and explained that the bond purchase will be facilitated through a U.K. broker dealer, "European Financial Institution 2."

76.     In a March 1, 2017 recorded meet, the CS met with URDANETA, AMPARAN, "CONSPIRATOR 5,"[10] and GOIS, at the offices of European Company 1 in Madrid, Spain. Prior to the meeting, URDANETA was captured on the recording explaining to the CS that the CS should not be concerned about the fake joint venture contract or being caught because they only had to worry about the United States and the "Americans … have no jurisdiction"; URDANETA uses the word "launder" to describe their activities.

77.     The purpose of the meeting was for the CS to gain comfort with the "operation" proposed by AMPARAN. CONSPIRATOR 5 and GOIS were introduced as the managers of the operation and meant to comfort the CS, who had relayed misgivings to URDANETA about working with AMPARAN.

78.     During the meeting, GOIS asked if there is anything he can tell the CS to make him more comfortable and the CS noted that he was concerned about European Financial Institution 2

_____

[9] AMPARAN and URDANETA would later report that they worked out a solution to achieve the transfer. Miami-Dade Property records show that the property was transferred from the developer to Paladium Real Estate Group LLC on January 12, 2017. According to the Florida Department of State, Paladium was formed on May 26, 2016 with URDANETA's wife as an owner. On September 23, 2016, AMPARAN's wife was added as a manager of Paladium, and on September 15, 2017, after the closing, URDANETA's wife was removed, leaving AMPARAN in control of Paladium and the condominium.

[10] CONSPIRATOR 5 is a third-party money launderer.

because they asked "no question" and had "no objection" when an account was opened in the CS's name to purchase the fake bond. GOIS explained that there is no issue with European Financial Institution 2. AMPARAN, GOIS, and CONSPIRATOR 5 went on to explain that they manage a fund which allows them to "generate payment structures, and third party payments institution, with a very light KYC." AMPARAN emphasized that they can make payments to "Miami, Panama, Europe"; the CS clarified, "And you have no issues paying in the United States?", to which AMPARAN replied, "No." GOIS explained that the CS should first buy a U.K. GILT, then transfer it to an account in the CS's name at European Financial Institution 2, after which it will be swapped with the fake bond to begin the transfer to URDANETA.

79.     On April 26, 2017, the CS, at the request of GOIS and URDANETA, purchased a 5-million-pound U.K. GILT. On June 20, 2017, the CS, at the request of GOIS, ordered his bank, to "free deliver" the GILT to an account opened for the CS at European Financial Institution 2. At European Financial Institution 2, GOIS would oversee an operation to have the GILT exchanged for a separate worthless bond, so the funds could ultimately be transferred to and concealed for URDANETA. Thereafter, the parties continued to discuss the movement of the balance of URDANETA's portion of the PDVSA funds through 2018, though no additional funds have been moved to date.

80.     In a recorded December 11, 2017 meet with GOIS in the U.K., GOIS explained how European Company 1 is the front supporting the laundering operation with the fake bond, and that AMPARAN, CONSPIRATOR 5, and "CONSPIRATOR 6"[11] are the directors. GOIS also lamented their criminal exposure, and advised the CS as follows:

> ...the faster you get out, the better for you.  Because if you... they're going to lock us all up.  That... I'm telling you, [CS], what do you want me to tell you?  That it's

---

[11] CONSPIRATOR 6 is a third-party money launderer.

not like that? It's the truth, there's going to be a day that they are going to lock all of us up; they are going to lock us up. This will be known. [CS], I have no doubt. I already saw where the shit comes from. I saw where it comes from, how they're doing things, then in the end, whoever has the money is the one who is going to have problems. The rest, well, he will have to defend himself, saying "Look, I got paid here." You'll defend yourself in your own way, I'll defend myself in the same way. But that will happen

<u>ORTEGA and GUSTAVO's Efforts to Continue Laundering PDVSA Funds</u>

81. Also beginning in April 2016, ORTEGA and GUSTAVO continued their efforts to launder ORTEGA's portion of the PDVSA funds through GUSTAVO's fake mutual fund, which culminated in the actual movement of funds about a year later.

82. In February 2017, the CS laundered some of ORTEGA's portion of the PDVSA funds with GUSTAVO's fake mutual fund structure at ORTEGA's direction. On February 21, 2017, GUSTAVO emailed the CS subscription instructions and a subscription agreement for the fake fund. Per these documents, the name of the fund was Global Securities Trade Finance, a Cayman Islands entity, and the custodian bank was "US Financial Institution 1" in New Jersey. On February 24, 2017, the CS instructed a bank in the Bahamas (where a portion the PDVSA funds were then held) to subscribe to the fund per the instructions in the amount of 5,000,0000 U.S. Dollars. Thereafter, on or around February 28, 2017, that amount was wired to U.S. Financial Institution 1; the fake subscription was obtained by the CS, and the 5,000,000 U.S. Dollars was available for further use by ORTEGA.

83. In a March 29, 2017 recorded meet in Miami, Florida, the CS asked GUSTAVO about U.S. Financial Institution 1 and GUSTAVO explained that the bank is controlled by his partners in Uruguay, who also control another bank in Puerto Rico ("U.S. Financial Institution 2") and that they "have our people in the back" of the bank.

84.     In numerous BBM chats between the CS and ORTEGA, ORTEGA asks how things are going with "G" (GUSTAVO) and acknowledges the ongoing laundering of his (ORTEGA's) funds.

85.     Later in April 2017, GUSTAVO, with ORTEGA's agreement, laundered $400,000 of the $5,000,000 back to the CS as the CS's "fee" for the CS's role in facilitating the laundering of ORTEGA's $5,000,000 to GUSTAVO. The CS provided GUSTAVO with an undercover (UC) bank account in the name of a shell company in the Southern District of Florida to receive the fee. On April 24, 2017, GUSTAVO wired $396,000 from U.S. Financial Institution 1 to the UC account. To "justify," i.e., conceal, the transaction, GUSTAVO created a fake loan contract between the UC shell company and Global Securities Trade Finance.

86.     The next stage of this scheme was the laundering of the fake subscription out of the CS's account and into an account ultimately benefiting ORTEGA in order to eliminate any final trace of the movement. GUSTAVO and ORTEGA proposed several methods for this, which the CS rejected. These efforts continue to this day. Over the course of the summer of 2017, however, GUSTAVO revealed his connections to yet another complicit U.S. financial institution, U.S. Financial Institution 2, in an effort to launder the subscription.

87.     In a recorded June 7, 2017 meet with GUSTAVO, GUSTAVO told the CS that he works with U.S. Financial Institution 2, that he knows the owner, and that he can facilitate things: "Sure, and discreet. And the good thing about [U.S. Financial Institution 2] is that without being, without being in U.S., it is in U.S....in Puerto Rico." GUSTAVO later introduced the CS to GUTIERREZ, the majority shareholder of U.S. Financial Institution 2, and the CS and GUTIERREZ agreed to meet in the future.

88.     On July 31, 2017, GUTIERREZ flew to Miami from Uruguay to meet with the CS. During a recorded meet on July 31, 2017 with GUTIERREZ in Miami, the CS explained to GUTIERREZ that the CS needed to transfer GUSTAVO's fund subscription to GUSTAVO's "client" (ORTEGA) with no trail. The CS and GUTIERREZ discussed options including internal account-to-account transfers at U.S. Financial Institution 2.

89.     In a recorded August 14, 2017 call with GUTIERREZ, GUTIERREZ and the CS further discussed the subscription to GUSTAVO's fund. GUTIERREZ offered possible schemes to justify the transaction  using U.S. Financial Institution 2 and agreed that U.S. Financial Institution 2  will charge a two-and-a-half percent (2.5%) fee.

90.     During a recorded August 15, 2017 meet with GUSTAVO in Miami, Florida, the CS complained to GUSTAVO about how explicit GUTIERREZ was regarding their criminal activities because he seemed reckless, and the following conversation ensued as GUSTAVO attempted to reassure the CS that GUTIERREZ did not know about the ORTEGA "kick-backs":

| | |
|---|---|
| CS | I mean, I didn't tell him, "Look, this Ortega thing is a *kick-back,*" but I imagine that he knows what it is, I mean… |
| GUSTAVO | No, no, I haven't told him anything at all, I mean, zero [0], zero [0], zero [0].  And I will never tell him anything because it's not necessary.   I never say anything to these people because *you don't need to*.  There isn't, I mean… everything is done well. |

91.     ORTEGA ultimately rejected the U.S. Financial Institution 2 option because he wanted to avoid the United States. The transfer of the subscription remains unresolved.

<u>GUSTAVO's Other Laundering Schemes</u>

92.     During the course of multiple meetings in Miami with the CS, GUSTAVO attempted to develop a relationship with the CS as a potential feeder of additional criminal clients

Case 1:20-cv-21339-AKK   Document 116   Entered on FLSD Docket 01/06/2026   Page 159 of
Case 1:18-cr-20682-CMA   Document 3   Entered on FLSD Docket 07/24/2018   Page 26 of 33
246

in need of money laundering. Indeed, GUSTAVO would go on to encourage and develop additional money laundering schemes with the CS, touting his connections at multiple U.S. financial institutions along the way, including other broker/dealers, in addition to U.S. Financial Institutions 1 & 2.

93.     In a November 8, 2016 recorded meet in Miami, the CS conducted a sting against GUSTAVO, informing GUSTAVO about a "client" who had to buy a plane in Brazil that is "doing a delicate job" and is "going to move ... sensitive merchandise." Prior to the CS proposing this transaction, GUSTAVO assured the CS that the CS could speak frankly as they were "beyond good and evil." The CS explained that the client needed to pay someone in Spain for the plane, but that the payment could not be traced back to the plane because "there could be a risk ... the authorities eventually investigate the plane." GUSTAVO responded "ok" and "uh huh" without hesitation. The CS further explained that source money is in the United States and is completely clean. GUSTAVO suggested some options and quickly agreed: "We'll open an account right away ... and we'll make the payment" and that they will justify receiving the payment by selling the "client" a "product," i.e., a false investment. The CS and GUSTAVO agree to only charge the "client" ten percent (30,000 U.S. Dollars) in the hopes that he will do more business with them.

94.     Thereafter, GUSTAVO and the CS discussed the logistics of the transfer on several occasions. In January 9, 2017 recorded meet, the CS explained to GUSTAVO that the CS was worried about ORTEGA and the money they (Venezuelan kleptocrats) are moving more than the CS was "worried about the plane, the DEA." GUSTAVO responded, "Yes, yes."

95.     On January 10, 2017, the CS and GUSTAVO commenced the transaction. Upon the CS receiving instructions from GUSTAVO, HSI-Miami wired 300,000 U.S. Dollars from a UC account in the Southern District of Florida to a U.S. Wells Fargo account held by Global

Securities Management LLC, and, on or around January 13, 2017, the funds were received in a UC account in Spain as instructed. As previously agreed, GUSTAVO emailed the CS a fake 300,000 U.S. Dollar loan contract to support the initial transaction as well as an invoice from Global Securities Management in the amount of 30,000 U.S. Dollars for "Loan Structuring."

<u>KRULL's Conspires to Launder Additional PDVSA Funds with GUSTAVO</u>

96.     In October 2016, the CS met with KRULL in Panama. KRULL explained that he was looking for a bank to deposit approximately 600,000,000 U.S. Dollars from a currency exchange with PDVSA on behalf of a client, "CONSPIRATOR 7,"[12] and which the CS learned were located in Gazprombank. The CS stated the CS could explore some options but needed a contract proving the source of funds. On November 8, 2016, KRULL explained that he had the contract. In a November 17, 2016 WhatsApp chat, KRULL asked if the CS had "the hush" (meaning hushmail, an encrypted email provider), and the CS provided a hushmail address. That same day a PDVSA loan contract arrived at the CS's hushmail account.

97.     The PDVSA contract that the CS received from KRULL was an amendment to the original contract between PDVSA and Rantor, and doubled the credit line from 7.2 to 14 billion Bolivars. The amendment was dated May 25, 2015, and specifically incorporated the initial PDVSA loan contract.

98.     Over the course of the next few weeks, KRULL continued to press the issue over WhatsApp chats, explaining his client was in a "hurry." On November 30, 2016, the CS and KRULL met again in Panama. Per the CS, KRULL explained that the funds came from exchange contracts which generated around 1.2 billion U.S. Dollars. KRULL explained that, in addition to

---

[12] CONSPIRATOR 7 is another reported billionaire member of the "boliburgués" and owner of a television network in Venezuela.

Case 1:20-cv-21339-AKK   Document 116   Entered on FLSD Docket 01/06/2026   Page 161 of
246
Case 1:18-cr-20682-CMA   Document 2   Entered on FLSD Docket 07/24/2018   Page 28 of 33

the 600-million-Dollar solution for CONSPIRATOR 7, KRULL needed an additional solution for 200 million U.S. Dollars held in European Financial Institution 1 in the name of a straw owner, "CONSPIRATOR 8." (The CS recognized CONSPIRATOR 8 as a straw owner previously proposed to be used to conceal money for the stepsons of VENEZUELAN OFFICIAL 2, a.k.a, "los chamos," during a prior meeting with the CONSPIRATOR 8, CONVIT, and "los chamos.")

99.    On November 30, 2016, KRULL sent the CS a WhatsApp message with photos of CONSPIRATORS 7 and 8's Venezuelan passports. KRULL also forwarded an email to the CS explaining the European Financial Institution 1 structure; the email was in fact a string of previously forwarded emails attaching documents from European Financial Institution 1, which had been sent from AMPARAN to "CONSPIRATOR 9," to CONSPIRATOR 7, to KRULL, and to the CS.

100.    In early December 2016, the CS informed KRULL of a solution for laundering the additional PDVSA funds. The CS ultimately proposed GUSTAVO and his mutual-fund laundering solution. On December 21, 2016, KRULL sent the CS a resume for CONSPIRATOR 8, whom KRULL referred to as his "buddy." In a later recorded January 7, 2017 phone call with KRULL, the CS explained that he could not use the CONSPIRATOR 8 resume, noting "this shit is a joke." KRULL agreed, "Yes, it's a joke…. I agree, I agree."

101.    In a recorded January 9, 2017 meet with GUSTAVO in Miami, the CS asked GUSTAVO for a solution similar to ORTEGA's for CONSPIRATORS 7 & 8, and GUSTAVO immediately agreed. GUSTAVO noted that CONSPIRATOR 7 has one of the wealthiest fortunes from the "chavismo." GUSTAVO walked through all the different laundering options for both and how to handle any "KYC" issues. KRULL later agreed to the solution presented by GUSTAVO, and in BBM chats would acknowledge "Gustavo" when inquiring of the status. The CS and

KRULL and the CS and GUSTAVO had numerous recorded conversations and message chats about the scheme over the course of months.

102.   In a January 10, 2017 recorded conversation, KRULL noted that "[CONSPIRATOR 7]" is asking if the money can be sent. In another, on January 23, 2017, KRULL said the money at European Financial Institution 1 is ready to be moved to CONSPIRATOR 8 and that "I met the dude, and also met the guy that represents him." The CS asked, "Are these the guy's sons?" (meaning the stepsons of VENEZUELAN OFFICIAL 2), and KRULL responded, "Nah. Don't, don't, don't ask."

103.   In a January 31, 2017 recorded call, the CS informed KRULL that he is in Miami and both discuss the laundering further.   KRULL acknowledged receiving money from the European Financial Institution 1 accounts before (i.e., other laundering activity) when he described how the wires work.

104.   On March 7, 2017, KRULL sent the CS a WhatsApp chat and explained that the clients are asking about GUSTAVO's fund being in the United States. In a March 7, 2017 recorded call, KRULL advised that "[CONSPIRATOR 7]" is worried, and the CS explained that the fund is not in the United States, but that GUSTAVO has offices in the United States (Miami and New York). The CS explained that GUSTAVO lives in Miami. KRULL asked if GUSTAVO can fly to Panama, and the CS assured KRULL he could.

105.   On March 16, 2017, the CS met with KRULL and CONSPIRATOR 8 in Panama, and at one point called GUSTAVO (who was not in Panama) to discuss the laundering operation. During the meeting, CONSPIRATOR 8 stated that he "represented three persons." After the meeting, KRULL confided to the CS that he had once seen CONSPIRATOR 8 at CONSPIRATOR 7's office having lunch with "los chamos," i.e., the stepsons of VENEZUELAN OFFICIAL 2.

106.   In a recorded April 5, 2017 call with KRULL, KRULL stated that CONSPIRATOR 8 was worried about wiring funds to purchase GUSTAVO's fraudulent fund to U.S. Financial Institution 1 in New Jersey because he was worried about using U.S. banks. KRULL explained that he told CONSPIRATOR 8 it was irrelevant because all U.S. Dollar wire transactions travel through correspondent banks in the United States regardless.

107.   In a recorded April 14, 2017 meet in Miami with KRULL, KRULL and the CS discussed GUSTAVO and CONSPIRATOR 7 and the plan to launder the other PDVSA funds.

108.   GUSTAVO and KRULL would continue to discuss this scheme with the CS for months thereafter. For instance, in a recorded call with KRULL on August 2, 2017, the CS told KRULL, "I am going to be with GUSTAVO tomorrow … and he's going to ask me about the fund with the children." KRULL explained that he is not sure, but that "CONSPIRATOR 7" may be doing something on it with "Chente" (AMPARAN) and explained that he (KRULL) speaks mostly to "[CONSPIRATOR 8]" about it because he is "the client."

109.   Records obtained from email search warrants confirm the flow of the PDVSA funds from PDVSA to the defendants and other conspirators through European Financial Institution 1. For instance, a September 2015 email circulated among AMPARAN and CONSPIRATORS 5 and 6 with the subject line "Numeros [CONSPIRATOR 7]" includes an attachment titled "Operation 600k," which contains the following work sheets:

a.   A work sheet titled "Detailed Income from PDVSA" shows ten transfers from PDVSA from December 29, 2014 through February 3, 2015 totaling 511,913,270.74 Euros.

b.   A work sheet titled "Summary of the 600 Operation" shows that, of the 511 million Euros: 20,476,530.83 was assigned to European Financial

Institution 1 as a 4% fee; 227,265,537.52 Euros went to the "BOLI" (CONVIT and CONSPIRATOR 2); 159,085,876.26 Euros went to "CHAMOS" (the stepsons of VENEZUELAN OFFICIAL 2); and 68,179,661.26 Euros went to CONSPIRATOR 7. The remaining 36,905,664.87 Euros was accounted for as the "Cost" of the initial 7.2 billion Bolivars used to obtain the 511 million Euros.

        c.      Further worksheets account for how each recipient moved the money. The "BOLI" for instance moved 78.8 million Euros to the CS and the majority of the rest through apparent shell companies, Volbor Vontobel and Vencon Holding. CONSPIRATOR 7 sent dozens of U.S. Dollar wires through banks in Malta and Austria, including to aviation and yacht services as well as brokerage companies in Miami, Florida.

These records not only exhibit the conspiracy in blunt detail, but confirm the connection among KRULL and the additional conspirators and the initial 78.8 million Euros in PDVSA funds received by the CS.

<u>KRULL's Additional Venezuelan Laundering Schemes</u>

        110.    Throughout the course of KRULL's scheme to launder the additional PDVSA funds with the CS, KRULL presented other laundering schemes to the CS. One of the schemes involved a relative of VENEZUELAN OFFICIAL 3 who needed a way to receive kickbacks from foreign law firms who had been hired by the Government of Venezuela.

        111.    KRULL first approached the CS with this scheme in the summer of 2017 because KRULL needed a laundering structure for receiving the kickbacks. Both KRULL and the CS agreed that GUSTAVO was again a good laundering option.

112.    On June 29, 2017, KRULL called the CS and, in a recorded conversation, the CS told KRULL that he is in Los Angeles, California. KRULL said he has to be "candid and direct" and stated:

> Uh, I'm sitting here with, with, with, with the [title of VENEZUELAN OFFICIAL 3]'s brother.... And, and, and well, they, they, they have earned in the last years a payment they're going to receive that is for five [5]....Okay? And, and, and we have been talking about the, the, the options they, they might have. Right? And, and, and I don't know if, if, if you have something that you, that you might think of, as to how it can be, uh, things can be structured. Right?

113.    The CS noted that it may be difficult based on the recipient's profile, but said they can talk more tomorrow and explained he will be flying to Miami then. In a later recorded call on June 29, 2017, KRULL further specified that these were payments from law firms that had handled international arbitrations on the Venezuelan government's behalf with international companies and had charged the government a lot of money (5,000,000 U.S. Dollars). In a recorded call the next day, June 30, 2018, the CS, KRULL, and VENEZUELAN OFFICIAL 3's brother discussed ways to launder the payment which was again explicitly described as payments deriving from law firms who represented Venezuelan government in arbitrations. Different options for laundering the payments and "KYC" requirements were discussed.

114.    In a recorded August 25, 2017 meet with GUSTAVO in Miami, the CS explained that KRULL had two clients related to VENEZUELAN OFFICIAL 3 who needed a way to launder the payments they are going to receive from attorneys who were hired by the Venezuelan government. The CS specifically stated "the lawyers are giving them their kick backs" and GUSTAVO responded, "Mm-hmmm." The CS then suggested that the lawyers themselves would pay the kickback, and GUSTAVO immediately corrected him:

> No, they can't pay these two [2] guys.  No, that's impossible.... Just imagine. Specially nowadays with OFAC, and with all of these people reviewing every money transfer every day. .... Brother, that's kindergarten Algebra.  Right? Well,

we will have to give a vehicle to each one of these guys...A private fund...The same thing we did for [ORTEGA].

115.   In recorded meetings on August 29, 2017 and November 14, 2017 with KRULL in Miami, the CS and KRULL further discussed the kick-back laundering scheme.

## CONCLUSION

116.   Based on the foregoing, probable cause exists that the defendants conspired to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h), and did travel in and use facilities of interstate and foreign commerce to further the laundering activities, in violation of Title 18, United States Code, Section 1952.

Respectfully submitted,

GEORGE F. FERNANDEZ, SPECIAL AGENT, HOMELAND SECURITY INVESTIGATIONS

Sworn and subscribed before me this ___ day of July, 2018.

EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE

31

# EXHIBIT 14

Case 1:15-cr-20840-MGC   Document 22-4   Entered on FLSD Docket 11/19/2015   Page 1 of 9



MDR:KJH:JEC:AML
182-15800 (please repeat when responding)

**U.S. Department of Justice**

Criminal Division
*Office of International Affairs*

*Washington, D.C.  20530*

TO:       The Central Authority of Switzerland

SUBJECT:   Request for Assistance in the Prosecution of Martin Lustgarten Acherman

## I. **INTRODUCTION**

The Central Authority of the United States requests the assistance of the appropriate

authorities in Switzerland pursuant to the 1973 U.S.-Swiss Confederation Mutual Legal

Assistance Treaty (the "Treaty").  The U.S. Attorney's Office for the District of Massachusetts

and the Asset Forfeiture and Money Laundering Section of the U.S. Department of Justice,

Criminal Division (the "U.S. prosecutors"), with assistance from the U.S. Department of

Homeland Security, Homeland Security Investigations and the U.S. Drug Enforcement

Administration (collectively, the "U.S. authorities"), have charged Martin Lustgarten Acherman

("Lustgarten") with money laundering conspiracy, conspiracy to obstruct an official proceeding,

and obstruction of an official proceeding. ████████████████████████

████████████████████████████████

█████████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████ U.S. authorities seek certified

copies of records from CBH Compagnie Bancaire Helvetique S.A. and at Berenberg Bank Schweiz AG and assistance from Swiss authorities ████████████████████ ██████████████████████.

## II. REQUEST FOR CONFIDENTIALITY

Due to the sensitive nature of this investigation, we ask that this request be treated as confidential and, to the extent permissible under Swiss law, public disclosure of any matter relating to its execution be prevented. Please do not share the contents of this request or its subject matter with any private persons (including potential subjects of the investigation), or any governmental official whose knowledge is not absolutely necessary for purposes of executing this request. In addition, please advise all who must be made aware of this request for assistance for purposes of its execution that the contents and subject matter are to be kept confidential and should not be shared with any potential subjects of the investigation or any other persons. Should it become impossible to execute any portion of this request without breaching such confidentiality, please contact the points of contact listed at the end of the request prior to do doing so, in order to discuss how to proceed.

## III. FACTS

### A. Background

Since 2009, the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") and the U.S. Drug Enforcement Administration ("DEA") have been investigating the activities of an international money laundering organization that is known to operate in Switzerland, Hong Kong, the United States, Colombia, Panama, Venezuela, and Singapore. One of the primary subjects of the investigation is Lustgarten, a Venezuelan citizen and Panamanian resident who travels occasionally to the United States. Agents from DEA and

HSI have acquired information about Lustgarten's international money laundering activities from lawful search warrants, judicially authorized wire interceptions, interviews of cooperating witnesses, and analysis of bank and wire transfer records.



4





## IV. THE OFFENSES

**18 U.S.C. § 1956   Money Laundering**

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the

property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

**18 U.S.C. § 1512(c)(2)  Obstruction of an Official Proceeding**

Whoever corruptly alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

## V.  SUBJECTS OF THE INVESTIGATION

1.    MARTIN LUSTGARTEN ACHERMAN
      Date of Birth:
      Citizenship:
      Race:
      Passport Information:
      Address:



2.    SALOMON BENDAYAN
      Date of Birth:
      Citizenship:
      Race:
      Passport Information:
      Address:



3.    ANDAN LTD.
      Place of Incorporation:        Hong Kong SAR, China
      Address:                       HK Company Registry #1111880,
                                     3/f Jonsim Place 228,
                                     Queens Road East,
                                     Wanchai, Hong Kong SAR



7

B. **Bank Records**

Please ask the competent Swiss authority designated to execute this request to provide complete records from CBH Compagnie Bancaire Helvetique S.A. (Switzerland) relating to the following accounts:

    a.   account number 0021000B000C, held in the name of A L Services Inc.;

    b.   account number 0021066B000C, held in the name of Andan Ltd.;

    c.   account number 0020999B000C, held in the name of ESL Services Inc.;

    d.  account number 0021088B000C, held in the name of Henlux Inc.;

as well as from Berenberg Bank Schweiz AG (Switzerland), relating to account number 000104100200, held in the name of Andan Ltd.

Records should be for the period beginning January 1, 2010, to present, and should include, but not be limited to:

Bank records should be should include, but not be limited to:

    a.    signature cards;

    b.    documents relating to the opening of the account including identity of persons who opened the account and any known beneficial owners;

    c.    account ledger cards;

    d.    periodic account statements;

    e.    deposit and withdrawal records;

    f.    instructions relating to the receipt or transfer of any funds in or out of the account whether by telex or other means of communication;

    g.    correspondence to, from, or on behalf of the account holder;

    h.    internal e-mails and memoranda relating to the account or to Martin Lustgarten Acherman or Saloman Bendayan; and

8

Case 1:15-cr-20840-MGC   Document 22-4   Entered on FLSD Docket 11/19/2015   Page 9 of 9

i. identification of any beneficiaries of the account other than those on the signature cards.



## IX. CONCLUSION

The United States appreciates the cooperation and aid it has received in the past from Switzerland in the area of international law enforcement. We thank you for your attention to this request for assistance, and extend the assurance of our highest consideration.

7/7/15
_____
Date

_____
Jason E. Carter
Acting Deputy Director
Office of International Affairs
Criminal Division

# EXHIBIT 15

**Bundesstrafgericht**

**Tribunal pénal fédéral**

**Tribunale penale federale**

**Tribunal penal federal**



Numéro de dossier: RR.2019.11

**Arrêt du 18 avril 2019**
**Cour des plaintes**

| | |
|---|---|
| Composition | Les juges pénaux fédéraux<br>Giorgio Bomio-Giovanascini, président,<br>Tito Ponti et Cornelia Cova,<br>la greffière Victoria Roth |
| Parties | **A. S.A.,** représentée par Mes Thomas Sprenger et Yves Pellet, avocats,<br><br>recourante<br><br>**contre**<br><br>**OFFICE FÉDÉRAL DE LA JUSTICE, OFFICE CENTRAL USA,**<br><br>partie adverse |
| Objet | Entraide judiciaire internationale en matière pénale aux Etats-Unis<br><br>Remise de moyens de preuve (art. 74 EIMP) |

- 2 -

**Faits:**

**A.** Le 13 mars 2018, le Département américain de justice (*Department of Justice*; ci-après: DOJ) a demandé l'entraide aux autorités suisses dans le cadre d'une enquête dirigée contre B. La compagnie pétrolière d'Etat du Venezuela, C. SA, aurait, en mars 2012, conclu un contrat de prêt avec plusieurs sociétés-écran. Elle leur emprunterait des Bolivars (devise locale) et rembourserait en dollars américains à un taux lucratif fixé par l'Etat; le gouvernement du Venezuela possédant un système d'échange de devises étrangères par lequel celui-ci échange ses devises locales (bolivars) à un taux fixe pour des dollars américains, bien inférieur au véritable taux d'échange économique. Ceci aurait été possible grâce à des paiements corruptifs faits à des officiels vénézuéliens. Les dollars américains pouvaient ensuite être changés au marché noir permettant la réalisation d'une plus-value importante. Plus de 4,5 milliards de dollars américains auraient été ainsi détournés, principalement à travers des comptes ouverts en Suisse par B. Il aurait en outre perçu 22 millions de dollars américains via des commissions, dont une partie aurait été utilisée pour acheter des biens immobiliers aux Etats-Unis (act. 7.1).

**B.** La demande d'entraide a été complétée le 25 mai 2018. Parmi les sociétés impliquées figure également la société D. SA, laquelle aurait participé aux opérations précitées en utilisant des comptes en Suisse. L'autorité requérante a notamment identifié un versement de USD 1'000'000.-- effectué le 25 mai 2012 à destination d'un compte suisse appartenant à A. S.A. (ci-après: la recourante), auprès de la banque E. SA à Zurich. Dans sa requête complémentaire, l'autorité requérante sollicite notamment la remise de la documentation bancaire complète relative aux comptes détenus par A. S.A. auprès d'E. SA depuis le 1er janvier 2012 à ce jour (act. 7.2).

**C.** Par décision du 25 juillet 2018, l'Office fédéral de la justice, par son office central USA (ci-après: Office USA), est entré en matière sur la demande américaine et en a confié l'exécution au Ministère public de la République et canton de Genève (ci-après: MP-GE; act. 7.3). Les faits sous enquête peuvent être qualifiés, selon l'Office USA, de blanchiment d'argent (art. 305bis CP), de gestion déloyale des intérêts publics (art. 314 CP) et de corruption privée passive (art. 322novies CP).

**D.** En exécution de la décision précitée, le MP-GE a requis, par ordonnance de dépôt du 20 septembre 2018, l'édition de la documentation bancaire concernant la recourante, notamment les documents d'ouverture complets,

- 3 -

l'existence d'un *safe*, les relevés et avis de mouvements de compte du 1er janvier 2012 à ce jour, les estimations complètes et détaillées au 31 décembre des années 2012 à 2017 et du jour ainsi que les notes internes et la correspondance (act. 7.4).

E.   Le 12 octobre 2018, l'Office USA a informé E. SA que l'interdiction de communiquer qui avait été ordonnée dans le cadre la décision d'entrée en matière (*cf. supra* let. B) était levée et que celle-ci était autorisée à informer ses éventuels clients touchés par l'ordonnance de dépôt du MP-GE (*cf. supra* let. C) de l'existence de la demande d'entraide et de tous les faits en rapport avec elle (act. 7.5).

F.   Par décision de clôture du 21 décembre 2018, l'Office USA a ordonné la transmission à l'autorité requérante de la documentation bancaire relative au compte n°1 ouvert au nom de A. S.A. auprès d'E. SA (act. 2).

G.   A. S.A. interjette un recours contre la décision précitée par mémoire du 25 janvier 2019 auprès de la Cour des plaintes du Tribunal pénal fédéral. Elle conclut en substance à l'annulation de la décision de clôture (act. 1).

H.   Lors de l'échange d'écritures ordonné par la Cour de céans, les parties maintiennent leurs conclusions (act. 7; 10).

Les arguments et moyens de preuve invoqués par les parties seront repris, si nécessaire, dans les considérants en droit.

**La Cour considère en droit:**

1.

1.1   L'entraide judiciaire pénale entre les Etats-Unis d'Amérique et la Confédération suisse est régie par le Traité sur l'entraide judiciaire en matière pénale liant ces deux Etats (TEJUS; RS 0.351.933.6) et la loi fédérale d'application de celui-ci (LTEJUS; RS 351.93).

1.2   La loi du 20 mars 1981 sur l'entraide internationale en matière pénale (EIMP; RS 351.1) et son ordonnance d'exécution (OEIMP; RS 351.11) s'appliquent toutefois aux questions non réglées, explicitement ou implicitement, par le

- 4 -

traité et lorsqu'elles sont plus favorables à l'entraide (ATF 142 IV 250 consid. 3; 140 IV 123 consid. 2; 137 IV 33 consid. 2.2). L'application de la norme la plus favorable doit avoir lieu dans le respect des droits fondamentaux (ATF 135 IV 212 consid. 2.3; 123 II 595 consid. 7c).

1.3   En vertu de l'art. 17 al. 1 LTEJUS, peuvent faire l'objet d'un recours devant la Cour des plaintes du Tribunal pénal fédéral, la décision de l'Office USA relative à la clôture de la procédure d'entraide et, conjointement, les décisions incidentes antérieures de l'autorité d'exécution.

1.4   Interjeté dans le délai de 30 jours dès la notification de la décision attaquée (art. 17c LTEJUS), le recours a été déposé en temps utile.

1.5   Selon l'art. 17a LTEJUS, a qualité pour recourir quiconque est personnellement et directement touché par une mesure d'entraide et a intérêt digne de protection à ce qu'elle soit annulée ou modifiée. Aux termes de l'art. 9a let. a OEIMP, est notamment réputé personnellement et directement touché, en cas d'informations sur un compte, le titulaire du compte dont les documents font l'objet de la décision de clôture.

En tant que titulaire des relations bancaires visées par la décision querellée, la recourante a qualité pour attaquer celle-ci.

1.6   Compte tenu de ce qui précède, il convient d'entrer en matière sur le fond.

2.

2.1   Dans un grief qu'il convient de traiter en premier lieu compte tenu de sa nature formelle, la recourante dénonce une violation de son droit d'être entendue, et ce à plusieurs titres. Elle n'aurait pas eu l'occasion de participer à la procédure, elle aurait bénéficié *de facto* d'un délai de recours raccourci et n'aurait pas eu accès au dossier complet. De plus, l'Office USA aurait refusé, sans justes motifs, la mise sous scellés requise par la recourante (act. 1, p. 7 ss).

2.2   L'art. 29 al. 2 Cst. consacre le droit d'être entendu, lequel découle également du droit à un procès équitable (art. 6 par. 1 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales [CEDH; RS 0.101]). Le droit d'être entendu comprend notamment le droit pour la partie intéressée de s'exprimer sur les éléments pertinents avant qu'une décision touchant sa situation juridique ne soit prise (ATF 137 II 266 consid. 3.2 p. 270). Ce droit porte avant tout sur les questions de fait. Les parties doivent éventuellement aussi être entendues sur les questions de droit lorsque l'autorité concernée

- 5 -

entend se fonder sur des normes légales dont la prise en compte ne pouvait pas être raisonnablement prévue par les parties (ATF 129 II 492 consid. 2.2 p. 505 et les références citées). Par ailleurs, une autorité se rend coupable d'une violation du droit d'être entendu si elle omet de se prononcer sur des griefs qui présentent une certaine pertinence ou de prendre en considération des allégués et arguments importants pour la décision à rendre (ATF 133 III 235 consid. 5.2 p. 248).

**2.3** Le droit du particulier de s'exprimer avant qu'une décision le concernant ne soit prise découle de ce droit (arrêt du Tribunal pénal fédéral RR.2009.294 du 7 octobre 2009 consid. 3.1.1). Il en va de même du droit du particulier de recevoir la décision qui le concerne (ATF 124 II 124 consid. 2a p. 127; 107 Ib 170 consid. 3 p. 175/176 et les références citées). La participation du détenteur au tri des pièces à remettre à l'Etat requérant découle entre autres de ce droit (ATF 129 I 85 consid. 4.1 et références citées; arrêts du Tribunal fédéral 6B_397/2012 du 20 septembre 2012 consid. 1.2; 8C_509/2011 du 26 juin 2012 consid. 2.2; arrêt du Tribunal pénal fédéral RR.2009.294 du 7 octobre 2009 consid. 3.1.1). En matière d'entraide judiciaire, cela implique pour la personne soumise à des mesures de contrainte d'aider l'autorité d'exécution, notamment pour éviter que celle-ci n'ordonne des mesures disproportionnées, partant inconstitutionnelles. Ainsi, la personne touchée par la perquisition et la saisie de documents lui appartenant est tenue, sous peine de forclusion, d'indiquer à l'autorité d'exécution quels documents ne devraient pas, selon elle, être transmis et pour quels motifs. Ce devoir de collaborer découle du fait que le détenteur des documents en connaît mieux le contenu que l'autorité; il facilite et simplifie la tâche de celle-ci et concourt ainsi au respect du principe de la célérité de la procédure ancré à l'art. 17a al. 1 EIMP. Cette obligation est applicable non seulement dans la procédure de recours, mais aussi au stade de l'exécution de la demande. Sous l'angle de la bonne foi (art. 5 al. 3 Cst.), il ne serait en effet pas admissible que le détenteur de documents saisis laisse l'autorité d'exécution procéder seule au tri des pièces, sans lui prêter aucun concours, pour lui reprocher après coup, dans le cadre d'un recours, d'avoir méconnu le principe de la proportionnalité. Encore faut-il que cette dernière donne au détenteur l'occasion, concrète et effective, de se déterminer à ce sujet, afin de lui permettre d'exercer son droit d'être entendu et de satisfaire à son obligation de coopérer à l'exécution de la demande (ATF 126 II 258 consid. 9b/aa; arrêt du Tribunal fédéral 1A.212/2001 du 21 mars 2002 consid. 2.1). Il sied finalement de relever qu'une violation du droit d'être entendu peut toutefois être réparée lors de la procédure de recours. L'irrégularité ne doit cependant pas être particulièrement grave et la partie concernée doit pouvoir s'exprimer et recevoir une décision motivée de la part de l'autorité de recours disposant d'un plein pouvoir de cognition en fait et en droit. Une violation du droit d'être

- 6 -

entendu commise par l'autorité d'exécution est en principe guérissable dans le cadre de la procédure de recours auprès de la Cour de céans (arrêt du Tribunal fédéral 1C_168/2016 du 22 avril 2016 consid. 1.3.2). En matière d'entraide internationale, une telle réparation entre en ligne de compte afin de respecter les principes de célérité et d'économie procédurale (art. 17*a* EIMP). Des limites au-delà desquelles la violation du droit d'être entendu ne peut plus être réparée ont toutefois été fixées par la jurisprudence. Ainsi, lorsque l'autorité méconnaît systématiquement la portée du droit d'être entendu, se défaussant par la même occasion sur l'autorité de recours (arrêt du Tribunal pénal fédéral RR.2015.278 du 16 décembre 2015 consid. 2.1.3; ZIMMERMANN, La coopération judiciaire internationale en matière pénale, 5ᵉ éd. 2019, n° 472, p. 509-510).

**2.4**

**2.4.1** Selon la recourante, l'Office USA ne lui aurait pas donné la possibilité de s'exprimer, d'une part, à propos de la demande d'entraide en général, d'autre part, à propos de la transmission de la documentation bancaire dont il est question (act. 1, p. 7-8). La notification faite uniquement à la banque ne serait pas suffisante, car celle-ci et la recourante se seraient mises d'accord sur les modalités de communication. De son côté, l'Office USA soutient que la notification effectuée à E. SA serait suffisante et que c'était à la banque d'en informer sa cliente, dès lors que la recourante n'est pas domiciliée en Suisse et n'a pas élu domicile en suisse (act. 2, p. 4). En outre, selon l'Office USA, une convention de banque restante ne vaudrait pas élection de domicile au sens de l'art. 80*m* al. 1 let. b EIMP, et la cliente supporterait donc les conséquences si la banque ne devait pas l'avertir.

**2.4.2** En application du principe du droit d'être entendu et en vertu de l'art. 80*m* EIMP, les décisions de l'autorité d'exécution sont notifiées à l'ayant droit domicilié en Suisse (let. a) et à l'ayant droit résidant à l'étranger qui a élu domicile en Suisse (let. b). Selon l'art. 9 OEIMP, la partie qui habite à l'étranger ou son mandataire doit désigner un domicile de notification en Suisse (1ᵉʳᵉ phrase). A défaut, la notification peut être omise (2ᵉ phrase).

Dans les cas où la décision de clôture et/ou la décision d'entrée en matière est notifiée à un établissement bancaire en l'absence d'une notification formelle à l'intéressé, la jurisprudence considère que, lorsque le titulaire du compte a conclu une convention dite de « banque restante », le délai de recours commence à courir dès le lendemain du dépôt de la décision dans le dossier de « banque restante » (ATF 124 II 124 consid. 2e). En effet, le lien entre la banque et le titulaire relève du mandat. En vertu de l'obligation de reddition de comptes, la banque doit renseigner le client et l'informer de tous les faits qui sont susceptibles d'avoir un impact sur la relation

- 7 -

contractuelle (arrêt du Tribunal pénal fédéral RR.2016.24 du 27 avril 2016 consid. 2.2 et références citées). Il peut être attendu de la banque qu'elle informe le titulaire de la relation saisie afin que l'intéressé puisse se déterminer sur la conduite à tenir (ATF 130 IV 43 consid. 1.3 et références citées). Si la banque n'a pas informé à temps le titulaire du compte des décisions rendues ou qu'elle n'a pas pu le faire faute d'adresse valable, c'est au titulaire du compte d'en assumer les conséquences. Dans ce cas, il n'y a pas de violation du droit d'être entendu (arrêt du Tribunal pénal fédéral RR.2010.85 du 14 février 2011 consid. 4.2 et références citées). Si le client a indiqué à la banque qu'il ne souhaitait pas recevoir les communications que la banque doit lui adresser mais que celles-ci doivent être conservées par la banque dans son dossier (clause « banque restante »), chaque communication effectuée « banque restante » est réputée valablement notifiée et lui est opposable comme s'il l'avait personnellement reçue.

**2.4.3** En l'occurrence, il ressort des pièces versées au dossier que la banque et la recourante ont conclu une convention de « banque restante ». La première a, alors, l'obligation de conserver toute la correspondance du client (« *All correspondance, without exception, should be retained by the Bank as "hold mail" […]* »; act. 1.7). Dès lors que la recourante et la banque sont liées par une convention dite de « banque restante », les communications notifiées à la banque et déposées dans le dossier de « banque restante » sont opposables au client comme s'ils les avait effectivement reçues (ATF 124 II 124 consid. 2e). L'obligation de confidentialité a été levée le 12 octobre 2018 par une notification à E. SA, celle-ci étant également en possession de la demande initiale, de la demande complémentaire ainsi que de la décision d'entrée en matière (act. 7, p. 2; 7.5). Rien ne permet de douter que E. SA ait bien reçu dites notifications et les ait notifiés au dossier banque restante, ce que la recourante ne conteste d'ailleurs pas. La décision de clôture a quant à elle été rendue le 21 décembre 2018 (act. 7.6). Plus de deux mois se sont donc écoulés entre ces deux actes sans que la recourante, domiciliée à l'étranger, ne se soit manifestée. Partant, au vu des considérants ci-dessus (cf. *supra*, consid. 2.4.2), il était du devoir de la banque d'avertir son client, et ce dernier d'assumer les conséquences d'une omission de la banque. C'est dès lors à juste titre que l'Office USA a communiqué la décision d'entrée en matière, la levée de confidentialité et la décision de clôture uniquement à la banque. Une personne visée par une procédure d'entraide en Suisse a le devoir de se manifester auprès de l'autorité d'exécution dès qu'elle a connaissance de ladite procédure. Il ressort de la jurisprudence que l'intérêt public lié à une exécution rapide des décisions relatives à l'entraide internationale (art. 17a EIMP), de même que le respect des règles de la bonne foi, imposent à celui qui entend prendre part à ladite procédure qu'il se manifeste sans délai (v. ATF 124 II 124

- 8 -

consid. 2d/dd p. 130). La recourante, qui ne s'est par conséquent pas prononcée sur la demande d'entraide en général alors que rien indique qu'elle en aurait été empêchée, et, plus spécifiquement, sur la transmission des documents dont il est question, ne peut pas se prévaloir d'une violation de son droit d'être entendue. Celui-ci doit, sous cet angle, être rejeté.

**2.4.4** Dès lors que l'Office USA a respecté la procédure de notification de la décision pour un titulaire n'ayant pas élu de domicile en Suisse, l'argument de la recourante, selon lequel le délai de recours aurait – *de facto* – été raccourci (act. 1, p. 11), tombe à faux, tout comme l'argument selon lequel l'Office USA ne lui aurait pas donné la possibilité de s'exprimer. Quoi qu'il en soit, même en voulant admettre l'hypothèse d'une violation du droit d'être entendue, ce qui, en l'espèce, est manifestement à écarter, une telle violation aurait été réparée dans le cours de la présente procédure (v. *supra* consid. 2.3 *in fine*).

**2.5**

**2.5.1** La recourante soutient ensuite que l'Office USA aurait, de façon injustifiée, refusé de procéder à la mise sous scellés des documents la concernant (act. 7.10). L'Office USA retient que dite demande serait sans objet dès lors que la phase d'exécution était déjà terminée et que, de toute manière, seule la banque, en tant que détentrice, aurait pu solliciter la pose de scellés. Partant la révocation de la décision de clôture devrait être refusée (act. 7, p. 2 et 3).

**2.5.2** Contrairement à ce que l'Office USA prétend, la recourante serait légitimée à solliciter la mise sous scellés. En effet, le message du Conseil fédéral à propos de l'art. 248 al. 1 CPP (applicable par renvoi de l'art. 9 EIMP) fait mention d'une interprétation élargie du terme « détenteur ». La personne qui est autorisée à disposer des documents concernés par la mise sous scellés, notamment le titulaire du compte bancaire, doit également être considérée comme « détenteur » et peut, par conséquent, demander la mise sous scellés (ATF 140 IV 28 consid. 4.3.3 et les références citées).

Cependant, la requête de la recourante doit de toute manière être rejetée. Il convient en effet de relever que la demande de mise sous scellés est irrecevable. Elle aurait en effet dû être formulée directement auprès de l'autorité d'exécution et non pour la première fois devant l'autorité de recours (art. 248 CPP par renvoi de l'art. 9 EIMP). Partant, et au vu des considérants ci-dessus (*cf. supra* 2.4), la recourante ne peut pas se prévaloir du fait qu'elle n'eût pas été avertie de la procédure en cours pour justifier une requête tardive de mise sous scellés. Le grief de la violation du droit d'être entendue et, partant, du droit à un procès équitable doit dès lors, sous cet angle, être

- 9 -

également rejeté.

**2.6**

**2.6.1** La recourante soutient ensuite que l'accès au dossier aurait été insuffisant, l'Office USA ne lui aurait pas transmis toutes les pièces (act. 1, p. 11; 12). L'Office USA a reconnu avoir, par erreur, omis d'adresser une copie du courrier de levée de la confidentialité qui avait été adressée à la banque le 12 octobre 2018 (act. 7.13). Dans sa réponse au recours, il a toutefois indiqué que celui-ci ne serait pas essentiel pour permettre à la recourante de se déterminer sur la demande d'entraide et faire valoir les motifs qui s'opposeraient à la transmission de la documentation bancaire (act. 7, p. 3).

**2.6.2** En sus des considérants ci-dessus, il convient de rappeler que le droit de consulter le dossier s'étend à toutes les pièces décisives pour l'issue de la cause; *a contrario*, la consultation des pièces non pertinentes peut être refusée (*cf.* ATF 132 II 485 consid. 3.2; 121 I 225 consid. 2a p. 227). En matière d'entraide judiciaire, le droit d'être entendu est mis en œuvre par l'art. 9 LTEJUS. Cette disposition permet à l'ayant droit, à moins que certains intérêts ne s'y opposent (art. 9 al. 2 LTEJUS), de consulter le dossier de la procédure, la demande d'entraide et les pièces annexées. La consultation ne s'étend en tout cas qu'aux pièces pertinentes (ATF 119 Ia 139 consid. 2d; 118 Ib 438 consid. 3) et, selon l'art. 9 al. 1 LTEJUS *a contrario*, qu'aux pièces fournies par l'autorité requérante.

**2.6.3** En l'espèce, la recourante, par courrier du 15 janvier 2019, a requis que lui soit transmise la copie de l'ensemble des pièces du dossier (act. 7.8). Par missive du 16 janvier 2019, l'Office USA a envoyé à la recourante les pièces pertinentes (sur une clef USB), dont la documentation bancaire requise par les autorités américaines (act. 7.9). Il a cependant omis de transmettre la copie du courrier du 12 octobre 2018 précité. Celle-ci contenait l'information faite à la banque que la confidentialité était levée et que celle-ci pouvait informer son client de la procédure dont il faisait l'objet en Suisse. Force est de constater que cette omission ne saurait être qualifiée de grave. En effet, la pièce en question, qui ne contenait pas d'autres informations, n'était pas indispensable pour permettre à la recourante de prendre connaissance des aspects essentiels de la procédure et, le cas échéant, de faire valoir des motifs qui s'opposeraient à la demande d'entraide. Elle a d'ailleurs déposé un recours motivé et a détaillé les raisons pour lesquelles, selon elle, la transmission devrait être refusée. Elle n'indique en tout état de cause pas en quoi cette omission l'aurait empêchée de faire valoir tous ses moyens.

**2.7** Compte tenu de ce qui précède, le grief relatif à la violation du droit d'être entendu doit être rejeté.

- 10 -

**3.**

**3.1**  La recourante invoque également une violation de l'art. 28 TEJUS. L'autorité américaine qui a fait la demande d'entraide ne serait pas compétente (act. 1, p. 14; 15). Aucune procuration expresse ne figurerait dans la demande, de sorte que F., signataire de la demande d'entraide, ne serait pas compétent à ce propos.

**3.2**  Conformément à l'art. 28 al. 1 TEJUS, le traitement des demandes d'entraide judiciaire incombe à un office central. Aux Etats-Unis, celui-ci est le DOJ ou un mandataire désigné à cet effet. En l'espèce, la demande a été effectuée par F., directeur adjoint de l'*Office of International Affairs,* qui fait partie de la *Criminal Division,* qui fait, lui, partie du DOJ, soit l'autorité compétente pour adresser une demande d'entraide (act. 7.1, p. 1). En vertu du principe de la bonne foi entre les Etats, il n'y a pas de raison de douter que celui-ci ne soit pas compétent pour requérir, au nom du DOJ, l'entraide judiciaire à la Suisse. Partant, il n'y a pas non plus de motif de mettre en doute la valeur des informations fournies par le DOJ dans sa demande d'entraide. L'analyse de la recourante ne saurait dès lors être suivie (v. également arrêt du Tribunal pénal fédéral RR.2013.199-201 du 14 janvier 2014 consid. 3.1), de sorte que ce grief, mal fondé, doit également être rejeté.

**4.**

**4.1**  La recourante se plaint également d'une violation du principe de la proportionnalité (act. 1, p. 12 ss). Selon elle, il n'existerait aucun lien entre la recourante et l'enquête menée aux Etats-Unis, hormis le seul virement de USD 1'000'000.-- du 25 mai 2012 (*cf. supra* let. A). Le montant serait d'ailleurs bien inférieur au montant total du produit estimé des infractions en question et ne saurait dès lors constituer un lien suffisant. En outre, il ne serait pas proportionnel de transmettre les documents bancaires sur une période de sept ans (de 2012 à 2018), alors que les faits se sont déroulés entre 2012 et 2014. Elle soutient également que la transmission de la documentation bancaire entraînerait un danger pour les ayants-droit économiques du compte, de nationalité vénézuélienne, et leur famille, au vu de la situation politique actuelle au Venezuela.

**4.2**  Selon la jurisprudence relative au principe de la proportionnalité, lequel découle de l'art. 63 al. 1 EIMP, la question de savoir si les renseignements demandés sont nécessaires ou simplement utiles à la procédure pénale est en principe laissée à l'appréciation des autorités de poursuite de l'Etat requérant. Le principe de la proportionnalité interdit aussi à l'autorité suisse d'aller au-delà des requêtes qui lui sont adressées et d'accorder à l'Etat requérant plus qu'il n'a demandé. Cela n'empêche pas d'interpréter la

- 11 -

demande selon le sens que l'on peut raisonnablement lui donner. Le cas échéant, une interprétation large est admissible s'il est établi que toutes les conditions à l'octroi de l'entraide sont remplies; ce mode de procéder permet aussi d'éviter d'éventuelles demandes complémentaires (ATF 121 II 241 consid. 3a; 118 Ib 111 consid. 6; arrêt du Tribunal pénal fédéral RR.2009.286-287 du 10 février 2010 consid. 4.1). Sur cette base, peuvent aussi être transmis des renseignements et documents non mentionnés dans la demande (TPF 2009 161 consid. 5.2; arrêts du Tribunal pénal fédéral RR.2010.39 du 28 avril 2010 consid. 5.1; RR.2010.8 du 16 avril 2010 consid. 2.2). L'examen de l'autorité d'entraide est régi par le principe de l'« utilité potentielle » qui joue un rôle crucial dans l'application du principe de la proportionnalité en matière d'entraide pénale internationale (ATF 122 II 367 consid. 2c et les références citées). Sous l'angle de l'utilité potentielle, il doit être possible pour l'autorité d'investiguer en amont et en aval du complexe de faits décrits dans la demande et de remettre des documents antérieurs ou postérieurs à l'époque des faits indiqués, lorsque les faits s'étendent sur une longue durée ou sont particulièrement complexes (arrêt du Tribunal fédéral 1A.212/2001 du 21 mars 2002 consid. 9.2.2; arrêt du Tribunal pénal fédéral RR.2017.53-54 du 2 octobre 2017 consid. 8.2 *in fine*). C'est en effet le propre de l'entraide de favoriser la découverte de faits, d'informations et de moyens de preuve, y compris ceux dont l'autorité de poursuite étrangère ne soupçonne pas l'existence. Il ne s'agit pas seulement d'aider l'Etat requérant à prouver des faits révélés par l'enquête qu'il conduit, mais d'en dévoiler d'autres, s'ils existent. Il en découle, pour l'autorité d'exécution, un devoir d'exhaustivité, qui justifie de communiquer tous les éléments qu'elle a réunis, propres à servir l'enquête étrangère, afin d'éclairer dans tous ses aspects les rouages du mécanisme délictueux poursuivi dans l'Etat requérant (arrêts du Tribunal pénal fédéral RR.2010.173 du 13 octobre 2010 consid. 4.2.4/a et RR.2009.320 du 2 février 2010 consid. 4.1; ZIMMERMANN, La coopération judiciaire internationale en matière pénale, 5ᵉ éd. 2019, n° 723 s.).

Les autorités suisses sont tenues, au sens de la procédure d'entraide, d'assister les autorités étrangères dans la recherche de la vérité en exécutant toute mesure présentant un rapport suffisant avec l'enquête pénale à l'étranger, étant rappelé que l'entraide vise non seulement à recueillir des preuves à charge, mais également à décharge (ATF 118 Ib 547 consid. 3a; arrêt du Tribunal fédéral 1A.88/2006 du 22 juin 2006 consid. 5.3; arrêt du Tribunal pénal fédéral RR.2008.287 du 9 avril 2009 consid. 2.2.4 et la jurisprudence citée). L'octroi de l'entraide n'implique pas que la personne soumise à une mesure de contrainte dans l'Etat requis soit elle-même accusée dans l'Etat requérant. Dans le domaine de l'entraide judiciaire, les mesures de contrainte ne sont pas réservées aux seules personnes

- 12 -

poursuivies dans la procédure étrangère, mais à toutes celles qui détiendraient des informations, des pièces, des objets ou des valeurs ayant un lien objectif avec les faits sous enquête dans l'Etat requérant (arrêt du Tribunal fédéral 1A.70/2002 du 3 mai 2002 consid. 4.3; arrêt du Tribunal pénal fédéral RR.2013.301 du 22 mai 2014 consid. 6.2).

S'agissant de demandes relatives à des informations bancaires, il convient en principe de transmettre tous les documents qui peuvent faire référence au soupçon exposé dans la demande d'entraide; il doit exister un lien de connexité suffisant entre l'état de fait faisant l'objet de l'enquête pénale menée par les autorités de l'Etat requérant et les documents visés par la remise (ATF 129 II 461 consid. 5.3; arrêts du Tribunal fédéral 1A.189/2006 du 7 février 2007 consid. 3.1; 1A.72/2006 du 13 juillet 2006 consid. 3.1). Lorsque la demande vise à éclaircir le cheminement de fonds d'origine délictueuse, il convient en principe d'informer l'Etat requérant de toutes les transactions opérées au nom des personnes et des sociétés et par le biais des comptes impliqués dans l'affaire, même sur une période relativement étendue (ATF 121 II 241 consid. 3c). L'utilité de la documentation bancaire découle du fait que l'autorité requérante peut vouloir vérifier que les agissements qu'elle connaît déjà n'ont pas été précédés ou suivis d'autres actes du même genre (v. arrêt du Tribunal pénal fédéral RR.2018.88-89 du 9 mai 2018 consid. 4.2).

4.3   En l'espèce, l'on rappelle que l'autorité requérante enquête sur les agissements de B., soupçonné de plusieurs infractions pénales. Selon le dossier de l'Office USA, il a été démontré qu'il existe au moins un mouvement de fonds entre A. S.A. et D. SA, société qui aurait également été impliquée dans les agissements de B. C'est cette société même qui aurait par la suite effectué le virement de USD 1'000'000.-- le 25 mai 2012. Partant, bien que le montant puisse être inférieur au montant total du produit estimé des infractions, il n'apparaît pas disproportionné, mais au contraire conforme au principe de l'utilité potentielle, que l'autorité requérante veuille vérifier qu'il n'existe pas d'autres mouvements de fonds sur le compte de la recourante. De plus, même si les faits semblent se limiter aux années 2012 à 2014 selon la commission rogatoire, il n'en demeure pas moins que l'autorité requérante dispose d'un intérêt à vérifier elle-même que la recourante n'ait pas été impliquée dans des transactions ultérieures, dès lors que l'enquête est encore en cours. Partant, et contrairement aux affirmations de la recourante, la documentation bancaire à partir de l'année 2012 présente une utilité potentielle pour l'enquête étrangère, et elle a expressément été sollicitée par les autorités américaines. Il existe ainsi un lien de connexité suffisant qui justifie la transmission de ces données, dès lors que l'entraide vise non seulement à recueillir des preuves à charge, mais également à décharge.

- 13 -

4.4   Enfin, l'argument selon lequel les ayants-droit économiques et leur famille seraient en danger dans le cas où la documentation serait lue par des tiers et que les informations finiraient dans les mains de criminels ne saurait en l'espèce être suivi. La recourante ne démontre pas concrètement être exposée à un danger, mais se contente d'exposer la situation générale, certes compliquée, du Venezuela. De plus, les arguments avancés concernant des tiers n'ont pas à être examinés par l'autorité de céans. Dans tous les cas, en vertu du principe de la bonne foi (art. 5 al. 3 Cst) et du principe de la spécialité (art. 67 EIMP) entre les Etats, il n'y a pas de raison de douter que l'Etat traitera de manière confidentielle toute la documentation transmise dans le cadre de l'entraide demandée.

4.5   Le grief de violation du principe de la proportionnalité est donc mal fondé.

5.   Il s'ensuit que le recours est mal fondé et doit, partant, être rejeté.

6.   Les frais de procédure, comprenant l'émolument d'arrêté, les émoluments de chancellerie et les débours, sont mis à la charge de la partie qui succombe (art. 63 al. 1 PA, applicable par renvoi de l'art. 39 al. 2 let. b LOAP). Le montant de l'émolument est calculé en fonction de l'ampleur et de la difficulté de la cause, de la façon de procéder des parties, de leur situation financière et des frais de chancellerie (art. 73 al. 2 LOAP). La recourante supportera ainsi les frais du présent arrêt, fixés à CHF 5'000.-- (art. 73 al. 2 LOAP, art. 8 al. 3 du règlement du Tribunal pénal fédéral sur les frais, émoluments, dépens et indemnités de la procédure pénale fédérale du 31 août 2010 [RFPPF; RS 173.713.162] et art. 63 al. 5 PA), entièrement couverts par l'avance de frais effectuée.

- 14 -

**Par ces motifs, la Cour des plaintes prononce:**

1. Le recours est rejeté.

2. Un émolument de CHF 5'000.--, intégralement couvert par l'avance de frais versée, est mis à la charge de la recourante.

Bellinzone, le 18 avril 2019

Au nom de la Cour des plaintes
du Tribunal pénal fédéral

Le président:                                              La greffière:

**Distribution**

-   Mes Thomas Sprenger et Yves Pellet, avocats
-   Office fédéral de la justice, Office central USA

**Indication des voies de recours**

Le recours contre une décision en matière d'entraide pénale internationale doit être déposé devant le Tribunal fédéral dans les 10 jours qui suivent la notification de l'expédition complète (art. 100 al. 1 et 2 let. b LTF).

Le recours n'est recevable contre une décision rendue en matière d'entraide pénale internationale que s'il a pour objet une extradition, une saisie, le transfert d'objets ou de valeurs ou la transmission de renseignements concernant le domaine secret et s'il concerne un cas particulièrement important (art. 84 al. 1 LTF). Un cas est particulièrement important notamment lorsqu'il y a des raisons de supposer que la procédure à l'étranger viole des principes fondamentaux ou comporte d'autres vices graves (art. 84 al. 2 LTF).

# EXHIBIT 16

Bundesgericht
Tribunal fédéral
Tribunale federale
Tribunal federal



**1C_234/2019**

**Arrêt du 13 mai 2019**

**Ire Cour de droit public**

Composition
MM. les Juges fédéraux Chaix, Président,
Fonjallaz et Kneubühler.
Greffière : Mme Kropf.

Participants à la procédure
A._____ S.A., représentée par Maîtres Thomas Sprenger et Yves Pellet, avocats,
recourante,

*contre*

Office fédéral de la justice - Office central USA.

Objet
Entraide judiciaire internationale en matière pénale avec les États-Unis d'Amérique; remise de moyens de preuve,

recours contre l'arrêt de la Cour des plaintes du Tribunal pénal fédéral du 18 avril 2019 (RR.2019.11).

**Faits :**

**A.**
Le 13 mars 2018, le Département américain de justice (Department of Justice; ci-après : DOJ) a demandé l'entraide aux autorités suisses dans le cadre d'une enquête dirigée contre B._____. Il était exposé que la compagnie pétrolière d'État de V._____, E._____ SA, aurait, en mars 2012, conclu un contrat de prêt avec plusieurs sociétés-écrans; elle leur aurait emprunté des V.B._____ (devise locale), remboursés ensuite en dollars américains à un taux lucratif fixé par l'État, ce dernier possédant un système d'échange de devises étrangères par lequel ses devises locales (V.B._____) étaient échangées à un taux fixe pour les dollars américains, bien inférieur au véritable taux. Ce système aurait été possible grâce à des paiements corruptifs faits à des officiers de V._____. Les dollars américains pouvaient ensuite être changés au marché noir, ce qui permettait la réalisation d'une plus-value importante. Plus de USD 4.5 milliards auraient été ainsi détournés, principalement à travers des comptes ouverts en Suisse par B._____; ce dernier aurait en outre perçu USD 22 millions via des commissions, dont une partie aurait été utilisée pour acheter des biens immobiliers aux États-Unis d'Amérique (USA).
Cette demande a été complétée le 25 mai 2018. Parmi les sociétés impliquées figure également C._____ SA, laquelle aurait participé aux opérations précitées en utilisant des comptes en Suisse. L'autorité requérante a notamment identifié un versement de USD 1'000'000.- effectué le 25 mai 2012 à destination du compte suisse appartenant à A._____ S.A., relation bancaire détenue auprès de la banque D._____ SA à Zurich. Dans ce complément, l'autorité requérante a sollicité notamment la remise

de la documentation bancaire complète relative aux comptes détenus par A._____ S.A. auprès de la banque susmentionnée depuis le 1er janvier 2012 jusqu'à ce jour.

Le 25 juillet 2018, l'Office fédéral de la justice - par son Office central USA (ci-après : OFJ) - est entré en matière sur la demande américaine et en a confié l'exécution au Ministère public de la République et canton de Genève. Les faits sous enquête peuvent être qualifiés, selon l'OFJ, de blanchiment d'argent (art. 305bis CP), de gestion déloyale des intérêts publics (art. 314 CP) et de corruption privée passive (art. 322novies CP). En exécution de cette décision, le Ministère public genevois a requis, par ordonnance de dépôt du 20 septembre 2018, l'édition de la documentation bancaire concernant A._____ S.A., notamment les documents d'ouverture complets, l'existence d'un "safe", les relevés et avis de mouvements de compte du 1er janvier 2012 jusqu'à ce jour, les estimations complètes et détaillées au 31 décembre des années 2012 à 2017 et à ce jour, ainsi que les notes internes et la correspondance.

Par courrier du 12 octobre 2018, l'OFJ a informé la banque D._____ SA que l'interdiction de communiquer - qui avait été ordonnée dans le cadre de la décision d'entrée en matière - était levée et que l'établissement était autorisé à informer ses éventuels clients touchés par l'ordonnance de dépôt du Ministère public genevois de l'existence de la demande d'entraide et de tous les faits s'y rapportant.

Par décision de clôture du 21 décembre 2018, l'OFJ a ordonné la transmission à l'autorité requérante de la documentation bancaire relative au compte n° xxx ouvert auprès de la banque D._____ SA au nom de A._____ S.A.

**B.**
Le 18 avril 2019, la Cour des plaintes du Tribunal pénal fédéral a rejeté le recours formé par A._____ S.A. le 25 janvier 2019 contre cette décision. Cette autorité a écarté les différents griefs soulevés en lien avec le droit d'être entendu; en particulier, elle a constaté la validité de la procédure de notification via la banque, procédé qui permettait, le cas échéant, à l'intéressée de se déterminer, l'irrecevabilité de la demande de scellés adressée tardivement et uniquement à l'autorité de recours et l'accès aux pièces pertinentes (cf. consid. 2 p. 4 ss). La Cour des plaintes a également déclaré l'incompétence alléguée du représentant du DOJ sans fondement (cf. consid. 3 p. 10) et a relevé l'utilité potentielle des documents bancaires requis, respectivement la proportionnalité de la période visée par la requête (2012 à 2018 [cf. consid. 4 p. 10 ss]).

**C.**
Par acte du 3 mai 2019, A._____ S.A. forme un recours en matière de droit public contre cet arrêt, concluant à son annulation et, à titre subsidiaire, au renvoi de la cause à l'autorité précédente, respectivement à l'OFJ.
Il n'a pas été demandé de réponse.

**Considérant en droit :**

**1.**
Conformément à l'art. 54 al. 1 LTF, le présent arrêt sera rendu en français, langue de l'arrêt attaqué, même si le recours a été libellé en allemand, comme l'autorise l'art. 42 al. 1 LTF.

**2.**
Selon l'art. 109 al. 1 LTF, la cour siège à trois juges lorsqu'elle refuse d'entrer en matière sur un recours soumis à l'exigence de l'art. 84 LTF.

**2.1.** A teneur de l'alinéa 1 de la seconde disposition susmentionnée, le recours est recevable à l'encontre d'un arrêt du Tribunal pénal fédéral en matière d'entraide judiciaire internationale si celui-ci a pour objet notamment la transmission de renseignements concernant le domaine secret et s'il concerne un cas particulièrement important. Un cas est particulièrement important notamment lorsqu'il y a des raisons de supposer que la procédure à l'étranger viole des principes fondamentaux ou comporte d'autres vices graves (art. 84 al. 2 LTF).

Ces motifs d'entrée en matière ne sont toutefois pas exhaustifs et le Tribunal fédéral peut être appelé à intervenir lorsqu'il s'agit de trancher une question juridique de principe ou lorsque l'instance précédente s'est écartée de la jurisprudence suivie jusque-là (**ATF 142 IV 250** consid. 1.3 p. 254).

En vertu de l'art. 42 al. 2 LTF, il incombe au recourant de démontrer que les conditions d'entrée en matière posées à l'art. 84 LTF sont réunies (**ATF 139 IV 294** consid. 1.1 p. 297). En particulier, il ne suffit pas d'invoquer des violations des droits fondamentaux de procédure pour justifier l'entrée en matière; seule une violation importante, suffisamment détaillée et crédible peut conduire, le cas échéant, à considérer que la condition de recevabilité posée à l'art. 84 al. 2 LTF est réalisée (arrêt 1C_393/2018 du 14 décembre 2018 consid. 1.4 et 1.5 destinés à la publication).

**2.2.** La présente cause porte certes sur la transmission de documents bancaires, soit des renseignements touchant le domaine secret. Toutefois, compte tenu des faits à l'origine de la demande - soit des infractions dont la recourante ne prétend pas qu'elles auraient un caractère politique ou fiscal - et de la nature de la transmission envisagée - limitée à la documentation relative à des comptes bancaires -, le cas ne revêt en soi aucune importance particulière.

**2.3.** La recourante soutient en substance que tel serait le cas vu les violations systématiques par l'OFJ de son droit d'être entendue (cf. ad 7 de son mémoire). Sur le fond, elle prétend notamment qu'il ne serait pas établi par le dossier que le courrier du 12 octobre 2018 levant l'interdiction de communication pour la banque aurait été reçu par cette dernière (cf. ad 22 ss du mémoire de recours), respectivement que cette lettre aurait été placée dans son dossier "banque restante" (cf. ad 38 ss de cette même écriture). Il en résulterait qu'elle n'aurait ainsi pas pu se déterminer notamment sur la demande d'entraide.

La recourante ne remet pas en cause l'existence d'une convention de "banque restante" dans le cas d'espèce (cf. ad 47 du recours), ni les règles en matière de notification prévalant dans une telle situation, à savoir qu'une communication à l'établissement bancaire lui est directement opposable dès le moment où elle aurait pu/dû recevoir ladite information si la banque la lui avait adressée sans retard (**ATF 124 II 124** consid. 2d/dd p. 129 s.; voir également sur cette problématique en matière pénale **ATF 130 IV 43** consid. 1.3 p. 45 s. et arrêt 1B_239/2016 du 19 août 2016 consid. 3.4 qui rappellent ces principes; plus récemment en matière civile, arrêt 4A_119/2018 du 7 janvier 2019 consid. 6.1.1).

La recourante ne conteste pas non plus avoir reçu, par l'intermédiaire de la banque, la décision de clôture rendue par l'OFJ le 28 décembre 2018 (cf. notamment ad 24 s. de son mémoire). Dès lors que, selon la recourante, la banque se réfère à l'interdiction de communiquer au moment de procéder à cet envoi (cf. ad 34 du recours) - ce qui tend certainement à expliquer le défaut de communication antérieure -, on peut légitimement considérer que cet établissement a reçu, à un moment donné ou à un autre, la levée de cette mesure, puisqu'à défaut, elle n'aurait en principe pas pu procéder à cet envoi. Un retard de sa part dans la communication à la recourante - ce qui pourrait expliquer le défaut de mention expresse du courrier du 12 octobre 2018 dans sa lettre d'envoi du 28 décembre 2018 (cf. ad 34 du mémoire) - ne saurait ainsi en tout cas pas être reproché à l'OFJ. Celui-ci a de plus attendu deux mois avant de notifier la décision de clôture à la banque, soit une durée permettant tant la transmission des documents à la recourante qu'une éventuelle intervention de sa part, à tout le moins afin de requérir un délai pour se déterminer ou déposer une requête de mise sous scellés. Une violation par l'OFJ des droits de procédure de la recourante n'apparaît ainsi pas manifeste au sens de la jurisprudence afin de justifier une entrée en matière (**ATF 133 IV 125** consid. 1.4 p. 129; arrêts 1C_393/2018 du 14 décembre 2018 consid. 1.4 et 1.5 destinés à la publication et les arrêts cités).

Cela vaut au demeurant d'autant plus que l'autorité précédente paraît avoir répondu d'une manière circonstanciée à l'ensemble des griefs de la recourante (cf. consid. 2 p. 4 ss du jugement entrepris), relevant notamment que certaines violations - dans la mesure où elles auraient dû être admises - avaient pu être guéries au cours de la procédure de recours (cf. consid. 2.4.4 p. 8 de l'arrêt attaqué).

**2.4.** La recourante soutient encore que la cause serait particulièrement importante dès lors que le Tribunal fédéral n'aurait jamais examiné l'obligation - contestée - incombant aux personnes concernées par une requête d'entraide de se manifester sans délai auprès des autorités (cf. ad 8 de son recours).

L'intérêt public lié à une exécution rapide des décisions relatives à l'entraide internationale est reconnu par la jurisprudence (**ATF 124 II 124** consid. 2d/dd p. 130). Dans ce même arrêt, il a également été relevé que le principe de la bonne foi, ainsi que celui de célérité posé à l'art. 17a EIMP imposaient que les contestations pouvant surgir à propos d'une demande d'entraide soient soulevées sans délai. On ne voit dès lors pas quelle question importante ou de principe n'aurait pas encore été traitée.

**3.**
Il s'ensuit que le recours est irrecevable.
La recourante, qui succombe, supporte les frais judiciaires (art. 66 al. 1 LTF). Il n'est pas alloué de dépens (art. 68 al. 3 LTF).

   **Par ces motifs, le Tribunal fédéral prononce :**

**1.**
Le recours est irrecevable.

**2.**
Les frais judiciaires, arrêtés à 2'000 fr., sont mis à la charge de la recourante.

**3.**

Le présent arrêt est communiqué à la recourante, à l'Office fédéral de la justice - Office central USA -, et à la Cour des plaintes du Tribunal pénal fédéral.

Lausanne, le 13 mai 2019

Au nom de la Ire Cour de droit public
du Tribunal fédéral suisse

Le Président : Chaix

La Greffière : Kropf

# EXHIBIT 17



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID FNK-6137

OFFICE OF FOREIGN ASSETS CONTROL

### DESIGNATION AND BLOCKING MEMORANDUM

The Office of Foreign Assets Control, pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act), in consultation with the Attorney General, the Director of the Central Intelligence Agency, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, the Secretary of State, and the Secretary of Homeland Security, finds that there is reason to believe that the two individuals, 13 entities, and one aircraft identified below and in the attached evidentiary memorandum are persons (a) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of, a person designated pursuant to the Kingpin Act, (b) owned, controlled, or directed by, or acting for or on behalf of, persons designated pursuant to the Kingpin Act, and/or (c) playing a significant role in international narcotics trafficking, and therefore are designated or blocked pursuant to sections 805(b)(2), (3) and/or (4) of the Kingpin Act, 21 U.S.C. § 1904(b)(2), (3) and/or (4).

#### Individuals

1. EL AISSAMI MADDAH, Tareck Zaidan (a.k.a. EL AISSAMI, Tareck; a.k.a. EL AISSAMI, Tarek), Venezuela; DOB 12 Nov 1974; POB El Vigia, Merida, Venezuela; citizen Venezuela; Gender Male; Passport C1668015 (Venezuela); Identification Number 12.354.211 (Venezuela); Executive Vice President; Former Governor of Aragua State (individual) [SDNTK].

2. LOPEZ BELLO, Samark Jose (a.k.a. LOPEZ DELGADO, Samark), Caracas, Venezuela; DOB 27 Jul 1974; POB Venezuela; citizen Venezuela; Gender Male; Passport 122560011 (Venezuela); alt. Passport 055439970 (Venezuela); alt. Passport 002494535 (Venezuela); Identification Number 11.208.888 (Venezuela) (individual) [SDNTK] (Linked To: PROFIT CORPORATION, C.A.; Linked To: YAKIMA TRADING CORPORATION; Linked To: GRUPO SAHECT, C.A.; Linked To: ALFA ONE, C.A.; Linked To: SMT TECNOLOGIA, C.A.; Linked To: SERVICIOS TECNOLOGICOS INDUSTRIALES, C.A.; Linked To: MFAA HOLDINGS LIMITED; Linked To: 1425 BRICKELL AVE 63-F LLC; Linked To: 1425 BRICKELL AVENUE UNIT 46B, LLC; Linked To: 1425 BRICKELL AVENUE 64E LLC; Linked To: AGUSTA GRAND I LLC; Linked To: 200G PSA HOLDINGS LLC).

FNK-23166 0001

FNK-6137 0001



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

(U) Case ID FNK-6137

(U) OFFICE OF FOREIGN ASSETS CONTROL

(U) **EVIDENTIARY MEMORANDUM**

Dated 2/10/2017

(U) MEMORANDUM FOR: ANDREA M. GACKI
ACTING DEPUTY DIRECTOR
OFFICE OF FOREIGN ASSETS CONTROL

(U) THROUGH:  GREGORY T. GATJANIS    Dated 2/3/2017
ASSOCIATE DIRECTOR
OFFICE OF GLOBAL TARGETING

MARK SAMARA    Dated 2/3/2017
ASSISTANT DIRECTOR
CRIME/NARCOTICS & WESTERN HEMISPHERE DIVISION

Dated 2/3/2017

SECTION CHIEF
SOUTH AMERICA/INTERNATIONAL SECTION

(U) FROM:    Dated 2/3/2017

Sanctions Investigator
South America/International Section

(U) SUBJECT:  Proposed designation of two individuals and eight entities as
Specially Designated Narcotics Traffickers, and the blocking of
five U.S. entities and an aircraft, pursuant to the Foreign Narcotics
Kingpin Designation Act

**I.   (U) Summary**

(U) The information presented in this memorandum and the related exhibits provide reason to
believe that each of the individuals and foreign entities identified below is a "foreign person"
who is:

- (U) materially assisting in, or providing financial or technological support for or to, or
providing goods or services in support of, the international narcotics trafficking
activities of an individual proposed for designation in this memorandum; and/or

# EXHIBIT 18

Reuters

# Exclusive: Giuliani told U.S. his client deserves leniency for financing Venezuela's opposition – Parnas

By Aram Roston, Matt Spetalnick and Brian Ellsworth
January 22, 2020 6:43 AM EST Updated January 22, 2020



FILE PHOTO: U.S. President Trump's personal lawyer Rudy Giuliani has coffee with Ukrainian-American businessman Lev Parnas at the Trump International Hotel in Washington, U.S. September 20, 2019. REUTERS/Aram Roston/File

WASHINGTON (Reuters) - At a lavish August gathering at a private estate in Spain, a wealthy Venezuelan businessman under criminal investigation in the United States introduced Rudy Giuliani, President Donald Trump's personal lawyer, to the father of Venezuela's opposition leader, Juan Guaido.

The affair was part of a campaign for leniency for the businessman, Alejandro Betancourt, who sought to demonstrate his close ties to opposition figures looking to oust Venezuela's socialist President Nicolas Maduro - a key objective of the Trump administration.

1

Betancourt told Giuliani he secretly helped bankroll Guaido's efforts to take over the leadership of Venezuela, according to four people familiar with the situation, two of whom provided details about the meeting in Spain. Betancourt hoped those bona fides would enable Giuliani, his lawyer, to persuade Trump's Justice Department to drop its probe of Betancourt in connection with a Florida money laundering and bribery case, the people said.

A month later, at a meeting in Washington, D.C., Giuliani urged Justice Department prosecutors to go easy on Betancourt, according to a person with direct knowledge of the meeting, and Lev Parnas, a former Giuliani associate, who said Giuliani told him about it soon afterward. Parnas and the other person said Giuliani told prosecutors that Betancourt had provided assistance for Guaido's political efforts, and was therefore doing good work for the United States.

This is the first time Parnas detailed his story about Betancourt, Giuliani and Venezuela.

Giuliani declined to confirm meeting with U.S. prosecutors on Betancourt's behalf and wouldn't say whether the Venezuelan businessman is a client. "Lev Parnas has no right to be talking about that meeting," Giuliani told Reuters in a brief phone interview. "It was a confidential meeting - if it did happen."

"Lev Parnas's credibility is worth nothing," Giuliani said.

The Justice Department declined to comment. Betancourt and his attorney Frank Wohl did not respond to multiple requests for comment.

Reuters couldn't determine whether Betancourt did provide financing to the U.S.-backed opposition or if he was just claiming he did.

Guaido and the main opposition political party, Popular Will, both denied receiving funding from Betancourt. Guaido was a member of Popular Will until he stepped back from it earlier this month.

"I do not know Mr. Betancourt, there is no relationship," Guaido told Reuters. "As such, that is not possible."

Wilmer Guaido, Guaido's father, denied meeting Betancourt in Spain. "I only support my son like the whole family against that criminal dictatorship but I have not met anyone," he said.

Giuliani's meeting with Betancourt at the Spanish estate, and his efforts to lobby the Justice Department on the businessman's behalf, were previously reported by the Washington Post. Reuters is the first to report that Betancourt told Giuliani that he provided financial support for Venezuela's opposition, and that Giuliani touted that

alleged assistance to U.S. prosecutors as a reason to remove the legal cloud dogging his client.

The episode speaks to the complex roles that Giuliani, the former New York City mayor, has played in Washington since Trump took office in 2017.

Giuliani frequently proclaims himself a business consultant and lawyer working on behalf of private clients. Yet he also enjoys extraordinary access to the halls of power as the president's unpaid personal attorney - work that has landed him at the center of Trump's impeachment trial.

Any attempt by a Giuliani client to avoid possible prosecution by claiming to have been backing an American foreign policy objective - the toppling of Maduro in this case - could prove embarrassing to the administration.

The White House did not immediately respond to a request for comment.
Parnas played a key role in Giuliani's effort to dig up dirt on Democratic presidential candidate Joe Biden in Ukraine for Trump. Now under indictment for campaign finance violations, Parnas has been sharing information with Capitol Hill impeachment investigators, as well as the media, about the extent of the work he did for Giuliani.

Betancourt said "he was backing Guaido financially," Parnas told Reuters, and "was helping America with his cause."

Since January 2019, the United States and dozens of other countries have recognized Guaido as Venezuela's rightful president. But Maduro has remained firmly in power, much to the frustration of the Trump administration.

Maduro's government cut off paychecks for opposition lawmakers in 2016 after the opposition took control of the National Assembly.

Claims that Betancourt helped finance his country's opposition are potentially explosive in Venezuela, where the mogul forged a profitable relationship with the socialist government. Derwick Associates, his Caracas-based energy firm, obtained hundreds of millions of dollars in state contracts to build power plants under Maduro's predecessor, Hugo Chavez, according to local media.

In a statement to Reuters, the opposition Popular Will party said that "information about the supposed remittance of funds by Alejandro Betancourt to our political organization is not true."

The existence of the U.S. criminal probe of Betancourt was confirmed to Reuters by a source familiar with the matter.  The Miami Herald reported last November that the investigation is linked to a large money laundering case in Miami, and that Betancourt is an unindicted co-conspirator listed, but not named, in legal records. The 2018 charges accused eight defendants of embezzling $1.2 billion from Venezuela's government-

owned oil company PDVSA, then laundering it through schemes in Miami involving false real estate and security deals.

A representative of Betancourt who declined to be identified said the magnate "didn't do anything and he has not been charged with any wrongdoing." He also told Reuters that the businessman had provided "very substantial" financial support to Venezuela's opposition.

PDVSA did not respond to a request for comment.

At the State Department, Elliott Abrams, the U.S. Special Representative for Venezuela, told Reuters the administration is aware of the lack of transparency in the opposition's financing.

"We're concerned about who are all these people, and how did they make their money. And that is something we have raised with the opposition," Abrams said.
Asked whether Betancourt was one of those individuals of concern, Abrams said: "No comment on individual names."

He added that Giuliani had not been authorized to play any role in U.S. policy in Venezuela.

'HELPING THE UNITED STATES'

Parnas said the August meeting at Betancourt's estate outside Madrid, and the presence of Guaido's father, were meant to demonstrate Betancourt's strong ties to Guaido and his support for U.S. interests in Venezuela. It was to show Giuliani "that Betancourt is a really important person for the cause and that he is helping America," Parnas said.

The lobbying took place in Washington the month after the Spain meeting. Giuliani met with Assistant U.S. Attorney General Brian Benczkowski, a Justice Department lawyer working on the case, and some other government lawyers, according to Parnas and the person with direct knowledge of that meeting.

Department of Justice spokesman Peter Carr, who handles communications for Benczkowski, said the department declined to comment.

The person said Giuliani was there with two other Betancourt lawyers, and made his pitch that the prosecutors let Betancourt off the hook for the case in Florida.
Giuliani first insisted there wasn't enough evidence to prosecute the case. He then moved to U.S. foreign policy, pointing to Betancourt's alleged support for Guaido. "This guy's been helping the United States," the person with direct knowledge of the meeting said in describing Giuliani's reasoning.

Giuliani argued that Betancourt was crucial to the survival of the Venezuelan opposition, and he urged the Justice Department lawyers to talk to Guaido themselves to corroborate his claims, the person said.

Reporting by Aram Roston and Matt Spetalnick in Washington, Brian Ellsworth in Caracas; Additional reporting by Paola Luelmo in Madrid; Editing by Marla Dickerson

# EXHIBIT 19

https://vickyward.com/article/exclusive-photos-of-giuliani-in-spain-show-lev-parnas-has-lots-more-to-share/

February 7, 2020 / CNN

## *Exclusive photos of Giuliani in Spain show Lev Parnas has lots more to share*

\* \* \*

### Betancourt courts Giuliani

Parnas, Giuliani and Fruman met Betancourt, 40, in June at a Yankees game in London, according to both Parnas and another source with knowledge of their meeting. Two of the photos obtained by CNN show Giuliani and Parnas at the game. In one, Giuliani is seen using electronic equipment that Parnas says is for taping his podcast. In the other, they are in the Yankees' dugout. News of Giuliani and Parnas at the game was first reported by CNN's KFile.

In London, Parnas says **Betancourt asked Giuliani to join his legal team, which already consisted of two long-time Giuliani friends: former US attorney Frank Wohl and the Miami-based former Watergate prosecutor Jon Sale. "Frank and Jon are great lawyers. The only reason Rudy was needed as well was to exert leverage with Barr," Parnas told CNN. A separate source familiar with Betancourt's legal strategy told CNN that Giuliani's connections at the Justice Department, including familiarity with Barr, were considered helpful by Betancourt.** Giuliani did not comment on Parnas' assertion.

Parnas told CNN that hiring lawyers close to Barr was an idea being deployed at the same time by Firtash, who shared that thinking with him. "For both Firtash and for Betancourt, the only point of hiring these lawyers was to get to Barr," Parnas said.

At the Yankees game and in discussions in London afterwards, Parnas says Betancourt invited Giuliani, himself and others to Spain.

### A castle near Madrid

Most of the newly-released images and a video shared with CNN document a week-long trip Parnas took with Giuliani last summer to a castle outside Madrid to meet Betancourt.

According to Parnas, who spoke to CNN about the trip, no expense was spared in the effort to impress the President's personal attorney and a large entourage traveling with him, including the families of Parnas and Fruman. The trip was first reported by the Daily Beast. Giuliani told the Daily Beast he was there for business and vacation.

1

Parnas told CNN that **Giuliani made two videos while there, and was told by Giuliani that they would serve two purposes. First, to help Betancourt, a Venezuelan energy executive who is looking to stave off potential criminal charges connected to a billion-dollar money-laundering case filed in Florida last year.**

**Second, the video was intended to show that Betancourt was of value to Juan Guaido, the head of Venezuela's opposition-controlled parliament, who has been recognized by more than 50 countries, including the U.S, as the interim president.**

"The purpose of the videos was 100 percent to show Trump how helpful Betancourt was to the Guaidos," said Parnas. **The Trump administration's support for Guaido was on display this week. Guaido was a guest at the President's State of the Union speech and spent two days in Washington meeting with Trump at the White House and members of the State Department.** He received a standing ovation from both Republicans and Democrats when Trump referred to Guaido in his address, going on to call him the "true and legitimate president of Venezuela."

A source familiar with Giuliani's legal strategy confirms that Giuliani made video recordings for the Justice Department, but denies Parnas' claim that any videos were intended for the President. There is no indication Giuliani showed the videos at the Justice Department or to Trump. The Justice Department declined to comment for this story. Betancourt and his lawyers did not respond to CNN requests for comment.

When asked about the trip to Madrid and the video-recordings of Betancourt, Giuliani had this to say in a text to CNN: "Your story about the interview[s] is given to you by not just an unreliable source, but a proven liar… I can't discuss any tape recordings or confirm or deny them."

Parnas, who does not possess the videos, is adamant the recordings were also intended for the President. "I would swear under oath that the purpose of the Guaido recording and the Betancourt recording was to be shown to President Trump — although Betancourt's video was designed to be shown principally to the Justice Department and Barr."

**August in Spain**

Parnas says he was often asked to arrange logistics for Giuliani and tend to the smallest of his needs. One photograph reviewed by CNN shows Parnas wiping Giuliani's face.

Messages from Parnas' cell phone that were handed over to House investigators for the impeachment hearing show that details of Giuliani's trip to Madrid were organized by Parnas, who arranged for an airport greeter. "When you arrive in Madrid their [sic] will

be someone waiting for you with a sign that says 'NUBA' at the door of the plane. They will take you through cotumes [sic]."

The trio's first stop in Madrid was with Andriy Yermak, the right hand of Volodymyr Zelensky, the new Ukraine president.

After that, according to Parnas, a large group descended on the castle, El Castillo del Alamín. The group included Giuliani's girlfriend, Dr. Maria Ryan and Wohl, as well as the Parnas and Fruman families. Wohl did not respond to request for comment, but a source close to Giuliani verified Parnas' account of the guest list. A photo shows Giuliani sitting in a chair smoking a cigar with Ryan in his lap. Another has them posing for a photo with Betancourt in the background.

**Wilmer Guaido at a castle outside Madrid.**

**<u>Also in attendance was Wilmer Guaido, the taxi-driving father of Venezuela's struggling opposition leader Juan Guaido, Parnas and another source told CNN.</u>** Wilmer Guaido is pictured in one of the images grabbing an hors d'oeuvre. He did not respond to questions from CNN about his presence at the castle. That the elder Guaido was at the gathering was first reported by Reuters.

During the trip, Parnas says that Giuliani set up his recording equipment on the castle grounds and made video interviews with both Betancourt and Wilmer Guaido. He also spoke with Juan Guaido via FaceTime, according to Parnas.

**<u>"Giuliani told me that Betancourt explained in his interview that he had given secret financial support to the Guaido family and regime," Parnas told CNN. This would clearly put Betancourt in good standing with the President, since Guaido's position is predicated on US support.</u>**

Betancourt and his lawyer have not responded to CNN for comment. Reuters reported that Guaido has denied any financial relationship to Betancourt. Reuters was not able to determine if Betancourt helped to finance the U.S.-backed opposition.

Betancourt, who has made millions from Venezuelan government contracts, was presumed to be a supporter of the rival, oppressive regime of the socialist Nicolas Maduro. The US has recognized Guaido and not Maduro as the official Venezuelan president since early 2019.

While in Spain, **<u>Giuliani told Parnas that he was confident he could get Betancourt's legal problems "cleared up in a couple of weeks,"</u>** according to Parnas.

A month later, in September, Giuliani met with Justice Department officials to discuss Betancourt's case and Barr dropped in on the meeting. A source familiar with the gathering says that the videos were not shown to Barr and would not comment on

whether they were shown to lawyers there. The Justice Department declined to comment on the meeting.

Afterwards, Parnas says he met up with Giuliani at the Trump International hotel in DC. According to a conversation that Parnas says the two had, Giuliani appeared to think the meeting had gone well. But that was before Parnas and Fruman were arrested on indictments in early October followed by reports that Giuliani is under federal investigation.

# EXHIBIT 20

# **infödio** (/index.php/)

🔲 English
(/07022020/alejandro/betancourt/wilmer/guaido/financing/national/security/rudy/giuliani/)   🔲 Español
(/es/node/993)

Home (/index.php/)     Who is...? (/index.php/290813/who)     Forum (/index.php/forum/4)

About (/index.php/about)     Contact (/index.php/contact)

Message to INFODIO readers: investigative journalism, which is what this site does, takes lots of time. Visiting media looking for a quick run down on Venezuela's gargantuan corruption, have the decency to at least cite the source (https://twitter.com/alekboyd/status/1121514133323644937) when plagiarising this site's content without attribution (https://infodio.com/030119/corruption/journalism/argus/media/plagiarism) (exhibit Reuters here (https://twitter.com/infodi0/status/1261348078902284288) and here (https://infodio.com/25062021/reuters/angus/berwick/special/report/derwick/alejandro/betancourt), exhibit Bloomberg here (https://infodio.com/29052020/bloomberg/reuters/plagiarism/venezuela), exhibit OCCRP here (https://infodio.com/17022021/plagiarism/exhibit/occrp/drew/sullivan)). To all readers, do the right thing, the honest thing: support independent investigative journalism, help us expose rampant corruption. Note added 28/06/2021: impostors are using INFODIO's former editor's full name, and a fake email address (alek.boyd.arregui at gmail.com) to send copyright infringement claims / take down requests to web hosting companies (exhibit Hostgator (https://twitter.com/infodi0/status/1409189789635653640)). The attempt is yet another effort (https://infodio.com/20052021/jp/morgan/eduardo/travieso/guillermo/drew-bear/tamayo/derwick/online/reputation/management) paid by corrupt thugs to erase information about their criminal activities (https://infodio.com/es/terrorismo/boliburgues). Infodio.com has no issues with other websites / journalists using / posting information published here, so long as the source is properly cited.

## **"Matter of national security": Rudy Giuliani tells CNN Alejandro Betancourt meeting Wilmer Guaido, financing Juan Guaido, can't be discussed**

5 years ago  |  By Alek Boyd



Just have a listen to what Rudy Giuliani told CNN (https://edition.cnn.com/2020/02/07/politics/lev-parnas-exclusive-images-giuliani/index.html)... To say that I am utterly flabbergasted is an understatement, so much so I just couldn't resist making this public comment. Alejandro Betancourt is one of the biggest thugs Venezuela has ever produced. To his eternal credit, he and his chums basically left the country in darkness. Literally. He then went to establish associations with Russia's FSB, and bribed Rafael Ramirez into letting him and his mates misappropriate / syphon, at the very least, $5.7 billion USD (https://infodio.com/30012020/switzerland/federal/court/derwick/gazprombank/oberto/money/laundering/p

Betancourt is now part of Juan Guaido's circle of friends / financiers. Last August, he dispatched his father Wilmer, to a gathering at Betancourt's castle near Madrid, and then facetimed with Giuliani AND Betancourt to advance the notion that, erm, as Betancourt was "helping the cause" he should be spared from any Justice Department's criminal probes. That's Juan Guaido ladies and gents. That's Venezuela's "new hope".

I will reiterate: Juan Guaido is a two bit thug (https://infodio.com/29012020/usaid/padf/humanitarian/aid/venezuela/futuro/presente). By ignoring his connections and who funds him, his American handlers are, effectively, siding with proven criminals, and undermining the incredible job of Justice, Treasury, Homeland Security, FBI, DEA, CIA, and the SEC to tackle chavista corruption. It is politically-motivated interfering with law enforcement, of the highest order.

---

LATEST     ARCHIVE



**Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme.** (/index.php/11122025/alejandro/b
(/index.php/111220
Dec 11, 2025 - 15:48

**[UPDATED 05/12/2025] - Derwick's Alejandro Betancourt arrested in London by British police**
(/index.php/alejandro/betancourt/
(/index.php/alejandro
Sep 21, 2025 - 07:17

**Spain's Anti Corruption Prosecutors charge Nervis Villalobos, Javier Alvarado, Duro Felguera.**
(/index.php/12072024/spain/anti/
(/index.php/120720
Jul 12, 2024 - 04:59

**France's TRACFIN stops Luis Oberto's St Barts real estate sale to Kirill Pisarev**
(/index.php/12072024/france/trac
(/index.php/120720
Jul 12, 2024 - 04:50

More >

MOST POPULAR



(/11122025/alejandro/betancourt/pedro/trebbau/

**Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme.**
(/11122025/alejandro/betancourt/pedr

DERWICK ASSOCIATES
(/TAGS/DERWICK-ASSOCIATES)

To say that Betancourt, or his meeting with Guaidó's brother and others, or his funding of Guaidó, is a matter of "national security" (see below) is an insult to the millions of Venezuelans that have seen their lives destroyed by unbridled theft. In my particular case, it is personal. For Betancourt's closest associate is Francisco Convit, a DoJ-wanted fugitive directly responsible for the break into my apartment, theft of laptops, and campaign of terror against my children. Betancourt's isn't any better, and has been recorded issuing threats to people from his cushy life in London.

Juan Guaidó is just more of the same, just like Giuliani: Betancourt's little bitch (https://infodio.com/01022020/juan/guaido/betancourt/alamin/rudy/giuliani). I sincerely hope he fails. As per Giuliani, whoever told him that Betancourt was a matter of national security, Trump?



[UPDATED 05/12/2025] -
Derwick's Alejandro Betancourt
arrested in London by British
police
(/alejandro/betancourt/derwick/arreste

DERWICK ASSOCIATES
(/TAGS/DERWICK-ASSOCIATES)

# Exclusive photos of Giuliani in Spain show Lev Parnas has lots more to share (https://edition.cnn.com/2020/02/07/pol parnas-exclusive-images-giuliani/index.html)

By Vicky Ward (https://edition.cnn.com/profiles/vicky-ward), CNN
Updated 2213 GMT (0613 HKT) February 7, 2020

EL FISCAL, despachando el trámite previsto en los artículos
700.1° y 701, ambos de la Ley de Enjuiciamiento Criminal, interesa la
apertura del juicio oral ante la SALA DE LO PENAL DE LA AUDIENCIA
NACIONAL, formulando ESCRITO DE ACUSACIÓN contra,
los siguientes personas físicas:
1.- Nervis Gerardo Villalobos Cárdenas (N. I. E. Y-1957365-L) ;
2.- Milagros Coromoto Torres Morán;
3.- Luis Justo Barrios Melean (titular de documento de identidad
venezolano número 4.148.272);
4.- Javier Alvarado Ochoa, posteriormente identificado, por cambio de
apellido, como Javier Ochoa Alvarado (D.N.I. n° 06679337-N);
5.- Mariela Comendo Pardi;
6.- Carixda Catalina Casanova;
7.- Luis Carlos de León Pérez;

(/12072024/spain/anti/corruption/prosecutor/ner

*New York (CNN)*Stored in devices seized from Lev Parnas by law enforcement, there's a 34-second cell phone video of Rudy Giuliani relishing a bullfight. There are also photos of Donald Trump's personal attorney posing with two matadors, a flamenco dancer twirling her skirt and an image of the father of Venezuela's opposition leader beside a tray of hors d'oeuvres on the lawn of a Spanish castle.

Spain's Anti Corruption
Prosecutors charge Nervis
Villalobos, Javier Alvarado,
Duro Felguera...
(/12072024/spain/anti/corruption/pros

The videos and photographs of Giuliani's trip to Spain, obtained exclusively by CNN, show the efforts Parnas went through to document and save a trove of information. They have aided a slow-drip campaign (https://www.cnn.com/2020/01/20/politics/joseph-bondy-lev-parnas-attorney/index.html) by Parnas' legal team to keep the indicted Giuliani associate in the limelight as he builds a defense for his indictment, and could plague Giuliani—and ultimately the President—well after impeachment has passed.

NERVIS VILLALOBOS (/TAGS/NERVIS-VILLALOBOS)

Last week, Parnas and his attorney Joseph Bondy made a show of traveling to Washington and walking up to the US Senate (https://www.cnn.com/2020/01/29/politics/lev-parnas-senate-impeachment-trial-watching/index.html), with cameras in tow. The two knew full well that Parnas could be turned away from the impeachment trial because he was wearing an ankle bracelet, an electronic device that violates the Senate chamber rules.

The stunt came days after Parnas' lawyer released an 83-minute recording (https://www.cnn.com/2020/01/25/politics/recording-trump-lev-parnas-igor-fruman-ukraine-ambassador/index.html) from an April 2018 Trump International Hotel fundraiser where President Donald Trump discusses firing former US ambassador to Ukraine, Marie Yovanovitch, with Parnas and his estranged business partner Igor Fruman. Fruman made the recording, and Parnas' lawyer made it public. Yovanovitch was recalled from her post about a year later.

Parnas and Fruman were indicted for campaign finance violations last year by federal prosecutors in New York (https://www.cnn.com/2019/10/23/politics/igor-fruman-lev-parnas-rudy-giuliani-hearing/index.html). They have pleaded not guilty. Parnas' role as Giuliani's alleged proxy in Ukraine and the information he possesses became an intriguing part of the impeachment hearings. Fruman and his legal team are not cooperating with the impeachment inquiry and declined to comment for this story.

## Parnas is not done

Parnas still possesses an unseen stash of photographs and recordings, Bondy says. Those exist in addition to the notes, text messages and other evidence that is currently in the hands of Congress. The materials were seized by federal investigators in New York from Parnas' phones and computers when he was indicted in October and shared with Congress by Parnas' legal team after the judge in his case allowed them to do so in December. (https://www.cnn.com/2020/01/17/politics/lev-parnas-documents-january-17/index.html)

"Over the past several months, it has been revealed that Lev Parnas is a prolific collector of photos and videos," Bondy told CNN in an interview. "Contrary to what one might expect, Mr. Parnas has not destroyed any. Rather, he has preserved them. The universe of subject matter is yet to be publicly revealed but is of interest in matters well beyond the impeachment inquiry."

The images obtained by CNN are of trips that provide a peek into relationships Giuliani has not been willing to discuss, specifically work he's done for legally embattled foreign clients whose interests could intersect with his most prominent client – the President of the United States. Parnas says that the photos help show ties that Giuliani had with business and political interests in Venezuela.

Asked about the trip, Giuliani told CNN that he could not discuss details because it is a matter of "national security." Giuliani is currently under federal investigation

(https://www.cnn.com/2019/10/16/politics/giuliani-counterintelligence-probe/), but has not been charged with any crimes.

Parnas told CNN based on what he heard and saw while traveling last August, Giuliani was seeking to argue that Alejandro Betancourt Lopez, a wealthy Venezuelan client, should be treated leniently by the Department of Justice because of ties with an opposition figure of great importance to US foreign policy. This was first reported by Reuters. (https://www.reuters.com/article/us-venezuela-politics-guaido-giuliani/exclusive-giuliani-told-u-s-his-client-deserves-leniency-for-financing-venezuelas-opposition-parnas-idUSKBN1ZL1AR)

The possible conflict of interests is a recurring theme with Giuliani. The effort bears striking similarity to how Parnas has described an effort to solve legal problems (https://www.cnn.com/2019/11/01/politics/parnas-firtash-giuliani-ties/index.html) in the US faced by Ukrainian oligarch Dmytro Firtash.

According to Parnas, (and Firtash in a November interview with the New York Times (https://www.nytimes.com/2019/11/25/us/giuliani-ukraine-oligarchs.html)) Giuliani directed Parnas to tell Firtash that Joseph di Genova and Victoria Toensing would represent him and could get his case in front of Attorney General William Barr, if Firtash could hand over information on Joe Biden that would be helpful for the 2020 election. CNN reported last month that Di Genova and Toensing, friends of Giuliani's, did get a face-to-face meeting with Barr to discuss Firtash (https://www.cnn.com/2020/01/17/politics/barr-giuliani-justice-department-meeting/index.html), who is facing extradition on bribery charges.

Firtash told the Times he has no information on Biden or his son and did not finance any effort to unearth dirt on them. "Without my will and desire, I was sucked into this internal U.S. fight," he told the Times. Giuliani has said he "never met" Firtash, but has given conflicting answers on seeking information from him (https://www.cnn.com/2019/11/27/politics/rudy-giuliani-ukranian-oligarch/index.html).       .

## Betancourt courts Giuliani

Parnas, Giuliani and Fruman met Betancourt, 40, in June at a Yankees game in London, according to both Parnas and another source with knowledge of their meeting. Two of the photos obtained by CNN show Giuliani and Parnas at the game. In one, Giuliani is seen using electronic equipment that Parnas says is for taping his podcast. In the other, they are in the Yankees' dugout. News of Giuliani and Parnas at the game was first reported by CNN's KFile (https://www.cnn.com/2019/10/26/app-politics-section/kfile-giuliani-london-trip/index.html).

In London, Parnas says Betancourt asked Giuliani to join his legal team, which already consisted of two long-time Giuliani friends: former US attorney Frank Wohl and the Miami-based former Watergate prosecutor Jon Sale. "Frank and Jon are great lawyers. The only reason Rudy was needed as well was to exert leverage with Barr," Parnas told CNN. A separate source familiar with Betancourt's legal strategy told CNN that Giuliani's connections at the Justice Department, including familiarity with Barr, were considered helpful by Betancourt. Giuliani did not comment on Parnas' assertion.

Parnas told CNN that hiring lawyers close to Barr was an idea being deployed at the same time by Firtash, who shared that thinking with him. "For both Firtash and for Betancourt, the only point of hiring these lawyers was to get to Barr," Parnas said.

At the Yankees game and in discussions in London afterwards, Parnas says Betancourt invited Giuliani, himself and others to Spain.

## A castle near Madrid

Most of the newly-released images and a video shared with CNN document a week-long trip Parnas took with Giuliani last summer to a castle outside Madrid to meet Betancourt.

According to Parnas, who spoke to CNN about the trip, no expense was spared in the effort to impress the President's personal attorney and a large entourage traveling with him, including the families of Parnas and Fruman. The trip was first reported by the Daily Beast (https://www.thedailybeast.com/democrats-want-to-know-who-paid-rudy-giuliani). Giuliani told the Daily Beast he was there for business and vacation.

Parnas told CNN that Giuliani made two videos while there, and was told by Giuliani that they would serve two purposes. First, to help Betancourt, a Venezuelan energy executive who is looking to stave off potential criminal charges (https://www.cnn.com/2020/01/17/politics/barr-giuliani-justice-department-meeting/index.html) connected to a billion-dollar money-laundering case filed in Florida last year.

Second, the video was intended to show that Betancourt was of value to Juan Guaido, the head of Venezuela's opposition-controlled parliament, who has been recognized by more than 50 countries, including the U.S. as the interim president.

"The purpose of the videos was 100 percent to show Trump how helpful Betancourt was to the Guaidos," said Parnas. The Trump administration's support for Guaido was on display this week. Guaido was a guest at the President's State of the Union speech and spent two days in Washington meeting (https://www.cnn.com/2020/02/06/politics/trump-juan-guaido-white-house-meeting/index.html) with Trump at the White House and members of the State Department. He received a standing ovation from both Republicans and Democrats when Trump referred to Guaido in his address, going on to call him the "true and legitimate president of Venezuela."

A source familiar with Giuliani's legal strategy confirms that Giuliani made video recordings for the Justice Department, but denies Parnas' claim that any videos were intended for the President. There is no indication Giuliani showed the videos at the Justice Department or to Trump. The Justice Department declined to comment for this story. Betancourt and his lawyers did not respond to CNN requests for comment.

When asked about the trip to Madrid and the video-recordings of Betancourt, Giuliani had this to say in a text to CNN: "Your story about the interview[s] is given to you by not just an unreliable source, but a proven liar... I can't discuss any tape recordings or confirm or deny them."

Parnas, who does not possess the videos, is adamant the recordings were also intended for the President. "I would swear under oath that the purpose of the Guaido recording and the Betancourt recording was to be shown to President Trump – although Betancourt's video was designed to be shown principally to the Justice Department and Barr."

## August in Spain

Parnas says he was often asked to arrange logistics for Giuliani and tend to the smallest of his needs. One photograph reviewed by CNN shows Parnas wiping Giuliani's face.

Messages from Parnas' cell phone that were handed over to House investigators for the impeachment hearing show that details of Giuliani's trip to Madrid were organized by Parnas, who arranged for an airport greeter. "When you arrive in Madrid their [sic] will be someone waiting for you with a sign that says 'NUBA' at the door of the plane. They will take you through cotumes [sic]."

The trio's first stop in Madrid was with Andriy Yermak, the right hand of Volodymyr Zelensky, the new Ukraine president.

After that, according to Parnas, a large group descended on the castle, El Castillo del Alamin. The group included Giuliani's girlfriend, Dr. Maria Ryan and Wohl, as well as the Parnas and Fruman families. Wohl did not respond to request for comment, but a source close to Giuliani verified Parnas' account of the guest list. A photo shows Giuliani sitting in a chair smoking a cigar with Ryan in his lap. Another has them posing for a photo with Betancourt in the background.

Also in attendance was Wilmer Guaido, the taxi-driving father of Venezuela's struggling opposition leader Juan Guaido, Parnas and another source told CNN. Wilmer Guaido is pictured in one of the images grabbing an hors d'oeuvre. He did not respond to questions from CNN about his presence at the castle. That the elder Guaido was at the gathering was first reported by Reuters (https://www.reuters.com/article/us-venezuela-politics-guaido-giuliani/exclusive-giuliani-told-u-s-his-client-deserves-leniency-for-financing-venezuelas-opposition-parnas-idUSKBN1ZL1AR).

During the trip, Parnas says that Giuliani set up his recording equipment on the castle grounds and made video interviews with both Betancourt and Wilmer Guaido. He also spoke with Juan Guaido via FaceTime, according to Parnas.

"Giuliani told me that Betancourt explained in his interview that he had given secret financial support to the Guaido family and regime," Parnas told CNN. This would clearly put Betancourt in good standing with the President, since Guaido's position is predicated on US support.

Betancourt and his lawyer have not responded to CNN for comment. Reuters reported (https://www.reuters.com/article/us-venezuela-politics-guaido-giuliani/exclusive-giuliani-told-u-s-his-client-deserves-leniency-for-financing-venezuelas-opposition-parnas-idUSKBN1ZL1AR) that Guaido has denied any financial relationship to Betancourt. Reuters was not able to determine if Betancourt helped to finance the U.S.-backed opposition.

Betancourt, who has made millions from Venezuelan government contracts, was presumed to be a supporter of the rival, oppressive regime of the socialist Nicolas Maduro. The US has recognized Guaido and not Maduro as the official Venezuelan president since early 2019.

While in Spain, Giuliani told Parnas that he was confident he could get Betancourt's legal problems "cleared up in a couple of weeks," according to Parnas.

A month later, in September, Giuliani met with Justice Department officials to discuss Betancourt's case and Barr dropped in on the meeting. A source familiar with the gathering says that the videos were not shown to Barr and would not comment on whether they were shown to lawyers there. The Justice Department declined to comment on the meeting.

Afterwards, Parnas says he met up with Giuliani at the Trump International hotel in DC. According to a conversation that Parnas says the two had, Giuliani appeared to think the meeting had gone well. But that was before Parnas and Fruman were arrested on indictments in early October followed by reports that Giuliani is under federal investigation (https://www.cnn.com/2019/10/16/politics/giuliani-counterintelligence-probe/index.html).





**Tags**

DERWICK ASSOCIATES (/TAGS/DERWICK-ASSOCIATES)

**Add to Breaking news**
Off

Fight corruption, spread the word, support independent
investigative journalism.

Copyright © 2018, INFODIO. All rights reserved.

# EXHIBIT 21

# infŏdĭo (/index.php/)

🇬🇧 English (/alejandro/betancourt/derwick/arrested/london/police/210925)    🇪🇸 Español (/es/node/1251)

Message to INFODIO readers: investigative journalism, which is what this site does, takes lots of time. Visiting media looking for a quick run down on Venezuela's gargantuan corruption, have the decency to at least cite the source (https://twitter.com/alekboyd/status/112151413332644937) when plagiarising this site's content without attribution (https://infodio.com/030119/corruption/journalism/argus/media/plagiarism) (exhibit Reuters here (https://infodio.com/25062021/reuters/angus/berwick/special/report/derwick/alejandro/betancourt), exhibit Bloomberg here (https://infodio.com/29052020/bloomberg/reuters/plagiarism/venezuela), exhibit OCCRP here (https://infodio.com/17022021/plagiarism/exhibit/occrp/drew/sullivan)). To all readers, do the right thing, the honest thing: support independent investigative journalism, help us expose rampant corruption. Note added 28/06/2021: Impostors are using INFODIO's former editor's full name, and a fake email address (alek.boyd.arregui at gmail.com) to send copyright infringement claims / taking down requests to web hosting companies (exhibit Hostgator (https://twitter.com/infodi/status/1409189789635653640)). The attempt is yet another effort (https://infodio.com/25052021/ip/morgan/eduardo/travieso/guillermo/drew-bear/tamayo/derwick/online/reputation/management) paid by corrupt thugs to erase information about their criminal activities (https://infodio.com/es/terrorismo/boliburgues). Infodio.com has no issues with other websites / journalists using / posting information published here, so long as the source is properly cited.

# [UPDATED 05/12/2025] - Derwick's Alejandro Betancourt arrested in London by British police

2 months ago · By Anonymous

[UPDATED 05/12/2025] - Sources in Spain reported yesterday that Alejandro Betancourt was arrested by British police in London (https://www.elperiodico.com/es/politica/20250920/policia-britanica-detiene-empresario-venezolano-121783200) and released on bail. Spain's Audiencia Nacional and Anticorruption Court requested the action (https://elpitazo.net/politica/policia-britanica-detiene-al-empresario-venezolano-alejandro-betancourt/) for his involvement in money laundering (Operation Money Flight (https://www.justice.gov/archives/opa/pr/two-members-billion-dollar-venezuelan-money-laundering-scheme-arrested)).

Betancourt became known in Venezuela after the company he co-founded, Derwick Associates, bribed authorities to obtain a dozen contracts to provide power plants and solve electricity outages in the country. According to experts, Derwick Associates overcharged the State more than one billion U.S. Dollars. After Derwick, Betancourt went into different deals with Petroleos de Venezuela (https://infodio.com/031119/alejandro/betancourt/operation/money/flight/corruption). One involved an illicit partnership with Gazprom executives to produce oil (Petrozamora). In two others, Betancourt was a key player in multibillion dollar money laundering schemes masked as loans to PDVSA (https://infodio.com/14082020/nervis/villalobos/rafael/ramirez/pdvsa/corruption). The U.S. Department of Justice charged Betancourt's partner and Derwick co-founder Francisco Convit for one of the schemes (Operation Money Flight), and all but named Betancourt as conspirator no. 2 (https://infodio.com/211018/pdvsa/convit/krull/pedro/binaggia/money/laundering).

Since, Betancourt has been lobbying and fighting criminal investigations (https://infodio.com/26112021/alejandro/betancourt/derwick/corruption) in Venezuela, Spain, Switzerland and the U.S.A. During Donald Trump's first presidency, Rudy Giuliani was retained by Betancourt to seek favour with DoJ, the NSC and Attorney General William Barr (https://infodio.com/07022020/alejandro/betancourt/wilmer/guaido/financing/national/security/rudy/giuliani).

Beyond Venezuela, Betancourt has used an investment vehicle called O'Hara Financial to launder ill gotten proceeds through a number of ventures in Spain, the UK, Switzerland and beyond.

[UPDATED 05/12/2025] - The DailyMail posted yesterday "EXCLUSIVE - Billionaire wanted in Switzerland over alleged money laundering fights extradition from two luxury homes in UK, including country estate once frequented by Princess Diana" (https://www.dailymail.co.uk/news/article-15348503/Billionaire-wanted-Switzerland-money-laundering.html):

| LATEST | ARCHIVE |


(/index.php/111220)

Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme. (/index.php/11122025/alejandro/b
Dec 11, 2025 - 15:48


(/index.php/alejand

[UPDATED 05/12/2025] - Derwick's Alejandro Betancourt arrested in London by British police (/index.php/alejandro/betancourt/
Sep 21, 2025 - 07:17


(/index.php/120720

Spain's Anti Corruption Prosecutors charge Nervis Villalobos, Javier Alvarado, Duro Felguers. (/index.php/12072024/spain/anti-
Jul 12, 2024 - 05:30

Saint Barth: la justice financière bloque la vente suspecte d'une villa à 38 millions
France's TRACFIN stops Luis Oberto's St Barts real estate sale to Kirill Pisarev (/index.php/12072024/france/trac
Jul 12, 2024 - 04:50
(/index.php/120720

More »

MOST POPULAR


(/11122025/alejandro/betancourt/pedro/trebbau/t

Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme. (/11122025/alejandro/betancourt/pedr

DERWICK ASSOCIATES (/TAGS/DERWICK-ASSOCIATES)

"

Venezuelan energy magnate Leopoldo Alejandro Betancourt Lopez has been granted the unusual bail condition of being able to travel by private helicopter between his luxury residences in Chelsea and Oxfordshire while he fights legal attempts to make him travel to Switzerland to face alleged money laundering offences.

The main bail address approved by Westminster Magistrates Court is the £24 million six-bedroom contemporary mansion in west London, called Burnsall House.

Described in marketing literature as 'the largest detached home to have been built in Chelsea for almost a decade', it boasts a huge kitchen/dining/living area, sumptuous sitting room and secluded patio garden, as well as a wine cellar and indoor swimming pool.

The alternative bolthole is 14-bedroom Kingstone Lisle Park, a Grade II listed Georgian country house near Wantage which was last sold for £18 million in 2018 prior to extensive renovations.

Set in a private estate with sculptured grounds and a croquet lawn, parts of its interior was once described by Country Life as 'one of the most breath-taking surprises to be found in an English country home'.

Under bail conditions set by the court, Betancourt Lopez, 45 – who has surrendered his Venezuelan and Italian passports - must not apply for any international travel documents or be in possession of any.

But he can live at the two addresses and use London Heliport in Battersea to travel between them.

Betancourt Lopez, who is worth an estimated £2.6 billion, was arrested on November 3 in Charing Cross under an international arrest warrant from Switzerland.

Swiss authorities allege he was involved in money laundering there between October 2010 and January 2018.

He was initially held in custody but released on bail after paying a £2 million security.

The businessman was previously arrested in the Oxford area in September under a European Arrest Warrant issued by Spain – although it is understood this was withdrawn.

A court spokesman said: 'He had competing warrants. The Spanish (warrant) was discharged and replaced by the Swiss warrant, which is the current case.

'As only one set of proceedings can be in place at any one time, this was the solution to this person.'

Betancourt Lopez, who is understood to be leasing both bail properties and has homes in Paris, New York, Florida and Spain where he allegedly bought a £21 million hilltop castle, has invested in companies and property in territories across Europe and the US.

He is chairman and chief executive of Derwick Associates, an engineering, procurement and construction company, as well as majority shareholder of international investment



(/alejandro/betancourt/derwick/arrested/london/p

[UPDATED 05/12/2025] - Derwick's Alejandro Betancourt arrested in London by British police (/alejandro/betancourt/derwick/arreste

DERWICK ASSOCIATES (/TAGS/DERWICK-ASSOCIATES)

(/12072024/spain/anti/corruption/prosecutor/ner

Spain's Anti Corruption Prosecutors charge Nervis Villalobos, Javier Alvarado, Duro Felguera. (/12072024/spain/anti/corruption/pros

NERVIS VILLALOBOS (/TAGS/NERVIS-VILLALOBOS)

*group O'Hara Administration and a director of Canadian gas and oil company Pacific Exploration & Production Corporation.*

*Betancourt Lopez denies any wrongdoing and continues to contest the extradition request. A five-day hearing is due to take place in May.*

Source: https://www.dailymail.co.uk/news/article-15348503/Billionaire-wanted-Switzerland-money-laundering.html (https://www.dailymail.co.uk/news/article-15348503/Billionaire-wanted-Switzerland-money-laundering.html)



**Tags**

DERWICK ASSOCIATES (/TAGS/DERWICK-ASSOCIATES)

**Add to Breaking news**

On

Fight corruption, spread the word, support independent investigative journalism.

Copyright © 2018, INFODIO. All rights reserved.

# EXHIBIT 22

Miami Herald

# *Venezuelan tied to epic corruption case funneled millions into secretive Luxembourg companies*

By Jay Weaver , Antonio María Delgado , Kevin G. Hall , Antonio Baquero and Nathan Jaccard Updated March 30, 2021 1:47 PM

As one of the world's biggest oil producers, Venezuela's government allegedly handed out billions of dollars in energy contracts to an inner circle of politically connected young businessmen, who in turn moved the bulk of their new fortunes to Europe, with some diverting their assets to South Florida. One such entrepreneur was Alejandro Betancourt Lopez, a savvy Venezuelan who has managed to avoid prosecution in Miami while amassing his investments in Europe instead of here. Betancourt appears in a new data investigation of Luxembourg's registry of corporate records that reveal he is the controlling person behind previously unknown companies in the tiny European tax haven. Federal prosecutors in Miami have charged more than a dozen nouveau riche Venezuelans — dubbed boliburgueses, or Bolivarian bourgeoisie — who profited wildly off these alleged bribery-fueled contract schemes tracing back to the presidency of Hugo Chávez and his successor, Nicolás Maduro.

These Venezuelan defendants have been charged here because federal investigators have collected evidence showing they used the U.S. banking system and real estate market to hide their allegedly tainted assets. Under investigation for five years, Betancourt has studiously avoided the U.S. banking system and real estate market and invested the vast majority of his wealth in shell companies set up in Spain, Switzerland and — now, it turns out — Luxembourg, which has grown into a preferred haven for rich people seeking secrecy and tax benefits. Betancourt's name pops up as the "beneficial owner" of at least four companies in Luxembourg, the Miami Herald and its reporting partners found. They are Latin America Ventures SARL, Gainsboro Developments, Ming International and O'Hara Financial S.A., with corporate records showing they have been used for hundreds of millions of dollars in business investments. Those range from oil exploration to sunglasses manufacturing to transportation services — all outside of Betancourt's native Venezuela, where he made much of his money off the state-run oil company, Petróleos de Venezuela S.A., or PDVSA.

In early 2019, the U.S. government hit PDVSA with sanctions, saying it "has long been a vehicle for corruption," while blocking its assets in the United States and any American from doing business with the company. Betancourt's relationship to his shell companies listed in Luxembourg's corporate registry became more transparent in 2019 when that country started requiring disclosure of a beneficial owner's name under an anti-money-laundering law that aims to combat offshore holdings set up to avoid taxes and launder illicit funds. However, Luxembourg's registry cannot be searched by owner

1

name; instead, it is only searchable by company name, making it impossible to discover whether someone is a beneficial owner of a company without knowing the name of it in the first place. The castle/home of Alejandro Betancourt in Spain. The Miami Herald and its parent McClatchy partnered with 17 media outlets, including Le Monde in France, Süddeutsche Zeitung in Germany and the Organized Crime and Corruption Reporting Project, as well as the nonpartisan Anti-Corruption Data Collective to analyze Luxembourg's corporate registry, which contains more than 140,000 active companies, as part of a project called OpenLux. Le Monde collected the registry information and created a searchable database that would allow news partners to look up a beneficial owner's name and match it with his or her shell companies.

Venezuelan lawyer Alejandro Rebolledo, an expert on money laundering, said Luxembourg has become an ideal place to conceal millions that European and U.S. authorities suspect is tainted by corrupt Venezuelan energy contracts. Betancourt and others — including his cousin and former business partner, Francisco Convit Guruceaga, who faces indictment in Miami — use Luxembourg and other opaque jurisdictions to set up shell companies and move funds between them, he said. "This is a network of companies that creates layers to transfer money in order to diversify it and hide it," Rebolledo said. Betancourt's lawyers, Jon Sale and Frank Wohl, said he is using his companies for legitimate investments and has not hidden himself or them from the public. "Mr. Betancourt's assets and sources of money are perfectly legal," his lawyers said in a statement released Wednesday. "They are not hidden. In fact, his interest in Luxembourg companies is publicly disclosed for the world to see. He is a legitimate and very successful businessman who has not broken any law." Convit's defense attorney, Adam Kaufmann, did not respond to requests for comment.

For now, Betancourt, 40, remains an unnamed co-conspirator in a $1.2 billion money-laundering indictment filed about three years ago in Miami — a major corruption case alleging his cousin and business partner, Convit, arranged a sham loan with Venezuela's state-run oil company. A federal criminal affidavit alleges the Convit-led ring used a shell company to loan $42 million worth of bolivars to PDVSA in late 2014, which then was repaid in euros at an exchange rate favorable to the lenders. That currency exchange transaction instantly multiplied the loan repayment to the equivalent of $600 million, which was distributed to Convit and others in the network, including senior PDVSA officials and Betancourt. The affidavit doesn't identify Betancourt by name, only as a co-conspirator who received a huge sum of money along with Convit. Most of the windfall proceeds ended up in Malta, Spain and Switzerland, but also in Miami. Of the total payout, about $200 million was deposited in Malta bank accounts in the name of straw owners for the benefit of Maduro's three grown stepsons, according to court records and sources familiar with the investigation.

The case, named "Operation Money Flight," is among a half-dozen foreign corruption, money-laundering and narcotics investigations in Miami, Houston and New York, where prosecutors have charged Maduro and his political allies with drug trafficking. Convit, designated as a fugitive along with several other defendants in Homeland Security Investigations' money flight case, has been implicated by a solid trail of emails as well

2

as recordings by a confidential federal informant, with the evidence stretching from South America to South Florida, according to the criminal affidavit. Convit gave Betancourt about $85 million in proceeds from the PDVSA loan deal, according to several law enforcement sources and court records. Although Betancourt is not identified by name in the federal case filed in Miami, several sources familiar with the investigation say that he is "Conspirator 2" among the dozen unnamed Venezuelan conspirators and officials listed in the criminal affidavit that details the alleged international racket. The affidavit says that "Conspirator 2" was among the ring of boliburgueses and government officials who received hundreds of millions of dollars in late 2014 from the alleged PDVSA loan scheme.

However, Betancourt has not been indicted like Convit and nine others in the money flight case. That's because of a lack of evidence that he knew the money given to him by his cousin was from the sham loan with PDVSA and was later washed through a highly profitable government currency exchange, according to sources familiar with the federal investigation. "There is no question Betancourt was connected to Operation Money Flight," said one source with knowledge of the probe, but there's "no direct connection" through emails or witnesses indicating he played a role in the alleged loan scheme or had any knowledge of the source of the subsequent payoffs. Boston to Business Betancourt, who grew up with Convit in Caracas and attended Suffolk University in Boston, founded an energy company called Derwick Associates with him and another cousin a decade ago. The unproven company was awarded lucrative electric and oil contracts by the Venezuelan government through Betancourt's relationship with the late President Chávez and some of his senior officials. It has been reported that Betancourt later had a falling out with Chávez's successor, Maduro, and has been supportive of the opposition leaders in Venezuela. While Convit was indicted in 2018, Betancourt was living in a castle outside Madrid and diversifying his investments in Switzerland by transferring hundreds of millions of dollars into shell companies in Luxembourg, the tax haven wedged between France, Germany and Belgium, according to corporate records in the Luxembourg registry.

Betancourt and Convit were barely 30 when they founded Derwick, an electric company incorporated in Barbados in 2011. Without much experience, they obtained no-bid contracts from the Chávez government to build power plants in Venezuela. According to a 128-page report on the energy sector written by ONG Transparencia Venezuela, the local chapter of the corruption fighting organization Transparency International, Derwick Associates was awarded 11 construction contracts worth $5 billion. But the government contracts were over-billed by $2.9 billion, says the report, which was widely covered by the news media in Venezuela and elsewhere. Caracas TV mogul Raul Gorrín During this same period, Betancourt and Convit also established Derwick Oil & Gas Corp. in Barbados in 2011. Derwick entered into a highly profitable joint venture with the Russian state-owned Gazprombank, which was awarded the right to explore an oil field known as Petrozamora, one of the jewels of Venezuelan industry. The Derwick partners' roles in the venture remained secret, but they were eventually revealed by an investigative blog, Infodio. The Derwick-Gazprombank venture was authorized by the executive director of the state-run oil company, Rafael Ramirez, who publicly declared that he did

not know that Derwick was involved in the deal. Ramirez is living in Italy. Ramirez's then-deputy, Nervis Villalobos, who resides in Spain, has been charged in an unrelated PDVSA contract-bribery case in Houston. Records filed in the Luxembourg corporate registry show that Convit became the director of a Dutch foundation, Stichting Administratiekantoor DOG, in 2014. The following year, the foundation became the owner of a newly created company, Latin America Ventures SARL in Luxembourg, which eventually received assets from the Petrozamora oil bonanza. Latin America Ventures holds more than $300 million in assets and lists Betancourt as the sole beneficial owner, according to 2019 corporate records in the Luxembourg registry. Convit left his position as the head of the Dutch foundation after he was indicted in Miami. He was replaced by Orlando José Alvarado Moreno, a Derwick director in Caracas who appears as an administrator in most of Betancourt's companies and has advised him on investments.

In addition to controlling Latin America Ventures, Betancourt is the ultimate beneficiary of three other companies in Luxembourg: Gainsboro Developments, registered in 2015; Ming International, in 2016; and O'Hara Financial S.A., registered in 2018. Each one appears to be a vehicle for moving the Venezuelan entrepreneur's assets into his portfolio of business investments, according to corporate records in the Luxembourg registry. Like the role of Latin America Ventures, Gainsboro Developments acts as an intermediary for Betancourt's major investments, mainly in Spain, including a temporary employment company and transportation services. Another one of Betancourt's Luxembourg companies, Ming International, invests in a fashionable sunglasses company, Hawkers, which has partnered with soccer star Lionel Messi to design a line of eyewear, according to the Luxembourg corporate records. Betancourt's Luxembourg portfolio is completed with a fourth company: O'Hara Financial S.A. Corporate records filed in Delaware show that the company owns a Falcon 2000 private jet. In recent years it has been spotted in the United Kingdom, Spain, the Netherlands, and the Portuguese islands of the Azores, along with Poland and Russia.

But before Luxembourg became the alternative haven for hiding foreign assets, Switzerland and its highly secretive banking system were the favored destination for the immense portfolios of Venezuela's boliburgueses, according to U.S and Swiss records. Betancourt, Convit and other members close to Chávez's government, including Venezuelan brothers Luis and Ignacio Oberto and Caracas TV mogul Raul Gorrín, have been under investigation by U.S. authorities in Miami since 2016. They are suspected of paying massive bribes to senior government officials in PDVSA and the national treasury in exchange for access to energy contracts and currency exchanges that produced massive profits.

While the Oberto brothers, who own penthouse condos overlooking Miami Beach, have not been charged, Gorrín was indicted in 2018 in a money-laundering conspiracy accusing him of pocketing hundreds of millions of dollars in a kickback scheme with two former Venezuelan treasurers, Alejandro Andrade, who pleaded guilty and was sentenced to 10 years, and Claudia Diaz, who awaits extradition from Spain. That year, the U.S. Department of Justice, along with the U.S. Attorney's Office in Miami, sought

Switzerland's legal assistance with their money-laundering investigation under a treaty agreement, requesting account records at Compagnie Bancaire Helvetique and other Swiss financial institutions such as EFG Bank, which by law manage wealthy clients' money in total secrecy. In the Swiss court's review of the Justice Department's request for bank records, businesses associated with Betancourt (Calandra Business SA and IPC Investments Corp.) and Convit (Banstead Assets SA and Vencon Holdings Investments) — along with Gazprombank Latin America Ventures B.V. (co-founded by Convit but separate from Latin America Ventures SARL) — tried to block the release of CBH bank records to U.S. authorities. They failed. Both CBH and EFG banks did not challenge the department's request, according to sources familiar with the matter.

Meanwhile, a handful of Venezuelan money-laundering cases in Miami continue to gain momentum — despite an interruption of the federal grand jury due to the COVID-19 pandemic. But it remains unclear whether Betancourt will ever be charged in connection with Operation Money Flight.

Antonio Baquero and Nathan Jaccard report for the Organized Crime and Corruption Reporting Project (OCCRP), and collaborated on this story. This story was originally published February 11, 2021 at 5:38 PM.

Read more at: https://www.miamiherald.com/news/nation-world/world/americas/article249091760.html#storylink=cpy

# EXHIBIT 23

Miami Herald

# *Venezuela's business elite face scrutiny in $1.2 billion money laundering case*

By Jay Weaver and Antonio Maria Delgado Updated January 29, 2021 12:08 PM

As Venezuela's oil-based economy continues to crumble, a politically connected class of businessmen with financial ties to Miami has grown fabulously wealthy from energy deals with the socialist government. Among the Venezuelan upper crust who have made fortunes during the Bolivarian revolution: Alejandro Betancourt. Without any experience in the energy industry, Betancourt co-founded a power company called Derwick Associates a decade ago that has reaped billions of dollars in government contracts for a string of new plants in Venezuela — drawing barbs about being overpaid for the projects and having cozy relationships with top politicians. With his windfall, Betancourt not only expanded his business into the United States but also bought a penthouse apartment in Manhattan's Olympic Tower, along with a castle estate and other luxury properties in Spain, according to court documents.

In Miami, Betancourt has surfaced in a massive money laundering case that charges his cousin and several of the so-called Boliburgueses — young, well-educated entrepreneurs close to the Venezuelan regime — with conspiring to bribe government officials to approve a loan scheme to embezzle $1.2 billion from the country's national oil company during the presidency of Nicolas Maduro. Although Betancourt is not identified by name in the federal case filed in Miami, several sources familiar with the widening investigation say that he is "Conspirator 2" among the dozen unnamed Venezuelan conspirators and officials listed in a criminal complaint that details the alleged international racket. Betancourt, 39, and some of the other unidentified conspirators and officials could be added as defendants to an indictment, according to sources familiar with the federal case. So far, nine defendants have been charged in the Miami case, with two pleading guilty and one awaiting trial. The remaining six defendants, including Betancourt's cousin, Francisco Convit Guruceaga, are considered fugitives by the U.S. Attorney's Office in Miami. Betancourt's attorney, prominent Miami lawyer Jon Sale, issued a statement Friday denying his involvement. "My client denies any wrongdoing," Sale said. In Miami, Houston and New York, several corruption cases have been pursued by the Justice Department alleging bribery, embezzlement and money laundering activities in Venezuela and the United States that have taken a devastating toll on Venezuela's economy. The country has suffered the loss of billions of dollars embezzled from its state-owned oil company, Petroleos de Venezuela S.A, or PDVSA, mainly because of green-palming between government officials and the country's elite business class, federal authorities say. Russell Dallen, a lawyer and investment manager, spoke about foreign corruption at the Latin America Summit on Friday in Miami, spotlighting the prosecution of the PDVSA money-laundering case and others. Dallen, head of Caracas Capital in Miami, said Venezuela's rampant corruption has caused dramatic declines in oil production and income over the past two decades,

fueling hyperinflation, widespread poverty and the exodus of more than four million people. "Instead of reinvesting the money and rebuilding the country, it was all stolen through these currency-exchange and loan schemes," said Dallen, pointing out that Venezuela was once among the biggest oil producers in the world. "The Venezuelan people are starving," he added. "The [minimum wage] is $5 a month, up from $2. That's all they make — it's less than Haiti, less than Cuba. That's why people are voting with their feet and leaving the country." In the Miami case, federal court records say that "Conspirator 2" was among the ring of Boliburgueses and government officials who received hundreds of million of dollars in late 2014 from PDVSA as payment for a loan that they made to the state-owned oil company.

A criminal affidavit alleges the ring used a shell company to loan $42 million worth of bolivars and then got repaid in euros at the government's favorable exchange rate. That currency exchange transaction instantly multiplied the loan repayment to the equivalent of $600 million. Betancourt's cousin, Convit, who also sits on the board of directors of Derwick's Oil and Gas Corp., is the lead defendant mentioned with Conspirator 2 in the introduction to the complaint affidavit. Betancourt's chief financial officer at Derwick, Orlando Alvarado, is listed as "Conspirator 4" in the Miami case and also as an associate of his cousin, Convit. According to the affidavit, Conspirator 4 discussed a plan in 2016 with one of the ring's leaders to create "fake" foreign currency exchange contracts to make the embezzlement of the national oil company's funds look legitimate so the proceeds could be transferred to Convit and several others, including Conspirator 2 and Venezuelan officials accused of accepting bribes. "Conspirator 4 [Alvarado] suggested a meeting with everyone who has 'an interest' to sort things out and fix 'the papers' before things get bad when it is too late," the affidavit says. The close relationship between Convit, Betancourt and Alvarado raises questions about what Betancourt knew of the alleged loan scheme at Venezuela's state-owned oil company and the flow of laundered money.

The detailed affidavit, however, does not provide evidence of Betancourt's knowledge of the illicit PDVSA loan scheme. Nor does it provide proof, such as a bank record or wire transfer, showing he was aware of the source of the laundered money he allegedly received. According to the affidavit filed in July of last year, PDVSA repaid the ring's loan to a shell company called Rantor Capital, transferring the $600 million to Portmann Capital Management in Malta. The oil company's loan repayment was eventually turned over to another shell company, Eaton Global Services Limited, set up in Hong Kong, which was controlled by the Venezuelan leaders of the money-laundering conspiracy, federal prosecutors say. The $600 million windfall was then divided up among the group of wealthy Venezuelan businessmen, the three stepsons of Maduro and PDVSA officials, according to an email obtained by agents with Homeland Security Investigations and sources familiar with the criminal case. The president and his stepsons — Yosser Gavídia Flores, Walter Gavídia Flores and Yoswal Gavídia Flores — are under investigation in the Miami case, sources said.

According to the affidavit, here is how the government funds were distributed in in late 2014 and early 2015:

• $272.5 million went to Raul Gorrín, the Venezuelan tycoon who owns a Caracas TV network, insurance company and other businesses. He has not been charged in the Miami case, but is considered a main suspect in the federal investigation. In turn, Gorrín kept about $72.5 million for himself — wiring some money to pay for aviation, yacht and brokerage services in Miami — and gave the balance, $200 million, to Portmann Capital Management for the benefit of Maduro's three grown stepsons from his marriage to Cilia Flores.
• That account was set up for the stepsons in the name of a "straw" representative, Mario Enrique Bonilla Vallera, a Venezuelan businessman who owns a handful of Florida companies with addresses linked to four multimillion-dollar homes in the exclusive Cocoplum neighborhood of Coral Gables. Bonilla has been charged in the money-laundering indictment, but remains at large.
• $272.5 million also went to Convit and Conspirator 2. Of that total, $94 million was distributed to Pedro Binaggia, an attorney and businessman who was tasked to launder millions of dollars from Venezuela to Europe and the United States. (In 2016, Binaggia became a confidential source for Homeland Security Investigations out of fear that he would get caught laundering funds.)
• Binaggia redistributed about $20 million to: Carmelo Urdaneta Aqui, former legal counsel for the Venezuelan Ministry of Oil and Mining; Abraham Edgardo Ortega, a former director of finance at PDVSA; Jose Vicente Amparan Croquer, described as a professional money launderer, and three other unnamed Venezuelan conspirators with ties to the state-owned oil company. Those three are Victor Eduardo Aular Blanco, a former PDVSA vice president of finance who authorized the state-owned oil company's loan with the ring; Alvaro Ledo Nass, a former PDVSA general counsel, and his lawyer-brother, Adolfo Ledo Nass, according to sources familiar with the investigation. The remaining funds were absorbed by the cost of the initial loan to the oil company and Portmann Capital's charges related to the transaction.

Significantly, some of Venezuela's embezzled money was funneled through shell companies into fabricated investment funds, U.S. banks and South Florida luxury real estate, forming the foundation for the federal money-laundering case in Miami. Gorrin, who was close to the late Venezuelan President Hugo Chavez as well as Maduro, invested tens of millions of dollars in Cocoplum and in luxury condominiums in Miami and Manhattan. The news media in Venezuela and the United States have focused on Gorrin because of his high profile in business and political circles. Although he has not been charged in the Maduro-era money laundering case, Gorrin has been indicted in a similar $1 billion bribery and embezzlement scheme involving the former Venezuelan treasurer, Alejandro Andrade, in the Chavez administration. Andrade, who cooperated with federal authorities, has already pleaded guilty and begun a 10-year prison sentence. Betancourt, though less well known, exerts tremendous influence in Venezuela as well.

A graduate of Suffolk University in Boston, Betancourt founded Derwick a decade ago with Pedro Trebbau Lopez, the energy company's vice president. (Trebbau has not been implicated in the ongoing Venezuelan kleptocracy case in Miami.) Betancourt and Trebbau made immediate inroads with the Chavez administration as it looked for private

partners in the oil and energy industries. Ever since, Derwick has been surrounded by controversy. At times, the company has been accused of corruption for obtaining huge energy construction contracts from the Venezuelan government without having the required know-how. The company has also been accused of overcharging for the installation of used and inadequate equipment. According to a 128-page report on the energy sector written by ONG Transparencia Venezuela, the local chapter of Transparency International, Derwick was awarded 11 construction contracts worth $5 billion. But the government contracts were overbilled by $2.9 billion, an average increase of 162 percent, the report says. José Aguilar, an engineer who was tasked with investigating Derwick for the Wall Street Journal, said the company records he reviewed suggests that it charged the Venezuelan government between $2 billion and $2.2 billion for the 11 projects — work that could have been done for between $1.3 billion and $1.4 billion. "There was at least $800 million in overbilling," Aguilar told el Nuevo Herald, noting the company hired inexpensive contractors to do much of its work. But a study written by a professor at the Simon Bolivar University in Caracas commended Derwick's work, saying it was one of the few government energy contractors that actually completed their plants within budgets. But not all of Derwick's plants came online, and at least one never produced electricity, Aguilar said. "The output of all these plants has been traditionally poor," he said. Derwick's rapid rise led to confrontations with a leading financial institution, Banco Venezolano de Credito, which adopted an anti-Chavez stand and accused the energy company of being in league with the president. The rivals' accusations sparked defamation lawsuits, with Derwick firing the first salvo in a libel suit in Miami. Then, Otto J. Reich, a former ambassador to Venezuela and diplomat in three Republican administrations, was hired by the Venezuelan bank to take on Derwick in a public relations war. Reich himself ended up suing Betancourt and other Derwick officials in a libel case filed in New York federal court, accusing them of paying bribes to Venezuelan government officials. Reich's suit against Betancourt, Derwick's CEO, and its vice president, Trebbau, was dismissed.

After the dismissal, Reich reached a confidential settlement with a third defendant in 2016. Derwick's Betancourt and Alvarado have been collaborating on energy- and oil-related business deals for years. Betancourt and Alvarado made headlines in 2015, when they became major shareholders in a Panama-based investment company called O'Hara Administration that sought to take control of a Canadian oil company, Pacific Rubiales, which ran some of Colombia's largest oil fields. According to press reports, O'Hara joined with other investors to acquire about 20 percent of Pacific Rubiales's shares, establishing the group as the company's largest shareholders. But Betancourt's investment push — along with his becoming a member of Pacific Rubiales' board — led to strained relations with the company's original shareholders. Facing imminent bankruptcy amid falling oil prices, the Canadian oil company was sold to another investment group in an emergency transaction — but Betancourt, Alvarado and other investors lost millions in the end. Betancourt and Alvarado continue to face potential trouble as they come under scrutiny in the Miami money-laundering case. It is moving along, despite the absence of six defendants who are at large in Venezuela and possibly elsewhere.

Matthias Krull, an international banker who catered to mega-rich Venezuelans including Gorrin, pleaded guilty soon after his arrest in July of last year and was sentenced to 10 years in prison. Krull admitted that he was retained by Gorrin to help launder some of the Venezuelan ring's $600 million from Europe to the United States in 2016, including efforts to move $200 million through straw representatives for Maduro's three stepsons. But Krull has been allowed to remain free on a bond in Miami because of the value of his cooperation with the U.S. Attorney's Office, according to his lawyer, Oscar S. Rodriguez. Krull, the German-born son of a Lutheran pastor who was raised in Venezuela and educated in Switzerland, was based in Panama as a banker for the Swiss bank Julius Baer before his arrest. According to court records, he has helped investigators understand the complex web of relationships between the defendants and other suspects in the huge money laundering case. "Mr. Krull's value actually comes from the fact that he has been a banker in Venezuela ... for a long time," prosecutor Michael Nadler said in September while alerting a federal judge that he would be recommending a sentence reduction for Krull when he surrenders in March. "The amount of people that he has put us in contact with ... is large."

Abraham Edgardo Ortega, a former executive director of financial planning at PDVSA, also pleaded guilty a year ago to accepting millions of dollars in bribes that were secretly wired to U.S. and other financial institutions with the assistance of a Miami investment manager and others. Ortega, who worked at PDVSA for more than a decade, admitted he used his official role to give "priority" status to Venezuelan companies that did business with the government so they could tap into its vast oil income to make overnight fortunes through loan and currency exchange schemes. He has been free on bond while cooperating with authorities and still awaits sentencing. In February, Miami investment manager Gustavo Hernandez Frieri faces trial on charges of helping launder at least $12 million in bribery payments to Ortega. Hernandez's alleged role was to put that money into a fake mutual fund so that it looked legitimate and then launder it into U.S. banks for a fee. Hernandez, who lives in the exclusive Bay Point neighborhood of Miami and ran his business from a Brickell Avenue office, remains free on bond.

Nadler, the prosecutor, indicated in court that Hernandez may not go to trial because he and his attorney Michael Pasano, are "in discussions about pleas" and that "the terms are still being worked out."

This story was originally published November 3, 2019 at 8:30 AM.

https://www.miamiherald.com/news/local/article236793383.html#storylink=cpy

# EXHIBIT 24

 

infŏdĭo (/)

Home (/)    Who is...? (/290813/who)    Forum (/forum/4)    About (/about)

Contact (/contact)

Message to INFODIO readers: investigative journalism, which is what this site does, takes lots of time. Visiting media looking for a quick run down on Venezuela's gargantuan corruption, have the decency to at least cite the source (https://twitter.com/alekboyd/status/1121514133235644937) when plagiarising this site's content without attribution (https://infodio.com/030119/corruption/journalism/argus/media/plagiarism) (exhibit Reuters here (https://infodio.com/25062021/reuters/angus/berwick/special/report/derwick/alejandro/betancourt), exhibit Bloomberg here (https://infodio.com/29052020/bloomberg/reuters/plagiarism/venezuela), exhibit OCCRP here (https://infodio.com/17022021/plagiarism/exhibit/occrp/drew/sullivan)). To all readers, do the right thing, the honest thing: support independent investigative journalism, help us expose rampant corruption. Note added 28/06/2021: impostors are using INFODIO's former editor's full name, and a fake email address (alek.boyd.arregui at gmail.com) to send copyright infringement claims / take down requests to web hosting companies (exhibit Hostgator (https://twitter.com/infodii/status/1409189789635653640)). The attempt is yet another effort (https://infodio.com/20052021/jp/morgan/eduardo/travieso/guillermo/drew-bear/tamayo/derwick/online/reputation/management) paid by corrupt thugs to erase information about their criminal activities (https://infodio.com/es/terrorismo/boliburgues). Infodio.com has no issues with other websites / journalists using / posting information published here, so long as the source is properly cited.

# Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme.

1 day ago | By Anonymous






Imagine the world's largest money laundering jurisdiction (Switzerland) issuing an arrest warrant for a money launderer. That is exactly what is happening to Alejandro Betancourt. The reason? His direct involvement in a scheme to loot $4+ billion out of PDVSA (https://infodio.com/14082020/nervis/villalobos/rafael/ramirez/pdvsa/corruption). He didn't do it alone, of course. His associates from Derwick were there. Luis and Ignacio Oberto Anselmi "structured" the deal. Nervis Villalobos pitched it to Rafael Ramirez, PDVSA CEO at the time, who, definitely uncharacteristically, called for a board meeting, tasked corrupt colleagues to disburse billions and approved the whole thing in less than a week. Betancourt is being made the fall guy now, but how about the rest?

Spain's High Court named Pedro Trebbau, Francisco Convit, along with Betancourt, explicitly for the first time in connection to the scheme (https://elpais.com/espana/2025-12-08/la-audiencia-nacional-investiga-una-red-de-blanqueo-de-millones-desde-venezuela-que-implica-al-dueno-de-la-marca-de-gafas-hawkers.html). Convit and Betancourt also participated in a separate $1.2 billion U.S. Dollar money laundering scheme, for which Convit remains a wanted fugitive and Betancourt is known to U.S. Justice Department's authorities as co-conspirator 2. That is, Derwick Associates went from selling used power plants that didn't work to participate in PDVSA's largest ever looting cases (over $5.2 billion).

The Oberto Anselmi brothers, while not explicitly mentioned, were also exposed by the Court, which signaled Violet Advisors and Welka Holding as recipients of PDVSA's billions. The Oberto Anselmi continue laundering millions, to the very recent past, by selling fine art at auction.

Nervis Villalobos is involved in so many criminal probes, in so many jurisdictions, that it would take a miracle for him to walk free for much longer.

This site published a detailed account of how the deal came to be (https://infodio.com/14082020/nervis/villalobos/rafael/ramirez/pdvsa/corruption). Shortly after, an agent from Homeland Security Investigations reached out, keen to discuss information on Venezuelan corruption and international money laundering, to which we agreed. It remains a mystery how Rafael Ramirez has escaped explicit mentions and charges in relation to this affair, given that both the Homeland Security agent and Ramirez were based in Rome (https://infodio.com/07102020/italy/rafael/ramirez/money/laundering) at the time.

It has been reported that the Homeland Security Investigation ended up with charges to a number of individuals, who pleaded guilty and admitted to having paid millions of dollars worth of bribes to the likes of Ramirez (https://infodio.com/rafael/ramirez/canaima/finance/itd/banco/espirito/santo/47/million/bribe/06112023).

If a poster boy of chavismo's rampant corruption had to be chosen, Alejandro Betancourt's face would grace the campaign. We almost forgot when we started researching and posting about Betancourt's "entrepreneurial career", but it's been more than a decade. Since appearing in Venezuela's corruption league, Betancourt has denied every accusation, has kept ahead of every criminal probe, has spent tens of millions of U.S. Dollars in PR, lobbyists and lawyers, in every jurisdiction where he operates he has courted and employed corrupt politicians, former prosecutors, America's Mayor, and has partnered with the very worst specimens from Caracas all the way to Russia's FSB (https://infodio.com/16122019/rudy/giuliani/russia/tool). Betancourt is, and has always been, a criminal.

## LATEST / ARCHIVE

Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme. (/11122025/alejandro/betancourt/
Dec 11, 2025 - 15:48

[UPDATED 05/12/2025] - Derwick's Alejandro Betancourt arrested in London by British police (/alejandro/betancourt/derwick/ar
Sep 21, 2025 - 07:17

Spain's Anti Corruption Prosecutors charge Nervis Villalobos, Javier Alvarado, Duro Felguera. (/12072024/spain/anti/corruption/
Jul 12, 2024 - 05:30

France's TRACFIN stops Luis Oberto's St Barts real estate sale to Kirill Pisarev (/12072024/tracfin/luis/ob
Jul 12, 2024 - 04:50

More ▸

## MOST POPULAR


(/index.php/11122025/alejandro/betancourt/pedr

Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme. (/index.php/11122025/alejandro/betan

But so far, American, Swiss, Spanish, Andorran, Italian, Colombian, Canadian, and British authorities have not been able to make anything stick. Switzerland, for instance, ignored for many years the fact that Betancourt effectively controlled a Swiss bank (Banca Credinvest), despite our exposé about it in September 2017. As it turns out, Betancourt & co had 51 accounts at Credinvest (https://gothamcity.ch/2025/12/10/le-parquet-de-zurich-obtient-larrestation-dun-magnat-venezuelien-a-londres/). It is impossible not to be reminded of another episode, also in Switzerland, when a prosecutor dismissed a case about Alex Saab's having laundered about $126 million at UBS (https://infodio.com/27032021/switzerland/endri/gega/alex/saab/alvaro/pulido/vargas).

Spanish and British tax authorities have sparred about Betancourt in the past (https://infodio.com/spain/agencia/tributaria/alejandro/betancourt/derwick/04272023). Curiously, Betancourt boasts about his net worth: £2.6 billion (https://www.business-money.com/announcements/the-2-6-billion-formula-that-leopoldo-alejandro-betancourt-lopez-uses-to-evaluate-every-investment/). The Daily Mail, one of Britain's most read media, posted a story last week entitled "EXCLUSIVE - Billionaire wanted in Switzerland over alleged money laundering fights extradition from two luxury homes in UK, including country estate once frequented by Princess Diana (https://www.dailymail.co.uk/news/article-15348503/Billionaire-wanted-Switzerland-money-laundering.html)", where bail details regarding the two instances in which Betancourt has been arrested in the UK were published. The news that Switzerland wants Betancourt is now part of the public record.

Extradition cases are dealt with by Westminster's Magistrates Court, which set a hearing for May 2026. In the meantime, Betancourt can helicopter his way to the two multi million Pound Sterling residences he keeps in the UK. According to the Daily Mail, Betancourt surrendered his Italian and Venezuelan passports and can no longer travel internationally. Given that, for tax purposes, Betancourt is a resident of the UK, how could his fortune grow to £2.6 billion? How much of what he keeps, say at Banca Credinvest, is reported to British tax authorities?





DERWICK ASSOCIATES (/INDEX.PHP/TAGS/DERWICK-ASSOCIATES)

(/index.php/alejandro/betancourt/derwick/arreste

**[UPDATED 05/12/2025] - Derwick's Alejandro Betancourt arrested in London by British police (/index.php/alejandro/betancourt/derw**

DERWICK ASSOCIATES (/INDEX.PHP/TAGS/DERWICK-ASSOCIATES)

(/index.php/12072024/spain/anti/corruption/pros

**Spain's Anti Corruption Prosecutors charge Nervis Villalobos, Javier Alvarado, Duro Felguera. (/index.php/12072024/spain/anti/corru**

NERVIS VILLALOBOS (/INDEX.PHP/TAGS/NERVIS-VILLALOBOS)

## Tags

DERWICK ASSOCIATES (/TAGS/DERWICK-ASSOCIATES)

**Add to Breaking news**
Off

Fight corruption, spread the word, support independent investigative journalism.

Copyright © 2018, INFODIO. All rights reserved.

# EXHIBIT 25

# infŏdĭo (/)

Home (/)    Who is...? (/290813/who)    Forum (/forum/4)    About (/about)

Contact (/contact)

**Message to INFODIO readers**: investigative journalism, which is what this site does, takes lots of time. Visiting media looking for a quick run down on Venezuela's gargantuan corruption, have the decency to at least cite the source (https://twitter.com/alekboyd/status/1121514133323644937) when plagiarising this site's content without attribution (https://infodio.com/031119/corruption/journalism/argus/media/plagiarism) (exhibit Reuters here (https://twitter.com/infodi0/status/1261348078902284288) and here (https://infodio.com/25062021/reuters/angus/berwick/special/report/derwick/alejandro/betancourt), exhibit Bloomberg here (https://infodio.com/29052020/bloomberg/reuters/plagiarism/venezuela), exhibit OCCRP here (https://infodio.com/17022021/plagiarism/exhibit/occrp/drew/sullivan)). To all readers, do the right thing, the honest thing: support independent investigative journalism, help us expose rampant corruption. **Note added 28/06/2021**: impostors are using INFODIO's former editor's full name, and a **fake email address** (alek.boyd.arregui at gmail.com) to send copyright infringement claims / take down requests to web hosting companies (exhibit Hostgator (https://twitter.com/infodi0/status/1409189789635653640)). The attempt is yet another effort (https://infodio.com/20052021/jp/morgan/eduardo/travieso/guillermo/drew-bear/tamayo/derwick/online/reputation/management) paid by corrupt thugs to erase information about their criminal activities (https://infodio.com/es/terrorismo/boliburgues). Infodio.com has no issues with other websites / journalists using / posting information published here, so long as the source is properly cited.

## Get Betancourt DoJ: he'll bring Ramirez, PDVSA, Ivanov, Anisimov & Gazprom

6 years ago  |  By Alek Boyd

Further to news reported by Miami Herald today (https://www.miamiherald.com/news/local/article236793383.html), about involvement of Alejandro Betancourt in Operation Money Flight (https://infodio.com/211018/pdvsa/convit/krull/pedro/binaggia/money/laundering) and how the loot was divided among cartel members (https://www.maltatoday.com.mt/news/national/89823/venezuela_portmann_fiau_money_laundering_payments), sources have told this site that the U.S. Department of Justice allegedly leaked detailed information, seeking to force Betancourt out of his "I'm Venezuela's Steve Jobs" delusion and get him to cut a deal. High officials of the Trump administration, speaking on condition of anonimity, confirmed to this site that Betancourt has been a person of interest for quite some time.

DoJ's Michael Nadler, conducting criminal probes into Venezuelan corruption, is sitting on a mountain of evidence linking Betancourt, and already indicted partner Francisco Convit (https://www.justice.gov/opa/pr/two-members-billion-dollar-venezuelan-money-laundering-scheme-arrested), with vast money laundering schemes centered at PDVSA. Sealed indictments are waiting at the ready, according to people familiar with ongoing investigations. Pedro Binaggia, a key collaborator in the probe, was also involved in a previous $4+ billion scheme (2012), involving same set of characters (https://infodio.com/261019/questions/doj/rafael/ramirez/corruption). Betancourt's role was instrumental in both cases to get Rafael Ramirez's approval (https://infodio.com/es/061019/corrupcion/rafael/ramirez/pdvsa). Brothers Ignacio and Luis Oberto Anselmi are said to be collaborating with Nadler's probe into the $4+ billion deal. Crucially, Charles Henry de Beaumont, a Compagnie Bancaire Helvetique banker at the core of much of this corruption, has also been tapped by investigating DoJ prosecutors.

In Venezuela's corruption leagues, Betancourt is a better catch than either the Oberto brothers, or Matthias Krull. Betancourt, more than either his cousin and associate Pedro Trebbau, or Francisco Convit, seems to be the chief orchestrator of much of Derwick Associates' corruption. It was Betancourt -through Nervis Villalobos' longtime relation with Rafael Ramirez- who got the $4 billion plus deal for the Oberto brothers. In fact, this site has reported how EFG Bank internal documents show that just the first billion-dollar tranche received from PDVSA by the Obertos resulted in transfers totalling $100 million to accounts controlled by Betancourt and Convit (https://infodio.com/150119/luis/ignacio/oberto/derwick/associates/pdvsa). Operation Money Flight was a $1.2 billion encore, less than a third of first scheme.

While these money laundering schemes were taking place, Betancourt established a partnership with Gazprom's Boris Ivanov, and got into a joint venture with PDVSA called Petrozamora (https://infodio.com/14032016/derwick/oil/gas/money/laundering/gazprombank/pdvsa/petrozamora). Internal emails from Petrozamora leaked to this site show Vladimir Anisimov, former Deputy Head of Internal Affairs at FSB, as an associate (https://infodio.com/160319/fsb/vladimir/anisimov/derwick/venezuela). The originator of said emails is Orlando Alvarado, CFO of Derwick and conspirator no 4 in Operation Money Flight.

In addition to Money Flight, Betancourt is believed to be associated with Maikel Moreno and Raul Gorrin in a yet-to-start joint venture with PDVSA, called Petrosur. In that one, Betancourt's partners are former executives from Spain's REPSOL.

  

LATEST    ARCHIVE

**Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme.** (/11122025/alejandro/betancourt/
Dec 11, 2025 - 15:48

**[UPDATED 05/12/2025] - Derwick's Alejandro Betancourt arrested in London by British police** (/alejandro/betancourt/derwick/ar
Sep 21, 2025 - 07:17

**Spain's Anti Corruption Prosecutors charge Nervis Villalobos, Javier Alvarado, Duro Felguera.** (/12072024/spain/anti/corruption/
Jul 12, 2024 - 05:30

**France's TRACFIN stops Luis Oberto's St Barts real estate sale to Kirill Pisarev** (/12072024/france/tracfin/luis/ob
Jul 12, 2024 - 04:50

More >

MOST POPULAR



Alejandro Betancourt (finally) named in connection to PDVSA's largest money laundering scheme. (/index.php/11122025/alejandro/betan



(https://infodio.com/es/281117/alejandro/betancourt/petrosol/vapilas/maduro/jose/ramon/blanco/pdvsa).

Betancourt knows exactly where Rafael Ramirez is, as he was personally involved in setting up a meeting between Ramirez and Erik Prince, when Prince was pitching to different parties his plan for regime change in Venezuela earlier this year.

Betancourt is also privy to Juan Guaidó's innermost plans and strategies, as he has fetted and entertained Guaidó's brother in his Spanish castle near Madrid. Sources have informed this site that Guaidó has offered amnesty to Betancourt, in exchange for financial support.

Betancourt has exposure in probes in Venezuela, Spain, Portugal, Andorra, Malta, Switzerland, and the U.S. This site has chronicled and catalogued, like no other, Betancourt's criminal activities around the world (https://infodio.com/search/node?keys=derwick), which in addition to misappropriation of billions of dollars, include almost certain involvement in breaking and entering, theft, illegal surveillance, and threats of sexual abuse to minors.

Sources have informed this site that Betancourt, who travels on either his Italian or (multiple) Venezuelan passports, keeps a residence and spends considerable time in London. The UK is another jurisdiction where Betancourt is involved in criminal activity.

It's going to be interesting to see how Betancourt, who loves to threaten, sue and silence journalists and media, deals with the Miami Herald piece. Relatives of his -likely assisting in money laundering- grouped in Stambul LLC, are currently suing one of Venezuela's best investigative journalist in Miami, due to an expose into their dodgy affairs (https://infodio.com/27/09/19/stambul/llc/derwick/associates/censorship).

If it gets Betancourt, the DoJ could very well disrupt an international criminal gang that includes corrupt Russian, Spanish, American, and Venezuelan actors. The question is: why has it not done it already? While Betancourt is no Raul Gorrin, in the sense of ascendancy over current chavista establishment, he navigates like very few internal Venezuelan politics, Russian interests -both commercial and political-, Spanish powerful circles, sophisticated international finance, and the very best U.S. legal, political, media and PR circles for hire. Remember: Al Cardenas, Hans Hertell, Fusion GPS and Adam Kaufmann have all been on Betancourt's dime.



(/index.php/alejandro/betancourt/derwick/arreste

[UPDATED 05/12/2025] -
Derwick's Alejandro Betancourt
arrested in London by British
police
(/index.php/alejandro/betancourt/derw

DERWICK ASSOCIATES
(/INDEX.PHP/TAGS/DERWICK-
ASSOCIATES)

EL FISCAL, despachando el trámite previsto en los artículos 780.1° y 781, ambos de la Ley de Enjuiciamiento Criminal, interesa la apertura del juicio oral ante la SALA DE LO PENAL DE LA AUDIENCIA NACIONAL, formulando ESCRITO DE ACUSACIÓN contra,

los siguientes personas físicas:
1.- Nervis Gerardo Villalobos Cárdenas (N. I. E. Y-1937305-L);
2.- Milagros Coromoto Torres Martel;
3.- Luis Andrés Barrios Meléns (titular de documento de identidad venezolano número 4.148.371);
4.- Javier Alvarado Ochoa, posteriormente identificado, por cambio de apellidos, como Javier Ochoa Alvarado (D.N.I. nº 06679227-N);
5.- Maride Coromoto Pardi;
6.- Carieda Carolina Casanova;
7.- Luis Carlos de Leão Pérez;

(/index.php/12072024/spain/anti/corruption/pros

Spain's Anti Corruption
Prosecutors charge Nervis
Villalobos, Javier Alvarado,
Duro Felguera.
(/index.php/12072024/spain/anti/corru

NERVIS VILLALOBOS
(/INDEX.PHP/TAGS/NERVIS-
VILLALOBOS)



**Tags**

DERWICK ASSOCIATES (/TAGS/DERWICK-ASSOCIATES)

**Add to Breaking news**
Off

Fight corruption, spread the word, support independent
investigative journalism.

Copyright © 2018, INFODIO. All rights reserved.

# EXHIBIT 26

# Billionaire wanted in Switzerland over alleged money laundering fights extradition from two luxury homes in UK, including country estate once frequented by Princess Diana

By ANDREW LEVY AND JON AUSTIN

**PUBLISHED:** 20:22 EST, 3 December 2025 | **UPDATED:** 02:42 EST, 4 December 2025

When a billionaire locked in an extradition battle has his good name to clear and two multi-million pound properties at his disposal, there's no chance of a flight risk.

Unless he wants to get between the two mansions, of course.

Venezuelan energy magnate Leopoldo Alejandro Betancourt Lopez has been granted the unusual bail condition of being able to travel by private helicopter between his luxury residences in Chelsea and Oxfordshire while he fights **legal attempts to make him travel to Switzerland to face alleged money laundering offences**.

The main bail address approved by Westminster Magistrates Court is the £24 million six-bedroom contemporary mansion in west London, called Burnsall House.

Described in marketing literature as 'the largest detached home to have been built in Chelsea for almost a decade', it boasts a huge kitchen/dining/living area, sumptuous sitting room and secluded patio garden, as well as a wine cellar and indoor swimming pool.

The alternative bolthole is 14-bedroom Kingstone Lisle Park, a Grade II listed Georgian country house near Wantage which was last sold for £18 million in 2018 prior to extensive renovations.

Set in a private estate with sculptured grounds and a croquet lawn, parts of its interior was once described by Country Life as 'one of the most breath-taking surprises to be found in an English country home'.

1

The ground floor of the property, which dates from 1677, has a high-ceilinged dining room and drawing room, octagonal study, morning room, kitchen/breakfast room, butler's pantry, gun room and staff sitting room.

The first floor has a large master bedroom suite and second bedroom, while the upper first floor has a guest wing with two double bedrooms and adjoining bathroom.

Another staircase leads to a second guest floor with four double bedrooms and two bathrooms.

Also on the first floor is the children's wing, with four bedrooms, a bathroom, children's sitting room, linen room and nanny's en suite bedroom.

The estate was often visited by the late Diana, Princess of Wales with Prince Harry when her Lady in Waiting, Laura Grieg, lived there.

Under bail conditions set by the court, Betancourt Lopez, 45 – who has surrendered his Venezuelan and Italian passports - must not apply for any international travel documents or be in possession of any.

But he can live at the two addresses and use London Heliport in Battersea to travel between them.

Betancourt Lopez, who is worth an estimated £2.6 billion, was **arrested on November 3 in Charing Cross under an international arrest warrant from Switzerland.**

**Swiss authorities allege he was involved in money laundering there between October 2010 and January 2018.**

**He was initially held in custody but released on bail after paying a £2 million security.**

**The businessman was previously arrested in the Oxford area in September under a European Arrest Warrant issued by Spain – although it is understood this was withdrawn**.

A court spokesman said: 'He had competing warrants. The Spanish (warrant) was discharged and replaced by the Swiss warrant, which is the current case.

'As only one set of proceedings can be in place at any one time, this was the solution to this person.'

2

Betancourt Lopez, who is understood to be leasing both bail properties and has homes in Paris, New York, Florida and Spain where he allegedly bought a £21 million hilltop castle, has invested in companies and property in territories across Europe and the US.

He is chairman and chief executive of **Derwick Associates**, an engineering, procurement and construction company, as well as majority shareholder of international investment group O'Hara Administration and a director of Canadian gas and oil company Pacific Exploration & Production Corporation.

The entrepreneur is also president of Hawkers, a Spanish sunglasses company. His attorney, Thomas Clare, said in a letter that the allegations against him are 'politically motivated'.

Any suggestion of his client or his companies being 'engaged in corrupt activities, such as bribery, bid-rigging, kickbacks or other illegal behaviour' were 'categorically false', he added. Despite the extradition case, Betancourt Lopez has continued to promote his business interests by appearing in a number of interviews.

In one with Business Money on November 21, he described his commercial philosophy as being a 'massive risk taker [but with] a good batting average'.

He added: 'I'm the person that, when it goes bad, I sink with the ship. I don't walk out of the ship.

**Betancourt Lopez denies any wrongdoing and continues to contest the extradition request. A five-day hearing is due to take place in May**.

Betancourt Lopez was contacted for a comment.

# EXHIBIT 27

U.S. NEWS

# Secret US spying program targeted top Venezuelan officials, flouting international law



**This giving season stand for press freedom.**

Fundamental principles never go out of style. AP stands for press freedom today like it has for nearly two centuries.

Donate to the AP

BY JOSHUA GOODMAN AND JIM MUSTIAN
Updated 4:36 AM EST, February 1, 2024

MIAMI (AP) — A secret memo obtained by The Associated Press details a yearslong covert operation by the U.S. Drug Enforcement Administration that sent undercover operatives into Venezuela to surreptitiously record and build drug-trafficking cases against the country's leadership — a plan the U.S. acknowledged from the start was arguably a violation of international law.

"It is necessary to conduct this operation unilaterally and without notifying Venezuelan officials," reads the 15-page 2018 memo expanding "Operation Money Badger," an investigation that authorities say targeted dozens of people, including Venezuelan President Nicolás Maduro.

While there's no clear mechanism to hold the United States accountable legally, the revelation threatens to roll already fraught relations with Maduro's socialist government and could deepen resentment of the U.S. across Latin America over perceived meddling. It also offers a rare window into the lengths the DEA was willing to go to fight the drug war in a country that banned U.S. drug agents nearly two decades ago.

Some of Maduro's closest allies were ensnared in the investigation, including Alex Saab, the businessman recently freed in a prisoner swap for 10 Americans and a fugitive defense contractor. But until now, it was not clear that U.S. probes targeting Venezuela involved legally questionable tactics.



This June 13, 2016, file photo shows Drug Enforcement Administration agents in Florida. (Joe Bur    Read More

"We don't like to say it publicly but we are, in fact, the police of the world," said Wes Tabor, a former DEA official who served as the agency's country attaché in Venezuela well before the investigation described in the memo was launched.

Tabor, who would not confirm the existence of any such operations, said unilateral, covert actions can be an effective tool when conducted with proper limits and accountability, particularly in a country like Venezuela, where the blurred lines between the state and criminal underworld have made it an ideal transit point for up to 15% of the world's cocaine.

"We're not in the business of abiding by other countries' laws when these countries are rogue regimes and the lives of American children are at stake," he said. "And in the case of Venezuela, where they're flooding us

Stores open on Christmas    Christmas sports: How to watch    California storm    $1.8B Powerball jackpot    Christmas Day blaze

The DEA and Justice Department declined to answer questions from the AP about the memo, how frequently the U.S. conducts unilateral activities and the makeup of the panel that approves such operations.

Venezuela's communications ministry did not respond to requests for comment. But in recent days Maduro accused the DEA and the CIA — a regular target he uses to rally supporters — of undertaking efforts to destabilize the country. The CIA declined to comment.

"I don't think President Biden is involved," Maduro said in a televised appearance this month. "But the CIA and the DEA operate independently as imperialist criminal organizations."

## TARGETING MADURO

The never-before-seen document was authored at the cusp of Republican President Donald Trump's "maximum pressure" campaign to remove the Venezuelan president.

Maduro had just taken an authoritarian turn, prevailing in what the Trump administration decried as a sham re-election in 2018. Within weeks, senior DEA officials plotted to deploy at least three undercover informants to surreptitiously record top officials suspected of converting Venezuela into a narco state.

But because the plan appeared to run roughshod over Venezuelan and international law, it required the approval of what is known as the Sensitive Activity Review Committee, or SARC, a secretive panel of senior State and Justice Department officials that is reserved for the most sensitive DEA cases involving tricky ethical, legal or foreign policy considerations.

It marked an aggressive expansion of "Money Badger," which the DEA and prosecutors in Miami created in 2013 and would go on to investigate around 100 Venezuelan insiders, according to two people familiar with the operation who spoke on the condition of anonymity to discuss law enforcement details.



Venezuelan President Nicolas Maduro delivers his annual address at the National Assembly in Caracas, Venezuela, Monday, Jan. 15, 2024. (AP Photo/Ariana Cubillos)                                                                                    Read More

By authorizing otherwise illicit wire transfers through U.S.-based front companies and bank accounts, the DEA aimed to unmask the Colombian drug traffickers and corrupt officials leveraging Venezuela's tightly controlled foreign currency exchange system to launder ill-gotten gains. But it expanded over time, homing in on Maduro's family and top allies, although the president would end up being indicted elsewhere, by the U.S. Attorney's Office in Manhattan, on drug trafficking charges.

None of the indictments of Venezuelans either before or after the 2018 memo made any mention of U.S. spying. And "to limit or mitigate the exposure of the unilateral activities," the document advised DEA officials to protect their informants and curtail in-person meetings with targets.

It is not clear if "Money Badger" is still ongoing.

Since Democratic President Joe Biden took office in 2021, his administration has rolled back sanctions and brought few new prosecutions of Maduro insiders as the Justice Department's attention has turned to Russia, China and the Middle East. The Biden administration has also sought to lure Maduro back into negotiations with the U.S.-backed opposition, threatening to re-impose crippling oil sanctions if the OPEC nation doesn't abide by an agreement to hold fair and free elections this year.

The operation targeting Maduro's inner circle is not the first time the United States has conducted law enforcement operations overseas without notifying a host country.



Venezuelan President Nicolas Maduro holds a small copy of his nation's constitution during ceremony marking the start of the judicial year at the Supreme Court in Caracas, Venezuela, Jan. 22, 2024. (AP Photo/Ariana Cubillos, File)                   Read More

In 1998, Mexico castigated the United States for keeping it in the dark about a three-year money laundering sting known as "Operation Casablanca" — partly conducted on Mexican soil — that implicated some 160 people, including several bank executives.

Notably, legal experts say no international court or tribunal has jurisdiction to hold the United States or its agents accountable for covert law enforcement actions in other countries, and the U.S. Supreme Court has upheld arrests and evidence collected on such missions.

Evan Criddle, a law professor at William & Mary in Virginia, said international law forbids undercover operations such as those described in the memo that take place in another country's territory without consent. He expects the release of the memo to "cause some embarrassment to the United States, prompt Venezuelan diplomats to register their objections and potentially inhibit future cooperation."

Several current and former DEA officials who examined the memo told the AP they were surprised less by the brazenness of the plan than the agency's acknowledgement of it in internal documents.

"It's very rarely done simply because there's always that potential of it blowing up in the U.S. government's face," said Mike Vigil, the DEA's former chief of international operations. "But Venezuela had already become a rogue state. I think they figured they had nothing to lose."

## RELEASED BY ACCIDENT

The Operation Money Badger memo was never intended to be made public.

It was inadvertently uploaded among dozens of government exhibits to a file share website by the U.S. Attorney's Office in Manhattan during the bribery conspiracy trial late last year of two former DEA supervisors who helped spearhead the agency's offensive against the Maduro government. It would be removed hours after an AP reporter started asking about it.

A few days later, over the AP's objections, the federal judge presiding over the bribery trial took the highly unusual step of sealing the courtroom while the document was discussed, saying that doing so in open court would have "serious diplomatic repercussions." Neither he nor prosecutors explained what those might be.

Jonathan Mullane
30 Donnell Street
Cambridge, MA 02138-1352

**UNITED STATES POSTAL SERVICE.**

Retail

# G

## US POSTAGE PAID

### $13.70

Origin: 02138
12/31/25
240101038-17

## USPS GROUND ADVANTAGE®

1 Lb 8.50 Oz

RDC 01

C071



SHIP
TO:
RM 8N09
400 N MIAMI AVE
MIAMI FL 33128-1805

USPS TRACKING® #

Ms. Angela E. Noble
Wilkie D. Ferguson, Jr.
U.S. Courthouse
400 North Miami Avenue (Rm 8N09)
Miami, Florida 33128