IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

FILED BY _____ M _____ D.C.

FEB 10 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

JONATHAN MULLANE,

  *Plaintiff,*

v.

UNITED STATES OF AMERICA, ET AL.,

  *Defendants.*

Civ. A. No. 1:20-cv-21339
Hon. Liles C. Burke

**PLAINTIFF'S OMNIBUS
[1] UNOPPOSED MOTION TO CONVERT FEBRUARY 24, 2026 STATUS
CONFERENCE TO A VIDEOCONFERENCE HEARING; AND
[2] MEMORANDUM IN FURTHER SUPPORT OF THE UNOPPOSED
MOTION FOR THE APPOINTMENT OF COUNSEL**

Plaintiff Jonathan Mullane ("Plaintiff") in the above-entitled cause hereby respectfully moves this Honorable Court to convert the in-person status conference scheduled for February 24, 2026 10:00 a.m. [Doc. 121-22] to a virtual videoconference via Zoom. The Government has advised that it does not oppose the instant motion. Plaintiff resides in Cambridge, Massachusetts, and traveling to Miami, Florida, for the scheduled in-person hearing would be unduly burdensome. Without limitation, Plaintiff is presently required to undertake intensive medical treatment which requires that he travel to a Massachusetts hospital five days per week. Traveling out of state to Florida would thus foreseeably harm Plaintiff's health by interrupting and interfering with his ongoing medical care and treatment. Moreover, as noted in Attorney Mullane's January 6, 2026 affidavit [Doc. 116],[1] serious unaddressed concerns remain vis-à-vis the physical safety of Plaintiff and his family. *Compare, e.g.,* Ex. 1-6 (multiple suspicious deaths of witnesses and attorneys connected to the United States' unlawful unilateral coercive sanctions and fifty-plus criminal cases involving PDVSA, SEBIN, Kremlin-controlled Gazprombank JSC, *etc.* that both Plaintiff and his father E. Peter Mullane, Esq. worked on, and for both the prosecution and the defense); *with* Doc.

---

[1]     Plaintiff hereby adopts and incorporates the said affidavit in its entirety, together with the exhibits appended thereto. *See* Fed. R. Civ. P. 10(c).

*Mullane v. United States, et al.*

31 (sealed order[2]).  The foregoing is one of the many reasons why Plaintiff has appropriately and timely moved for referral to the volunteer attorney program—for the second time. *Compare* Doc. 3 (timely filed on March 27, 2020, the same date on which the initial complaint was submitted); *with* Doc. 117 (second request, filed on January 6, 2026). If allowed, local counsel could then appear on Plaintiff's behalf for any and all in-person, pre-trial events in this case, which would also be of great benefit to the Court itself.

As the Government is well aware, Martin Lustgarten had been threatened repeatedly prior to his untimely and suspicious death:

> The CS was activated on March 26, 2010. The CS was involved as a defendant or target in a pending criminal investigation. CS has a criminal history. The CS was the principle [sic] account holder for an account seized under a DEA investigation. CS [Lustgarten] was threatened. The threat was handled by NEFD FIT team. CS and family moved to Panama[.] The CS cooperated with the NEFD FIT investigation until deactivation.

Jul. 31, 2015 U.S. Drug Enf. Admin. mem. at 2 ¶ 6 (Confidential Source Deactivation) [Ex. 1] (emphasis supplied).

Unacceptably, and notwithstanding their direct involvement and participation in the PDVSA cases, the United States Government consistently refused to provide Plaintiff or his family any protection at all—let alone move them to Panama or Switzerland. Worse still, the NEFD FIT team negligently failed to ever contact them, or to let them know that Lustgarten was once again

---

[2]      The motion judge was later recused for cause after the undersigned was left with no alternative but to complain to the United States Court of Appeals for the Eleventh Circuit. Following a highly-unusual sealed order [Doc. 31] which was even entered without a hearing notwithstanding the gravity of the allegations, as more fully explained below: (1) Plaintiff's father E. Peter Mullane, Esq. suffered a serious brain injury after he was foreseeably targeted in a hit-and-run; (2) Lustgarten's identity as a CI was leaked to the *Miami Herald*; and (3) Lustgarten was found dead in Madrid, Spain, shortly thereafter under suspicious circumstances (assuming he was not placed in a DEA witness-protection program). As stated in Attorney Mullane's January 6, 2026 affidavit [Doc. 116], Lustgarten was repeatedly advised and warned not to cooperate with the United States Government in any capacity. It is regrettable that he knowingly opted to disregard the advice of counsel. But ultimately, that was Lustgarten's decision to make—not Plaintiff's or Attorney Mullane's—and, as an adult, he willingly assumed the foreseeable dangers, risks, and consequences of his actions.

         While Lustgarten is not a United States citizen, Plaintiff and his father both are. Under the United States Constitution, as citizens, they are guaranteed the right to vindicate their constitutional rights in a court of law through the judicial process, and in the ordinary course. But this litigation has not proceeded in the "ordinary course" by any measure. The judiciary's irresponsible and unethical actions directly harmed Plaintiff's psychological health by placing him in fear for a prolonged eight-year period; no normal person's psychological health would somehow not be harmed under such extreme circumstances. Since the motion judge was fully cognizant of his disqualifying conflicts of interest in this case *ab initio* (and through gleaning the allegations of the initial iteration of the complaint [Doc. 1]), he was legally required to recuse himself *prior* to ruling on Plaintiff's motions—not after.

*Mullane v. United States, et al.*

working as a CI for the DEA (and against the advice of counsel). And this was after Plaintiff had: (1) contacted the Federal Bureau of Investigation (FBI); (2) wrote to the Executive Branch regarding his well-founded concerns relating to his physical safety and that of his family; and (3) wrote to Chief Judge William H. Pryor, Jr. of the Eleventh Circuit, District Judge Patti B. Saris of the District of Massachusetts, and District Judge Federico A. Moreno notifying them of the fact that (i) his father's law firm had been broken into over three times, and through sophisticated techniques typically employed by domestic and foreign intelligence services (*e.g.*, *remotely* deactivating a particular CCTV camera precisely five minutes beforehand), (ii) that both of Lustgarten's attorneys had "coincidentally" been the targets of hit-and-runs (Attorney Diamond's arm was broken, while Plaintiff's father was knocked unconscious and suffered a Traumatic Brain Injury (TBI)), (iii) that Lustgarten himself had been found dead under highly-suspicious circumstances, (and "coincidentally" shortly after unknown persons leaked to the *Miami Herald* the fact that he was working as a DEA cooperator yet again), (iv) that Plaintiff understandably felt unsafe given his personal and publicly-acknowledged involvement in the PDVSA cases (for both the prosecution and defense) wherein countless other individuals were also found dead under similarly-suspicious circumstances, and that the ongoing delays were causing permanent harm to his physical and psychological health (most people generally do not enjoy living in terror or fear of physical harm on a daily basis for eight years), (v) that Plaintiff had been followed by unknown individuals approximately 100km from the Canadian border, which he immediately reported to the Vermont State Police in December 2018 after having been stopped by a state trooper who "coincidentally" happened to be working within a DEA joint task force at the time, and (vi) countless other objectively-unusual and concerning events. *Ab initio*, Plaintiff's reasonable and well-founded complaints were consistently disregarded by both the Executive Branch and federal judiciary, and for an illegitimate reason. Assisting the Executive Branch in its objective of violating international and domestic law through its ongoing actions against The Bolivarian Republic of Venezuela and the Islamic Republic of Iran—against the will of the American people, and in contravention of the constitutional separation of powers—is apparently more weighty than the constitutional rights, physical safety, and legal interests of United States citizens such as Plaintiff and Attorney Mullane (Lustgarten is a foreign national, and has a lengthy criminal record). It is also more important than the Due Process Clause too, in view of the fact that Plaintiff continues to wait for eight years and counting for a simple due-process hearing—and with zero

*Mullane v. United States, et al.*

discovery whatsoever to-date.[3]

Insofar as Plaintiff's physical presence may be required for one or more events in this case, the undersigned respectfully requests that "reasonable accommodations" be made, including, without limitation: (1) the issuance of an order directing the United States Marshals Service (USMS) to afford Plaintiff and his family the police protection which they have consistently requested; and (2) holding all such in-person events at the United States Courthouse in Huntsville, Alabama as opposed to the Miami courthouse (*i.e.*, where many, but not all, of the underlying events occurred). Indeed, Defendant Moreno remains employed there to this day; upon information and belief, no disciplinary action has been taken against him by the federal judiciary for the past eight years and counting. In January 2025, Plaintiff was requested to personally appear for oral argument before the Eleventh Circuit in the Miami courthouse, and in the exact same building where Plaintiff worked—and despite the fact that, as the Eleventh Circuit knew from perusing the verified complaint, Plaintiff had been suffering from, and continues to suffer from, symptoms related to Post-Traumatic Stress Disorder (PTSD). Unsurprisingly, being physically present in the Miami courthouse—where Defendant Moreno curiously remains employed—has harmed the undersigned by exacerbating and worsening his health conditions. Accordingly, this Court can, and indeed should, make all of the reasonable accommodations requested above. This includes, without limitation, allowing the unopposed motion for the appointment of counsel.

It should also be noted that, in a parallel criminal case in the District of Massachusetts brought by Defendant United States and the individual Defendants herein, the Government informed Plaintiff's prior counsel that it would continue to press criminal charges and keep Plaintiff under home detention for over nine months unless and until he "would agree to drop [this] lawsuit"—and even emailed copies of court filings from the instant civil case to Plaintiff's attorneys of record in the criminal case. Such conduct is unlawful and unethical, and further justifies the appointment of counsel in this civil case. It is black-letter law that the First Amendment's Petition Clause guarantees the fundamental right to file a lawsuit seeking redress

---

[3] The *Lustgarten* case that Plaintiff and his father worked on was so serious and far-reaching, it was even discussed on multiple occasions within the European Parliament in Brussels. Ex. 16 at 2 ¶ 3 ("Insofern hat es uns dann auch nicht verwundert zu sehen, dass sich unter Berenbergs Offshore- Kunden ein Martin Lustgarten-Ackermann befindet, er wird in den USA beschuldigt etwa 100 Millionen Dollar für kolumbianische und mexikanische Drogenkartelle gewaschen zu haben. Aufgrund eines Formfehlers wurde das Verfahren inzwischen eingestellt.").

*Mullane v. United States, et al.*

against the Government, as well as to engage in such constitutionally-protected speech. *See, e.g.,* *Bill Johnson's Restaurant, Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances."). And the right to subject governmental action to constitutional scrutiny "implicates central First Amendment concerns." *Legal Services Corp. v. Valazquez*, 531 U.S. 533, 547 (2001). More importantly, "retaliation by the government that is motivated, <u>at least in part</u>, by a lawsuit of constitutionally protected speech may violate the First Amendment[.]" *Nethersole v. Bulger*, 287 F.3d 15, 19 (1st Cir. 2002); *Boyle v. Burke*, 925 F.2d 497, 505 (1st Cir. 1991) (Emphasis supplied). By way of analogy, even if the Government's criminal charges were 80% motivated by a person's criminal conduct and 20% motivated by that person's lawsuit, such a situation would still be violative of the First Amendment.

Using a criminal case to obtain leverage against someone in a parallel civil case is considered unethical and sanctionable conduct in the State of Florida. Pursuant to Florida Bar Ethics Opinion 89-3, all lawyers are prohibited from using the criminal justice system to gain *any* form of advantage in a parallel civil matter. *See id.* The exact same rule also exists in the Commonwealth of Massachusetts and in the State of Rhode Island. Mass. R. Prof. C. 3.4(h) ("Fairness to opposing party and counsel") (a lawyer shall not "present, participate in presenting, or threaten to present criminal or disciplinary charges solely to obtain an advantage in a private civil matter"); Comment 6, Rule 3.4 ("Paragraph (h) prohibits filing or threatening to file disciplinary charges as well as criminal charges solely to obtain an advantage in a private civil matter."); R.I. R. Prof. C. 3.4(h) (similar); R.I. R. Prof. C. 4.4 (prohibition against using means that have "no substantial purpose other than to embarrass, delay, or burden"). In a word, using the threat of criminal prosecution to force a settlement in a civil dispute is considered a subversion of the justice system. *Cf.* Peter H. Geraghty, *Making Threats*, A.B.A. J. (2008).[4]

If the present lawsuit were somehow not the true, underlying motive and/or basis for prosecuting the parallel criminal case, then why is the Government emailing court filings from this civil case to Plaintiff's counsel in the criminal case *at all*? Naturally, it would have no legitimate reason to do so. And if this lawsuit were somehow not the true, underlying motive for prosecuting

---

[4]      Here, the Government's strategy is similar to the playbook it used against Lustgarten: it brought a civil deportation action against Lustgarten, which the Government used as leverage in order to pressure him into cooperating in the PDVSA and Maduro-related criminal cases.

*Mullane v. United States, et al.*

Plaintiff criminally, then why is the Government even discussing Plaintiff's protected First Amendment speech in the first place (*i.e.*, court filings submitted in the context of this lawsuit) in open court in the parallel criminal case? The United States Constitution prohibits such First Amendment retaliation—not to mention the code of conduct that applies to attorneys. The bottom line is this: criminal cases can never be used to gain leverage in any civil case. With a view to vindicate and protect his First Amendment rights, Plaintiff has appropriately requested the appointment of counsel in this matter.  When civil litigants submit court filings, they should never feel that they are doing so under duress or fear of criminal sanctions for exercising their First Amendment rights; nor should they feel coerced in any way. If the Government were legally authorized to "chill" such protected First Amendment speech, no rational citizen would dare to file a single lawsuit against the Government in the first place. It would not be in his or her legal interests to do so; the costs would simply be too great. First Amendment speech cannot be used as a basis for criminal sanctions. Similarly, criminal sanctions cannot be used to obtain leverage in a lawsuit in any way, shape, or form.

As further grounds for the appointment of counsel, the Government has deliberately spoliated evidence in this case, and with a view to prevent Plaintiff from effectively prosecuting his claims herein. Indeed, the Government—without any warrant, and thus a search and seizure which is untethered to any particular criminal case—disturbingly accessed Plaintiff's cloud account located on a server in the Northern District of Florida. That is unlawful.

*First*, as the court explained in *United States v. Barber*, 15-cr-40043-CM (D. Kan. Apr. 27, 2016), neither the Stored Communications Act (SCA) nor Fed. R. Crim. P. 41 allows a judge sitting in the District of Massachusetts to grant a warrant searching email/cloud accounts located in the Northern District of California. *See id.* In other words, even if the Government had a warrant in connection with a District of Massachusetts criminal case (it did not), such a warrant would have been void and invalid. *Second*, the Government did not have, and does not have, any warrant at all. It was a warrantless search. To be sure, the Government *did* indeed have warrants to search Plaintiff's iPhone and laptop computer. But that is where it ends. The warrants did not allow the Government to additionally enter Plaintiff's electronic cloud account and data located on a server in the Northern District of California. Thus, the Government has—once again—violated Plaintiff's Forth Amendment rights (and other constitutional rights) with impunity. And why would they not? Who is going to stop them? *Third*, even in a counterfactual scenario wherein the Government did

*Mullane v. United States, et al.*

possess a warrant—and it did not, according to Apple itself (they never received any warrant whatsoever in connection with any of Plaintiff's accounts)—it strains credulity to believe that a federal magistrate judge somehow would have authorized the deliberate spoliation of evidence related to an ongoing lawsuit, where the litigation hold obviously applies. Of course, in no way would such a warrant ever have authorized an FBI agent in Quantico, Virginia (*i.e.*, not in the District of Massachusetts) to: (1) completely <u>delete</u> Plaintiff's entire Gmail account; (2) tamper with Plaintiff's iCloud email account, changing the telephone number and password associated with the account thereby making all of the data inaccessible; and (3) most importantly, preventing Plaintiff from accessing his evidence folders and document folders located on his electronic cloud account (again, because the Government has tampered with it by *inter alia* resetting the login credentials). And that is without even addressing the Government's other egregious actions such as searching—without any "probable cause" therefor—Plaintiff's credit card statements, bank accounts, and countless other highly-invasive searches that have absolutely no possible factual connection to angry emails. Simply put, such calculated intrusions were solely designed to psychologically intimidate, harass, and coerce the undersigned into dropping this lawsuit, and to go on an (unsuccessful) "fishing expedition" to look for real, genuine crimes that Plaintiff may have committed. And because such actions are all factually related to this ongoing lawsuit—the Government even conceded that in open court, and repeatedly emailed Plaintiff's counsel Eleventh Circuit court filings—this Court is authorized to hold a hearing vis-à-vis sanctions in this civil case. The parties are the same.

So, to recap: Plaintiff filed a lawsuit against the United States Government in or around December 2018. *See* Doc. 1. In or around May 2025, the Government subsequently filed a parallel criminal case without probable cause (as explained below, there was no "true threat" of actual and imminent physical violence, which means it was a legally baseless, *mala fide*, and malicious prosecution[5]), and then used that baseless, pretextual criminal case as a convenient pretext and

---

[5]      And there are countless other indicia evidencing the fact that Plaintiff is presently the victim of a "selective prosecution." *First*, the recipients of Plaintiff's emails never even blocked Plaintiff's email address. This is because they knew that those emails were specifically related to the present lawsuit; they were not random harassment or actual threats of physical violence. *Second*, on March 27, 2020 [Doc. 3], Plaintiff moved for the appointment of counsel because *inter alia* his PTSD-related symptoms were being triggered by needing to litigate this case *pro se*. So what did the Government do in response? It opposed that motion and reasonable request. Later, when Plaintiff notified the Government that his health conditions and disability were (shockingly) becoming worsened by the *status quo*, just as he had truthfully disclosed again and again, the Government *still* refused to let Plaintiff communicate through counsel (*i.e.*, as opposed to Plaintiff having to send emails to

*Mullane v. United States, et al.*

excuse to spoliate Plaintiff's evidence and "look at his cards" by improperly viewing: (1) privileged attorney-client communications located on Plaintiff's cloud account and email account in the Northern District of California, including emails relating to litigation strategy in this civil action to and from Plaintiff's father and countless other attorneys—and without establishing a so-called "taint team" beforehand; (2) work-product including draft motions related to this ongoing lawsuit—which the Government is not entitled to look at ever, at least not without a taint team in place; (3) all of the evidence Plaintiff had related to this lawsuit, which is obviously confidential; and (4) once the Government was done snooping around, and once it had finished viewing all of that confidential and privileged information, it thereupon spoliated all of that electronic data and

---

opposing counsel and fact witnesses by himself). The Government cannot now shed crocodile tears by pretending to be completely shocked by events which Plaintiff had warned them of years in advance—particularly given that: (a) the Government's tortious conduct was the sole underlying cause of Plaintiff's health condition; and (b) the Government easily could have avoided the present situation by simply stipulating to Plaintiff's motion for counsel [Doc. 3] (which is now belatedly doing, albeit six years too late). *Third*, the Due Process Clause requires "fair notice," yet not once did the email recipients send (a) any email asking Plaintiff to stop; (b) a single cease-and-desist letter; or (c) put Plaintiff on notice of the fact that, in the United States, angry emails devoid of explicit threats of physical violence could somehow constitute "stalking" under federal law (assuming that they even do, which is doubtful; the point here is simply that "fair notice" is required under the Due Process Clause), since sending emails—threatening or otherwise—to lawyers and witnesses in a lawsuit is hardly what the average American thinks of when they think of the term "stalking" (the sum total of the Government's criminal complaint is that Plaintiff *only* sent emails to their professional email addresses—nothing more; in other words, the Government is not alleging that Plaintiff followed anyone, visited their workplaces or homes, made telephone calls to their homes, hacked into anyone's computer to view private photographs, contacted someone anonymously through fake email addresses or social-media profiles, broke into a person's home to steal their underwear, or other such unlawful acts that the average speaker of American English would think of when he or she hears the word "stalking;" accordingly, the "fair notice" requirement is plainly unmet).

*Fourth*, the Government is prosecuting Plaintiff for having lawfully invoked his right to remain silent. Disturbingly, in both the complaint and in open court, the Government stated that Plaintiff's actions must have been criminal in nature because, when the Government sent USMS agents to Plaintiff's home, those agents told Plaintiff that, quote, they "wanted to talk to [him] about emails" related to his lawsuit, and that, instead of speaking with them, Plaintiff properly invoked his right to remain silent because he (understandably) did not wish to speak about matters relating to ongoing litigation against their employer. He knew that he was being videorecorded. Plaintiff then asked them to leave, and politely wished them a pleasant evening.

For starters, it is settled law that prosecutors are never permitted to fault defendants for invoking their right to remain silent (they cannot even mention it in support of a criminal charge)—let alone put that information into a criminal complaint—and worse, to thereupon use it in open court in support of their request for harsher bail conditions. The Government cannot punish Plaintiff for having properly invoked his Fifth Amendment right to remain silent and to decline to communicate with law enforcement.

Even more unconscionable is the fact that, again—in order to justify harsher bail conditions—the Government perpetrated a fraud on the court by falsely claiming that the USMS agents, quote, "asked Mullane to stop sending emails" and "warned him that he would be arrested" for stalking (those statements are patently false, blatant lies, and rank dishonesty; such misrepresentations by the Government can easily be disproven by the USMS body-camera audio and video recordings; not once did they ever ask or tell Plaintiff to stop, and for the simple reason that no conversation whatsoever occurred (Plaintiff immediately invoked his right to silence and asked them to leave his home)).

*Mullane v. United States, et al.*

prevented Plaintiff from using it in this lawsuit. That is beyond sanctionable; it is egregious, unethical litigation misconduct, and the Court should refer the matter to the Office of Professional Responsibility (OPR) at Main Justice in addition to imposing sanctions. Once again, the Executive Branch continues to trample over, and overtly flout, Plaintiff's First, Fourth, and Fifth Amendment rights—while the judiciary stands by and watches as a helpless bystander, powerless to intervene (or, in many instances, even acting as a direct and willing participant—just ask Judge Moreno). This Court can, and indeed should, grant the unopposed motion for counsel and hold a timely hearing on the issue of sanctions against Defendant United States. It is respectfully submitted that, given the egregious (and ongoing) nature of the Government's abuses of the litigation process for the past eight years and counting, the only acceptable sanction would be the issuance of a default judgment.

From Day One, the United States Government knew that this case was not a conspiracy theory; yet it boldly made such deliberate misrepresentations to this Court and to countless other federal courts (including, most recently, in the criminal case). *Contra, e.g.*, Fed. R. Civ. P. 11. Unsurprisingly, both of the Government's two attorneys of record in this lawsuit have since resigned from the DOJ as a result, and shortly after the previous judge assigned to this lawsuit, former United States District Judge Abdul K. Kallon, resigned too. Why? Because, as the internal DEA memoranda prove, the Government deliberately and unethically concealed from the Court that <u>the death threats against Lustgarten were so serious, and so credible, that the Government even felt the need to move Lustgarten's family members (*i.e.*, in addition to Lustgarten himself), to a foreign country</u>. Jul. 31, 2015 U.S. Drug Enf. Admin. mem. at 2 ¶ 6 [Ex. 1]. But apparently not Plaintiff's family, whose safety is of no consequence to the Government since Attorney Mullane had the audacity to exercise his First Amendment rights by criticizing President Trump's PDVSA-related cases in *Vice* and other national media outlets. Thus, at all times relevant hereto, the Government was fully and completely aware that Lustgarten's lawyer—who was conspicuously listed as "lead counsel of record" on PACER, for the whole world to see—would foreseeably be targeted too, particularly since, as noted in his January 6, 2026  affidavit [Doc. 116], Attorney Mullane *himself* was in possession of the relevant evidence (*e.g.*, Swiss bank records) implicating murderous and corrupt government officials, persons allegedly connected to Columbian drug cartels, and high-ranking members of the Maduro regime. Lying to federal judges, and submitting perjurious affidavits, is unacceptable litigation misconduct. Even worse, the Government was fully

*Mullane v. United States, et al.*

aware of the fact that Attorney Mullane had obviously been targeted: Plaintiff had told them so, repeatedly. It knew that Attorney Mullane's law firm had been broken into over three times. It knew how dangerous the PDVSA targets were, and that other United States citizens had already been harmed (six executives of Citgo Petroleum Corp., PDVSA's U.S. subsidiary, were taken hostage); one such individual was followed by SEBIN agents in midtown Manhattan following a meeting at the United Nations headquarters. And it knew that Attorney Mullane had been the target of a hit-and-run. It knew that Attorney Mullane had suffered a serious TBI. So what did it choose to do? Not only did the United States Government choose to ignore Plaintiff's ongoing safety concerns, it further perpetrated a fraud by lying to each and every federal court about the underlying facts of this case, and in verified filings no less. Moreover, after former AUSA Jason C. Weida criminally interfered with Plaintiff's FOIA/PA requests, President Trump rewarded him for his misconduct by appointing him Inspector General of HHS, and "coincidentally" just two (2) short weeks after Attorney Mullane had filed a complaint against Weida. If the foregoing facts are somehow insufficient to justify sanctions against an adversary in civil litigation, it is hard to imagine what is.

Almost unbelievably, the Government further stated on the record—in open court, no less—that it has "always known that this [criminal] case was about Mullane's lawsuit" in the Southern District of Florida. In other words, the Government has correctly conceded that the underlying subject matter and context of the criminal action—which, according to the indictment, was filed solely due to certain inappropriate, strongly-worded emails (all devoid of any explicit threats) written under the influence of multiple psychiatric medications that Plaintiff was prescribed for his PTSD-related systems (which, ironically, he would not have needed to take in the first place but for the tortious, traumatizing conduct of Defendants herein, which included causing Plaintiff to fear for his physical safety and that of his family[6])—was the instant civil case.

---

[6]    In this lawsuit, Plaintiff's monetary damages will include compensation for the physical and psychological harms he needlessly and unnecessarily suffered from receiving negligent medical care vis-à-vis his PTSD-related symptoms. This is due to the basic fact that Plaintiff never would have needed to go to any psychiatrist *in the first place* had he not encountered Defendants Moreno and Alison W. Lehr a/k/a Alison Fryd (she changed her last name shortly after being terminated from the Miami USAO for violently attacking Plaintiff's process server, which resulted in a 911 call and criminal complaint against AUSA Lehr [Doc. 55, Aff. N. Caplan]). And, under the so-called eggshell skull rule (also known as the "thin skull" rule in the case law), the original tortfeasors are *de jure* liable for all damages resulting from subsequent medical care received as a result of the injuries, together with all other intervening events. Here, this includes, without limitation, all harms incurred from the criminal case, including nearly an entire year of home detention (the negligent medical treatment being the "but for" cause of the criminal case).

*Mullane v. United States, et al.*

Consequently, this Court has the requisite jurisdiction to entertain a motion for sanctions against the United States, and to fashion a suitable remedy. Here, the remedy Plaintiff is seeking is *not* an order dismissing the criminal case; rather, he is seeking the issuance of a default judgment in this lawsuit.

*First*, as the United States was well aware at the time it filed its retaliatory criminal case, federal law always provides for the use of reasonable force in self-defense. No reasonable juror—after being shown the various DEA memoranda detailing the death threats received in the *Lustgarten* cases—could possibly think that it was somehow unreasonable for Plaintiff and his father to fear for their physical safety too. Of course they did. Sending angry emails to the Government in frustration for *inter alia* refusing to intervene and assist them, and for being the underlying cause of the danger in the first place (*i.e.*, their irresponsible decision to engage in lawfare, coercive unilateral sanctions, and military interventions against the Bolivarian Republic of Venezuela and Islamic Republic of Iran—all in violation of international and domestic law—and all of which directly places Plaintiff at risk (which means that he has legal standing to object)), squarely constitutes "reasonable force" under those unique circumstances. It is an absolute affirmative defense to criminal charges (assuming *arguendo* that sending someone inappropriate emails is even a crime, *quod non*). Under federal common law, the defense of third parties (such as Attorney Mullane, who was the victim of a hit-and-run), including family members, is also an absolute affirmative defense. Consequently, in filing their criminal complaint, the Government knew that Plaintiff's conduct constituted legally-protected speech and a reasonable use of force under the unique circumstances of the case.

Further, the Government committed numerous *Brady* violations by unlawfully failing to turn over in discovery any documents whatsoever detailing the death threats—*i.e.*, exculpatory *Brady* material because it goes to both: (1) affirmative defenses (including, but not limited to, self-defense, defense of third parties, mental disease or defect, *etc.*); and (2) *mens rea*, specific intent, and Plaintiff's state of mind at the time (in other words, was Plaintiff subjectively venting frustration about ongoing criminal activity and other misconduct, which he felt was putting his family in danger?). Similarly, the defense of "involuntary intoxication" is an absolute defense in federal court, and the Government already knew that Plaintiff was undergoing psychiatric treatment long before it filed its criminal complaint. Not only did the Government know that Plaintiff had never made any "true threat" of imminent, physical violence, they also knew that his

*Mullane v. United States, et al.*

emails were nothing more than the result of a mental-health crisis (due to the effects of powerful psychotropic medications which he had been improperly prescribed to treat his PTSD-related symptoms) rather than a *bona fide* criminal act. Proving Plaintiff's point: (1) the Government even provided Plaintiff's father with the business card of a court-appointed psychiatrist prior to the filing of its criminal complaint; and (2) the email recipients all subjectively knew that Plaintiff's was not threatening physical violence (he had even said so explicitly in one of his emails; there is zero ambiguity or "wiggle room" for the Government on this point), and in fact, the email recipients even asked the United States Marshals Service (USMS) to delay the arrest by over one entire month (something which they obviously would not have requested had they subjectively thought that Plaintiff was making a "true threat" of *imminent* physical violence).

*Second*, even if Plaintiff had not been involuntarily intoxicated, and even if he had somehow not been suffering from a mental-health crisis at the time of the events, none of his emails—when viewed collectively, as the case law requires (the Government is not permitted to cherry-pick the worst possible messages from a particular email chain, and to thereupon show those emails alone and out of context to a grand jury as the Government unlawfully did here in contravention of, without limitation, the Supreme Court's requirement promulgated in *Watts v. United States* that allegedly-threatening messages be considered in their full context as opposed to viewing them in a vacuum)—constitutes a so-called "true threat" as defined by the Supreme Court. Emotional distress is not enough.[7] And to constitute a "true threat," the messages, when viewed in their entirety and in their full underlying factual context, must convey a message of imminent physical violence—not emotional fear or terror. Even scary and/or unsettling messages are protected speech according to the case law. The mere fact that Plaintiff transmitted a follow-up email clarifying that he was *not* making any "true threat" of physical violence—and that he did not even have any intention of visiting the recipients at their homes or at work (so how exactly could he have physically harmed them, in that case?)—conclusively proves that there was never any "true threat" to begin with. Thus, the Government's retaliatory prosecution was plainly initiated without "probable cause" of any form of criminal offense as a matter of law. It was made

---

[7]     This makes perfect sense. If causing someone "emotional distress" could constitutionally be criminalized, any time someone files a lawsuit, sends a threatening demand letter, or emails a menacing cease-and-desist letter, he or she could potentially be criminally prosecuted. Naturally, suing someone, threatening them with a judicial-misconduct complaint, or mailing them a cease-and-desist letter all foreseeably cause the recipient emotional distress. What normal person likes to be sued? For that reason, the First Amendment bars the Government from drawing the line too closely when the messages pertain to litigation.

*Mullane v. United States, et al.*

in bad faith. *See, e.g., Virginia v. Black*, 538 U.S. 343, 359 (2003) (under the First Amendment, for "crimes" consisting solely of speech, citizens may only be criminally prosecuted for "true threats" of imminent physical harm; emotional distress incurred from speech is not proscribable under the First Amendment); *United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011) (threatening "Obama fk the niggar [sic], he will have a 50 cal in the head soon" was not a "true threat" because the speaker never specifically stated that he *himself* intended to engage in actual violence; statements such as "someone needs to kill you" are "exhortations to others to injure or kill[,]" and thus cannot constitute true threats); *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) ("[G]enerally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear. This may be true even where a protestor tells the objects of protest that they are in danger[.]"); *United States v. Patillo*, 431 F.2d 293, 297-98 (1970) (reversing conviction; "There is no danger to the President's safety from one who utters a threat and has no intent to actually do what he threatens."); *United States v. Weiss*, 475 F. Supp. 3d 1015 (N.D. Cal. 2020) (emails sent directly to Senator Mitch McConnell including "You are a fucking dog who will be put down[,]" "Someone needs to kill you[,]" *etc.* absolutely protected under the First Amendment; although they were scary and emotionally distressing, the First Amendment requires a "true threat" of imminent physical violence); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 894 (1982) ("[W]e're gonna break your damn neck" is protected speech under the First Amendment); *Coates v. Cincinnati*, 402 U.S. 611 (1971); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992); *Brandenburg v. Ohio*, 395 US 444 (1969); *Elonis v. United States*, 575 U.S. 723 (2015); *Snyder v. Phelps*, 562 U.S. 443 (2011); *Watts v. United States*, 394 U.S. 705, 708 (1969) (courts are required to consider the underlying context in which the problematic communications were made, rather than viewing them in a vacuum).

In *Counterman v. Colorado*, 600 U.S. 66 (2023), the Supreme Court promulgated a new subjective standard, holding that the First Amendment requires that the Government prove, beyond a reasonable doubt, that the defendant *subjectively* intended to transmit a "true threat," and notwithstanding that the recipients, or third-party onlookers, may have *objectively* and reasonably viewed the message as being a "true threat"); *United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016) ("[A] 'true threat' is one that a reasonable recipient *familiar with the context* would interpret as a *serious expression* of an intent to do harm." (Emphasis supplied)); *United States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015) (a true threat must contain an actual "declaration of intention,

*Mullane v. United States, et al.*

purpose, design, goal, or determination to inflict [bodily injury] on another." (citations omitted, cleaned up)); *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1281-82, 1285 (M.D. Ala. 2004) (no "true threat" because the defendant did not *expressly or explicitly* claim that he intended to kill or physically injure anyone at all; "evidence of an atmosphere of general intimidation is not enough to find that the [statement] is a 'true threat.'"); *United States v. Stevens*, 881 F.3d 1249, 1254 (10th Cir. 2018) (in a "true threat" analysis, courts must consider "where a statement was made and how an audience reacted."); *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005) ("We are therefore bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat"); *United States v. Davila*, 461 F.3d 298, 302 (2d Cir. 2006) (a "true threat" must include an "indication of impending danger or harm"); *United States v. White*, 670 F.3d 498, 525 (4th Cir. 2012) (Floyd, J., concurring in part and dissenting in part) (speakers such as Plaintiff "whose ideas or views occupy the fringes of our society have more to fear, for their violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure, is more likely to strike a reasonable person as threatening"); *Sines v. Kessler*, No. 3:17-cv-00072 at 11-12 (W.D. Va. May 29, 2020) (while defendant's repugnant emails may "come[] close to—but do[] not cross—the line between protected speech and a true threat of physical violence[,]" they were ultimately "a very crude offensive method of stating his opinions about [the] litigation and his adversaries," and thus protected speech under the First Amendment); *United States v. Sryniawski*, 48 F.4th 583, 587 (2022) ("The Free Speech Clause protects a variety of speech that is intended to trouble to annoy, or *to make another timid or fearful*[,]" and even where "*emotional distress is reasonably expected to result*"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3rd Cir. 2001) (Alito, J.) ("There is no categorical 'harassment exception' to the First Amendment's free speech clause"); *United States v. Magleby*, 241 F.3d 1306, 1311 (10th Cir. 2001) (in a "true threat" analysis, courts must also take into account the responses of the recipients); *Mullane v. Moreno*, No. 1:18-cv-12618 at 16 ¶ 2 (D. Mass. Jan. 6, 2020) (Saris, J.) (emotionally-distressing speech—even homophobic, discriminatory messages causing Plaintiff significant emotional distress—are categorically protected under the First Amendment); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

Moreover, speech "advocating violence" is also constitutionally protected under the First

*Mullane v. United States, et al.*

Amendment. *Planned Parenthood of Columbia/Williamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1072 (9th Cir. 2002) (en banc). This includes threats which can "acquire[ ] the tinge of menace." *Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 244 F.3d 1007, 1014 (9th Cir. 2001), *rev'd on other grounds*, 290 F.3d 1058 (9th Cir. 2002). "[A]dvocacy of the use of force or violence does not remove speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927, 1215 (1982). As the Supreme Court has consistently held, speech does not lose its protected character under the First Amendment simply because it may coerce others into violence (*e.g.*, telling someone to go shoot herself). *Id.* at 910. In order for threats to rise to the level of criminality and to constitute *de jure* "true threats," "a court must be sure that the recipient is fearful of the execution of the threat *by the speaker* [himself]." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) (emphasis in original). That too is the polar opposite of telling another person to shoot himself or herself. Legally speaking, "a person who informs someone that he or she is in danger of violence from a third party has not made a threat, even if the statement produces fear." *Id.* In other words, a "true threat" warns of violence or other harm to be committed by the speaker himself. *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011) (no "true threat" because the speaker did not use the first person in writing his threat). In *Bagdasarian*, the court also concluded that there was no "true threat" because the defendant was also drunk at the time he made his threats; that is analogous to the case at bar, where the recipients all knew that Mr. Mullane was suffering from psychological problems (he disclosed that repeatedly, and in multiple court filings), was not thinking rationally, and had discussed suicide in his email communications (suicide is obviously not a "true threat" of physical violence to anyone other than oneself; how could Plaintiff possibly harm someone after he is already dead?). *See id.*

To constitute a "true threat," the message must be "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution[.]" *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976), *cert. denied*, 429 U.S. 1022, 1027 (1976); *see United States v. Patillo*, 438 F.2d 13, 16 (4th Cir. 1971) (to constitute a "true threat," there must be a "present intention" to inflict imminent physical harm). And it is settled law that "ambiguous letters, standing alone, cannot establish a predicate for violating [an anti-threat statute]." *United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994); *United States v. Carmichael*, 326 F. Supp. 2d 1267,

*Mullane v. United States, et al.*

1281-82, 1285 (M.D. Ala. 2004) (defendant's messages that "expressed intent to publicize his trial and his statement of innocence implicate weighty First Amendment concerns").

As a matter of law, the Government cannot use Plaintiff's constitutionally-protected court filings in the present civil action in any parallel criminal case; the First Amendment forbids it. Separately, the entire criminal case itself violates the Fifth Amendment's prohibition against selective prosecution because: (1) it was motivated—at least in part—by Plaintiff's pending lawsuit against the Government; and (2) the Government was, at all relevant times, fully aware of the fact that not one of Plaintiff's emails constituted a *de jure* "true threat" of imminent physical violence, thereby vitiating probable cause.

And while the Government will obviously argue that Plaintiff is somehow limited to raising all of the above-mentioned First and Fifth Amendment arguments in the separate criminal case, and that this Court somehow lacks jurisdiction to entertain them, such an argument fails. In fact, under the Court's "inherent authority" at common law, sanctions can be applied to attorneys' or parties' actions occurring before a suit has been filed, after it has ended, or even if the court lacked jurisdiction in the first place. *Carr v. Tillery*, 591 F.3d 909, 919-920 (7th Cir. 2010). At a minimum, the Government's sanctionable actions as described above constitute yet another compelling basis for the appointment of counsel in this matter in order to effectively address these serious concerns; Plaintiff's unsuccessful efforts to vindicate his rights as a *pro se* party have manifestly been completely ineffective for the past eight years, and they continue to be ineffective to-date. Even assuming *arguendo* that the parallel criminal case was legally justified—and it was not pursuant to the above-cited case law—the mere fact that the Government is presently using it to obtain leverage in the instant civil action grants this Court jurisdiction. And the requested remedy— namely, the grant of a default judgment against Defendant United States—can only be granted in this lawsuit, not in any criminal case. This Court can, and indeed should, take the appropriate measures to mitigate the Government's ongoing, unabated violations of Plaintiff's constitutional rights. For instance, the Government's ongoing First Amendment violations are so extreme that it is even introducing relevant, non-threatening Bibles contained in Plaintiff's court filings in his civil cases to justify: (1) subjecting him to home detention and GPS monitoring for over nine months; (2) depriving him of internet access; (3) depriving him of his right to use a law library; (4) depriving him of his computer and cell phone (both of which contain the relevant evidence that Plaintiff obviously needs to litigate the instant civil case against the Government); and (5)

*Mullane v. United States, et al.*

countless other criminal sanctions. It is respectfully submitted that even a first-year law student would know that religious speech, including the citation of innocuous Bible verses, is categorically protected under the First Amendment. This is not rocket science. Such protected First Amendment speech obviously cannot be used to punish someone criminally, or to request harsher bail conditions as the Government did.[8]

Worse still, the Government continues to demand that Plaintiff be subjected to over nine months of home detention for *inter alia* having the audacity to reference "Venezuela and Iran" in the present civil case as well as "Swiss law" (all protected First Amendment speech, naturally) and for having properly expressed concerns about: (1) the spouse of a judge presiding over his Iran-related case being contemporaneously employed by an entity connected to the Israeli government, for having significant political and financial connections to that country, and for contemporaneously traveling to Tel Aviv for meetings with former Prime Minister Ariel Sharon and other high-ranking government officials, *see, e.g.,* https://www.hbs.edu/news/releases/Pages/israelixp2012.aspx (in the United States, there unfortunately appears to be a double standard when it comes to Israel; proving Plaintiff's point, imagine how the federal judiciary would react if the spouse of a federal judge were to repeatedly meet with the president of Iran and the head of the IRGC special forces division [*see* Ex. 41 at 2 ¶ 4 ("Another key aspect of the trip was visiting with members of elite special unites from the Israeli Defense Forces")], and while that same judge was contemporaneously presiding over a lawsuit pertaining to Israel (in no way do such statements make Plaintiff—who has Ashkenazi Jewish ancestry through his mother—an anti-Semite, as the Government claimed; but even if they were somehow anti-Semitic, *quod non*, they would still be protected First Amendment speech nonetheless[9])); (2) ethical concerns relating to the same federal judge improperly exerting control

---

[8]    Fortunately Plaintiff only cited the Bible, not the Quran; had he done so, the Government obviously would have argued that that too constitutes an "implicit" threat against Jews. The Government has already faulted Plaintiff for having visited Qatar and Abu Dhabi, and used that to justify requesting pre-trial detention (and in a non-violent case against someone with no criminal record whatsoever). The Government's *mala fide* request for pre-trial detention constitutes further indicia of: (1) First Amendment retaliation in connection with the present lawsuit, and in a transparent effort to obtain their "pound of flesh" through imposing lengthy pre-trial incarceration in a case where there is no reasonable expectation of a conviction; and (2) Defendant United States' ongoing efforts to unlawfully impede and hinder Plaintiff's ability to effectively prosecute his claims in this lawsuit (Plaintiff was even deprived of access to a law library during his four-night detention at Wyatt Detention Center before a magistrate judge ordered his release over the Government's objections).

[9]    *First*, anti-Zionism and anti-Semitism are not the same thing—and the Government's efforts to conflate the two constitute intellectual dishonesty. In furtherance of their dishonest efforts to do so, the Government even asked for pre-trial detention because, quote, Plaintiff "has recently visited Qatar and Abu Dhabi"—something

*Mullane v. United States, et al.*

over various so-called "blind trusts" containing millions of dollars, and with distributions therefrom being unaccounted for, *contra, e.g., Centripetal Networks, Inc. v. Cisco Systems, Inc.*, 38 F.4th 1025 (Fed. Cir. Jun. 23, 2022) (federal judges are not allowed to have blind trusts); (3) failing to disclose, at the outset of the lawsuit, her personal relationship with Defendant Moreno; (4) pretending not to know who Martin Lustgarten was, his connection to this lawsuit, his multiple connections to Venezuela, Iran, and Israel and that <u>he was contemporaneously working as a Confidential Informant (CI) for the DEA</u>—which, as the judge knew, Plaintiff would have inevitably discovered eight years ago had the subject judge permitted full discovery as required under Fed. R. Civ. P. 26, which she tellingly refused to do—despite the fact that she had personally presided over <u>at least two (2) previous cases</u> wherein Lustgarten was directly and personally involved as an undercover CI for the DEA, *see, e.g., United States v. Michael S. Griffin, et al.*,

---

which obviously makes him a dangerous anti-Semite or terrorist, according to the Government. Ironically, while Plaintiff is not anti-Semitic, the United States Government is plainly Islamophobic. Not only does its foreign policy dehumanize Muslims, it punishes any and all persons (including the undersigned) who dare to criticize the State of Israel, a foreign nation, and its policies. The First Amendment guarantees Plaintiff the right to: (1) criticize federal judges for perceived ethical violations (*e.g.*, failing to disclose potential and actual conflicts of interest); (2) judges' respective allegiances to foreign powers and financial relationships with those countries (Venezuela, Israel, *etc.*); and (3) questioning whether a particular judge's decisions may have been improperly influenced by relationships with a third party based upon the fact that the judge in question (i) appeared to have communicated with that person, (ii) was a member of the same religious community (had they both been either Catholic or Muslim and in the same religious/social community, and had they both attended the same church or mosque, Plaintiff would have made the exact same statement, and would have arrived at the exact same conclusion), (iii) both reside in the same town, and (iv) both had previously worked in the exact same state court. There is nothing remotely "anti-Semitic" about any of that, and the Government's *mala fide* efforts to falsely couch and mischaracterize it as such constitutes intellectual dishonesty and rank bias. *A fortiori*, it further evidences that the parallel criminal case against the undersigned was primarily brought for the unlawful purpose of "selective prosecution," which is prohibited under the Fifth Amendment's Due Process Clause. In other words, it was not primarily brought for any legitimate penological purpose.

　　*Second*, the Government is presently prosecuting Plaintiff for: (1) allegedly performing basic background research on certain judges (dangerous activities such as Google searches) after receiving information indicating that they failed to properly disclose certain potentially-disqualifying conflicts of interests and other serious improprieties vis-à-vis the judicial process; and (2) publicizing the numerous conflicts of interest discovered through his alleged research. But, as the Government is well aware, all such conduct is protected under both the First Amendment (Petition Clause) and the Fifth Amendment (right to a fair and impartial trial, and before a neutral and detached tribunal). So why are they *criminally* prosecuting him for that? And in addition to the United States Constitution, there are numerous federal statutes such as the Ethics in Government Act of 1978, 5 U.S.C. §§ 13101-13111, which specifically allow all citizens to order the financial disclosure reports of judges. So why exactly has the Government brought a retaliatory criminal case for engaging in conduct which they know to be lawful and protected under not one, but three independent sources of law (*i.e.*, the First Amendment, Fifth Amendment, and the Ethics in Government Act of 1978)? The answer is clear: the Government is prosecuting Plaintiff for lawful, constitutionally-protected conduct in order to punish him for suing the Government in this case, and to pressure him to drop this lawsuit. They even said so, advising Plaintiff's prior counsel that the criminal case would magically "go away" if Plaintiff were to agree to drop the civil action. That is unethical, sanctionable conduct.

*Mullane v. United States, et al.*

1:03-cr-10404-PBS (D. Mass.) (Saris, J.) ("Operation Boston Blizzard" [Ex. 14]); *United States v. Andres Covelli Cadavid*, 11-cr-10187-PBS (D. Mass.) (Saris, J.) (Rosemont case, *see* Aff. E.P. Mullane at ¶ 23; *see also* Ex. 12 at 3 ¶ 3 "Rosemont Materials" (conspicuously citing a criminal case number ending in "PBS," which refers to District Judge Patti B. Saris)); (5) the federal judiciary's pattern and practice of covering up criminality and serious misconduct such as that of Defendant Moreno, including, without limitation, the rape of a British national committed by a Boston-based federal magistrate judge in the late 1980s—which Plaintiff properly complained of in one of his emails, albeit in a strongly-worded way (the victim was a former client of Plaintiff's father; instead of prosecuting the federal magistrate judge, the judiciary opted to give him an ultimatum and allowed him to "quietly" resign and go back to private practice, thereby keeping the British government and American media in the dark vis-à-vis the hitherto-unabated criminality and misconduct within the United States judiciary); (6) the subject judge's financial relationship with the University of Miami School of Law, which, as she knew, was a party of interest in Plaintiff's lawsuit; and (7) the subject judge's decision to deny Plaintiff discovery in a case involving the so-called "fair report" privilege, which was disturbingly antithetical to her holding in a prior case involving that exact same legal issue, *see Alharbi v. Beck, et al.*, No. 14-11550-PBS, Doc. 133 (D. Mass. Aug. 9, 2016) (factually-analogous defamation action against a right-wing media defendant; Judge Saris afforded the plaintiff full discovery prior to her ruling on the applicability of the "fair report" privilege[10]).

    This Court can, and indeed should, intervene by: (1) appointing counsel on Plaintiff's behalf; and (2) scheduling and holding a timely hearing to determine the appropriate sanctions

---

[10]    Not only did Judge Saris allow full discovery in *Alharbi* (unlike in Plaintiff's defamation suit, where she permitted no discovery whatsoever), her holding that the "fair report" privilege did *not* shield the media defendant from liability under similar facts was curiously antithetical to her holding in Plaintiff's case. In point of fact, in her opinion in Plaintiff's case wherein she arrived at the exact opposite conclusion, Judge Saris tellingly did not even cite to her own decision in the *Alharbi* case addressing the exact same facts and legal issues, and which she had issued just two years earlier—something which is hardly surprising in light of her undisclosed conflicts of interest in Plaintiff's lawsuit, and since, had she done so, that would have alerted the parties to the glaring inconsistencies in her decisions.

    In any event, Plaintiff has a First Amendment right to question each and every one of those glaring inconsistencies, and without fear of criminal sanctions by the Government for doing so—full stop. It is respectfully submitted that the First Amendment does not shield federal judges from criticism for their official and unofficial actions, regardless of whether that criticism ultimately proves to be right or wrong. Federal judges are not entitled to special treatment, and for the same reason that the Executive Branch is not entitled to special treatment. To be sure, nobody likes to be criticized; the undersigned is no different. But fortunately, there is no such thing as a "federal judge" exception to the First Amendment.

*Mullane v. United States, et al.*

needed to deter the Government's ongoing litigation misconduct.

## CONCLUSION

WHEREFORE, for the above-mentioned reasons, Plaintiff respectfully prays for the issuance of an order:

(i)     Converting the status conference scheduled for February 24, 2026 10:00 a.m. [Doc. 121-22] to a virtual videoconference via Zoom; and

(ii)    Granting the pending, unopposed motion for referral to the volunteer attorney program [Doc. 117].

At Cambridge, Massachusetts,
This 9th Day of February, 2026.

Respectfully submitted,

/s/ Jonathan Mullane
JONATHAN MULLANE
30 Donnell Street
Cambridge, Massachusetts 02138
Tel. (617) 800-6925

*Plaintiff Pro Se*

### CERTIFICATE OF CONFERRAL

Pursuant to L.R. 7.1(a)(2), the undersigned hereby certifies that he conferred with counsel for Defendants telephonically on February 5, 2026, who advised that Defendants do not oppose the allowance of the relief requested herein.

/s/ Jonathan Mullane
JONATHAN MULLANE

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 9, 2026, he caused to be served a true copy of the foregoing filing on Anthony Erickson-Pogorzelski, Esq., counsel for Defendants, and specifically addressed as follows: Anthony.Pogorzelski@usdoj.gov.

/s/ Jonathan Mullane
JONATHAN MULLANE





Reusable F X6 MPBA