IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

JONATHAN MULLANE,

    *Plaintiff,*

v.

UNITED STATES OF AMERICA, ET AL.,

    *Defendants.*

Civ. A. No. 1:20-cv-21339



FILED BY _____ D.C.

~~MAR~~ 1 3 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

FILED BY _____ D.C.

APR 0 3 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**PLAINTIFF JONATHAN MULLANE'S
[1] NOTICE OF SUPPLEMENTAL AUTHORITIES; AND
[2] OBJECTIONS**

Plaintiff Jonathan Mullane ("Plaintiff") in the above-captioned case hereby gives notice of the supplemental authorities set forth below. To the extent the cited authorities and/or arguments conflict with the Eleventh Circuit panel opinion issued in this matter, Plaintiff hereby respectfully objects and requests that such objections be noted on the record.[1] *See United States v. Davis*, 2016 WL 3997209, *1 (11th Cir. 2016) (law-of-the-case doctrine does not preclude reconsideration of an issue where: (i) a subsequent trial produces substantially different evidence; (ii) controlling case law subsequently made a contrary decision of law applicable to that issue; or (iii) a prior decision was clearly erroneous and would work manifest injustice) (citing *United States v. Stinson*, 97 F.3d 466, 469 (11th Cir. 1996)); *This That & The Other Gift & Tobacco*, 439 F.3d 1275, 1283-84 (same).

1.     *Korematsu v. United States*, 140 F.2d 289 (9th Cir. 1943) (subsequently-overruled

---

[1]     Without limitation, these objections will ensure that all relevant arguments are of record and properly preserved for any subsequent appeal in this action.

*Mullane v. United States, et al.*

case wherein the Ninth Circuit erroneously deprived the plaintiff of his rights under the Due Process Clause for reasons relating to national security and because the President had declared a national emergency; citing *inter alia Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), the plaintiff argued: (1) that the President's Executive Orders constituted impermissible *lettres de cachet*[2] because he was deprived of a timely trial to clear his name; (2) his "banishment" without a trial constituted cruel and unusual punishment within the meaning of the Eigth Amendment; and (3) that he had a Fifth Amendment property interest in his "right to work");

2.      *Korematsu v. United States*, 323 U.S. 214 (1944);[3]

---

[2]      *Lettres de cachet* were secret, non-public orders issued by the king or executive branch imposing punishment on an individual without a trial.

[3]      In *Korematsu*, notwithstanding the national emergency declared by the President—the case was adjudicated during World War II, and Japan had recently attacked the United States by bombing Pearl Harbor—at least the litigant was afforded timely judicial review of his due-process claims. In other words, he was not forced to wait until after the war and "national emergency" finally terminated years later in order to obtain timely judicial review of the complained-of actions of the Executive Branch; rather, his claims under the Due Process Clause were all timely adjudicated while the war was still ongoing (World War II did not end until 1945). Although Mr. Korematsu ultimately lost the case, he was not forced to wait over eight years for a court to determine whether he was entitled to a trial or name-clearing hearing under the Due Process Clause. Thus, if the existence of a World War is *de jure* insufficient to deprive a citizen of his right to timely judicial review of claims under the Due Process Clause, it follows that the undersigned should not be deprived of timely judicial review of his own due-process arguments—issues which were timely presented to the Eleventh Circuit on appeal—due to any ongoing "national emergency" declared by the President with respect to Venezuela, Iran, or anything else. *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) (due-process protections apply during national emergencies—even during wartime—and all citizens are entitled to judicial review as long as courts remain open); Canon 3A(5), CODE OF CONDUCT FOR UNITED STATES JUDGES (effective Mar. 12, 2019) ("In disposing of matters *promptly*, efficiently, and fairly, a judge must demonstrate due regard for the rights of the parties to be heard and to have issues resolved without unnecessary cost or delay.").
     As a matter of procedural due process, the instant case is more problematic than the judicial review seen in *Korematsu*. There, Mr. Korematsu: (1) was timely apprised of the specific Executive Orders issued by the President which the Government was relying upon to justify its violations of the Due Process Clause; and (2) was permitted to challenge the constitutionality of those particular Executive Orders in court, and even though the war was still ongoing at the time. That is a far cry from the instant proceedings wherein the undersigned was: (1) never informed of the order(s)—formal or informal, from the Supreme Court or Executive Branch—being relied upon to justify the ongoing delays vis-à-vis judicial review of the alleged due-process deprivations, *contra Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (requiring timely notice, an opportunity to be heard, and an opportunity to object); and (2) never provided any meaningful opportunity to challenge the constitutionality of those particular orders since, to this day, he has yet to be informed of what those orders even are, *contra Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) (right to judicial review of actions taken by the Executive Branch). It bears reiterating that even lawful, constitutionally-authorized warfare (*e.g.*, World War II,

Page 2 of 11

*Mullane v. United States, et al.*

3. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) (judicial review of due process and other alleged Fifth Amendment violations available during national emergencies—even during wartime—and all citizens are entitled to judicial review as long as civilian courts remain open);

4. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) (right to judicial review of actions taken by the Executive Branch);[4]

5. *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (observing that "neither the IEEPA nor the Hostage Act constitutes specific authorization of the President's action suspending claims" pending in federal court in light of foreign policy and national security considerations vis-à-vis the Islamic Republic of Iran, and in response "to the hostile acts of [such] foreign sovereigns;" "[W]e have declined to conclude that the IEEPA or the Hostage Act directly authorizes the President's *suspension of claims* [in federal court] for the reasons noted");

6. *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (Powell, J., concurring in part and dissenting in part) (noting that "parties whose valid claims are not adjudicated or not fully paid may bring a 'taking' claim against the United States");

---

wherein President Franklin D. Roosevelt properly sought and obtained formal declarations of war from Congress, thereby complying with the Declare War Clause of the United States Constitution (which President Donald J. Trump unlawfully failed to do vis-à-vis Venezuela and Iran, respectively)) cannot, and does not, justify the actions taken by both the Executive Branch and United States judiciary in this matter. They contravene bedrock principles of procedural due process; and the legality or illegality of the wars does not alter that conclusion. Insofar as the President's Executive Orders, including his declared "national emergencies," directly or indirectly implicate Plaintiff's legal interests and rights to life, liberty, or property, Plaintiff: (1) has legal standing to object since he continues to be harmed; and (2) was, at all relevant times, entitled to timely judicial review thereof.

[4] It is respectfully submitted that the holding of *Marbury* would be rendered nugatory and meaningless if the judiciary waited until *after* the complained-of Executive Branch actions had finally terminated in order to perform its prescribed judicial review, and nearly a decade later. That is illogical. It is analogous to—in a deportation case invoking the United Nations Convention Against Torture (CAT)—first deporting the immigrant to a country where he is likely to be subjected to physical or psychological torture, and then subsequently conducting *post hoc* judicial review of the United States' deportation notwithstanding the fact that refoulement had already occurred.

*Mullane v. United States, et al.*

7.   *In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d 1273 (S.D. Fla. 2020) (Dimitrouleas, J.) (FTCA case holding that the United States Government has a "*duty to warn*[5] or protect [citizens] against criminal conduct precipitated by third persons . . . where the risk is foreseeable[;]" the Government failed to comply with its mandatory obligations to "handle, investigate, and intervene on tips it received" of possible criminal conduct);

8.   *Learning Resources, Inc. v. Trump*, 607 U.S. __ (2026) (majority holding, in pertinent part, that Executive Orders issued by the President pursuant to the IEEPA are subject to judicial review, and are subject to constitutional challenges by private citizens in federal court);

9.   *Learning Resources, Inc. v. Trump*, 607 U.S. __ (2026) (Thomas, J., dissenting) ("The Constitution's separation of powers forbids Congress from delegating core legislative power to the President. This principle, known as the nondelegation doctrine, is rooted in the Constitution's Legislative Vesting Clause and Due Process Clause. Art. I, §1; Amdt. 5. Both Clauses forbid Congress from delegating core legislative power, which is the power to make substantive rules setting the conditions for deprivations of life, liberty, or property.");

10.   HON. HENRY J. FRIENDLY, *Some Kind of Hearing*, 123 U. PA. L. REV. 1267 (1975) (excellent overview of minimum procedural due process requirements when the government deprives a private citizen of life, liberty, or property: (1) an unbiased tribunal; (2) notice of the proposed action; (3) opportunity to present objections; (4) right to present evidence; (5) access to opposing evidence being used against the

---

[5]   Here, both the Executive Branch and the Circuit Justice for the Eleventh Circuit were timely notified in 2018, *i.e.*, eight years ago.

*Mullane v. United States, et al.*

citizen; (6) right to cross-examine adverse witnesses; and (7) right to a court decision based solely on the record, and solely on evidence produced at the hearing);

11.   *Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."), quoted with approval in *Goldberg v. Kelly*, 397 U.S. 254, 270 (1970);

12.   *United States v. Smith*, 780 F.2d 1102, 1107 (4th Cir. 1985) (requiring admission into evidence any and all classified information which is "helpful to the defense of an accused, *or is essential to a fair determination of a cause*" (citations omitted));

13.   *United States v. Rezaq*, 899 F. Supp. 697, 708 (D.D.C. 1995) (clarifying that even legitimate "national security interest[s]" of the Government cannot override a citizen's constitutional rights);

14.   *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990) (while the Government's interest in protecting national security must always be considered and taken into account, it "cannot override" the accused's right to a fair trial);

15.   *United States v. Poindexter*, 698 F. Supp. 316, 320 (D.D.C. 1988) ("[I]n the end, defendant's constitutional rights must control.");

16.   *Ridge v. Police and Firefighters Ret. & Relief Bd.*, 511 A.2d 418, 425 n.11 (D.C. Cir. 1986) (noting that a "Kafkaesque chain of secrecy is not what the Due Process Clause contemplates");[6]

17.   *United States v. 2323 Charms Rd.*, 946 F.2d 437, 445 (6th Cir. 1991) (Merritt, J.,

---

[6]   *Compare id. with* Ex. 1.

*Mullane v. United States, et al.*

dissenting) (noting the similarities in that case to Kafka's *The Trial*, and asking how the defendant is expected to reply to charges "when the case against him is based on unknown sources, unidentified people and an undescribed investigation");

18. Exec. Order No. 13,292, 3 C.F.R. 196, 196 (2003) ("Our democratic principles require that the American people be informed of the activities of their Government.");[7]

19. *Rafeedie v. I.N.S.*, 880 F.2d 506, 516 (D.C. Cir. 1989) (comparing the defendant to Joseph K., Kafka's protagonist in *The Trial*, who was denied access to information related to his own case);

20. *United States v. Coplon*, 185 F.2d 629, 638 (2d Cir. 1950) ("Few weapons in the arsenal of freedom are more useful than the power to compel a government to disclose the evidence on which it seeks to forfeit the liberty of its citizens . . . . All governments, democracies as well as autocracies, believe that those they seek to punish are guilty; the impediment[s] of constitutional barriers are galling to all governments when they prevent the consummation of that just purpose. But those barriers were devised and are precious because they prevent that purpose and its pursuit from passing unchallenged by the accused, and unpurged by the alembic of public scrutiny and public criticism. A society which has come to wince at such exposure of the methods by which it seeks to impose its will upon its members, has already lost the feel of freedom and is on the path towards absolutism.");

21. *United States v. Salerno*, 481 U.S. 739, 750 (1987) (balancing the Government's "compelling" interest in preventing crime against the "individual's strong interest

---

[7]   *Contra, e.g.*, Ex. 1.

*Mullane v. United States, et al.*

in liberty");

22.  U.S. CONST. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . . .");

23.  U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime,[8] unless on a presentment or indictment of a Grand Jury . . . .");

24.  U.S. CONST. amend. V ("[N]or shall private property[9] be taken for public use,

---

[8] At and after the April 10, 2018 hearing, Judge Moreno pretextually accused the undersigned of criminal conduct. Without limitation, Judge Moreno accused Plaintiff of pretending to have been sent by the DOJ to speak with his clerk. *See, e.g.*, 18 U.S.C. § 912 ("Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both."). So how can it be that eight entire years have already passed, yet Plaintiff *still* has not been afforded both a jury trial as to the criminal allegations, and also a name-clearing hearing as to the non-criminal misconduct allegations? Any first-year law student would know that the foregoing violates the plain language of the Fifth Amendment; this is not complicated. The legal education and experience of the Circuit Justice for the Eleventh Circuit is unnecessary to appreciate that federal judges cannot haphazardly accuse private citizens of misconduct, never provide them a timely jury trial and name-clearing hearing for eight years, and thereupon proceed as if nothing out of the ordinary or improper had transpired. What young student could possibly find employment within the United States in the interim while waiting to clear his name—and in any field, even outside the legal profession? For the past eight years and counting, the Supreme Court (which was contacted regarding this matter in 2018) and federal judiciary unconscionably continue to deprive Plaintiff of a timely jury trial and due-process hearing (he is entitled to both), while the Executive Branch continues to deprive Plaintiff of a timely name-clearing hearing (under binding Eleventh Circuit precedents, Plaintiff is entitled to such a timely post-termination hearing and, pursuant to *Johnston v. Borders*, to injunctive relief requiring that the Executive Branch afford him the same).

[9] Here, there are at least three "property" interests implicated: (1) the "taking" of a claim; (2) Plaintiff's "property" and "liberty" interests in his right to employment; and (3) Plaintiff's "property" and "liberty" interests in his reputation.

*First*, Plaintiff's due-process claim was never passed upon by the Eleventh Circuit, and notwithstanding the fact that that issue was timely raised on appeal. *Contra, e.g.*, *Korematsu v. United States*, 140 F.2d 289, 290 n.1 (9th Cir. 1943) (rev'd on other grounds) ("In Anglo Saxon law the right of a litigant to a reasoned opinion considering his [own] contentions on issues raised was recognized at least as early as 1588 by Edmund Anderson on Elizabeth's Queen's Bench"). And the Supreme Court has consistently held that legal claims are considered "property" within the meaning of the Fifth Amendment. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (Powell, J., concurring in part and dissenting in part) (noting that "parties whose valid claims are not adjudicated or not fully paid may bring a 'taking' claim against the United States"); *cf. Fulton v. Fulton Cty. Bd. of Comm'rs*, No. 22-12041 (11th Cir. Jul. 31, 2025) (Rosenbaum, J.) (binding Eleventh Circuit precedent recognizing an implied right of action against the government for Fifth Amendment takings, and even in the absence of any statutory vehicle authorizing such a claim). Indeed, the panel conspicuously ignored the "elephant in the room" by failing to ever pass upon the issue of Plaintiff's entitlement to a timely due-process hearing—for eight years and counting—from both: (1) Judge Moreno (Plaintiff was accused of misconduct in open court); and (2)

Page 7 of 11

*Mullane v. United States, et al.*

without just compensation. . . .");

25.   *United States v. Moussaoui*, 2003 WL 21263699, at *4 (E.D. Va. Mar. 10, 2003) ("Consistent with established principles of due process, the Government may not suppress evidence favorable to an accused that is 'material either to guilt or to punishment.'") (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963));

---

the DOJ (Plaintiff's employer at the time, which terminated his federal employment and then contemporaneously smeared him in the national media (something which is actionable under the "stigma-plus" doctrine)). This is also common sense. What company would be willing to take the unnecessary risk of hiring someone accused of misconduct by a sitting federal judge, particularly if the judge in question was never timely reprimanded for doing so? What HR department does not have access to Google? The prolonged eight-year delay is so irreparably damaging to Plaintiff's legal interests that one material fact witness, Martin Lustgarten Acherman, is no longer alive and is thus unavailable to testify at any trial or name-clearing hearing (assuming *arguendo* that the federal judiciary would even order one at this late juncture). And the above is without mentioning the irreversible harm to Plaintiff himself and his family members—something which was completely unnecessary and avoidable had this litigation properly proceeded in the ordinary course, and something which was a directly-foreseeable consequence. Money damages are thus an inadequate remedy, and cannot make Plaintiff whole.

*Second*, and relatedly, Plaintiff has "property" and "liberty" interests in his right to employment. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923) ("Without doubt, [liberty] denotes not merely freedom from bodily restraint, but also the right of the individual to contract, *to engage in any of the common occupations of life*, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."); *Perry v. Sindermann*, 408 U.S. 593 (1972) (even absent a formal contract, public employees have a Fifth Amendment "property" interest in continued government employment if it is based upon a "mutually explicit understanding"); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

*Third*, Plaintiff has both "property" and "liberty" interests in his reputation. *Rosenblatt v. Baer*, 383 U.S. 75 (1966) (Stewart, J., concurring) ("Society has a pervasive and strong interest in preventing and redressing attacks upon reputation. The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." (quotation omitted)). *Jenkins v. McKeithen*, 395 U.S. 411 (1969) (the public branding of an individual implicates interests cognizable as either "liberty" or "property," and such public condemnation cannot be accomplished without procedural safeguards designed to eliminate arbitrary or capricious executive action); *Wisconsin v. Constantineau*, 400 U.S. 433 (1971) (due-process hearing required even where the government merely accuses someone of being a drunk, or other "stigma or badge of disgrace"); *Paul v. Davis*, 424 U.S. 693, 734-35 (1976) (Brennan, J., dissenting) (promulgating the so-called "stigma-plus" doctrine, which authorizes defamation claims against the government when accompanied by loss of employment; "[O]ne of this Court's most important roles is to provide a formidable bulwark against governmental violation of the constitutional safeguards securing in our free society the legitimate expectations of every person to innate human dignity and sense of worth. It is a regrettable abdication of that role and a saddening denigration of our majestic Bill of Rights when the Court tolerates *arbitrary and capricious* official conduct branding an individual as a criminal without compliance with constitutional procedures designed to ensure the fair and impartial ascertainment of criminal culpability."); *Johnston v. Borders*, 36 F.4th 1254 (11th Cir. 2022) (Due Process Clause required a name-clearing hearing when at-will employee was terminated and her reputation was harmed by false and stigmatizing statements; plaintiff was additionally entitled to injunctive relief requiring the government to grant her a timely post-termination hearing).

Page 8 of 11

*Mullane v. United States, et al.*

26.   *Jencks v. United States*, 353 U.S. 657, 671 (1957) (holding that it is unconscionable to allow the Government to publicly accuse a citizen "and then invoke its governmental privileges to deprive [him] of anything which might be material to his defense") (quoting *United States v. Reynolds*, 345 U.S. 1, 12 (1953));

27.   *Roviaro v. United States*, 353 U.S. 53, 60 (1957) ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a *fair determination of a cause*, the [government] privilege must give way." (citations omitted));

28.   *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (the accused has a constitutional right to compulsory process for favorable witnesses);

29.   FRANZ KAFKA, THE TRIAL 12 (Alfred A. Knopf 1992) (1925) ("[T]hough I am accused of something, I cannot recall the slightest offense that might be charged against me. But that even is of minor importance, the real question is, *who* accuses me?" (emphasis added));

30.   *Id.* at 127 ("For the proceedings were not only kept secret from the general public, but from the accused as well. Of course only so far as this was possible, but it had proved possible to a very great extent. For even the accused had no access to the Court records, and to guess from the course of an interrogation what documents the Court had up its sleeve was very difficult, particularly for an accused person, who was himself implicated and had all sorts of worries to distract him.");

31.   *Brady v. Maryland*, 373 U.S. 83 (1983) (all evidence favorable to the accused must be turned over by the Government);

32.   *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (articulating the modern test for

*Mullane v. United States, et al.*

what form of due process is required before the government may invade a protected interest in a civil proceeding);

33.   *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (citing *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961) (if the federal government seeks to deprive a person of a protected life, liberty, or property interest, the Fifth Amendment's Due Process Clause requires that the government first provide certain procedural protections);

34.   *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (procedural due process includes affording the affected person timely notice and an opportunity to be heard);

35.   *United States v. Lovett*, 328 U.S. 303, 313, 315-16 (1946) (government's decision to cut off pay of certain individually-named federal employees accused of being subversives constituted an unconstitutional "bill of attainder" since it effectively declared them of being guilty "without the safeguards of a judicial trial" and because it barred those persons from government service, which the Court deemed "punishment . . . of a most severe type.");

36.   *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) (broadly defining bills of attainder); and

37.   *Cummings v. Missouri*, 71 U.S. 227, 327, 329 (1867) (rules requiring anti-Confederacy oath for prospective members of the bar were unconstitutional bills of attainder because they inflicted punishment without the benefit of the "formality of a judicial trial;" while the challenged rules "did not expressly define any crimes, or declare that any punishment shall be inflicted, [] they produce[d] the same result

*Mullane v. United States, et al.*

upon the parties, against whom they are directed, as though the crimes were defined

and the punishment was declared;" the rules specifically "aimed at past acts, and

not future acts, and were intended to operate by depriving such persons of the right

to hold certain offices and trusts, and to pursue their ordinary and regular voca-

tions.").

At Cambridge, Massachusetts,
    This 30th Day of March, 2026.

Respectfully submitted,

/s/ Jonathan Mullane
JONATHAN MULLANE
30 Donnell Street
Cambridge, Massachusetts 02138
Tel. (617) 800-6925

*Plaintiff Pro Se*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 30, 2026, he caused to be served a true copy of the foregoing filing on Anthony Erickson-Pogorzelski, Esq., counsel for Defendants, and specifically addressed as follows: Anthony.Pogorzelski@usdoj.gov.

/s/ Jonathan Mullane
JONATHAN MULLANE

# EXHIBIT 1

| | |
|---|---|
| **From:** | Sheehan, Evelyn B. (USAFLS) |
| **To:** | Lehr, Alison (USAFLS) |
| **Subject:** | RE: Call earlier |
| **Date:** | Tuesday, April 10, 2018 8:53:22 AM |



(b)(5)

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, April 10, 2018 8:48 AM
**To:** Sheehan, Evelyn B. (USAFLS)
**Subject:** Fwd: Call earlier

Sent from my iPhone

Begin forwarded message:

> **From:** Jonathan Mullane <j.mullane@icloud.com>
> **Date:** April 9, 2018 at 3:42:40 PM EDT
> **To:** Alison Lehr <alison.lehr@usdoj.gov>
> **Subject: Call earlier**
>
> Hi Alison,
> Thank you for speaking with me earlier. To be honest, I was somewhat surprised by your request that I complete my internship by the end of this week. Coincidently I ran into Lesnay Vazquez in the HR department a week or two ago. Not only did she state that it would be more than ok for me to extend my internship to May, there was curiously no mention of any "personnel changes" or any other conditions precedent to staying on. If you could please clarify this misunderstanding, I would appreciate it.
> Unfortunately I am now in an uncomfortable position vis-à-vis HR, as they previously asked that I provide at least two (2) weeks' notice prior to completing my internship. I will need to speak with them when I go into the office tomorrow to see how I can finish the internship by this Friday.
> Regards,
> Jonathan
>
> **Jonathan Mullane**
> Tel.: +1 (617) 800-6925 | j.mullane@icloud.com
> *This e-mail message and any attachments are confidential and may be privileged. Emails transmitted or received shall neither constitute acceptance of conducting transactions via electronic means nor shall create a binding contract in the absence of a fully signed written agreement.*

EOUSA-2019-000468-01212

| From: | Sheehan, Evelyn B. (USAFLS) |
| To: | Lehr, Alison (USAFLS) |
| Subject: | RE: Call earlier |
| Date: | Tuesday, April 10, 2018 9:22:19 AM |

Ok. sounds good.

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, April 10, 2018 9:22 AM
**To:** Sheehan, Evelyn B. (USAFLS)
**Subject:** Re: Call earlier

E-
(b)(5)

Sent from my iPhone

On Apr 10, 2018, at 8:53 AM, Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov> wrote:

(b)(5)

**From:** Sheehan, Evelyn B. (USAFLS)
**Sent:** Tuesday, April 10, 2018 8:53 AM
**To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
**Subject:** RE: Call earlier
(b)(5)

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, April 10, 2018 8:48 AM
**To:** Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov>
**Subject:** Fwd: Call earlier

Sent from my iPhone

Begin forwarded message:

> **From:** Jonathan Mullane <j.mullane@icloud.com>
> **Date:** April 9, 2018 at 3:42:40 PM EDT
> **To:** Alison Lehr <alison.lehr@usdoj.gov>
> **Subject: Call earlier**
>
> Hi Alison,
> Thank you for speaking with me earlier. To be honest, I was somewhat surprised by your request that I complete my internship by the end of this week.

EOUSA-2019-000468-01213

| From: | Sheehan, Evelyn B. (USAFLS) |
| --- | --- |
| To: | Lehr, Alison (USAFLS) |
| Subject: | RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE |
| Date: | Tuesday, May 15, 2018 10:59:58 AM |

Spit spit spit to INFINITY.

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:59 AM
**To:** Sheehan, Evelyn B. (USAFLS)
**Subject:** RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE

**Very** sorry.
I will make certain (should there be a next time) spit spit spit

**From:** Sheehan, Evelyn B. (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:57 AM
**To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
**Subject:** RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE

We're all super busy. If I was told it didn't quite register during one of my ADD moments. You need to hit me over the head with it
I'm having heartburn bc of my notes, etc. I wasn't careful with papers etc

**From:** Lehr, Alison (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:55 AM
**To:** Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov>
**Subject:** RE: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE

E-
Apologies. I really thought I had told you. I know I discussed it with Nalina and Adrienne and, based on our discussions, we took away an assignment he was given initially.
A

**From:** Sheehan, Evelyn B. (USAFLS)
**Sent:** Tuesday, May 15, 2018 10:40 AM
**To:** Lehr, Alison (USAFLS) <ALehr@usa.doj.gov>
**Subject:** FW: How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE

Hey
Until last night I did NOT know that our infamous intern's father represented one of these targets/current cooperator in the VZ matter. If you find out about stuff like this for future interns, pls be sure to share with me and others to make sure we wall that person off completely. Quite unnerving bc I usually take extra precautions with my papers, discussions, research assignments, etc. What are the chances!?!
E

**From:** Evelyn Baltodano-Sheehan <(b)(6) ███████████
**Sent:** Monday, May 14, 2018 9:07 PM
**To:** Sheehan, Evelyn B. (USAFLS) <esheehan@usa.doj.gov>

**Subject:** How the Feds Blew a Case Against an Alleged South American Drug Money Launderer - VICE

https://www.vice.com/en_us/article/8gk7xx/how-the-feds-blew-a-case-against-an-alleged-south-american-drug-money-launderer

# How the Feds Blew a Case Against an Alleged South American Drug Money Launderer

## Experts and former drug warriors say the debacle represents a stunning blow against the US government's efforts to punish those who profit from the global drug trade.

For federal law enforcement officials, Martin Lustgarten Acherman was a prize catch in the war on drugs. Since 2007, investigators had been keeping tabs on the Miami-based businessman who maintains dual citizenship in Austria and Venezuela, methodically gathering evidence that Lustgarten was laundering tens of millions of dollars for Colombian and Mexican drug traffickers, as well as paramilitary groups, according to court documents obtained by VICE.

On April 8, 2015, authorities arrested Lustgarten in Miami after a grand jury indictment charged him with conspiracy to commit money laundering, obstruction of an official proceeding, and conspiracy to obstruct an official proceeding. His bust generated headlines heralding the dirty drug money nexus between Miami and Venezuela.

But nine months later, the case against Lustgarten suddenly unraveled as prosecutors dismissed the charges against him in what money laundering experts and former drug warriors say represents a stunning blow against the US government's efforts to punish those who profit from the narcotics trade.

"It is very unusual for a case like this to get dismissed," Michael Levine, a New York-based trial consultant who worked for a quarter-century as a Drug Enforcement Administration (DEA) special agent, told VICE. "It suggests to me that something was unearthed by the prosecutors that they decided to stop

EOUSA-2019-000468-01442

and not go any further with it."

"It is a steep fall for the government to dismiss a case like this one so abruptly and so quickly,"added Charles A. Intriago, a former Miami federal prosecutor who founded the Association of Certified Anti-Money Laundering Specialists.

Calls to the lead federal prosecutor, Joseph Palazzo, were referred to a US Department of Justice spokesman in Washington DC, who did not respond to VICE's requests for comment. A spokesman for the DEA's New England division, which handled the criminal investigation, likewise did not return phone calls seeking comment.

Of course, E. Peter Mullane, the lead attorney for Lustgarten, says the case was dropped for a simple reason: his client is innocent. "From day one we had vigorously protested the fact that this person had been indicted for alleged offenses that he did not commit," Mullane said in an interview. "It took approximately nine months of extensive discovery and aggressive pleadings to make this point."

According to the feds' indictment, Lustgarten operated companies in Hong Kong, Singapore, and Panama that provided capital loans and purchase-order financing to Venezuelan firms involved in the international trade. In Venezuela, companies like Lustgarten's allegedly took advantage of that country's strict controls regarding the availability of US dollars by exchanging American currency in the black market for Venezuelan bolivars at a higher rate than normal. By striking deals with Lusgarten's companies, Venezuelan importers would have access to American cash in order to pay for consumer goods coming from outside the country.

Prosecutors argued Lustgarten was obtaining the US dollars from drug traffickers and paramilitary groups. The indictment details how the DEA Boston office seized accounts in March 2009 tied to Lustgarten's firms at a Bank of America branch in Doral, a city largely populated by Venezuelans in Miami-Dade County. Yet Lustgarten continued to launder drug proceeds through banks in Hong Kong, Singapore, and Switzerland, according to the feds. During an April 13 detention hearing in Miami, Palazzo accused the Venezuelan-Austrian businessman of laundering between $40 million and $100 million.

"The government's case is also very strong," Palazzo said at the time, according

EOUSA-2019-000468-01443

to a transcript of the hearing. "Mr. Lustgarten's arrest was the culmination of several years of investigation by a joint task force in the District of Massachusetts... Extensive wiretaps were conducted in the US and in Colombia and several search warrants were executed on Mr. Lustgarten's emails. So there is plenty of documentary evidence supporting the charges as well."

Palazzo also accused Lustgarten of being an unreliable confidential informant who routinely passed false information to the Boston task force investigators. "Mr. Lustgarten is basically a professional liar that has been lying to the DEA and Homeland Security and to the US Attorney's Office in Boston for several years," Palazzo told magistrate Judge Edwin G. Torres.

The indictment went on to name a man named Salomon Bendayan, whom Palazzo alleged controlled shell companies that worked in concert with Lustgarten's supposedly shady businesses. Bendayan was arrested one month after Lustgarten.

While Lustgarten was held without bail for nine months, his defense team went to work taking apart the prosecution's case against their client. On November 19, Lustgarten's other lawyer Nathan P. Diamond filed a motion against Palazzo's request to delay the trial date until February, accusing the prosecutor of stall tactics and failing to produce evidence against his client. In essence, Diamond argued Lustgarten was being denied his right to a speedy trial, pointing out that the prosecutorial team had not provided documents detailing their client's banking transactions in seven countries.

That's because prosecutors never obtained the documents, according to Diamond. In order for prosecutors to obtain evidence in other countries, they must first obtain permission from foreign governments to do so under what is known as a <u>mutual legal assistance treaty agreement</u>.

That process appears to have helped derail the feds.

In Lustgarten's case, a request to gather evidence in Colombia was sent to that country's government in February, but US prosecutors did not receive a response until August, five months after he had been arrested, according to Diamond's motion, which cites a DOJ memo he apparently obtained. Prosecutors sent requests to Hong Kong officials in February, July and September, but said they did not get a reply at all, the motion states, and a request to Switzerland's government was made in July, three months after

EOUSA-2019-000468-01444

Lustgarten's arrest.

On November 20, Miami federal judge Marcia G. Cooke denied Palazzo's request to delay the trial, according to Lustgarten's court docket. About a month later, it seems like Palazzo gave up. On December 14, the US Attorney's Office dismissed the more serious charges when Lustgarten agreed to plead guilty to a misdemeanor charge of illegally entering the US on October 12, 2011, according to court documents obtained by VICE.

Bendayan, the other man charged in the indictment, also had money laundering charges dismissed against him when he pleaded guilty to a felony count of operating an unlicensed money transmitting business.

Andrew Ittleman, a partner in the Miami law firm at Fuerst Ittleman David & Joseph who specializes in money laundering cases, said Lustgarten's ordeal shows how difficult it is for the US government to prosecute international money laundering crime cases.

"It places a high burden on the government," Ittleman told me. "His defense attorneys did a masterful job of holding the government to its burden of not only proving beyond a reasonable doubt, but that government would also have to do it quickly."

The turning point in Lustgarten's case was the prosecutor's inability to secure cooperation from foreign countries, according to Ittleman.

"An assistant US attorney can't just make a phone call to another country to get permission," Ittleman said. "You need to abide by certain rules. In this case, the US government was not getting the cooperation it needed from Hong Kong, Argentina, Colombia, etc."

Gregory D. Lee, a retired supervisory DEA agent who also provides expert witness testimony, said he was surprised investigators and prosecutors did not attempt to retrieve Lustgarten's foreign banking documents prior to the indictment.

"Once you have somebody in custody, the clock starts ticking to go to trial," Lee explained. "You have to anticipate these type of problems so you avoid them. When you don't have the documents to turn over to the defense, it turns into a house of cards and it all comes tumbling down. Apparently that is what

EOUSA-2019-000468-01445

happened here."

*Follow Francisco Alvarado on <u>Twitter</u>.*

EOUSA-2019-000468-01446

# EXHIBIT 2



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Assistant Attorney General        *Washington, D.C. 20530*

December 23, 2025

## (U) MEMORANDUM FOR LEGAL ADVISOR, NATIONAL SECURITY COUNCIL

### (U)  Re: Proposed War Department Operation to Support Law Enforcement Efforts in Venezuela

(U) Since taking office, the President has directed a government-wide effort to combat certain cartels identified as designated terrorist organizations ("DTOs") in a classified National Security Presidential Memorandum ("NSPM").[1]  As part of that campaign, we have advised on the legality of a number of proposed policy options.[2]  We assume familiarity with those opinions, their naming conventions, and their underlying factual bases.  We adopt rather than repeat their analysis here, summarizing their contents only as necessary to understand our response to your new question.

███████ For decades, a substantial number of the DTOs listed in the classified NSPM have found safe haven in the Bolivarian Republic of Venezuela.[3]  Since 2013, they have been allowed to flourish under the corrupt leadership of Nicolás Maduro Moros.  You have asked whether, consistent with domestic law, the President may lawfully order military personnel to assist law enforcement in forcibly removing Maduro from Venezuela to the United States for prosecution.  We have orally advised that such an action—typically known as "irregular" or

---

[1] ████████████████████████████████████████████████████████████████ We have been advised that the operation name of ██████████████████████████████████ after the completion of ██████████ We have continued to use the old operation name to avoid confusion and do so again here.

[2] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The factual bases for the operation are discussed at length in the Statement of Facts ("SOF") appended to ██████████ as well as in documents maintained at a higher level of classification than can be discussed given the classification level of this opinion.

[3] (U) *E.g., Ex-FARC Mafia in Venezuela,* InSight Crime (Sept. 20, 2022), https://insightcrime.org/; Benjamin R. Young, *It's Time to Designate Venezuela as a State Sponsor of Terrorism,* Rand (Aug. 22, 2024), https://www.rand.org/ (Aug. 22, 2024); John P. Sullivan & Nathan P. Jones, *Hybrid Threats: Cartel and Gang Links to Illicit Global Networks,* 11 Int'l J. of Criminology 13, 23-25 (2024).

███████████████

"extraordinary rendition"[4]—would not endanger any subsequent U.S. prosecution. Moreover, based on the facts as explained to us on December 22, 2025, the President may unilaterally order such an operation, as the amount of force involved serves important national interests and involves a use of force that he could reasonably conclude does not rise to the level of war in a constitutional sense. ███████████████████████████████ This memorializes the basis of that advice.

## I.

### A.

(U) Although your question focuses on Venezuela, its answer begins in Colombia—and specifically its longstanding non-international armed conflict with the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), a far-left Marxist guerilla group that started selling drugs to finance its revolution and is now considered the prototypical narco-terrorist organization. *E.g.*, *Who are the FARC*, BBC News (Nov. 24, 2016), https://www.bbc.com/. As we have explained elsewhere, the United States has long supported Colombia in combatting the FARC's influence, including by providing actionable intelligence and munitions. ███████ ██████████████████████. This partnership has led to a number of lethal strikes aimed directly at FARC leadership ███████████████. *E.g.*, Dana Priest, *Covert Action in Colombia: U.S. Intelligence, GPS Bomb Kits Help Latin American Nation Cripple Rebel Forces*, Wash. Post. (Dec. 21, 2013). The proximate result of these successful operations is that many in FARC leadership have emigrated to Venezuela, bringing their violence and corruption with them. *E.g.*, *Ex-FARC Mafia, Venezuela and the Current International Climate*, InSight Crime (Nov. 11, 2019), https://insightcrime.org/.

(U) That corruption has become enmeshed in the highest levels of the Venezuelan military apparatus. The result is a shadowy group of high-ranking officers known as the Cartel de Los Soles ("CDLS"), a moniker based on the distinctive sunburst insignia of a Venezuelan flag officer's uniform. ███████ For years, CDLS has been intimately involved with the drug trade though Venezuela, *e.g.*, *id.*, which involves not just FARC but also other armed groups such as Hezbollah, *see* Joseph M. Humire, *The Maduro-Hezbollah Nexus: How Iran-backed Networks Prop up the Venezuelan Regime*, Atlantic Council (Oct. 7, 2020).

### B.

(U) For over a decade, Maduro has been under indictment in the United States for narcotics-related crimes arising from his relationship with the FARC. That indictment alleges that he both leads the CDLS and has directed a debilitating effort to flood the U.S. market with narcotics. Superseding Indictment ¶ 4, *United States v. Maduro Moros et al.*, No. S2 C11 Cr. 205 (AKH) (S.D.N.Y.) ("Indictment"). We have also been advised that "[a]s recently as 2024,

---

[4] (U) The term "rendition" usually refers to transfer of a fugitive or person in custody to a different jurisdiction. *E.g.*, *Rendition*, Black's Law Dictionary (12 ed. 2024). "Extradition" is a "distinct form of rendition" in which "one country surrenders a person within its territorial jurisdiction to a requesting country via a formal legal process, typically established by treaty." *Arar v. Ashcroft*, 585 F.3d 559, 564 n.1 (2d Cir. 2009) (cleaned up). For purposes of this opinion, we will simply use the term "rendition."

2

███████████████



████████████████████████ . . . have attended meetings inside Venezuela with high-ranking members of the FARC and members of the Venezuelan government to openly discuss future narcotics shipments." Email for Lanora C. Pettit, Deputy Assistant Attorney General, OLC, from HSC Representative (July 21, 2025) ("HSC Undertaking"); ████████████ Indictment ¶ 14. Although the intelligence community has had difficulty corroborating reports that Maduro personally directs this activity, he has been assessed to be one of a cadre who run CDLS and could be described as its de facto leader.[5]

(U)  To date, all intelligence provided to us indicates that Maduro will not give up power voluntarily. During his first Administration, President Trump undertook a variety of actions to bring democracy back to Venezuela. And Maduro promised free and fair elections in 2023—a pledge he promptly ignored. *See, e.g.*, Kanishka Singh & Matt Spetalnick, *US Recognizes Maduro's Opponent as Winner in Venezuela Election*, Reuters (Aug. 1, 2024), https://www.reuters.com/. Maduro has responded with a wave of repression. And notwithstanding repeated public appeals for the President's assistance to effectuate the electoral outcome with force if necessary,[6] Maduro continues to express public confidence in his ability to maintain power.

████████ It is less clear how Maduro, Venezuela, or its allies will respond to a direct use of military force within Venezuelan territory. It has been assessed that Maduro is likely

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

**C.**

████████ The current proposed operation, code-named ABSOLUTE RESOLVE, assumes that Maduro remains unwilling to leave voluntarily, which would require the President

---

[5] (U) *E.g.*, DEA, *Report Re: Initial Debriefing of [Redacted] on 2/20/19 Regarding the Drug Trafficking Activities of Diasdado Cabello et al.*, at 7 (Feb. 25, 2019) (identifying nine individuals, who did not include Maduro, as prominent members of CDLS and identifying Cabello as their "leader"); DEA, *Report Re: CS Debriefing of [Redacted] in Ft. Lauderdale FL on June 25th, 2014*, at 1 (July 16, 2014) (identifying 14 individuals, which did *not* include Maduro).

[6] (U) *E.g.*, Mishal Husain, *Nobel Peace Prize Winner: US Escalation Is 'Only Way' to Free Venezuela*, Bloomberg (Oct. 31, 2025), https://www.bloomberg.com/; Billy Stockwell, *Venezuela's Nobel Peace Prize Winner Calls on Trump to Stop Maduro's 'War' on Her Country*, CNN (Oct. 15, 2025), https://www.cnn.com/ (summarizing a video record to which there is also a link).

[7] (U) *See also* Igor Patrick, *Xi Pledges Support for Maduro, Criticises US Actions in Venezuela*, South China Morning Post (Nov. 25, 2025) https://www.scmp.com/; Amir Daftari, *Putin Answers Maduro's Call to Help Venezuela Resist Trump*, Newsweek (Nov. 7, 2025), https://www.newsweek.com/ (quoting Russian foreign ministry spokesperson Maria Zakharova). *But see* Ronny Reyes, *Why Venezuela's Allies Russia and China Are Slinking Away as Trump Ramps Up Pressure on Maduro*, N.Y. Post (Nov. 30, 2025), https://www.nypost.com/.

██████████████████████     █

to order U.S. military personnel to assist law enforcement in forcibly bringing Maduro to New York to stand trial.[8]  We understand that ████████████████████████████████████████ are often co-located with Maduro and would be seized if present at the time of the operation. *See* █████████ **But** ██████████████████████████████████████████████████████████████████ we have assumed that Maduro is the sole target of the proposed operation.

(TS // NF) The War Department has advised that Maduro spends considerable time at Fort Tiuna, a fortified location at the southern end of Caracas. ████████████████████ █████████████ We have also been advised that Maduro's personal body guard has at least ████ ████████████████████████████████████ As of December 22, we were told to assume these personnel are ███████████████ We were further advised that there may be a number of █████████████ in the vicinity. ██████████████████████████████████████████ ████████████████████████████████████████████████

████████████ It is expected that U.S. forces will face significant resistance on the approach. There are as many as 75 anti-aircraft battery sites along the approach route to Fort Tiuna. Moreover, we have been orally advised that there are estimated to be ████████████████ ████████████████████████████████████████████ These weapons, ███████████████████ are capable of downing the helicopters carrying the assault and retrieval force. ████████████████████████████████████████████████

████████████ As of December 22, 2025, the proposed assault will include approximately ████████████ within Venezuelan territory: an ████████████████ assault force carried by helicopters ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Before the assault force arrives at Fort Tiuna, approximately ████ aircraft comprising ████████████████ will serve as an escort and clear emplaced anti-aircraft batteries as needed. ████

████████████ The expected duration of the operation within Venezuelan territory is ████████ hours:[11] ████████████████████████████████████ in order to minimize ██████████████████████████████████████████████████████

[8] ████████████████████████████████████████████████ ████████████████████████████████████████████████

[9] ████████ Maduro's wife is also expected to be present, but other than noting that she is "known to be more aggressive and combative" than her husband, ██████████████████████

[10] ████████████████████████████████████████████████

[11] ████████████████████████████████████████████████ ████████████████████████████████████████████████

4

██████████████████████



casualties, the strike will take place at 0100 am (local time) on a date when a maximum number of Venezuelan military would be on leave for the holidays. Moreover, kinetic operations will be preceded by non-kinetic action ██████████████████████████████████████

████████████████████ Power at Fort Tiuna will be disrupted for a lengthier period of time because ████████████████████████ the War Department will aim pre-assault fire is the local power switching station.[12]

████████████ Risks to the mission are significant. Success will depend on surprise

████████████████████ The level of that risk will depend, in part, on Maduro's precise location within the Fort at the time of the attack.

## II.

(U) Consistent with the scope of your question, our analysis focuses on the legality of ABSOLUTE RESOLVE under domestic law. We note, however, that the proposed operation *will constitute* an armed conflict under international law. The U.N. Charter announces a strong principle that "Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state." U.N. Charter art. 2, ¶ 4. As we have explained, █████████████████████████ any difference arising between two States involving members of armed forces constitutes an armed conflict. *See* International Committee of the Red Cross, Geneva Convention Relative to the Treatment of Prisoners of War, Commentary, art. 2 at 23. In making that determination, it "does not matter how long a conflict last between States, how many are killed, or even if there is no fighting." Kenneth Watkin,

---

[12] ████████ In addition to the targets for pre-assault fire, the War Department has identified three airfields that may be destroyed should it appear that fighters are being assembled there to intercept the assault force. ██████ ██████ (noting that the airfields will not be struck otherwise as they are dual use for military and civilian purposes).



Fighting at the Legal Boundaries: Controlling the Use of Force in Contemporary Conflict 330 (2016).

(U) Extraordinary rendition from the territory of another State is recognized to be such an exercise of force by the United Nations, William W. Bishop, *International Law: Cases and Materials* 475 n. 52 (1962) (discussing the abduction of Adolph Eichman from Argentina); by various international law scholars;[13] and by this Office, *Extraterritorial Apprehension by the Federal Bureau of Investigation*, 4B Op. O.L.C. 543, 549 (1980) ("1980 Opinion"), *overturned in part on other grounds by Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. 163 (1989) ("FBI Opinion").[14]

(U) Because this extraordinary rendition will be conducted using military force, the operation will be governed by the law of armed conflict—on both sides. Regardless who starts the fight, DODW LOWM 3.5.2.1, "[t]he most basic rule of warfare" is that "[t]he right of belligerents to adopt means of injuring the enemy is not unlimited." Gary D. Solis, *The Law of Armed Conflict: International Humanitarian Law in War*, 38 (2010) (quoting Department of the Army, Field Manual (FM 27-10), *The Law of Land Warfare* ¶ 53 (1956)). This includes the "combatant's privilege," which since at least the time of Grotius if not Euripides, "has always been an important customary element of the law of war." *Id.* at 41–42; *accord* International Committee on the Red Cross, *Handbook of International Rules Governing Military Operations* 2.3.1.1 ("The first step is the determination of whether an armed conflict is international or non-international, because the classification . . . . determines the specific set of rules which apply to conduct of military operations.").

(U) To be clear, we have *not* reached a definitive conclusion about how international law would apply to ABSOLUTE RESOLVE. To the contrary, as we have discussed, there are reasons to conclude that, consistent with the United States' views on international law, ███████████ ████████████████████████████████████████[15] Alternatively, there are arguments that Maduro's refusal to cede power following the most recent election demonstrate that the true representative of the Venezuelan people is unable to control the threat Maduro poses to the United States and its allies in the region. *See generally* Ashley S. Deeks, *"Unable or Unwilling": Toward a Normative Framework for Extraterritorial Self-Defense*, 52 Va. J. Int'l Law 483 (2012) (discussing the development and limitations of the unable and unwilling test);

---

[13] ███████████████████████████████████████████

[14] ███████████████████████████████████████████

[15] ███████████████████████████████████████████

6

███████

Yoram Dinstein, *War, Aggression, and Self-Defense* 250 (4th ed. 2005) (quoting 1 *Oppenheim's International Law* 355 (9th ed. 1992) ("*Oppenheim*")); *see also, e.g.*, Antoine Cassese, *International Law* 369–70 (2d ed. 2005) (listing the requirements of valid consent).

(U) We do not reach the question because it is unnecessary to address the issue you raise: that is, "[i]nternational law . . . does not restrict the President as a matter of domestic law," Memorandum for William J. Haynes II, General Counsel of the Department of Defense, from Jay S. Bybee, Assistant Attorney General, OLC, *Re: Legal Constraints to Boarding and Searching Foreign Vessels on the High Seas* at 18 n.18 (June 13, 2002), when it comes to extraordinary rendition. *See also Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. Op. 163 (1989) ("*Override Opinion*"); Memorandum for Jamie S. Gorelick, Deputy Attorney General, from Richard L. Shiffrin, Deputy Assistant Attorney General, OLC, *Re: Meaning of "Covert Action"* at 6 & n.7 (Mar. 28, 1997).

## III.

████████ What does define the President's authority to order ABSOLUTE RESOLVE is the Constitution—which we turn to now. Again, "[w]hen it comes to the war powers of the president, we do not write on a blank slate." *April 2018 Airstrikes Against Syrian Chemical Weapons Facilities*, 42 Op. O.L.C. 39, 41 (2018) ("*Syrian Chemical Weapons*"); *see also* ████████████████████████████████ In determining whether the President may unilaterally order *any* use of military force in another country—including the one at issue here— we examine (1) whether the President can reasonably determine that the action serves important national interests, and (2) whether the "anticipated nature, scope, and duration" of the conflict falls within the President's constitutional authority. *Syrian Chemical Weapons*, 42 Op. O.L.C. at 48 (citation omitted). This remains a "highly fact specific" inquiry. *Authority to Use Military Force in Libya*, 35 Op. O.L.C. 20, 37 (2011). The facts relevant to both aspects of the test are admittedly closer than in ████████████████████ Nevertheless, based on how the facts were briefed to us on December 22, 2025, we think that the President could reasonably make the determinations necessary to order ABSOLUTE RESOLVE.

## A.

(U) Starting with the first element of our test, "the President could reasonably determine that the action serves important national interests." *Syrian Chemical Weapons*, 42 Op. O.L.C. at 48. During discussions over the potential rendition, policymakers have raised a number of such interests, which "situate . . . within [our] framework of prior precedents." *Id.* at 49. Due to the hybrid nature of this operation, both how those interests manifest and the manner in which the interact with the proposed operation vary slightly from a typical OLC opinion regarding a military use of force. But they exist and help explain why robust military support would be justified for what is otherwise a *law enforcement* operation.

████████ To start, though it is certainly far from common, this is not the first time that the Executive Branch has concluded that it is lawful to use the military to support the extraterritorial arrest of particularly dangerous individuals. For example, ████████████ ████████ were deployed to support the FBI in detaining an al-Qaeda member accused of

███████

participating in the 1998 bombings of U.S. embassies in East Africa.[16] Approximately ▮▮▮ ▮▮▮▮▮▮ were deployed with the FBI to support the capture of Abu Khatallah, who was responsible for the attack on the U.S. embassy in Benghazi.[17] An unknown number of military personnel were deployed to support the capture of his co-conspirator Mustafa al-Imam.[18] In at least the last two instances, support of law enforcement was identified without further elaboration as the domestic legal justification.[19]

(U) It is unclear whether statutes providing authority for the War Department to assist law enforcement extend to ABSOLUTE RESOLVE. Congress, in 10 U.S.C. § 274(b)(2)(F)(iii), has permitted the Secretary of War, upon request, to make personnel available for the "transportation of suspected terrorist suspects from foreign countries to the United States for trial." Section 274(b)(1)(D) allows the War Department to operate equipment, for among other things "rendition of a suspected terrorist from foreign country to the United States to stand trial." As the raid is designed to transport individuals determined by the President to be terrorists, and is anticipated to require various forms of military equipment (e.g., jet fighters, night vision, firearms, etc.), the statute could in some sense be read according to its literal terms to apply. But in context, it is a stretch—particularly because Congress required the requesting law enforcement operation to "provide[] all security for such transportation." 10 U.S.C. § 274(b)(2)(F)(iii). That is particularly so given that while we have been advised that Maduro is under investigation for potential charges of material support for terrorism, he has not yet been charged with such offenses as of the time of this memorandum.

(U) But, as we have noted, these provisions are a clarification of the Posse Comitatus Act—not a limitation on the President's ability to use the military to conduct operations abroad. That is, the Posse Comitatus Act purports to forbid all involvement of the military in law enforcement actions. 18 U.S.C. § 1385. These statutory provisions act "as a grant of authority as well as a kind of 'safe harbor' of permissible activities." *Extraterritorial Effect of the Posse Comitatus Act*, 13 Op. O.L.C. 321, 338 (1989). But they "do[] not operate to restrict military enforcement activity beyond the limitations imposed by the Posse Comitatus Act itself," and are thus not relevant to military actions abroad where the Posse Comitatus Act does not apply. *Id.*;

---

[16] ▮▮▮ See Gordon Modarai, et al., *The Seizure of Abu Anas Al-Libi: An International Law Assessment*, 89 Int'l L. Studies 817, 817–18 (2013) (describing Al-Libi's detention); Email for Lanora Pettit, Deputy Assistant Attorney General, OLC, from Legal Advisor to the Joint Chiefs of Staff, *Re: Risk* (Dec. 2, 2025) ▮▮▮ ("Risk Email").

[17] ▮▮▮

[18] ▮▮▮ See Memorandum for Secretary of War, from William S. Castle, Acting General Counsel, Department of War, *Re: Legal Review of Department of [War] Proposal to Capture Mustafa al-Imam* (Sept. 13, 2017). ▮▮▮ the War Department have made a good-faith effort to find records of the force package used in this operation. As of the date of this memorandum, the records have not been located.

[19] (U) We have not identified a legal memorandum discussing the al-Libi operation in advance.

8

███████████

(U) To the best of our knowledge, there is no established, independent test for the President's use of the military in support of law enforcement abroad under a pure Article II theory.[20] If the operation were conducted by a domestic SWAT team—the closest domestic law enforcement analogue that we have been able to find to the professional armed services—we would look to questions about whether the amount of force was reasonable given the alleged conduct leading to the arrest, potentially uncharged conduct, and the level of danger posed to the arresting force.[21] But those standards are ill-fitting in this context because they arise from individual constitutional rights that do not apply to action taken against non-U.S. persons and conducted entirely outside the United States. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273–75 (1990).

████████ These law enforcement factors do, however, overlap with the type of circumstances that could support the need for military involvement in the law enforcement operation. In particular, we have identified several considerations that either are national interests that would support military action in their own right, or demonstrate why military support is needed to conduct an otherwise purely law enforcement operation. In particular, we found five such factors to be relevant.[22]

████████ *First*, the allegations against Maduro are severe. As we have described at length, █████████████ was justified by the necessity to disrupt the ability of DTOs to fund ongoing armed conflict with the U.S. and its allies in the region that is beyond the level at which ordinary law enforcement can effectively respond. ████████████ Although not charged with homicide, Maduro is factually accused of directly participating—or, at minimum, facilitating—that activity. HSC Undertaking, *supra*; *see also* Indictment at ¶ 5. True, the intelligence provided to us is somewhat contradictory about how closely Maduro is tied to that conflict, meaning that we probably could not target him directly for a lethal strike outside of the paradigm of the law of armed conflict. But the severity of the conduct and his access to significant weaponry (even apart from his control of the Venezuelan armed forces) would justify a use of force significantly higher than most law-enforcement operations could justify.

████████ Critics are likely to insist that it is artificial to distinguish between a rendition and a targeted military strike given that the War Department anticipates significant resistance in reaching their target. But this criticism ignores the key question of intent when it comes to potential criminal liability for U.S. personnel. *See* Letter for Elizabeth Rindskopf from William B. Barr, Deputy Attorney General, *Re: Deception Operations: Iraqi Diplomatic and Military*

---

[20] (U) The very existence of sections 271–74 as an exception to the Posse Comitatus Act suggests that Congress deems the apprehension of terrorists for trial in the United States to be an "extraordinary circumstance" requiring the use of military force. Congressional Research Service, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 1–2 (Nov. 6, 2018). As Maduro is being investigated but has not been charged with any crimes related to terrorism, however, it is unclear how that ground applies here.

[21] (U) *See, e.g., Penate v. Sullivan*, 73 F.4th 10, 14 (1st Cir. 2023); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1183 (10th Cir. 2001); *Ramage v. Louisville-Jefferson Cnty. Metro Gov't*, 520 F. App'x 341, 342–44 (6th Cir. 2013).

[22] (U) For the avoidance of doubt, these five considerations are not intended as a multi-factor "test." They are provided as reasons why the President could determine that military force is justified to arrest this particular felon among the many currently resident in South America.

████████████



*Personnel 2* (Jan. 8, 1991)

(U) Moreover, even in the domestic context, courts have been reluctant to say that the likelihood that a criminal will resist arrest is grounds to say that he cannot be arrested. *E.g.*, *Barnes v. Felix*, 605 U.S. 73, 87 (2025) (Kavanaugh, J., concurring) ("Encouraging officers to stand back and allow drivers to take off would . . . create 'perverse incentives' for those who are stopped by the police." (citing *Scott v. Harris*, 550 U.S. 372, 385 (2007)). It would be particularly troubling to adopt such a rule in the international context given that the same argument could be made about the leader of any decentralized armed group—a phenomenon that is occurring with increasing regularity. *See generally* Sylvain Vité & Isabelle Gallino, *Decentralized Armed Groups: Can They Be Classified as Parties to Non-International Armed Conflicts*, 106 Int'l Rev. Red Cross 931 (2024). The severity of the conduct alleged in the indictment would support a presidential conclusion that unlike the average drug king pin, it is necessary to arrest Maduro in South America, and that military support is an operational necessity for law enforcement to do so safely.

▮▮▮▮▮ *Second*, in addition to the severe conduct alleged in the indictment, Maduro and his regime have been assessed as being involved in numerous other highly dangerous activities. For example, Hezbollah has reportedly established a base of operations in Venezuela with direct ties to Maduro in order to exploit its illicit narcotics networks to finance terrorism around the globe. *See* Humire, *supra*. Moreover, the link between Iran and Venezuela is well established, *e.g.*, *id.*, including ▮▮▮▮ shipments of weapons ▮▮▮▮▮▮

▮▮▮▮▮ A counterargument is that we have not been provided intelligence that the weapons will imminently be used to attack the United States. ▮▮▮▮▮▮ And, like the United States, Venezuela has an inherent right of self-defense. Malcom H. Shaw, *International Law* 129 & n.1 (6th ed. 2008) ("According to legal theory, each state is sovereign and equal.") (collecting sources).

(U) Nevertheless, we do think that the President is entitled to consider the existence of these weapons in determining whether to send law enforcement to arrest Maduro—and thus military support to protect such law enforcement personnel. After all, Congress has expressly concluded that the proliferation of weapons from Iran is of sufficient concern to specifically outlaw the activity. *See* 22 U.S.C. § 9423(a)(5). And Hezbollah is among the groups that we have been targeting throughout the War on Terror. Memorandum for John A. Eisenberg, Legal Advisor to National Security Council, from Steven A. Engel, Assistant Attorney General, OLC, *Re: January 2020 Airstrikes in Iraq Against Qassem Soleimani* at 14 (2020) ("*Soleimani*").

▮▮▮▮▮ Indeed, it could be seen as reckless not to do so. After all, based on the facts provided to us, if the FBI were to attempt to arrest Maduro without assistance from the military, the mission would undoubtedly fail. In addition to the near certain deaths of the personnel

10

involved, ███████████████████ such a failed operation would lead Maduro to retaliate against U.S. interests in the region █████████████████████████████████

████████████████████████ As history amply demonstrates, such troop movements are inherently dangerous because they can be misinterpreted, causing small issues to flare up into major bloodshed.[23]  This creates the type of regional instability that would justify military intervention even without the involvement of a law-enforcement motive. ████████████████████

██████████ Syrian Chemical Weapons, 42 Op O.L.C. at 57 (citing Authority of the President to Repel the Attack in Korea, 23 Dep't of State Bull. 173, 174 (1950)).  At the very least, creating such a cache of such dangerous weapons is arguably the archetypical example of when it would be appropriate to use overwhelming force to disrupt a criminal enterprise.  See Karan R. Singh, Treading the Thin Blue Line: Military Special-Operations Trained Police Swat Teams and the Constitution, 9 Wm. & Mary Bill Rts. J. 673, 677–78 (2001) (noting that the "general[]" justifications for a SWAT team typically including "hand[ling] incidents in which people with high-destruction weapons have taken hostages and are holed up in a fortified location." (citation omitted)).

(U) Third, force may be necessary to protect civilians both in Venezuela and abroad from Maduro.  Although often paired with other interests, "Presidents have on many occasions" used military force "to prevent or mitigate humanitarian disasters," including the mass "displacement of civilians" that can "deepen[] the instability in the region." Syrian Chemical Weapons, 42 Op. O.L.C. at 52–53 (collecting authorities).  The same phenomenon is seen on a smaller scale in a law-enforcement context when force has been justified to protect bystanders from the actions of dangerous felons.  Cf. Est. of Parker v. Miss. Dep't of Pub. Safety, 140 F.4th 226, 242 (5th Cir. 2025) (discussing the reasonableness of deadly force in an active-shooter situation); Cruz v. City of Deming, 138 F.4th 1257, 1267 (10th Cir. 2025) (same).

(U) Public reporting reflects that of a population of 28.8 million, "[o]ver 20 million Venezuelans live in multidimensional poverty with inadequate access to . . . food and essential medicines." Tirana, Hassan, Venezuela: Events of 2024, Human Rights Watch (2024), https://www.hrw.org/.  Over 14 million of those individuals "face severe humanitarian need" with medicines "unavailable at 28.4 percent of pharmaceutical dispensaries" and 5.1 million people facing hunger.  Further, illegal mining has led to the displacement of indigenous communities and exacerbated issues involving child labor—including children as young as seven.  U.S. Dep't of State, Venezuela 2024 Human Rights Report at 25 (2025) ("State 2024 Report").

(U) Although these effects are not entirely new, recent developments have underscored that non-forceful options are unlikely to be effective.  The U.N. Special Rapporteur on Food has

---

[23] (U) E.g. David Preston, When Young George Washington Started a War, Smithsonian Mag. (2019), https://www.smithsonianmag.com/ (discussing how an effort to warn French occupiers of a frontier fort led to a 15-minute firefight sparking the Seven Years War); War of the Stray Dog—The Incident at Petrich 1925, Balkan Military History, https://balkanhistory.org/ (last visited Dec. 23, 2025) (discussing the claim that troops massed at the border between Greece and Bulgaria engaged in a fire fight when a Greek soldier chased his dog across the line of demarcation).

identified international economic sanctions and politicization of state food as responsibility for much of the suffering. Hassan, *supra*. The international community has already tried to send money to ameliorate the effects of these sanctions; a single member of the elite is accused of stealing in excess of $100 million of that relief aid. *See* Julia Turkewitz, *What Happened to Venezuela's Democracy?*, N.Y. Times (July 30, 2024), https://www.nytimes.com/. Even before the election, the Communications Minister of Maduro's dictatorial predecessor, Hugo Chavez, blamed Maduro for the state of affairs. *Id.*

The situation has only deteriorated as Maduro has responded to his electoral loss with a new wave of repression against dissenting voices. *See* State 2024 Report at 2 (noting an NGO had reported 361 extrajudicial killings in the first 8 months of 2024); *see also* Inter-American Commission on Human Rights, *Venezuela: Serious Human Rights Violation in Connection with the Election* at 8–9 (2025) (reporting a similar phenomenon). Maduro is accused of arresting thousands of political dissidents and torturing some unknown subset of his detainees. *Id.*

And there have been reports of Venezuelan attacks on opposition members that have sought to protect themselves by fleeing abroad. *See, e.g.*, U.S. Department of State, *Venezuela: Two Prominent Venezuelan Human Rights Activists Wounded in Targeted Attack in Bogota* (Oct. 14, 2025). Military force has been deemed justified under similar circumstances—albeit force that had the blessing of the international community in the form of a Security Council resolution. *E.g.*, *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 10 (1992). But, at minimum, such deliberate and reckless endangerment of the public at large and cruelty to dissidents and children would justify increased use of force in a law-enforcement context.[24]

(U) Critics of this argument will likely point to widespread public accusations that ▮ is itself violating international humanitarian law by improperly targeting civilians. *E.g.*, *United States "Drug Boat" Strikes Are Illegal And Need To Be Investigated, UN Official Says*, The Independent (Oct. 31, 2025). Such a criticism reflects a lack of understanding of bot▮ ▮, and the law of armed conflict, which permits the death of individuals deemed members of non-state armed groups based on their conduct, civilians directly participating in hostilities such as by assisting in war-sustaining activities, or civilians who are present at legitimate targets provided that the harm is not excessive in relation to the military advantage gained ▮

(U) *Fourth*, as alluded above, precisely because Maduro controls the military of a sovereign nation, his criminal conduct presents a greater risk to the public than could any ordinary criminal by threatening "regional stability" in a "critical region" in this hemisphere. *Syrian Chemical Weapons*, 42 Op. O.L.C. at 49–50 (quoting *Libya*, 35 Op. O.L.C. at 36). This has no direct analogue in a law-enforcement context. But in assessing the dangerousness of this particular felon, it would be remised for the President not to consider that ever since the U.S.

---

[24] (U) *Cf. Graham v. Connor*, 490 U.S. 386, 396 (1989) (noting that "whether the suspect poses an immediate threat to the safety of . . . others" is among the factors considered in determining whether a use of force is reasonable); *Ybarra v. Chicago*, 946 F.3d 975, 979 (7th Cir. 2020); *accord* U.N.G.A. Res. 191 (2005) (establishing the Responsibility to Protect).

12



Navy began shifting resources to the theatre in order to conduct ███████████ Maduro has engaged in a series of aggressive actions ranging from buzzing American naval vessels to placing troops on the border with Colombia. ███████████ These actions augment the months-long efforts to destabilize its neighbors such as, for example, its neighbor Guyana with which it has a longstanding and very public boundary dispute.

███████ We have not assessed this threat as sufficient to justify a military attack on Venezuela itself, as military commanders have not advised us that Maduro's actions are a direct or imminent threat to U.S. forces. ███████████—the very type of attack that has been seen to justify the use of military forces in support of law-enforcement operations in the past. *See supra* notes 16–18. And in making the assessment whether to do so again, the President is entitled to considerable deference. *Cf. Libya*, 35 Op. O.L.C. at 28–29 (citing, *inter alia*, *Training of British Flying Students in United States*, 40 Op. Att'y Gen. 58 (1941)); *Syrian Chemical Weapons*, 42 Op. O.L.C. at 48.

███████ *Fifth*, it is indisputable that if Fort Tiuna were in the United States rather than Venezuela, there would be a sufficient threat of armed resistance to justify the use of considerable force in order to arrest him. *Supra* page 9 and note 21. Courts have found the *possibility* that a small handful of adults in a barricaded location may be armed to justify "dynamic entry" using overwhelming force. *E.g., Holland*, 268 F.3d at 1190–91. Here, we were told to assume that there were as many as 200 armed guards in a literal fort who have been sent from and armed by another country purely to ensure Maduro's safety. This level of expected armed resistance supports the need for military forces to provide security for law enforcement personnel carrying out the rendition, *accord* 10 U.S.C. § 272–74 (acknowledging that in certain instances military force may be needed to apprehend particularly dangerous fugitives)—a rendition that for the forgoing reasons, the President can reasonably conclude is in the national interest.

## B.

(U) Assuming the President can and does reasonably assess that the interest in arresting Maduro justifies the use of military force, such an operation would still only be lawful if he concludes that the *amount* of force would be proportional to its law-enforcement mission and not rise to the level of war based on a "fact specific assessment of the [operation's] anticipated nature, scope, and duration." *Soleimani* at 11. For example, President Roosevelt could not have unilaterally ordered D-Day on the grounds that it was an operation intended to bring German Fuhrer Hitler to justice even if he had been indicted for his role in atrocities against civilians. Relevant considerations include whether U.S. ground forces will be involved, whether they must be introduced into hostilities, and whether they are likely to "suffer or inflict substantial casualties." *Id.* at 17–18 (cleaned up). Based on the figures most recently quoted to us, he likely could conclude that the operation falls short of war in the constitutional sense.

(U) To start, the proposed operation involves the type of forces most likely to require congressional approval: boots on the ground. Although not dispositive, we have consistently treated the need to involve American ground forces as fundamentally different in kind than

13

███████████

███████████████████████

airstrikes, whether by manned aircraft or drones, due to the risk of immediate of casualties; the risk of escalation; and the difficulties of immediate extraction once American soldiers are under fire within hostile territory, *e.g.*, *Libya*, 35 O.L.C. at 38; *Soleimani* at 17–18; *Targeted Airstrikes Against the Islamic State of Iraq and the Levant*, 38 Op. O.L.C. 82, 118–19 (2014). Moreover, we have been advised that the War Department anticipates the proposed operation would be preceded by a preparatory bombardment ██████████████ This is itself a type of operation that we consider important in whether an action amounts to a war. *Libya*, 35 Op. O.L.C. at 38.

(U) The current projected figures are within the range of activities that we have found to be within the President's unilateral constitutional authority. They are approximately twice the size of the largest force package cited to us in support of law enforcement. *Supra* page 8. But they are considerably smaller than the 20,000 troops we approved to assist in the removal of the Haitian dictator in the early 1990s under roughly analogous circumstances. *Deployment of United States Armed Forces into Haiti*, 18 Op. O.L.C. 173, 179 n.10 (1994) ("*Haiti I*"). And the preparatory bombardment contemplated falls well-short of the airstrikes we approved in *Libya*, 35 Op. O.L.C. at 35–38, and *Authorization for Continuing Hostilities in Kosovo*, 24 Op. O.L.C. 327, 339 (2000) ("*Kosovo*").

██████████ The best counterargument to that position is that unlike in Haiti, █████████ is not likely to "deter armed resistance by the [Venezuelan] military and thus to hold both the United States and [Venezuelan] casualties to a minimum." *Haiti I*, 18 Op. O.L.C. at 179 n.10. True, the intelligence community has suggested that—notwithstanding his public posturing—Maduro may not currently have the capacity to engage in the kind of "significant armed resistance" that is likely to lead to war in a constitutional sense. *Syria Chemical Weapons*, 42 Op. O.L.C. at 58. ████████████████████████
████████████████████████
████████████████████████ which ordinarily would raise questions about whether the Venezuelan army is also less than entirely loyal.[25] But throughout our discussions, there has never been a suggestion that forces within Fort Tiuna will do anything other than go down fighting.

(U) It is unlikely that even the full loss of the strike force would amount to the type of sustained casualties that would amount to a constitutional war. We have never attempted to define what would suffice to "suffer or inflict substantial casualties" under our test. *Haiti I*, 18 Op. O.L.C. at 179 n.10. By way of comparison, the United States suffered 40,934 casualties during the Vietnam War, *Vietnam War U.S. Military Fatal Casualty Statistics*, Nat'l Archives (Apr. 29, 2008), https://www.archives.gov/, and 4,432 in Operation Iraqi Freedom, *Casualty Status*, U.S. Dep't of Defense, https://www.war.gov/ (providing data as of Jan. 30, 2025). By contrast, approximately ████ U.S. service members die a year from *accidents*. *Cf.* Defense Casualty Analysis System, *US Active Duty Deaths by Year & Manner (as of Aug. 2023)*,

---

[25] (U) Joseph Friexes, *'Colectivos': Maduro's Paramilitary Groups Sowing Terror in Venezuela*, Colombia One (Sept. 8, 2025), https://colombiaone.com/. *But see* Alicia Civita, *Inside Venezuela's Military: Leaders, Composition, and What's Behind the Support for the Maduro Regime*, Latin Times (Aug. 1, 2024), https://www.latintimes.com/ (quoting Defense Minister Vladimir Padrino López as reaffirming "absolute loyalty and unconditional support" for Maduro).

███████████████████████

█████ As a result, the most difficult part of the analysis is likely whether the action is going to *lead* to war. ████████████████ we asked whether policymakers will find it intolerable to allow such losses to go unanswered. While we cannot speculate as to any presidential decision in response to the significant loss of U.S. servicemembers, we were assured that there is no contingency plan to engage in any substantial and sustained operation that would amount to a constitutional war. We were further assured that there is no contingency plan that would involve using U.S. forces occupying Venezuela should the removal of Maduro result in civil unrest in that country. Based on that assessment of U.S. intentions, *we* do not currently plan any action that would amount to a constitutional war.

Of course, the enemy gets a vote. ██████████████ the likely result of Maduro's departure (whether voluntary or otherwise) would be mass confusion. There are a number of contenders both within his inner circle and in the legitimately elected government who might succeed him, and no clear frontrunner. Leaving aside other policy considerations, which are outside the scope of OLC's remit, such confusion would limit Venezuela's ability to respond in a way amounting to a constitutional war. Based on the briefings we received, the largest risk would be if Maduro or his successor were to attack U.S. interests in the Caribbean. Both the War Department and the intelligence community have assessed this to be a legitimate risk, but one that the War Department can (and has) defended against through deployment of appropriate forces.

█████ As for Maduro's allies, to date, they have provided only limited support, but that might change ██████████████████ It is entirely possible under the right circumstances that a major foreign power might lend additional support,[26] in order to protect significant investments either they or their nationals have made in the region.[27]



---

[26] (U) E.g., Demian Bio, *Russia Appears to Warn U.S. Over Pressure Against Venezuela: 'We Stand Ready to Respond Appropriately,'* Latin Times (Oct. 31, 2025), https://www.latintimes.com/.

[27] (U) E.g., *RPT-Private Chinese Firm Producing Oil in Venezuela Under Rare 20-Year Pact, Source Says*, World Energy News (Aug. 24, 2025), https://www.worldenergynews.com/; *Venezuela and China Sign Agreement for Reciprocal Promotion of Investments*, Fundación Andrés Bellow (May 24, 2024), https://fundacionandresbello.org/.

██████████████████████

(U) Critics are likely to point out that we have repeatedly concluded that the President could order a surgical strike on an adversary because he was *not* attempting to effectuate regime change, which is an inevitable consequence of a successful operation here. *E.g.*, *Soleimani* at 19; *Syrian Chemical Weapons*, 42 Op. O.L.C. at 61. True, but irrelevant. It is a logical fallacy to state that because the presence of a fact lends support to a conclusion, the absence of that fact renders the conclusion untenable. Indeed, if it were otherwise, we would have reached the opposite conclusion in *Haiti I*. *See* 18 Op. O.L.C. at 179 n.10. Having an open-ended goal suggests that a conflict will be prolonged—and thus more likely to constitute "war." *Libya*, 35 Op. O.L.C. at 33. But ultimately the question will turn on the likelihood of substantial and sustained hostilities resulting from the proposed operation. As described to us on December 22, 2025, ABSOLUTE RESOLVE does not cross the line drawn by this office over generations of OLC attorneys for what constitutes a constitutional war.

## C.

████████████ That being said, the fact that the President can lawfully authorize the operation does not by itself render any and all use of force in its completion lawful. As we have described at length elsewhere, to be entitled to the public-authority exception, personnel involved must implement his lawful order in a reasonable way. ████████████████████████ What that means is a context-specific inquiry. ██████████████████████████ In this context, this means (among other things) that the operation must be conducted in a manner designed to capture rather than kill Maduro, but it is still an armed conflict subject to the rules of such a conflict. *Supra* Part II.

(U) Put another way, not all armed conflicts are the same; the applicability of the law of armed conflict to the proposed operation does not mean that U.S. forces may use force to the maximum extent permissible if we were at war with Venezuela. Instead, the operation must comply with, among other principles, the principle of proportionality in both the *jus ad bellum* and *jus in bello* contexts. *Cf. Authority Under International Law to Take Action if the Soviet Union Establishes Missile Bases in Cuba*, 1 Supp. Op. O.L.C. 251, 253 (1962); *Handbook of the International Law of Military Operations* 442 (2d ed. 2016). For the reasons discussed above, we think that the operation as described to us on December 22, 2025, meets that standard.

## IV.

████████████ Whether the President has the authority to order the proposed operation will not affect the United States' ability to prosecute Maduro. It could, in theory, lead to significant potential implications for U.S. personnel who are involved.

## A.

(U) Although still the subject of some amount of public debate,[28] all three branches have accepted the practice of "extrajudicial transfer of a person from one [country] to another." *Arar*, 585 F.3d at 564 n.1. We are not aware of any such precedent that addresses the situation where

---

[28] (U) Leila Nadya Sadat, *Ghost Prisoners and Black Sites: Extraordinary Rendition Under International Law*, 47 Case W. Res. J. Int'l L. 309 (2006).

16

██████████████████████

such an extrajudicial transfer occurred in the context of a military action that the President lacked authority to order, but we think the better view is that the reasoning would permit Maduro's prosecution even without the consent of the legitimate Venezuelan government.

(U) We have concluded on at least two prior occasions that executive branch officials do not exceed the scope of their statutory authority by *arresting* fugitives located abroad—even where doing so violates international law. Specifically, we have concluded on more than one occasion that "an arrest in violation of customary international law [does] not violate the Fourth Amendment," FBI Opinion, 13 Op. O.L.C. at 181, so long as "officers with authority under United States law arrest with probable cause," *id.* at 183 (citing *United States v. Reed*, 639 F.2d 896, 902 & n.2 (2d Cir. 1981)). And our view since 1989 has been that customary international law does *not* prevent the FBI "with appropriate direction" from "us[ing] its broad statutory authority to investigate and arrest individuals [residing in a foreign state] for violations of United States law." *Id.* at 163. Speaking specifically in the context of drug trafficking, we reasoned that the President has "inherent constitutional power to authorize law enforcement activities," *id.* at 176 (citing *In re Neagle*, 135 U.S. 1 (1890)), and to manage the nation's foreign affairs, *id.* at 177. This power, we concluded, could allow for the extraterritorial arrest of fugitives *even if* the statutes otherwise authorizing law enforcement action are "construed as authorizing enforcement only within the limits imposed by international law." *Id.* at 178.

(U) One counterargument that we have seen in other contexts is that since the FBI Opinion, the Supreme Court has issued a number of opinions requiring Congress to speak clearly if it wishes to apply statutes extraterritorially. *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016); *Kiobel v. Royal Dutch Petrol.*, 569 U.S. 108 (2013). But these are hardly the first time the Court has applied a clear-statement rule to the extraterritorial application of statutes. *E.g., Smith v. United States*, 507 U.S. 197, 204 n.5 (1993); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957). We see nothing in these opinions that meaningfully changes our analysis. They expressly acknowledge that "the presumption against extraterritoriality is 'typically appl[ied]' to statutes 'regulating conduct.'" *RJR Nabisco*, 579 U.S. at 336 (quoting *Kiobel*, 569 U.S. at 116). These cases expanded the presumption to "constrain courts considering causes of action that may be brought" regarding such conduct, *id.*, but they did so precisely to avoid the "international discord that can result" if an alternative rule was applied, *id.* at 335. As a result, these cases do nothing to displace our reasoning, which hinged on the inherent role of the President in enforcing law and as the "sole organ of the federal government in the field of international relations." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 20 (2015) (quotation marks and citation omitted).

(U) We think it particularly unlikely that these recent cases have sub-rosa prohibited a practice that "administrations past and present have reserved the right to employ," *Arar*, 585 F.3d at 564 n.1, given that the Supreme Court has similarly held that a federal court does not exceed its statutory authority by *hearing* a case against a fugitive detained abroad. The Court first recognized that extrajudicial rendition did not prevent a subsequent prosecution in *Ker v. Illinois*, 199 U.S. 436 (1886). In that instance, President Chester Arthur issued a warrant for the extradition of Frederick Ker, a fugitive evading trial for larceny in Peru. *Id.* at 438. Rather than comply with an extant extradition treaty, a private messenger forcibly abducted Ker and put him

17

on a boat bound for the United States. *Id.* His subsequent conviction was upheld on appeal because his rendition—or what the Court called "forcible abduction"—was deemed to be "no sufficient reason why [Ker] should not answer when brought within the jurisdiction of the court." *Id.* at 444.

(U) In doing so, the Court adopted as a matter of U.S. law an old common law maxim: *male captus bene detentus.* Roughly translated, this means that "'a person improperly seized may nevertheless be properly detained (and brought to trial),'" and this principle is also "applied by the courts of a number of [other] states, including Canada, France, Germany, England and Israel." Halberstam, *supra* at 737-38 (quoting Louis Henkin, *International Law: Politics, Values and Functions,* 216 Recueil des Cours 9, 305 (1989)). The Court has reaffirmed that decision multiple times in the intervening century in what has come to be known as the *Ker-Frisbie* doctrine. *E.g., Alvarez-Machain,* 504 U.S. at 662; *Frisbie v. Collins,* 342 U.S. 519, 520 n.3 (1952) (collecting cases).

(U) Although the exact common-law scope of this principle is somewhat murky, we think its modern form is best understood as a gloss on the statutes creating federal court jurisdiction. Outside the scope of the Supreme Court's original jurisdiction, *see* U.S. Const. art. III, § 2, Congress decides the scope of the federal courts' power to hear cases, *see Patchak v. Zinke,* 583 U.S. 244, 253 (2018) (collecting cases). In the criminal context, Congress has provided that "[t]he district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States." 18 U.S.C. § 3231. *Ker-Frisbie* effectively recognized that because Congress did not carve out an exception for individuals who "had been brought within court's jurisdiction by reason of a 'forcible abduction,'" the Court held that "the power of a court to try a person for crime is not impaired by [that] fact." *Frisbie,* 342 U.S. at 522. *Alvarez-Machain* recognized that Congress can change that rule by treaty, but that whether it did so involves a question of statutory interpretation. 504 U.S. at 663 (citing *Air France v. Saks,* 470 U.S. 392, 397 (1985)); *Valentine v. U.S. ex rel. Neidecker,* 299 U.S. 5, 11 (1936)).

(U) Our view is that the Supreme Court has already foreclosed what we perceive to be the primary counterargument—namely, that *Ker-Frisbie* cannot apply if the proposed operation were to exceed the President's constitutional authority to order the use of force. In *United States v. Toscanino,* the Second Circuit found an exception to *Ker-Frisbie* for when the extraordinary rendition was conducted in an "outrageous" manner that the court deemed to independently violate the Due Process Clause. *United States v. Toscanino,* 500 F.2d 267, 275 (2d Cir. 1974). Without mentioning *Toscanino* by name, *Alvarez-Machain* expressly acknowledged that "Respondent and his *amici* may be correct that respondents abduction was 'shocking,'" but rejected the notion that it deprived the court of jurisdiction it would otherwise have. 504 U.S. at 669.[29] Because the abduction did not violate a treaty, the Court explained, "[w]hether respondent should be returned to Mexico . . . is a matter for the Executive branch"; it "does prohibit his trial in a court in the United States for violations of the criminal laws of the United States." *Id.* at 670.

---

[29] (U) Notwithstanding the Court's choice not to expressly discuss *Toscanino,* the jurisdiction in which Maduro would be prosecuted recognizes "*Toscanino* no longer is good law." *United States v. al Liby,* 23 F. Supp. 3d 194, 198–99 (S.D.N.Y. 2014).

███████████████

(U) The same general principle would apply to allegations that Maduro's abduction was conducted in a manner that exceeds the scope of the President's power under Article II. The scope of a federal court's statutory jurisdiction must be read in light of *both* the structural limitations of Article III power and individual rights. *E.g.*, *Walden v. Fiore*, 571 U.S. 277, 283 (2014); *Flast v. Cohen*, 392 U.S. 83, 92–93 (1968). But the same rules of statutory interpretation apply. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025). As already noted, an abduction is a use of force under international law regardless of how much force is actually required. *Supra* Part II. There is either a treaty that prohibits that use of force or there isn't. Because here there is not, *supra* note 14, the use of excessive force does not take any prosecution of Maduro outside *Ker-Frisbie*. *Alvarez-Machain*, 504 U.S. at 669.

(U) Finally, Congress has declined to amend relevant statutes to deny the Executive the ability to engage in rendition. Several pieces of legislation have been proposed to prohibit extraordinary rendition even absent a specific treaty.[30] Those bills have all failed, leading one scholar to bemoan "that the U.S. government and its officials face few legal restrictions on rendition operations." Daniel L. Pines, *Rendition Operations: Does U.S. Law Pose Any Restrictions*, 42 Loy. U. Chi. L.J. 523, 537, 582 (2011). It is always dangerous to infer approval of an existing practice from legislation that does not pass, but Congress's continued appropriation of funds to the agencies known to engage in the practice should be taken as (at minimum) acquiescence. *See Kosovo*, 24 Op. O.L.C. at 339.

**B.**

████████ That Maduro may still be prosecuted upon rendition to the United States does *not* mean that there could be no consequences should the President order an operation that falls outside the scope of his constitutional authority. As we have explained, U.S. personnel cannot be prosecuted for participation in ████████████ ue in large part to the implied public-authority exception that both we and the courts have found in generally applicable laws. ████████████████ Although we need not reach a firm conclusion now given that we have found the operation as explained to us to fall within constitutional bounds, we caution that such reasoning may not apply to operations that are ordered despite knowledge that the President lacked constitutional authority to order them.

████████████████████████

That is, a police officer who engages in illegal activities as part of his law enforcement activities cannot be prosecuted under an implied understanding of legislative intent—*unless* he goes "beyond the scope of [his] duties." *Hampton v. United States*, 425 U.S. 484, 490 (1976); *see also Neagle*, 135 U.S. at 75 (noting that a federal officer is

---

[30] (U) *E.g.*, National Security and Justice Act, S. 1876, 110th Cong. 1st Sess. (2007); Torture Outsource Prevention Act, H.R. 952, 109th Cong., 1st Sess. (2005); S. 72, 103d Cong. 1st Sess. (1993); H.R. 3346, 103d Cong. 1st Sess. (1993); International Kidnapping and Extradition Treaty Act of 1992, H.R. 5565, 102d Cong., 2d Sess. (1992).

19

████████████████████

"innocent of any crime" if his activity was "authorized . . . . by the law of the United States . . . and if, in doing that act, he did no more than what was necessary and proper for him to do").

(U) If the President does not have the authority for the actions, he cannot cloak his subordinates with the authority to engage in them. That authority can come from a statute or from the Constitution itself. *E.g.*, *Al-Bihani v. Obama*, 619 F.3d 1, 23–42 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc) (discussing the different sources of law that impact the President's war-making powers). But ultimately, a principal cannot authorize an agent to exercise a power he does not himself possess. *Cf. Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess."). Because the War Department assesses that it may inflict casualties in the effort to get to Maduro, in theory, this could subject U.S. personnel to prosecution for actions exceeding the President's lawful order.

(U) To be clear, this does *not* mean that an individual involved in the operation could be prosecuted merely because military personnel faced stiffer resistance than expected. The test is itself based on reasonable, prospective assessments about what is *likely* to happen. ███████ ███████ The law recognizes across a number of contexts that time may disprove the wisdom of predictions without rendering them false or unreasonable at the time they were made. *Cf. Lafler v. Cooper*, 566 U.S. 156, 174 (2012) (constitutional sufficiency of counsel); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (securities regulation). But the law does not permit the President to order troops into Venezuela without congressional authorization if he knows it will result in a war. As of December 22, 2025, we have not received facts indicating it will, but our legal advice is premised on such predictions.

(U) One counterargument to this view is that questions of war and peace are "matters of political judgment for which judges have neither technical competence nor official responsibility." *Ludecke v. Watkins*, 335 U.S. 160, 170 (1948). In such matters, including whether "an exigency requiring military aid . . . has arisen," the President's "decision to that effect is conclusive." *Sterling v. Constantin*, 287 U.S. 378, 399 (1932). We agree in principle. *Cf. Al-Bihani*, 619 F.3d at 40 ("The President's execution of foreign affairs statutes often requires judgment of policy and principle, and the foreign policy expertise of the executive places it—not courts—in the best position to make those judgments." (cleaned up)). However, such arguments have been met with considerable skepticism in recent months. *W.M.M. v. Trump*, 154 F.4th 207 (5th Cir. 2025), *vacated for rehearing en banc*, 154 F.4th 319 (5th Cir. 2025) (pending). More fundamentally, such issues sound in justiciability of a question before a court—*not* the legality of the underlying action. *See Dellums v. Bush*, 752 F. Supp. 1141, 1144 (D.D.C. 1990) (finding a dispute by 54 members of Congress regarding the President's authority to attack Iraq without congressional authorization to be unripe); *Baker v. Carr*, 369 U.S. 186, 217 (1962). Thus, they offer cold comfort for any charge that might be brought outside a federal court.

20

████████████████████

███████████████

## C.

(U) Finally, the existence of presidential authority under domestic law to order the operation does *not* preclude all of these consequences.[31] Perhaps the most troubling possible consequence for U.S. personnel is whether they could be extradited to Venezuela. Our Office has previously suggested that they could. 1980 Opinion at 556. Upon a closer examination, we do not agree.

(U) By statute, the United States cannot extradite an individual within its territory except by treaty. 18 U.S.C. § 3181, *et seq.*; *see also, e.g.*, *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936). Such a treaty is read like a statute, including by reference to background principles of law. *See, e.g.*, *Alvarez-Machain*, 504 U.S. at 663. Importantly, "[u]nder United States law, a treaty that provides that the parties are not obligated to extradite their own nationals does not provide authority for the United States to extradite its nationals." Restatement (Third) of the Foreign Relations Law of the United Sates § 475 cmt. f (1989). The U.S.-Venezuela extradition treaty is such a treaty. U.S.-Ven. Treaty art. VIII.

(U) Moreover, for officials who could be charged only with secondary liability, the Treaty imposes a dual criminality requirement. *Id.* at art. II(21) (requiring "such participation be punishable by imprisonment by the laws of both Contracting Parties"). By definition, acts that are covered by the public-authority exception are *not* punishable by imprisonment. ████████

███████████████

(U) For U.S. personnel directly involved in ABSOLUTE RESOLVE in Venezuela (whether military or the law-enforcement officers they are present to support), the primary protection will come from the fact that the Treaty does not require extradition of U.S. citizens. U.S.-Ven. Treaty art. VIII. As a practical matter, their extradition is also unlikely because the Secretary of State always has discretion to refuse to extradite. *Cf.* 18 U.S.C. § 3184; FBI Opinion, 13 Op. O.L.C. at 183 & n.37. We consider it unlikely that any future administration would agree to extradite operators when decisionmakers could not be extradited.

---

[31] (U) It is an open question whether the public-authority exception prevents domestic civil liability. *Alvarez-Machain*, 542 U.S. at 700, 736–38. Our longstanding view, which we reiterate today, is that it does. FBI Opinion, 13 Op. O.L.C. at 164 n.1.

███████████████

**V.**

(U) For these reasons, there are ways in which U.S. government personnel can, consistent with domestic law, forcibly bring Maduro to the United States. As currently posed, the operation is lawful as it does not rise to the level of a war in the constitutional sense. Even if someone were later to argue that the operation violated international law, such an argument does not vitiate the President's authority to order it under longstanding precedent. Should the facts change, however, our conclusions may also require revision.

(U) Please let us know if we can provide further assistance.

Sincerely,

T. Elliot Gaiser
Assistant Attorney General

22

B. JONATHAN MULLANE
30 DONNELL STREET
CAMBRIDGE, MA 02138-135



MS. ANGELA E. NOBLE
U.S. COURTHOUSE
400 NORTH MIAMI AVENUE
(ROOM 8N09)
MIAMI, FL 33128

REC'D BY
APR 03 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

BAeR



BAeR