IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

RE'CD BY _____ D.C.

◄ MAY 2 1 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

JONATHAN MULLANE,

     *Plaintiff,*

*v.*

UNITED STATES OF AMERICA, ET AL.,

     *Defendants.*

Civ. A. No. 1:20-cv-21339
Hon. Liles C. Burke

**PLAINTIFF'S
[1] NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE; AND
[2] SECOND SET OF OBJECTIONS**

For health-related reasons, on January 1, 2026, Plaintiff Jonathan Mullane ("Plaintiff") moved for referral to the Volunteer Attorney Program. Doc. 124. The said motion was assented to by the Government, and no objection was filed. On February 27, 2026, the stipulated motion was denied by the Court. Doc. 132. Accordingly, Plaintiff hereby voluntarily dismisses the above-captioned case without prejudice. *See* Fed. R. Civ. P. 41(a)(1)(A)(i).

I.

In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162 (1803), a controlling precedent which appears to have been overruled *sub silentio* according to the various decisions rendered in the instant litigation—in conjunction with the parallel Article III proceedings within and without the Eleventh Circuit—Chief Justice Marshall rhetorically asked, "If [a citizen] has a right, and that right has been violated, do the laws of his country afford him a remedy?" *Id.* By "remedy[,]" Chief Justice Marshall presumptively meant one which affords timely, effective relief; and the word "right" presumably included those specifically set forth in the United States Constitution, including

*Mullane v. United States, et al.*

*inter alia* the right to due process, the right to petition the judiciary for redress, and the Fifth

Amendment right to compensation for harms to "liberty" and "property" interests (*e.g.*, interests

vis-à-vis reputation and one's right to work), together with the constitutional protections against

bills of attainder, cruel and unusual punishment, and First Amendment retaliation. *Cf.* Benjamin

Plener Cover, *First Amendment Right to a Remedy*, 50 UC DAVIS L. REV. 1741 (2017). He then

went on to explain, in pertinent part:

> The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain, *the King himself is sued* in the respectful form of a petition, and he never fails to comply with the judgment of his court. In the third volume of his Commentaries, page 23, Blackstone states two cases in which *a remedy is afforded by mere operation of law*. "In all other cases," he says, "it is a general and indisputable rule that *where there is a legal right, there is also a legal remedy* by suit or action at law whenever that right is invaded." The Government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right.

> \*     \*     \*

> Is it to be contended that where the law, in precise terms, directs the performance of an act in which an individual is interested, the law is incapable of securing obedience to its mandate? Is it on account of the character of the person against whom the complaint is made? Is it to be contended that the heads of departments are not amenable to the laws of their country? Whatever the practice on particular occasions may be, the theory of this principle will certainly never be maintained. No act of the Legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law. After stating that personal injury from the King to a subject is presumed to be impossible, Blackstone, Vol. III. p. 255, says, "but injuries to the rights of property can scarcely be committed by the Crown without the intervention of its officers, for whom, the law, in matters of right, entertains no respect or delicacy, but furnishes various methods of detecting the errors and misconduct of those agents by whom the King has been deceived and induced to do a temporary injustice."

> \*     \*     \*

> [W]hen the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law, is amenable to the laws for his conduct, and cannot

*Mullane v. United States, et al.*

at his discretion, sport away the vested rights of others. The conclusion from this reasoning is that, where the heads of departments are the political or confidential agents of the Executive, merely to execute the will of the President, or rather to act in cases in which the Executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy.

\*     \*     \*

[I]f the officer is by law not removable at the will of the President, the rights he has acquired are protected by the law, and are not resumable by the President. They cannot be extinguished by Executive authority, and he has the privilege of asserting them in like manner as if they had been derived from any other source.

\*     \*     \*

The Constitution declares that "no bill of attainder or *ex post facto* law shall be passed." If, however, such a bill should be passed and a person should be prosecuted under it, must the Court condemn to death those victims whom the Constitution endeavours [sic] to preserve?

\*     \*     \*

Why otherwise does it direct the judges to take an oath to support [the Constitution]? This oath certainly applies in an especial manner to their conduct in their official character. How immoral to impose it on them if they were to be used as the instruments, and the knowing instruments, for violating what they swear to support! The oath of office, too, imposed by the Legislature, is completely demonstrative of the legislative opinion on this subject. It is in these words: "I do solemnly swear that I will administer justice without respect to persons, and do equal right to the poor and to the rich; and that I will faithfully and impartially discharge all the duties incumbent on me as according to the best of my abilities and understanding, agreeably to the Constitution and laws of the United States." Why does a judge swear to discharge his duties agreeably to the Constitution of the United States if that Constitution forms no rule for his government? if it is closed upon him and cannot be inspected by him? If such be the real state of things, this is worse than solemn mockery. To prescribe or to take this oath becomes equally a crime. It is also not entirely unworthy of observation that, in declaring what shall be the supreme law of the land, the Constitution itself is first mentioned, and not the laws of the United States generally, but those only which shall be made in pursuance of the Constitution, have that rank. Thus, the particular phraseology of the Constitution of the United States confirms and strengthens the principle, supposed to be essential to all written Constitutions, that a law repugnant to the

*Mullane v. United States, et al.*

Constitution is void, and that courts, as well as other departments, are bound by that instrument.

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162-67, 179-80 (1803).

When the United States Constitution was ratified in 1788, English law—as adopted by the United States—had already begun the centuries-long process of chipping away at the vast powers of the Crown (*i.e.*, the executive branch) in favor of Parliament (*i.e.*, the democratically-elected legislature). For instance, the longstanding common-law trend of abrogating the sovereign immunity of the executive branch and king finally culminated in a statute formally abolishing it in 1947. *See* Crown Proceedings Act 1947, 10 & 11 Geo. 6 c. 44 (abolishing sovereign immunity and allowing the Crown to be sued in civil proceedings in the same manner of private citizens, and reversing the maxim that "the King can do no wrong" in civil matters). But again, the powers of the Crown were already being abrogated by 1788 through, without limitation, English common law; the Magna Carta; the English Bill of Rights 1689, 1 Will. & Mar. Sess. 2. c. 2; and Lord Coke's Petition of Right 1628, 3 Cha. 1 c. 1. At that point in time, the prevailing law reflected the historical fact that England's gradual transformation from a monarchy to a true democracy was already well underway following the Glorious Revolution of 1688.

The foregoing also included matters relating to foreign policy, control of which was already being transferred from the executive branch to the legislature by 1788. *Ab initio*, this same trend has been followed in the United States, with the Supreme Court consistently holding that the President and Executive Branch do not have absolute, exclusive control over foreign policy[1]—particularly when acting outside of constitutional parameters or statutory mandates, or in matters requiring domestic legal implementation. *See, e.g., Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804)

---

[1]    Pursuant to Fed. R. Civ. P. 10(c), Plaintiff hereby adopts and incorporates the January 6, 2026, affidavit of E. Peter Mullane, Esq. in its entirety [Doc. 116].

*Mullane v. United States, et al.*

(invalidating Executive Order pertaining to war and foreign policy because, even during wartime, the President does not have any "inherent authority" or "inherent powers" under Article II to violate laws passed by Congress); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (although the Korean War was still ongoing, timely judicial review was conducted; Court held that the President did not have any "inherent authority" to seize property[2] of private citizens in the absence of either specifically enumerated authority under Article II of the Constitution or specific statutory authority conferred on him by Congress); *Medellín v. Texas*, 552 U.S. 491 (2008) (Article II does not bestow upon the President a right to make and/or implement laws merely because they relate to the foreign policy of the United States); *Zivotofsky v. Kerry*, 576 U.S. 1 (2015) (granting private citizen judicial review of Executive Branch action in matters relating to foreign policy; while acknowledging a specific exclusive power of the President to recognize foreign nations, the Court affirmed that the President cannot disregard federal statutes directing specific action in foreign affairs); *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (granting judicial review of Executive Branch action in matters of foreign policy, and reviewing for violations of international law and the Geneva Convention; the Court additionally reviewed whether the President's actions were specifically authorized under Congress' narrow grant of an Authorization for the Use of Military Force (AUMF[3,4]), Pub. L. No. 107-40, 115 Stat. 224); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004)

---

[2]     As noted in Plaintiff's first set of objections, the case law refers to the legal interests in the right to work and in one's reputation as both "property" and "liberty" interests within the meaning of the Due Process Clause. *See* U.S. CONST. amend. V; *see also Brown v. United States*, 12 U.S. 110 (1814) (President and Executive Branch cannot confiscate "property" during wartime without explicit authorization from Congress).

[3]     Here, neither an AUMF nor congressional declaration of war was obtained by the President with respect to either Venezuela and Iran; thus, the President was not acting within any constitutionally or congressionally-sanctioned mandate, and the Executive Branch's actions were unauthorized as a matter of law.

[4]     In the United States, just as in 18th-century England, there can be no doubt that the Framers of the Constitution intended to curtail Executive Branch overreach in foreign-policy matters by transferring many of its powers to Congress. *Cf., e.g., United States v. Wong Kim Ark*, 169 U.S. 649 (1898) (English common law was incorporated into American constitutional law); *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S.

*Mullane v. United States, et al.*

(although Executive Branch's action was specifically authorized under Congress' AUMF, such

action did not vitiate due-process rights under the Fifth Amendment;[5] Court applied international

---

687 (1999) (interpreting pre-independence English common law); *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) (same). This adopted English law specifically incorporated the Protestation of 1621, a legislative act reaffirming the legislature's right to intervene in matters of foreign policy. Conrad Russell, *The Foreign Policy Debate in the House of Commons in 1621*, Vol. 50, No. 2 HIST. J. 289-309 (Jun. 1977). At the time of the Protestation, the democratically-elected legislature wished to declare war against Spain, but the executive branch did not. Similarly, this was due to the fact that the English king had a conflict of interest: his son was due to marry the daughter of the Spanish king.

In the United States, the rationale behind the Declare War Clause, art. I § 8 cl. 11, was to avoid dragging the nation into unnecessary and costly wars at the whims of the king—armed conflicts which are typically precipitated by sanctions, tariffs, embargoes, naval blockades, unilateral coercive sanctions, and the like, all of which directly impact the United States' relations with foreign sovereigns and which predictably lead to armed conflict. *Cf.* Mitch Rogers, *From Freeze to Fire: How Economic Sanctions Against Japan Led to the War in the Pacific*, 47 THETAN 1, 1 (2018). In reference to the Declare War Clause specifically, President Abraham Lincoln explained in pertinent part:

> The provision of the Constitution giving the war-making power to Congress, was dictated, as I understand it, by the following reasons—Kings had always been involving and impoverishing their people in wars, pretending generally, if not always, that the good of the people was the object– This, our convention understood to be the most oppressive of all Kingly oppressions; and they resolved to so frame the Constitution that no one man should hold the power of bringing this oppression upon us[.]

Letter of Abraham Lincoln to William H. Herndon, The Papers of Abraham Lincoln Digital Library (Feb. 15, 1848); https://papersofabrahamlincoln.org/documents/D200458. It is unlikely that the Declare War Clause would have been promulgated if judicial review and legal enforcement thereof were not specifically contemplated by the Framers: any absence of judicial review would reduce it to meaningless "guidance" and surplusage for the Executive Branch's consideration rather than binding law under the Constitution. The foregoing is particularly relevant here, where neither an AUMF nor a congressional declaration of war was obtained.

Separately, the mere fact that the Framers saw fit to promulgate the Declare War Clause—which vests Congress with the exclusive power to declare war, as opposed to the President or Executive Branch—is clear indicia of the fact that they did not wish to create an Executive Branch with absolute control over all matters pertaining to foreign policy, and likely for the same serious concerns raised by President Lincoln in his 1848 letter, *supra*. Put simply, the President lacks constitutional authority to bypass the dialectic of the democratic process. And it would make little sense to think that, at the founding, the Framers wished to escape the monarchic rule of King George III only to replace and substitute him with yet another king—and to thereupon vest in one single individual absolute control over foreign policy which is contrary to the will of the overwhelming majority of American citizens, diametrically opposed to the consensus of the people whom the Government is supposedly serving in a democratic manner, and devoid of the give-and-take of deliberative democracy by sidestepping congressional review. Accordingly, it is respectfully submitted that the expansionist view of the unitary executive theory and Article II's Vesting Clause is historically unsupported in the context of foreign policy, economic warfare, and armed conflict. And there are countless other examples, too, of the Framers' intent besides the Declare War Clause. Consider, for instance, the Framers' separate requirement set forth in the Treaty Clause, which stipulates that the President may only enter into treaties "by and with the Advice and Consent of [two-thirds of] the Senate." U.S. CONST. art. II § 2 cl. 2.

[5]     In *Hamdi*, the Court observed in pertinent part:

*Mullane v. United States, et al.*

law and Geneva Convention to petitioner, a U.S. citizen[6]); *accord Kennedy v. Mendoza-Martinez,*

---

> We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake. *Mistretta v. United States*, 488 U. S. 361, 380 (1989) (it was "the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty"); *Home Building & Loan Assn. v. Blaisdell*, 290 U. S. 398, 426 (1934) (The war power "is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme cooperative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties").

542 U.S. at 536.

[6] Under (i) jus cogens, (ii) jus in bello, (iii) international customary law, (iv) customary international humanitarian law, (v) treaty law, and (vi) and other principles of international law, guarantees of a timely fair trial for those suspected of potentially aiding an enemy of the United States and/or constituting a security threat, including the right of "access to the government's file," always survive national emergency situations—even those invoked by the President under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701, *et seq.*, or pursuant to any other congressional approval or mandate. *See, e.g.*, Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 3, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (Common Article 3 of the Geneva Conventions applies to persons who might not otherwise qualify as "protected persons" under the stricter definitions of the full Conventions, and functions as a minimum standard for all individuals in non-international armed conflicts); *id.* art. 33 ("No person may be punished for an offence [sic] he or she has not personally committed . . . . Reprisals against protected persons and their property are prohibited."); *id.* art. 3(c)-(d) (prohibiting "[o]utrages upon personal dignity, in particular humiliating and degrading treatment" and "[t]he passing of sentences . . . without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples"); *id.* art. 27 ("Protected persons are entitled, in all circumstances, to respect for their persons, their honour [sic], their family rights, their religious convictions and practices, and their manners and customs. They shall at all times be humanely treated, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity."); *id.* art. 39 ("Protected persons who, as a result of the war, have lost their gainful employment, shall be granted the opportunity to find paid employment. That opportunity shall, subject to security considerations and to the provisions of Article 40, be equal to that enjoyed by the nationals of the Power in whose territory they are. Where a Party to the conflict applies to a protected person methods of control which result in his being unable to support himself, and especially if such a person is prevented for reasons of security from finding paid employment on reasonable conditions, the said Party shall ensure his support and that of his dependents."); *Hamdi*, 542 U.S. 507 (although petitioner was a U.S. citizen, he was entitled to the benefits of the Geneva Convention because he was suspecting of aiding the enemy); U.N. Hum. Rts. Comm., CCPR General Comment 29, States of Emergency: Article 4: Derogation During a State of Emergency, ¶ 16, U.N. Doc. CCPR/C/21/Rev.1/Add.11 (2001); Judicial Guarantees in States of Emergency (Arts. 27(2), 25, and 8 American Convention of Human Rights), Advisory Opinion OC-9/87, Inter-Am. Ct. H.R. (ser. A) No. 9, ¶ 29 (Oct. 6, 1987); *Comm'n v Kadi* ("*Kadi II*"), ECLI:EU:C:2013:518, ¶¶ 98-99 (Jul. 18, 2013) ("[T]he right[] of defence [sic] . . . includes the right to be heard and the right to have access to the file, subject to legitimate interests in maintaining confidentiality."); Alexander Orakhelashvili, Peremptory Norms in International Law 60 (2006) (due process and the right to a fair trial as jus cogens in the international community); United Nations Counter-Terrorism Implementation Task Force, *Basic Human Rights Reference Guide: Right to a Fair Trial and Due Process in the Context of Countering Terrorism* (2014); *see also* International Covenant on Civil and Political Rights (ICCPR), Dec. 16, 1966, 999 U.N.T.S. 171 (applicable due

*Mullane v. United States, et al.*

372 U.S. 144, 164-65 (1963) ("The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action"); *United States v. Robel*, 389 U. S. 258, 264 (1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile"); *Webster v. Doe*, 486 U.S. 592 (1988) (while CIA director has broad statutory discretion to terminate employees on national-security grounds under the National Security Act, 50 U.S.C. § 3024, this does not bar judicial review of constitutional claims arising

---

process rights under international law); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), Dec. 10, 1984, 1465 U.N.T.S. 85 (prohibiting psychologically degrading treatment).

International law also protects the right to employment, the right to "simple and prompt [judicial] recourse[,]" and other relevant rights which have been flouted here in a calculated manner by both the Executive Branch and United States federal judiciary. *See, e.g.*, International Covenant on Economic, Social and Cultural Rights art. 6-7, Dec. 16, 1966, 993 U.N.T.S. 3 (recognizing the right of everyone to have the opportunity to gain their living by work they freely choose, together with the right to "just and favourable [sic] work conditions"); Universal Declaration of Human Rights art. 23-24, G.A. Res. 217 (III) A, U.N. Doc. A/RES/217(III) (Dec. 10, 1948); American Declaration of the Rights and Duties of Man art. XIV, Res. XXX, Final Act of the Ninth International Conference of American States (Pan American Union), Bogotá, Colombia, Mar. 30-May 2, 1948, at 38; Organization of American States, American Convention on Human Rights art. 25, Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123 ("Everyone has the right to simple and prompt [judicial] recourse . . . even though such violation may have been committed by persons acting in the course of their official duties.").

Insofar as one or more of the above treaties may be non-binding and/or non-self-executing, such treaties nevertheless carry the force of law in federal court because their universal application through consistent state practice and opinio juris is incorporated into, without limitation: (i) customary international law (also referred to as the "law of nations"); and (ii) peremptory norms (jus cogens) as non-derogable, supreme rules of international law. *Compare* Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 331, 8 I.L.M. 679; *with Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (applying customary international law vis-à-vis tort claims); *The Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is part of our [federal] law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction"); *Ware v. Hylton*, 3 U.S. 199 (1796) (international treaties are the supreme law of the land in the United States, overriding domestic law); *The Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812) (applying international law); Thomas H. Lee, *The Law of Nations and the Judicial Branch*, 106 GEO. L.J. 1707 (2018) ("The Americans who adopted the Constitution were keenly aware of their place in the world as a militarily weak new state in need of peace and trade with the European powers for survival, and thus eager to comply with the law of nations [*i.e.*, international customary law]—the intramural rules of the European world order. They recognized that the *judicial branch* could play an important role in advancing the new nation's international acceptance and survival by judicious deployment of the law of nations as an instrument of U.S. foreign policy, which is why eight of the nine constitutional grants of judicial power in Article III implicated the law of nations. The law of nations was the original federal common law.").

*Mullane v. United States, et al.*

from the termination; federal employee was terminated because his homosexuality was viewed as a security risk).

## II.

As Chief Justice Warren E. Burger explained in his 1970 address to the American Bar Association,

> A sense of confidence in the courts is essential to maintain the fabric of ordered liberty for a free people and three things could destroy that confidence and do incalculable damage to society: that people come to believe that inefficiency and delay will drain even a just judgment of its value; that people who have long been exploited in the smaller transactions of daily life come to believe that courts cannot vindicate their legal rights from fraud and over-reaching; that people come to believe the law—in the larger sense—cannot fulfill its primary function to protect them and their families in their homes, at their work, and on the public streets.

Hon. Warren E. Burger, "What's Wrong with the Courts: The Chief Justice Speaks Out," *U.S. News & World Report* (Vol. 69, No. 8, Aug. 24, 1970) 68, 71 (address to American Bar Association meeting, Aug. 10, 1970) (emphasis added); cited in *Vantage Point Technology, Inc. v. Amazon.com Inc.*, Civ. A. No. 2:2013-cv-909 Doc. 200 at 11 ¶ 2 (E.D. Tex. 2015); and *Mwangi v UAP Old Mutual Insurance Co. Ltd.* (Civil Case E174 of 2021) [2025] KEMC 185 ¶¶ 1-2 (KLR) (29 July 2025) (Judgment) (quoting Chief Justice Burger, *supra*, and lamenting that "[Plaintiff] has been in the corridors of justice since 2018 in a bid to touch its pure fountain."). *Cf.* Jonathan Swift, *A Tritical Essay Upon the Faculties of the Mind* 6 (1707) ("Laws are like Cobwebs which may catch small Flies, but let Wasps and Hornets break through.").

## III.

In *Baker v. Carr*, 369 U.S. 186, 211-12 (1962), the Supreme Court acknowledged that not "every case or controversy which touches foreign relations lies beyond judicial cognizance;" rather, the Court analyzes each question on a case-by-case basis. *Id.* Indeed, the Court has repeatedly rejected the application of the political question doctrine notwithstanding a foreign-

*Mullane v. United States, et al.*

affairs dimension to the case, something which is particularly appropriate in the instant action wherein the foreign-affairs dimension is indirect and tangential to the narrow allegations of the complaint. *See, e.g., Kent v. Dulles*, 357 U.S. 116 (1958), *Japan Whaling Ass'n*, 478 U.S. 221 (1986); *Boumediene v. Bush*, 553 U.S. 723 (2008); *Zivotofsky*, 566 U.S. 189; *Weir v. United States*, 518 F. Supp. 3d 1 (D.D.C. 2021) (although the question of whether the United States violated treaty obligations was subject to the political question doctrine, plaintiffs' tort claims were not).

At Cambridge, Massachusetts,
  This 13th Day of May, 2026.

                                        Respectfully submitted,

                                        /s/ Jonathan Mullane
                                        JONATHAN MULLANE
                                        30 Donnell Street
                                        Cambridge, Massachusetts 02138
                                        Tel. (617) 800-6925

                                        *Plaintiff Pro Se*


### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 13, 2026, he caused to be served a true copy of the foregoing filing on Anthony Erickson-Pogorzelski, Esq., counsel for Defendants, and specifically addressed as follows: Anthony.Pogorzelski@usdoj.gov.

                                        /s/ Jonathan Mullane
                                        JONATHAN MULLANE

JONATHAN MULLANE
30 DONNELL STREET
CAMBRIDGE, MA 02138-1352



quadient
FIRST-CLASS MAIL
IMI
$002.17 º
05/13/2026 ZIP 02138
044K33236560
US POSTAGE

U.S. COURTHOUSE
ATTN:  ANGELA E. NOBLE
400 NORTH MIAMI AVENUE
(ROOM 8N09)
MIAMI, FL 33128

REC'D BY _____ D.C.
MAY 21 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI



BAER